IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br>    *Defendant*. | Case No. 16-745-ESH |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This case challenges the legality of fees charged to access records through the Public Access to Court Electronic Records system, commonly known as PACER. The theory of liability is that these fees—set at the same rate across the judiciary—far exceed the cost of providing the records, and thus violate the E-Government Act, which authorizes fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note. As the Act's sponsor put it: PACER fees are now "well higher than the cost of dissemination" and hence "against the requirement of the E-Government Act," which allows fees "only to recover the direct cost of distributing documents via PACER"—not unrelated projects that "should be funded through direct appropriations." Taylor Decl., Ex. B.

Because this theory of liability applies equally to everyone who has paid a PACER fee within the six-year limitations period, the plaintiffs move to certify the case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class: "All individuals and entities who have paid fees for the use of PACER within the past six years, excluding class counsel and agencies of the federal government."

1

## BACKGROUND

PACER is a system that provides online access to federal judicial records and is managed by the Administrative Office of the U.S. Courts (or AO). The AO has designed the system so that, before accessing a particular record, a person must first agree to pay a specific fee, shown on the computer screen, which says: "To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser." Here is an example of what the person sees on the screen:

To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser.

| Pacer Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| Mon May 2 09:27:00 2016 | | | |
| **Pacer Login:** | | **Client Code:** | |
| **Description:** | Image1-0 | **Case Number:** | 1:16-cv-00745-ESH |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

View Document

The current PACER fee is set at $.10 per page (with a maximum of $3.00 per record) and $2.40 per audio file. Only if the person affirmatively agrees to pay the fee will a PDF of the record appear. Unless that person obtains a fee waiver or incurs less than $15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees.

Each of the named plaintiffs here—the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice—has repeatedly incurred fees to access court records through the PACER system.

***Congress authorizes fees "to reimburse" PACER expenses.*** This system stretches back to the early 1990s, when Congress began requiring the judiciary to charge "reasonable fees" for access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the fees to the cost of providing the records: "All fees hereafter collected by the Judiciary . . . *as a charge for services rendered*

shall be deposited as offsetting collections . . . *to reimburse expenses incurred in providing these services*." *Id.* (emphasis added). The AO set the fees at $.07 per page in 1998. *See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program, http://1.usa.gov/1lrrM78.

It soon became clear that this amount was far more than necessary to recover the cost of providing access to records. But rather than reduce the rate to cover only the costs incurred, the AO instead used the extra revenue to subsidize other information-technology-related projects.

***The AO begins using excess PACER fees to fund ECF.*** The expansion began in 1997, when the judiciary started planning for a new e-filing system called ECF. The AO produced an internal report discussing how the system would be funded. It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." AO, *Electronic Case Files in the Federal Courts: A Preliminary Examination of Goals, Issues and the Road Ahead* (discussion draft), at 34 (Mar. 1997), http://bit.ly/1Y3zrX0. Yet, just two pages later, the AO contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* at 36. The AO did not offer any statutory authority to support this view.

***Congress responds by passing the E-Government Act of 2002.*** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement. Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this

information is freely available to the greatest extent possible." S. Rep. No. 107–174, 107th Cong., 2d Sess. 23 (2002).

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> **(b)** The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services*.

28 U.S.C. § 1913 note (emphasis added).

***Even after the E-Government Act, the AO increases PACER fees.*** Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Memorandum from AO Director Leonidas Ralph Mecham to Chief Judges and Clerks (Oct. 21, 2004). To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund—the account into which PACER fees and other funds (including appropriations) are

deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *Id.* As before, the AO cited no statutory authority for this increase.

