IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br>     *Defendant*. | Case No. 16-745-ESH |

## PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION

This case bears all the hallmarks of a prototypical class action. The plaintiffs challenge the legality of PACER fees, which are set by a single fee schedule that applies nationwide—meaning that anyone who pays a fee pays the rate in that schedule. The plaintiffs allege that these rates violate a statute authorizing fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note. The common liability question is thus whether the plaintiffs are correct: Are the fees higher than necessary to recoup the costs? And the central damages question is likewise common: What should the fees have been? Because every class member paid fees set at the rates determined by the uniform fee schedule, their claims are entirely cohesive: they rise or fall together.

The government nevertheless opposes class certification. Before addressing its objections, it is worth highlighting what the government does not say: It does not deny that this Court has jurisdiction over the nationwide class, that a class action will be both manageable and efficient, that class membership is readily ascertainable, and that class notice can be easily accomplished (mainly through email). Instead, the government offers four objections—two new and two old.

**1.** First the old: the government contends (at 9–10) that the class is not sufficiently numerous because PACER's terms and conditions require users to alert the PACER Service Center of any "billing errors" within 90 days of receiving their bills, and not enough people have done so. This is a repackaging of the "exhaustion" argument that the government pressed in its motion to dismiss, and it suffers from the same elementary misunderstanding. As we explained in our opposition to that motion, the plaintiffs are *not* alleging a billing error under the fee schedule; they challenge the legality of the schedule itself. *See* ECF No. 15, at 4–5. So the billing-error-notification provision is just as irrelevant here. Hence the class definition requires only that class members have paid PACER fees within the statute of limitations—not that they have first presented their statutory challenge to a customer-service employee. Once the government's meritless "exhaustion" defense is set aside, there is no dispute that the number of class members who meet this definition is large enough to justify treating this case as a class action.

**2.** The government also reaches into the recycling bin for a second argument, suggesting (at 17–19) that the class should not be certified because of the existence of *Fisher v. United States*, No. 15-1575C (Fed. Cl.), a lawsuit challenging the accuracy of the billing algorithm used to calculate the number of pages in certain docket reports (those with case captions of more than 850 characters). This contention—which echoes the government's "first-to-file" argument from its motion to dismiss—fails once again to appreciate the fundamental differences between the two cases. We articulated some of these differences in our opposition to the government's motion, *see* ECF No. 15, at 2–3, and need not repeat them all. But a few points warrant emphasis. Mr. Fisher has not yet moved to certify his case as a class action, and he is now facing a motion to dismiss. If he is able to fend off dismissal and moves for certification, he will have to establish that membership in his proposed class is readily ascertainable. As the government rightly points out (at 5), this means that he must demonstrate an "administratively feasible" way for the court to

determine which PACER users accessed docket reports in cases with captions of more than 850 characters. Unlike in this case, where class membership can be easily assessed based on the government's own records (because it keeps track of everyone who pays a fee), it is entirely unclear whether the government's recordkeeping system distinguishes between those who pay for docket sheets with captions of more than 850 characters and those who do not.

That is not all. Even if Mr. Fisher could somehow show ascertainability (and manageability), his class would consist only of those people who elect to fill out a consent form and affirmatively opt in to the class—in stark contrast with this case, which seeks to certify an opt-out class under Federal Rule of Civil Procedure 23. And even for that vanishingly small subset of PACER users, Mr. Fisher's case focuses exclusively on the accuracy of the government's formula for converting case captions in docket reports to billable pages. It will not address the question posed by this case: whether the fee schedule itself violates the E-Government Act. The government cites no authority for the proposition that a court should decline to certify a class that otherwise meets Rule 23's requirements because the plaintiffs in a *different* case, in a *different* court, raising a *different* claim on a *different* theory, seeking *different* relief, might eventually move to have that case certified as a (far narrower) opt-in class action. And although the government vaguely hints at the possibility of "inconsistent judgments" (at 18), that will not happen. The question whether the fee schedule is unlawful is entirely independent of the question whether there is a minor billing error that results in an overbilling of certain docket sheets. One theory can win and the other lose, and vice versa. *Fisher* poses no barrier to class certification here.

**3.** Turning to the two new arguments, the government levies its most sustained attack on the named plaintiffs, questioning whether, as nonprofit organizations, they have the requisite "incentive to pursue fully the claims of the other class members." Opp. 11. By "other class members," the government apparently means the claims of people like the organizations' own

constituents (veterans, consumers, and other everyday Americans who have paid PACER fees).
Truth be told, the argument is difficult to follow. But it seems to run thus: Because nonprofits can
potentially qualify for fee waivers, they are ill-suited to represent those who have paid fees (and
who presumably cannot qualify for waivers)—even if the nonprofits have also paid fees. To
restate this argument is to refute it. If PACER fees are excessive, then *anyone* who has paid a fee
has paid an excessive fee, and has every incentive to vigorously pursue a claim to recover the
excess. That includes the three named plaintiffs here. Like the class they seek to represent, each
plaintiff has paid PACER fees claimed to be illegal, and each wants the excess back. The interests
of these two groups of people (the representatives and the represented) are thus perfectly aligned.[1]

