## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
              *Plaintiffs,*

              v.

UNITED STATES OF AMERICA,
              *Defendant.*

Case No. 16-745-ESH

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

William H. Narwold
Meghan S.B. Oliver
Elizabeth Smith
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com*

August 28, 2017

*Counsel for Plaintiffs National Veterans Legal Services
Program, National Consumer Law Center, Alliance for
Justice and the Class*

**TABLE OF CONTENTS**

Table of authorities ............................................................................................................. ii

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 3

    A.   Overview of PACER fees ......................................................................................... 3

    B.   History of PACER fees ............................................................................................. 3

    C.   Use of PACER fees within the class period ........................................................... 8

    D.   This case ................................................................................................................ 10

Argument ......................................................................................................................... 11

    I.     The E-Government Act prohibits the AO from charging more in PACER
          fees than is necessary to recoup the total marginal cost of operating PACER. ....... 11

    II.    The AO has violated the E-Government Act by charging more in PACER
          fees than is necessary to recoup the total marginal cost of operating PACER. ....... 17

Conclusion ....................................................................................................................... 20

# TABLE OF AUTHORITIES*

## Cases

*Citizens Action Group v. Powers*,
723 F.2d 1050 (2d Cir. 1983) ............................................................................................. 2, 15

*Conyers v. Merit Systems Protection Board*,
388 F.3d 1380 (D.C. Cir. 2004) ............................................................................................... 11

*Cox v. New Hampshire*,
312 U.S. 569 (1941) ............................................................................................................... 15

*Engine Manufacturers Association v. EPA*,
20 F.3d 1177 (D.C. Cir. 1994) ......................................................................................... 12, 13

*Federal Power Commission v. New England Power Co.*,
415 U.S. 345 (1974) ............................................................................................................... 12

*Fernandes v. Limmer*,
663 F.2d 619 (5th Cir. 1981) .................................................................................................. 15

*Florida Power & Light Co. v. United States*,
846 F.2d 765 (D.C. Cir. 1988) ............................................................................................... 13

*Gomez v. United States*,
490 U.S. 858 (1989) ............................................................................................................... 13

*Jesse E. Brannen, III, P.C. v. United States*,
682 F.3d 1316 (11th Cir. 2012) .............................................................................................. 13

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) ............................................................................................................ 2, 14

*National Awareness Foundation v. Abrams*,
50 F.3d 1159 (2d Cir. 1995) ................................................................................................... 15

*National Association of Broadcasters v. FCC*,
554 F.2d 1118 (D.C. Cir. 1976) ............................................................................................. 13

*National Cable Television Association, Inc. v. United States*,
415 U.S. 336 (1974) ............................................................................................. 12, 13, 17, 18

*Peretz v. United States*,
501 U.S. 923 (1991) ............................................................................................................... 16

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ............................................................................................................... 14

*Seafarers International Union of North America v. U.S. Coast Guard*,
81 F.3d 179 (D.C. Cir. 1996) ................................................................................................. 13

*Skinner v. Mid-America Pipeline Co.*,
490 U.S. 212 (1989) .......................................................................................................... 2, 13

---

* Authorities upon which we chiefly rely are marked with asterisks.

\* *Sullivan v. City of Augusta*,
    511 F.3d 16, 38 (1st Cir. 2007) .................................................................. 2, 14, 15

**Statutes**

28 U.S.C. § 612(c)(1) ............................................................................................... 5

\* 28 U.S.C. § 1913 note,
    Pub. L. No. 107–347, § 205(e), 116 Stat. 2899 (Dec. 17, 2002)...................... passim

31 U.S.C. § 9701(a) ............................................................................................... 12

31 U.S.C. § 9701(b)............................................................................................... 12

5 U.S.C. § 552 (a)(4)(A)(iv)................................................................................... 19

Judiciary Appropriations Act, 1991,
    Pub. L. No. 101–515, § 404, 104 Stat. 2129........................................................ 3

**Other Authorities**

Antonin Scalia & Bryan Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ....................................... 16

David Ardia,
    *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017),
    https://ssrn.com/abstract=2883231 .................................................................. 16

