**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant*. | Case No. 16-745-ESH <br><br> Judge Ellen S. Huvelle |

**Proposed Brief *Amici Curiae* by The American Association of Law Libraries, et al.,
<u>In Support of Plaintiffs' Motion for Summary Judgment</u>**

Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5) of this Court, which requires compliance with the

requirements of Rule 29(a)(4)(A)) and Rule 26.1 of the Federal Rules of Appellate Procedure:

I, the undersigned, counsel of record for *amici curiae*, certify that to the best of my knowledge

and belief, the American Association of Law Libraries has no parent corporation and no publicly

held corporation holds 10% or more of its stock.

Dated: September 5, 2017

<div style="text-align: right;">

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................. iii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*  ...................................... 1

ARGUMENT ..................................................................................................................... 2

I.   CURRENT PACER FEES PREVENT SCHOLARS FROM DOING
     DEMOCRATICALLY IMPORTANT WORK ........................................................ 4
     **A.  Building Systems For Accessing, Teaching, And Practicing The Law** ................... 4

     **B.  Diagnosing Societal Issues By Examining The Legal Record** ................................ 6

     **C.  Studying And Contributing To Jurisprudential Development** ............................... 9

II.  PACER FEES PREVENT LAW LIBRARIES FROM PROVIDING PUBLIC
     ACCESS TO LEGAL INFORMATION ............................................................. 13
     **A.  PACER Fees Harm Patron Access And Legal Research Instruction** .................... 14

     **B.  PACER Fees Impede Law Libraries' Responsibility To Preserve
          Legal Materials** ................................................................................................ 16

III. THIS COURT MUST ENFORCE CONGRESS'S REQUIREMENT THAT THE
     FEDERAL COURTS MAKE FEDERAL ELECTRONIC COURT RECORDS
     "FREELY AVAILABLE TO THE GREATEST EXTENT POSSIBLE,"
     BECAUSE COURT ADMINISTRATORS HAVE PROVEN UNWILLING TO
     DO SO VOLUNTARILY ................................................................................... 17

CONCLUSION ................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ashcroft v. Iqbal*, 55 U.S. 662 (2009) ........................................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................ 11

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)......................................................... 2

*Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) ......................................................2

**Other Authorities**

Administrative Office of the United States Courts, *Electronic Public Access at 10*, The
    Third Branch, September 2000 ......................................................................................... 3

Civil Rights Litigation Clearinghouse, https://www.clearinghouse.net/about.php ....................... 6

CodeX, The Stanford Center for Legal Informatics, http://codex.stanford.edu/ ........................... 5

Clifford J. Carrubba and Tom S. Clark, *Rule Creation in a Political Hierarchy*, 106 AM.
    Pol. Sci. R. 622, 634 (2012) ......................................................................................... 10

Cornell Legal Information Institute, https://www.law.cornell.edu/.............................................. 4

Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. OF POL. 591 (2017)........................... 10

Digital Public Library of America, https://dp.la/ .........................................................................17

Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016)................................... 19

Elizabeth Warren, *Bankrupt Children*, 86 MINN. L. REV. 1003 (2002)..........................................7

Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009),
    https://perma.cc/4CEC-Z7JT ........................................................................................ 15

HathiTrust Digital Library, https://www.hathitrust.org/................................................................ 17

Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach
    to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016)
    (working paper), https://ssrn.com/abstract=2694326 ...................................................... 12

Iain Carmichael, James Wudel, Michael Kim, and James Jushchuk, Comment, *Examining
    the Evolution of Legal Precedent through Citation Network Analysis*, 96
    N.C. L. REV. (forthcoming 2017)................................................................................... 10

J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US
    Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3
    (2015), https://perma.cc/33S9-XW3Z ...........................................................................18

Jay Lawrence Westbrook, *Empirical Research in Consumer Bankruptcy*, 80 Tex. L. Rev. 2123, 2148 (2002) ............................................................................................. 7

Jennifer Mascott, *Who are "Officers of the United States"?* 70 Stanford L. Rev. (forthcoming 2017) .........................................................................................11

Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011) .......................................................................................... 12

*Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property  and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017) ......................................................................... 3

Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005) ...................... 16

Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494 ................................................................. 11

Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56 .................... 20

Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-9UV6 .......................................................................... 7

Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 Writings of James Madison 103, 103 (Hunt ed., 1910) ................................................................................. 2

Library Innovation Lab at Harvard University, http://lil.law.harvard.edu/ .................................... 5

Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 Fed. Cts. L. Rev. 1 (2011)............................. 12

Lynn M. LoPucki, *Court-System Transparency,* 94 Iowa L. Rev. 481, 515 (2009).................... 21

Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161 (2002)................................................................................................ 8

Media Freedom and Information Access Clinic, https://law.yale.edu/mfia/ ................................. 5

NARA Records Disposition Schedule N1-021-10-2 ...................................................................16

Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 Libr. Quarterly 61 (2010) ........................................................16

