## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, et al.,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action No. 16-745 (ESH)

## PROPOSED BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY

———————————

Bruce D. Brown (D.C. Bar No. 457317)
*Counsel of record for Amicus Curiae*
Caitlin Vogus (D.C. Bar No. 988826)
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9301

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE..................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 2

ARGUMENT ............................................................................................................ 4

    I.   The public and the press benefit from unfettered access to electronic court records. ........ 4

       A.   The news media uses electronic court records to inform the public about matters of public concern. ............................................................................................................. 4

       B.   Ready access to electronic court records prompts fairness and accuracy in reporting... 7

    II.   The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values. ....................................................................... 9

    III.  PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records. ............................. 12

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ........................................................... 7

*\*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) ............................. 9, 10

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ......................................................... 11

*In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*,
  728 F.3d 1033 (9th Cir. 2013) ................................................................................ 11, 14

*In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*,
  585 F. Supp. 2d 83 (D.D.C. 2008) ............................................................................... 10

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) ......... 11

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) .................................................. 11

*\*Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589 (1978) ............................................. 9, 10

*\*Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ........................................ 9, 10

*\*Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ............................................ 9, 10

*\*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ............................. 9, 10, 12

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .................................................................. 11

*\*United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) ...................................... 9, 10

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ................................................ 9

## Statutes

*\*E-Government Act of 2002, Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17,
  2002) (28 U.S.C § 1913 note) .................................................................................... 1

## Other Authorities

*About the Herald Investigation*, Miami Herald, July 20, 2008,
  https://perma.cc/6M9D-HB8D ..................................................................................... 6

Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15,
  2016, https://perma.cc/5ZPF-Q3H5 ........................................................................... 12

Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007,
  https://perma.cc/2ZNY-EYR9 ....................................................................................... 4

Brad Heath, *ATF uses fake drugs, big bucks to snare suspects*, USA TODAY (June 27, 2013),
  https://perma.cc/U5LF-JZGV ......................................................................................... 5

Craig Silverman, *Show the reporting and sources that support your work*, American Press
  Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5 ............................................. 8

Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed
  Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW ............................ 4

Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017,
  https://perma.cc/UA3K-G99G ...................................................................................... 12

Electronic Public Access Fee Schedule, PACER,
  https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) ........... 11, 13, 14

Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017,
  https://perma.cc/LE6H-UWAG .................................................................................. 12

Harlan Yu & Stephen Schultze, *Using Software to Liberate U.S. Case Law*, 18 ACM XRDS 12
  (2011), *available at* https://perma.cc/7FPD-NL4E ................................................... 13

Howard Berkes, Anna Boiko-Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating
  Despite Injuries, Violation And Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v 13

Jack Dolan, Rob Barry, & Matthew Haggman, *Ex-convicts active in mortgage fraud*, Miami
  Herald, July 20, 2008, https://perma.cc/8AXS-7C4C ................................................ 6

Janet Roberts, *Data for Criminal Justice Stories*, Investigative Reporters and Editors Conference
  (2008), *available at* http://bit.ly/2vlRf7I.................................................................. 7

Jeff Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*,
  Apr. 18, 2017, https://perma.cc/2PFX-6BX5............................................................. 13

Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff Reach Back to 2008 Case*, Wall
  Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe ................................................ 6

Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration
  Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w...................................... 8

Jonathan D. Silver, *Defaulting developer is target of fraud probe*, Pittsburgh Post-Gazette, Feb.
  14, 2009, http://bit.ly/2wpfFAX............................................................................... 13

Joseph Cox, *Unsealed Court Docs Show FBI Used Malware Like 'A Grenade'*, Motherboard,
  Nov. 7, 2016, http://bit.ly/2uMX2XH ....................................................................... 5

Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*,
  Politico, Aug. 10, 2017, http://politi.co/2iewDfK..................................................... 8

Kate Willson, *How to Search Federal Court Records*, International Consortium of Investigative
  Journalists, Mar. 30, 2012, http://bit.ly/2vG6Miw .................................................. 6

Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17,
  2017, https://perma.cc/ALG4-8TNR.......................................................................... 12

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse
  Reporter*, 9 J. App. Prac. & Process 299 (Fall 2007)............................................... 7

Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From Shadowy Cigarette Sales*,
  N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq ................................................. 6

Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017,
  **h**ttps://perma.cc/6YN5-U2QG ................................................................................ 12

Michael Harriot, *Everything You Think You Know About the Death of Mike Brown Is Wrong, and
  the Man Who Killed Him Admits It*, TheRoot, Mar. 15, 2017, **https://perma.cc/2L6D-BB53** . 5

Robert Snell, *Feds use anti-terror tool to hunt the undocumented*, Detroit News, May 18, 2017,
  https://perma.cc/86TB-D245..................................................................................... 12

Susan E. Seager, *Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40 Years Ago*, Comm. Law, Spring 2016 ..................................................... 7

Toni Locy, *Covering America's Courts* (2013) ............................................................................. 8

Wesley Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash. Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5 ........................................................ 5

Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X .............................. 8

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

*Amici curiae* are the Reporters Committee for Freedom of the Press and American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, The Center for Investigative Reporting, First Amendment Coalition, First Look Media Works, Inc., International Documentary Assn., Investigative Reporting Workshop at American University, The Media Consortium, MPA - The Association of Magazine Media, National Press Photographers Association, Online News Association, Radio Television Digital News Association, Reporters Without Borders, The Seattle Times Company, Society of Professional Journalists, and Tully Center for Free Speech.  A supplemental statement of identity and interest of *amici* is included below as Appendix A.  Pursuant to Local Civ. R. 7(o), *amici* have submitted a motion for leave to file their brief as *amici curiae*.[1]

As representatives and members of the news media, *amici* have a strong interest in ensuring that the press and the public have ready access to court documents.  Members of the news media frequently use court records to report on matters of public concern, and such records serve as the foundation for reporting on the justice system, including important criminal and civil proceedings.  Because the news media serves as a conduit through which the public receives information, when reporters cannot access court records, it is the public that loses.

The E-Government Act of 2002 permits the Judicial Conference to charge reasonable fees for electronic access to court records "only to the extent necessary."  Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (Dec. 17, 2002) (28 U.S.C § 1913 note) (hereinafter "E-

---

[1] Counsel for *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than *amici*, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

Government Act of 2002"). Charging fees through the Public Access to Court Electronic Records system ("PACER") which are higher than the cost of dissemination impinges on access to court records by journalists and members of the public. Independent journalists and local news media, in particular, cannot afford to pay excessive fees. It is vital that access to these important records is not inhibited by fees in excess of what the E-Government Act of 2002 permits. *Amici* write to emphasize the importance of unfettered access to court records by all members of the press and the public.

## SUMMARY OF ARGUMENT

Access to court records is essential to the public's understanding of our judicial system. Court records shed light on the actions of parties, counsel, and the judiciary, as well as the basis for judicial decisions and orders. Access to court records discourages corruption and obfuscation—the eradication of which is essential to a democracy. The news media frequently relies on court records to report on criminal and civil cases, and media coverage permits the public to engage in meaningful discussion about the judicial system and the allegations made or issues raised in particular cases. Unfettered and inexpensive access to court documents promotes accuracy and fairness in the news media's reporting and, therefore, the public's knowledge.

Ready access to court records is also consistent with First Amendment values. The U.S. Supreme Court and U.S. Court of Appeals for the D.C. Circuit have recognized that the First Amendment and common law create presumptions of access to judicial proceedings and judicial records and that such access is essential to a healthy democracy and judicial system. The E-Government Act of 2002's limitation on fees for access to court records through PACER to cover only the cost of dissemination is consonant with the constitutional and common law presumptions of access to court records.

In contrast, imposing fees for access to court records higher than the cost of dissemination—and higher than what the E-Government Act of 2002 permits—erects an improper barrier to public access.  The impact will be felt throughout the broad community of PACER users but particularly at news organizations.  As news outlets' budgets shrink, even large media companies are daunted by higher fees for court records.  Independent journalists and community news media companies are even less able to pay such fees.  Thus, charging fees for court records beyond the cost of dissemination not only violates the E-Government Act of 2002, but also inhibits the press from producing original reporting about cases of public importance.  It is also out of step with vast benefits to judicial administration brought on by digitization.

