**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA <br><br> *Defendant*. | Civil Action No. 16-745 (ESH) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE AND RESPONSE
TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7(h), Defendant submits the following list of material facts as to which there is no genuine dispute:

1.     PACER fees find their origin in a 1988 decision of the Judicial Conference to authorize "an experimental program of electronic access for the public to court information in one or more district, bankruptcy, or appellate courts[.]" Rep. of Proceedings of the Judicial Conference of the United States at 83 (Sept. 18, 1988)

2.     The Judicial Conference authorized the Committee on Judicial Improvement "to establish access fees during the pendency of the program." *Id.*

3.     In 1989, the Judicial Conference voted to recommend that Congress credit to the judiciary's appropriations account any fees generated by providing electronic public access to court records. *See* Rep. of Proceedings of the Judicial Conference of the United States at 19 (Mar. 14, 1989).

4.      In the Judiciary Appropriations Act of 1990, Congress established the judiciary's right to retain revenues from fees generated through the provision of court records to the public. *See* Pub. L. No. 101-162, § 406(b).

5.      In 1990, the Judicial Conference approved an initial rate schedule for electronic public access to court data via the PACER system.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 21 (Mar. 13, 1990).

6.      In the Judicial Appropriations Act of 1991, Congress instituted a requirement that the Judicial Conference set a schedule of "reasonable fees … for access to information available through automatic data processing equipment." Pub. L. No. 101-515, § 404.

7.      Through the Judicial Appropriations Act of 1991, Congress determined that PACER users, rather than taxpayers generally, should fund public access initiatives.  Congress further required that the Judicial Conference submit each such fee schedule to Congress at least thirty days before its effective date.  *See* Pub. L. No. 101-515, § 404.

8.      Congress directed that all such fees collected for services rendered be deposited into the Judiciary Automation Fund ("JAF")[1] to reimburse expenses incurred in providing such services to the public.  Pub. L. No. 101-515, § 404.

9.      In the Judicial Appropriations Act of 1992, Congress expressly required that the Judicial Conference "shall hereafter prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, and 1930 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment."  Pub. L. No. 102-140.

---

[1] The Judiciary Automation Fund was renamed the Judiciary Information Technology Fund.  *See* 28 U.S.C. § 612.

10.     Congress also allowed that fees need not be collected for all access; rather the "fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. *Id.*

11.     The House Appropriations Committee report for the Judicial Appropriations Act of 1993 expressly stated that charging fees for public access was "desirable."  H. Rep. No. 102-709.

12.     The Judicial Conference later expanded the fee schedule to cover access to public records in appellate courts and the Court of Federal Claims.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 44–45 (Sept. 20, 1993); Rep. of Proceedings of the Judicial Conference of the United States at 16 (Mar. 15, 1994).

13.     Congress also required that the public access fee schedule be expanded to cover multidistrict litigation.  *See* Pub. L. No. 104-317, § 403.

14.     In 1996, the Judicial Conference also approved a reduction in the fee for electronic public access for dial-up Internet connections.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 16 (Mar. 13, 1996).

15.     Congress repeatedly expressed its intention that the Judicial Conference use the fees generated from electronic public access services to improve and update various public access platforms.  For instance, the Senate Committee on Appropriations Report for the Judicial Appropriations Act of 1997 stated:

> The Committee supports the ongoing efforts of the Judiciary to improve and expand information made available in electronic form to the public.  Accordingly, the Committee expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information.  The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy noticing.

3

S. Rep. No. 104-676 at 89.

16.     In 1998, the Judicial Conference determined that with the introduction of Internet technology to the judiciary's current public access program, it would include a per-page fee for access, while introducing new technologies to expand public accessibility to information via PACER.  Specifically, the Judicial Conference established a fee of $0.07 per page for access to certain court records on PACER.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 64–65 (Sept. 15, 1998)

17.     In 2001, the Judicial Conference provided that attorneys of record and parties in a case would receive one copy of all filed documents without charge and also that no fee will be owed until an individual account holder accrues more than $10 in a calendar year.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 12–13 (Mar. 14, 2001)

18.     In 2002, the Judicial Conference established a fee cap for accessing any single document, where there will be no charge after the first thirty pages of a document.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 11 (Mar. 13, 2002).

