# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**NATIONAL VETERANS LEGAL
SERVICES PROGRAM,** *et al.*,

          **Plaintiffs,**

     **v.**

**UNITED STATES OF AMERICA,**

          **Defendant.**

        **Civil Action No. 16-745 (ESH)**

---

## <u>MEMORANDUM OPINION</u>

The federal judiciary's Public Access to Court Electronic Records ("PACER") system, which is managed by the Administrative Office of the United States Courts ("AO"), provides the public with online access to the electronic records of federal court cases. The fees for using PACER are established by the Judicial Conference of the United States Courts and set forth in the judiciary's Electronic Public Access ("EPA") Fee Schedule. In this class action, users of the PACER system contend that the fees charged from 2010 to 2016 violated federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)). Before the Court are the parties' cross-motions for summary judgment as to liability. (*See* Pls.' Mot. Summ. J., ECF No. 52; Def.'s Cross-Mot. Summ. J., ECF No. 73.) For the reasons stated herein, the Court will deny plaintiffs' motion and grant in part and deny in part defendant's motion.

# BACKGROUND

## I.     FACTUAL BACKGROUND

Although the present litigation is a dispute over whether, during the years 2010–2016, the PACER fees charged violated 28 U.S.C. § 1913 note, the relevant facts date back to PACER's creation.[1]

### A.     Origins of PACER and the Judiciary's Electronic Public Access ("EPA") Fee Schedule

In September 1988, the Judicial Conference "authorized an experimental *program of electronic access for the public to court information* in one or more district, bankruptcy, or appellate courts in which the experiment can be conducted at nominal cost, and delegated to the Committee [on Judicial Improvements] the authority to establish access fees during the pendency of the program."  (Rep. of Proceedings of the Jud. Conf. of the U.S. ("Jud. Conf. Rep.") at 83 (Sept. 18, 1988) (emphasis added) (Ex. A to the Decl. of Wendell Skidgel, Nov. 11, 2017, ECF No. 73-2 ("Skidgel Decl.")); *see also* Def.'s Statement Facts ¶¶ 1-2, ECF No. 73-3 ("Def.'s Facts")).  The following year, the Federal Judicial Center initiated pilot PACER programs in several bankruptcy and district courts.  (*See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program at 1 ("EPA Chronology") (Ex. C to the Decl. of Jonathan Taylor, Aug. 28, 2017, ECF No. 52-1 ("Taylor Decl.")).)

In February 1990, during a hearing on judiciary appropriations for 1991, a subcommittee of the House Committee on Appropriations took up the judiciary's "request[] [for] authority to collect fees for access to information obtained through automation."  *Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1991: Hearing Before*

---

[1] The facts set forth herein are undisputed.

*a Subcomm. of the H. Comm. on Appropriations*, 101st Cong. 323 (1990) ("1990 Hrg.").  It

asked a representative for the judiciary whether there were "any estimates on how much you will

collect and will this fee help offset some of your automation costs." *Id*. at 324.  The response

from the judiciary was that "estimates of the revenue that will be generated from these fees are

not possible due to the lack of information on the number of attorneys and individuals who have

the capability of electronic access," but that there "ha[d] been a great deal of interest expressed"

and it was "anticipated that the revenue generated will offset a portion of the Judiciary's cost of

automation." *Id*.  The Senate Report on 1991 appropriations bill noted that it "included language

which authorizes the Judicial Conference to prescribe reasonable fees for public access to case

information, *to reimburse the courts for automating the collection of the information*."  S. Rep.

No. 101-515, at 86 (1990) ("1990 S. Rep.") (emphasis added).

In March 1990, "barring congressional objection," the Judicial Conference "approved an

initial rate schedule for electronic public access to court data [in the district and bankruptcy

courts] via the PACER system."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990) (Skidgel Decl. Ex. C);

Def.'s Facts ¶ 5.)[2]

Then, in November 1990, Congress included the following language in the Judiciary

Appropriations Act of 1991:

> (a) The Judicial Conference shall prescribe reasonable fees, pursuant to sections
> 1913, 1914, 1926, and 1930 of title 28, United States Code, for collection by the
> courts under those sections for access to information available through automatic
> data processing equipment.  These fees may distinguish between classes of
> persons, and shall provide for exempting persons or classes of persons from the

---

[2] At that time, "PACER allow[ed] a law firm, or other organization or individual, to use a
personal computer to access a court's computer and extract public data in the form of docket
sheets, calendars, and other records."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990).)  The initial fee
schedule included a Yearly Subscription Rate ($60 per court for commercial users; $30 per court
for non-profits) and a Per Minute Charge ($1 per minute for commercial users; 50 cents per
minute for non-profits).  (*Id*.)

fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

Pub. L. 101-515, § 404, 104 Stat. 2101 (Nov. 5, 1990) (codified at 28 U.S.C. § 1913 note).[3]

Three aspects of this law are relevant to this litigation: (1) the Judicial Conference was given the authority (indeed, it was required) to charge reasonable fees for "access to information available through automatic data processing equipment,"[4] which covered its newly-developed PACER

---

[3]  The statutory sections referenced authorize the federal courts to charge certain fees. *See* 28 U.S.C. § 1913 (fees for courts of appeals); *id* § 1914 (fees for district courts); *id*. § 1926 (fees for Court of Federal Claims); *id*. § 1930 (fees for bankruptcy courts).

[4]  The term "automatic data processing equipment" is not defined in 28 U.S.C. § 1913 note, but it was defined in 28 U.S.C. § 612 as having "the meaning given that term in section 111(a)(2)(A) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2)(A))," which at that time defined it as:

> . . . any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching interchange, transmission, or reception, of data or information—
>
> . . .
>
> (B) Such term includes—
>
> (i)      computers;
> (ii)     ancillary equipment;
> (iii)    software, firmware, and similar procedures;
> (iv)     services, including support services; and
> (v)      related resources as defined by regulations issued by the Administrator for General Services.

system; (2) the Director of the AO was required to publish a "schedule of reasonable fees for electronic access to information"; and (3) the fees collected by the judiciary pursuant to that fee schedule were to be deposited in the Judiciary Automation Fund[5] "to reimburse expenses incurred in providing these services." *Id*.

In the summer of 1992, the House Committee on Appropriations issued a report that "note[d] that the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ed] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so." H.R. Rep. No. 102-709, at 58 (July 23, 1992) ("1992 H.R. Rep.") (report accompanying appropriations bill for the judiciary for fiscal year ("FY") 1993).[6]

---

[5] Congress had established the Judiciary Automation Fund ("JAF") in 1989 to be "available to the Director [of the AO] without fiscal year limitation for the procurement (by lease, purchase, exchange, transfer, or otherwise) of automatic data processing equipment for the judicial branch of the United States" and "for expenses, including personal services and other costs, for the effective management, coordination, operation, and use of automatic data processing equipment in the judicial branch." *See* Pub. L. 101-162, 103 Stat 988 (1989) (codified at 28 U.S.C. § 612(a)).  Before 28 U.S.C. § 1913 note was enacted, PACER fees were required to be deposited in the U.S. Treasury.  (*See* Jud. Conf. Rep. at 20 (Mar. 14, 1989) (Skidgel Decl. Ex. B).)  In 1989, the Judicial Conference, "[o]bserving that such fees could provide significant levels of new revenues at a time when the judiciary face[d] severe funding shortages," had "voted to recommend that Congress credit to the judiciary's appropriations account any fees generated by providing public access to court records"; determined that it would try to change that.  (*See id*.; Def.'s Facts ¶ 3; *see also* Jud. Conf. Rep. at 21 (Mar. 13, 1990) (noting that the FY 1990 appropriations act provided that the judiciary was "entitled to retain the fees collected for PACER services in the bankruptcy courts," and that the Conference would "seek similar legislative language to permit the judiciary to retain the fees collected for district court PACER services").)

[6] According to this report, the Committee believed that "more than 75 courts are providing this service, most of them at no charge to subscribers"; that "approximately a third of current access to court records is by non-Judiciary, governmental agencies" and that "fees for access in these instances are desirable"; and that it was "aware that a pilot program for the collection of fees ha[d] been successfully implemented in the Courts and encourage[d] the Judiciary to assess charges in all courts, in accordance with the provisions of section 404(a) of P.L. 101-515[.]"

In 1993, the Judicial Conference amended the fee schedules for the Courts of Appeals to include a "fee for usage of electronic access to court data" for "users of PACER and other similar electronic access systems," while deciding not to impose fees for another "very different electronic access system" then in use by the appellate courts.  (Jud. Conf. Rep. at 44–45 (Sept. 20, 1993) (Skidgel Decl. Ex. D).)[7]  In 1994, the Judicial Conference approved a "fee for usage of electronic access to court data" for the Court of Federal Claims.  (Jud. Conf. Rep. at 16 (Mar. 15, 1994) (Skidgel Decl. Ex. E).)  Finally, in March 1997, it did the same for the Judicial Panel on Multidistrict Litigation.  (Jud. Conf. Rep. at 20 (Mar. 11, 1997)[8]; Def.'s Facts ¶ 13.)

