```
                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
--------------------------------X

NATIONAL VETERAN LEGAL SERVICES
PROGRAM, ET AL.,

                 Plaintiffs        Civil Action No.16-745

          vs.

UNITED STATES OF AMERICA,

                 Defendant.

--------------------------------X
                                  Washington, D.C.
                                  Friday, March 23, 2018
                                       1:30 p.m.

         TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
           BEFORE THE HONORABLE ELLEN S. HUVELLE
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:   Jonathan E. Taylor, Esq.
                      Deepak Gupta, Esq.
                      Daniel Townshend, Esq.
                      GUPTA WESSLER, PLLC
                      1900 L Street, N.W.
                      Suite 212
                      Washington, D.C.  20036
                      (202) 888-1741

                      Meghan S.B. Oliver, Esq.
                      MOTLEY RICE, LLC
                      28 Bridgeside Boulevard
                      Mount Pleasant, S.C.  29464
                      (843) 216-9492




Court Reporter:       Lisa Walker Griffith, RPR
                      U.S. District Courthouse, Room 6507
                      Washington, D.C.  20001
                      (202) 354-3247
```

APPEARANCES (Cont'd):

For the Government:    Brian J. Field, Esq.
                       William Mark Nebeker, Esq.
                       U.S. ATTORNEY'S OFFICE
                       Civil Division
                       555 Fourth Street, N.W.
                       Washington, D.C.  20530
                       (202) 234-2806
                       (202) 252-2536

**P R O C E E D I N G S**

1

2          THE DEPUTY CLERK:  Your Honor, this afternoon this

3     is In Re: The National Veterans Legal Services Program versus

4     the United States of America, Civil Action Number 16-745.

5          Ask the parties to step forward, identify

6     yourselves for the record, please.

7          THE COURT:  If you could come to the mic, then the

8     court reporter can take it down.

9          MR. TAYLOR:  Good afternoon, Your Honor.  I'm

10    Jonathan Taylor for the plaintiffs.  And I'm from the Gupta

11    Wessler law firm.

12          And joining me at counsel table, we have Deepak

13    Gupta and Daniel Townshend, both of Gupta Wessler as well,

14    and then our cocounsel from the Motley Rice Firm, Meghan

15    Oliver.

16          THE COURT:  Good afternoon.

17          MR. TAYLOR:  Good afternoon.

18          THE COURT:  And your last name is Taylor, you're

19    not on the computer.

20          Okay.  For the Government?

21          MR. FIELD:  Good afternoon, Your Honor, Brian Field

22    on behalf of the Government.  And with me at counsel table is

23    Mark Nebeker, also from the U.S. Attorney's Office.

24          And then three representatives of the

25    Administrative Office of the United States Court, Mr. Wendell

 1    Skidgel in the back, Ed Cain and William Meyers.

 2              THE COURT:  Okay.  So, Mr. Field, you're going to

 3    be arguing on behalf of the Government?

 4              MR. FIELD:  Yes, Your Honor.

 5              THE COURT:  Okay.  We are here today on the

 6    question of PACER fees.  And I'm going to start with the

 7    plaintiff's counsel if I may.  I have some questions.  There

 8    have been lots of pleadings filed, lots of information.  But

 9    I do have a question.

10              We certified a class here a while ago based on your

11    pleadings, et cetera.  And the class was defined -- let me

12    make sure I get it right.

13              Or the issue, at least, according to my opinion,

14    was whether or not PACER fees, where the plaintiffs have

15    shown that the Act, the E-Government Act was violated because

16    the cost of distributing the information via PACER, the fees

17    exceeded that.

18              Now, is that the question before me today?

19              MR. TAYLOR:  That is the legal question before you

20    today.  So the plaintiffs have, we have sought summary

21    adjudication as to the liability only, reserving the question

22    of damages for a later stage.  And the Government has moved

23    for summary judgment.  So the only question before the Court

24    at this stage is whether the AO has transgressed its

25    statutory authority by charging PACER fees that exceed the

1   marginal cost of disseminating information through the PACER

2   system.

3           THE COURT:  The defense is taking the position that

4   all expenditures where PACER fees have been used, and there

5   are a series of them, are covered.  And there is no liability

6   for any of those.  What is your response as to that?

7           MR. TAYLOR:  Right.  Yes, I take that to be the

8   real argument on the other side, that the Appropriations

9   Committee, in their reports and in some less formal

10  communications with representatives at the Administrative

11  Office, have effectively acquiesced in the way that these

12  PACER fees are being spent.

13          And if that is the argument, I think for it to do

14  any work you'd have to find that that somehow -- that that

15  acquiescence somehow expanded the scope of the statutory

16  authorization that is found in the E-Government Act.

17          THE COURT:  Well, where in the E-Government Act

18  does it say that PACER fees can only be used for PACER?

19          MR. TAYLOR:  So it doesn't mention, the Act itself

20  does not mention PACER explicitly.  So if you have the text

21  of the Act in front of you?

22          THE COURT:  In more than a dozen places.

23          MR. TAYLOR:  Well, one place you could look, Your

24  Honor, is to our motion at pages 4 and 5.  We reproduced the

25  text in full, the bottom of 4.  And that's Docket, I think

1   52.

2            THE COURT:  Let me look at the -- are you looking

3   at the Act as proposed or as codified?

4            MR. TAYLOR:  As codified, Your Honor.  That can be

5   found at 28 USC 19 note.

6            THE COURT:  Okay.

7            MR. TAYLOR:  And I think it might be helpful to

8   walk through the text of the statute because you're right

9   that the statute itself doesn't use the word PACER.  That can

10  be found in the fee schedule.  And so it's the fee schedule

11  that has been promulgated by the AO.  And it's the fee

12  schedule that is specifically mentioned in the statutory

13  text.

14           So let's begin with the first sentence.  The text

15  itself is only five sentences.  So the first sentence is

16  obviously quite important.  It authorizes the imposition of

17  reasonable fees only to the extent necessary for access to

18  information available electronically.

19           The second sentence is not particularly relevant

20  here, it allows fee waivers and other exemptions.

21           And then the third sentence, I think is quite

22  important, and this is where PACER comes in.  It says that

23  the AO must prescribe a schedule of fees that it charges for

24  electronic access to information.  And the AO has done that

25  here by charging fees for three different services.  And

1   you'll find these services at the -- in the fee schedule and

2   that is provided at Docket 52-2.  It's Exhibit A to my

3   declaration, the Taylor declaration.

4           And those three services are PACER, that's the bulk

5   of it.  The PACER Service Center, and then also printing

6   records at the courthouse.  And then you have two more

7   sentences in subsection B.  I'll give you a second.

8           THE COURT:  You're talking about a fee schedule

9   that existed back in 2002.

10          MR. TAYLOR:  So there was a fee schedule that

11  existed before the Act, and there was also one that existed

12  afterward.  And it was the exact same fee schedule.

13          THE COURT:  Okay.  So for every search, this is

14  PACER Service Center fees.

15          MR. TAYLOR:  Right.  So you'll see three different

16  categories there if you're looking at the fee schedule.  I'll

17  pull it up, too, so we're all on the same page.

18          The first one is fees for PACER.  The second one is

19  fees for courthouse electronic access, and then the third is

20  PACER Service Center fees.  So those are the three services

21  that are being provided in exchange for a fee.

22          And just to return to the statutory text, if you

23  still have that in front of you, subsection B, the first

24  sentence is a procedural requirement that the fee schedule be

25  provided at least 30 days before it becomes effective.  And

1    then the last sentence is also quite important.  It's the one

2    that says that, "Any fee collected as a charge for services

3    rendered."

4            So there are three different services you find in

5    the fee schedule, "is deposited into the judiciary's

6    information fund," quote, "to reimburse expenses incurred in

7    providing these services," close quote.

8            THE COURT:  Well, let me ask you this.  When you

9    look at the statute, the E-Government Act, and the amendments

10   that were occurring at the same time as what you just quoted

11   to me, it is requiring the judiciary to do a bunch of things.

12           One is to provide a website so that documents can

13   be accessible to the public regarding things like court

14   location, schedule, times, basic information.

15           MR. TAYLOR:  That's right, Your Honor.

16           THE COURT:  What's your position on that?

17           MR. TAYLOR:  So you'll see, if you look back at

18   that fee schedule we were just looking at, if you turn the

19   page, you'll see at the bottom of subsection nine, in the

20   category labeled "discretionary fee exemptions," at the very

21   last bullet point says, "Courts may provide local court

22   information at no cost.  Local rules, for example, local

23   rules, court forms, news items, court calendars and other

24   information to benefit the public."  So the AO has exercised

25   its discretion and decided not to impose a fee for this

```
 1    particular service.

 2              THE COURT:  Right.  But statute doesn't say they

 3    can't.  That was the AO's decision not to charge for a

 4    government website.  My point is the government website is

 5    required by the E-Government Act.  And the E-Government Act

 6    further requires electronic filings.

 7              MR. TAYLOR:  No, I don't think the E-Government Act

 8    itself requires that.  But if it does, it's not part of the

 9    statute at issue.  The sole statute on which the AO has

10    relied for its authority to impose a fee in the first place,

11    which expressly limits --

12              THE COURT:  Wait, wait, wait.  The AO doesn't

13    interpret the statute the way you do.

14              MR. TAYLOR:  That is certainly right, Your Honor.

15              THE COURT:  Wait a second.  I'm trying to

16    understand the statute as a whole.  I don't think you can

17    remove 205(E) and ignore what else Congress was telling them

18    in this statute, which was besides the section you have just

19    read, do you not admit that they are saying that they want

20    the judiciary to develop a system so that there can be links

21    to the filings and the documents which is ultimately what we

22    come to know as CMECF.

23              Under D, under the section one, they want to talk

24    about electronic filings.  And they talk about various --

25    make documents that are filed electronically publicly
```

1    available.  And they don't provide any money for this.  Do

2    you agree?

3              MR. TAYLOR:  I think that's right.  So I guess the

4    argument would be that because it's an unfunded mandate that

5    there's some rule against doing that.  And I think --

6              THE COURT:  What do you mean there's some rule

7    against doing what?

8              MR. TAYLOR:  Against providing a requirement in a

9    statute that another branch of government do something

10   without actually specifying a funding mechanism in the text

11   of that particular statute itself.  So typically it would be

12   appropriated funds that would cover it.

13             THE COURT:  If appropriated funds, there are no

14   appropriated funds to cover this.  You're saying that this --

15   these parts of the statute are, what, null and void?

16             MR. TAYLOR:  No, I think so that the E-Government

17   Act, it didn't -- so it did amend section 1913 note, which is

18   the sole statute at issue in this case.

19             THE COURT:  You say that, but if I don't agree with

20   you, why don't you assume I'm looking at the whole statute

21   for a minute?

22             MR. TAYLOR:  Well, I think that's right that in the

23   E-Government Act Congress did some other stuff too.  It

24   didn't just amend the statute.  But it still is the case that

25   this statute is the only source of revenue raising authority

1   because, of course, it's the Congress that has the sole

2   authority to levy taxes.  And so what the Supreme Court has

3   said in user fee jurisprudence more broadly is that Congress

4   has to be really clear when it's delegating that authority to

5   another branch of government.

6         And so what we're looking for in reading this text

7   is in a clear statement that Congress wanted another branch

8   of government to impose user fees, not only to reimburse the

9   cost of the service for which the fee is charged, but also to

10   raise revenue for other things, which in that kind of

11   redistributive revenue raising function is the prerogative of

12   Congress only.  And whatever you think of the statutory text,

13   and I think we have the better argument, I think it has to be

14   the case that it doesn't provide that clear authorization.

15         THE COURT:  Well, let's go back.  What do you say

16   when Congress says to the judiciary the Court shall make any

17   document that is electronically filed publicly available on

18   line or filed electronically, publicly available on line.

19   Then they also go on and say that they shall explore the

20   feasibility of technology to post on line dockets.  So if

21   they don't provide a penny for that.

22         And then when you go on to look at the -- before it

23   is made into the, when it's still a public law, it reads, "E,

24   cost to providing electronic docketing information."

25         MR. TAYLOR:  Right.

1          THE COURT:  And that's where they say we're going

2     to amend to say "may only to the extent necessary."

3          MR. TAYLOR:  Right.

4          THE COURT:  What do you say the cost of providing

5     electronic docketing information means?  If it means

6     anything.

7          MR. TAYLOR:  I think it means, the way I would look

8     at it is, you take a look at the fee schedule that is

9     promulgated by the AO, and that's mandated by the text of

10    section 1913 as amended, and then you see what services are

11    being provided in exchange for a fee on the fee schedule.

12    And you've got three of them.  You've got PACER, PACER

13    Service Center, and the printing records at the courthouse.

14         Now, it is true that on the next page, as I pointed

15    out earlier, that the AO is complying with its statutory

16    requirement to post standing orders and other basic

17    information on its website.  And it could have decided to

18    charge a fee for that if it wanted to, but it decided not to.

19    Because it said explicitly courts may provide local court

20    information at no cost, for example, local rules, court

21    forms, news items, court calendars, and other information to

22    benefit the public.

23         Now, I think our reading is that this service,

24    having a website, posting information on it, complying with

25    the statutory requirements, would not be part of the bucket

```
 1    of fees for which would be reasonably reimbursed through
 2    PACER.  But I think even if you disagreed as to that
 3    question, to return to my point at the very beginning, the
 4    only issue before the Court right now is whether any, whether
 5    the fees even are one dollar too much.  And so you have to
 6    keep in mind all the various --
 7              THE COURT:  Wait, wait, wait.  But you keep saying
 8    the only issue.  I've got their motion for cross summary
 9    judgment.
10              MR. TAYLOR:  Right.
11              THE COURT:  So, and their issue is everything that
12    we've used PACER fees for is okay.
13              MR. TAYLOR:  That's exactly right.
14              THE COURT:  And you, in your brief, have a large
15    bucket of items in which you say don't worry about those,
16    Judge, even though they're asking for summary judgment.  Down
17    the road they'll go to damages, which, you know, let's say,
18    let's call it a bucket that is largely CMECF.  I don't
19    understand your position when you say it goes to damages, not
20    liability.  And we can't really tell you much about that.
21              MR. TAYLOR:  Well, I guess the way I would put it
22    is this.  If you take a look at one of the documents that the
23    Government provided in response to Your Honor's questions
24    last week, I don't know if you have them, it's a fairly big
25    document.  But one of the documents at page 26 --
```

1          THE COURT:  Hold on.

2          MR. TAYLOR:  I have copy if you'd like it.

3          THE COURT:  Hold on.  What tab is it?

4          MR. TAYLOR:  So it's tab 10.

5          THE COURT:  Okay, hold on.

6          MR. TAYLOR:  So here, this is the judiciary fiscal

7    year 2007 spending plan.  And you'll notice at the bottom of

8    this first page, so it's page 27 of the ECF and 45 of the

9    spending plan if you're looking at the bottom right.

10          THE COURT:  Okay, this is the spending plan for

11   '06, is that it?

12          MR. TAYLOR:  '07 is what I have, but either way.

13   Is it '06?

14          THE COURT:  Right.  Okay.

15          MR. TAYLOR:  It doesn't really matter.  But you'll

16   notice in the second paragraph in the middle.

17          THE COURT:  What page?

18          MR. TAYLOR:  So 27 of the ECF if you're looking at

19   the upper right-hand corner.

20          THE COURT:  Okay.

21          MR. TAYLOR:  So there are two sentences.  One reads

22   in the middle of that second paragraph, "Funds," meaning

23   PACER funds, "are used first to pay the expenses of the PACER

24   program.  Funds collected above the level needed for the

25   PACER program are then used to fund other initiatives."  And

1    I think our position is that the first sentence is okay.  All

2    that stuff is well and good.  The second sentence is not.

3            But what I meant when I said that the only question

4    is liability is that, you're right, the defendant is taking

5    the position that all the different programs that it uses

6    PACER fees to fund, including a pilot program for the State

7    of Mississippi, flat screens for jurors, notices to law

8    enforcement agencies, that that -- those are all properly

9    considered part of the, you know, cost of providing the

10   records.

11           THE COURT:  I understand.  But your position is

12   what -- is that nothing that goes for ECF.  Well, I don't

13   know, is your position that CMECF is not covered and

14   therefore they lose?

15           MR. TAYLOR:  So we address this at page 19 of our

16   motion.  And I would say two things in response to that

17   question.  Number one, our best answer is, based on our

18   reading of the statute, that the cost of running CMECF and

19   allowing lawyers to file the documents, which is a cost that

20   the judiciary will have to bear irrespective of whether you

21   have PACER, is not part of the marginal cost of operating

22   PACER.  If you wanted to fund that using fees, you would have

23   to impose fees on the users of that particular system, so the

24   lawyers.  But, I think --

25           THE COURT:  Could they have in 2000 -- CMECF went

1    on line in this court at least before 2002.

2            MR. TAYLOR:  It did.

3            THE COURT:  So could they have had a separate fee

4    schedule for that and use PACER revenues to do it?