**The AO finds new ways to spend extra PACER fees as they keep growing.** By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. AO, *Judiciary Information Technology Annual Report for Fiscal Year 2006*, at 8, http://bit.ly/1V5B9p2. But once again, the AO declined to reduce or eliminate PACER fees. It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those provided by PACER only in the sense that they too concern technology and the courts. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on H.R. 7323/S. 3260, 110th Cong. 51 (2008). Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

**The E-Government Act's sponsor says that the AO is violating the law.** In early 2009, Senator Joe Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the law. Taylor Decl., Ex. B (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)). He noted that the Act's "goal" was "to increase free public access to [judicial] records," yet "PACER [is] charging a higher rate" than it did when the law was passed.

*Id.* Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The Judicial Conference replied with a letter defending the AO's position that it may use PACER fees to recoup non-PACER-related costs. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" Letter from Hon. Lee Rosenthal and James C. Duff to Sen. Lieberman (Mar. 26, 2009). Yet the letter claimed that Congress has "expand[ed] the permissible use of the fee revenue to pay for other services," *id.*—even though it actually did the opposite, enacting the E-Government Act specifically to limit any fees to those "necessary" to "reimburse expenses incurred" in providing the records. 28 U.S.C. § 1913 note. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Letter from Rosenthal and Duff to Sen. Lieberman. The letter did not provide any support (even from a committee report) for using fees to recover non-PACER-related expenses beyond ECF.

Later, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins). "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." *Id.* It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to

recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

**The AO again increases PACER fees.** The AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." AO, *Electronic Public Access Program Summary* 1 (2012), http://1.usa.gov/1Ryavr0. But the AO believed that the fees comply with the E-Government Act because they "are only used for public access." *Id.* at 10. It did not elaborate.

Subsequent congressional budget summaries, however, indicate that the PACER revenue at that time was more than enough to cover the costs of providing the service. The judiciary reported that in 2012, of the money generated from "Electronic Public Access Receipts," it spent just $12.1 million on "public access services," while spending more than $28.9 million on courtroom technology. *The Judiciary: Fiscal Year 2014 Congressional Budget Summary*, App. 2.4.

**The AO continues to charge fees that exceed the cost of PACER.** Since the 2012 fee increase, the AO has continued to collect large amounts in PACER fees and to use these fees to fund activities beyond providing access to records. In 2014, for example, the judiciary collected more than $145 million in fees, much of which was earmarked for other purposes, like courtroom technology, websites for jurors, and bankruptcy-notification systems. AO, *The Judiciary Fiscal Year 2016 Congressional Budget Summary* 12.2, App. 2.4 (Feb. 2015).

The chart on the following page—based entirely on data from the published version of the judiciary's annual budget, *see* Taylor Decl. ¶ 3—illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including

exponentially cheaper data storage, "should have led to reduced costs." Taylor Decl., Ex. A (Letter from Sen. Lieberman to Sens. Durbin and Collins).



For much of this period, the judiciary projected that the annual cost of running the program would remain well under $30 million. AO, *Long Range Plan for Information Technology in the Federal Judiciary: Fiscal Year 2009 Update* 16 (2009).

Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. When questioned during a 2014 House appropriations hearing, representatives from the judiciary admitted that the "Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Fin. Servs. and General Gov. Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 113th Cong. 152 (2014).[1] And Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding

---

[1] As a percentage of the judiciary's total budget, however, PACER fees are quite small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make up less than 2% of the total budget—meaning that the excess fees are a fraction of a fraction. Matthew E. Glassman, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), http://bit.ly/1QF8enE.

courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitor. . . . [There have also been] audio enhancements. . . . This all ties together and it's funded through these [PACER] fees." Panel Discussion, William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), bit.ly/1PmR0LJ.

## ARGUMENT

### I.     This Court has jurisdiction over the claims of all class members.

Before certifying the class, the Court must first assure itself that it has subject-matter jurisdiction over the claims of all class members. The basis for jurisdiction here is the Little Tucker Act, which waives the federal government's sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1348 (Fed. Cir. 2005) (quoting *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996)). Courts have long recognized such illegal-exaction claims—claims that money was "improperly paid, exacted, or taken from the claimant" in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action.