In making its "nonprofit" argument, the government also seizes on the named plaintiffs'
desire to have judicial records made "freely available to the greatest extent possible," *id.* at 11, as
Congress intended when it enacted the E-Government Act in 2002. *See* S. Rep. No. 107−174,
107th Cong., 2d Sess. 23 (2002). From this agreement with congressional policy, the government
draws the mystifying conclusion (at 15) that the named plaintiffs are somehow interested only in a
"favored subset" of PACER users—their fellow nonprofits—as opposed to class members "who

---

[1] The government's argument also reflects a basic misunderstanding of how the PACER fee-waiver policy actually works. Although the government says (at 11) that the plaintiffs "have the ability to request PACER fee exemptions as non-profits," and faults them for not doing so (at 10 n.3), courts grant waivers only very rarely, in their discretion, and when they do the waiver must be "limited in scope" and good only "for a definite period of time." *See* Electronic Pubic Access Fee Schedule § 9, *available at* http://bit.ly/2aAPtsq. The guiding consideration is not whether the requester is a nonprofit, but whether it can prove that "an exemption is necessary in order to avoid unreasonable burdens," *id.*—a standard that the AO has told courts should be "strictly limited" to the situation where there has been "an individualized showing of need and hardship," AO Br. in *In re Application for Exemption from Electronic Public Access Fees by Jennifer Gollan and Shane Shifflett*, No. 12-16373, ECF No. 24, at 22, 24 (9th Cir.). Indeed, when a nonprofit organization challenged the denial of a waiver, the AO defended the denial on appeal as "consistent with" the policy of "stringent application of the waiver requirement." *Id.* at 20, 23. And when the AO produced a summary of the Electronic Public Access Program in December 2012, it listed the types of "users who are exempt from any charge—including indigents, case trustees, academic researchers, CJA attorneys, and *pro bono* attorneys." *Id.* at A11. It did not even mention nonprofit advocacy groups.

may not share the goals of providing free access." But these organizations exist to advance the interests of their constituents—some of the most vulnerable people in our society, many of whom come into contact with the legal system and are charged PACER fees. *See* ECF No. 1, at 3–4. The government's insinuation that the organizations would be anything other than zealous in advocating for the best interests of their constituents is, to put it mildly, baseless.

If anything, the plaintiffs' broad public-interest missions make them *better* suited to serve as representatives—it is not a mark against them. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 277 F.R.D. 52, 62 (D. Mass. 2011) (appointing nonprofits as class representatives because they "will provide more vigilant and consistent representation than individual representatives"); *cf. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289–90 (1986) ("[A]n association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. . . . The very forces that cause individuals to band together in an association will . . . provide some guarantee that the association will work to promote their interests."). Indeed, plaintiff Alliance for Justice is "a national association of over 100 public-interest organizations that focus on a broad array of issues—including civil rights, human rights, women's rights, children's rights, consumer rights, and ensuring legal representation for all Americans." ECF No. 1, at 3. Its members include AARP, the Children's Defense Fund, Disability Rights Education and Defense Fund, and the National Center on Poverty Law. *Id.* at 3–4. It is hard to imagine better class representatives, and the government does not identify any.

**4.** That leaves the government's final objection to certification: the half-formed theory (at 20) that the plaintiffs cannot show that common questions predominate over individual issues because of the AO's uniform policy of charging only for the first 30 pages of a document. But, despite the government's statement to the contrary (at 20), this Court will not have to determine "whether and in what degree" individual class members "were able to secure free pages in excess

of the 30 pages" any more than it will have to determine whether class members accessed judicial opinions or incurred less than $15 in a given quarter (both of which result in no charges). The only thing the Court will have to determine is what a lawful fee would have been for the pages that were actually charged to class members. Put another way: This case does not challenge the AO's uniform decision *not* to charge for access to certain pages or records—it challenges the uniform rates that the AO *actually charges*. Should the plaintiffs prevail in that challenge, the damages can be calculated pro rata, based on the total amount each class member paid in fees over the class period. That kind of ministerial calculation is commonplace in large class actions, and is no obstacle to certification. *See, e.g.*, *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 85 (D.D.C. 2015) ("The D.C. Circuit has agreed 'that the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification.'" (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984)); *Hardy v. District of Columbia*, 283 F.R.D 20, 28 (D.D.C. 2012) (Wilkins, J.) (finding that common questions predominated over individualized damages issues because calculating damages "would clearly be a mechanical task"); Rubenstein, *Newberg on Class Actions* § 4:54 (5th ed. 2015) (collecting cases).

## CONCLUSION

The plaintiffs' motion for class certification should be granted.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
1735 20th Street, NW
Washington, DC 20009
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*
*jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
**MOTLEY RICE LLC**
3333 K Street NW, Suite 450
Washington, DC 20007
Phone: (202) 232-5504
Fax: (202) 232-5513
*bnarwold@motleyrice.com*

August 4, 2016                    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2016, I filed this opposition brief through this Court's

CM/ECF system, and that all parties required to be served have been thereby served.

*/s/ Deepak Gupta*

Deepak Gupta