*Financial Services and General Government Appropriations for 2015, Part 6: Hearings Before a
    Subcommittee of the House Committee on Appropriations*, 113th Cong. (2014).................... 10

Government Accountability Office,
    *Principles of Federal Appropriations Law* (3d ed. 2008) ..................................... 14

Matthew E. Glassman, Congressional Research Service,
    *Judiciary Appropriations FY2016* (June 18, 2015), https://goo.gl/R8QARr............... 8

N. Gregory Mankiw,
    *Principles of Economics* (6th ed. 2012) ................................................................. 4

Office of the Law Revision Counsel, U.S. House of Representatives,
    *Detailed Guide to the United States Code*, http://uscode.house.gov/detailed_guide.xhtml. ............ 11

Panel Discussion,
    William and Mary Law School Conference on Privacy and Public
    Access to Court Records (Mar. 4–5, 2010), https://goo.gl/5g3nzo. ....................... 10

Stephen Schultze,
    *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records*
    (Aug. 25, 2017) (draft), http://ssrn.com/abstract=3026779 ................................. 16

Subcommittee on Privacy & Public Access to Electronic Case Files, Judicial Conference
    of the U.S., *Report of the Judicial Conference Committee on Court Administration and Case Management
    on Privacy and Public Access to Electronic Case Files* (2001), https://goo.gl/G8n6qM ..................... 14

## INTRODUCTION

This class action challenges the legality of the fees that the federal judiciary charges people to access its Public Access to Court Electronic Records system, known as PACER. The plaintiffs contend that the fees far exceed the cost of providing the records and thus violate the E-Government Act of 2002, which authorizes fees "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses in providing these services." 28 U.S.C. § 1913 note.

Now that the Court has certified this case as a class action and denied the government's motion to dismiss, two key questions remain: Has the Administrative Office of the U.S. Courts (or AO) violated the E-Government Act by charging more than necessary to recoup the total marginal cost of providing access to records through PACER? And if so, by how much? This motion addresses only the first question. It seeks summary adjudication of the defendant's liability, reserving the damages determination for after formal discovery.

The liability question is straightforward and ripe for resolution. In 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5. Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, the E-Government Act prohibits the imposition of fees that are not "necessary" to "reimburse expenses in providing" access to the records. 28 U.S.C. § 1913 note. The only permissible reading of this language is that it bars the judiciary from charging more in PACER fees, in the aggregate, than the reasonable costs of administering the PACER system.

Despite the E-Government Act's express limitation, PACER fees have twice been *increased* since the Act's passage in 2002. This prompted the Act's sponsor, Senator Joe Lieberman, to reproach the AO for continuing to charge fees "well higher than the cost of dissemination"— "against the requirement of the E-Government Act"—rather than doing what the Act demands:

"create a payment system that is used only to recover the direct cost of distributing documents via PACER." Taylor Decl., Exs. G & H. Instead of complying with the law, the AO has used PACER fees to fund projects far removed from the costs of providing records upon request. For example, it has used the money to buy flat-screen TVs for jurors, to send required notices to bankruptcy creditors, and even to fund a study by the State of Mississippi for its own court system. This is more than enough to establish liability. Although the AO's violations are much more extensive than these isolated examples, this Court need not determine the full extent of the overcharge at this stage. Because PACER fees exceed the marginal costs of providing records, in violation of the E-Government Act, summary adjudication on liability is warranted.

Any other result would not only run afoul of the E-Government Act's text and contravene its purpose but would also raise two serious constitutional problems. The first is reflected in the background law limiting user fees throughout the federal government: Because only *Congress* may constitutionally impose taxes, the general rule is a user fee may not exceed the cost of providing the service "inuring directly to the benefit" of the person who pays that fee—unless Congress has "indicate[d] clearly its intention to delegate" its taxing power. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). Here, Congress has done the opposite.

The second concern flows from the First Amendment right to access court records. "The Supreme Court has held that a government cannot profit from imposing" a fee "on the exercise of a First Amendment right." *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943)). Hence, the general rule is that "fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." *Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983). There is no reason for a more fee-friendly rule here, where Congress has imposed the same limitation ("only to the extent necessary") by statute.