Peter W. Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working paper) (Aug. 17, 2017) ...................................................19

Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to Patterns*, 53 Vill. L. Rev. 855, 864 (2008) ..............................................17

*Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL ....................................................16

Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 Law Libr. J. 67 (2017) ....................................................16

S. Rep. No. 107-174, at 23 (2002) ......................................................................................... 3

Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017) ...................8

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* (1989)................... 6

Teresa A. Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *Persistence of Local Legal Culture: Twenty Years of Evidence from the Federal Bankruptcy Courts*, 17 Harv. J. L. & Pub. Pol'y 801 (1994).....................................................................6

Thomas Lee & Stephen Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. (forthcoming 2017)............................................................................................ 11

Thomas Lee & Stephen Mouritsen, The Path Forward for Law and Corpus Linguistics, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19 ...................................... 11

William M. Landes & Richard A. Posner, Legal Precedent: A Theoretical and Empirical Analysis, 19 J.L. & Econ. 249 (1976) ..............................................................................9

**STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]**

**The American Association of Law Libraries** (AALL) is the only national association dedicated to the legal information profession and its professionals. Founded in 1906 on the belief that people—lawyers, judges, students, and the public—need timely access to relevant legal information to make sound legal arguments and wise legal decisions, its nearly 4,500 members are problem solvers of the highest order.

**Deborah Beim** is an **Assistant Professor of Political Science** at **Yale University**.  Her work focuses on "learning in the judicial hierarchy," probing the ways in which law develops. She and her colleagues across the country seek to explain the development of the law using empirical methods that rely on fulsome legal corpuses and refinement of theoretical models.

**Thomas Bruce** is **Director and Co-founder** of **Cornell Legal Information Institute.** He co-founded LII (the first legal information web site) in 1992 with Peter Martin, former Dean of Cornell Law School. The LII publishes electronic versions of core materials in many areas of the law, relying on the government to provide reasonable access to primary legal sources.

**Phillip Malone** is a **Professor of Law** at **Stanford Law School**. He is Director of the Juelsgaard Intellectual Property and Innovation Clinic, serving clients by advocating for greater opportunities for innovation and generativity. His work focuses on legal innovation, increased access to justice, and facilitating open access to information and online expression.

---

[1] Counsel for amici declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than amici, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief. The named individuals sign this brief in their individual, not representational, capacity. Their professional affiliations are listed for identification and contextual purposes only.

1

**Jonathan Zittrain** is the **George Bemis Professor of International Law** and **Professor of Computer Science** at **Harvard University**. He is Director of the Harvard Law Library, which houses the Library Innovation Lab (LIL).  LIL seeks to make electronic case law available for free; to confront archival challenges of the legal record; and to improve tools for teaching the law.

## ARGUMENT

*Popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.*[2] — James Madison

As Madison knew, our democracy's success requires that the people know how the governmental apparatus exerts its power.  Public access to federal court proceedings and records is essential to this knowledge.  Accordingly, while *amici* submit that plaintiffs' construction of the E-Government Act provision at issue on this motion is correct as a matter of pure textual analysis and legislative history, they urge this Court also to take into account that adopting plaintiffs' position is likewise consistent with the fulfillment of basic democratic principles.

It is by now well-established that fundamental democratic ideals underpin the common law, constitutional, and statutory mandates for public access to court proceedings.  *See, e.g.*, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 567 (1980) (describing the "unbroken, uncontradicted history" of common-law access to court proceedings when presented with a judge-ordered closure of  courthouse doors, and further locating such a right in the First Amendment); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (recognizing the same for written records maintained by the clerk).  Justice Brennan observed a "special solicitude for

---

[2] Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 WRITINGS OF JAMES MADISON 103, 103 (Hunt ed., 1910).

the public character of judicial proceedings." *Richmond*, 448 U.S. at 592 (Brennan, J., concurring in judgment).  Such solicitude is due because public access to proceedings is foundational to popular justice.  Access guarantees, especially to trial court records, are "bottomed upon a keen appreciation of the structural interest served in opening the judicial system to public inspection." *Id.*

Congress clearly intended that the E-Government Act help ensure that the adoption of e-filing would make the federal court system more accessible to the public, rather than becoming a profit center for the federal courts.  Administrative Office of the United States Courts, *Electronic Public Access at 10*, THE THIRD BRANCH, September 2000, at 3-4 (describing PACER as allowing the public to "surf to the courthouse door on the Internet"); S. Rep. No. 107-174, at 23 (2002) (expressing the intent to make PACER access "freely available to the greatest extent possible"); *Judicial Transparency and Ethics: Hearing Before the H. Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary*, 115th Cong. 2 (Feb. 14, 2017) (statement of Rep. Darrell Issa, Chairman) (expressing concern at the "tidy profit" that PACER continues to make).