Because the government is charging fees for access to judicial records that are not authorized by the E-Government Act of 2002 and such charges harm the press and public's ability to access court records, *amici* urge this Court to grant Plaintiffs' motion for summary judgment as to liability.

**ARGUMENT**

I. **The public and the press benefit from unfettered access to electronic court records.**

    A.    The news media uses electronic court records to inform the public about matters of public concern.

A wide variety of news organizations use PACER to access electronic records in the federal district and appellate courts and to report on a broad array of topics important to the public interest. Journalists routinely rely on electronic court records to report on matters concerning public safety, government misconduct, and public controversy and to conduct in-depth investigations on matters of public concern.

News organizations have used court records available through PACER to report on civil disputes that implicate public safety. For example, in March of 2017, *The New York Times* relied on federal court documents that raised questions about the safety of certain pesticides manufactured by Monsanto to report on those concerns. *See, e.g.*, Danny Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents*, N.Y. Times, Mar. 14, 2017, http://nyti.ms/2mLxYuW. The records also revealed disagreement within the Environmental Protection Agency over its safety assessment of the pesticide's main ingredient, a possible carcinogen. *Id.* Similarly, in 2007, Law360 reported on a putative class action lawsuit against a crib manufacturer that accused the company of negligence after its crib allegedly caused the death of at least one infant. Anne Urda, *Mother Blasts Crib Company in Court*, Law360, Sept. 26, 2007, https://perma.cc/2ZNY-EYR9. The report quoted from the complaint's description of the crib's defects, explaining that the crib could develop "'a dangerous gap leading to a child falling through and being trapped between the side rail and the mattress.'" *Id.*

In addition, reporters have used court records available on PACER to inform the public about possible government misconduct or controversial government activities. In 2016, for

example, Motherboard used federal court records to report that the FBI may have illegally

exceeded the scope of search warrants that authorized them to use a form of malware against

specific users of the email service TorMail.  Joseph Cox, *Unsealed Court Docs Show FBI Used

Malware Like 'A Grenade'*, Motherboard, Nov. 7, 2016, http://bit.ly/2uMX2XH.  According to

one expert, the FBI delivered the malware to "innocent TorMail users" and did not inform the

federal court "about the extent to which they botched the TorMail operation." *Id.*  In another

example, in 2013, USA TODAY reported on controversial sting operations conducted by the

U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Brad Heath, *ATF uses fake drugs,

big bucks to snare suspects*, USA TODAY (June 27, 2013), https://perma.cc/U5LF-JZGV.  USA

TODAY reporters reviewed "thousands of pages of court records" to "tell the story of how an

ATF strategy meant to target armed and violent criminals has regularly used risky and expensive

undercover stings to ensnare low-level crooks." *Id.*

Court records available through PACER also shed light on ongoing matters of public

debate.  After the shooting of Michael Brown by a Ferguson, Missouri police officer, *The

Washington Post* relied on federal court records to report that the officer had made a sworn

admission that he and other officers had used a racial slur to describe black people.  Wesley

Lowery, *Darren Wilson told attorneys he and other Ferguson officers used the n-word*, Wash.

Post, Mar. 14, 2017, https://perma.cc/6RQS-52A5.  This report, and the court records upon

which it was based, informed public discussion concerning Mr. Brown's shooting, which

prompted nationwide protests.  *Id.*; *see also* Michael Harriot, *Everything You Think You Know

About the Death of Mike Brown Is Wrong, and the Man Who Killed Him Admits It*, TheRoot,

Mar. 15, 2017, https://perma.cc/2L6D-BB53 (discussing competing interpretations of the court

records reported by *The Washington Post*).  In addition, after the Department of Justice sought to

compel Apple Inc. to unlock a smartphone belonging to the man who shot and killed 14 people in San Bernardino in December 2015, reporters from *The Wall Street Journal* used federal court records to report about the first case, in 2008, in which a federal judge ordered Apple to assist the government in unlocking a phone.  Joe Palazzolo & Devlin Barrett, *Roots of Apple-FBI Standoff Reach Back to 2008 Case*, Wall Street J., Apr. 7, 2016, http://on.wsj.com/2x82QMe.