19.     In 2002, Congress passed the E-Government Act of 2002.  *See* Pub. L. No. 107-347.

20.     The E-Government Act amended existing law to remove the requirement that the Judicial Conference "shall hereafter prescribe fees" for public access to, instead, provide that the Judicial Conference "may, only to the extent necessary, prescribe reasonable fees."  Pub. L. No. 107-347.

21.     The E-Government Act also included several directives, including that all federal courts have websites with certain general court information (*e.g*., courthouse location, contact information, local rules, general orders, docket information), that all court opinions issued after

April 16, 2005, be available in text-searchable format, and that an annual report be provided to Congress identifying any court requesting a deferral from these requirements.   *See* Pub. L. No. 107-347, § 205.

22.     The E-Government Act did not include any provisions regarding sources of funding for providing this information other than the "reasonable fees prescribed by the Judicial Conference for electronic access to information stored in automated data processing equipment." Pub. L. No. 102-140, § 303(a); Pub. L. No. 104-347, § 205.

23.     In 2003, the House Appropriations Committee stated that it "expect[ed] the fee for the Electronic Public Access program to provide for Case Management Electronic Case File ("CM/ECF") system enhancement and operational costs."  H. Rep. No. 108-221 at 116; *see also* H. Rep. No. 108-401 ("the conferees adopt the House report language concerning Electronic Public Access fees.").

24.     Similarly, the Senate Appropriations Committee stated that it was "impressed and encouraged" by the "new and innovative" CM/ECF system and that it expected a report on "the savings generated by this program at the earliest date possible."  S. Rep. No. 108-144 at 118.

25.     In order to provide sufficient revenue to support the CM/ECF operational and maintenance costs that Congress expected, the Judicial Conference issued a new rate schedule, charging $0.08 per page.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 12 (Sept. 21, 2004).

26.     The Senate Committee on Appropriations Report for the Judicial Appropriations Act of 1999 provides that the Committee "supports efforts of the judiciary to make information available to the public electronically, and expects that available balances from public access fees

in the judiciary automation fund will be used to enhance the availability of public access."  S. Rep. No. 105-235, at 114.

27.     In 2007, the Administrative Office of the U.S. Courts ("AO") submitted the Judiciary's Fiscal Year ("FY") 2007 Financial Plan to both the House and Senate Appropriations Committees that, among other things, provided for "expanded use of the Electronic Public Access ('EPA') revenues."  Judiciary FY07 Financial Plans (Mar. 14, 2007).

28.     On May 2, 2007, the Appropriations Committees sent letters to the AO, stating that the Committees had "reviewed the information included and ha[d] no objection to the financial plan including the following proposal[ ]: … the expanded use of [EPA] Receipts."  Ltr. from Sens. Durbin and Brownback (May 2, 2007); Ltr. from Rep. Serrano (May 2, 2007).

29.     The AO submitted its FY 2007 Financial Plan to both Appropriations Committees, outlining various courtroom technology installations and maintenance that would be funded through EPA revenues.  Declaration of Wendell A. Skidgel Jr. ("Skidgel Decl."), Ex. K at 43. These expenditures were approved through the Financial Services and General Government Appropriations Act of 2008.  Pub. L. No. 110–161.

30.     In 2011, the Judicial Conference amended the PACER fee schedule, raising the per-page cost to $0.10.  *See* Rep. of Proceedings of the Judicial Conference of the United States at 16 (Sept. 13, 2011).