## B.     EPA Fees Before the E-Government Act (1993–2002)

As the Judicial Conference was adding EPA fees to the fee schedules for additional courts, it became apparent that the "income accruing from the fee[s] w[ould] exceed the costs of providing the service."  (Jud. Conf. Rep. at 13–14 (Mar. 14, 1995).)  Accordingly, after noting that this revenue "is to be used to support and enhance the electronic public access systems," the Judicial Conference reduced the fee from $1.00 to 75 cents per minute in 1995.  (*Id.*)  In 1996, after noting that the previous reduction had been "to avoid an ongoing surplus," it "reduce[d] the

---

1992 H.R. Rep. at 58.

[7]  The Judicial Conference Report explained that:

> Some appellate courts utilize a very different electronic access system called Appellate Court Electronic Services (ACES) (formerly known as Electronic Dissemination of Opinions System (EDOS)).  The Committee determined that, at this time, the costs of implementing and operating a billing and fee collection system for electronic access to the ACES/EDOS system would outweigh the benefit of the revenues to be generated.

(Jud. Conf. Rep. at 44 (Sept. 20, 1993).)

[8]  Legislation authorizing the Judicial Conference to establish a fee schedule for the Judicial Panel on Multidistrict Litigation was enacted in 1996.  *See* Pub. L. No. 104-317 (1996) § 403(b), Oct. 19, 1996, 110 Stat. 3854 (codified at 28 U.S.C. § 1932).

fee for electronic public access further," from 75 to 60 cents per minute.  (Jud. Conf. Rep. at 16

(Mar. 13, 1996) (Skidgel Decl. Ex. F); *see also* EPA Chronology at 1; Def.'s Facts ¶ 14.)

Shortly after the 1996 fee reduction, the House and Senate Appropriations Committees

issued reports that included commentary on the judiciary's EPA fees.  The House Report stated:

> The Committee supports the ongoing efforts of the Judiciary to improve and
> expand information made available in electronic form to the public.  Accordingly,
> the Committee expects the Judiciary to utilize available balances derived from
> electronic public access fees in the Judiciary Automation Fund to make
> information and services more accessible to the public through improvements to
> enhance the availability of electronic information.  *The overall quality of service
> to the public will be improved with the availability of enhancements such as
> electronic case documents, electronic filings, enhanced use of the Internet, and
> electronic bankruptcy noticing.*

H.R. Rep. No. 104-676, at 89 (July 16, 1996) (emphasis added) ("1996 H.R. Rep.").  The Senate

Report stated that:

> The Committee supports efforts of the judiciary to make electronic information
> available to the public, and expects that available balances from public access fees
> in the judiciary automation fund will be used to enhance availability of public
> access.

S. Rep. No. 104-353, at 88 (Aug. 27, 1996) ("1996 S. Rep.").

Soon thereafter, "the judiciary started planning for a new e-filing system called ECF

[Electronic Case Filing]." (Pls.' Statement Facts ¶ 9, ECF No. 52-16 ("Pls.' Facts").)  In March

1997, the staff of the AO prepared a paper, entitled "Electronic Case Files in the Federal Courts:

A Preliminary Examination of Goals, Issues and the Road Ahead," "to aid the deliberations of

the Judicial Conference in this endeavor," which would allow courts to maintain complete

electronic case files.  (Taylor Decl. Ex. B, at 36 ("1997 AO Paper").)  In discussing how the ECF

system could be funded, the paper discussed the possibility of charging a separate fee for ECF,

but also opined that "[s]tarting with fiscal year 1997, the judiciary has greater freedom in the use

of revenues generated from electronic public access fees" because "the [1996] House and Senate

appropriations committee reports . . . include[d] language expressly approving use of these monies for electronic filings, electronic documents, use of the Internet, etc." (1997 AO Paper at 36; *see* Pls.' Facts ¶ 9; *see also* Second Decl. of Wendell Skidgel, March 14, 2018, ECF 81-1 ("2d Skidgel Decl."), Tab 1 ("FY 2002 Budget Request") ("Fiscal year 1997 appropriations report language expanded the judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) In the summer of 1998, the Senate Appropriations Committee reiterated its view that it "support[ed] efforts of the judiciary to make information available to the public electronically, and expect[ed] that available balances from public access fees in the judiciary automation fund will be used to enhance the availability of public access." S. Rep. No. 105-235, at 114 (July 2, 1998) ("1998 S. Rep.").

At some point, "a web interface was created for PACER" and the Judicial Conference prescribed the first Internet Fee for Electronic Access to Court Information, charging 7 cents per page "for public users obtaining PACER information through a federal judiciary Internet site." (Jud. Conf. Rep. at 64 (Sept. 15, 1998) (Skidgel Decl. Ex. G); *see* EPA Chronology at 1.) The Judicial Conference stated in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue while introducing new technologies to expand public accessibility to PACER information.

(Jud. Conf. Rep. at 64 (Sept. 15, 1998).)[9]

---

[9] At the same time, the Judicial Conference "addressed the issue of what types of data or information made available for electronic public access should have an associated fee and what types of data should be provided at no cost." (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998).) It concluded that while it "prescribed a fee for access to court data obtained electronically from the

In March 2001, the Judicial Conference eliminated the EPA fees from the court-specific miscellaneous fee schedules and replaced them with "an independent miscellaneous EPA fee schedule that would apply to all court types." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001) (Skidgel Decl. Ex. H); *see also* EPA Chronology at 1.) At the same time, it amended the EPA fee schedule to provide: (1) that attorneys of record and parties in a case would receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer, which could then be printed and saved to the recipient's own computer or network; (2) that no fee is owed by a PACER user until charges of more than $10 in a calendar year are accrued; (3) a new fee of 10 cents per page for printing paper copies of documents through public access terminals at clerks' offices; and (4) a new PACER Service Center search fee of $20.[10] (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).) In 2002, the Judicial Conference further amended the EPA fee schedule "to cap the charge for accessing any single document via the Internet at the fee for 30 pages."[11] (Jud. Conf. Rep. at 11 (Mar. 13, 2002) (Skidgel Decl. Ex. I).)

Starting no later than fiscal year 2000,[12] the judiciary was using its EPA fees to pay for

---

public dockets of individual case records in the court," courts should be allowed to "provide other local court information at no cost," such as local rules, court forms, news items, court calendars, opinions designated by the court for publication, and other information—such as court hours, court location, telephone listings—determined locally to benefit the public and the court." (*Id.*)

[10] At the time, "[t]he PACER Service Center provide[d]s registration, billing, and technical support for the judiciary's EPA systems and receive[d] numerous requests daily for particular docket sheets from individuals who d[id] not have PACER accounts." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).)

[11] The Judicial Conference took this step because otherwise "the fee is based upon the total number of pages in a document, even if only one page is viewed, because the case management/electronic case files system (CM/ECF) software cannot accommodate a request for a specific range of pages from a document," which "can result in a relatively high charge for a small usage." (Jud. Conf. Rep. at 11 (Mar. 13, 2002).)

[12] The record does not include any specifics as to the use of EPA fees prior to FY 2000.

PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN").[13]

(*See* 2d Skidgel Decl. ¶¶ 31–33 & Tabs 30–32 ("expenditures relating to the Judiciary's

Electronic Public Access Program" for FY 2000–2002).)

C.     **E-Government Act of 2002**

In December 2002, Congress passed the E-Government Act of 2002.  Section 205

pertained to the "Federal Courts.  Subsection (a) required all courts to have "individual court

websites" containing certain specified information or links to websites that include such

information (e.g., courthouse location, contact information, local rules, general orders, docket

information for all cases, access to electronically filed documents, written opinions, and any

other information useful to the public)"; subsection (b) provided that "[t]he information and rules

on each website shall be updated regularly and kept reasonably current; subsection (c), entitled

"Electronic Filings," provided that, with certain exceptions for sealed documents and privacy and

security concerns, "each court shall make any document that is filed electronically publicly

available online"; subsection (d), entitled "Dockets with links to documents" provided that "[t]he

Judicial Conference of the United States shall explore the feasibility of technology to post online

dockets with links allowing all filings, decisions, and rulings in each case to be obtained from the

docket sheet of that case"; and subsections (f) and (g) address the time limits for courts to

comply with the above requirements.  E-Government Act of 2002, § 205(a)–(d), (f), and (g)

(codified at 44 U.S.C. § 3501 note).  Subsection (e), entitled Cost of Providing Electronic

Docketing Information, "amend[ed] existing law regarding the fees that the Judicial Conference

prescribes for access to electronic information" by amending the first sentence of 28 U.S.C. §

---

[13]  A line item amount expended from EPA fees for Electronic Bankruptcy Noticing appears in AO's accounting of EPA fees for FY 2000, but not for 2001 or 2002.  (*See* 2d Skidgel Decl. Tabs 30–32.)