5            MR. TAYLOR:  You wouldn't be using PACER revenues

6    to do it.  You could have a separate fee schedule and then

7    use the fees that were collected under that schedule.  And

8    actually when the judiciary was considering creating ECF, it

9    considered how to fund it, and it primarily focused on that

10   specific question, potentially using a separate user fee to

11   fund the program.  It also considered the use of appropriated

12   funds.  And then finally it considered just using the pot of

13   money it already had from PACER fees, expanding it and

14   funding this program.  And I think it's that last move that

15   we think is unlawful, and Congress agreed because it

16   intervened and amended the statute.

17           THE COURT:  Let's go back to the statute.

18           MR. TAYLOR:  Okay.

19           THE COURT:  What does the statute tell me about the

20   scope of services?  I understand it tells me something about

21   fees.  They are moving towards less user fees, more free

22   access, and the fee should be reasonable.  That's always been

23   the statute.

24           MR. TAYLOR:  Right.

25           THE COURT:  And only to the extent necessary.  But

1    what does it tell me about what services can be covered?

2            MR. TAYLOR:  So all it says about services is that

3    the services are for access to information available

4    electronically, right?  But the place I would look, what the

5    statute says is that in the third sentence of subsection A is

6    that the AO, quote, "shall prescribe a schedule of reasonable

7    fees for electronic access to information."

8            And so the schedule is what tells you what the

9    services are.  And the schedule that is promulgated by the AO

10   contains PACER fees, PACER Service Center fees, and then fees

11   for electronic access.  And even if you also thought that

12   reimbursing the cost of running the website would also be

13   properly part of the use of PACER fees, that too is found on

14   the fee schedule.  And the judiciary made the considered

15   decision not to charge for it.  But what you won't find is

16   any mention of CMECF or a Mississippi study or some of these

17   other things.

18           THE COURT:  Well, that's because it really hadn't

19   become terribly popular in the sense it hadn't covered a lot

20   of jurisdictions.  But it was, I think we were a pilot,

21   frankly, when we started in late 2000 or 2001.

22           MR. TAYLOR:  Right.  Right.

23           THE COURT:  But what do you say about the House

24   report, I think it's for fiscal 2007.

25           MR. TAYLOR:  Right.

1    THE COURT:  Which it says very clearly, the words

2  are electronic filings, bankruptcy notices.  And they're

3  pretty clear about what they think is coming down the pike.

4  Why should the judiciary ignore that?

5    MR. TAYLOR:  Well, Your Honor, I would have a

6  couple of responses.  And the thrust of the response would be

7  the same response that we gave in our reply brief, which is

8  Docket 75 at page 9, where we deal with this specific

9  question.

10    And I take the AO in their response at page 10 to

11  now be conceding that the Appropriations Committee, by

12  approving the fiscal year spending plans, cannot provide a

13  separate source of authority to charge fees, right, because

14  the only source, whatever it is, has to derive from the

15  statute that's enacted by the full Congress and signed into

16  law by the President.

17    And I think that the Supreme Court in *TVA versus*

18  *Hill* has been very clear that language in an Appropriations

19  Committee report, even if it were clearer than the language

20  we have here, cannot expand or alter the meaning of the

21  statute passed by Congress.  And that has to be particularly

22  the case here because the Appropriations Committee --

23    THE COURT:  Well, I want to go back to the notion

24  of what our service is.  The words, all the words you're

25  talking about -- those words didn't change, nothing changed.

1          MR. TAYLOR:  Right.

2          THE COURT:  So we have a House, I understand what

3   you say about TVA, but prior to the E-Government Act, the

4   House Appropriations report, which I think is 104-676 --

5          MR. TAYLOR:  Right.

6          THE COURT:  -- passed in '76 says -- in 1996, it

7   says, "The overall quality of service to the public will be

8   improved with the availability of enhancements such as

9   electronic case documents, electronic filings, enhanced use

10  of the Internet, and electronic bankruptcy notices."

11         So, it may be those charges didn't exist when the

12  fee schedule was developed, I don't know.  But the fee

13  schedule you're relying on may well only cover certain

14  things, but I don't know that they had incurred costs in 2002

15  for those, maybe Mr. Field will let us know when he gets up.

16  But if they didn't cover those costs then, your position is

17  in terms of services it's frozen as of 2002?

18         MR. TAYLOR:  No, Your Honor.  To be clear, this fee

19  schedule was promulgated, I think the most recent version is

20  from 2017, and it still has the same services.  So it's not

21  that -- you know, it was frozen in place back in the day.

22  And this is the current modern version.

23         THE COURT:  Well, that's just what they can charge

24  for.  I understand.  But it doesn't say how they can spend

25  it.

1          MR. TAYLOR:  Well, I actually think that

2     distinction helps us here.  Because the question in this case

3     is kind of the input side, right?  It's how much money you

4     can raise, which is -- which Congress has that authority.

5     And the question is whether Congress has clearly delegated

6     that authority.  And what the appropriators are dealing with

7     is how you spend the money that has already been allocated

8     that you have, and that's a different question, and it's also

9     just the Appropriations Committee, not the full Congress.

10          And so you can't rely on that to somehow alter the

11     meaning of what Congress has done, and the limitation that

12     Congress has imposed by amending the E-Government Act to say

13     if you're going to charge fees at all, it can be only to the

14     extent necessary.  And you've got to -- whoever is going to

15     win this case or this motion at this stage has to have some

16     account of what Congress was trying to do when it intervened

17     and said in 2002, we're restricting the scope of what you can

18     charge only to the extent necessary.

19          As the Supreme Court --

20          THE COURT:  You're saying that they're restricting

21     the scope of what they can charge.  I keep saying the scope

22     definition hasn't changed.  The fee amounts have changed.

23          MR. TAYLOR:  No, no, I think it's exactly the

24     opposite.

25          THE COURT:  You're supposed to not charge more than

```
1     is necessary.  That's basically the thrust of the amendment.

2              MR. TAYLOR:  Correct.

3              THE COURT:  But, in the same statute they say we

4     want you to do a whole bunch of other things too, by the way.

5     And they don't discuss how they're paid for.  But they have

6     recognized in prior, at least House reports, that they have

7     in mind understanding where the technology is going.

8              What you are saying is the technology says PACER

9     fees are PACER fees and that's all you can pay for.  But it

10    doesn't quite say that in the statute.  And so, you can't

11    look back, the scope has never changed.  It's just the fees

12    have changed.

13             MR. TAYLOR:  Right.  I guess, I think what matters

14    here if you want to look at the statutory text, I guess a

15    couple of points.  The first point is, you're right, the fees

16    didn't change.  There is a schedule in 2001, and there was a

17    schedule in 2003, and it was the exact same schedule.  But in

18    between Congress intervened and said you can only charge fees

19    to the extent necessary.

20             And the basic rule, which the Supreme Court has

21    said over and over and over again that when Congress amends

22    legislation, courts must presume that it intends the change

23    to have real and substantial effect.  That's a direct quote

24    from the case a couple of years ago.  We have some

25    understanding of what the statute does that gives it real and
```

1    substantial effect.  And the other side doesn't at all

2    because nothing changed after the statute was passed.

3             And I think if you want to look at the text of the

4    statute --

5             THE COURT:  To be fair, they made changes in terms

6    of having the floor, you know, that you can't get charged

7    until you get $15.  And then there are things that were

8    efforts to minimize in some way some costs.

9             MR. TAYLOR:  Right.

10            THE COURT:  It didn't get rid of all the costs.

11   But it's not as if, but they expanded over time the services.

12   And that's really the question on how I see it.

13            MR. TAYLOR:  Yeah.

14            THE COURT:  Well, let me ask you this.

15            MR. TAYLOR:  Sure.

16            THE COURT:  If I don't accept your position, which

17   is that they can use PACER for more than PACER, where are

18   you?

19            MR. TAYLOR:  So, I guess we would have -- the

20   fallback position would be that if you think that the statute

21   authorizes more than PACER fees, or authorizes PACER fees to

22   exceed the marginal cost of operating the PACER system, based

23   on an understanding that at the same time that Congress

24   amended the statute in the E-Government Act, it also imposed

25   on the judiciary some requirements to post information on

1    line, on the website, I think that you could construe the

2    statute to allow PACER to fund those operations.  But I still

3    think that there would be categories here that would fall

4    outside of even that scope because they really just don't

5    have anything to do with the provision of records.

6              And I do want to take one more crack at the premise

7    of the question, which is --

8              THE COURT:  Not yet, not yet.  What are those

9    categories specifically?  We've got the Mississippi study,

10   we've got the VCCA.

11             MR. TAYLOR:  Yeah, so I guess we would --

12             THE COURT:  And you've got the juror notification.

13             MR. TAYLOR:  The courtroom technology, the juror

14   notification, notices to creditors in bankruptcy proceedings,

15   Mississippi study, notices to local law enforcement agencies.

16   And these are great services.  They deserve to be provided.

17   The question is how do you fund them.  Do you do it through

18   the traditional route of appropriations or can you use a user

19   fee that is provided in exchange for a different service to

20   then, you redistribute it and fund this.

21             And I think that's where the delegation problem

22   comes in because the Supreme Court has been very clear that

23   if you're going to construe a user fee statute to allow that

24   kind of redistribution, Congress has to be very clear that it

25   wanted it to do that.  And if anything, Congress by

1    intervening and limiting the scope of the fee, I think

2    signaled the opposite.

3         THE COURT:  Limited the amount of the fee, not the

4    scope necessarily.  I think we have two concepts.  Services

5    have to mean something.

6         MR. TAYLOR:  That's right.  But the services are

7    the services, and so the statute says you can impose the fee

8    as a charge for services rendered, right?  And the services

9    that are rendered under the fee schedule are the provision of

10   records through PACER.  If they want to also, if the

11   judiciary wants to charge fees to the users of the website or

12   someone who wants to access the standing orders on line, they

13   could do that.  They could have some payroll, and they would

14   have the authority, I think, under the statute to do that.

15   They have decided not to do that.  And so the only fee that

16   they can charge PACER users in exchange for the service of

17   providing the record through PACER is the fee that is

18   necessary to recoup the cost of providing that service.

19   That's the way that user fees typically work.

20        THE COURT:  What do you do with the fact, and I

21   think it's undisputed, that PACER is nothing more than a

22   portal now.  Maybe, you know, back when, when you got access

23   to a docket, you didn't get access to a whole wealth of 500

24   million documents.

25        MR. TAYLOR:  Right.

1          THE COURT:  So you have a body of information

2    available to the PACER user that is all the electronic

3    filings.

4          MR. TAYLOR:  Right.

5          THE COURT:  You don't get that merely by having

6    PACER.

7          MR. TAYLOR:  That's right.  But I think that just

8    shows that -- look, any court to operate has to have a filing

9    system and a system for storing it.  And you have to have a

10   courthouse and various other things, right?  And I think that

11   if anything, what you're pointing out is that technology has

12   advanced to the point where it's very easy to just

13   disseminate information that you already have to store for

14   case management purposes and other purposes.  And that's why

15   those data storage costs have gone down, and dissemination

16   costs have gone down.  The fees should actually have gone

17   down.

18         Senator Lieberman makes this point both in his

19   amicus brief supporting us and in his exchange with the AO,

20   that at the same time when you have the cost of providing

21   records to PACER like going way down, you have the fees

22   skyrocketing, I think it's that imbalance that is where the

23   problem is.

24         THE COURT:  It depends, if you decide that the new

25   generation of ECF is covered, I mean, you can't decide

1    that -- you can't decide that ECF, CMECF is covered and then

2    say you can't get a new generation, I mean, we should be

3    stuck back in the old days of tech.

4               MR. TAYLOR:  Right.

5               THE COURT:  And it's your position that that whole

6    sort of middle bucket, which you kind of say is a question of

7    damages and not liability.

8               MR. TAYLOR:  Right.

9               THE COURT:  Why is it a question of damages and not

10   liability?  Either that it's covered by the Act or not

11   covered by the Act.  If it's covered by the Act, it's

12   liability.  If it's not covered, then it would be damages.

13   But don't I have to decide whether these buckets that you

14   take no position on and say it's not a matter of discovery,

15   what --

16              MR. TAYLOR:  So the question -- here's the way I

17   would frame the question before the Court.  If even one of

18   the buckets is impermissible and so PACER fees cannot be used

19   to fund it, then liability is required because there's been a

20   statutory violation.

21              Now, the extent of the violation, the reason we

22   call that a damages questions, depends on how many different

23   buckets and how much is in each bucket, right?  And so that's

24   why I think we've conceptualized it as a damages question.

25              But you're right in interpreting --

1          THE COURT:  No, but how is it a damage -- wait,

2    wait, wait.  If you -- you have to answer my question with

3    the following assumption:  That PACER is not limited to

4    PACER.

5          MR. TAYLOR:  Right.

6          THE COURT:  So if it covers ECF, CMECF, how do I

7    deal with those buckets, the ones that you have not touched,

8    so-to-speak?

9          MR. TAYLOR:  So if you find that it covers ECF, I

10   think, first, I don't know how you would find that as a

11   textual matter, but I suppose the argument would be something

12   along the facilitation theory that you seem to be

13   articulating, which is, that because having the filing system

14   facilitates records, that it could be reimbursed for that.  I

15   think that's wrong as a textural matter.  But if you find

16   that that is a permissible use, then there are still other

17   categories that I think would fail that facilitation theory,

18   and that would be --

19         THE COURT:  What about the middle bucket?  I

20   understand your categories of things that happen post-2002 or

21   3, I understand that.  That's why debates are going on here,

22   after the definitional ones.  But you take the position that

23   upgrading courtroom technology, let's see, what page was it

24   on the brief again?  Was it the reply or --

25         MR. TAYLOR:  Are you looking for our position on

1    CMECF or are you looking for --

2              And so just to go back to the --

3              THE COURT:  It's on page 19 of document 52.  What

4    about the other categories of expenses on which judiciary

5    spends PACER fees.  And you put CMECF infrastructure,

6    telecommunication expenses and court allotments.  And you say

7    there's a short and a long answer.  And I would probably, I

8    don't know whether you put the court, do you put the court

9    website in there, the government website or are you not

10   challenging that?

11             MR. TAYLOR:  So I just want to be clear, the reason

12   we -- we didn't create those categories out of whole cloth,

13   right?  And the reason that we think those are outside the

14   scope is that those services are provided to people

15   irrespective of whether they use PACER.  It has nothing to do

16   with PACER.  And so that's why --

17             THE COURT:  How can you say that?  You can't get

18   the documents, a litigant can get the documents once on ECF,

19   a party to it.  But the world can get access to those

20   documents and the litigant and the parties after the first --

21             MR. TAYLOR:  That's right.

22             THE COURT:  -- have peaked only through PACER.

23             MR. TAYLOR:  That's right.  But I think that the

24   reason that the -- accessing the first look is free is

25   because that's a -- the AO's exercised its exemption

1    authority under subsection A of the statute to provide that

2    for free.  It's exercised discretion not to charge a fee for

3    that particular part.  And it has the authority to do that.

4    But that doesn't make it part of the ECF side, the filing

5    side.  And I would distinguish between those two groups of

6    people because --

7         THE COURT:  I don't understand what you just said.

8    Does not make it part of the ECF side.

9         MR. TAYLOR:  So ECF is a system that, the service

10   that it provides is to a different group of people.  It's the

11   people, the lawyers and litigants who want to file documents,

12   and the service that it provides it that it allows them to

13   file those documents electronically.

14        Providing access to the documents is a different

15   service provided to a -- you know, there's some overlapping

16   people there, of course, but it's a different group of

17   people.  And the people who pay the fee, the only service

18   they receive is the provision of the record through PACER.

19   And that's why it's a different -- but I think, you know,

20   again, you could answer the CMECF question differently.

21        THE COURT:  Provision of a record through PACER.

22   What is the record?  It's the ECF filing, right.  I don't

23   see, I have a hard time, as you can tell, differentiating

24   PACER from what you get access to and what the public gets

25   access to.  And you take the position that PACER should only

1    benefit the PACER user.  But the PACER user includes the

2    public.

3             MR. TAYLOR:  No, I completely agree with that.

4    PACER is the public facing side.  It provides records to the

5    public.  And ECF is where -- how the records are filed and

6    they're stored, and there's a case management component to

7    ECF; that's why it's CMECF, and that just allows the Court to

8    manage the docket.

9             And I think what PACER does is it then allows those

10   records that have already been filed and been stored, it then

11   disseminates that information, makes a PDF available to the

12   user who specifically requests it.  And so the only service

13   being provided is the dissemination of the record that's just

14   being stored at the courthouse already.  And so that's why I

15   think we're focusing on --

16            THE COURT:  It's pretty important, though, because

17   it used to be you had to come to the courthouse to look at

18   the record.  Now through technology, the -- you may object to

19   them sort of collecting one fee for all services,

20   so-to-speak, with the CMECF and PACER, but there are certain

21   benefits for sending out bills and, you know, figuring out

22   how to pay what.