By its terms, the Little Tucker Act grants district courts "original jurisdiction, concurrent with the United States Court of Federal Claims," over any non-tort, non-tax "claim against the United States, not exceeding $10,000," 28 U.S.C. § 1346(a)(2), while vesting exclusive appellate jurisdiction in the Federal Circuit, *id.* § 1295(a). This means that the Federal Circuit's interpretation of the Act is binding on district courts. And the Federal Circuit has made clear that, in a class action, "there will be no aggregation of claims" for purposes of assessing the $10,000 limit. *Chula Vista City Sch. Dist. v. Bennett*, 824 F.2d 1573, 1579 (Fed. Cir. 1987).

The Federal Circuit has also made clear that the Little Tucker Act does not require that each plaintiff's total *recovery* be $10,000 or less. Quite the contrary: Federal Circuit precedent holds that even a single plaintiff seeking millions of dollars may bring suit in federal district court under the Little Tucker Act if the total amount sought represents the accumulation of many separate transactions, each of which gives rise to a separate claim that does not itself exceed $10,000. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 797 (Fed. Cir. 1993).

In the 1990s, airline companies brought two lawsuits in this district seeking to recover what they claimed were illegal exactions by the government. In one case, the General Services Administration (or GSA) deducted roughly $100 million from future payments it owed the airlines after determining that it had overpaid for plane tickets. *Alaska Airlines v. Austin*, 801 F. Supp. 760 (D.D.C. 1992). In the other, GSA "withheld future payments to the airlines to offset" the costs of tickets that were never used. *Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 74 (D.D.C. 1991). The airlines claimed that GSA was "recouping alleged overcharges from them in violation of the law," and sought "return of the funds" that had "been assessed against them unlawfully." *Alaska Airlines*, 801 F. Supp. at 761.

In both cases, the court recognized that each airline was seeking well over $10,000, but determined that the total amount each plaintiff sought "represents the accumulation of disputes over alleged overcharges on thousands of individual tickets." *Id.* at 762. Thus, the court held that the asserted overcharge for each individual ticket constituted its own claim under the Little Tucker Act—even though the airlines paid numerous overcharges at a time through GSA's withholdings, and even though each case presented one "straightforward" legal question. *Id.* Because "[e]ach contested overcharge is based on a single ticket and is for less than $10,000," the district court had jurisdiction. *Id.*; *see Am. Airlines*, 778 F. Supp. at 76. The court explained that "[t]he Government cannot escape [Little Tucker Act] jurisdiction by taking a lump sum offset

that totals over $10,000 and then alleging that the claims should be aggregated." *Id.* On appeal, the Federal Circuit agreed, holding that "the district court had concurrent jurisdiction with the Court of Federal Claims." *Alaska Airlines*, 8 F.3d at 797.

Under this binding precedent, each transaction to access a record through PACER in exchange for a certain fee—a fee alleged to be excessive, in violation of the E-Government Act—constitutes a separate claim under the Little Tucker Act. As a result, each class member has multiple individual illegal-exaction claims, none of which exceeds $10,000. Even if a very small percentage of class members might ultimately receive more than $10,000, that amount "represents the accumulation of disputes over alleged overcharges on thousands of individual [transactions]"; it is no bar to this Court's jurisdiction. *Alaska Airlines*, 801 F. Supp. at 762.

Nor does the Little Tucker Act's venue provision pose a barrier to certifying the class here. Although it requires that individual actions be brought "in the judicial district where the plaintiff resides," 28 U.S.C. § 1402(a)(1), it does not alter the general rule in class actions that absent class members "need not satisfy the applicable venue requirements," *Briggs v. Army & Air Force Exch. Serv.*, No. 07–05760, 2009 WL 113387, *6 (N.D. Cal. 2009); *see also Whittington v. United States*, 240 F.R.D. 344, 349 (S.D. Tex. 2006); *Bywaters v. United States*, 196 F.R.D. 458, 463–64 (E.D. Tex. 2000).