## BACKGROUND

### A.      Overview of PACER fees

PACER is a system that provides online access to federal judicial records and is managed by the AO. Pls.' Statement of Undisputed Material Facts (Statement) ¶ 1. The current fee to access records through PACER is set at \$.10 per page (with a maximum of \$3.00 for "any case document, docket sheet, or case-specific report") and \$2.40 per audio file. *Id.* ¶¶ 2–4. Unless a person obtains a fee waiver or incurs less than \$15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees. *Id.* ¶ 5.

### B.      History of PACER fees

***Congress authorizes fees "to reimburse" PACER expenses.*** This system stretches back to the early 1990s, when Congress began requiring the judiciary to charge "reasonable fees" for access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101–515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress sought to limit the fees to the cost of providing the records: "All fees hereafter collected by the Judiciary . . . as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.* The AO set the fees at \$.07 per page in 1998. Statement ¶ 10.

It soon became clear that this amount was far more than necessary to recover the cost of providing access to records. But rather than reduce the rate to cover only the costs incurred, the AO instead used the extra revenue to subsidize other information-technology-related projects.

***The AO begins using excess PACER fees to fund ECF.*** The expansion began in 1997, when the judiciary started planning for a new Electronic Case Filing system, known as ECF. *Id.* ¶ 9. The staff of the AO produced a paper discussing how the system would be funded. *Id.* It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing

3

a particular service." *Id.* Yet, just two pages later, the AO staff contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* The paper did not offer any statutory authority or legal reasoning to support this view.

**Congress responds by passing the E-Government Act of 2002.** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement.

Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Taylor Decl., Ex. D, at 5 (S. Rep. No. 107–174, 2d Sess., at 23 (2002)); *see* Statement ¶ 11.[1]

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees—removing the mandatory "shall prescribe" language and replacing it with language permitting the Judicial Conference to charge fees "only to the extent necessary." Pub. L. No. 107–347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (codified at 28 U.S.C. § 1913 note). The full text of the statute is thus as follows:

> **(a)** The Judicial Conference may, *only to the extent necessary*, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections *for access to information available through automatic data processing equipment*. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule of

---

[1] In the language of economics, marginal cost means "the increase in total cost that arises from an extra unit of production." N. Gregory Mankiw, *Principles of Economics* 268 (6th ed. 2012).

reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(**b**) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) *as a charge for services rendered* shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) *to reimburse expenses incurred in providing these services.*

28 U.S.C. § 1913 note (emphasis added).

**Even after the E-Government Act, the AO increased PACER fees.** Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Statement ¶ 15. To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund (or JITF)—the account into which PACER fees and other funds (including "funds appropriated to the judiciary" for "information technology resources") are deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *See id.*; Taylor Decl., Ex. E (Memorandum from Leonidas Ralph Mecham, Director of the Admin. Office, to Chief Judges & Clerks (Oct. 21, 2004)); *see also* Taylor Decl., Ex. I, at 3 (Letter from AO Director James Duff explaining: "The JITF finances the IT requirements of the entire Judiciary and is comprised primarily of 'no-year' appropriated funds which are expected to be carried forward each year."). As before, the AO cited no statutory authority for this increase.

**The AO finds new ways to spend extra PACER fees as they keep growing.** By the end of 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. Statement ¶ 16. But once again, the AO did not reduce or eliminate PACER fees. *Id.* ¶ 17. It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those

5

provided by PACER only in the sense that they too concern technology and the courts. *Id.*; Taylor Decl., Ex. G, at 3 (Letter from Sen. Lieberman to Sens. Durbin and Collins (Mar. 25, 2010)).

Two years later, in 2008, the chair of the Judicial Conference's Committee on the Budget testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Statement ¶ 18. Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

**The E-Government Act's sponsor says that the AO is violating the law.** In early 2009, Senator Lieberman (the E-Government Act's sponsor) wrote the AO "to inquire if [it] is complying" with the law. Taylor Decl., Ex. H, at 1 (Letter from Sen. Lieberman to Hon. Lee Rosenthal (Feb. 27, 2009)); *see* Statement ¶ 19. He noted that the Act's "goal" was "to increase free public access to [judicial] records"—allowing fees to be charged only to recover "the marginal cost of disseminating the information"—yet "PACER [is] charging a higher rate" than it did when the law was passed. Taylor Decl., Ex. H, at 1. Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The AO's Director replied with a letter defending the AO position that it may use PACER fees to recoup non-PACER-related costs. Taylor Decl., Ex. I. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" *Id.* at 1; *see* Statement ¶ 20. Yet the letter claimed that