This brief describes how PACER's fees have prevented scholars and libraries from protecting and promoting essential public access benefits.  Scholars and libraries play a critical role in creating, protecting, and amplifying the democratic benefits that flow from public access to court records.  Whereas litigants may interact with court records only with respect to individual cases, libraries and scholars need the ability to use those records to examine our judicial system more systemically—a task that, in many cases, requires access to the full body of PACER records and the ability to share those records.

## I.   Current PACER Fees Prevent Scholars from Doing Democratically Important Work

Scholars, academic institutions, and legal clinics amplify the benefits of public access to court records, and their work suffers when access is restricted.  They rely on access to court records in various ways to enhance the effectiveness of our legal system as a whole and ensure greater public access to justice.  Scholars, academic institutions, and legal clinics: 1) build systems for accessing, teaching, and practicing the law, 2) diagnose societal issues by examining the legal record, and 3) study and contribute to jurisprudential development.  Each of these components of their missions is hampered by the excessive PACER fees they currently must pay.

### A.  Building systems for accessing, teaching, and practicing the law

Scholars are responsible for creating many of the innovative platforms that provide greater public access to the law and greater ability to analyze and understand it.  These platforms frequently find more use than do government sources of legal information: indeed, they are used every day by practitioners, students, and the public.

For example, the Cornell Legal Information Institute (LII) is perhaps best known as the first result in any web search for the United States Code or the Code of Federal Regulations.  The organization's simple vision is that "everyone should be able to read and understand the laws that govern them, without cost."[3]  To that end, LII publishes the law online for free (when it is obtainable), creates materials that help people to understand the law, and develops tools that make it easier for people to find and to understand the law.

LII is not alone.  The Harvard Law Library Innovation Lab is working to make all reported U.S. case law freely accessible online.  It also is providing tools for educators to assign

---

[3] CORNELL LEGAL INFORMATION INSTITUTE, https://www.law.cornell.edu/.

and excerpt raw legal materials as part of free, next-generation casebooks and is permanently archiving online materials that are cited in court filings, opinions, and articles.[4]

Meanwhile, Stanford's Center for Legal Informatics brings together researchers, lawyers, entrepreneurs, and technologists in order to enhance legal efficiency, court transparency, and access to legal systems and services.[5]  For example, it "incubated" Lex Machina, an innovative tool for analyzing intellectual property jurisprudence that mines data from millions of pages of litigation documents, many from PACER. The project was spun off as a for-profit and acquired by LexisNexis.  Unfortunately, the underlying data that powers Lex Machina—court records derived from PACER—is expensive, driving up the cost of the service. Major law firms and well-compensated practitioners can afford the benefits of this system; others cannot. Many public-minded efforts to make federal trial court records more accessible to all, not just those with ample resources, suffer the same limitation: PACER is prohibitively expensive.

Scholars do more than make information available and conduct research.  They also develop the next generation of practitioners through hands-on experience. Law school clinics teach aspiring legal professionals; like the lead plaintiffs in the instant case, they also enhance the public's access to justice by directly serving the public.  Yale's Media Freedom and Information Access Clinic (MFIA) helps clients to enforce their constitutional and statutory rights of access to government information—often in federal court.[6]

Yet, one of the most difficult-to-access bodies of government information is the corpus of federal district court records.  While individual records are reasonably obtainable (if not always reasonably findable) via PACER, securing any significant portion of these records is fiscally

---

[4] LIBRARY INNOVATION LAB AT HARVARD UNIVERSITY, http://lil.law.harvard.edu/.
[5] CODEX, THE STANFORD CENTER FOR LEGAL INFORMATICS, http://codex.stanford.edu/.
[6] MEDIA FREEDOM AND INFORMATION ACCESS CLINIC, https://law.yale.edu/mfia/.

impossible.  Efforts like the University of Michigan's Civil Rights Litigation Clearinghouse have
limited resources, so the supervising faculty simply directs patrons seeking additional
information to PACER.[7]  Because it is impossible to obtain a substantial corpus of PACER data,
both clinic work in general and the specific public access work of entities like MFIA can be
difficult or impractical.  Access to information about the workings of the courts suffers, as does
the public's access to justice.

### B.  Diagnosing societal issues by examining the legal record

Beyond providing access to the law, scholars also seek to understand how other social
phenomena manifest in legal proceedings.  These endeavors, too, have been frustrated by the
high price of obtaining records through PACER.

For decades, a group of preeminent scholars has examined bankruptcy through the best
available lens: bankruptcy court records.  The Consumer Bankruptcy Project gathered records
first in 1981, fueling scholarship by this group for more than twenty years.  *See, e.g.*, Teresa A.
Sullivan, Elizabeth Warren, and Jay Lawrence Westbrook, *As We Forgive Our Debtors:
Bankruptcy and Consumer Credit in America* (1989); Teresa A. Sullivan, Elizabeth Warren, and
Jay Lawrence Westbrook, P*ersistence of Local Legal Culture: Twenty Years of Evidence from
the Federal Bankruptcy Courts*, 17 HARV. J. L. & PUB. POL'Y 801 (1994).  In 2002, on the heels
of their second major data gathering effort, these scholars realized that their work could be at a
turning point.  They had been laboriously gathering court records through manual photocopying,
but one of the scholars predicted that "empirical work in the bankruptcy field will be
revolutionized over the next few years by the arrival around the country of Case
Management/Electronic Case Filing ('CM/ECF')."  Jay Lawrence Westbrook, *Empirical*

---

[7]   CIVIL RIGHTS LITIGATION CLEARINGHOUSE, https://www.clearinghouse.net/about.php.