Investigative journalists, too, routinely rely on court records available through PACER to uncover stories important to the public interest.  *See* Kate Willson, *How to Search Federal Court Records*, International Consortium of Investigative Journalists, Mar. 30, 2012, http://bit.ly/2vG6Miw.  For example, *New York Times* reporter Matt Apuzzo used court records from a federal racketeering lawsuit, some of which were available on PACER, to write an in-depth report revealing that agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives "used a web of shadowy cigarette sales to funnel tens of millions of dollars into a secret bank account."  Matt Apuzzo, *A.T.F. Filled Secret Bank Account With Millions From Shadowy Cigarette Sales*, N.Y. Times, Feb. 22, 2017, https://nyti.ms/2lurrCq.  In addition, *The Miami Herald* won the Gerald Loeb Award for a series of stories that relied on federal court records and other documents to report lapses by Florida regulators that allowed thousands of convicted felons to work in the state's mortgage industry, some of whom went on the steal millions of dollars from lenders and borrowers.  *See* Jack Dolan, Rob Barry, & Matthew Haggman, *Ex-convicts active in mortgage fraud*, Miami Herald, July 20, 2008, https://perma.cc/8AXS-7C4C; *About the Herald Investigation*, Miami Herald, July 20, 2008, https://perma.cc/6M9D-HB8D.  Reliance on PACER is so routine that organizations for investigative journalists even provide training on how to use the system to unearth important news stories.  Willson, *supra*; *see also* Janet Roberts, *Data for Criminal Justice Stories*,

Investigative Reporters and Editors Conference (2008), *available at* http://bit.ly/2vlRf7I

(directing reporters to PACER for federal court records in criminal cases).

> B.   Ready access to electronic court records prompts fairness and accuracy in
>       <u>reporting.</u>

Court records are among the most reliable sources of information for reporting on

lawsuits and matters of public concern.  As official, primary sources, court records are essential

to reporters' ability to report the news accurately and completely.  As longtime U.S. Supreme

Court correspondent Lyle Denniston has noted:

> No courthouse reporter can do his or her work without prompt——
> sometimes, virtually immediate—access to original documents. . . .
> News reporters and editors are fond of saying that a reporter is only
> as good as his or her sources.  For the courthouse reporter—indeed,
> for any reporter who would undertake to cover the law, possibly at
> any level—there is no source equal to, and certainly none superior
> to, an actual document.

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse*

*Reporter*, 9 J. App. Prac. & Process 299, 299–300 (Fall 2007).

Reporting on legal disputes is most authoritative and accurate when court records are

readily available for inspection, copying, and reference by members of the news media.  Indeed,

many states have recognized the reliability of reporting based on official records by adopting a

common law or statutory fair report privilege that shields reporters from liability when they

accurately report material from official meetings, records, or statements.  *See* Susan E. Seager,

*Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair*

*Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40*

*Years Ago*, Comm. Law, Spring 2016, at 1 n.1 (noting that "[a]t least 47 states and the District of

Columbia have adopted either a common law or statutory fair report privilege"); *see also Cox*

*Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975) (stating that "[g]reat responsibility is . . .

placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations").

Reporters and their readers benefit tremendously when news reports can reference and quote directly from court documents.  In a textbook on legal news reporting, professor and veteran journalist Toni Locy stresses this point.  *See* Toni Locy, *Covering America's Courts* 61– 67 (2013)**Error! Bookmark not defined.** (focusing on the theme that, when reporting on courts, "reading is fundamental").  Locy advises reporters not to rely solely on press releases and statements given by attorneys and instead to "review[] court filings or other public records," among other things, to determine whether and how a fact or allegation should be reported.  *Id*. at 3–4, 9.