31.     The Judicial Conference noted, in raising the PACER fee schedule to $0.10 per page, the existing statutory and policy requirements of charging fees commensurate with the cost of providing existing services and developing enhanced services.  *See id.*

32.     The Judicial Conference also recognized that it had not increased PACER access fees since 2005 and also that its EPA obligations during the past three fiscal years had exceeded revenue.  *See id.*

\*       \*       \*

Pursuant to Local Rule 7(h), Defendant submits the following response to Plaintiffs' Statement of Undisputed Material Facts.  As many of Plaintiffs' statements consist of immaterial facts, mischaracterizations of the record, and improper argument, all in violation of Local Rule 7(h), the fact that Defendant denies any of Plaintiffs' statements does not preclude this Court from granting Defendant's Cross-Motion for Summary Judgment.  The following responds to each numbered paragraph included in Plaintiffs' Statement of Undisputed Material Facts:

1.-4. Admitted.

5.   Denied, except to admit that no fee is owed for electronic access to court data or audio files via PACER until the account holder accrues charges of more than $15.  A person accessing an electronically filed document for the first time who is a party in a case does not incur a fee; no fee is charged for access to judicial opinions; and no fee is charged for viewing case information or documents at courthouse public access terminals.  Taylor Decl. Ex. A at 2.

6.-8. Admitted

9.   Defendant admits that the language similar to that cited can be found in Exhibit B to the Taylor Declaration, but also notes that each page of the document (Electronic Case Files in the Federal Courts: A Preliminary Examination of Goals, Issues, and the Road Ahead – Discussion Draft) contains a footer stating:

> This paper was prepared by staff of the Administrative Office of the United States Courts, with substantial assistance from judges and court staff, to aid the deliberations of the Judicial Conference of the United States and its committees. The ideas expressed in this paper do not necessarily reflect the policies of the

Conference or any committee thereof, any court of the United States, or the
Administrative Office.

Taylor Decl. Ex. B.

10.-11. Admitted.

12. Defendant admits that language similar to that cited can be found in the cited statute,
but denies that Plaintiffs' selective quotations from the statute present a fair reading of the
enactment.  *See* Pub. L. No. 107-347, § 205; Pub. L. No. 102-140, § 303; Pub. L. No. 101-515,
§ 404; 28 U.S.C. § 612.

13.  Defendant admits that Plaintiffs have accurately quoted the selected language from the
Congressional enactment found in the note to 28 U.S.C § 1913, but denies that these selective
quotations present a fair reading of the enactments reflected in the legislation.  *See, e.g.,* Pub. L.
No. 102-140, § 303; Pub. L. No. 104-317, § 403; Pub. L. No. 107-347, § 205.

14.  Defendant admits that, where a per-page fee was charged, it was not reduced, but notes
that the Judiciary did, as contemplated in the E-Government Act, increase the amount of data it
made freely available. Taylor Decl. Ex. L.

15.  Defendant admits this statement and notes that "[t]his increase is predicated upon
Congressional guidance that the judiciary is expected to use Pacer fee revenue to fund CM/ECF
operations and maintenance."  Taylor Decl. Ex. E.

16.  Defendant admits this statement, except to note that the correct terminology for what
Plaintiffs call a surplus is an unobligated available balance, as allowed for in the legislation
creating the Judiciary Information Technology Fund ("JITF").  28 U.S.C. § 612; Pub. L. No. 101-
162, § 404(b)(1).

17. Defendant admits that Plaintiffs have accurately quoted the selected language from the
cited document, but denies that their selective quotations from the document present a fair reading

of the contents, noting, for instance, that Plaintiffs have omitted the following language from Exhibit F (JITF annual report): "in accordance with authorizing legislation"; "with the authorization of Congress." Taylor Decl. Ex. F.  Defendant further notes that the "Judiciary asked for and received written consent from the Appropriations Committees to use Electronic Public Access ('EPA') receipts to support courtroom technology allotments." Ltr. from Sen. Lieberman (Taylor Decl. Ex. G at 4), *see also* Ltr. from Sens. Durbin and Brownback (May 2, 2007) (Skidgel Decl. Ex. L); Ltr. from Rep. Serrano (May 2, 2007) (Skidgel Decl. Ex. M).