1913 note to replace the words "shall hereafter" with "may, only to the extent necessary."  E-Government Act of 2002, § 205(e).  The E-Government Act left the remainder of 28 U.S.C. § 1913 note unchanged.

> The Senate Governmental Affairs Committee Report describes Section 205 as follows:
>
> Section 205 requires federal courts to provide greater access to judicial information over the Internet. Greater access to judicial information enhances opportunities for the public to become educated about their legal system and to research case-law, and it improves access to the court system. The mandates contained in section 205 are not absolute, however.  Any court is authorized to defer compliance with the requirements of this section, and the Judicial Conference of the United States is authorized to promulgate rules to protect privacy and security concerns.

S. Rep. No. 107-174, at 23 (June 24, 2002) ("2002 S. Rep.") (Taylor Decl. Ex. D).  As to the amending language in subsection 205(e), the report stated:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible.  For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index.  Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23.

### D.     EPA Fees After the E-Government Act

#### 1.     2003–2006

After the passage of the E-Government Act, the judiciary continued to use EPA fees for the development of its CM/ECF system.  (*See* Taylor Decl. Ex. F (FY 2006 Annual Report for the Judiciary Information Technology Fund ("JITF") (formerly the "Judiciary Automation Fund")[14] ("The entire development costs for the Case Management/Electronic Case Files

---

[14] In 2005, 28 U.S.C. § 612 had been amended to substitute "Judiciary Information Technology

(CM/ECF) project have been funded solely through EPA collections.").)

In 2003, a report from the House Appropriations Committee stated that: "The Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs."  H.R. Rep. No. 108-221, at 116 (July 21, 2003) ("2003 H.R. Rep.").  The Senate Appropriations Committee also expressed its enthusiasm for CM/ECF:

> The Committee fully supports the Judiciary's budget request for the Judiciary Information Technology Fund [JITF]. The Committee would like to see an even greater emphasis on automation in the local courts. To this end, the Committee expects the full recommended appropriation for the JITF, as reflected in the budget request, be deposited into this account. The Committee lauds the Judicial Committee on Information Technology (IT Committee) and their Chairman for their successes helping the Courts run more efficiently through the use of new automation. Of particular note, the Committee is impressed and encouraged by the new Case Management/Electronic Case File system [CM/ECF]. This new and innovative system allows judges, their staffs, the bar and the general public to work within the judicial system with greater efficiency. This new system is currently implemented in many bankruptcy and district courts and will soon begin implementation in the appellate courts. The CM/ECF system is already showing its potential to revolutionize the management and handling of case files and within the next few years should show significant cost savings throughout the Judiciary. The Committee on Appropriations expects a report on the savings generated by this program at the earliest possible date.

S. Rep. No. 108-144, at 118 (Sept. 5, 2003) ("2003 S. Rep.").  The associated Conference Committee report "adopt[ed] by reference the House report language concerning Electronic Public Access fees."  *See* 149 Cong Rec. H12323, at H12515 (Nov. 23, 2003) ("2003 Conf. Rep.").

In September 2004, the Judicial Conference, "[i]n order to provide sufficient revenue to fully fund currently identified case management/electronic case files system costs," "increase[d]

---

Fund" for "Judiciary Automation Fund" and "information technology" for "automatic data processing."

the fee for public users obtaining information through a federal judiciary Internet site from seven

to eight cents per page." (Jud. Conf. Rep. at 12 (Sept. 21, 2004) (Skidgel Decl. Ex. J); *see also*

EPA Chronology at 2; Taylor Decl. Ex. E (Oct. 21, 2004 AO memorandum) ("This increase is

predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue

to fund CM/ECF operations and maintenance.  The fee increase will enable the judiciary to

continue to fully fund the EPA Program, in addition to CM/ECF implementation costs until the

system is fully deployed throughout the judiciary and its currently defined operations and

maintenance costs thereafter.").)

> The judiciary's Financial Plan for fiscal year 2006 described its EPA program at the time:

> The judiciary's Electronic Public Access (EPA) program provides for the
> development, implementation and enhancement of electronic public access
> systems in the federal judiciary.  The EPA program provides centralized billing,
> registration and technical support services for PACER (Public Access to Court
> Electronic Records), which facilitates Internet access to data from case files in all
> court types, in accordance with policies set by the Judicial Conference.  The
> increase in fiscal year 2006 EPA program operations includes one-time costs
> associated with renegotiation of the Federal Telephone System (FTS) 2001
> telecommunications contract.

> Pursuant to congressional directives, the program is self-funded and collections
> are used to fund information technology initiatives in the judiciary related to
> public access.  Fee revenue from electronic access is deposited into the Judiciary
> Information Technology Fund.  Funds are used first to pay the expenses of the
> PACER program. Funds collected above the level needed for the PACER
> program are then used to fund other initiatives related to public access.  The
> development and implementation costs for the CM/ECF project have been funded
> through EPA collections.  Beginning last year, in accordance with congressional
> direction, EPA collections were used to support CM/ECF operations and
> maintenance as well.  In fiscal year 200[6], the judiciary plans to use EPA
> collections to continue PACER operations, complete CM/ECF development and
> implementation, and operate and maintain the installed CM/ECF systems in the
> various courts across the country.

(2d Skidgel Decl. Tab 9 (FY 2006 Financial Plan at 45).)

### 2.    2006–2009

In July 2006, the Senate Appropriations Committee issued a report pertaining to the 2007

appropriations bill in which it stated: "The Committee supports the Federal judiciary sharing its case management electronic case filing system at the State level and urges the judiciary to undertake a study of whether sharing such technology, including electronic billing processes, is a viable option."  S. Rep. No. 109-293, at 176 (July 26, 2006) ("2006 S. Rep.") (2d Skidgel Decl. Tab 38).

By the end of 2006, "resulting from unanticipated revenue growth associated with public requests for case information," the judiciary found that its EPA fees fully covered the costs of its "EPA Program" and left it with an "unobligated balance" of $32.2 million from EPA fees in the JITF.  (FY 2006 JITF Annual Rep. at 8; Pls.' Facts ¶ 16.)  In light of this "unobligated balance," the judiciary reported that it was "examining expanded use of the fee revenue in accordance with the authorizing legislation."  (FY 2006 JITF Annual Rep. at 8.)

In March 2007, the judiciary submitted its financial plan for fiscal year 2007 to the House and Senate Appropriations Committees.  (Def.'s Facts ¶ 27.)  In the section of the plan that covered the JITF, it proposed using EPA fees "first to pay the expenses of the PACER program" and then "to fund other initiatives related to public access."  (Skidgel Decl. Ex. K (FY 2007 Financial Plan at 45).)  It identified the "public access initiatives" that it planned to fund with EPA fees as CM/ECF Infrastructure and Allotments; EBN; Internet Gateways; and Courtroom Technology Allotments for Maintenance/Technology Refreshment.  (Id.)  With respect to Courtroom Technology, the plan requested "expanded authority" to use EPA fees for that purpose:

> Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically

through electronic public access services when it is presented electronically and becomes an electronic court record.

(FY 2007 Financial Plan at 43, 46.)  With no specific reference to EPA fees, the plan also sought

spending authority to implement a Memorandum of Agreement with the State of Mississippi to undertake a three-year study of the feasibility of sharing the Judiciary's case management electronic case filing system at the state level, to include electronic billing processes. The estimated cost of this three year pilot will not exceed $1.4 million.

(*Id*. at 41.)  In May 2007, the FY 2007 Financial Plan was approved by the House and Senate

Appropriations Committees, with the approval letter signed on May 2, 2007, by the Chairman

and the Ranking Member of the Subcommittee on Financial Services and General Government,

stating that there was no objection to "the expanded use of Electronic Public Access Receipts" or

"a feasibility study for sharing the Judiciary's case management system with the State of

Mississippi."  (Skidgel Decl. Ex. L ("FY 2007 Senate Approval Letter"); *id*. Ex. M ("FY 2007

House Approval Letter").)

The judiciary began using EPA fees to pay for courtroom technology expenses in 2007,

"to offset some costs in [its] information technology program that would otherwise have to be

funded with appropriated funds."  (Pls.' Facts ¶ 18; 2d Skidgel Decl. Tab 35 (FY 2007–08 EPA

Expenditures); *Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on

H.R. 7323/S. 3260*, 110th Cong. 51 (2008) (testimony of the chair of the Judicial Conference's

Comm. on the Budget) ("[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in

PACER fees will be available to finance information technology requirements in the courts'

Salaries and Expenses account, thereby reducing our need for appropriated funds").)