23            But the PACER allows the public to get access to

24   the court documents.

25            MR. TAYLOR:  Right.

1          THE COURT:  And without the court documents being

2     available electronically, PACER would be a far less valuable

3     commodity.

4          MR. TAYLOR:  I think that's right.  And I think

5     under that logic, you could also use PACER to fund

6     courthouses because you need to have the infrastructure for

7     the proceedings in order make PACER fees -- make the records

8     available.  But I think --

9          THE COURT:  You're talking about allowing the

10    public access to electronically stored information.

11         MR. TAYLOR:  That's right.  But I do want to just

12    go back to the statute which authorizes the judiciary in its

13    discretion no more than necessary to impose fees for

14    accessing documents -- or information.

15         Now, ECF doesn't -- nobody's accessing information,

16    they're filing a record with the court, right?  And so you

17    couldn't actually charge for ECF even if you wanted to under

18    this particular statute.  You'd have to either find a

19    separate statutory source or you'd have to get appropriated

20    funds.  And I think that's --

21         THE COURT:  But there are two parts of ECF you've

22    recognized already.  One is the filing, docketing.

23         MR. TAYLOR:  Right.

24         THE COURT:  And the other is making those docket

25    entries available to whomever, litigants, it can be.

1          MR. TAYLOR:  Right.  And that actually is PACER.

2    What you've described in the second half is actually called

3    PACER.  And I would again point to the tab 10 document I was

4    just referring to a few minutes ago where the judiciary is

5    recognizing here that funds are used first to pay the

6    expenses of the PACER program.  We think that's okay.  Funds

7    collected above the level needed for the PACER program are

8    then used to fund other initiatives.  And it's those other

9    initiatives that we think are impermissible.  And if you turn

10   to page -- to the next page, you'll see that --

11         THE COURT:  Is this one of your exhibits?

12         MR. TAYLOR:  No, this is actually one of the

13   Government's submissions, which is why I think it's

14   particularly revealing.  The next page, the judiciary --

15         THE COURT:  Can you tell me which exhibit?

16         MR. TAYLOR:  Yes, so this is Exhibit 10, it's the

17   fiscal year 2000 -- I'm sorry, not Exhibit 10, but tab 10,

18   it's what the Government filed last Thursday.

19         THE COURT:  Okay.

20         MR. TAYLOR:  And if you look at the next page,

21   which is page 28 of the ECF, the judiciary is recognizing

22   that it currently lacks the authority.  And it says it's

23   seeking, quote, expanded authority.

24         Now, this is an argument that the, you know, years

25   after the E-Government Act was enacted, the acts of the

1    appropriators in approving spending somehow could expand the

2    scope of the statutory authorization.

3             Now, if that's the argument, and I think it would

4    have to be, that's an argument that the other side here has

5    abandoned, on page 10 of their reply brief, they recognize

6    that none of this, that the Appropriations Committee has no

7    authority to amend the scope of the statute passed by

8    Congress.

9             THE COURT:  Page 10 of their brief?

10            MR. TAYLOR:  Page 10 of their reply brief, it can

11   be found at Docket, I think it's 79.

12            THE COURT:  Okay.  What page?

13            MR. TAYLOR:  One of the very last pages, it's page

14   10, the penultimate page.

15            THE COURT:  Are you reading the pages at the bottom

16   or the top?

17            MR. TAYLOR:  Oh, I'm reading the one at the bottom,

18   so it's page 12 of 14, if you have it in front of you.

19            THE COURT:  Page 10 at the bottom.

20            MR. TAYLOR:  Yes.  So here they're saying the

21   defendant points to various statements from the House and

22   Senate Appropriations Committees as indicative of the fact

23   the defendant's interpretation of the E-Government Act is

24   correct.

25            And so it is recognizing that these statements, the

1      committee reports and the actions of the Appropriations

2      Committee cannot provide a freestanding source of authority.

3      Much less, quote, provide expanded authority, which is what

4      they --

5              THE COURT:  How about things that happened before

6      the passage of the Act?  When nothing was changed in the Act

7      regarding services per se, why can't I consider those

8      appropriations House reports?  Why is that any better or

9      worse than the legislative history, I guess penned by Senator

10     Lieberman?

11             MR. TAYLOR:  Well, I think for one thing, the

12     legislative history has the virtue of actually attempting to

13     talk about the statute at issue whereas the Appropriations

14     Committee doesn't mention the statute, much less purport to

15     offer any authoritative interpretation of it.  They deal with

16     the spending side, right?

17             THE COURT:  If I follow Justice Scalia, I don't get

18     much out of the legislative history.

19             MR. TAYLOR:  No, that's right.  I think there's a

20     debate even about the use of legislative history, but there

21     should be no debate about the use of post-enactment of

22     legislative history from a different committee that didn't

23     say anything about the statute and would have no authority to

24     interpret it any way.  And I think that's the basic point.

25             THE COURT:  Would I consider the exchange of

1    letters between the senator and the AO?

2             MR. TAYLOR:  So we provided that, I think, to show

3    what the sponsor of the Act thought that the Act meant.  I

4    agree with you that that is not entitled to a lot of weight

5    on its own.

6             THE COURT:  Do you realize that in the, quote,

7    legislative history, he does -- he seems to be aware of

8    things that you're not quite so willing to concede.  The last

9    sentence reads, for example --

10            MR. TAYLOR:  Right.

11            THE COURT:  -- when he says the PACER fees are

12   higher than the marginal cost of disseminating the

13   information.  What does that mean, by the way, they're higher

14   than the marginal cost?  I'm not familiar with the marginal

15   cost.

16            MR. TAYLOR:  So we took a stab at providing a

17   definition in our motion.  But the way I think -- I would

18   think of it, without getting into the economics jargon, is

19   it's kind of the but for cost of providing a system that

20   makes these records available.  So if you had additional

21   staff that would be required to do that, additional --

22   whatever the technology would be necessary to have a website

23   that would then allow these records to be retrieved and made

24   available to people, that would all be part of the marginal

25   cost.  But I think that's how you would figure it out.  And

1    that's what the Congress was talking about in that report.

2              But I think the reason it says --

3              THE COURT:  Well, you know when you say "for

4    example," that makes it sound like there are other things out

5    there.

6              MR. TAYLOR:  There were other things out there.

7              THE COURT:  There are?

8              MR. TAYLOR:  Well, there were, so the fee schedule,

9    as I was mentioning earlier, at that time it provided fees

10   for three different services, I think the same services they

11   still use now, which were PACER, PACER Service Center, and

12   then printing documents at the courthouse.  And so you're

13   right, PACER is just one of the three, it happens to be by

14   far the largest of the three, but I think that's what -- and

15   that's what Congress specifically mentioned there.

16             But the reason it said "for example," is because it

17   was only one of the three services charged.  And it's our

18   view that it's those specific services that should guide the

19   inquiry.

20             THE COURT:  What do I do with the sentence, the

21   committee, which is, I assume, the Senate committee, intends

22   to encourage the Judicial Conference to move from a fee

23   structure in which, and I'm quoting, electronic docketing

24   systems are supported primarily by user fees.  How do you

25   understand an electronic docketing system?  That's the same

1    words, by the way, that they used in the statute before it

2    became codified, providing electronic docketing information.

3    Don't you think that's broader than PACER, which is providing

4    access to the electronic docketing systems?

5            MR. TAYLOR:  I think that PACER is providing access

6    to the docketing system, and so it's making that docketing

7    information available to the public.  And I think that that's

8    what the Senate had in mind, that committee had in mind in

9    that sentence.

10            But I think the reason they used the word

11    "encourage" is because remember, Congress was doing two

12    things in amending the statute.  It was first adding the

13    "only to the extent necessary," which is a signal that the

14    fees would have to be less, and the AO responded by leaving

15    the fees the same.

16            But the other thing it did was it changed the

17    mandatory "shall" to "may."  And so what it was trying to do

18    is say you don't have to charge any fees at all, you could

19    make this free if you wanted to, and that's our goal.

20            THE COURT:  But it didn't require it.

21            MR. TAYLOR:  It didn't require it, correct.

22            THE COURT:  Exploratory at best.

23            MR. TAYLOR:  Oh, that's absolutely right.  And to

24    be clear about our theory, we think that if the AO wants to

25    exercise its authority, its discretionary authority to impose

1    a fee, that it can do so.  We are not challenging that

2    determination.  We are challenging its determination to use

3    the fee to fund other programs that don't have anything to do

4    with the cost of the PACER system.

5              THE COURT:  So if you look at one of the examples

6    from -- it's Plaintiff's Exhibit L.

7              MR. TAYLOR:  Yes.

8              THE COURT:  They come year after year.  There's a

9    budget.  I don't know if you know the answer to this, and

10   Mr. Field may have to tell me.  Are these budgets made

11   available to Congress?  Do you know?  These are Exhibit L's.

12             MR. TAYLOR:  I think -- so this was a document that

13   was provided to us by the defendant in this litigation.  I

14   think, I don't know if it was produced just for purposes of

15   this litigation.  I don't know if this information --

16             THE COURT:  I don't know.  I was going to ask them.

17             Can I just get an answer to that?  And I got more

18   prior to 2010 were submitted to me in the later supplemental

19   pleadings, because I want to see how this evolved.

20             And so if you could just shed a light on -- you

21   know what I'm talking about by Plaintiff's L?

22             MR. FIELD:  Yes, Your Honor.  Those particular

23   exhibit -- Exhibit L, and then the ones we provided in the

24   second Skidgel declaration for other years pursuant to your

25   request are not provided to Congress.  Those are internal

1    documents that go to -- I'd be happy to talk about this when

2    we're up, but to the Judicial Conference's electronic public

3    access working group.  So these are an internal document that

4    was provided.

5              THE COURT:  Who is that group?

6              MR. FIELD:  It will have, if my memory serves me

7    correctly, that's going to have a selection of judges from

8    across the country who are part of the Judicial Conference or

9    they're not part of the Judicial Conference, but they're

10   brought in to --

11             THE COURT:  Are they part of CACM?

12             MR. FIELD:  They provide advice.

13             THE COURT:  All right.  So these -- we're talking

14   about -- okay.  I'm sorry.  What is L?  You have all this

15   public access services.

16             MR. TAYLOR:  Right.

17             THE COURT:  Then you have case management.  You go

18   all the way down and ultimately you get to Congressional

19   priorities, which is the, if, hypothetically, I didn't find

20   your argument persuasive as to the items that go through, I'm

21   looking at 2015.

22             MR. TAYLOR:  2015, okay.  One second, let me catch

23   up to you.  So this is fiscal year 2015 you're looking at?

24             THE COURT:  Yes.

25             MR. TAYLOR:  Okay, I got it.

1          THE COURT:  So they're done contemporaneously, they

2     weren't done for purposes of litigation.

3          MR. TAYLOR:  Uh-huh, okay.

4          THE COURT:  And we have these going from back at

5     least to quite a few years as the recent filing shows.

6          MR. TAYLOR:  Right.

7          THE COURT:  But there are lots and lots of things

8     here that go under CMECF.  Then you've got the bankruptcy

9     notices.  All of this, and then court allotments.  Other than

10    the bankruptcy notice, which I know what your position is, do

11    you have any position on these if the statute were

12    interpreted to cover ECF -- CMECF?

13         MR. TAYLOR:  So I think if you were to find that

14    the statute covers CMECF, our position would be that the

15    additional programs under the umbrella Congressional

16    priorities.

17          THE COURT:  I understand.

18         MR. TAYLOR:  Would be -- I think the giveaway is

19    the fact that they don't even put this under an attempt, even

20    internally, to put it under the program requirements.  And

21    requirement is kind of another way of saying what is

22    necessary.  And I think these other --

23         THE COURT:  I'm looking above the Congressional

24    priority line, so-to-speak.

25          MR. TAYLOR:  You're looking above it?

1              THE COURT:  Yes.

2              MR. TAYLOR:  So I think everything below it, you

3      understand our position on.

4              THE COURT:  Clearly.

5              MR. TAYLOR:  Okay.  And then I guess -- I guess

6      part of our -- if you accept our position on the other stuff,

7      then I think the only thing we are asking is for summary

8      adjudication on the question of liability.  And where you

9      draw the line, you know, within the category of CMECF, how

10     much is necessary for PACER, how much of it is really just

11     part of the management side or other things, that I think

12     maybe discovery could reveal exactly, because I have to be

13     honest, I don't know what some of the -- exactly what the

14     contours are of some of these categories.  We haven't -- we

15     had only very limited discovery, and they provided us this,

16     and that's about it.

17             THE COURT:  Well, and then that's because you took

18     the position from the getgo when the class was certified

19     consistent with your position, we -- we have an all or

20     nothing position.

21             Now, they come back and say, well, we think it's

22     everything, all up and down.  And you say the middle

23     categories are subject to discovery?

24             MR. TAYLOR:  Well, I think at a minimum we'd have

25     to kind of know what some of these categories are.  I mean, I

1    just -- I don't -- I have to be honest, some of this stuff

2    may be a little bit beyond me.  But I don't really know.  I

3    mean, I understand the defendant submitted in responding to

4    our interrogatories some descriptions and definitions.  But

5    even that I found to be in places a little bit impenetrable

6    and if we could have a little bit of limited discovery to

7    figure out how much of this is going to -- is really

8    necessary to operate PACER or CMECF, if you think the statute

9    has a broader sweep.

10          But I think that in any event, because some of

11   these other categories are quite clearly in our view

12   outside the scope.

13          THE COURT:  I just want to keep you above the line

14   for a little while.

15          MR. TAYLOR:  Sure, yeah.

16          THE COURT:  It's pretty important.

17          MR. TAYLOR:  I agree with you.

18          THE COURT:  I have a cross motion and I've got --

19   you continuously say "some."  You recognize some.  But even

20   for these categories, when you say in your statement of

21   facts, you are not talking about the below Congressional

22   priorities, you recognize that some of these things may have

23   to do with PACER.

24          MR. TAYLOR:  It's possible that they might.  I

25   mean, the fact that they don't fall under the PACER label is

1   a pretty good clue that maybe they don't, that maybe they're

2   just having to do with the case management and filing side

3   and not the public access side.

4        But I think that if you're asking is whether

5   there's a clear line, I think the AO itself thinks there's a

6   clear line because it has said in the document I pointed to

7   earlier, funds are first used to pay the expenses of PACER.

8   And funds collected above the level needed for the PACER

9   program are then used to fund other initiatives.  And I

10  think -- it's our position that that is a line that the AO

11  understands.  It's a line that seems to be reflected --

12       THE COURT:  The AO would agree with you if the

13  statute is interpreted, you can only use PACER fees to

14  maintain PACER.

15       MR. TAYLOR:  Right.

16       THE COURT:  If you would win that, they would

17  agree.  I think there's no question.  They admit it.

18       You say, though, court allotments, I'm just giving

19  an example, at least some of the money given to courts is not

20  part of the marginal cost of disseminating records through

21  PACER.

22       So even when it comes to court allotments, which is

23  above the line, we have not figured out which goes into PACER

24  and which doesn't.

25       MR. TAYLOR:  I think we just said at least some, I

1    mean, I think in our view it would probably be the whole

2    category.  But the reason we use that formulation --

3              THE COURT:  Goes where?

4              MR. TAYLOR:  I think the way that this category is

5    defined makes it seem like this is all related to CMECF or at

6    least most of it is.  And the reason we said that at least

7    some is because we're only trying to establish the

8    proposition that at least some of this -- of these expenses

9    are being used to fund unrelated activities which is the only

10   thing we've asked the Court to rule on.

11             And I think the reason why I think that that whole

12   category probably, if pressed, I would think it would be

13   outside the scope, it goes back to my response to the ECF

14   question because I think my understanding of the way that the

15   allotments work is there are allotments that are pegged to

16   the E-filing system.

17             THE COURT:  Right, I don't disagree with that.  But

18   I worry about your recognition that some relates to PACER.

19             MR. TAYLOR:  I wouldn't say that we've recognized

20   that some relate to PACER.  I think we were just, maybe

21   overly cautious.  Maybe we should have said all of it is

22   unauthorized because I think that's our best understanding.

23             THE COURT:  All unauthorized because it relates to

24   ECF and not PACER.

25             MR. TAYLOR:  That would be our view based on the

1  reading of the statute that we think is clearest based on

2  text, let alone the presumptions against excessive fees.

3          THE COURT:  The class was certified as follows, all

4  individuals and entities who have paid fees for the use of

5  PACER between 2010 and 2016, excluding class counsel and the

6  Federal Government.

7          So the class, if you don't accept your definition,

8  the class no longer really exists --

9          MR. TAYLOR:  Well, I think the class would --

10         THE COURT:  Because the rationale, I rejected the

11  Government's argument, I said that your theory of liability

12  is that the fee schedule itself violated the E-Government

13  Act.  Not that the charges to individual plaintiffs violated

14  the Act, when they amounted to more than the cost of

15  distribution.  So if the plaintiffs prevail in their common

16  legal theory that the judiciary was required to set a lower

17  rate than -- I'm sorry.  Were required to set a lower rate

18  that corresponded to PACER funding needs, defendant would be

19  liable to any class member who paid a higher rate.