Were the law otherwise, the Little Tucker Act would preclude nationwide class actions, instead requiring nearly a hundred mini class actions, one in each federal district, to remedy a widespread, uniform wrong committed by the federal government. That extreme result "simply is not to be found in the text of the Act itself," and "the venue provision would be an awkward vehicle by which to effectuate any anti-class policy." *Briggs*, 2009 WL 113387, at *7. This Court thus has the authority to certify the class if it meets the requirements of Rule 23.

## II.    This Court should certify the class under Rule 23.

Class certification is appropriate where, as here, the plaintiffs can satisfy the requirements of both Rule 23(a) and (b). Rule 23(a) requires a showing that (1) the class is sufficiently numerous to make joinder of all class members impracticable, (2) there are common factual or legal issues, (3) the named plaintiffs' claims are typical of the class, and (4) the named plaintiffs will fairly and adequately protect the interests of the class.

Rule 23(b) requires one of three things. Under subsection (b)(1), the plaintiffs may show that prosecuting separate actions would create a risk of inconsistent results, such as where the defendant is "obliged by law to treat the members of the class alike." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under (b)(2), the plaintiffs may show that the defendant "has acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief is appropriate. And under (b)(3), the plaintiffs may show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The class in this case satisfies both (b)(1) and (b)(3).

### A.    This case meets Rule 23(a)'s requirements.

#### 1.    The class is sufficiently numerous.

To begin, this case satisfies Rule 23(a)(1)'s requirement that the class be "so numerous that joinder of all members is impracticable." "Courts in this District have generally found that the numerosity requirement is satisfied and that joinder is impracticable where a proposed class has at least forty members," *Cohen v. Warner Chilcott Public Ltd. Co.*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007), and a plaintiff need not "provide an exact number of putative class members in order to satisfy the numerosity requirement," *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998); *see Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 305–06 (D.D.C. 2007)

(certifying class of 30 people). Although the plaintiffs do not have access to the defendant's records, and so cannot yet know exactly how many people have paid PACER fees in the past six years, they estimate that the class contains at least several hundred thousand class members. According to documents prepared by the judiciary and submitted to Congress, there are nearly two million PACER accounts, "approximately one-third" of which "are active in a given year." *The Judiciary: Fiscal Year 2016 Congressional Budget Justification*, App. 2.1. Making even the most generous assumptions about how many of these people receive fee waivers or have never incurred more than $15 in charges in a given quarter (and thus have never paid a fee), there can be no serious dispute that this class satisfies Rule 23(a)(1).

## 2.      The legal and factual issues are common to the class.

This case likewise easily satisfies Rule 23(a)(2)'s requirement of "questions of law or fact common to the class." This requirement is met if "[e]ven a single common question" exists, *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) (Huvelle, J.), so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, the two most important questions in the case are common: (1) Are the fees imposed for PACER access excessive in relation to the cost of providing the access—that is, are the fees higher than "necessary" to "reimburse expenses incurred in providing the[] services" for which they are "charge[d]"? 28 U.S.C. § 1913 note; and (2) what is the measure of damages for the excessive fees charged? *See* Compl. ¶ 29. These questions "will generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim and the claims of the class as a whole." *Thorpe*, 303 F.R.D. at 146–47.

### 3.   The named plaintiffs' claims are typical of the class.

This case also meets Rule 23(a)(3)'s requirement that the named plaintiffs' claims be typical of the class's claims, a requirement that is "liberally construed." *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003). When "the named plaintiffs' claims are based on the same legal theory as the claims of the other class members, it will suffice to show that the named plaintiffs' injuries arise from the same course of conduct that gives rise to the other class members' claims." *Id.* at 35. That is the case here. The named plaintiffs' claims are typical of the class because they arise from the same course of conduct by the United States (imposing a uniform PACER fee schedule that is higher than necessary to reimburse the cost of providing the service) and are based on the same legal theory (challenging the fees as excessive, in violation of the E-Government Act). *See* Compl. ¶ 30.