6

Congress has "expand[ed] the permissible use of the fee revenue to pay for other services," Taylor Decl., Ex. I, at 2—when in fact it enacted the E-Government Act to do the opposite. The sole support that the AO offered for its view was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." Taylor Decl., Ex. I, at 2. The letter did not provide any support (even from a committee report) for using fees to recover non-PACER-related expenses beyond ECF.

The following year, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Taylor Decl., Ex. G, at 2.; Statement ¶ 21. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." *Id.* It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

***The AO again increases PACER fees.*** The AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. Statement ¶ 22. It acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." *Id.* But the AO claimed that the fees comply with the E-Government Act because they "are only used for public access." *Id.* It did not elaborate.

**C.      Use of PACER fees within the class period**

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected over $920 million in PACER fees, with the total annual amount collected increasing from $102.5 million in 2010 to $146.4 million in 2016. *Id.* ¶¶ 28, 46, 62, 80, 98, 116, 134.

The chart below—based entirely on data from the published version of the judiciary's annual budget, *see* ECF No. 8-3, and confirmed by documents provided by the AO in this litigation—illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including exponentially cheaper data storage, "should have led to reduced costs." Taylor Decl., Ex. G, at 3; *see also* Lee and Lissner Decl. ¶ 16 (explaining that the cost per gigabyte of storage fell by 99.9%—from $65.37 to $0.028—over this period).[2]



Indeed, the costs of operating the "Electronic Public Access Program"—according to the AO's own records—steeply declined over this period, going from nearly $19 million for fiscal

---

[2] As a percentage of the judiciary's total budget, however, PACER fees are quite small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make up less than 2% of the total budget—meaning that the excess fees are a fraction of a fraction. Matthew E. Glassman, CRS, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), https://goo.gl/R8QARr.

year 2010 to less than $1 million for fiscal year 2016. Statement ¶¶ 29 & 135. Even including all other expenses designated by the AO as part of the costs of providing "Public Access Services"—including "[d]evelopment and [i]mplementation costs for CM/ECF," "expenses for CM/ECF servers," "costs associated with the support of the uscourts.gov website," and "[c]osts associated with managing the non-technical portion of the PACER Service Center"—the total annual expenses of providing these services ranged between $12 and $24 million over this period. *Id.* ¶¶ 29, 47–48, 63–64, 81–82, 99–100, 117–18, 135–36; *see* Taylor Decl., Ex. L.

The excess PACER fees have been used to fund a variety of programs beyond administering PACER itself. To highlight just a few, the AO used PACER fees to fund the following programs from fiscal year 2010 to 2016:

- $185 million on courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138;

- $75 million to send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144;

- $9.5 million to provide web-based services to jurors, *id.* ¶¶ 70, 88, 106, 124, 142;

- $3.5 million to send notices to local law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; and

- $120,000 for the State of Mississippi study on "the feasibility of sharing the Judiciary's CM/ECF filing system at the state level," *id.* ¶ 35.

Some members of the federal judiciary have been open about the use of PACER revenue to cover unrelated expenses. When questioned during a 2014 House appropriations hearing, representatives from the judiciary admitted that the "Electronic Public Access Program encompasses more than just offering real-time access to electronic records." *Fin. Servs. and Gen. Gov. Appropriations for 2015, Part 6: Hearings Before a Subcomm. of the House Comm. on Appropriations,*

113th Cong. 152 (2014). And Judge William Smith (a member of the Judicial Conference's Committee on Information Technology) has acknowledged that the fees "also go to funding courtroom technology improvements, and I think the amount of investment in courtroom technology in '09 was around 25 million dollars. . . . Every juror has their own flat-screen monitor. . . . [There have also been] audio enhancements. . . . This all ties together and it's funded through these [PACER] fees." Panel Discussion, William and Mary Law School Conference on Privacy and Public Access to Court Records (Mar. 4–5, 2010), https://goo.gl/5g3nzo; *see* Statement ¶ 26.