*Research in Consumer Bankruptcy*, 80 TEX. L. REV. 2123, 2148 (2002).  One scholar warned

that the PACER fee structure could extinguish this hope, but the optimists advocated for a policy

"that permits the broadest possible access to data."  *Id.* at 2150.

While promoting the "broadest possible access" may have been the policy intended by

Congress when it passed the E-Government Act that same year, it was not the approach adopted

by the Administrative Office of the United States Courts ("AO").  In the following years, the

researchers were forced to make do by applying for fee waivers individually at each bankruptcy

court.  *See, e.g.*, Letter from Professor Elizabeth Warren, Harvard Law School to The Honorable

John J. Thomas, U.S Bankr. Court, Middle District of Pa. (Jan. 4, 2008), https://perma.cc/P2D7-

9UV6 (requesting reinstatement of an expired fee waiver and describing the patchwork of

agreements with different courts).  Behind the scenes, an army of research assistants tried to keep

the waivers up-to-date, and the scholars promised not to share the public court records with the

public.  *Id.*  This jury-rigged arrangement held up long enough to allow the Consumer

Bankruptcy Project team to research the rise in bankruptcies in the mid-2000's, and to apply the

data in new domains such as medical research.[8]

Then-Professor Elizabeth Warren sought to use empirical bankruptcy data as a "sort of

pathology laboratory for data and insights about other social issues."  Westbrook, *supra*, at 2125.

Through the legal record, she and her colleagues sought to explore economic fractures in

American society.  *See, e.g.*, Elizabeth Warren, *Bankrupt Children*, 86 MINN. L. REV. 1003

---

[8] PACER fee waivers are entirely discretionary, may be revoked at any time for any reason, must
be applied for individually at each court, and must be limited in time.  No PACER documents
obtained as a result of a fee waiver may be redistributed—presumably because the AO has the
economic incentive to require others to engage in otherwise unnecessary downloading so that
they will have pay for the same documents.  Collectively, these limitations not only hinder the
*gathering* of data but expressly prohibit *redistribution* of the data underlying any study—a core
requirement of rigorous scholarship.

(2002).  However, the perpetual need to renegotiate fee waivers and restrictions on distributing source data made the work unsustainable.  Nothing has since filled the void: today's consumer bankruptcy empiricists are stuck working with decade-old data.  *See, e.g.*, Sara S. Greene, Parina Patel, and Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 MINN. L. REV. 1031 (2017).

The lack of fresh data for this badly needed research into how our bankruptcy system works in practice is not for want of capability of PACER.  Indeed, the Department of Justice, by contrast, appears to receive free nightly updates of bankruptcy data from PACER.  *See* Memorandum of Understanding Between the Admin. Office of the United States Courts and the Exec. Office for United States Trs. Concerning the Bankruptcy Data Download (Dec. 14, 2009), https://perma.cc/UFA9-UA3X.  Yet this information is not made available to the general public, and the AO's policies preclude researchers from replicating it.

Nor is it for want of creativity and effort from researchers, who have always gone to remarkable lengths to acquire necessary data. Consider the backstory of the Consumer Bankruptcy Project's data gathering phases in 1981 and 2001, as described by Professor Lynn LoPucki.  *See* Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 TEXAS L. REV. 2161 (2002).  In 1981, the team "bought photocopy machines, flew the copiers air freight to the cities where they would collect the data, and rolled them into the clerks' offices on dollies."  *Id*. at 2166-2167.  With the consent of the courts, they copied the records for a tenth of the rate mandated by the public access fee schedule under the formal process.

In 2001, the team followed much the same process for courts that would allow it, despite considerable advances in technology in the intervening years. The most significant improvement they were able to make was paying moonlighting clerks to make copies using the courts' existing

photocopiers. PACER was available in many courts by 2001, but the electronic fee schedule made it far more expensive than relying on 20-year-old technology.

### C.  Studying and contributing to jurisprudential development

Research enabled by public access touches the core of the common law—jurisprudential development.  In 1976, Landes and Posner set out a method for systematically analyzing development of the law by mapping citation history.  William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis*, 19 J.L. & ECON. 249 (1976).  They described what lawyers and judges already knew to be true—the accretion of citations to a given judicial opinion could, over time, forge legal rules.  In short, they described precedent.