Moreover, in the digital age, when media outlets are no longer constrained by space in the same way they once were in print, many choose to publish the court records behind a report by posting them alongside a story or linking to them.  *See* Craig Silverman, *Show the reporting and sources that support your work*, American Press Institute, Sept. 24, 2014, https://perma.cc/M8UU-H6E5; *see also, e.g.*, Joel Rose & Jessica Taylor, *DOJ Files Brief In Appeals Court, Defending Trump's Immigration Executive Order*, NPR, Feb. 6, 2017, http://n.pr/2kM3J6w (reporting on and embedding DOJ brief filed in the Ninth Circuit); Josh Gerstein, *Legal fight breaks out over deposition of Trump dossier author Christopher Steel*, Politico, Aug. 10, 2017, http://politi.co/2iewDfK (reporting on and linking to motion to intervene to oppose a deposition and opposition filed in response in the Southern District of Florida); Zoe Tillman, *Lawsuit Accuses Baton Rouge Police Of Excessive Force During Protests Over Alton Sterling's Death*, BuzzFeed, July 10, 2017, http://bzfd.it/2wYaF3X (reporting on and linking to

complaint filed in the Middle District of Louisiana).

In short, access to court records makes reporting more accurate, fair, and transparent. Reporters with access to primary source materials are more likely to get the story right when reporting on legal news.  And publication of court records alongside such stories enhances readers' trust by allowing readers to read the documents themselves and hold reporters accountable for the facts underlying a story.  These benefits of access to court records can accrue, however, only if news organizations can afford to access them.

## II.  The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with First Amendment values.

The common law provides a broad presumptive right of access to judicial documents. *See Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents"); *United States v. Hubbard*, 650 F.2d 293, 314 (D.C. Cir. 1980) (recognizing "this country's common law tradition of public access to records of a judicial proceeding").  In addition, the U.S. Supreme Court has recognized a First Amendment right of access to criminal proceedings.  *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press–Enterprise II*"); *Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press–Enterprise I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).  The D.C. Circuit has also found that the First Amendment "guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed."  *Wash. Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991).

These presumptions of access arise from the public's interest in observing matters before the federal courts.  *See Globe Newspaper Co*, 457 U.S. at 606.  Public access to judicial

proceedings and records "permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Id.*; *Hubbard*, 650 F.2d at 314–15 (explaining that "access to records serves the important functions of ensuring the integrity of judicial proceedings in particular"). As the U.S. Supreme Court has explained, "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed[.]" *Press-Enterprise I*, 464 U.S. at 508. Thus, "[i]n addition to ensuring actual fairness, the openness of judicial proceedings helps ensure the appearance of fairness." *In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 90 (D.D.C. 2008).

Indeed, the public's interest in obtaining information contained within judicial documents plays a key role in determining whether access is allowed under both the common law and First Amendment. The common law test requires courts to "weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts." *Nixon*, 435 U.S. at 602. The First Amendment standard employs the well-established "experience and logic" test, examining both whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 8.

Although the presumptions of access apply to all members of the public, access to court records by the news media is especially important because the press serves as a conduit of information for the public. *See Richmond Newspapers, Inc.*, 448 U.S. at 573 (stating that members of the press often "function[] as surrogates for the public" by, for example, attending proceedings, reviewing court documents, and reporting on judicial matters to the public at large). The American people rely on the news media for information. "'[A]n untrammeled press [is] a

vital source of public information,' . . . and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (alterations in original)); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) (writing that "the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. . . .The press was protected so that it could bare the secrets of government and inform the people"). The U.S. Supreme Court has recognized that the news media plays a vital role in facilitating public monitoring of the judicial system, in particular. As the Court has noted:

> A responsible press has always been regarded the handmaiden of effective judicial administration, especially in the criminal field. . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

The E-Government Act of 2002's authorization of the judiciary to prescribe "reasonable fees" for access to electronic court records "only to the extent necessary" is consistent with the presumption of access found in the First Amendment and common law. In addition, the Electronic Public Access Fee Schedule's fee waiver provision, which was implemented at the direction of Congress and applies when a requester demonstrates a waiver "is necessary. . . to avoid unreasonable burdens and *to promote public access to information*," is also in accord with the constitutional and common law presumptions of access. *See* Electronic Public Access Fee Schedule, PACER, https://www.pacer.gov/documents/epa_feesched.pdf (Effective Dec. 1, 2013) (emphasis added); *In re Application for Exemption from Electronic Public Access Fees by Gollan & Shifflet*, 728 F.3d 1033, 1035 (9th Cir. 2013) ("*In re Application for Exemption*")

(stating that "Congress directed to the Judicial Conference to provide for exempting persons or classes or persons for whom fees would be an unreasonable burden" (internal quotation marks omitted)).  These provisions, if followed, promote the openness that is "an indispensable attribute" of the judicial system.  *Richmond Newspapers*, 448 U.S. at 569.