18. Defendant admits that Plaintiffs have accurately quoted the selected language from the cited testimony, but denies that their selective quotations from the testimony present a fair reading of the contents, noting, for instance, that Plaintiffs have omitted the pertinent part of Judge Gibbons' statement that reads: "*Congress has authorized* the Judiciary to utilize these fees to run the PACER program as well as to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds. The Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements in the courts' Salaries and Expenses account, thereby reducing our need for appropriated funds." *See* www.uscourts.gov/file/3563/download (emphasis added).

19. Admitted.

20. Plaintiffs claim that the sole support that Director Duff offered for the view that the Judiciary was charging PACER fees only to the extent necessary was a 2004 conference report is false.  Director Duff explained that "many services and documents are provided to the public for free, and charges that are imposed are the minimum possible only to recover costs." Ltr. from Hon. Lee Rosenthal and James C. Duff to Sen. Lieberman (Mar. 26, 2009) (Taylor Decl. Ex. I). The letter further explained:  "And that as such, the Judiciary believed it was meeting the E-

Government Act's requirements to promote public access to federal court documents while recognizing that such access cannot be entirely free of charge." *Id*. The Director also reminded Senator Lieberman that eighteen years earlier, Congress mandated that the Judiciary charge user fees for electronic access to court files as a way to pay for this service." *Id*. And that, "[s]ince that time, various legislative directives have amended the mandate, mostly to expand the permissible use of the fee revenue to pay for other services related to the electronic dissemination of court information, such as the Case Management/Electronic Case Files ('CM/ECF') system and an Electronic Bankruptcy Noticing ('EBN') system." *Id*. The letter included a citation to H. Rep. No. 108-401, at 614 (adopting the language of H. Rep. No. 108-221).

21. Admitted, except to note that Plaintiffs fail to disclose that in the cited annual letter to the Appropriations Committee, Senator Lieberman expressly acknowledged that "the judiciary asked for and received written consent from the House and Senate Appropriations Committees, to "expand use of [EPA] receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance." Taylor Decl. Ex. G.

22. Admitted, except to note that Plaintiffs state that in the EPA program Summary (Taylor Decl. Ex. J) the AO posits that the fees comply with the E-Government Act because they "are only used for public access, and are not subject to being redirected for other purposes." Defendant notes that the preceding sentences state, in part:

> In order to maintain the level of service presently provided through the public access program, the Judiciary would need appropriated funds to replace the fee revenue, and in this fiscal climate increased appropriations are not available. Fee revenue allows the Judiciary to pursue new technologies for providing public access, develop prototype programs to test the feasibility of new public access technologies, and develop enhancements to existing systems. By authorizing the fee, Congress has provided the Judiciary with revenue that is dedicated solely to promoting and enhancing public access. These fees are only used for public access, and are not subject to being redirected for other purposes. The fee, even a nominal

fee, also provides a user with a tangible, financial incentive to use the system judiciously and efficiently, and in the absence of a fee the system can be abused.

Taylor Decl. Ex. J.

23.   Defendant admits the assertions in this paragraph, but also notes that all of the 2012 expenditures listed in Plaintiffs' Exhibit K, were contained in the Judiciary's 2012 spending plan, and were approved by Congress.  *See* Taylor Decl. Ex. K (Defendant's 2012 spending plan, and Plaintiff's 2012 House and Senate Appropriations Reports).