In its fiscal year 2008 financial plan, the judiciary indicated that it intended to use EPA

fees for Courtroom Technology ($24.8 million) and two new programs: a Jury Management

System ("JMS") Web Page ($2.0 million) and a Violent Crime Control Act ("VCCA")

Notification.  (2d Skidgel Decl. Tab 11 (FY 2008 Financial Plan at 11).)  Actual expenditures for

fiscal year 2008 included spending on those programs.  (*Id.* Tab 35 (FY 2008 EPA Expenditures)

($24.7 million spent on Courtroom Technology; $1.5 million spent on the JMS Web Page; $1.1

million spent on the VCCA Notification).)  Its fiscal year 2009 financial plan included a third

new expense category: a CM/ECF state feasibility study ($1.4 million)—this was previously

described in the 2007 financial plan as the State of Mississippi study, albeit not in the section

related to EPA fee use.  (*Id.* Tab 12 (FY 2009 Financial Plan at 45).)  The judiciary also

projected spending $25.8 million on Courtroom Technology; $200,000 on the JMS Public Web

Page; and $1 million on VCCA Notification.  (*Id.*)  Again, actual expenditures for fiscal year

2009 included each of these programs.  *(Id.* Tab 36 (FY 2009 EPA Expenditures) ($160,000

spent on the State of Mississippi study; $24.6 million spent on Courtroom Technology; $260,000

spent on Web-Based Juror Services (replacing line item for JMS); and $69,000 spent on VCCA

Notification).)

      In February 2009, Senator Lieberman, in his capacity as Chair of the Senate Committee

on Homeland Security and Government Affairs, sent a letter to the Chair of the Judicial

Conference Committee on Rules of Practice and Procedure, inquiring whether the judiciary was

complying with the E-Government Act.  (*See* Taylor Decl. Ex. H.)  According to Senator

Lieberman, the "goal of this provision . . . was to increase free public access to [court] records."

(*Id.*)  Given that PACER fees had increased since 2002, and that "the funds generated by these

fees [were] still well higher than the cost of dissemination," he asked the Judicial Conference to

"explain whether the Judicial Conference is complying with Section 205(e) of the E-Government

Act, how PACER fees are determined, and whether the Judicial Conference is only charging 'to

the extent necessary' for records using the PACER system."  (*Id.*)

On behalf of the Judicial Conference and its Rules Committee, the Committee Chair and the Director of the AO responded that the judiciary was complying with the law because EPA fees are "used only to fund public access initiatives," such as "CM/ECF, the primary source of electronic information on PACER," and the "EBN system, which "provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service." (Taylor Decl. Ex. I ("3/26/2009 AO Letter").)

In March 2010, Senator Lieberman raised his concerns in a letter to the Senate Appropriations Committee. (*See* Taylor Decl. Ex. G.) In addition, he specifically questioned the use of EPA receipts for courtroom technology, acknowledging that the Appropriations Committees had approved this use in 2007, but expressing his opinion that this was "an initiative that [was] unrelated to providing public access via PACER and against the requirement of the E-Government Act." (*Id*. at 3.)

In 2011, the Judicial Conference, "[n]oting that . . . for the past three fiscal years the EPA program's obligations have exceeded its revenue," again amended the PACER fee schedule, raising the per-page cost from 8 to 10 cents. (Jud. Conf. Rep. at 16 (Sept. 13, 2011) (Skidgel Decl. Ex. N).) At the same time, it increased the fee waiver amount from $10 to $15 per quarter. (*Id*.)

### 3.     2010–2016[15]

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased

---

[15]  These are the years that are relevant to the present litigation because there is a six-year statute of limitation on plaintiffs' claims.

from about $102.5 million in 2010 to $146.4 million in 2016.[16]  (*See* Pls.' Facts ¶¶ 28, 46, 62,

80, 98, 116, 134; Taylor Decl. Ex. L; *see also* Attachment 1 hereto.[17])

During that time, PACER fees were used to pay for the costs of PACER, CM/ECF, EBN,

the State of Mississippi study, Web-Based Juror Services, VCCA Notification, and Courtroom

Technology.  In its internal accounting, the judiciary divided these costs into Program

Requirements and Congressional Priorities.  (Taylor Decl. Ex. L.)

Under Program Requirements, there are five categories: (1) Public Access Services;

(2) CM/ECF System; (3) Telecommunications (2010–11) or Communications Infrastructure,

Services and Security (2012–16); (4) Court Allotments; and (5) EBN.  (*Id.*)  The Public Access

Services category includes only expenses that relate directly to PACER.  (*See* Taylor Decl. Ex.

M, at 22-23 ("Def.'s Resp. to Pls.' Interrogs."); 3/23/18 Tr. at __.)  From 2010 to 2016, the

judiciary spent nearly $129.9 million on Public Access Services.  (*Id.*)  The next three categories,

CM/ECF System, Telecommunications/Communications Infrastructure, and Court Allotments,

include only expenses that relate to CM/ECF or PACER.  (*See* 3/23/18 Tr. at __[18]; *see also*

Def.'s Resp. to Pls.' Interrogs. at 22–26.)  From 2010 to 2016, the judiciary spent $217.9 million

on the CM/ECF System; $229.4 million on Telecommunications/ Communications

Infrastructure; and $74.9 million on Court Allotments.  (Taylor Decl. Ex. L (FY 2010-2016 EPA

---

[16]  This number does not include print fee revenues, which are also collected pursuant to the EPA fee schedule.

[17]  The document submitted to the Court as Exhibit L to the Taylor Declaration is defendant's internal accounting of PACER revenues and the use of PACER fees from FY 2010 through FY 2016.  (*See* Taylor Decl. Ex. L; 3/23/18 Tr. at __.)  While the contents of this document are described in this Memorandum Opinion, for the reader's benefit, an example of this internal accounting for the year 2010 is appended hereto as Attachment 1 in order to demonstrate how the judiciary has described and categorized the expenditures that were paid for by PACER fees.

[18]  The official transcript from the March 23, 2018 motions hearing is not yet available.  The Court will add page citations once it is.

Expenditures).)  The final category, Electronic Bankruptcy Noticing, refers to the system which

"produces and sends court documents (bankruptcy notices, including notices of 341 meetings)

electronically to creditors in bankruptcy cases."  (Def.'s Resp. to Pls.' Interrogs. at 10.)  From

2010 to 2016, the judiciary spent a total of $73.3 million on EBN.  (Taylor Decl. Ex. L.)

     Under Congressional Priorities, there are four categories: (1) State of Mississippi;

(2) VCCA Victim Notification; (3) Web-Based Juror Services; and (4) Courtroom Technology.

(*Id*.)  The State of Mississippi category refers to a study which "provided software, and court

documents to the State of Mississippi, which allowed the State of Mississippi to provide the

public with electronic access to its documents."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  In 2010—

the only year this category appears between 2010 and 2016—the judiciary spent a total of

$120,988 for the State of Mississippi study.  (Taylor Decl. Ex. L.)  The next category is Victim

Notification (Violent Crime Control Act), which refers to "[c]osts associated with the program

that electronically notifies local law enforcement agencies of changes to the case history of

offenders under supervision."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  Via this program, "[l]aw

enforcement officers receive electronic notification of court documents that were previously sent

to them through the mail."  (*Id*.)  From 2010 to 2016, the judiciary spent $3.7 million on the

VCCA victim notification program.  The third category, Web-Based Juror Services, refers to

"[c]osts associated with E-Juror software maintenance, escrow services, and scanner support."

(*Id*. at 26.)  "E-Juror provides prospective jurors with electronic copies of courts documents

regarding jury service."  (*Id*.)  From 2010 to 2016, the judiciary spent $9.4 million on Web-

Based Juror Services.  (Taylor Decl. Ex. L.)  Finally, the category labeled Courtroom

Technology funds "the maintenance, cyclical replacement, and upgrade of courtroom technology

in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 26.)  From 2010 to 2016, the judiciary spent

$185 million on courtroom technology.  (Taylor Decl. Ex. L.)

## II.   PROCEDURAL HISTORY

On April 21, 2016, three national nonprofit organizations, National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice, on behalf of themselves and a nationwide class of similarly-situated PACER users, filed suit against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), claiming that the PACER fees charged by the Administrative Office of the United States Courts "exceeded the amount that could be lawfully charged, under the E-Government Act of 2002" and seeking "the return or refund of the excessive PACER fees."  (Compl. ¶¶ 33–34.)

After denying defendant's motion to dismiss (*see* Mem. Op. & Order, Dec. 5, 2016, ECF Nos. 24, 25), the Court granted plaintiffs' motion for class certification (*see* Mem. Op. & Order, Jan. 24, 2017, ECF Nos. 32, 33).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class consisting of: "[a]ll individuals and entities who have paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and federal government entities" and "certifie[d] one class claim: that the fees charged for accessing court records through the PACER system are higher than necessary to operate PACER and thus violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees under the Little Tucker Act."  (Order, Jan. 24, 2017, ECF No. 32.)