20         So your view is that the -- a calculation of

21  damages would be ministerial; that you would just take the

22  PACER fees and that would be all they could spend.  But if

23  that PACER services is defined differently, we're no longer

24  able to have a ministerial for the calculation.

25         MR. TAYLOR:  I disagree with that point, Your

1    Honor.  I think -- so we had -- our theory of liability and

2    our theory of damages was that you just take the delta, as

3    you pointed out, between the cost of operating the PACER

4    system, and the total cost collected, and then you'd

5    redistribute it pro rata to the on class members, which is

6    ministerial.

7            Now, if you would draw the line as to liability in

8    a different place, that might mean that the delta becomes a

9    little bit smaller.  But it doesn't become any less

10   ministerial because you still then have the same type of

11   exercise where it's the difference between two numbers.  And

12   then that amount is redistributed pro rata.  And so I don't

13   think it actually has any class certification ramifications.

14           THE COURT:  So if you decided that some of these

15   things that are called Congressional priority hypothetically

16   don't belong being covered by PACER fees, your argument would

17   be that people who paid in those six years would get a pro

18   rata reduction, to say that Congressional priorities amount

19   to say 25 million, that figure comes up.  The people who paid

20   during those years, if they file a claim or they're, I guess

21   it could be done just through the computer, those people who

22   were paid more than the $10 or whatever it was, you would

23   give them back some amount of money that --

24           MR. TAYLOR:  Is pegged to the liability.

25           THE COURT:  -- pro rata share of the 25 million?

1          MR. TAYLOR:  Exactly.  And just to return to the

2     class definition, the class definition doesn't incorporate

3     any theory of liability, it is just simply all individuals

4     and entities who have paid fees for the use of PACER between,

5     you know, one date and the other, excluding class counsel and

6     the government.

7          And so, you know, the class as defined would still

8     exist.  It's just that the individual damages amount for each

9     class member would be a little bit smaller if you accepted a

10     theory of liability that was other than the one that we've

11     been submitting and that we've primarily put forth in our

12     briefs.

13          THE COURT:  Okay.  So you maintain the class still

14     exists.  But your theory of liability, you're saying the

15     class doesn't depend on you prevailing on your theory of

16     liability, so-to-speak.

17          MR. TAYLOR:  Well, I just want to be clear because

18     I think there might be -- I think it's good to emphasize this

19     point.  So we have moved for summary adjudication solely as

20     to the liability.  And we've offered a reading of the statute

21     that has a particular consequence.  But it's still the case

22     that the question before the Court at this stage is only if

23     any one of these buckets, maybe the Congressional priorities

24     bucket or one of the sub-buckets within it, if any one of

25     that exceeds the scope of the statutory authorization, then

1   there is liability.  It has been established, and you can

2   grant our motion.

3           And then as the case proceeds, we would use this

4   Court's decision and reading of the statute as a guide to

5   determine how the rest of the cases should unfold and what

6   the damages should be.  And I guess that's the best way to

7   answer.  And that's what I mean when I say that really only

8   the question of liability is teed up because the question you

9   have to answer in order to resolve not only our motion, but

10  the Government's motion, which asks for summary judgment.

11          THE COURT:  And so, if you were to write an order,

12  which I don't think you did, what would the order say?

13          MR. TAYLOR:  I think the order would say that the

14  plaintiff's motion for judgment as to liability is granted.

15  And then I think under this Court's scheduling order, which

16  is Docket 34, the parties would then have 15 days to meet and

17  confer and discuss a plan for the remainder of the case,

18  including any discovery that would need to take place.  And I

19  don't know if that would be built in.  But I think the order

20  would just be simply that the Government's motion is denied

21  and the plaintiff's motion is granted.

22          THE COURT:  Because that scheduling order that you

23  just referenced, the parties, we're talking about the notice

24  period after we gave notice?

25          MR. TAYLOR:  Right.

1          THE COURT:  The parties will enter into a

2     stipulation and/or permit limited document discovery in an

3     effort to establish what portion of PACER fee revenue during

4     the class period was in excess of the amount necessary to

5     fund PACER services.

6          And then they want to know what portion of the

7     PACER fee, revenue supported CMECF and other administrative

8     initiatives, and then the average per page PACER fee.

9          It's your position that, it has to be under this,

10    that the PACER revenue supported CMECF and other initiatives,

11    if you don't win on that, paragraph 2 of the scheduling

12    order, where are we?

13          MR. TAYLOR:  Well, I mean, I think if we don't win

14    on that and this Court were to hold that the statute clearly

15    authorizes the AO to charge fees that exceed the services,

16    the cost of the services provided on the fee schedule, and

17    that kind of anything goes, any program that they've been

18    funding is okay.

19          THE COURT:  No, no.

20          MR. TAYLOR:  Then we lose.  I think that that is

21    the consequence of that.

22          THE COURT:  No, but that's not exactly the

23    Government's position that anything goes on.

24          MR. TAYLOR:  Well, I think the Government's

25    position is that everything that they've used PACER fees for

1    is okay, is expressly authorized by the statute.  And I think

2    that you have to, I mean, you have to answer that question in

3    order to resolve their motion because they've moved for

4    summary judgment.

5             THE COURT:  Yeah.  I agree with that.

6             MR. TAYLOR:  Yeah.  But I think in the course of --

7    it's necessarily the same question that we've posed.  Because

8    if they lose their motion, then they've lost because their

9    reading of the statute is incorrect, which means they're

10   liable, which means that we prevail.  And then the rest of

11   the case --

12            THE COURT:  Hold on.

13            (A brief pause in the proceedings.)

14            THE COURT:  Tell me what you think that electronic

15   bankruptcy noticing is.

16            MR. TAYLOR:  My understanding of it is that these

17   are notices that are sent to creditors in bankruptcy

18   proceedings to notify them of their rights, I think.  It is

19   important.

20            THE COURT:  Of meetings?  To notify them of

21   meetings.

22            MR. TAYLOR:  Yes.

23            THE COURT:  Do you know where the source of the

24   notification is?

25            MR. TAYLOR:  I mean, I think it was -- I don't know

1    what the source of requiring the notification is.  But I

2    think the only question here is what the source of the

3    funding can be.

4              THE COURT:  No, I'm trying to understand the scope

5    of services.  It is that a PDF reflecting the docket entry

6    and the link is made available the first time free.  It's

7    available to group creditors, not everybody gets it that way.

8    But it is using the bankruptcy's ECF, CMECF system to get out

9    these notices about the meetings.  So it's not a clearcut

10   sort of -- it's not like Mississippi in a way.  Really, it's

11   a much more murky situation because it does depend on having

12   the bankruptcy court prefers to get some kind of ECF filing

13   system, so it does use the docket sheets to notify.

14             Is the judiciary supposed to ignore what Congress

15   tells them in the appropriations legislation, or let's just

16   stick to the reports for a minute.  When they tell them to go

17   and develop a system where they have electronic docketing,

18   what are they supposed to do with that?

19             MR. TAYLOR:  Well, I think you have to comply with

20   the Congressional mandate.  So if they have to have

21   electronic docketing and they have to make that information

22   available, either on their website or through PACER, I think

23   they have to comply with the mandate.  But it's a separate

24   question then whether they can charge fees.  And in answering

25   that question, they also have to comply with the mandate that

1    it restricts the way that they can charge fees, right, which

2    is the E-Government Act.

3           And I think that, you know, if the broader question

4    is, what do they do with -- what do they do with the fact

5    that the appropriators seem to have signed off on the way

6    that they've said they want to -- they intend to spend the

7    money they've already collected, I think the --

8           THE COURT:  Well, some of that is after the fact.

9           MR. TAYLOR:  That is all after the fact, yes.

10          THE COURT:  I'm not so sure that electronic

11   bankruptcy filing was in play before, I guess it's 1996.

12          MR. TAYLOR:  Yeah.

13          THE COURT:  So I'm not sure that that's after the

14   fact.  And the House report specifically talks about

15   electronic bankruptcy notices.

16          MR. TAYLOR:  Yeah, but one thing you won't see

17   about the bankruptcy, it's not a service that is listed

18   anywhere on the fee schedule, right.  And so again, I think

19   it's the fee schedule that tells you what the services are.

20   And what the services are that are provided in exchange for

21   the fee.  And the Statutory Text Act specifically, and it's

22   very important and it focuses on the schedule.

23          And I think that if the judiciary wanted to have a

24   separate item on the schedule, then they added bankruptcy

25   notices and they charged the credit, maybe they gave them a

1    free look, but then they charged after that, and they wanted

2    to have that schedule, then I suppose then it would be a

3    service that they're provided.  But they've made the decision

4    not to charge those, the users of those notices for the first

5    time.  And that's something, a decision they made in their

6    discretion.  But it doesn't really answer the question of

7    what services are provided in exchange for the PACER fees,

8    which is solely the dissemination of the information through

9    PACER.

10         THE COURT:  So if I were to find the statute

11   ambiguous, what happens then?

12         MR. TAYLOR:  I think if you find it ambiguous, then

13   you will necessarily have found that Congress didn't speak

14   sufficiently clearly to delegate revenue-raising authority on

15   the AO to charge more than the reasonable cost of

16   administering the system.  And I think that that under --

17   binding Supreme Court precedent, interpreting user fee

18   statutes.

19         THE COURT:  What is your case again?

20         MR. TAYLOR:  So there are a number of cases from

21   the 1970s.  We cite these cases at pages 12 through 14 of our

22   motion.  And these are cases that interpret the general user

23   fee statute that applies to administrative agencies, which is

24   actually a more broadly worded statute than the statute we

25   have at issue in this case.  And even that more broadly

worded statute was not -- the Supreme Court said, look,

there's a delicate constitutional question because the minute

a user fee starts to exceed the reasonable cost of providing

the service for which fee is charged, and at that moment it

becomes a tax and then gets used to fund other unrelated

projects to help either some other group of people or the

public more broadly, and that is the world of Congress and

Congress alone.

     And so if Congress is going to delegate that

authority, we insist that Congress speak clearly.  And the

Supreme Court held that squarely in a couple of cases in the

1970s.

     THE COURT:  What would have happened if the

E-Government Act of 2002 is either interpreted solely to talk

about whether the fees are, quote, necessary, whether they're

excessive, as opposed to services, or alternatively let's

just assume that phrase never got added.  Would you under the

prior statute as it is listed in 1990 be able to charge for

what became ECF?

     MR. TAYLOR:  I think -- so my understanding is that

ECF, you're not providing access to information, you're

providing filing privileges, which is a different question.

So I think you would say no.

     THE COURT:  But there are two parts to that.

     MR. TAYLOR:  But if you wanted to charge for that,

1   then I think that maybe you could.  But you would charge the

2   users of CMECF, the lawyers who then file, you would charge

3   them for the service of filing electronically.  That would be

4   the service that they would then be provided.

5          THE COURT:  Well, doesn't the public get

6   information from the documents that are filed?  They do.  The

7   press does, I know that.

8          MR. TAYLOR:  Well, only through PACER.

9          THE COURT:  I know.  But that ECF has a public side

10  to it.  Yes, PACER is the portal that opens up that document.

11  But to say that only the lawyers and the parties use ECF is

12  not accurate.  You are saying that PACER people, if there was

13  no ECF, they wouldn't get much.  In the beginning all they

14  got was a docket.

15         MR. TAYLOR:  I think what it would look like, if

16  you were back in the old days where you didn't have

17  computers, I think the way you would analyze this is you

18  would -- the Court would still have a filing system, it would

19  accept filing from lawyers and it would store those filings.

20  And then the PACER equivalent, if you will, would be the

21  person who shows up and says I'd like to look at this

22  document.  And then you could reimburse the cost of the

23  person who then goes and retrieves the document, for whatever

24  their time was, and then the cost of maybe transcribing it or

25  printing it or making a photocopy, all of those costs would

1    be part of the marginal cost of providing the record, that

2    is, the service for which the person is being charged.

3          But you couldn't -- you couldn't charge beyond that

4    because the rest of, you know, the infrastructure, the filing

5    system, all that stuff is not attributable to making records

6    available electronically, it's something that isn't necessary

7    for the Court to be able to function as a court.

8          And so, I think that, you know, you're right that

9    journalists and members of the public access information that

10   is filed using ECF.  But the way that they do that is through

11   PACER, and they're charged a fee for it.  And all we're

12   saying is that that fee has to be in line with the service

13   for which they're paying.  And that is the provision of the

14   records through PACER and needs to be limited to that

15   particular service because if the fee exceeds --

16         THE COURT:  Well, what if somebody gets PACER and

17   they're not a litigant so they don't get one peek at the

18   court document, and take a very high profile case like the

19   AT&T merger.  So the world of finance wants these documents.

20   And so, if we didn't make it available to them, they're

21   getting the documents, to the extent they want to -- they

22   have to pay to get them.

23         MR. TAYLOR:  Right.

24         THE COURT:  And so PACER --

25         MR. TAYLOR:  And we're not taking issue with --

1          THE COURT:  -- that's around, get their hands on

2     the document because they're electronically filed and

3     available through PACER.

4          MR. TAYLOR:  Right.  And I would go back to the

5     schedule because there are two ways right now.  If we have

6     this proceeding and a member of the public wants to access

7     the transcript, my understanding is they can do it in one of

8     two ways.  They can go to this courthouse, they can't go to

9     any other courthouse, they have to go to this one because

10    this is where the proceeding took place.  And they can access

11    it on line here.  And then if they want to print out a copy

12    of it, they would pay a printing fee, and that would be one

13    of the services.

14          The other way would be PACER.  They would go log in

15    on PACER, they would establish their account, and then they

16    would retrieve the document for a fee, right?  So those are

17    the two ways in which the public is able to access public

18    court documents.  And --

19          THE COURT:  And there are certain exemptions, caps,

20    but --

21          MR. TAYLOR:  There are certain exemptions, but the

22    service that they're being provided with is just the

23    transmission of the document to them, right, so they have a

24    copy of it.  And all -- our humble point is that that -- it

25    is fully within the authority of the AO to charge a fee for

that.  That's what section 1913 says.  But if they're going

to do it, they just have to just limit the amount to the cost

of providing the particular service for which the person is

charged.

        And that -- and if you think the statute could have

been a little bit clearer on that point, maybe it's

ambiguous, then I think we necessarily have to win because of

this clear statement rule that the Supreme Court has laid

down in a number of different cases interpreting user fee

statutes.  And I think what those cases hold quite clearly is

that Congress has to be really super specific before an

agency or here the Administrative Office, someone other than

Congress, has the ability to profit off of providing a

service and then redistribute the money.

        THE COURT:  I agree that they're not supposed to be

profiting.  But the key here comes down to services.  But I

go back to asking you, had they not done something in 2002

when ECF comes on line, could they have been -- and Congress

has continued to say you shall --

        MR. TAYLOR:  Yeah.

        THE COURT:  -- the statute reads as it read before,

but it was -- I mean, the statute now read as it did in 1990,

could they do what they're doing now?  Put aside the things

under --

        MR. TAYLOR:  Well, one thing I -- I think what they

could do, so what they were doing then, just to back up for a
second, is you're right, they were required to charge for the
fee.  And the only services that they actually charged were
the same services they now charge in the fee schedule.  So
even though under their reading of the statute, they were
required to charge for all these services, they only charged
for those same three services, the provision of records
through PACER, the PACER Service Center, and printing records
at the courthouse.  And so --

          THE COURT:  Didn't they charge anything for
electronic --

          MR. TAYLOR:  No, those were the only services that
they charged for.  And those were the only services you could
find on the fee schedule.  Congress intervened and said you
can only do this to the extent necessary.  And you're no
longer required to do it.  You cannot do it if you don't want
to.  And the fee schedule just remained in place.  It didn't
change at all, they provided the same services, charged the
same fees, acted as if Congress didn't act.  And then two
years later --

          THE COURT:  When did ECF pop up in their --

          MR. TAYLOR:  So I think ECF, so there's no -- I
mean, ECF, one thing you will not see in the fee schedule is
any reference to ECF.  It's not a service that they provide
under the schedule.

1          THE COURT:  You keep going on the fee schedule.

2    But I'm wondering when they started including it in their

3    Exhibit L.

4          MR. TAYLOR:  So I think they started including it,

5    I think in the late '90s or early 2000s.  But it's actually

6    that decision, that critical decision that prompts Congress

7    to act.  You know, for a while the PACER --

8          THE COURT:  Well, gee, if they wanted to stop them

9    serving, spending money on either electronic bankruptcy

10   noticing on ECF, they could have said it.  They didn't say

11   that.

12         MR. TAYLOR:  They could have been even more

13   emphatic, you're right.  But they add the phrase only to the

14   extent necessary.  And that phrase has to mean something.

15   And on the other side's view, it meant nothing because

16   nothing changed afterward.