### 4.   The named plaintiffs are adequate representatives.

Rule 23(a)(4) asks whether the named plaintiffs "will fairly and adequately protect the interests of the class," an inquiry that "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. It has two elements: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997); *Thorpe*, 303 F.R.D. at 150. Both are met here.

***a. The named plaintiffs.*** The plaintiffs are three of the nation's leading nonprofit legal advocacy organizations: the National Veterans Legal Services Program, the National Consumer Law Center, and the Alliance for Justice. Compl. ¶¶ 1–3. They all care deeply about "preserv[ing] unfettered access to the courts," *id.* ¶ 3, and brought this suit to vindicate

Congress's goal in passing the E-Government Act: to ensure that court records are "freely available to the greatest extent possible." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002).

Since 1980, the National Veterans Legal Services Program has represented thousands of veterans in individual court cases, and has worked to ensure that our nation's 25 million veterans and active-duty personnel receive all benefits to which they are entitled for disabilities resulting from their military service. Compl. ¶ 1. Excessive PACER fees impede this mission in numerous ways—including by making it difficult to analyze patterns in veterans' cases, and thus to detect pervasive problems and delays. The organization is concerned that the fees have not only hindered individual veterans' ability to handle their own cases, but have also "inhibited public understanding of the courts and thwarted equal access to justice." *Id.* at 2.

The excessive fees likewise impede access to justice for low-income consumers—like those waging legal battles to try to save their homes from foreclosure—which is why the National Consumer Law Center also brought this suit. The Law Center conducts a wide variety of research, litigation, and other activities on behalf of elderly and low-income consumers, and publishes 20 different treatises that comprehensively report on the development of consumer law in the courts. *Id.* ¶ 2. The organization has incurred PACER fees in carrying out all of these activities, *id.*, and is also concerned about the many *pro se* consumers whose interaction with the judicial system has been made far more difficult by the PACER fee structure.

Finally, the Alliance for Justice is a national association of over 100 public-interest organizations—such as the National Center on Poverty Law and the National Legal Aid & Defender Association—nearly all of whom are affected by excess PACER fees. *Id.* ¶ 3. These organizations also strongly support the judiciary's efforts to obtain whatever resources it needs. They do not aim to deplete the judiciary's budget, nor do they object to the judiciary's quest for

increased funding. All they object to is using excess PACER fees to fund unrelated projects that "should be funded through direct appropriations." Letter from Sen. Lieberman to Rosenthal.

Because excess PACER fees are unlawful and significantly impede public access (and yet make up only a fraction of a fraction of the judiciary's budget, as explained in footnote 1), the named plaintiffs will vigorously prosecute this case on behalf of themselves and all absent class members. Each named plaintiff has paid numerous PACER fees in the past six years, and each has the same interests as the unnamed class members. Compl. ¶ 31. And the relief the plaintiffs are seeking—a full refund of excess fees charged within the limitations period, plus a declaration that the fees violate the E-Government Act—would plainly "be desired by the rest of the class." *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 446 (D.D.C. 2002) (Huvelle, J.).

**b. Class counsel.** Proposed co-lead class counsel are Gupta Wessler PLLC, a national boutique based in Washington that specializes in Supreme Court, appellate, and complex litigation; and Motley Rice LLC, one of the nation's largest and most well-respected class-action firms. The firms will also consult with two lawyers with relevant expertise: Michael Kirkpatrick of Georgetown Law's Institute for Public Representation and Brian Wolfman of Stanford Law School. Together, these law firms and lawyers have a wealth of relevant experience.