**D.    This case**

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this suit on behalf of themselves and a nationwide class of those similarly situated, asking this Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges.

The Court denied a motion to dismiss in December 2016, rejecting the argument that the suit is barred because a different case had been brought based on PACER fees, and because the plaintiffs did not first present their challenge to the PACER Service Center. *See* ECF No. 25.

In January 2017, this Court certified this case as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The Court certified the following class: "All individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities." ECF Nos. 32 & 33. The Court further certified one class claim: "that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under

the Little Tucker Act." *Id.* The class notice period has now ended, and this motion follows the Court's scheduling order of January 24, 2017, *see* ECF No. 34, as modified on July 5, 2017.

## ARGUMENT

### I.    The E-Government Act prohibits the AO from charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER.

**A.** The E-Government Act authorizes the AO to impose PACER fees "as a charge for services rendered"—meaning, as a charge "for electronic access to information" through PACER. 28 U.S.C. § 1913 note. But the AO may do so "only to the extent necessary" "to reimburse expenses in providing these services." *Id.*[3]

The best reading of this statutory language is that it prohibits the AO from charging more than is necessary to recoup the total marginal cost of providing access to records through PACER. That reading is supported not only by the plain text of the law, but also by its statutory history—Congress's decision to amend the law in 2002 to allow fees "only to the extent necessary." And the legislative history makes clear that Congress added this language because it sought to prevent the AO from "charg[ing] fees that are higher than the marginal cost of disseminating the information," as it had been doing for several years, so that records would be "freely available to the greatest extent possible." Statement ¶ 11.

Post-enactment history confirms this straightforward reading. The Act's sponsor has repeatedly expressed his view, in correspondence with the AO's Director, that the law permits the AO to charge fees "only to recover the direct cost of distributing documents via PACER,"

---

[3] "It is "of no moment" that this law was "codified as a statutory note," rather than as section text. *Conyers v. Merit Sys. Prot. Bd.* 388 F.3d 1380, 1382 n.2 (D.C. Cir. 2004). As noted on the website for the United States Code: "A provision of a Federal statute is the law whether the provision appears in the Code as section text or as a statutory note . . . The fact that a provision is set out as a note is merely the result of an editorial decision and has no effect on its meaning or validity." Office of the Law Revision Counsel, *Detailed Guide to the United States Code*, at IV(E), http://uscode.house.gov/detailed_guide.xhtml.

and that the AO is violating the Act by charging more in PACER fees than is necessary for providing access to "records using the PACER system." *Id.* ¶¶ 19, 21; 28 U.S.C. § 1913 note. In light of the fact that the Act's text, purpose, and history all point in the same direction, the statute cannot reasonably be read to authorize fees that exceed the costs of administering PACER.

**B.** Any doubt on this score is dispelled by the background law on federal user fees. Although courts have not yet interpreted the key language in the E-Government Act, there is a long line of cases interpreting an analogous statute: the Independent Offices Authorities Act (or IOAA). This statute authorizes agencies to charge a user fee for "each service or thing of value provided by [the] agency." 31 U.S.C. § 9701(a). Like the E-Government Act, the IOAA's goal is to make agency programs conferring benefits on recipients "self-sustaining to the extent possible." *Id.* It is not to turn them into profit centers to fund agency activities more broadly.

The IOAA's text requires that user fees be "fair" and "based on" four factors: (1) "the costs to the Government," (2) "the value of the service or thing to the recipient," (3) "public policy or interest served," and (4) "other relevant facts." *Id.* § 9701(b). Notwithstanding this potentially limitless language—which is far broader than that found in the E-Government Act— the Supreme Court has declined to read the Act "literally," and has instead interpreted it to forbid agencies from charging fees that exceed the costs of providing the service. *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974); *see Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345 (1974). As the Court reasoned: "It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read [the IOAA] narrowly as authorizing not a 'tax' but a 'fee.'" *Nat'l Cable Television*, 415 U.S. at 341.