Landes and Posner proposed that, by quantitatively examining networks of citations, they could document—and perhaps even shape or predict—the development of the law.  In classic Chicago School style, they characterized precedents as "capital stock that yields a flow of information services." *Id.* at 250-51.  The currency of our judiciary is legal precedent, and any precedent's value depends upon knowledge of and citation to it.  Transaction costs in this legal economy serve only to devalue the informational commodity and reduce efficiency.

Landes and Posner's work infused empirical approaches into legal practice in a way that presaged our contemporary electronic research tools.  It also indicated that efficient service by our justice system was bound up—figuratively and literally—with efficient access to judicial information.

In the following 40 years, citation analysis of published opinions has flourished in scholarship and legal research, providing lawyers and judges with far better tools for understanding and interpreting the law.  Published opinions—at least for federal Supreme Court and circuit court decisions—are readily available.  Law students now collaborate with computer

science students in order to discover algorithmic approaches drawn from network science that better explain how rules of law develop. *See, e.g.*, Iain Carmichael, James Wudel, Michael Kim, and James Jushchuk, Comment, *Examining the Evolution of Legal Precedent through Citation Network Analysis*, 96 N.C. L. REV. (forthcoming 2017).[9]

Empirical scholarship that moves beyond citation-based analysis of our higher courts, however, has been made difficult by lack of access to court records. For example, Yale political science professor Deborah Beim studies what she and her colleagues call "learning in the judicial hierarchy." Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. OF POL. 591 (2017). She set out to examine the development of rules of law not simply by looking at citations, but also by examining the actual language used by jurists at every level of the judicial hierarchy. She sought to answer questions such as, "how and how often do terms or phrases used by district court judges become adopted by circuit court judges or by the Supreme Court?" Her research ended before it began because district court opinions are not accessible as a coherent electronic corpus.[10] Colleagues in her field build models of judicial "rule creation" that theoretically apply to the whole judiciary, but these scholars can only test their hypotheses against corpuses of Supreme Court and circuit court opinions. *See, e.g.*, Clifford J. Carrubba and Tom S. Clark, *Rule Creation in a Political Hierarchy*, 106 AM. POL. SCI. R. 622, 634 (2012).

---

[9] The authors of that forthcoming piece explained to *amici* that their work had focused solely on Supreme Court and circuit court opinions because there were no accessible electronic corpuses of federal trial court opinions or established scholarly citation networks. Even though law students and faculty generally have free access to major commercial electronic databases, they do not have the ability to download and process the public data contained therein. Nor do those databases contain much of the relevant non-opinion data about cases.

[10] Even PACER's per-court "free opinions report" gives wildly inconsistent and inadequate results, making any systematic study impractical.

The emerging field of "corpus linguistics" analyzes language's meaning by studying how it is actually used in a large body of writing over time—an exercise with obvious utility to the legal profession. Last month, a Utah Supreme Court judge and his clerk explained, "we see corpus linguistic analysis playing a central role in legal interpretation going forward."  Thomas Lee & Stephen Mouritsen, *The Path Forward for Law and Corpus Linguistics*, Volokh Conspiracy (Aug. 11, 2017), http://wapo.st/2vVWG19.  In a forthcoming article in the *Yale Law Journal*, they explain one application—interpreting "ordinary meaning."  Thomas Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. (forthcoming 2017).  The use of corpus linguistics for legal scholarship and practice is promising indeed.  *See, e.g.*, Jennifer L. Mascott, *Who are "Officers of the United States"?*, 70 STANFORD L. REV. (forthcoming 2017); *see also* Lawrence B. Solum, Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record (Apr. 26, 2017) (working paper), https://ssrn.com/abstract=3019494.

But for all of its promise, corpus-based analysis fails without a corpus.  PACER fees artificially limit access to a vast body of federal case law (the opinions themselves) and the likewise-important case record documents and data.

Without public access to the raw material that collectively constitutes our body of precedent, scholars cannot effectively study many of the pressing questions facing litigants and judges.  For example, the most important recent change to federal trial practice may be the Supreme Court's alteration of the pleading-sufficiency standard via *Towmbly* and *Iqbal*. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 55 U.S. 662 (2009). The effect of these decisions has been as unclear as it is controversial, and the high price of PACER documents has hindered relevant research.

11

With respect to the study of *Twombly* and *Iqbal*, the Judicial Conference has acknowledged the value of empirical research based on judicial records.  It has taken the position that the federal court system itself—relying on its unique access to PACER records—should authoritatively study the issue and make policy recommendations, even as outside scholars are deprived of the information necessary to conduct similar analysis.  The Federal Judicial Center (FJC) conducted an extensive study of the decisions' empirical effects.  Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After Iqbal: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (2011).  Scholar Lonny Hoffman explained that the FJC's study benefited from data that had eluded all others.  Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions To Dismiss*, 6 FED. CTS. L. REV. 1 (2011).  The FJC had direct access to all records in PACER, rather than having to rely, as most scholars must, on whatever is available via searches of commercial electronic databases.  *Id.* at 10.  That is to say, the FJC had monopoly access to the best information about the most important evolution to federal trial practice in recent history.  Whatever one's take on the FJC's conclusions in this study, it is difficult to dispute that the federal judiciary would benefit from the insight of creative and innovative research by the nation's best scholars.  Indeed, Hoffman identified some potentially significant methodological issues with the FJC study.  *Id.* at 31-35.  Citing the same concerns that Professor LoPucki had raised a decade earlier, he observed that thorough empirical examination of these questions was made impossible because scholars lacked access to data.  *Id.* at 9 n. 18.