### III.    PACER fees in excess of those authorized by the E-Government Act of 2002 hinders journalists and members of the public from accessing court records.

The news media today faces serious financial stresses.  "Eight years after the Great Recession sent the U.S. newspaper industry into a tailspin, the pressures facing America's newsrooms have intensified to nothing less than a reorganization of the industry itself."  Amy Mitchell & Jesse Holcomb, *State of the News Media 2016*, Pew Research Center, June 15, 2016, https://perma.cc/5ZPF-Q3H5.  In response, many newsrooms have cut jobs; the newspaper workforce has shrunk by nearly 40% in the last twenty years, and cuts continue to occur.  *See id.* at 9 (Michael Barthel, *Newspapers: Fact Sheet*); *see also, e.g.*, Keith J. Kelly, *NY Times will cut budget and staff to reach digital demands*, N.Y. Post, Jan. 17, 2017, https://perma.cc/ALG4-8TNR; Dylan Byers, *Time Inc. cuts 300 positions*, CNNMoney.com, June 13, 2017, https://perma.cc/UA3K-G99G; Michael Calderone, *The Guardian Continues to Pare U.S. Edition*, HuffPost, Mar. 22, 2017, https://perma.cc/6YN5-U2QG.

As newsrooms across the country, and their budgets, continue to shrink, substantial fees for court records are a burden to even established news organizations.  *See* Mitchell & Holcomb, *supra.*  Local and freelance journalists who lack institutional support are even less likely to be able to pay high PACER fees.  *See, e.g.*, Erik Sass, *Signs of the Times: More Local Newspapers Closing*, MediaPost, Feb. 10, 2017, https://perma.cc/LE6H-UWAG.  If they cannot afford to access to court records, these community news outlets will lose a valuable source of information for informing the public on local events.  *See, e.g.*, Robert Snell, *Feds use anti-terror tool to hunt*

12

*the undocumented*, Detroit News, May 18, 2017, https://perma.cc/86TB-D245 (using court

records from Eastern District of Michigan to report government's use of cellphone tracking to

track undocumented immigrants in Michigan); Jonathan D. Silver, *Defaulting developer is target*

*of fraud probe*, Pittsburgh Post-Gazette, Feb. 14, 2009, http://bit.ly/2wpfFAX (reporting about

the local targets of a federal mortgage fraud conspiracy probe using federal court records); Jeff

Sturgeon, *Former Giles County doctor, stripped of license, faces federal criminal probe*, Apr.

18, 2017, https://perma.cc/2PFX-6BX5 (relying on federal court records "posted to the online

federal case management system" to report about a local doctor being investigated by federal

authorities following drug overdose deaths of 20 of his patients); Howard Berkes, Anna Boiko-

Weyrauch, & Robert Benincasa, *Coal Mines Keep Operating Despite Injuries, Violation And*

*Millions In Fines*, NPR, Nov. 12, 2014, http://n.pr/1zkB86v (reporting results of joint

investigation by NPR and *Mine Safety & Health News*, a legal reporting service for the U.S.

mining industry, that used federal court records and other government documents to show that

thousands of mine operators fail to pay safety penalties).