24.   The first sentence is a characterization rather than a fact, which characterization is not supported by the citation; the second sentence is admitted, but Defendant notes that the spending amounts made "information available to the public electronically" and were included in the Judiciary's yearly spending plan, was approved by Congress.  *See* Judiciary FY07 Financial Plans (Mar. 14, 2007) (Skidgel Decl. Ex. K); 2007 spending plan, Ltr. from Sens. Durbin and Brownback (May 2, 2007) (Skidgel Decl. Ex. L); Ltr. from Rep. Serrano (May 2, 2007) (Skidgel Decl. Ex. M)); S. Rep. No. 105-235 at 114 (stating that "[t]he Committee ... expects that available balances from public access fees in the judiciary automation fund will be used to enhance availability of public access.)"

25.   Defendant admits this assertion and notes that this was done in accordance with Congressional directives, and is consistent with Public Law 102-140, which states that fees collected shall be used "to reimburse expenses incurred in providing these services."  Pub. L. No. 102-140.

26. Defendant admits this assertion and notes that the Judiciary requested and received written consent from the Congressional Appropriators to use EPA funds for courtroom technology. *See* Judiciary FY07 Financial Plans (Mar. 14, 2007) (Skidgel Decl. Ex. K); 2007 spending plan,

Ltr. from Sens. Durbin and Brownback (May 2, 2007) (Skidgel Decl. Ex. L); Ltr. from Rep. Serrano (May 2, 2007) (Skidgel Decl. Ex. M)).

28. Defendant admits this assertion and notes that the Judiciary spent $110,985,208, which was $8.4 million more than was received in Fiscal Year 2010.

29. The cost of the EPA program in 2010 was $110,985,208, not $18,768,552 as Plaintiffs claim.  *See* Taylor Decl. Ex. L. at 2 (line 50).  It appears that Plaintiffs' assertion resulted from extracting a number from a place-holder subheading, under the Public Access Services and Applications Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund.  However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's Electronic Public Access Program.  Taylor Decl. Ex. L.

30. Denied, except as admitted in the paragraphs that follow.  Plaintiffs offer no citation in support of this enumerated paragraph and Plaintiffs appear to confuse the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 8, which is a description attached to Budget Organization Code ("BOC") OXEEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program.  Taylor Decl. Ex. L. at 1–2 lines 6–50 (listing the expenditures for the Judiciary's entire EPA program).

31.  Admitted.

32.  Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L, & M.

33.  Admitted.

34.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information[,]" H. Rep. No 104-676 at 89, and that the overall quality of service to the public will be improved with the availability of enhancements such as … enhanced use of the Internet," *id.*

35.  Admitted.

36.  Defendant admits this assertion and notes that Congress did "urge[] the judiciary to undertake a study of whether sharing such technology, including electronic billing processes, is a viable option."  S. Rep. No. 109-293 at 176.

37.  Admitted.

38.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as … electronic bankruptcy noticing."  H. Rep. No. 104-676 at 89.

39.-40.  Admitted.

41.  Defendant admits this assertion and notes that Congress indicated that it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Furthermore, the following are direct costs associated with development and maintenance of CM/ECF:   Software Development,

Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace CM/ECF.  Skidgel Decl. ¶ 17.

42.  Admitted.

43. Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

44.  Admitted.

45.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements

to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server).  Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors.  Skidgel Decl. ¶ 19.

46.  Admitted.

47.  The cost of the EPA program in 2011 was $108,665,271, not $3,363,770 as Plaintiffs claim.  *See* Taylor Decl. Ex. L. at 4 (line 64).  It appears that Plaintiffs' assertion results from extracting a number from a placeholder subheading, under the Public Access Services and Applications Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund.  However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's Electronic Public Access Program.  Accordingly, they are properly funded by PACER fees.  *See* Taylor Decl. Ex. L.

48.  Denied.  Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 12, which is a description attached to BOC OXEEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program.  *See* Taylor Decl. Ex. L. at 3–4 lines 9–64 (listing the expenditures for the Judiciary's entire EPA program).