On August 28, 2017, plaintiffs filed a motion seeking "summary adjudication of the defendant's liability," while "reserving the damages determination for after formal discovery." (Pls.' Mot. at 1.)  On November 17, 2017, defendant filed a cross-motion for summary judgment as to liability.  The Court permitted the filing of three amicus briefs.[19]  The cross-motions for

---

[19] Amicus briefs were filed by the Reporters Committee for Freedom of the Press, *et al.*, ECF No. 59, the American Association of Law Libraries, *et al.*, ECF No. 61, and Senator Joseph

summary judgment on liability are fully-briefed and a hearing on the motions was held on March

23, 2018.

## ANALYSIS

The parties' cross-motions for summary judgment on liability present the following

question of statutory interpretation:  what restrictions does 28 U.S.C. § 1913 note place on the

amount the judiciary may charge in PACER fees?

In relevant part, 28 U.S.C. § 1913 note reads:

Court Fees for Electronic Access to Information

 (a) The Judicial Conference may, only to the extent necessary, prescribe
reasonable fees . . . for collection by the courts . . . for access to information
available through automatic data processing equipment.

. . .

The Director, under the direction of the Judicial Conference of the United States,
shall prescribe a schedule of reasonable fees for electronic access to information
which the Director is required to maintain and make available to the public.

(b) . . .  All fees hereafter collected by the Judiciary under paragraph (a) as a
charge for services rendered shall be deposited as offsetting collections to the
Judiciary Automation Fund . . . to reimburse expenses incurred in providing these
services.

28 U.S.C. § 1913 note.

## I.   LEGAL STANDARD

Statutory interpretation "begins with the language of the statute."  *Esquivel-Quintana v.*

*Sessions*, 137 S. Ct. 1562, 1569 (2017).  This means examining "'the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole'" to

determine if it has a "'plain and unambiguous meaning with regard to the particular dispute in

the case.'"  *United States v. Wilson*, 290 F.3d 347, 352–53 (D.C. Cir. 2002) (quoting *Robinson v.*

---

Lieberman and Congressman Darrell Issa, ECF No. 63.

*Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (statutory interpretation "requires examination of the statute's text in light of context, structure, and related statutory provisions").  A statutory term that is neither a term of art nor statutorily defined is customarily "construe[d] . . . in accordance with its ordinary or natural meaning," frequently derived from the dictionary.  *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

Where statutory language does not compel either side's interpretation, the Court may "look to the statute's legislative history to determine its plain meaning."  *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 146 (D.D.C. 2015) (citing *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.").  The fact that a statute can be read in more than one way does not demonstrate that it lacks "plain meaning."  *United States v. Hite*, 896 F. Supp. 2d 17, 25 (D.D.C. 2012); *see, e.g.*, *Abbott v. United States,* 562 U.S. 8, 23 (2010).

A statute's legislative history includes its "statutory history," a comparison of the current statute to its predecessors and differences between their language and structure, *see, e.g.*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 231–32 (2007), along with relevant committee reports, hearings, or floor debates.  In general, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"  *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1289 n.26 (D.C. Cir. 1983) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)).  But even though, "[t]he view of a later Congress cannot control the interpretation of an earlier enacted statute," *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996), in certain narrow circumstances, "'congressional

acquiescence to administrative interpretations of a statute'" may "inform the meaning of an

earlier enacted statute." *U.S. Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 153 & 154 n.7

(D.D.C. 2015) (quoting *O'Gilvie*, 519 U.S. at 90); *Solid Waste Agency v. U.S. Army Corps of

Eng'rs*, 531 U.S. 159, 169 (2001)).  Such a situation may be where Congress has amended the

relevant provisions without making any other changes.  *See, e.g.*, *Barnhart v. Walton*, 535 U.S.

212, 220 (2002).  However, "[e]xpressions of committees dealing with requests for

appropriations cannot be equated with statutes enacted by Congress." *Tenn. Valley Auth. v. Hill*,

437 U.S. 153, 191 (1978).

## II.   APPLICATION

Applying the "ordinary principles of statutory construction," the parties arrive at starkly

different interpretations of this statute.  Plaintiffs take the position that the statute "prohibits the

AO from charging more in PACER fees than is necessary to recoup the total marginal cost of

operating PACER."  (Pls.' Mot. at 12.)  Under plaintiffs' interpretation, defendant's liability is

established because with the exception of the category of expenditures labeled Public Access

Services (*see* Attachment 1), most, if not all, of the other expenditures covered by PACER fees

are not part of the "'marginal cost of disseminating records' through PACER."  (*See* Pls.' Mot.

at 17; *see also*, *e.g.*, Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45 (fiscal year 2010).)  Defendant

readily admits that PACER fees are being used to cover expenses that are not part of the

"marginal cost" of operating PACER (*see, e.g.*, Def.'s Resp. to Pls.' Facts ¶¶ 32, 34, 36, 38, 41,

43, 45), but it rejects plaintiffs' interpretation of the statute.  Instead, defendant reads the statute

broadly to mean that the Judicial Conference "may charge [PACER] fees in order to fund the

dissemination of information through electronic means."  (3/23/18 Tr. at __; *see also* Def.'s Mot.

at 11 (Judicial Conference may "charge fees, as it deems necessary, for the provision of

information to the public through electronic means").)  Under defendant's interpretation, it is not liable because "every single expenditure . . . [is] tied to disseminating information through electronic means."  (3/23/18 Tr. at __.)

If the Court agreed with either proposed interpretation, the ultimate question of defendant's liability would be relatively straightforward.  If PACER fees can only be spent to cover the "marginal cost" of operating PACER, defendant is liable most expenditures.[20]  If PACER fees can be spent on any expenditure that involves "the dissemination of information through electronic means," defendant is not liable.  But the Court rejects the parties' polar opposite views of the statute, and finds the defendant liable for certain costs that post-date the passage of the E-Government Act, even though these expenses involve dissemination of information via the Internet.

A.      Does the E-Government Act Limit PACER Fees to the Marginal Cost of
        Operating PACER?

As noted, plaintiffs interpret the statute as prohibiting the AO "from charging more in

---

[20]  The Court would still have to determine the meaning of "marginal cost" and whether any of the expenditures beyond those in the category of Public Access Services are part of that cost, since plaintiffs only expressly challenged "some" of the expenditures in several important categories, and defendant has only admitted that "some" of the expenditures in those categories are not part of the marginal cost.  (*See, e.g.*, Pls.' Facts ¶¶ 41 (CM/ECF), 43 (Telecommunications), 45 (Court Allotments); Def.'s Resp. to Pls.' Facts ¶¶ 41, 43, 45.)  The categories that plaintiffs argue should be examined as part of a determination of damages (as opposed to liability), since they may include PACER-related costs, are CM/ECF, Telecommunications/Communications Infrastructure, and Court Allotments.  (Pls.' Mot. at 19; *see also* Attachment 1.)

Defendant, on the other hand, responds that even though only some of the costs associated with these categories involve PACER-related expenses, all of the expenses related to PACER and/or CM/ECF.  (3/23/18 Tr. at __.)

However these costs are categorized, the Court rejects plaintiffs' suggestion that the issue is one to be decided as part of a determination of damages, for the issue as to liability necessarily requires a determination of whether these costs are proper expenditures under the E-Government Act.

PACER fees than is necessary to recoup the total marginal cost of operating PACER."  (Pls.'

Mot. at 12.)  Plaintiffs concede, as they must, that this is not what the text of the statute actually

says.  But they argue that this is the best reading of the statutory language in light of its "plain

language," its "history," and the need to "avoid[] two serious constitutional concerns that would

be triggered by a broader reading."  (*See* Pls.' Reply at 1.)

Plaintiffs first argue that it is clear from the text that the words "these services" in the last

sentence of subparagraph (b), where it provides that the fees collected must be used "to

reimburse expenses incurred in providing *these* services," include only the services that the AO

is actually charging fees for as set forth in the EPA Fee Schedule, i.e., the PACER system, the

PACER Service Center, and the provision of printed copies of documents "accessed

electronically at a public terminal in a courthouse." (Pls.' Reply at 3–4; 3/23/18 Tr. at __.)  The

Court does not agree that the text dictates this constraint.  The term "these services" could also

mean any service that provides "access to information available through automatic data

processing equipment," whether or not it is expressly part of the EPA fee schedule.