17         THE COURT:  Well, what do you do about, court

18   technology includes making tapes of what goes on in the

19   courtroom and making them available for purchase instead of

20   having a document, an audio recording.  And they're available

21   on ECF for people to find out what happened in the courtroom.

22   Do you take the position that that is not public?

23         MR. TAYLOR:  So they're available through PACER,

24   not on ECF.  So, ECF -- I mean, PACER just provides access to

25   the docket.  And the way you would access it is through

1    PACER.  And I think that fee, that actually is on the fee

2    schedule, so it's one of the services that is provided.

3              THE COURT:  It was on the fee schedule when?  It

4    couldn't have been.  We haven't done it for that long.  I

5    mean, it wasn't on the 2002 fee schedule.

6              MR. TAYLOR:  I mean, I'd have to go back and see

7    exactly -- I mean, so the AO actually promulgates the

8    schedule.  So they pick what services they want to charge

9    for.  And all we're humbly saying is that, you know, they can

10   pick the services in line with what their statutory authority

11   is.  But then the fees just have to be tied to the cost of

12   providing those services.

13             And so you just look at the fee schedule, see what

14   the services are, and we see what the total amounts of

15   providing those services are.  I think that -- that really is

16   our reading of the statute, and the reading, I think the only

17   reading, it gives some effect to the Supreme Court's clear

18   statement user fee rule, which requires, you know, because if

19   you were to go take a different view and allow --

20             THE COURT:  I'm not sure you've answered my

21   question.  Let's assume no 2002 act.  Could they have

22   consistent with the statute charged the way they're doing it

23   for ECF?

24             MR. TAYLOR:  I think if they were going to do it

25   they would have to include it on the fee schedule and say

1    we're charging for ECF.  And then those fees, those ECF

2    filing fees would then have to be tied to the cost of

3    operating ECF.  So they could do that, I think if they wanted

4    to.  They chose not to do that.  I think there's still a

5    debate about whether the statute would even allow them to do

6    that or whether they'd need separate statute authorization

7    because it's not really accessing information.  It's being

8    able to file a document with the court.

9            But it raises a slightly different question.  I

10   think all this is pointing out is they have the authority to

11   charge -- to provide these services and charge fees that are

12   linked to the services that are being provided.  And all

13   we're saying is that PACER is the primary services they

14   provide.  And the fees should be commensurate with the costs

15   of providing that particular service.

16           THE COURT:  Okay.  Let's hear from Mr. Field.

17           (A brief pause in the proceedings.)

18           THE COURT:  So what is your position, Mr. Field,

19   regarding the meaning of the statute, the 2002 statute?

20           MR. FIELD:  We read the statute in the note to 1913

21   to authorize the charging, the setting and charging of fees

22   for access to information through electronic means.  That's

23   how we read the first sentence.  And, in fact, Mr. Taylor

24   used that same through electronic means when he was at the

25   lectern.

1      And where we diverge with plaintiffs is we read --

2   the defendant reads that statute to mean you may charge fees

3   in order to fund the dissemination of information through

4   electronic means.

5      And what you'll see if you look at every single

6   expenditure that has come up, they are all tied to

7   disseminating information through electronic means.

8      What we don't do --

9      THE COURT:  The statute, let's go back, I mean, we

10  know this from -- it is to the public, it isn't discussing

11  things in Greek.  Well, let's just look at the juror issue

12  for a minute, which came along some time post-2005.  What is

13  that?  What is that, what are they doing?

14     MR. FIELD:  What is the eJuror system?  That is an

15  electronic communication to prospective jurors.  It is an

16  electronic version of what jurors previously received in

17  paper notifying them --

18     THE COURT:  To show up.

19     MR. FIELD:  -- to show up.  It also, including a

20  link for them, too, there's a questionnaire that jurors fill

21  out.  They're able to do that electronically so that the

22  Court is able to get that information much more quickly and

23  digest that information much more quickly than waiting for a

24  paper document to come back from that prospective juror.

25  Somebody to have to by hand sort through those.  So it is an

1    electronic dissemination of information about the jury

2    service.  And also about a way for the potential, or

3    prospective juror to fill out the form.

4          It's my understanding that there is also still a

5    paper method or paper opportunity, which is funded

6    separately.

7          THE COURT:  But that information is not available

8    to anyone but a juror, prospective juror.  Correct?

9          MR. FIELD:  That's correct.

10          THE COURT:  And that information doesn't depend on

11    ECF in any way or PACER.

12          MR. FIELD:  My understanding is that the eJuror

13    notification actually gets a little hyper-technical, but it

14    kicks out through CMECF.  It is a function of the case, I

15    believe of the management function of -- it kicks out

16    through, I'm not sure if it's case management or electronic

17    case filing, but it is -- originates through the CMECF system

18    when a case is ongoing, and it then goes out to the

19    prospective --

20          THE COURT:  If it's not on the docket, it's not

21    available to the public.

22          MR. FIELD:  That's correct.

23          THE COURT:  I know that.  And where is it that

24    Congress in any way directed, authorized, what did Congress

25    have to say about this?

1          MR. FIELD:  So what Congress said about this, and

2     if I can step back just a bit more broadly, this will put it

3     in context for how my answer is specific to eJuror and to a

4     few of these other expenditures you were talking to

5     Mr. Taylor about.  And that's there are really two categories

6     of directives that come to the Judicial Conference.

7          One is a very specific directive.  The electronic

8     bankruptcy noticing is one you were discussing.  It was a

9     very clear directive saying that the committee expects the

10    Judicial Conference to use electronic public access funds or

11    PACER funds for electronic bankruptcy noticing.  That is --

12         THE COURT:  I don't know that they said that.  They

13    didn't say you've got to use those fees, did they?

14         MR. FIELD:  Yes.  So in --

15         THE COURT:  That's the House report in '96.

16         MR. FIELD:  It's the 1997.  And the language on

17    page 89 of that report --

18         THE COURT:  Yeah, let me find the report.

19         (A brief pause in the proceedings.)

20         THE COURT:  I stand corrected.  It said the

21    committee expects the judiciary to utilize available balances

22    derived from electronic public access fees in the judiciary.

23    And then they go in the funds to make information, services

24    more accessible to the public.  So far that's sort of

25    consistent with the statute.

1          Then they say, "Through improvements to enhance the

2     availability of electronic information."  And they give

3     specifics:  Electronic case documents and electronic filings,

4     enhanced use of the Internet and electronic bankruptcy

5     noticing.

6          So, but your opponent will say that that is not a

7     statute and it's not consistent with the E-Government Act

8     that came afterwards.  Therefore, what the judiciary hears

9     through the committee reports are not of any particular

10     merit.

11          MR. FIELD:  If I can finish the note about the

12     directives, and then I'd be happy to talk about this broader

13     question about what weight and what role this report language

14     plays in this case.  And so you have, what we are describing

15     and what I was just describing as the more specific

16     directive.  And then there are also these other categories

17     which is a more generalized directive which you'll see in, I

18     think part of what you just read in 1997, you see it in 1999,

19     which is more generally the committee saying that it expects

20     the available electronic public access balances will be used

21     to enhance availability of public access, just a general

22     charge to the judicial conference.

23          We expect, we, the appropriators, expect you, the

24     Judicial Conference, to spend available PACER fees to enhance

25     availability of public access.  And then what -- this is

1    where in this case, maybe even more so than in other cases

2    where we're just looking at legislative history to determine

3    what a particular word means, the legislative history here is

4    of particular importance because what you have following

5    these general directives is you have the Appropriations Act

6    which tells the Judicial Conference come back to us within 60

7    or 90 days and tell us how you plan to use your funds,

8    including your PACER funds.  The Judicial Conference does

9    that, and then the appropriators bless that use.

10                 THE COURT:  Are you now talking about a fee

11   schedule or are you talking about a budget?

12                 MR. FIELD:  We're talking about what is, I believe

13   in the papers it's been referred to sometimes as a spending

14   plan, sometimes as a financial plan.  They are found in

15   the --

16                 THE COURT:  The recent submissions by the

17   defendant.

18                 MR. FIELD:  Right, so there was one appended to

19   plaintiff's, the 2007 financial plan was appended to

20   plaintiff's motion.  And then we, in pursuant to your

21   request, included more of those financial plans.  But why I

22   think that's an important note is this is not passing

23   commentary in a large appropriations or other committee acts

24   that we are trying to say, you know, let's really focus on

25   this passing sentence and twist or tweak what's been said in

the statute.  Rather, we have the words that are in the

statute, which we in our papers explain how we've interpreted

them.

        And then we have 26 years where the only

legislative history that has gone to the Judicial Conference,

but for Senator Lieberman's letter, says the Judicial

Conference's interpretation is correct, the Judicial

Conference's interpretation of that language that PACER fees

may be used more broadly is correct.

        THE COURT:  Wait, I'm sorry, where do I find that?

I know one is the 1996 House report, which we've talked about

for 2007.  But I'm not sure where else you find this

authorization.

        MR. FIELD:  So what we see, I think there's two

ways to look at it.  The first is to make sure we understand

what happens on an annual basis between the Judicial

Conference and Congress, specifically the Appropriations

Committee.  In February of every year when the President's

budget goes to Congress, the Judicial Conference includes its

budget.  That is what you see, I believe it was appended to

some of the summary judgment filings.  But you can see it in

the first eight tabs of the second Skidgel declaration that

we filed last Thursday.  That is a bit higher level about the

appropriations request that the Judicial Conference is

making.

1          In those documents, you see starting in, for

2     example, 2001 and every year since then, the Judicial

3     Conference says to Congress, we understand our authority to

4     be the following:  To use PACER fees to finance automation

5     enhancements that improve the availability of electronic info

6     to the public.

7          Then, there will be hearings and ultimately an

8     Appropriations Act.

9          What you don't see in any Appropriations Act is any

10    instance of Congress saying Judicial Conference, you have it

11    wrong.  You told us that you're interpreting the language

12    this way, but that's not actually the law.  So you have the

13    Appropriations Act to go out.  And in that Appropriations Act

14    the full Congress tells the Appropriations Committee and the

15    Judicial Conference with respect to the granular line items,

16    you all work it out.  Judicial Conference, within 60 days,

17    you need to tell the appropriators exactly how you're going

18    to use electronic public access funds or PACER funds.

19          And what you see then in the exchange between the

20    members of the Appropriations Committee and the Judicial

21    Conference is they don't spend any money until they have

22    received approval from the appropriators that it is okay.

23    Every single expenditure has been approved by the

24    Appropriations Committee.

25          THE COURT:  So do you take a letter from where they

1    say, okay, we have no objection, I just want to follow back

2    to the juror issue.  Why don't you show me exactly how it is

3    we know that Congress, not just two people acting on behalf

4    of the Appropriations Committee, but that Congress has

5    approved the judiciary's understanding that these fees can be

6    used for a juror notification system.

7            MR. FIELD:  So, the juror notification shows up for

8    the first time in, I believer it is 2008 in the Skidgel, the

9    second Skidgel declaration at tab 11.

10           THE COURT:  At tab what?

11           MR. FIELD:  That's tab 11, and let me confirm that.

12           So on the second page of tab 11, you'll see the

13   second to last bullet says, "Jury management system web page

14   front ends, $2 million."

15           THE COURT:  Why do the appropriations people care a

16   whole lot, by the way, if you're not using the appropriated

17   funds?  What's in it for them to care about?  They're only

18   appropriating a bucket of money that the judiciary, and we're

19   telling them we're not using that money for electronic

20   bankruptcy noticing.

21           MR. FIELD:  I think they care, I'm not sure there's

22   anything in the record on which I could base this, but I

23   think as a conceptual matter, they would care because if

24   there's a directive or a project that an agency is going to

25   spend money on, and it's an unfunded mandate, they're going

1   to be getting a request for money from that agency.

2          If, for instance, the agency here says we're going

3   to do this eJuror system, and we're going to use PACER fees

4   for it, the appropriators have an interest in weighing in on

5   that because this is going to be a new initiative that's

6   going to be created, there will be individuals, you know,

7   hired or as part of their job duties assigned to handle it,

8   and if all of a sudden that's --

9          THE COURT:  Whose job duties?  Wait a minute.

10         MR. FIELD:  People within the Administrative Office

11  or within the courts to facilitate the eJuror system.  And if

12  all of a sudden somebody says no, you can't do that, you

13  can't use PACER fees for that, I think it's reasonable that

14  the Judicial Conference is going to go to Congress and say

15  then appropriate us money for it.  So I think appropriators

16  care how money is being spent by the instrumentalities of the

17  Federal Government.

18         THE COURT:  Do you have proof of that?

19         MR. FIELD:  We don't have anything in the record to

20  explain why the appropriators care.

21         THE COURT:  I don't see how one can look at this

22  where they say in fiscal 2008, we're going to use 67 million

23  in EPA collections to fund public access initiatives.  And

24  then they talk about within the salary and expense financial

25  plan.  And then they list things, you know, Lord only knows

1    what the appropriators know about the Violent Crime Control

2    Act notification.  I mean, why would they know what that is?

3             MR. FIELD:  Well, I think they would know, I mean,

4    they would know because they were going to be subject to

5    hearings and briefings on these points.  In between the

6    budget requests going over, there's going to be briefings,

7    and then also members of, I believe there would be AO staff

8    member, the Administrative Office is going to go over and

9    brief the Appropriations Committees about just this document.

10            THE COURT:  Well, you say that.  But I mean, you

11   are just speculating.  Who know?  There's nothing in front of

12   me.

13            His point, I'm looking at the same document, that

14   via this financial plan submission, the judiciary seeks the

15   authority to expand the use of EPA receipts to support

16   courtroom technology, et cetera.  They never asked in that

17   way for juror services.  Do you agree?  There's -- never did

18   they say we need expanded authority to use these receipts for

19   juror services or VCCA.

20            MR. FIELD:  On page, if we're looking at the same

21   document, that's the --

22            THE COURT:  I'm looking at tab 10, sorry.

23            MR. FIELD:  Oh, I'm sorry, at tab 11, and it's the

24   second page, 46 is the one that itemizes.

25            THE COURT:  I know that.  But if you go back one

1   before, all of a sudden they're asking for permission to

2   expand the use of EPA receipts.  Does that tell you that they

3   think they have the authority already?  I'm on page 46.

4        MR. FIELD:  Right.  And I don't know that the --

5   I'd have to go back and look to determine for certain.  I

6   believe that '08 is the first time that the juror

7   notification comes up and --

8        THE COURT:  I agree with that.  Right.  I agree

9   with that, but there's nothing comparable to the technology

10  for either the VCCA notification or the juror service.

11       MR. FIELD:  My understanding is the same as yours,

12  Your Honor, that it does not have that same, "We are

13  requesting authority" bolded paragraph like you see in the

14  2007 document.  But I would step back and say at the general

15  level, each of these documents is requesting approval for any

16  expenditure, and those expenditures are not made until the

17  appropriators respond, which is what we have later in this

18  declaration.

19       THE COURT:  I guess there's nothing in my record to

20  tell me that the appropriators are authorizing appropriations

21  that they're not paying for.  But be that as it may, if you

22  look at the same document, where they talk about Mississippi.

23  Let's see if I can put my hands on it.

24       MR. FIELD:  If you're looking for the --

25       THE COURT:  Okay, it's your document K in your

1    exhibit.

2            MR. FIELD:  Right.  So the financial plan.

3            THE COURT:  For 2007.  Here it is.  Okay.  It's the

4    judiciary's 2007 financial plan.  That's the one that they

5    talk about court technology and looking to spend EPA receipt

6    on that.  But in this financial plan they say the judiciary

7    seeks spending authority to implement a memorandum of

8    understanding with the State of Mississippi, to undertake a

9    three year study.

10           Now, they don't tell Congress in this one that

11   they're going to use the EPA funds.

12           MR. FIELD:  That's correct.  What you have is the

13   Mississippi study in particular is a little bit bifurcated.

14   Initially, we should step back one year before '07, so in

15   2006, the Senate Appropriations Report says, "The committee

16   urges the judiciary to undertake a study of whether sharing

17   CMECF technology, including electronic billing prophecies, is

18   a viable option."

19           THE COURT:  But they don't tell them how to finance

20   it.

21           MR. FIELD:  That's correct, Your Honor.  And then

22   you have the 2007 financial plan that you referenced.  You

23   have then the 2007 response from the appropriators.  There's

24   the letter from Senator Durbin at the first Skidgel

25   declaration, tab L, approving the pilot program.  Again,

1   there's still no reference to PACER fees.  We acknowledge

2   that.  That is approving the program.

3           But what you do then have is in 2009, you have the

4   judicial conference, this is in the second Skidgel

5   declaration at tab 12, you have the judicial conference

6   telling Congress that study that you directed us to do and

7   that you approved us to do, we are going to use EPA or PACER

8   fees for.  But that's subject to Congressional approval,

9   which they then provide in 2009.

10          THE COURT:  By not objecting to the financial plan.

11   You're finding approval by the lack of objection.  What do

12   you say --

13          MR. FIELD:  This one actually, this one -- it is a

14   letter from Senators Durbin and Collins, it does not

15   expressly mention the Mississippi plan.  This is in the

16   second Skidgel declaration at tab 14.  And it says that, "We

17   have reviewed the information included in the fiscal year

18   financial plan."