One of the two co-lead firms, Gupta Wessler, has distinctive experience with class actions against the federal government. Two of its lawyers, Deepak Gupta and Jonathan Taylor, represent a certified class of federal bankruptcy judges and their beneficiaries in a suit concerning judicial compensation, recently obtaining a judgment of more than $56 million. *See* Gupta Decl. ¶¶ 1, 4–8; *Houser v. United States*, No. 13-607 (Fed. Cl.). Mr. Gupta and Mr. Taylor both received the President's Award from the National Conference of Bankruptcy Judges for their work on the case. Gupta Decl. ¶ 8. Just over a month ago, the *American Lawyer* reported on the firm's work, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal

judges" in this important class-action litigation. *Id.* Mr. Gupta and Mr. Taylor also currently represent (along with Motley Rice) a certified class of tax-return preparers seeking the recovery of unlawful fees paid to the IRS. *See id.* ¶¶ 1, 9–10; *Steele v. United States*, No. 14-1523 (D.D.C.). And Mr. Gupta, who worked at the Consumer Financial Protection Bureau and Public Citizen Litigation Group before founding the firm, has successfully represented a certified class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering about $7.4 million in illegal charges. Gupta Decl. ¶¶ 1, 13–16.

The other co-lead firm, Motley Rice, regularly handles class actions and complex litigation in jurisdictions across the U.S., and currently serves as lead or co-lead counsel in over 25 class actions and as a member of the plaintiffs' steering committee in numerous MDL actions. Narwold Decl. ¶ 3. William Narwold, chair of the firm's class-action practice, will play a lead role in prosecuting this case and is also currently class counsel in *Steele v. United States*, the tax-return-preparer case mentioned above. *Id.* ¶¶ 1–3, 6. His colleague Joseph Rice, one of the top class-action and mass-tort-settlement negotiators in American history, will play a lead role in any settlement negotiations. *Id.* ¶ 1. Under their leadership, Motley Rice has secured some of the largest verdicts and settlements in history, in cases involving enormously complex matters. The firm is a member of the plaintiffs' steering committee in the *BP Deepwater Horizon Oil Spill Litigation*, where Mr. Rice served as one of the two lead negotiators in reaching settlements. One of those settlements, estimated to pay out between $7.8 billion and $18 billion to class members, is the largest civil class-action settlement in U.S. history. *Id.* ¶ 6. The firm also served as co-lead trial counsel on behalf of ten California cities and counties against companies that had concealed the dangers of lead paint. In 2014, after a lengthy bench trial, the court entered judgment in favor of the cities and counties for $1.15 billion. *Id.*

### B.   This case meets Rule 23(b)'s requirements.

#### 1.   This case satisfies Rule 23(b)(1).

Rule 23(b)(1) permits class certification if prosecuting separate actions by individual class members would risk "inconsistent or varying adjudications" establishing "incompatible standards of conduct" for the defendant. Because this case seeks equitable relief in addition to return of the excessive PACER fees already paid, the risk of inconsistent results is acute. If there were separate actions for equitable relief, the AO could be "forced into a 'conflicted position,'" Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 388 (1967), potentially subjecting it to "incompatible court orders," 2 William B. Rubenstein, *Newberg on Class Actions* § 4.2 (5th ed. 2015). That makes this case the rare one in which a class action is "not only preferable but essential." Rubenstein, *Newberg on Class Actions* § 4.2; *see also* Fed. R. Civ. P. 23(b)(1), 1966 advisory committee note (listing as examples cases against the government "to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment"). Under these circumstances, Rule 23(b)(1) is satisfied.

#### 2.   This case satisfies Rule 23(b)(3).

Because this case seeks the return of all excessive PACER fees paid in the last six years, however, the most appropriate basis for certification is Rule 23(b)(3). *See Dukes*, 563 U.S. at 362 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)."). Rule 23(b)(3) contains two requirements, predominance and superiority, both of which are met here.

"The first requirement is that common factual and legal issues predominate over any such issues that affect only individual class members." *Bynum*, 214 F.R.D. at 39. As already explained, the plaintiffs allege that the AO lacks the authority to charge (and in fact charges) PACER fees that exceed the costs of providing the service. The central argument is that the E-

Government Act unambiguously limits any PACER fees "charge[d] for services rendered" to those "necessary" to "reimburse expenses in providing these services"—a limit the AO has failed to heed. 28 U.S.C. § 1913 note. And even if this language were somehow ambiguous, the background rule of administrative law is that user fees may not exceed the cost of the service provided (because then they would become taxes) unless Congress "indicate[d] clearly" an "intention to delegate" its taxing authority. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). The plaintiffs might prevail on their theory; they might not. But either way, these are the common predominant legal questions in this case.