To keep a "fee" from becoming a tax, it must be imposed only "for a service that confers a specific benefit upon an identifiable beneficiary." *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1180

(D.C. Cir. 1994). That is, "a user fee will be justified under the IOAA if there is a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed." *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182–83 (D.C. Cir. 1996). This means that the "agency may not charge more than the reasonable cost it incurs to provide [that] service." *Engine Mfrs. Ass'n*, 20 F.3d at 1180; *see Seafarers*, 81 F.3d at 185 ("[T]he measure of fees is the cost to the government of providing the service.").

The reason for this limitation is constitutional. *See Nat'l Cable Television*, 415 U.S. at 342 ("read[ing] the Act narrowly to avoid constitutional problems"). The IOAA permits "agencies to levy fees based on services rendered but not levy taxes, which is the exclusive domain of the legislature." *Jesse E. Brannen, III, P.C. v. United States*, 682 F.3d 1316, 1317 (11th Cir. 2012); *see Nat'l Ass'n of Broadcasters v. FCC*, 554 F.2d 1118, 1129 n.28 (D.C. Cir. 1976) ("Once agency charges exceed their reasonable attributable cost they cease being fees and become taxes levied, not by Congress, but by an agency," which is "prohibited."). Although Congress may constitutionally delegate its taxing authority, it "must indicate clearly its intention to delegate to the Executive [or the Judiciary] the discretionary authority to recover administrative costs not inuring directly to the benefit" of those paying the costs. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989); *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988).

Here, of course, Congress did not "indicate clearly" any "intention to delegate" taxing authority when it enacted the E-Government Act. If anything, it did the opposite: The Act's text shows that Congress passed the law to *eliminate* excessive PACER fees, not to authorize them. So even if the statutory text were somehow ambiguous, or if Congress could have used even clearer language to express its intention, any ambiguity should be resolved against interpreting the statute in a way that would raise constitutional questions. *See Gomez v. United States*, 490 U.S. 858,

864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").

When Congress passed the E-Government Act in 2002, it was familiar with the IOAA's background rule of appropriations, as interpreted by the courts.[4] "Unless there is something in the statute or its legislative history to compel a different result," the settled approach is to read the more specific user-fees statute together with the IOAA as "part of an overall statutory scheme," and "look to the body of law developed under the IOAA for guidance in construing the other statute." 3 GAO, *Principles of Federal Appropriations Law* 12-172 (3d ed. 2008). There is nothing here to indicate that Congress intended a more permissive rule to apply to PACER fees. Quite the contrary, the Act's plain language, statutory history, and legislative history all demonstrate that Congress clearly intended for fees to be restricted to the costs of providing the service for which they are charged—providing access to court records upon demand—and nothing more.

**C.** This reading is further bolstered by a second constitutional principle: the First Amendment right of access to the courts, and access to court records more specifically. On top of the general limitations on user fees, courts have a special obligation not to assess fees that "unduly burden access to the judicial process." *Id.* 12-157. The Judicial Conference has itself recognized that "public access to federal court case files" implicates these "constitutional principles." Subcomm. on Privacy & Pub. Access to Electronic Case Files, Judicial Conference of the U.S., *Report of the Judicial Conference Committee on Court Administration and Case Management on Privacy and Public Access to Electronic Case Files* (2001), https://goo.gl/G8n6qM (App. A-3) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575−78 (1980)). And "[t]he Supreme Court has held that a government cannot profit from imposing" a fee "on the exercise of a First

---

[4] So was the AO: In a 1997 paper, it emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." Statement ¶ 9.

Amendment right." *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113−14 (1943)). When the imposition of a fee implicates First Amendment interests, "fees used to defray administrative expenses are permissible, but only to the extent necessary for that purpose." *Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983); *see also Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981) (citing cases invalidating fees "in excess of costs of administration"). Notably, this First Amendment jurisprudence on fees mirrors the E-Government Act ("only to the extent necessary").

Thus, for example, when a state imposed a $200 fee "to use a particular piece of state property as a forum for political expression," the Second Circuit held that the "fee [could not] be sustained" because there was "no evidence that the administrative fee charged" was "equal to the cost incurred" for "processing plaintiffs' request to use the property." *Powers*, 723 F.2d at 1056; *see also Sullivan*, 511 F.3d at 38 (finding that a fee exceeded "the actual administrative expenses" and invalidating "the excessive amount charged"); *Fernandes*, 663 F.2d at 633 & n.11 (invalidating a fee for a permit because it exceeded the amount "needed to defray the costs of operating the permit system"). By contrast, the Supreme Court has upheld a parade-permit fee because it was "not a revenue tax," but was instead "limited" to what was necessary "to meet the expense incident to the administration of the [permit] and to the maintenance of public order" during the parade. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *see also Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995) ("[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible.").