When scholars have direct electronic access to public records, they can buttress the integrity and efficiency of the justice system.[11]  For example, Berkeley Law doctoral students developed a method for detecting possible problems of inconsistency and bias using data from the California Board of Parole.  Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach to the Problems of Inconsistency and Bias in Adjudication* (October 21, 2016) (working paper), https://ssrn.com/abstract=2694326.  The systemic study of federal trial court records has untapped potential to similarly detect and remedy instances of individual injustice.  This is where data can fuel innovation.  The next generation of legal scholars will stand not just on the shoulders of their forbears, but—hopefully—on the structural foundation created by access to the electronic public record.  When they "surf to the courthouse door," they should find it open.

## II.     PACER Fees Prevent Law Libraries from Providing Public Access to Legal Information

Law librarians are committed to providing the greatest possible public access to court records.  Academic law librarians also support the scholarly work of faculty and students, conduct their own scholarly work, and teach effective legal research skills. The PACER charges at issue here limit law libraries' ability to provide effective patron access and equitable legal research instruction. They also hinder law librarians' ability to fulfill their responsibility to preserve and provide access to legal materials.

---

[11] It should go without saying that many other entities would likewise contribute to these ends, including the press, public interest organizations, government employees, and practicing attorneys.

### A. PACER fees harm patron access and legal research instruction

Because PACER fees are so high, academic law libraries have been forced to limit patron access. The majority of law libraries require students (and sometimes faculty) to approach a research librarian for access to PACER documents, which the librarian provides by logging into a central library account. Others libraries limit their assistance to helping users set up their own personal accounts. Few give the library's PACER password directly to students and faculty. Most libraries' PACER passwords are kept confidential to limit "overuse" of the library's account.

This controlled access limits the usefulness of PACER to researchers. Research through PACER may only be conducted during library hours, in the library. Given that much of the modern academic's and law student's research is done outside of the physical library using the library's subscription databases and other electronic resources, this is a major impediment to conducting legal research.

Even with controlled access, libraries that allow patrons to use their PACER passwords cannot predict how much they will spend on PACER fees in any given month, making effective budgeting impossible. PACER bills are entirely dependent on the interest and activity of library users. Supporting a budget item with such unpredictability is difficult to justify, so many libraries no longer provide direct access.

PACER fees also lead to inequitable access: wealthier schools are able to provide greater access. In 2009, Erika Wayne, then a law librarian at Stanford Law School, conducted a survey of law libraries and their spending on PACER. The survey found that private law school libraries spent nearly twice as much as public law school libraries on PACER, indicating that private law schools can afford to provide students with greater access. Wayne wrote that

academic law librarians reported that they "were very concerned about the costs" of PACER, with some commenting that "there is no way to limit costs"; "it gets expensive rather quickly"; and "if PACER were cheaper . . .  we would use PACER more frequently."  Erika Wayne, *PACER Spending Survey*, Legal Research Plus (Aug. 28, 2009), https://perma.cc/4CEC-Z7JT. Wayne concluded that "[t]he unknown/potential costs of using PACER hold back most law school libraries from letting their patrons fully utilize PACER . . . We need to train our students and equip our patrons with access to this important resource, but we can't afford to do so."  *Id.*

Law libraries' concerns are valid, because costs can mount quickly.  In order to view the Docket, Complaint, Motion for Summary Judgment, and accompanying records in the instant case, a user would incur a charge of $25.40.  For ordinary users, PACER waives fees for users that do not accumulate more than $15 in charges per quarter.  Thus, the quarterly allowance would be void and the full amount would be due once a user looked at *basic documents* in a *single pending case*.  If patrons viewed additional relevant documents in this docket, they would easily exceed the $50 quarterly limit.

PACER fees also hinder the ability of academic law librarians to teach law students how to conduct effective research. Many law courses, including legal research courses taught by law librarians, are simulation-based.  Students use resources as they would in real life.  And yet, students cannot use PACER freely because it is impractical to give the entire class the library's PACER password.  Instead, instructors choose to demonstrate PACER usage rather than permitting their students to use the system.  Thus, emerging lawyers graduate from law school without any hands-on experience with the authoritative source of federal court records.