PACER fees in excess of those authorized by the E-Government Act of 2002 may also be

prohibitively expensive for investigative journalists, who often need to look at court documents

in the aggregate for large-scale analysis.  *See* Harlan Yu & Stephen Schultze, *Using Software to*

*Liberate U.S. Case Law*, 18 ACM XRDS 12 (2011), *available at* https://perma.cc/7FPD-NL4E

(noting that users such as academics and journalists "who want to study large quantities of court

documents are effectively shut out" because of PACER fees).  Because PACER charges a user

by the page for certain activities like downloading a PDF or making a search query, *see*

Electronic Public Access Fee Schedule, *supra*, the larger the data set the user seeks, the higher

the cost.  As aggregate data analysis has become an increasingly important tool for investigative

journalists, PACER fees have become palpably more burdensome.  *See, e.g.*, *In re Application for Exemption*, 728 F.3d at 1035–36 (affirming denial of temporary PACER fee waiver sought by two reporters so they could "comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identifying situations requiring their recusal'" and publish their findings).

Moreover, members of the news media are often unable to obtain fee waivers for PACER fees, even when reporting on stories of public interest.  The Electronic Public Access Fee Schedule expressly states that courts "should not exempt . . . members of the media" from payment of PACER fees.   Electronic Public Access Fee Schedule, *supra*.  Even if non-profit media organizations may, in some cases, be granted fee waivers, *see In Re Application for Exemption*, 728 F.3d at 1040 n.5, the vast majority of news organizations are for-profit and therefore unable to obtain waivers of PACER fees, even if they cannot afford them.

In short, newsgathering is substantially hindered by PACER fees in excess of the cost of dissemination, which is the amount authorized by the E-Government Act of 2002, and members of the news media are generally not eligible for fee waivers.  Charging PACER fees greater than those permitted by law negatively impacts the news media's—and therefore the public's—right to access court records and impinges upon the distribution of information necessary to informed communities and a healthy democracy.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully request that this Court grant

judgment in favor of Plaintiffs.

Respectfully submitted,

/s/ *Bruce D. Brown*
Bruce D. Brown
*Counsel for Amici Curiae*
THE REPORTERS COMMITTEE
    FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

Dated: September 5, 2017

## CERTIFICATE OF COMPLIANCE

I, Bruce Brown, do hereby certify: (1) Brief of *Amici Curiae* complies with the type-volume limitation Fed. R. App. P. 29(a)(5) because it contains 4,220 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); (2) Brief of *Amici Curiae* complies with Local Civ. R. 7(o)(4) because it does not exceed 25 pages; and (3) Brief of *Amici Curiae* complies with the typeface requirements of Local Civ. R. 5(d) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 12-point Times New Roman.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

16

**CERTIFICATE OF SERVICE**

I, Bruce Brown, hereby certify that on September 5, 2017, I electronically filed the

foregoing document with United States Court of Appeals for the District of Columbia by using

the CM/ECF system. I certify that the following parties or their counsel of record are registered

as ECF filers and that they will be served through the CM/ECF system.

Dated: September 5, 2017

/s/ Bruce D. Brown
*Counsel for Amici Curiae*

## APPENDIX A

### SUPPLEMENTAL STATEMENT OF IDENTITY OF *AMICI CURIAE*

**The Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas.  ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders.  Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press Media Editors** is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence.  APME advances the principles and practices of responsible journalism; supports and mentors a diverse network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**The Center for Investigative Reporting** (CIR) believes journalism that moves citizens to action is an essential pillar of democracy. Since 1977, CIR has relentlessly pursued and revealed injustices that otherwise would remain hidden from the public eye.  Today, we're upholding this legacy and looking forward, working at the forefront of journalistic innovation to produce important stories that make a difference and engage you, our audience, across the aisle, coast to coast and worldwide.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people.  The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy.  To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media Works, Inc.** is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

**The International Documentary Association** (IDA) is dedicated to building and serving the needs of a thriving documentary culture.  Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Workshop**, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom.  The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**The Media Consortium** is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

**MPA - The Association of Magazine Media**, ("MPA") is the largest industry association for magazine publishers.  The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles.  The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans.  The MPA has a long history of advocating on First Amendment issues.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems.  ONA hosts the annual Online News Association conference and administers the Online Journalism Awards.  ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism.  RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries.  RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## APPENDIX B

### ADDITIONAL COUNSEL FOR *AMICI CURIAE*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
*Counsel for Association of Alternative Newsmedia*

Judy Alexander
Chief Legal Counsel
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, California 94608

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

James Cregan
Executive Vice President
MPA - The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*