15

49.  Denied, except as admitted in the paragraphs that follow.  Plaintiffs offer no citation in support of this enumerated paragraph.

50.  Admitted.

51.  Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L, & M.

52.  Admitted.

53.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information."  H. Rep. No. 104-676 at 89, and, that the overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet." *Id.*

54.  Admitted.

55.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing." H. Rep. No. 104-676 at 89.

56.  Admitted.

57.  Defendant admits this assertion and notes that Congress indicated that it "expects the fee for the [EPA] program to provide for [CM/ECF] Files system enhancements and

operational costs." H. Rep. No. 108-221 at 116. Furthermore, Software Development, Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

58.  Admitted.

59.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

60.  Admitted.

61.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the

Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet." H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303. Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server). Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors. Skidgel Decl. ¶ 19.

62. Admitted.

63. The cost of the EPA program in 2012 was $120,176,766, not $3,547,279 as Plaintiffs claim. *See* Taylor Decl. Ex. L. at 7 (line 57). It appears that Plaintiffs' assertion resulted from extracting a number from a placeholder subheading, under the Public Access Services Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund. However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's Electronic Public Access Program. Accordingly, they are properly funded by PACER fees. *See* Taylor Decl. Ex. L.

64. Denied. Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 11, which is a description attached to BOC OXEEPAX but is not an accurate representation of

the services and programs funded through the Judiciary's EPA program. *See* Taylor Decl. Ex. L. at 6–7 lines 9–57 (listing the expenditures for the Judiciary's entire EPA program).

65.  Denied, except as admitted in the paragraphs that follow.  Plaintiffs offer no citation in support of this enumerated paragraph.

66.  Admitted.

67. Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L & M.

68.  Admitted.

69.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information."  H. Rep. No. 104-676 at 89.  And that the overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet." *Id.*

70.  Admitted.

71.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet."  H. Rep. No. 104-676 at 89.

72. Admitted.

73. Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing."  H. Rep. No. 104-676 at 89.

74. Admitted.

75. Defendant admits this assertion and notes that Congress indicated that it "expects the fee for the [EPA] program to provide for [CM/ECF] system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Furthermore, Software Development, Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

76. Admitted.

77. Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at

89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

78.  Admitted.

79.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server).  Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors.  Skidgel Decl. ¶ 19.

80.  Admitted.

81.   The cost of the EPA program in 2013 was $143,339,525, not $4,652,972 as Plaintiffs claim.  *See* Taylor Decl. Ex. L. at 11 (line 66).   It appears that Plaintiffs' assertion resulted from extracting a number from a placeholder subheading, under the Public Access Services Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund.  However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's Electronic Public Access Program. Accordingly, they are properly funded by PACER fees.  *See* Taylor Decl. Ex. L.

82.   Denied.  Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 14, which is a description attached to BOC OPCEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program.  *See* Taylor Decl. Ex. L. at 9–11 lines 12–66. (listing the expenditures for the Judiciary's entire EPA program).

83. Denied, except as admitted in the paragraphs that follow.  Plaintiffs offers no citation in support of this enumerated paragraph.

84.  Admitted.

85.  Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L, & M.

86.  Admitted.

87.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements

to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet." H. Rep. No. 104-676 at 89.

88.  Admitted.

89.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet." H. Rep. No. 104-676 at 89.

90.  Admitted.

91.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet." H. Rep. No. 104-676 at 89.

92.  Admitted.

93.  Defendant admits this assertion and notes that Congress indicated that it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Furthermore, Software Development,

Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

94.  Admitted.

95.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

96.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements

to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet." H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.

97. Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs." H. Rep. No. 108-221 at 116. Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet." H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303. Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server). Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors. Skidgel Decl. ¶ 19.

98. Admitted.

99. Denied.  The cost of the EPA program in 2014 was $142,855,084, not $3,547,279 as Plaintiffs claim.  *See* Taylor Decl. Ex. L. at 13 (line 57).  It appears that Plaintiffs' assertion resulted from extracting a number from a placeholder subheading, under the Public Access Services Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund.  However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's Electronic Public Access Program. Accordingly, they are properly funded by PACER fees.  *See* Taylor Decl. Ex. L.