Plaintiffs' next argument is based on the legislative history of the 2002 amendment,

which consists of the following single paragraph in a Senate Committee Report:

> The Committee intends to encourage the Judicial Conference to move from a fee
> structure in which electronic docketing systems are supported primarily by user
> fees to a fee structure in which this information is freely available to the greatest
> extent possible.  For example, the Administrative Office of the United States
> Courts operates an electronic public access service, known as PACER, that allows
> users to obtain case and docket information from Federal Appellate, District and
> Bankruptcy courts, and from the U.S. Party/Case Index.  Pursuant to existing law,
> users of PACER are charged fees that are higher than the marginal cost of
> disseminating the information.

2002 S. Rep. at 23.  Plaintiffs argue that this paragraph "makes clear that Congress added this

language because it sought to prevent the AO from 'charg[ing] fees that are higher than the

marginal cost of disseminating the information,'" as it had been doing for several years, and that

25

"although the E-Government Act does not refer to PACER by name, Congress clearly had PACER in mind when it passed the Act."  (Pls.' Mot. at 11 (quoting 2002 S. Rep. at 23).)

The Court finds this argument unconvincing for several reasons.  First, there is no mention in the statute of PACER or its "marginal cost," and in the 2002 Senate Report, the reference to PACER and "marginal cost" follows the words "For example," suggesting that the amendment was not intended to apply only to PACER.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649 (1990) ("[T]he language of a statute—particularly language expressly granting an agency broad authority—is not to be regarded as modified by examples set forth in the legislative history.").  And, in fact, the 2002 Senate Report recognizes that PACER is only a subset of a larger system when it stated: "[t]he Committee intends to encourage the Judicial Conference to move from a structure in which *electronic docketing systems* are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible."  2002 S. Rep. at 23 (emphasis added).  The use of the phrase "electronic docketing systems" appears to envision more than just PACER, and to at least encompass CM/ECF, given that it, unlike PACER, is an electronic docketing system.

Second, a single committee's report reflects only what the committee members might have agreed to, not the "intent" of Congress in passing the law.  As the Supreme Court observed, "[u]nenacted approvals, beliefs, and desires are not laws."  *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988).  As the Supreme Court observed in rejecting reliance on "excerpts" said to reflect congressional intent to preempt state law, "we have never [looked for] congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text."  *Id*.

Perhaps most tellingly, the E-Government Act changed only one phrase in the first

sentence of the first paragraph—replacing "shall hereafter" with "may, only to the extent

necessary." It did not alter the third sentence of paragraph (b), which is the part of the statute

that governs what expenses can be reimbursed by PACER fees. Thus, even though the 2002

Senate Report correctly observes that PACER fees exceeded the marginal cost of operating

PACER, the amendment to the statute did not address which services could be reimbursed, but

only the amount of fees for services that could be charged. In addition, at the time the E-

Government Act was passed, CM/ECF had been in operation for at least four years, PACER fees

were already being used to pay for non-PACER costs, such as EBN and CM/ECF (*see* 2d

Skidgel Decl. Tabs 30–32), and there is nothing in the statute's text or legislative history to

suggest that Congress intended to disallow the use of PACER fees for those services. In the end,

a single sentence in a committee report, which has been taken out of context, is not enough to

persuade the Court that Congress intended the E-Government Act to impose a specific limitation

on the judiciary's collection and use of EPA fees to the operation of only PACER.

Plaintiffs also point to "[p]ost-enactment history"—the letters from the E-Government

Act's sponsor, Senator Joseph Lieberman, in 2009 and 2010. (Pls.' Mot. at 11–12 ("The Act's

sponsor has repeatedly expressed his view, in correspondence with the AO's Director, that the

law permits the AO to charge fees 'only to recover the direct cost of distributing documents via

PACER,' and that the AO is violating the Act by charging more in PACER fees than is necessary

for providing access to 'records using the PACER system.'").) But, as plaintiffs essentially

conceded during the motions hearing, the post-enactment statements of a single legislator carry

no legal weight when it comes to discerning the meaning of a statute. (3/23/18 Tr. at __); *see

Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J. concurring) ("the views of a

legislator concerning a statute already enacted are entitled to no more weight than the views of a

judge concerning a statute not yet passed"); *see also Consumer Prod. Safety Comm'n*, 447 U.S. at 117–18 ("even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history").

Plaintiffs' final argument is that the "constitutional doubt" canon of construction requires their interpretation because any other interpretation would raise a question as to whether Congress had unconstitutionally delegated its taxing authority because the statute does not clearly state its intention to do so. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) ("Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties."). Assuming *arguendo* that this doctrine applies with equal force to unregulated parties, an issue not addressed by the parties, the Court does not find plaintiffs' argument persuasive. First, this canon of construction has a role only where the statute is ambiguous, which, as explained herein, the Court concludes is not the case. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."). Second, the canon can only be applied where there is a "reasonable alternative interpretation," *Gomez v. United States*, 490 U.S. 858, 864 (1989), but the Court has already explained that it does not find plaintiffs' proposed interpretation to be a reasonable alternative interpretation. Finally, as will be discussed in Section C, *infra*, the Court finds that the statute does clearly state that the judiciary has the authority to use its PACER fees for services that may not directly benefit a particular PACER user. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153–54 (2013) ("This is not to say that Congress must incant magic words in order to speak

28

clearly.  We consider context . . . as probative of [Congress' intent].").

For these reasons, the Court will not adopt plaintiffs' interpretation of the statute as limiting PACER fees to the total marginal cost of operating PACER.

### B.      Does the E-Government Act Allow PACER Fees to Fund Any "Dissemination of Information Through Electronic Means"?

Defendant's interpretation of the statute embraces the other extreme, positing that the statute allows PACER fees to be used for any expenditure that is related to "disseminating information through electronic means."  (3/23/18 Tr. at __; *see* Def.'s Mot. at 11.)  It is not entirely clear to the Court how the defendant arrived at this definition.  Most of the reasons defendant gives to justify its interpretation are really just arguments against plaintiffs' interpretation, such as (1) the authority to charge EPA fees and use them to reimburse "services" predated the E-Government Act and that language was not changed by the Act; (2) there is no mention of PACER or "marginal cost" in the 2002 amendment; and (3) the legislative history discussed PACER only as an "example."  As for defendant's affirmative arguments, addressed below, none demonstrates that defendant's conclusion is correct.

Defendant's first argument is based on the fact that the text of the statute requires that EPA fees be deposited in the JITF, which is the fund that the judiciary is allowed to use for "broad range of information technology expenditures."  (Def.'s Mot. at 10.)  According to defendant, the fact that EPA fees are deposited in this fund "informs how Congress intended the fees received from PACER access to be spent."  (*Id*.)  However, while the statute provides that PACER fees are to be deposited in the JITF, it also directs that they are to be used to "reimburse expenses incurred" in providing "access to information available through data processing equipment."  That statutory language cannot be ignored as defendant attempts to do.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant.").  Notably, it is clear that the judiciary has never treated its EPA fees in the JITF as fungible with the rest of the money in the JAF.   (*See* FY 2006 JITF Annual Report; FY 2007 Financial Plan; 3/26/2009 AO Letter at 3-4 ("While fee collections from the EPA program are also deposited into the JITF, they are used only to fund electronic public access initiatives and account for only a small portion of its balance.").)

Defendant's main argument is that its interpretation of the statute has been accepted by Congress because the Appropriations Committees, either explicitly or implicitly, endorsed, mandated, or approved every request pertaining to the use of EPA fees.  For example, defendant points out that the 1996 House Report stated that the Committee "expect[ed] available balances from public access fees" to be used for electronic bankruptcy noticing and electronic case filing, 1996 H.R. Rep. at 89; the 2003 House and Senate Committee Reports "expressly directed the AO to use PACER fees to update the CM/ECF system," 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; those same Committees endorsed the Judiciary's FY 2007 Financial Plan, which set forth the AO's plan "to use receipts from PACER fees to fund courtroom technology and to perform infrastructure maintenance consistent with Congressional actions" (FY 2007 Financial Plan at 45; FY 2007 Senate Approval Letter; FY 2007 House Approval Letter); and the 2006 Senate Report, which urged the judiciary to undertake a study about the feasibility of sharing CM/ECF technology with states, *see* 2006 S. Rep. at 176, which the judiciary then did via its State of Mississippi study (FY 2009 EPA Expenditures).   (*See* Def.'s Mot. at 17–18.)  More generally, and applicable at least as to the expenditures that post-date the passage of the E-Government Act, congressional approval is reflected by the fact that after the judiciary submitted its proposed budget to Congress and Congress appropriated money to the judiciary, the judiciary was then

required to submit its proposed financial plan, which included its intended use of EPA fees, to the House and Senate Appropriations Committees for approval.  (Def.'s Reply at 3; 3/23/18 Tr. at__.)  Looking at this entire process as a "totality," defendant argues, establishes that by implicitly approving certain expenditures, Congress agreed with the Judicial Conference's interpretation of the statute.  (3/23/18 Tr. at __ ("[W]e have 26 years where the only legislative history that has gone to the judicial conference, but for Senator Lieberman's  letter, says the judicial conference's interpretation is correct.  The judicial conference's interpretation of that language that PACER fees may be used more broadly is correct.").)