19          THE COURT:  What tab?

20          MR. FIELD:  I'm sorry?

21          THE COURT:  What tab?

22          MR. FIELD:  This is tab 14 of our most recent

23   submission.

24          THE COURT:  Okay.

25          MR. FIELD:  And I was specifically referencing the

1    last sentence in the first paragraph.

2          THE COURT:  A consolidated display of EPA revenue

3    and program expenditures.  I've got to tell you, I don't know

4    what they're talking about.

5          MR. FIELD:  I'm sorry, of the initial paragraph, we

6    acknowledge that this letter does expressly mention the

7    Mississippi study.  Rather what it says is that the

8    judiciary's fiscal year 2009, financial plan has been

9    reviewed.  And in the last sentence of the introductory

10   paragraph, these two senators, Durbin and Collins, say, "We

11   have reviewed the information included and have no objection

12   to the financial plan, including the following proposals."

13         So there are some that they itemized.  We don't

14   have any indication as to why they identify these and not the

15   Mississippi study.  The Mississippi study is a $1.4 million

16   study over three years.  That's in the context of federal

17   budgeting, that's a relatively small figure.  It could be

18   that they did not --

19         THE COURT:  You're just speculating.  It may be

20   that they don't care about the things they're not paying for.

21   These other things they have to pay for, you know, positions,

22   and panel attorney rates. Congress appropriates those monies.

23         MR. FIELD:  Not necessarily.  I don't know for

24   certain, there is at least reference here to --

25         THE COURT:  Where do you think you're getting --

1           MR. FIELD:  Electronic public access.  Let's see,

2    the last bullet discusses, "A consolidated display of

3    electronic public access revenue and program expenditures

4    within the judiciary information technology funds."  I don't

5    know for certain if that -- I would think that's going to be

6    funded.

7           THE COURT:  I don't know what that means.

8           MR. FIELD:  But when you look at these letters in

9    their totality, particularly the 2007 letter, which is a

10   similar letter, and I believe that is appended to --

11          THE COURT:  That's --

12          MR. FIELD:  Right, in the summary judgment,

13   filings --

14          THE COURT:  What do you say about TVA case.  It

15   doesn't help you.

16          MR. FIELD:  I think that with respect to these

17   general arguments, whether or not they are raised under the

18   IOAA, as plaintiffs have, at least in their initial briefing,

19   kind of described them, that's the Independent Office's

20   Appropriations Act, or whether or not we look at just the

21   more general jurisprudence about fees, taxes, delegations, et

22   cetera.

23          It's important to note that there is -- that the

24   Court doesn't necessarily need to in those instances grapple

25   with whether or not something is a fee or a tax.  And the

circuit here explained as much in 2012.  It's a case called *Rural Cellular versus FCC*.

And in that case the circuit said, "When a statute clearly provides an intelligible principle to guide the commission's efforts," in that case, the FCC, "whether the assessment is deemed a tax is of no real moment."  And they said that, "Because the Supreme Court had held that when Congress confers decision-making authority upon agencies, Congress need only lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform."

Now, plaintiffs in their papers say, well, this whole concept of delegation and directives, that only applies when it's really specific.  I believe that plaintiff's counsel used the words "really super specific."  That's the only time that this comes into effect.

But in *Rural Cellular*, the statute that was being reviewed said simply that the FCC was to create, quote, a specific predictable and sufficient mechanism to preserve an advance universal service.

That is, we would submit, vaguer than what we have in section 1913.  Simply saying that the FCC needs to create a mechanism to preserve an advance universal service.  Here, we believe that the reasonable and only to the extent necessary language is that intelligible principle that the

1    Judicial Conference takes, and that because of that, we don't

2    need to get into whether or not this is a fee, whether or not

3    this is a tax.  But even if we do, under the IOAA

4    jurisprudence that plaintiff's counsel and plaintiffs rely on

5    in their papers, cases like *Seafarers*, *Engine Manufacturers*,

6    these cases all still acknowledge that there is an -- that an

7    ancillary benefit to the public is still permissible.  It

8    does not have to be so narrow, as plaintiff's counsel

9    suggested, that the individual downloading the document from

10   PACER must be the only person that obtains ten cents of value

11   per page.  That you can't have any other benefit.  And that's

12   really what their proposition boils down to.

13          THE COURT:  Well, but if I were to define the

14   benefit as to benefit to the public, I have substantial

15   difficulty understanding, for instance, the VCCA notification

16   which tells law enforcement about some change in someone's

17   criminal record, I think.

18          MR. FIELD:  Right.  So when they're -- yeah, when

19   they're --

20          THE COURT:  What's that got to do with the public?

21   The public's access is what the statutes continuously refer

22   to.

23          MR. FIELD:  Right.  I think that it would -- I

24   think it would increase the public access to information

25   because it would certainly increase the speed with which an

1    individual, a violent offender is potentially apprehended or

2    brought in, and a case is initiated against him or her so

3    that the person who's in charge of locating that individual

4    would still --

5              THE COURT:  Why can't we use PACER fees in order to

6    notify the marshal that there's a warrant available to arrest

7    20 million people?  I mean, where do you draw the line with

8    20 million warrants out there of people who haven't shown up

9    for court?  That gets the Marshal Service going to figure out

10   who to arrest.

11             MR. FIELD:  If that notice is going out through

12   CMECF, like the violent crime notifications or like the

13   eJuror systems, I think an argument could be made --

14             THE COURT:  Well, how is the violent crime going

15   out through ECF?

16             MR. FIELD:  It's when there's a change in an

17   individual's case, which is going to be within CMECF.

18             THE COURT:  What do you mean?  There's a docket in

19   the case that says what?

20             MR. FIELD:  I think this goes to a bit of the

21   difference between PACER and CMECF that you were discussing

22   with Mr. Taylor.  And that is CMECF is in one sense the

23   conduit to information being on PACER, which is the portal

24   for the public to access that information.  CMECF also allows

25   certain things like the electronic juror notices to be sent

1    out on the back end, not on the public face, not that an

2    individual from the public can just go on and see a violent

3    crime notification or something along those lines.

4           THE COURT:  But I don't even understand what ECF

5    has to do with the notification of violent crime?

6           MR. FIELD:  My understanding is that, when there's

7    a change in an individual's case, so that would be a case

8    that is pending or proceeding in court, that would have a

9    docket open for it, when that triggers, when that triggers a

10   change to the case history for a particular offender, a

11   violent offender who's under supervision, that triggers a

12   notice that is then sent out to whoever is charged with

13   supervising that offender.

14          THE COURT:  Are there any limits if the information

15   is coming from the docket?

16          MR. FIELD:  I think there are -- I think as a,

17   under this case, when we're looking at whether or not the

18   fees are lawful, provided that the dissemination of

19   information is done through electronic means or is providing

20   public access through electronic means, I don't think the

21   Court could find that the fees are unlawful unless the Court

22   finds, (A), that an expenditure, a particular program is not

23   subsumed under the statute.  So not subsumed under this,

24   providing information through electronic means.

25          THE COURT:  To the public.

1        MR. FIELD:  To the public.  And also would need to

2   find, not just that the Court disagrees with it, but that it

3   is, in fact, not authorized, that it is unlawful, and that it

4   would affect the fees because the question here is about

5   fees, not about expenditures.  The question is, is the PACER

6   fee unlawful.

7        THE COURT:  Well, no, but they go hand in hand.

8   But his position is there are three buckets, one of which is

9   okay, one we're not quite clear on, and then all these

10  Congressional priorities.

11       Your position is it covers everything.  I'm trying

12  to understand what is a public access program.  You often

13  refer by 2012, you're beginning to get a little more

14  sophisticated in your references, not you, I mean, the

15  judiciary, when talking about a public access program.

16       Now, I just don't see how you can say that it's a

17  public access program to tell people who are supervising

18  so-and-so defendant that their status has changed.  I don't

19  know what that has to do with the public.

20       MR. FIELD:  Well, I think, if I can maybe make the

21  point a little bit clearer with respect to where are the

22  limits.  And I do agree that the two go hand in hand, fees

23  and expenditures.  But the question is, are fees unlawful.

24       THE COURT:  No, the question for me now is whether

25  there's liability.  Not the exact fees, but whether or not

1    you can charge for this category of X or Y.

2         MR. FIELD:  I think, I think the question is

3    whether or not -- the illegal exaction question is whether or

4    not the PACER fees, which is the exaction, is unlawful.  And

5    I think that plaintiffs, I think plaintiff's counsel

6    mentioned if there's even one dollar spent above what is

7    authorized, that that necessarily means that there's an

8    illegal exaction claim.  And I'm not sure that's right

9    because the question is, are the fees unlawful.  If there is,

10   in fact, one dollar spent too much, I'm not sure that that

11   makes the fee unlawful because I don't think there's anything

12   to suggest that the fee is going to be anything different if

13   it is by one dollar.  I think there is --

14        THE COURT:  Well, it's very simple, I think.  What

15   you put in the buckets, I don't know.  But let's call it

16   about Congressional priorities.  Where did that title come

17   from, by the way?

18        MR. FIELD:  So that -- that title arose in 2007.

19   And I think the best way to say it, I would caution against

20   reading too much into the inclusion of a new title on an

21   internal document that goes to a working group.  You'll see,

22   I think we explained in our most recent submission, it was

23   previously called salaries and expenses utilization.

24        THE COURT:  I don't know what that means either.

25   But --

1          MR. FIELD:  Right.  There's nothing in the record

2     to explain why the term changed and why the individual who's

3     putting these together started to include that term.  But

4     what is, I think the key takeaway is every single thing

5     that's list on the document, both at Exhibit L, and also in

6     the updated -- or the newer -- I should say the older

7     versions that we provided in the second Skidgel declaration,

8     every item, whatever the category it's under, has been

9     presented to the appropriators and has been approved.  And so

10    that something is in Congressional priorities, we don't knows

11    necessarily why that title arrived.

12         THE COURT:  But do you think that if the judiciary

13    said, well, we have to have more computers in the courtroom,

14    that isn't covered now, my computer, for instance, is not

15    part of the court technology that you have been -- but do you

16    think that honestly they know what's covered by court

17    technology?  I don't.  But I happen to know that our systems

18    here, when you -- I think -- well, how do you understand

19    court technology that you got authorization for starting in

20    2007?

21         MR. FIELD:  My understanding, and I will confirm

22    this, my understanding is we are talking about the monitors

23    that are in the jury box.

24         THE COURT:  Yeah.

25         MR. FIELD:  The monitor presumably here, the

1    monitor over there, the monitor that shows case documents to

2    the public.

3            THE COURT:  Okay, we'll get to that in a minute.

4    But what you asked for was to expand the use of electronic

5    public access receipts to support courtroom technology

6    allotments for installation, cyclical replacement of

7    equipment and infrastructure maintenance.  They want to

8    improve the ability to share case evidence with the public.

9    And so you assume that the appropriators know exactly what

10   they're talking about.  You don't, do you?

11           MR. FIELD:  I think we have to assume that because

12   that is the system that Congress set up and that is -- I

13   mean, that is subject to meetings and questions with the

14   staffers and with the appropriators and hearings.  And I

15   think that we have to -- I think the Judicial Conference has

16   to assume that the system that Congress created is a system

17   on which it should rely.  And this is a different scenario

18   than one where you could -- you could envision an agency has

19   been spending money, appropriated or fee money, on X.

20   Something -- and never told anybody, nobody knew about it.

21   They weren't being forthright with Congress.

22           And here we have to assume that the system that

23   Congress set up is the system by which Congress can weigh in

24   on these expenditures.  And if they have questions, there is

25   a mechanism for that.

1          THE COURT:  And so you view the E-Government Act as

2    being somewhat meaningless.

3          MR. FIELD:  Respectfully, I would disagree.  I

4    think that there are limits.  Only to the extent necessary

5    and reasonable, each.

6          THE COURT:  Well, reasonable existed before.

7          MR. FIELD:  Correct.  And I think that's a very

8    important point that I wanted to make.  Is plaintiff's papers

9    suggest this 2002 watershed.  There's great weight put on

10   essentially a Senate report that accompanied the E-Government

11   Act.  And out of, I believe it's a 72-page public law, I

12   could be wrong, there's three lines where "shall hereafter"

13   is added to "only to the extent necessary."

14         We talked in our papers about the history all the

15   way back to 1991 because the lion's share of the statute

16   existed since then.  Plaintiffs in their papers said Court,

17   you don't need to worry about that.  That was before the

18   E-Government Act had said it is irrelevant.

19         And I think that the Court needs, I'm sorry, that

20   plaintiffs need to either adopt a view that the E-Government

21   Act changed everything and that things that were previously

22   permissible became impermissible.  That's one option.  And I

23   think it's fraught with problems, but it is an option.

24         The other possibility is that the expenditures have

25   been barred since 1991, since this statutory text was

created, these types of uses of PACER funds beyond PACER are
unlawful.  And if that's the case, then the plaintiff can't
just cast aside this additional decade almost of interaction
with Congress.  They have to account for the fact that
Congress told in 1997, as Your Honor noted, that the House
gave very -- the House appropriators gave very direct
instructions to the Judicial Conference.  And did so again in
1999 and again in, importantly then in 2003, after the
E-Government Act.  That's when the House appropriators said,
I expect, we expect you to use EPA funds for CMECF.

THE COURT:  Have you ever looked at the legislative
history to the 1990 Act, by the way?

MR. FIELD:  We've looked at the legislative
history.  My memory does not -- I don't recall there being
any specific explanation about this provision.

THE COURT:  Well, there is actually.

MR. FIELD:  Okay.

THE COURT:  They say in Section 404 of the bill,
the committee, this must be the Senate committee on
appropriations, it is, sorry, it is the Senate, "which
authorizes the Judicial Conference to prescribe reasonable
fees for public access to case information," comma, "to
reimburse the courts for automating the collection of the
information which the director is required to maintain and
make available to the public."

1          So it's a little broader than just talking about

2     access to the information.  It is also to reimburse the

3     courts for automating the collection of the information.  So

4     it's a little hard with technology for things to be precise,

5     but --

6          MR. FIELD:  I think part of the language you just

7     read from the 1990 Senate report, is -- I think that draws

8     in, I think another sentence in the act itself that we

9     haven't talked about, and that's the third sentence of

10    paragraph A.  So a lot of focus has been spent on, "May, only

11    to the extent necessary, describe reasonable fees for access

12    to information."

13         When Mr. Taylor was here, he passed over the second

14    sentence and focused on the third sentence, but he can't --

15         THE COURT:  I'm sorry.  What act are you looking

16    at?

17         MR. FIELD:  This is the note to 1913, I think

18    what's been called the Government Act, the language that

19    redated the Government Act.

20         If you have it, Your Honor, I believe it's in, I

21    don't know the page on plaintiff's motion.

22         THE COURT:  Are you talking about the language

23    before it got codified or the language as codified?

24         MR. FIELD:  I'm talking about the language that

25    existed since 1991.  So it's still in it.  Plaintiff's

counsel mentioned that, I believe it's page 4 and 5 of their

motion.  So what the last sentence says is the director of

the Office of the -- the Administrative Office of the United

States, under the direction of the Judicial Conference of the

United States, shall prescribe a schedule of reasonable fees

for electronic access to information.  But they ended there.

And the rest of the sentence is important because that says

electronic access to information, which the director is

required to maintain and make available to the public.

As Your Honor noted, there are many pieces of

information that must be made available to the public, like

the court websites that were discussed and standing orders.

It necessarily follows.

THE COURT:  He goes back to the fee schedule and

says that you've sort of self-defined it and excluded from

your self-definition other things on PACER.

MR. FIELD:  I will acknowledge that I don't

necessarily follow this reliance on the fee schedule.

Nothing in the fee schedule or in the statute says that you

need to promulgate a fee schedule which itemizes every

service you're going to provide and you may not provide any

other electronic public service beyond what you include in

what I think they're referring to as a last bullet point

where we talk about -- defendant talks about standing orders.

There were many components to the Judicial Conference's

electronic public access program that are not on the fee

schedule.

THE COURT:  That's because they don't charge for

them separately.  They subsume them within PACER fees, that's

what they're objecting to.

MR. FIELD:  Right.  But this reliance on the fee

schedule as if that is a part and parcel of -- as if the fee

schedule itself can somehow inform what the Judicial

Conference can spend money on, I don't see in the statute.

To be sure, a fee schedule must be made, and, in fact, must

be submitted to Congress.  But there is more information than

just PACER that must be made, the wording is, that is

required to be maintained and made available to the public.

And that gets then into the discussion you had

about CMECF.  And I think it's important to keep in mind just

how narrow the plaintiff's argument is in this case.  Their

argument is and has been throughout today, it's PACER or

nothing.

THE COURT:  I understand.