The sole individual issue—calculation of the amount of each class member's recovery, which depends on how many PACER fees they have paid—is ministerial, and hence cannot defeat predominance. The government's "own records . . . reflect the monetary amount that each plaintiff" has paid in fees over the past six years. *Hardy v. District of Columbia*, 283 F.R.D. 20, 28 (D.D.C. 2012). Once the total excess amount is calculated and the measure of damages is determined (both common questions), divvying up the excess on a pro rata basis would "clearly be a mechanical task." *Id.*

"The second requirement of Rule 23(b)(3) is that the Court find that maintaining the present action as a class action will be superior to other available methods of adjudication." *Bynum*, 214 F.R.D. at 40. This requirement, too, presents no obstacle here. Class treatment is most appropriate in cases like this one, "in which the individual claims of many of the putative class members are so small that it would not be economically efficient for them to maintain individual suits." *Id.* The vast majority of class members "stand to recover only a small amount of damages," making it difficult to "entice many attorneys into filing such separate actions." *Id.* Nor are there any concerns that "potential difficulties in identifying the class members and sending them notice will make the class unmanageable." *Id.* To the contrary, this class is manageable

because the government itself has all the information needed to identify and notify every class member, including their names and email addresses. Class counsel can send notice to the email addresses the PACER Service Center has on file for everyone who has paid a fee.

### III.    The Court should approve class counsel's notice proposal.

As required by Local Civil Rule 23.1(c), we propose the following class-notice plan, as reflected in the proposed order filed with this motion. First, we propose that class counsel retain a national, reputable class-action-administration firm to provide class notice. Second, to the extent possible, we propose that email notice be sent to each class member using the contact information maintained by the government for each person or entity who has paid PACER fees over the past six years. Third, we propose that if the PACER Service Center does not have an email address on file for someone, or if follow-up notice is required, notice then be sent via U.S. mail. Class counsel would pay all costs incurred to send the notice, and all responses would go to the class-action-administration firm. We respectfully request that the Court direct the parties to file an agreed-upon proposed form of notice (or, if the parties cannot agree, separate forms of notice) within 30 days of the Court's certification order, and direct that email notice be sent to the class within 90 days of the Court's approval of a form of notice.

Because the government has yet to enter an appearance, we were unable to confer with opposing counsel under Local Civil Rule 7(m) regarding the notice proposal or this motion. We are filing the motion now to toll the limitations period for the class, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and to ensure that class certification is decided at the outset, *cf.* Fed. R. Civ. P. 23 (class certification must be decided "[a]t an early practicable time after a person sues"); Local Civil Rule 23(b) (requiring motion to be filed "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action"). We intend to confer with opposing counsel as soon as they make their appearance.

## CONCLUSION

The plaintiffs' motion for class certification should be granted.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

MICHAEL T. KIRKPATRICK (D.C. Bar No. 486293)
**INSTITUTE FOR PUBLIC REPRESENTATION**
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, DC 20001
Phone: (202) 662-9535
Fax: (202) 662-9634
*michael.kirkpatrick@law.georgetown.edu*

May 2, 2016                    *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2016, I filed this class-certification motion through this Court's CM/ECF system. I further certify that, because no counsel for the defendant has yet appeared, I served copies via U.S. mail on the following counsel:

United States Attorney for the District of Columbia
555 Fourth Street, NW
Washington, DC 20530

Attorney General of the United States
United States Department of Justice
Room 4400
950 Pennsylvania Avenue, NW
Washington, DC 20530

*/s/ Deepak Gupta*

Deepak Gupta