Like the IOAA jurisprudence—and every relevant tool of statutory construction—this First Amendment precedent cuts against interpreting the E-Government Act to allow fees that exceed the marginal cost of providing access to records through PACER. Adopting such an

15

interpretation would raise serious constitutional concerns, because while the public has a First Amendment interest in accessing the courts, the AO has no legitimate interest in hindering access to court records by imposing an excessive fee in order to pay for other things that should be funded through the appropriations process. *See generally* Stephen Schultze, *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records* (Aug. 25, 2017) (draft), http://ssrn.com/abstract=3026779; David Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017), https://ssrn.com/abstract=2883231. Indeed, excessive PACER fees inhibit public understanding of the courts and thwart equal access to justice, erecting a financial barrier that many ordinary citizens are unable to clear. As a result, it is hard to see how excess fees are anything other than an undue burden on public access to courts.

This does not necessarily mean that a statute would actually *be* unconstitutional if it were to expressly allow the judiciary to recoup more than the costs of administering PACER. It is enough that this reading of the E-Government Act would "raise[] a substantial constitutional question." *Peretz v. United States*, 501 U.S. 923, 930 (1991); *see* Antonin Scalia & Bryan Garner, *Reading Law* 247–48 (2012) ("[The constitutional-doubt canon] militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality.").

Rather than interpret the statute in a way that would raise multiple constitutional questions—and run headlong into two walls of precedent—this Court should follow the text and apply the law in the way that Congress intended: to prohibit the AO from "charg[ing] fees that are higher than the marginal cost of disseminating the information." Statement ¶ 11.

16

## II.   The AO has violated the E-Government Act by charging more in PACER fees than is necessary to recoup the total marginal cost of operating PACER.

There is no doubt that the AO is charging more in fees than is necessary to administer PACER and provide access to records to those who use the system. Congress made this observation when it enacted the E-Government Act, finding that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Taylor Decl., Ex. D, at 5. This is even more true today. Since 1998, "the cost of a gigabyte of storage" has fallen "from $65.37 to $0.028, a reduction of over 99.9%," while "PACER's per-page fees increased 43%, from $0.07 to $0.10." Lee & Lissner Decl. ¶ 16. As Senator Lieberman has remarked: "[D]espite the technological innovations that should have led to reduced costs in the past eight years," the "cost for these documents has gone up" because the AO has used the fees to fund "initiatives that are unrelated to providing public access via PACER." Statement ¶ 21. Doing so is "against the requirement of the E-Government Act." *Id.* Indeed, our technical experts estimate that the true cost of retrieving a document from PACER—including the cost of data storage through a secure service used by many federal agencies—should be $0.0000006 per page (about one half of one ten-thousandth of a penny), meaning that the current fees actually collected by PACER could cover the costs associated with "215,271,893,258,900 requests, or approximately 1,825 pages per day for every person in the United States." Lee & Lissner Decl. ¶ 29.

During the class period, the AO has used PACER fees to: (1) upgrade courtroom technology, Statement ¶¶ 31, 50, 66, 84, 102, 120, 138; (2) send notices to creditors in bankruptcy proceedings, *id.* ¶¶ 37, 54, 72, 90, 108, 126, 144; (3) send notices to law-enforcement agencies under the Violent Crime Control Act, *id.* ¶¶ 33, 52, 68, 86, 104, 122, 140; (4) provide online services to jurors, *id.* ¶¶ 70, 88, 106, 124, 142; (5) cover "costs associated with the support of the uscourts.gov website," ¶ 118; and (6) fund a state-court study in Mississippi, *id.* ¶ 35.