### B.  PACER fees impede law libraries' responsibility to preserve legal materials

Digital government information must be preserved to ensure its equitable, permanent, and public accessibility.  *See Preservation Policy*, AALL, https://perma.cc/UKH7-M2GL.  PACER fees impede law libraries' efforts to provide permanent public access to legal information and to develop next-generation resources to serve their patrons.  Law libraries have become acutely aware of the challenges to digital preservation, including an inability to fulfill their obligation to preserve our digital legal record.  *See, e.g.*, Rebecca Kunkel, *Law Libraries and the Future of Public Access to Born-Digital Government Information*, 109 LAW LIBR. J. 67 (2017); Paul Conway, *Preservation in the Age of Google: Digitization, Digital Preservation, and Dilemmas*, 80 LIBR. QUARTERLY 61 (2010); Judith Cobb & Joan Allen-Hart, *Preserving Legal Materials in Digital Formats* (prepared for the Legal Information Preservation Alliance) (Feb. 4 2005).  While law librarians are familiar with the difficulty of archiving digital information held in proprietary commercial databases—a subject of great concern to institutions traditionally built on physical preservation—they are frustrated that PACER makes it impossible to archive public government records.  Furthermore, court administrators have failed to send any electronic court records to the National Archives and Records Administration as laid out in records disposition schedules with the courts.[12]

---

[12] NARA External Affairs Liason Meg Phillips confirmed this fact in an email to Emily Feltren, Director of Government Relations, AALL, on September 1, 2017.  The reality appears to be that the U.S. Courts have repeatedly established disposition schedules with NARA, only to put them on indefinite hold.  *See, e.g.*, NARA Records Disposition Schedule N1-021-10-2. (signed by the AO on June 29, 2010) (requiring deposit of electronic records within 3 years of close of case), https://perma.cc/U6K7-6RK9.  Ms. Phillips' email stated that the relevant current disposition schedules now bear the following disclaimer: "The Judiciary is in the process of reviewing internal requirements to establish an effective national policy concerning the future transmission of electronic records to NARA. The completion of the requirement analysis, clearance, and implementation of said policy is a prerequisite to the transmission of electronic records included in this and similar proposed schedules."  The court administrators' failure to ever provide NARA

With greater access to PACER, law libraries could also contribute to large-scale cooperative digital libraries and related organizations, such as the Digital Public Library of America[13] or HathiTrust.[14]  Libraries could expand on projects like Perma.cc, a service created by Harvard's Library Innovation Lab that archives digital records that are cited in briefs, opinions, and articles—generating a permanent link to an archived record.  Law libraries could mine PACER dockets and provide digital access to and preservation of materials on a local or regional issue, or on a substantive topic.  With greater access to PACER, opportunities abound for librarians to curate and preserve the raw legal materials that are important to students, scholars, and society.

### III.  This Court Must Enforce Congress's Requirement that the Federal Courts Make Federal Electronic Court Records "Freely Available to the Greatest Extent Possible," Because Court Administrators Have Proven Unwilling to Do So Voluntarily

The E-Government Act of 2002 was intended to reorient the federal courts' electronic access policies from serving primarily the interests of the courts to instead focusing on the needs of the public.  As LII co-founder Peter Martin explains, "[t]he federal courts did not establish computer-based case management systems or subsequent electronic filing and document management systems in order to provide the public with better access to court records.  Those systems were created because they offered major gains for judges and court administrators."  Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to*

---

with any electronic court records is a longstanding problem that could be ameliorated by allowing institutions such as libraries to help archive electronic records for posterity.

[13] DIGITAL PUBLIC LIBRARY OF AMERICA, https://dp.la/.

[14] HATHITRUST DIGITAL LIBRARY, https://www.hathitrust.org/.

*Patterns*, 53 VILL. L. REV. 855, 864 (2008).  This conclusion is supported by the detailed retelling of CM/ECF and PACER development by the system architects.[15]

While the potential for PACER to provide heightened public access soon became clear, the court system's financial dependency on PACER fees has always hamstrung its willingness to take steps that would be in the public interest.  Indeed, "[o]therwise-beneficial arrangements that might have threatened the willingness of the commercial sector to pay PACER fees have not been treated as realistic options."  Martin, *Online Access*, *supra*, at 870.  Put simply, the AO has a perverse incentive to maintain artificially high PACER fees and to limit functionality.

AALL has a long history of working with the AO to move it toward a model of no-fee access. In the early 2000s, the Association worked closely with Senator Lieberman on language that was added to the E-Government Act of 2002 to direct the Judicial Conference to charge fees "only to the extent necessary." For the next decade, the AALL encouraged the AO to promote public access and partnered with the AO to expand access to PACER at law libraries. These attempts at partnership have not succeeded in providing anything resembling full public access to court records.