100.  Denied.  Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 10, which is a description attached to BOC OPCEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program.  *See* Taylor Decl. Ex. L. at 12–13 lines 8–56 (listing the expenditures for the Judiciary's entire EPA program).

101. Denied, except as admitted in the paragraphs that follow.  Plaintiffs offer no citation in support of this enumerated paragraph.

102.  Admitted.

103.  Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L, & M.

104.  Admitted.

105.  Defendant admits this assertion and notes that Congress indicated that it: "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information."  H. Rep. No. 104-676 at

89. And, that the overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet" *Id.*

106. Admitted.

107. Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as … enhanced use of the Internet." H. Rep. No. 104-676 at 89.

108. Admitted.

109. Defendant admits this assertion and notes that Congress indicated that it: "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing." H. Rep. No. 104-676 at 89.

110. Admitted.

111. Defendant admits this assertion and notes that Congress indicated that it: "expects the fee for the [EPA] program to provide for [CM/ECF] system enhancements and operational costs." H. Rep. No. 108-221 at 116. Furthermore, Software Development, Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace

CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

112.  Admitted.

113.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

114.  Admitted.

115.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements

to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet." H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.. Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server). Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors. Skidgel Decl. ¶ 19.

116. Admitted.

117. Denied. The cost of the [EPA] program in 2015 was $147,722,744, not $2,575,977 plus $642,160 as plaintiffs claim. *See* Taylor Decl. Ex. L. at 16 (line 60). It appears that Plaintiffs' assertion resulted from extracting a number from a placeholder subheading, under the Public Access Services Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund. However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's EPA program. Accordingly, they are properly funded by PACER fees. *See* Taylor Decl. Ex. L.

118. Denied. Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 12, which is a description attached to BOC OXEEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program. *See* Taylor Decl. Ex. L. at 14–16 lines 10–60 (listing the expenditures for the Judiciary's entire EPA program).

119.  Denied, except as admitted in the paragraphs that follow.  Plaintiffs offer no citation in support of this enumerated paragraph.

120.  Admitted.

121.  Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  Skidgel Decl. Exs. K at 43, L, & M.

122.  Admitted.

123.  Defendant admits this assertion and notes that Congress indicated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information," and "that the overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet."  H. Rep. No. 104-676 at 89.

124.  Admitted.

125.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet."  H. Rep. No. 104-676 at 89.

126.  Admitted.

127.  Defendant admits this assertion and notes that Congress indicated that it: "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing."  H. Rep. No. 104-676 at 89.

128.  Admitted.

129.  Defendant admits this assertion and notes that Congress indicated that it: "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs." H. Rep. No. 108-221 at 116.   Furthermore, Software Development, Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize or replace CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

130.  Admitted.

131.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for

services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.  Skidgel Decl. ¶ 18.

132.  Admitted.

133.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89.  Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.   Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server).  Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors.  Skidgel Decl. ¶ 19.

134.  Admitted.

135.   Denied.   The cost of the Electronic Public Access Program in 2016 was $150,814,134, not $748,495 plus $2,443,614 as plaintiffs claim.   Taylor Decl. Ex. L. at 19 (line 60).   It appears that Plaintiffs' assertion resulted from extracting a number from a placeholder subheading, under the Public Access Services Heading, to argue that the EPA program subheadings represent the only expenses PACER fees should fund.   However, every expenditure in the Quarterly Report comprises public access services and are part of the Judiciary's EPA program.   Accordingly, they are properly funded by PACER fees.   *See* Taylor Decl. Ex. L.