For a number of reasons, defendant's argument is flawed.  First, the record does not reflect meaningful congressional approval of each category of expenditures.  Each so-called "approval" came from congressional committees, which is not the same as approval by Congress "as a whole."  *See Tenn. Valley Auth.*, 437 U.S. at 192.[21]  Moreover, the Court questions whether it is even possible to infer approval of a specific expenditure based solely on committee-approval of the judiciary's financial plans, where the record does not show any particular attention was paid to this itemization of intended uses of EPA fees.  For almost of all the years for which defendant has included copies of approvals, the "approvals" consist of a mere line in an email or letter that indicates, without any elaboration or specification, that the Appropriations Committee has "no objection." [22]  (*See, e.g.*, 2d Skidgel Decl. Tab 16 (2010); *see also id*. Tabs 15, 17, 20–27

---

[21]  Despite having the opportunity to respond to the holding of *Tennessee Valley Authority v. Hill*, defendant has failed to cite any legal support for its use of approvals by the Committee on Appropriations.

[22]  The one exception was courtroom technology.  In response to the judiciary's request in its FY 2007 Financial Plan to use PACER fees for Courtroom Technology, the Chairman and Ranking Member of the Subcommittee on Financial Services and General Government wrote on May 2, 2007: "We have reviewed the information included and have no objection to the financial plan including . . . the expanded use of Electronic Public Access Receipts."  (2007 Senate Approval Lettter; *see also id*. 2007 House Approval Letter.)

(2011, 2013–2016).)  In 2009 and 2012, there are letters from the Appropriations Committees which reflect a closer analysis of some parts of the financial plan, but neither mentions the judiciary's planned uses of PACER fees.  (*Id*. Tabs 14, 18–19.)  By contrast, in July 2013, the AO sent an email to the Senate Appropriation Committee at 1:02 p.m. noting that "[i]n looking through our records we don't seem to have approval of our FY 2013 financial plan.  Would you be able to send us an email or something approving the plan?  The auditors ask for it so we like to have the House and Senate approvals on file."  (2d Skidgel Decl. Tab 20.)  Less than an hour later, at 1:47 p.m., an email came from a staff member on the Senate Appropriations Committee stating "Sorry about that and thanks for the reminder.  We have no objection."  (*Id*.)

Second, even if the record established approval of the various uses of EPA fees, there is nothing to support the leap from approval of specific expenditures to defendant's contention that the Appropriations Committees were cognizant and approved of the Judicial Conference's "interpretation."  (*See* 3/23/18 Tr. at __).  In fact, the AO never used the definition defendant now urges the Court to adopt—the "dissemination of information through electronic means"—to explain its use of EPA fees for more than PACER.  Rather, it used terms like "public access initiatives" to describe these expenditures.  (*See* FY 2007 Financial Plan ("collections are used to fund information technology initiatives in the judiciary related to public access"); 2d Skidgel Decl. Tab 12 (FY 2009 Financial Plan at 45) (EPA revenues "are used to fund IT projects related to public access"); Taylor Decl. Ex. J at 10 (AO document, entitled Electronic Public Access Program Summary, December 2012, stating that EPA revenue "is dedicated solely to promoting and enhancing public access").)

Finally, as defendant acknowledges, the post-enactment action of an appropriations committee cannot alter the meaning of the statute, which is what controls what expenditures are

permissible.  *See Tenn. Valley Auth.*, 437 U.S. at 191 ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress.").[23]  Thus, the fact that appropriations committees expressly or implicitly endorsed the use of EPA fees for certain expenditures cannot establish that those expenditures are permissible uses of EPA fees.

For these reasons, the Court is not persuaded that the statute permits the collection of EPA fees to fund any expense that involves the "dissemination of information through electronic means."

### C.      What Limitation Did the E-Government Act Place on the Use of PACER Fees?

Having rejected the parties' diametrically opposed interpretations, the Court must embark on its own analysis to determine whether defendant's use of PACER fees between 2010 and 2016 violated the E-Government Act.  The Court concludes that defendant properly used PACER fees to pay for CM/ECF[24] and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for Courtroom

---

[23]  Even an appropriations Act passed by Congress cannot alter the meaning of statute.  *See Tenn. Valley Auth.*, 437 U.S. at 190–91 ("We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs.  When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden.  Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure.  [This] would lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation . . . .").

[24]  It is undisputed that the expenses in the categories now labeled CM/ECF, Court Allotments and Telecommunication/Communications Infrastructure include only expenses that are directly related to PACER or CM/ECF.  (*See* 3/23/18 Tr. at __; *see also* Skidgel Decl. ¶ 19 ("through court allotments, "courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server)" and "[f]unding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors"; Def.'s Resp. to Pls.' Interrogs. at 22–26.)

33

Technology.  (*See* Attachment 1.)

The statutory language in 28 U.S.C. § 1913 note is clear that, to be paid for with PACER

fees, a "service" must be one that provides the public with "access to information available

through automatic data processing equipment."  An examination of this statutory provision's

history—dating from its enactment in 1990 and culminating in its amendment by the E-

Government Act in 2002—resolves any ambiguity in its meaning and allows the Court to

determine which expenditures between 2010 and 2016 were properly funded by PACER fees.

When the 28 U.S.C. § 1913 note was first enacted in 1989, s*ee* Pub. L. 101-515, § 404,

PACER was in its infancy, but it was operational, and the statute clearly applied to it.  (*See* Jud.

Conf. Rep. at 83 (Sept. 14, 1988); EPA Chronology at 1; Jud. Conf. Rep. at 19 (Mar. 14, 1989);

Jud. Conf. Rep. at 21 (Mar. 13, 1990); 1990 S. Rep. at 86.)  Yet, there was no mention of

PACER in the statute, nor was there any suggestion that the judiciary was precluded from

recouping expenses beyond the cost of operating PACER.  In fact, it is apparent that Congress

recognized the possibility that fees would cover the costs of making court records available to

the public electronically.  *See* 1990 S. Rep. at 86 ("language  . . .  authorizes the Judicial

Conference to prescribe reasonable fees for public access to case information, to reimburse the

courts for automating the collection of the information"); *see also* 1992 H.R. Rep. at 58 (noting

that "the Judiciary's investments in automation have resulted in enhanced service to the public

and to other Government agencies in making court records relating to litigation available by

electronic media" and "request[ing] that the Judiciary equip all courts, as rapidly as is feasible,

with the capability for making such records available electronically and for collecting fees for

doing so").

The first federal court experiment with electronic case filing began in the Northern

District of Ohio in 1996.  (1997 AO Paper at 4.)  Later that year, both the House and Senate

Appropriations Committees made clear that they expected the judiciary to use its EPA fee

collections for more than just paying for the cost of PACER.  (1996 H.R. Rep. at 89 ("The

Committee supports the ongoing efforts of the Judiciary to improve and expand information

made available in electronic form to the public. Accordingly, the Committee expects the

Judiciary to utilize available balances derived from electronic public access fees in the Judiciary

Automation Fund to make information and services more accessible to the public through

improvements to enhance the availability of electronic information.  The overall quality of

service to the public will be improved with the availability of enhancements such as *electronic*

*case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy*

*noticing*.") (emphasis added); 1996 S. Rep. at 88 ("The Committee supports efforts of the

judiciary to make electronic information available to the public, and expects that available

balances from public access fees in the judiciary automation fund will be used to enhance

availability of public access.").)

        While these statements in the reports of the Committee on Appropriations predated the

passage of the E-Government Act, they are not dispositive in terms of discerning what Congress

intended the statute to mean.  They are part of a bigger picture and an important backdrop to the

passage of the E-Government Act.  Contemporaneously with Congress's prompting the judiciary

to use EPA fees to pay for public access to electronically-stored case documents "[t]he transition

towards electronic case files ("ECF") in the federal courts [wa]s underway" by March 1997.

(1997 AO Paper at v.)  Over the next few years, relying expressly on the 1996 House and Senate

Reports relating to fiscal year 1997 appropriations, the judiciary began using EPA fees to fund

the development of a national case management and electronic case filing system, CM/ECF,

which would allow federal courts to maintain complete electronic files.  (*See, e.g.*, FY 2002 Budget Request ("Fiscal year 1997 appropriations report language expanded the Judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").)  The judiciary anticipated that CM/ECF would "produce an impressive range of benefits . . . including . . . public access to case file information."  (1997 AO Paper at v.)  For instance, in 1998, the Judicial Conference created a web interface for PACER and added a per page fee for accessing case dockets and electronic filings via the Internet.  (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998); EPA Chronology at 1.)  At that time, the Judicial Conference noted in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services.  With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue *while introducing new technologies to expand public accessibility to PACER information*.