MR. FIELD:  But as soon as we start moving that

line, then I think it -- then I think it, first off, I don't

think that is plaintiff's claim for liability.  And when

offered an opportunity to move that line and say, well, maybe

there are some of these things, plaintiff's counsel was

pretty resistant to the notion and even toward the end said

1    again CMECF is out.  And once, I think to a large degree,

2    once that concession is made, there's nothing left.

3              (A brief pause in the proceedings.)

4              THE COURT:  You say once you move the line, what is

5    your point?

6              MR. FIELD:  Right.  So we were talking about this

7    question about whether or not CMECF is, in fact, included

8    under --

9              THE COURT:  Right.

10             MR. FIELD:  And the point I was trying to make, and

11   maybe was not doing so artfully, is plaintiffs continue to

12   insist it's only for PACER, nothing else.  I think that once

13   the line starts to be drawn, then we have the discussion of

14   certain expenditures, there is certainly a role for the Court

15   still to look at those expenditures.  But I also think it's

16   important to keep in mind that once at that granular level of

17   the budget, I think that the plaintiff's proper recourse is

18   legislative and not judicial.

19             And to be sure, the Court, as you noted, there is a

20   hand-in-glove relationship between the fees and the

21   expenditures.  But when we start really getting down and

22   saying the Court needs to go through these budget documents,

23   needs to examine every component of what has PACER met, what

24   is PACER, what are the telecommunications entries with

25   respect to PACER.  But then we have gone afield from what

1    question is really before the Court.  And there is a -- the

2    plaintiffs are not left without recourse, Congress.

3              THE COURT:  Well, neither are you, that's what

4    they'd say.  But in terms of their middle bucket, which

5    include most of the things that come after, you know, you're

6    the author of Exhibit L as perhaps not done you any great

7    favors because they define for you what are PACER access

8    fees, and that's three lines generally.  Then you get this

9    vast expenses for CMECF allotments, various other categories,

10   including the bankruptcy.

11             Is it your position that those things are either --

12   well, is it your position that that middle bucket, the things

13   that are not ultimately termed Congressional priorities is

14   unrelated to CMECF?  I'm not being that granular.  I'm just

15   saying --

16             MR. FIELD:  No, I understand.

17             THE COURT:  -- you've got a whole bunch of things,

18   and from your definitions, they sounds pretty much --

19             MR. FIELD:  To make sure that we're looking at the

20   same sheet.  I believe you were -- you were looking with

21   plaintiff's counsel at the 2015?

22             THE COURT:  Yes, we were, I guess that's as good as

23   any.

24             MR. FIELD:  Sure.  And that's the second, I think

25   second or third to the last page of Exhibit L.

1          THE COURT:  Yes.

2          MR. FIELD:  And so your question is do we think

3    congressional priorities information is not CMECF.

4          THE COURT:  No, that isn't the question.  There's

5    public access services that go from line 11 to probably 20,

6    21 million.  Those, I don't think they're contesting those.

7    They contest everything starting at 21, which all the way

8    through court allotments.

9          MR. FIELD:  If I can interject.  I believe they are

10   to some degree contesting also those public access services

11   because they're saying that even our PACER system is too

12   expensive.

13         THE COURT:  No, they're not.  I don't hear that.

14         MR. FIELD:  They said they needed discovery into

15   those.

16         THE COURT:  No, no, that's not what they argued.

17   They're arguing they want discovery if -- to see whether any

18   of -- starting at line 21, going through line 46, minus the

19   electronic bankruptcy noticing, they say that maybe --

20   because they talk about PACER net D.C.  And they don't accept

21   that they can say or they do not profess to say that they are

22   all ECF, CMECF.  They acknowledge that some could be PACER

23   related.  And then they're not sure if it's CMECF.

24         I'm asking you if it's your position that all that,

25   minus electronic noticing, relate to CMECF.  I guess PACER

1    net would be included.  But do you understand the total

2    program requirements?

3            MR. FIELD:  Total program requirements relates to

4    everything under program requirements to the very end of this

5    document.

6            THE COURT:  No, I'm excluding public access

7    services.  Let me just make sure that Mr. Taylor agrees.

8    Public access services and the actuals for 2015, you are not

9    contesting 11 through 20, lines 11 through 20.  Right.

10           That's -- they give it to you.

11           MR. FIELD:  Okay.

12           THE COURT:  They are contesting 21 all the way

13   through, I guess subtotals, 45.

14           MR. FIELD:  Right.  And so I --

15           THE COURT:  My question is, what is your position

16   on this?  Is it CMECF related unless indicated that it's

17   PACER?

18           MR. FIELD:  Many of these, it depends on what you

19   mean by CMECF related.  And I'm not trying to play with

20   words.  But is it the cost of creating and maintaining CMECF?

21   No.  Many of these touch of CMECF, like we talked about the

22   eJuror system.

23           THE COURT:  I'm not there, I'm not there, I'm

24   not -- well, the electronic bankruptcy, I've tried to

25   eliminate from our consideration.  I'm not under

1    congressional equalities.  Above that line.  That's why I

2    stopped at 45.

3              MR. FIELD:  I am not certain that we can say, the

4    way that it looks to me on paper, yes, it looks like that

5    is --

6              THE COURT:  And I looked at your definitions.

7    That's the best I have.  You give definitions.  Okay.

8              MR. FIELD:  I'd be happy to confer just briefly

9    with agency counsel and hopefully provide an answer.

10             THE COURT:  Okay, all right.

11             (Counsel conferred off the record.)

12             MR. FIELD:  So lines 20 and 16, lines 22 through

13   32, those that are under case management and electronic case

14   file system are, in fact, all CMECF.

15             THE COURT:  Through what line again?

16             MR. FIELD:  Through 32.

17             THE COURT:  Through 32, yeah.

18             MR. FIELD:  And then lines 38 and 39 would be our

19   PACER.

20             THE COURT:  Okay.

21             MR. FIELD:  And then lines 42, 43 and 44 are part

22   of CMECF.

23             THE COURT:  And then what's your position on an

24   electronic bankruptcy?

25             MR. FIELD:  Our position is a few things.  One is,

1    it is something the Judicial Conference was told to do.  And

2    secondarily, it is initiated and facilitated through CMECF, a

3    creditor signs up for electronic bankruptcy noticing through

4    CMECF.  That is something that Wells Fargo or anybody else

5    who's a frequent creditor that is tired of getting thousands

6    of paper notices can go on to CMECF and say I would like all

7    bankruptcy notices that come to me, Wells Fargo or whatever

8    or creditor, like individuals can sign up because individuals

9    can be creditors as well, to say I want all of my bankruptcy

10   noticing to come to me electronically.  And the judicial

11   conference pays for that with PACER fees.

12          Importantly, there are still individuals receiving

13   paper notices, paper bankruptcy noticing.  That is paid for

14   separately.  It is just the portion of bankruptcy noticing

15   that goes out electronically through CMECF that is paid for

16   with these fees.

17          THE COURT:  Can I go back to this juror

18   technology -- not juror, sorry, courtroom technology?  I've

19   sat here a long time.  And I see exhibits that are

20   demonstrated to jurors on their monitors.  Those are exhibits

21   that are introduced by the parties.  And the jurors get to

22   see them.

23          Where is the public access?

24          MR. FIELD:  Because there are, I think two

25   instances.  One, it's on that screen, this screen, and these

1   screens that the public sees.  I guess there's three answers.

2   Also I would suggest that the jurors are members of the

3   public as well.

4          But the third instance, there are courts around the

5   country where exhibits are put up on PACER and then are

6   generally available.  This court doesn't do that.  But there

7   are courts that would require, like you would have to file

8   jury instructions and so forth that exhibits go -- that were

9   introduced to the public are then put up on PACER.

10          THE COURT:  No, no, but I'm unaware of exhibits

11   being included in the public dockets.  Clearly a filing on

12   jury instructions are.  And most of us file our final jury

13   instructions on the docket as well.  But everybody holds onto

14   their own exhibits, and they're not part of the public's.

15          MR. FIELD:  In this district, that's correct.

16   There are districts, it's my understanding, and if the Court

17   would like further factual evidence on this front, we can

18   provide that.  But it's my understanding that there are

19   districts around the country where in addition to filing on

20   PACER the final jury instructions, at the end of the case

21   will also be the exhibits.

22          In addition, you know, when you have motions in

23   limine and so forth, oftentimes potential exhibits are put on

24   line.  So there are many places in which exhibits end up on

25   PACER, but even divorcing that question from PACER, they're

1  displayed to the public right here and to the jury during

2  trial.

3          THE COURT:  And --

4          MR. FIELD:  And I think it's important to note that

5  nothing in this conversation of public necessarily, nothing

6  restricts it to general public, it doesn't have the word

7  "general."  Every single dissemination of information does

8  not have to be to the public at large.

9          THE COURT:  Well, you're the one that in your 2012

10  EPA program summary, that's prepared by the AO, you know,

11  it's Exhibit J of the plaintiff's, it's called your EPA

12  program summary.

13          MR. FIELD:  Right, it is -- it is going to be

14  either prepared by the AO and approved by the Judicial

15  Conference or just prepared by the Judicial Conference, but I

16  believe, yes, that is our, that is defendant's document.

17          THE COURT:  But you talk about a public access

18  program.

19          MR. FIELD:  Uh-huh.

20          THE COURT:  I can't see how that word is to have

21  meaning if things are only available to a potential juror or

22  alternatively to a law enforcement supervisor.

23          MR. FIELD:  Well, they're available to thousands of

24  potential jurors.  I don't know, it is true that it is not

25  available to an individual who just opens up his or her

1    laptop and says I want to see X.  They're not going to see

2    the juror notice that went to prospective juror one, that's

3    correct.  But thousands and thousands of members of the

4    public, citizens of the District of Columbia are getting

5    electronic jury notices.  They are members of the public.

6    And there's nothing that says that the fees must be used for

7    electronic access to the general public, to the public at

8    large or anything like that.  It is for public access.  And I

9    think it necessarily follows that some of these programs are

10   going to be available to a broader degree than others.

11           THE COURT:  Well, I still go back to the fact that

12   if I issue a warrant and that's directed to the marshals, is

13   that -- should that be covered?

14           MR. FIELD:  I think an argument can be made like

15   the victim crime notification which goes both to the police

16   and also goes to DOJ in order to provide notice to victims,

17   that that is providing information to the public.  And I

18   think that, you know, talking in the abstract here, I think

19   an argument can be made that a warrant, if it is,

20   particularly in this case, if it is triggered through CMECF,

21   you could create a component of CMECF that when you approve a

22   warrant, it is issued to the marshals by way of the CMECF

23   infrastructure, technological infrastructure.  And Congress

24   would have the opportunity to say, nah, that is a bit too far

25   afield from what we meant by the statute.

1            Well, if the appropriations --

2            THE COURT:  Is the VCCA and web juror funded

3    entirely by EPA receipts, fees?

4            MR. FIELD:  Yes, they are.

5            THE COURT:  Okay.  And what is your legal

6    authority, there is a part of the *TVA versus Hill* case that

7    says, "Expressions of committees dealing with requests for

8    appropriations cannot be equated with statutes enacted by

9    Congress."

10           So, what is your legal authority for the things

11   that happened after the statutes were enacted?  The last

12   relevant statute is 2002, as far as I can tell.

13           MR. FIELD:  So at the very end of our reply brief,

14   we note that committee reports, language from committee

15   reports are routinely relied upon by courts when interpreting

16   statutes.  Our proposition here is --

17           THE COURT:  Let's see, what page are you on?

18           MR. FIELD:  I'm sorry, that is on -- we're on page

19   10 or ECF page 12 of our reply brief, the second to last

20   page.

21           THE COURT:  Courts routinely look to committee

22   reports, okay.

23           MR. FIELD:  So I think it's important to --

24           THE COURT:  Well, they're after the fact, though,

25   do you know?

1          MR. FIELD:  Some of it is -- some of it's -- it

2    depends on what the fact is, you mean after the E-Government

3    Act of 2002?  Every expression from Congress, whether that's

4    an appropriator, Appropriations Committee staff member,

5    anything of that nature, happened before the expenditure was

6    made.  Some of them predate, some of them postdate the 2002

7    E-Government Act.

8          THE COURT:  Do they have to do with the

9    Appropriations Committees, any of these cases?  You cited, as

10   far as I can see --

11         MR. FIELD:  Uh-huh, there's two cases, and I --

12         THE COURT:  *Mack* and *Broadcasting* something, I

13   assume that's -- the Supreme Court 2014, *Lawson* and a *John*

14   *Wiley and Sons*.  Those are the three cases here.  And you're

15   telling me these cases could help me interpret the

16   Congressional Committee reports, whether it be House or

17   Senate, to use them for understanding what's covered here?

18         MR. FIELD:  Yes.  I think these cases, and I would

19   submit that there is a litany of others that stand for the

20   general proposition that's expressed here, which is language

21   in committee report, we don't quarrel with plaintiffs.

22   Language in committee reports cannot change the law.  They

23   suggest that that was some concession.  I think a statement

24   of what we would agree is black letter law is simply that.

25   But what's important here is we have, and we have cited

1    Congressional representations from Senate reports and from

2    letters from appropriators and e-mails from committee staffer

3    that all were uniform.  They all say the same thing.  And

4    yes, that these cases and the others of the same ilk would

5    suggest that the Court may look to those reports to inform

6    the appropriate interpretation of the statute.

7            THE COURT:  Even if they come after the statute?

8    So I could go look to Senator Lieberman's letters to the

9    judiciary in 2009 to interpret, help interpret the statute

10   back in 2002?

11           MR. FIELD:  So as we mentioned, as we noted,

12   Justice Scalia and others certainly take a dimmer view of

13   post-enactment legislative history.  I think there is

14   something to be said for it.  But not every piece of

15   legislative history that we're talking about here post-dates

16   the 2002 Government Act.

17           THE COURT:  No.

18           MR. FIELD:  And so I think that plaintiffs have yet

19   to engage that.  They have said that's irrelevant.

20           THE COURT:  I find stuff that came before it to be

21   more probative than I find the stuff that came after.  I

22   don't know -- but what I'm looking for is a case where you

23   take a House appropriations, say we're happy with your

24   budget, whatever that means.  We have no objections.  And you

25   take that to mean that you can properly spend these fees this

1    way.  I don't know, you don't have a case for that.

2            MR. FIELD:  I don't have a case for that.  I do

3    have many cases that -- about the general importance and role

4    that legislative history can play and admittedly we were the

5    ones who made the argument that post hac explanations from

6    committees and so forth and individual members have

7    diminishing value.  But I do think --

8            THE COURT:  You said that you've gotten

9    authorization.  Let us just assume for a minute that Congress

10   had no idea that fees were being used to fund 1.4 million for

11   Mississippi, hypothetically.  What's your position then?  You

12   couldn't do it?  Do you understand my question?

13           Is your position for things post '02 that if

14   Congress hadn't said something in response to the budget of

15   the judiciary or in -- that you couldn't count on that, you

16   couldn't do it?

17           MR. FIELD:  That's not our position.  Our position

18   is, I think the APA provides some helpful context here.  It's

19   not an APA case, but I think the first question would be what

20   does the statute say.  And we would submit that the statute

21   says that the fees may be charged as long as they're

22   reasonable, and to the extent necessary, to provide

23   information to the public through electronic means.  That

24   question, if it's clear under the statute, we don't need to

25   talk about any of these other questions under using the

1    Chevron analysis.

2          But --

3          THE COURT:  If it isn't clear.

4          MR. FIELD:  If it isn't clear, then we get to

5    ambiguity.  And then we get to whether or not the Judicial

6    Conference's interpretation is permissible under a highly

7    differential standard.  And we would --

8          THE COURT:  I didn't see any analysis of that

9    anywhere in your brief.

10         MR. FIELD:  Correct.

11         THE COURT:  There wasn't any discussion about

12   deference to the judiciary or what they could do.  It's not

13   their statute.

14         MR. FIELD:  No, and we don't -- admittedly we don't

15   engage the Chevron analysis.  And I'm not saying here today

16   that in an illegal exaction case it is necessarily a Chevron

17   analysis, but that is a readily available standard, and, in

18   fact, the standard that the federal circuit uses in illegal

19   exaction cases to say, I'm being called on, I, as the court,

20   am being called on to determine if an agency is acting

21   contrary to law.  Well, we do that every day in the APA

22   context, why don't I borrow from that standard.  And there

23   are multiple cases from the Federal Circuit where they

24   analyze it under that rubric.

25              And the question then, if we get past the first

1    step, the question is, is the way we've really described it

2    is more, it's a reasonableness question.  And you find

3    reasonableness in the statute.  And I don't think you have to

4    necessarily engage the post-enactment legislative history,

5    but I also likewise don't think that the Court needs to

6    ignore it entirely.  It informs the question.  It's

7    post-enactment, so it certainly informs it less.

8             THE COURT:  Well, aren't I informed by the

9    judiciary in their financial plan, which is your Exhibit K

10   that says, "The judiciary seeks authority to expand use of

11   electronic public access receipts to support courtroom

12   technology."  Then it goes on for installation, cyclical

13   replacement.  It doesn't strike me that the judiciary thinks

14   it has authority for that.