17

None of these projects is remotely part of the marginal cost of making records available through PACER. None "bestows a benefit" on a PACER user that is "not shared by other members of society." *Nat'l Cable Television Ass'n*, 415 U.S. at 341 (interpreting the IOAA). Instead, each of these projects exists to benefit the public at large, or some other group of people. And the AO has admitted as much, asserting in this litigation that the costs of sending bankruptcy notices, for example, are recoverable through PACER because "[e]lectronic bankruptcy noticing improves the overall quality of electronic service *to the public*." Taylor Decl., Ex. M, at 45 (emphasis added); *see also id.* at 50 (attempting to justify spending PACER fees on law-enforcement notices under the Violent Crime Control Act because that program "improves the overall quality of electronic service *to the public* via an enhanced use of the Internet"); *id.* (same, for "E-Juror service"); *id.* at 42 (same, for uscourts.gov website); *id.* at 51 (attempting to justify spending PACER fees on courtroom technology on the theory that better technology "improves the ability to share case evidence with *the public in the courtroom* during proceedings"); *id.* at 53 (attempting to justify spending PACER fees on the Mississippi state-court study because "the costs associated with improving the overall quality of service *to the public* by studying whether CM/ECF could be shared with a state court").

As worthwhile as these projects may be, they "should be funded through direct appropriations," as Senator Lieberman has explained; they may not be funded by PACER users. Taylor Decl., Ex. G, at 3. Allowing the AO to make PACER users fund the judiciary's general electronic operations— including programs that confer no specific and direct benefit on those PACER users—takes the AO "far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House." *Nat'l Cable Television*, 415 U.S. at 341. Congress did not pass the E-Government Act to delegate taxing power to the Administrative Office.

What about the other categories of expenses on which the judiciary spends PACER fees, such as CM/ECF, infrastructure and telecommunications expenses, and "court allotments"? There is a short answer and a long answer. The short answer is that this Court need not decide these questions now because they go to damages rather than liability. The long answer is that the AO has thus far provided only very general information about these programs. Without more detailed information, it is impossible to say whether any of these costs may be recoverable through PACER fees. Some of these costs might be attributable to providing records through PACER, while many will not be. Formal discovery will reveal which expenses fall into the latter category, and which (if any) fall into the former.

For what it is worth, however, the principles we have laid out strongly indicate that CM/ECF and its associated costs may not be funded with PACER fees. To see why, consider an example from before the existence of the Internet. Suppose that the judiciary wanted to allow the public to access court records in the early 1900s, and to charge fees for providing such access. Under a fees-only-to-the-extent-necessary regime, the judiciary could charge fees as necessary to reimburse the costs of searching the files and providing copies of the records, as well as the labor costs associated with these specific services. But the judiciary could not charge fees to reimburse the costs of accepting documents for filing and storing them with the court in the first place, or overhead costs that are not part of the marginal cost of providing public access to the records (much like an agency, in responding to a public-records request today, may not charge a fee that exceeds "the direct costs of search, duplication, or review," 5 U.S.C. § 552 (a)(4)(A)(iv)). These expenses would exist irrespective of whether the records were made publicly accessible, because courts can only function as courts if they have a system for accepting and storing case filings. And the same is true of CM/ECF.

But this is for another day. For now, the only question is whether the AO is charging more than necessary to recoup the costs of operating PACER. The answer is plainly yes. Under even the most permissive conception of what the AO is permitted to charge under the E-Government Act, it is not charging "reasonable fees" "to the extent necessary" to make records available upon request. 28 U.S.C. § 1913 note. As an illustration of just how unreasonable PACER fees are, our experts Tom Lee and Mike Lissner calculate that, if the AO were to use the market leader for data storage, the "total yearly estimate for storing and serving PACER's dataset" (based on very generous estimates of the size of that dataset) would be "$227,399.84, or 0.16% of PACER's reported 2016 fee revenue." Lee & Lissner Decl. ¶ 28. Charging more than 600 times that amount is unreasonable and excessive under any standard.

## CONCLUSION

This Court should grant the plaintiffs' motion for summary judgment as to liability.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Jonathan E. Taylor
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

William H. Narwold
Meghan S.B. Oliver
Elizabeth Smith
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 232-5504

August 28, 2017

*Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2017, I electronically filed this motion for summary judgment through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Deepak Gupta
Deepak Gupta