In 2006, the AALL Executive Board approved a Resolution on No-Fee FDLP Access to PACER, which was likewise endorsed by the American Library Association (ALA). This resolution helped motivate the Government Publishing Office (GPO) to work with the AO on a

---

[15] The court administrators' myopic focus on CM/ECF improvements is evident from the extensive list of features slated for CM/ECF, and the lack of PACER improvements promised as part of the "NextGen" effort.  *See* J. Michael Greenwood & John Brinkema, *E-Filing Case Management Services in the US Federal Courts: The Next Generation: A Case Study*, 7 Int'l J. for Ct. Admin. 3, 3 (2015), https://perma.cc/33S9-XW3Z. The authors also note the high cost, delays, and budget overruns on "NextGen" due to "serious management issues that have adversely affected the project and pose a serious risk to its eventual completion."  *Id*. at 11.  In short, PACER fees have supported an expensive and mismanaged project, with little benefit to PACER itself.

pilot project to make PACER available at no cost to users of federal depository libraries.  A

three-year pilot project was launched in 2007 at 17 federal depository libraries, 10 of which were

law libraries.  This very modest experiment, which gave free PACER access to those few people

who lived near a participating library, was ended prematurely and never reinstated.

Then, in 2011, the AO and GPO announced plans to make PACER opinions available to

the public.  AALL applauded the decision to make opinions available through GPO's FDsys,

which provides access to authentic electronic information from all three branches of government.

This program, however, has turned out to be no substitute for PACER access.

One fundamental flaw in the program is the limited set of documents made available.

Only *some* courts transmit *some* opinions to the GPO for free distribution online.  Each court's

participation in the system is voluntary.  Each judge's determination of what constitutes an

opinion is discretionary.  The result is wildly inconsistent publication that is useless for most

purposes.  *See* Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016); Peter W.

Martin, *District Court Opinions that Remain Hidden Despite a Longstanding Congressional*

*Mandate of Transparency – The Result of Judicial Autonomy and Systemic Indifference* (working

paper) (Aug. 17, 2017).

And even if *all* courts transmitted *all* opinions—and they currently do not—the outcome

would be far inferior to the treasure trove that is buried inside PACER.  Only opinions are

transmitted to the GPO, and so no other case documents are made available through this

program; indeed, there is no record at all of ongoing cases or cases for which there was no

opinion.  The opinions often are stripped of obviously relevant data—such as the presiding

19

judge—without which they are of much less use for research purposes as well as for general public access.[16]

In 2012, AALL, GPO, and the AO established the "PACER: Access and Education Program" with the aim of increasing use of PACER at federal depository libraries, public law libraries, and public libraries.  Participating libraries, which are asked to create PACER educational materials and training guides, are exempt from the first $50 of quarterly usage charges.  The program has experienced low participation from libraries, with approximately 15 participating as of 2017.[17]

After more than a decade of attempting to work collaboratively with the AO to increase no-fee access to PACER, the inescapable conclusion is that there is little progress to be made through voluntary arrangements.  Even as digital storage and transmission costs have plummeted, PACER fees have increased. The goals of the E-Government Act are frustrated by this increasing divergence between PACER fees and the costs that purportedly justify them, particularly when the AO declines to take measures that would reduce costs still further or even eliminate them. For example, the Internet Archive—a well-respected partner of many forward-thinking law libraries—has offered to host all PACER content for public access for free, forever. *See* Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Reps. Issa and Nadler, H. Comm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary (Feb. 10, 2017), https://perma.cc/BT6M-4J56.

---

[16] The name of the presiding judge might be useful, for example, for research on potential bias or sentencing trends.

[17] It has been difficult to determine the exact participation from libraries. This estimate was provided by Robert Lowney, manager of the Electronic Public Access Program, AO, in an email to Emily Feltren, Director of Government Relations, AALL, May 10, 2017.

Professor Lynn LoPucki warned in 2002 that the field of empirical legal research as a whole was destined to remain small and insular because of an artificial limitation created by court administrators—access fees. Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 TEXAS L. REV. 2161 (2002). LoPucki surmised that PACER's anachronistic fees were motivated at least in part by judges' desire to limit scrutiny of themselves. *Id.* at 2170 (noting that the annual summary databases produced by the Federal Judicial Center are stripped of judge names prior to public release).[18] Whether his hypothesis was correct or if the longstanding over-charging is instead motivated by court administrators' desire to subsidize unrelated costs with PACER revenues, the fee schedule seems patently at odds with principles of public access and the mandates of the E-Government Act. It is time for this Court to step in and enforce Congress's clear direction that unreasonable PACER fees unrelated to actual costs must stop.

**<u>CONCLUSION</u>**

For the foregoing reasons, *amici curiae* respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

Dated: September 5, 2017

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
(DC Bar No. 1026113)
Stephen M. Dane
(DC Bar No. 982046)

</div>

---

[18] Years later, Professor LoPucki noted that the fee waiver system that ostensibly relieved some burden for researchers was both ineffective and might encourage perverse outcomes: "One problem is that the courts may grant, deny, or condition them in ways that encourage researchers to portray the courts in a positive light." Lynn M. LoPucki, *Court-System Transparency*, 94 IOWA L. REV. 481, 515 (2009) (describing how one court denied his request for waiver renewal after he published research critical of that court).

RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
Counsel for *Amici Curiae*