136.   Denied.   Plaintiffs appear to be confusing the EPA program (which encompasses all the electronic public access services the Judiciary provides) with the text of line item 12, which is a description attached to BOC OPCEPAX but is not an accurate representation of the services and programs funded through the Judiciary's EPA program.   *See* Taylor Decl. Ex. L. at 17–19 lines 10–60 (listing the expenditures for the Judiciary's entire EPA program).

137.   Denied, except as admitted in the paragraphs that follow.   Plaintiffs offer no citation in support of this enumerated paragraph.

138.   Admitted.

139.   Defendant admits this assertion and notes that Congress specifically authorized the use of EPA funds for courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.   Skidgel Decl. Exs. K at 43, L, & M.

140.   Admitted.

141.   Defendant admits this assertion and notes that Congress indicated that it: "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through

improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing."  H. Rep. No. 104-676 at 89.

142.  Admitted.

143.  Defendant admits this assertion and notes that providing prospective jurors with electronic copies of court documents is consistent with Congress' expectation for "the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... enhanced use of the Internet."  H. Rep. No. 104-676 at 89.

144.  Admitted.

145.  Defendant admits this assertion and notes that Congress indicated that it: "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as ... electronic bankruptcy noticing."  H. Rep. No. 104-676 at 89.

146.  Admitted.

147.  Defendant admits this assertion and notes that Congress indicated that it: "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs." H. Rep. No. 108-221 at 116.   Furthermore, Software Development, Implementation, Operations, Maintenance, Training on CM/ECF and attempts to modernize

or replace CM/ECF are direct costs associated with development and maintenance of CM/ECF.  Skidgel Decl. ¶ 17.

148.  Admitted.

149.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet."  H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services."  Pub. L. No. 102-140, § 303.  Telecommunication costs, (including communications hardware, maintenance and security services) are direct costs associated with CM/ECF, PACER, and the other public access services the Judiciary provides.   Skidgel Decl. ¶ 18.

150.  Admitted.

151.  Defendant admits this assertion and notes that Congress indicated it "expects the fee for the [EPA] program to provide for [CM/ECF] Case Files system enhancements and operational costs."  H. Rep. No. 108-221 at 116.  Congress also stated that it "expects the Judiciary to utilize available balances derived from [EPA] fees in the Judiciary Automation Fund to make information and services more accessible to the public through improvements

to enhance the availability of electronic information. The overall quality of service to the public will be improved with the availability of enhancements such as electronic case documents, electronic filings, [and] enhanced use of the Internet." H. Rep. No. 104-676 at 89. Congress also stated that "[a]ll fees … collected by the Judiciary … as a charge for services rendered shall be deposited as offsetting collections … reimburse expenses incurred in providing these services." Pub. L. No. 102-140, § 303.   Through EPA allotments, courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server).   Funding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors.   Skidgel Decl. ¶ 19.

152.   This purported fact exceeds the Court's limitation on the subject of the current briefing (*i.e.* motions as to liability), because it addresses what damages, if any, may exist. Defendant reserves the right to seek discovery into such an issue, should it be deemed significant. Moreover, the purported fact is not material to liability (or damages) because it alone does not reflect the cost of disseminating court information through PACER or otherwise in that the CM/ECF system is more than a data storage system.   Accordingly, reliance on cost of data storage alone, without factoring in the other costs associated with PACER and CM/ECF (*e.g.*, security), does not provide a meaningful analysis of the relevant expenses.   Indeed, Plaintiffs' own experts, (Lee and Lissner) readily admit that "as outside analysts with limited information, we cannot anticipate or account for all of the costs that could conceivably be associated with access to PACER records."   Lee & Lissner Decl. at 10 (ECF No. 52-15).

November 17, 2017

Respectfully submitted,

JESSIE K. LIU
D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Chief, Civil Division

By:    */s/ W. Mark Nebeker*
W. MARK NEBEKER (D.C. Bar #396739)
BRIAN J. FIELD (D.C. Bar #985577)
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2536
mark.nebeker@usdoj.gov