(Jud. Conf. Rep. at 64–65 (Sept. 15, 1998) (emphasis added).)  By no later than fiscal year 2000, the judiciary was spending substantial sums of money, derived from EPA fees, on CM/ECF and EBN.  (2d Skidgel Decl. Tab 30 (FY 2000 EPA Expenditures).)  In fact, over $10 million was spent on case management/electronic case files, infrastructure and electronic bankruptcy noticing in 2000.  (*Id.*)

Then in 2002, Congress passed the E-Government Act.  This Act encompassed far more than § 205(e)'s limitation on the charging of fees.  The overall purpose of the section pertaining to the judiciary was to "require federal courts to provide greater access to judicial information over the Internet."  2002 S. Rep. at 23.  To that end, the Act mandated that the judiciary expand the public's access to electronically stored information that was accessible via PACER:

- § 205(a), "Individual Court Websites," "require[d] the Supreme Court, each circuit court,

each district court, and each bankruptcy court of a district to establish a website that would include public information such as location and contact information for courthouses, local rules and standing orders of the court, docket information for each case, and access to written opinions issued by the court, in a text searchable format." 2002 S. Rep. at 22.

- § 205(b), "Maintenance of Data Online," required that "[t]he information and rules on each website . . . be updated regularly and kept reasonably current."

- § 205(c), "Electronic Filings," required, subject to certain specified exceptions, that courts provide public access to all electronically filed documents and all documents filed in paper that the court converts to electronic form.

  and

- § 205(d), "Dockets with Links to Documents," directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filing, decision, and rulings in each case to be obtained from the docket sheet of that case."

Subsection 205(e), entitled "Cost of Providing Electronic Docketing Information," changed the language that required the judiciary to charge fees ("shall, hereafter") to make its decision to charge fees discretionary and to limit those fees "to the extent necessary."  Even though the judiciary was already using EPA fees to pay for the costs of CM/ECF and EBN, no changes were made to the last sentence of subparagraph (b), which defined the scope of services that can be reimbursed with EPA fees.

As is clear from the E-Government Act, Congress intended in 2002 for the judiciary to expand its capability to provide access to court information, including public information relating to the specific court and docket information for each case, including filings and court opinions.  With certain exceptions, documents filed electronically were to be made available publicly, and the judiciary was to explore the possibility of providing access to the underlying contents of the docket sheets through links to filings, decisions and rulings.  This ambitious program of providing an electronic document case management system was mandated by Congress, although no funds were appropriated for these existing and future services, but

37

Congress did provide that fees could be charged even though the fees could be "only to the extent necessary."

Consistent with this view the Appropriations Committees reiterated their support for allowing EPA fees to be spent on CM/ECF in 2003.  2003 H.R. Rep. at 116; 2003 S. Rep. at 118; 2003 Conf. Rep. at H12515.

Although congressional "acquiescence" as an interpretative tool is to be viewed with caution, the Court is persuaded that when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of EPA fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and EBN.  Accordingly, the Court concludes that the E-Government Act allows the judiciary to use EPA fees to pay for the categories of expenses listed under Program Requirements: CM/ECF, EBN, Court Allotments and Telecommunications/Communications Infrastructure.[25]  (*See* Attachment 1.)

However, Congress' endorsement of the expenditures being made in 2002, in conjunction with the statutory language, the evolution of the E-Government Act, and the judiciary's practices as of the date of the Act's passage, leads the Court to conclude that the E-Government Act and its predecessor statute imposed a limitation on the use of PACER fees to expenses incurred in providing services, such as CM/ECF and EBN, that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.  This interpretation recognizes that PACER cannot be divorced from CM/ECF, since

---

[25]  Plaintiffs' recent supplemental filing after the motions hearing suggested for the first time that the CM/ECF category might require closer examination to determine whether the expenditures therein, in particular CM/ECF NextGen, were all appropriately treated as "public access services."  (*See* Pls.' Resp. to Def.'s Supp. Authority at 3, ECF No. 85.)  But plaintiffs made no such argument in response to defendant's motion for summary judgment.  (*See* Pls.' Reply at 6 (raising no challenge to CM/ECF if the statute authorizes "PACER fees to cover all costs necessary for providing PACER access and other public access services").)

PACER is merely the portal to the millions of electronically-filed documents that are housed by the judiciary on CM/ECF and are available to the public via the Internet only because of CM/ECF.

With this understanding, the Court will consider whether the judiciary properly used PACER fees for the remaining categories of expenses, which the judiciary now identifies as Congressional Priorities: Courtroom Technology, the State of Mississippi study, Web-Juror, and VCCA. (*See* Attachment 1.)

The judiciary only began using EPA fees for these expenses five or more years after the E-Government Act. Defendant's first attempt to justify the use of EPA fees for each of these categories focused almost exclusively on purported congressional approvals. As previously discussed, post-enactment legislative history as a general rule is of limited use in statutory interpretation, particularly when the action comes from a committee—especially an appropriations committee—rather than Congress as a whole. Compounding that problem here, also as previously noted (with the exception of courtroom technology, *see* supra note 22), is the questionable substance of the congressional approvals for several of these expenditures with the exception of courtroom technology.

Even if defendant could rely on congressional approvals, the Court would still have to decide whether the expenses fit within the definition of permissible expenses.

*State of Mississippi*: The category labeled "State of Mississippi" is described by defendant as a study that "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents." (Def.'s Resp. to Pls.' Interrogs. at 5.) It is apparent from this description that this study was not a permissible expenditure since it was unrelated to providing access to electronic

information on the federal courts' CM/ECF docketing system.

*VCCA*: The category labeled Victim Notification (Violent Crime Control Act) refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." (Def.'s Resp. to Pls.' Interrogs. at 11.) Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to the through the mail." (*Id*.) Defendant first defended the use of EPA fees to pay for this program on the ground that it "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 34, 53, 69, 87, 105, 123, 141.) Defendant has also argued that this program benefits the public because by sharing this information electronically, the information gets to law enforcement agencies more quickly, and they in turn may be able to revoke supervision, if warranted, more quickly. (*See* 3/23/18 Tr. at __.) But neither of these justifications establishes that VCCA is a permissible expenditure of PACER funds. While this program disseminates federal criminal case information, and its outcome may indirectly have some benefit to the public, it does not give the public access to any electronically stored CM/ECF information.

*Web-Juror*: The category labeled Web-Based Juror Services refers to the costs associated with E-Juror, a juror management system. (Def.'s Resp. to Pls.' Interrogs. at 11.) It "provides prospective jurors with electronic copies of court documents regarding jury service." (*Id*.) Defendant's justification for using EPA fees to pay for these costs is that the E-Juror program "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 71, 89, 107, 125, 143.) Again, whether a program "improves the overall quality of electronic service to the public via an enhanced use of the Internet" does not establish that it is permissible use of EPA fees where there is no nexus to the

public's ability to access information on the federal court's CM/ECF docketing system.

*Courtroom Technology*:   The category labeled "Courtroom Technology" funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 11.)  The expenses in this category include "the costs of repairs and maintenance for end user IT equipment in the courtroom; obligations incurred for the acquisition and replacement of digital audio recording equipment in the courtroom; costs for audio equipment in the courtroom, including purchase, design, wiring and installation; and costs for video equipment in the courtroom, including purchase, design, wiring and installation."  (Def.'s Resp. to Pls.' Interrogs. at 32.)  Defendant argues that EPA fees are appropriately used for courtroom technology because "it improves the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record."  (FY 2007 Financial Report at 46.)  Again, there is a lack of nexus with PACER or CM/ECF.  From the existing record, it would appear that the only courtroom technology expenditure that might be a permissible use of EPA fees is the "digital audio equipment" that allows digital audio recordings to be made during court proceedings and then made part of the electronic docket accessible through PACER.  (*See* Taylor Decl. Ex. A (2013 EPA Fee Schedule) (charging $2.40 "for electronic access to an audio file of a court hearing via PACER").)  But, the Court does not see how flat-screen TVs for jurors or those seated in the courtroom, which are used to display exhibits or other evidence during a court proceeding, fall within the statute as they do not provide the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.

Accordingly, with the exception of expenses related to digital audio equipment that is

used to create electronic court records that are publicly accessible via PACER, the Court concludes that the expenses in the categories listed as Congressional Priorities are not a permissible use of EPA fees.[26]

## CONCLUSION

For the reasons stated above, the Court will deny plaintiffs' motion for summary judgment as to liability and will grant in part and deny in part defendant's cross-motion for summary judgment as to liability.  A separate Order, ECF No. 88, accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2018

---

[26]  The Court urges the parties to confer prior to the next status conference to determine for the years 2010 to 2016 the amount of courtroom technology expenditures that cannot be paid with PACER fees.