15            MR. FIELD:  Right.

16            THE COURT:  Then they changed their mind and they

17   don't ask for it anymore after that.  That's the last time.

18            MR. FIELD:  They're expanding their authority from

19   the appropriators because they can't spend that money until

20   that financial plan is approved.  The previous year's

21   financial plan, if it didn't say courtroom technology in it,

22   and the plan was approved, the Judicial Conference does not

23   yet have appropriator's authority to make that expenditure.

24            So that is why they are seeking approval to expand

25   the use of EPA receipts because they're asking the

1    appropriators who hold the keys to their ability to spend

2    money on electronic public access programs, they're asking

3    for that authority to expand, not the plaintiff's --

4            THE COURT:  Okay.  If you can find anything in the

5    law in 24 hours and tell me that the appropriators care about

6    the use of expenditures that are not appropriated, I'd be

7    interested to know.  I mean, you put a lot of credence.  Have

8    they not said this here, and they just put a line item on

9    their budget, say, court technology, you say that's enough,

10   that they put in $7 million court technology.  They don't

11   flag for them any other place except in '07 that they're

12   seeking authority.

13           But under your analysis, if they put Congress on

14   notice that they're going to use public access fees or EPA

15   fees anywhere in their document, that's it.  As long as

16   Congress didn't come back and say no, no, no, no, no.

17           MR. FIELD:  Well, I would say Congress says yes.

18   Congress says we've reviewed everything you've submitted.

19   And we're approving it or we have no objections to it.  And

20   so we will look, I don't know that there's going -- we will

21   look to see if there is any authority to say that about the

22   particular role that appropriators put on language on

23   providing --

24           THE COURT:  Non-appropriated funds.

25           MR. FIELD:  How non-appropriated funds are going to

1    be spent.  I would say that this is all still -- this is

2    still, I think several layers down from the initial question,

3    which is that we don't have to -- the Court needn't engage

4    this at all if the Court agrees with our statutory

5    interpretation.

6              THE COURT:  Well, I don't quite, you haven't

7    answered my question about the marshals.  I don't understand

8    your -- how far you allow the definition of public access

9    program to be stretched.

10             MR. FIELD:  I think at this stage the -- I would

11   say two things.  First is we believe it to be to encompass

12   everything that it has been used for.  And I think that you

13   could make an analogy between some of these things and a

14   system whereby warrants that go out to the Marshal Service

15   are -- through CMECF are part of the electronic public access

16   program.  I don't know that that's a question that the

17   Judicial Conference has ever engaged.  And they may have to

18   think about that and think about the technology, and if that

19   even works, but --

20             THE COURT:  Well, you concede that in 2006 they

21   were sitting on a lot of money.  And so they decide that

22   they're going to expand their usage.  They make it quite

23   clear, we have $32 million surplus.  And we're going to

24   expand our public access initiatives.

25             MR. FIELD:  I would take issue, I know that

1   plaintiffs used that term, I would take issue with surplus.

2   That sounds like here's a bunch of this extra money, and

3   we're going to go -- we have it left over, and we're going to

4   go and spend it.  But it's important to put it in proper

5   context.  It's a carryforward.  And that's an important

6   distinction because unlike appropriations, in the

7   appropriations context, the Department of Defense asks for X

8   billions of dollars, and the check is written, that goes into

9   the bank, and then they draw down on that throughout the

10  year.

11          This is different.  This is receipts coming in

12  during the year that are then immediately spent.  So there is

13  a bit more of estimation that goes into it where the judicial

14  conference has to guess how many PACER users am I going to

15  have next year.  I'm assuming there's going to be an X

16  percentage of growth based on historical trends.  So we

17  assume we're going to have X dollars coming in.  At any given

18  time that may not happen.  And that's where the carryforwards

19  happened is there may be --

20          THE COURT:  Sure.

21          MR. FIELD:  But what's important about that is the

22  Anti Deficiency Act comes into play here because they

23  can't -- they can't go into a deficit.  And so they have to

24  estimate this in such a way that allows there to be a bit of

25  a carryforward for the next year that then they take into

that next year, apply it to their budget, and apply it to

particularly the rolling out across the country of the next

gen system that some courts do more slowly than others.  And

in certain years the court that was supposed to says we're

going to actually kick it back to the next year.  Some

rollouts are less expensive than others.  And so those create

these carryforwards that are, as you mentioned, I think it

was 32 million was the one that you referenced.

THE COURT:  It says here that they have 32.2

million retained in the electronic public access program

resulting from unanticipated revenue growth associated with

public requests for case information.  At that point they

have a choice.  They can start to lower the cost or they do

what they did.

The judiciary is examining expanded use of the fee

revenue in accordance with the authorizing legislation.  And

then you start to get these, quote, Congressional priorities

after that, exactly after that.  Not ECF.  That's already

happened.  That's already --

MR. FIELD:  Right, the electronic bankruptcy

noticing had already happened as well.  Yes, there are -- the

courtroom technology happens in, I believe it was first

mentioned in '07.

THE COURT:  So if it's not listed in the budget

that goes to appropriations, hypothetically, you would be in

the same position, would you be making the same argument

today?  You're relying on the fact there's a line in these

budgets that says VCCA notification, two million.

MR. FIELD:  I'm relying on that as indicative of

Congressional approval for the Judicial Conference's

interpretation of the statute.  The Judicial Conference as a

separate matter would not be allowed to spend money unless it

were included because they're not allowed to spend money

unless it's approved.

But in terms of the question before the Court, I

think that the interplay between the financial plans and the

responses from the appropriators serve as evidence of the

correctness of the Judicial Conference's interpretation of

the statutory language in 1913.  We are not relying

exclusively on it, on the interactions with the

appropriators.  But we are saying that this wealth of, for

lack of a better term, legislative history, although some of

it postdates it.  But for this wealth of legislative

information informs the analysis because on one hand we

have --

THE COURT:  Yes, I'm just trying to figure out if

we didn't have this, quote, wealth, which often letters

written by two senators that say we approve your budget, you

also have Senator Lieberman saying something quite different.

He's not part of the appropriations, but so, this wealth goes

1    both ways.

2            MR. FIELD:  I mean, the wealth on one hand is --

3            THE COURT:  We have acquiescence, so-to-speak, by

4    Congress.

5            MR. FIELD:  I guess we would take issue with that

6    because although in some instances there are statements we

7    have no objections, there's other instances where it says we

8    approve it, and we're approving it specifically, your

9    Mississippi study.

10            THE COURT:  One, one.

11            MR. FIELD:  And it's the 2007 one --

12            THE COURT:  Yes.

13            MR. FIELD:  -- is the most explicit.  But I think

14    it's helpful to notice that there are other instances where

15    there are examples of the appropriators saying no.

16            THE COURT:  There is?

17            MR. FIELD:  Yes.

18            THE COURT:  Find me one.

19            MR. FIELD:  Not with respect to the use of

20    electronic public access fees, but in this same back and

21    forth you see in the 2012 letter from the appropriator.

22            THE COURT:  What tab?

23            MR. FIELD:  That is the second Skidgel declaration

24    at tab 18.  This is one I believe where the committee, the

25    letter expresses concerns and tells the committee this is

1   specifically about the defender services appropriations.

2          THE COURT:  Tab what again?

3          MR. FIELD:  This is tab 18.

4          THE COURT:  Okay, I've got it.  Yes.

5          MR. FIELD:  And here you see the chair of the --

6   this is the Financial Service and Government Subcommittee

7   that had reviewed the financial plan, this is the House side.

8   This is a statement saying at the second, the penultimate

9   paragraph, "The committee notes the cost of the defender

10  services appropriations are estimated to grow by 30 million

11  while the number of representations is estimated to decline

12  and that the committee expects the judiciary to do more to

13  manage the cost of this program and ensure in the future the

14  program can provide effective representation in the time of

15  declining services."

16         THE COURT:  Resources, okay.

17         MR. FIELD:  Yes, resources.

18         THE COURT:  Yes, but they didn't --

19         MR. FIELD:  And then in tab -- one tab over in tab

20  19, in response to, again, the same type of financial plan,

21  this is from Senator Durbin.  Final sentence of the third

22  paragraph, "After reviewing the financial plan," he says, "in

23  that regard the court should not incur any personnel costs

24  that will result in ongoing annual costs that may not be

25  affordable in FY 13 with expected budget constraints."

1          THE COURT:  Right.  But these are appropriated

2    funds they're talking about, defender services and the staff.

3          MR. FIELD:  Correct.

4          THE COURT:  But in any case, I haven't bothered --

5    it seems to me by necessity I have no basis to recuse.

6    Obviously Thomas Hogan was a judge of this court, he was on

7    the AO, and so was -- he was the AO, and so was John Bates,

8    and I know Senator Lieberman a long time ago, way back.  But

9    I figure -- I think I brought that to your attention.

10          MR. FIELD:  I believe that was addressed in the

11   motion for certification hearing and neither side had any

12   qualms.  But I do think it is true that those are

13   appropriations, that language relates to appropriations, but

14   it is important to see how the committee responds to these

15   financial plans.  It is not just a rubber stamp.  We see the

16   2007 letter with expressed approval.  And we see these

17   instances, we see exactly how the committee would say no, if

18   it wanted to say no.  And this is after a back and forth

19   with Administrative Office staff where the committee can ask

20   any and all questions it wants.  There are hearings,

21   questions for the record, if at any point somebody had a

22   question about whether or not, about what exactly --

23          THE COURT:  None of this is in the record before

24   me.  I mean, I have the record as I have the record.

25          Okay.  I'll give you two more minutes, and then

1   we'll hear for a few minutes from the plaintiff.

2           Anything else that I need?

3           MR. FIELD:  No, Your Honor.

4           THE COURT:  All right.  Thank you.  But if you can

5   find anything that tells me about Congressional, House or

6   Senate appropriation communications, I'd be interested.

7           Okay.  Mr. Taylor, briefly, please.

8           MR. TAYLOR:  Thank you, Your Honor, I'll try to be

9   quick.  Just a few points.

10          The first point is you didn't hear any response to

11  the Supreme Court's decision in *TVA versus Hill*, which

12  resolves any doubt.  The actions of the Appropriations

13  Committee cannot override or change the meaning of a statute.

14  And that's particularly true when the question in the case is

15  the scope of the statutory authority to impose a fee rather

16  than a spending decision, which is the other side of the

17  ledger.

18          And I think that if you --

19          THE COURT:  But I can't find the statute to be

20  clear, I don't know how I -- I agree with you that the

21  Congress can't appropriate money inconsistent with the

22  statute.  But I don't think the statute is so clear as

23  anybody thinks.  He says its public access program includes

24  just about anything that is electronically spewed out.

25          MR. TAYLOR:  Right.

1          THE COURT:  I think that's -- I hope that's pretty

2     close to -- skip the word "spewed," but I think that's pretty

3     much what you're saying.

4          MR. TAYLOR:  I think if you want to look at the

5     statute, I think -- I have two responses to that.  The first

6     is I think we have the better reading of the statute just on

7     its own, not taking into account any presumptions or other

8     canons of statutory interpretation.

9          THE COURT:  Do you think the judiciary is entitled

10    to any deference?

11         MR. TAYLOR:  They haven't asked for it.  And I

12    would say that to the extent the statute is ambiguous, that

13    ambiguity has to be resolved against allowing a fee that

14    would exceed the marginal cost of the service provided

15    because that is exactly what the Supreme Court has held

16    squarely in the cases that we cite from pages 12 to 14 of our

17    motion.  I'd really look at those few pages.  I think that

18    principle is controlling here.  It tells you the difference

19    between a user fee, and then something that looks more like a

20    tax.  I'm going to quote a direct quote from the Supreme

21    Court, binding precedent.

22         THE COURT:  Which case?

23         MR. TAYLOR:  So this is a case called *Skinner*.  And

24    it's describing two cases, two earlier cases from the Supreme

25    Court.  One is called *National Cable Television Association*,

1   the other is called *New England Power*.  And this is the rule

2   that emerges from those two cases.  This is a direct quote:

3          "Congress must indicate clearly its intention to

4   delegate to the executive or the judiciary here, the

5   discretionary authority to recover administrative costs not

6   inuring directly for the benefit of the person paying the

7   cost in the service provided."

8          So the question here isn't whether there's some

9   public access that benefits the public more broadly.  The

10  question is whether there is a specific service that is

11  provided to the specific person who's paying the fee.  And it

12  is solely the cost of that specific service that can be, you

13  know, that the fee could be set to ensure that there's some

14  reimbursement for it.

15         THE COURT:  Well, would you agree --

16         MR. TAYLOR:  And that is exactly what the statute

17  says, too.  But the last sentence --

18         THE COURT:  Would you agree that the service here

19  is not just the portal, but what you get when you get through

20  the door?

21         MR. TAYLOR:  The service is, if I go on PACER and I

22  pay ten cents for one document, the service is the receipt of

23  that document.  That's the service I've received.  And the

24  statute itself --

25         THE COURT:  But you wouldn't get that via the

1    Internet unless the documents were electronically compiled.

2            MR. TAYLOR:  That's right.  That is exactly the

3    case in the FOIA context, for example.  So FOIA requires

4    agencies to maintain their records.  And if there's a request

5    for the agency to provide a public record, the person can be

6    charged a fee for that, right, and that's set by statute.

7            But the fee cannot exceed the total marginal cost

8    of providing the record.  The agencies cannot expand the cost

9    of the fee to cover then the cost of holding onto the

10   documents and maintaining them and ensuring that they're

11   filed.  I mean, that would be outside the scope.  It's a

12   similar principle.

13           THE COURT:  Well, you can hold me to this.  I

14   thought it was a duplicating fee that's provided for.  And

15   it's not just a search fee.  I think that FOIA talks in terms

16   of duplication.  We'll give you X amount free, and the rest

17   of it you have to pay for.

18           MR. TAYLOR:  Right.  It's duplicating a record, and

19   here it's disseminating the record, right.  Just basically

20   providing a PDF.  I mean, that is what PACER is, it's

21   providing PDF's.  And I think that that is the service that

22   is being provided.  And the statutory text, the very last

23   sentence of the statute, which opposing counsel has no

24   account of what it's doing there, says, "to reimburse

25   expenses incurred in providing these services," and those are

1    the services rendered in exchange for the fee.  And so here

2    it's the provision of PACER.

3              And I think that, you know, just to go back quickly

4    to the point about the Appropriations Committee in *TVA versus*

5    *Hill*, so I think just to -- if you want a window into what

6    this process looks like, I would take a look at tab 20 of

7    what the Government submitted.  So this is beginning at page

8    50.

9              THE COURT:  What are you referring to?

10             MR. TAYLOR:  So this is an e-mail exchange between

11   someone at the AO and someone at the Appropriations

12   Committee.

13             THE COURT:  Is this in the supplemental filings?

14             MR. TAYLOR:  This is what the Government filed last

15   week.  So that's what I mean by tab.

16             THE COURT:  Okay.  And then tab 20?

17             MR. TAYLOR:  Tab 20, yeah.  So this is what the

18   process looks like.  So this is a -- the AO is seeking

19   approval for its fiscal year 2013 spending.  And we're almost

20   done with fiscal year 2013.  It's July 31st now in 2013.  And

21   this is after the bill has been passed.  And presumably the

22   money has been spent.  And there's a question here, would you

23   be able to send us an e-mail or something approving the plan.

24   And then the response comes 45 minutes later saying we have

25   no objection.

1              And there's no mention of the statute, there's no

2    mention of the statute in anything that the Government

3    provided.  So to the extent you're going to look at this

4    exchange of e-mails and correspondence as a way of figuring

5    out what Congress meant in 2002, you're going to be pretty

6    frustrated because there's no mention of the statute, much

7    less any attempt to interpret what it means.

8              And so in any event, this kind of correspondence is

9    not what the Supreme Court had in mind when it said that

10   Congress must clearly indicate its intent to authorize a user

11   fee that exceeds the cost of providing the service to which

12   the fee is charged.

13             And I think if you recognize that the AO itself

14   understood it needed expanded authority after the

15   E-Government Act was already enacted, that the appropriators,

16   by sending e-mails or doing anything else, do not have the

17   authority to confer that authority on the AO.  Whatever

18   authority the AO has to charge a fee must come from this

19   particular statute, and that's it.

20             THE COURT:  Okay.  Thank you very much.  So, all

21   counsel, the Court will take it under advisement.  And if

22   anybody has a specific case besides the *TVA* one that you

23   would like us, that was not cited in your papers, I'm happy

24   to have them.  You can just send a letter by fax to the

25   chambers, cc the other side, but by tomorrow.  Okay?

1        Thank you.   Thank you.

2        THE DEPUTY CLERK:   Parties are excused.

3        (Court recessed at 4:18 p.m.)

4                          -  o  -

1

2                    CERTIFICATE OF REPORTER

3              I, Lisa Walker Griffith, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

10   _____   5-2-18_____
     Lisa Walker Griffith, RPR          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25