Michael T. Pines
619-771-5302
magicalmichael100@gmail.com

Leave to File Granted

PAUL L. FRIEDMAN
8/26/21

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL T. PINES, et. al.<br><br>Plaintiff/Petitioner<br><br>vs.<br><br>UNITED STATES OF AMERICA, et. al.<br><br>    Defendants and Respondents | Case No. 1:16-cv-00745-ESH<br><br>DECLARATION OF MICHAEL T. PINES IN SUPPORT OF MOTIONS TO MODIFY CLASS CERTIFICATION AND TO INTERVENE AND FOR SANCTIONS |

1.  I, Michael T. Pines, am the plaintiff in the proposed Complaint in Intervention filed herewith.

2.  My story is a long one and details are set forth in the draft complaint I was planning to file in the Sacramento Bankruptcy Court which is filed as Exhibit A herewith. The draft is not nearly complete but enough of it has been done to tell the facts of my story.

3.  If Pines is not bound by this class action, he intends to file in the bankruptcy court.

4.  I have been exposing bad conduct by the "Too Big To Fail Banks" and the complicity of the federal and state governments since about 2010. At one point what I said was reported in the press around the world.

5.  As a result, I was disbarred, put in jail, prison, and mental hospitals but was innocent of

any wrongdoing.

6.   The proposed legal action concerns this.

7.   I want to get in front of Judge Christopher Klein if possible. He clearly understands the evil being perpetrated by the big banks and awarded over $46 million against B of A in the Sundquist case.

8.   He is smart too. He ordered most of the money to be donated to charity to increase the chances it would hold up on appeal.

9.   When the parties settled and tried to keep it confidential, the judge literally said "no way".

10. As for this case, I have not appeared in this federal district before.

11. I chose this case to appear in because ████████████████████████ ████████████████████████.

12. ████████████████████████.

13. Maybe just one will decide to do what is right and just.

14. I was wrongfully jailed beginning on or about Feb. 23, 2011. After that I was wrongfully jailed twelve times for various lengths of time. I was sent to prison and mental hospitals because I told the truth including criticizing ████████.

15. When you go to prison you lose everything. I still have not fully recovered.

16. Long before I was arrested, I reported crimes being committed against me including by ████████████████████, including to the F.B.I, Pacer, when they hacked my account, ████████████████, ████████████████ (who was a witness to an assault on my assistant by ████████) and the San Diego Bankruptcy Court.

17. They did nothing.

18. It appears this Court ordered notice of the class action to be sent some time in 2017. I do

not know whether any such notice was sent.

19. I was in the San Diego County jail from June 23, 2017 to Sept. 18, 2017.

20. Was in prison from September 18, 2017 to June 12, 2018.

21. In addition, I was in custody in Patton State Hospital twice between 2011 and 2018 for more than six months each time..

22. On or about September 18, 2017 I was sent to Atascadero State Hospital and was there for about a year.

23. I did not receive any notice of this class action and did not have a chance to opt out so it appears I am a class member who may be bound.

24. From being in jail and prison I can say that inmates are very active in working on their legal matters but there is no access to the internet or Pacer while in custody.

25. I am informed and believe that other inmates however, have access when they are not incarcerated, and may be class members but did not receive notice if they were in custody at the time notice was given.

26. I did not know about this class action until, as alleged in the Complaint in Intervention, I attempted to open a new Pacer account in August 2020 and was having great difficulty doing so.

27. On or about August 19, 2020 I contacted counsel for the United States in the case by email with questions expressing my desire to be heard and participate in the matter and for help getting a Pacer account.

28. I also sent an email to all Plaintiff's and other counsel. I included a draft complaint I was anticipating filing and provided the facts set forth in the Complaint in Intervention. It included a claim for overcharges by Pacer.

29. At the time, I was planning to file an action in San Diego and in fact did file one in the federal court which was dismissed due to lack of prosecution after the court wrongfully denied

my application to waive filing fees.

30. I intended to file a Notice of Related Action and have the matters coordinated.

31. I have changed my mind and decided to try to intervene here.

32. When I tried to get a new Pacer account in August 2020, I could not.

33. In communicating with counsel in this case, I explained, *inter alia,* that I was being denied access to Pacer and wanted an account.

34. At first I received a prompt response from ████████████ who claimed she wanted to help.

35. Thereafter I sent her other emails telling her and other counsel what happened to me and what relief I was seeking.

36. I stated many times that as a class member I wanted to be involved, and if necessary I would seek intervention.

37. Within a short time of sending the first email in August 2020, all my emails after that were completely ignored. For about a full year, counsel did not even give me the courtesy of responding. I believe this is an "adoptive admission by silence" that what I said in those emails, including what I state in the proposed Complaint in Intervention and this Declaration are true and correct and cannot now be properly denied.

38. I am used to this. Whenever I expose the truth, attorneys go completely dark. When I file in court, judges almost always get rid of the case as quickly as possible making rulings that make no sense and their conduct is clearly unethical.

39. Recently, I was the victim of serious crimes by ████████████████ who wrongfully evicted me while I was living in Sequim Washington and who even threatened my life.

40. I filed proceedings in the federal court in Seattle (No. 21-71023), the Ninth Circuit No.

(21-71023), the bankruptcy court in Seattle , and with the Washington Supreme Court. Each court made rulings that are absurd to not hear the case and provided no relief.

41. The complaint in the federal court explains the situation and is submitted herewith.  The judge in that court remanded the matter to state court on his own and before anyone even appeared, like the proverbial "hot potato" as soon as he read the file.

42. I had filed a bankruptcy to stay any eviction and that judge dismissed on his own as soon as he read the file. Then he sent me a letter claiming he really didn't mean to dismiss. But, he clearly isn't going to do anything even though the automatic stay was clearly violated.

43. I filed a writ in the Ninth Circuit but the Ninth Circuit refused to even consider the matter as soon as they read the file.

44. The Washington Supreme Court also refused to hear the matter.

45. ███████████████████████ are involved and as usual they have remained completely silent. No one has ever denied the crimes that occured, denied a single or a single word of what I have alleged and in fact no one has even filed anything in these proceedings except ███████████████████████. Yet no one will do anything.

46. ███████████████████ was notified and he also remained completely silent. As usual, all my emails were ignored.

47. An appeal is pending, but the Court of Appeal also made a ruling that makes no sense and is directly contrary to law.

48. I understand why.  The irrefutable evidence I provide shows that the financial system is run by the big banks. The banks ignore the law and consistently commit crimes as is common knowledge. (The docu-series The Con tells the story, link below).

49. The federal government and state governments go along because they have to. If the banks fail, the entire system fails and judges are part of the system as are lawyers and they don't

want the system to fail. All this became well known as a result of the 2008 financial crisis when the government got a scare.

50. However, practically everyone knows that the United States is in big trouble now and a collapse is going to occur anyway.

51. But, back to this case where I have also been completely ignored by counsel.

52. On June 29, 2021, I sent an email to all counsel of record stating I intended to file a Motion To Modify Class Certification and have the class decertified, and to Intervene, and describing the basis for the motions. I stated I intended to object to any settlement and they might be wasting time and energy trying to settle until after the court heard the motion to decertify.

53. I provided them with the local rule requiring parties to meet and confer regarding any non-dispositive motion to determine if there would be opposition to a motion or to narrow the issues if possible. (Local Rule, LcVR7). I demanded they respond but predicted I would hear nothing. I stated I would seek sanctions.

54. I heard nothing.

55. I have decided to take a new legal approach in this and other cases to capitalize on what appears to be a trend in 2021.

56. I am not a fan of class actions. I did serve as class action counsel in one case a long time ago in San Diego federal court and after observing first hand what happened, I refrained from being involved further in class actions.

57. I believe as many do that they benefit attorneys far more than the clients in many cases. As one empirical study found:

> "The bottom line: The hard evidence shows that class actions do not provide class members with anything close to the benefits claimed by their proponents, although they can (and do) enrich attorneys."

58. In my opinion, class actions are appropriate when the plaintiff only suffers very small damages making it economically difficult to pursue an individual action. But, when someone is injured they have claims based on multiple legal bases, while in class actions the claims are usually limited to one specific legal theory. In individual actions plaintiffs who have more than nominal damages can usually obtain far more damages than they can get in a class action.

59. This is especially true in cases involving home loans as will be discussed further below.

60. Some time ago, I notified ████████████████████████, that many of its class actions they pursue involving home loans harmed consumers more than helped them because they could recover far more in damages in individual suits than class actions. I gave ████████ details in those cases of the kinds of claims that could be pursued and the damages that could be recovered. In many cases, I showed millions of dollars have been recovered in the very same kinds of cases ██████ prosecutes as class actions where the class members receive almost nothing.

61. He ignored me completely.

62. I have also notified other class action lawyers in many consumer class actions involving wrongful conduct concerning home loans that it is a big mistake to bring claims in class actions.

63. When a person suffers regarding a home loan because of the actions by the "Too Big To Fail Banks" they have many legal claims based on many different laws.

64. The whole story of why home loans are illegal and in fact criminal is set forth in the docu-series, The Con (www.thecon.tv) which is incorporated herein by reference.

65. Thomas Jefferson warned us what would happen at the dawn of this country:

"I believe that banking institutions are more dangerous to our liberties than standing armies," Jefferson wrote. "If the American people ever allow private banks to control the issue of their currency, first by inflation, then by deflation, the banks and corporations that will grow up around (these banks) will deprive the people of all property until their children wake up homeless on the continent their fathers conquered... The issuing power of currency shall be taken from the banks and restored to the people, to whom it properly belongs."

Plenty of people these days are homeless.

66. The typical settlement or judgment when a case is pursued against the banks regarding home loans (and now commercial real estate loans) is often for millions of dollars.

67. In California a jury awarded $16.4 million to a homeowner against the parties involved in collecting a home loan.

68. In Texas, a settlement was reached for $5.4 million against bank parties.

69. The New York Times compiled cases where bankruptcy judges made large awards against bank parties wrongfully collecting loans.

70. In the *Sundquist* case in Sacramento California, the judge awarded over $46 million to homeowners against Bank Of America which engaged in conduct very typical of the banks.

71. However, class actions based on wrongful conduct regarding a home loan result in the plaintiffs recovering very small amounts.

72. I consulted with attorney ███████ for a short time in the securities class actions brought by investors regarding Mortgage Backed Securities until it became apparent to me he and his large class action law firm were acting more in their own self interests than the clients.

73. In this case, the plaintiffs themselves gave two examples where Pacer has committed wrongful acts in addition to overcharging fees. Journalists were wrongfully denied a waiver of fees in which case it seems their damages are for any and all fees they paid. A poor woman was the victim of wrongful loan collection. In dealing with Pacer she had a similar experience to me. These people would have to file all their claims against Pacer in one legal action and suffered damages other than the overcharges this court found were improper.

74. Class actions present problems in trying to achieve justice. They have long been controversial.

75. One problem that arose was that attorneys acting as "serial objectors" started to file objections to settlements that were without merit and threatened to appeal or did appeal to hold up a settlement to extort money.

76. In 2018, Rule 23 was amended to try to address the problem.

77. It is an ongoing subject of debate.

78. I am considering becoming an objector in class actions involving home loans representing myself.

79. Being a class member in this case gives me standing and I will object to any settlement and appeal the question if necessary in this case.

80. In addition, there is a trend evolving recently where judges are starting to reject unfair settlements. One recent news report discusses this trend:

"The decision from U.S. District Judge Vince Chhabria of the Northern District of California on Wednesday to reject a proposed $2 billion class action settlement over Roundup didn't come lightly. Chhabria gave the lawyers nine questions to consider ahead of an approval hearing, which lasted nearly an entire day, during which he grilled them with more questions.

In the end, Chhabria wasn't satisfied with the answers he got. In his May 26 [2021] order, the judge outlined his concerns—everything from the "garbled" notice program to the "vastly overstated" compensation fund.

"Why would I want to be part of this deal?" Chhabria asked the lawyers at last week's preliminary approval hearing. "Why would I want to be in this class?"

Chhabria's questions, while more numerous than most, are becoming more commonplace among federal judges, who are increasingly scrutinizing class action settlements at the preliminary approval stage. That's in stark contrast to years past, when judges often approved settlements early on, only to raise questions later, at the final approval stage, once class members had received notices and lawyers knew how many of them had participated.

'What you're seeing is that judges are flexing their muscle and showing they're a part of this process," said William Rubenstein of Harvard Law School. "This development is a good thing because it demonstrates there's good oversight in the system and the judges are increasingly keen on using the leverage they have to the benefit of the class members.'

Judges have many reasons to get involved much earlier in the process. For one thing, many have interpreted recent amendments to the Federal Rule 23 of Civil Procedure, which governs class actions, as an instruction to take a closer look at settlements during the preliminary approval

stage.

Then there are the settlements themselves. Some of them, such as the Roundup settlement, have included personal injuries, which historically have not fit into the mold of class actions because each individual has a different experience with a product, making commonality difficult. That means some plaintiffs lawyers have been creative in structuring some class action settlements.

"Some of the creativity is welcomed by the judges, and some of it is probably not—if it's perceived as the creativity coming at the expense of absent class members, in particular," said Ragan Naresh, a Washington, D.C., partner at Kirkland & Ellis.

'Raise the Floor'
The Rule 23 amendments, effective in 2018, focused on several aspects of class action settlements but included an increased focus on the approval of such agreements prior to sending out notices, which occurs after preliminary approval. Also, in 2018, the Northern District of California, which is home to numerous class actions, issued its own guidance governing class action settlements.

Judges are responding to the rules changes.
"The front-loading provision of 2018 is to get people to lay their cards on the table so the judge could do the function of making sure the criteria is satisfied before giving approval," said U.S. District Judge Robert Dow of the Northern District of Illinois, at the Western Alliance Bank Class Action Law Forum, a conference held virtually in April in conjunction with the University of San Diego School of Law. "Often, the judges didn't know better, didn't think they could ask questions, or were in a hurry to get case off the docket. Sometimes, truly disastrous cases followed from that."

To be sure, many judges already were asking questions early in the process. In 2014, U.S. District Judge Lucy Koh of the Northern District of California, rejected preliminary approval of a $324.5 million "no-poach" settlement involving high tech workers in Silicon Valley. And U.S. District Judge Anita Brody of the Eastern District of Pennsylvania, rejected the initial National Football League concussion settlement, then worth $760 million.

The idea behind the Rule 23 amendments, however, was to normalize that kind of scrutiny, Naresh said.

"There is a rigor that was being applied to some cases, but not all cases," he said. "The intent was to apply consistency and, rather than lowering the floor, to raise the floor."

By reviewing settlements at the preliminary approval stage, judges can catch problems early on, rather than after the notices have gone out to millions of class members and objectors begin flagging problems.

One rule change that judges have focused on in particular allows for more electronic notices to class members, given technological advances such as email, social media and smartphones.

Last year, before granting preliminary approval, U.S. District Judge James Donato of the

Northern District raised concerns about the notice program in a $550 million settlement of a class action alleging Facebook violated the Illinois Biometric Information Privacy Act with its "tag suggestions" photo feature.

The judge granted final approval Feb. 26. But that was after the settlement increased to $650 million and, with a notice program that used Facebook's newsfeed and an Internet ad campaign, had obtained a 22% claims rate for an estimated class of 6.9 million.

Co-lead plaintiffs counsel Jay Edelson of Edelson PC, speaking at last month's conference with Dow, said Donato put pressure on his team to improve the claims rate beyond single digits.

"It was so amazing to see," he said. "We got $100 million from the settlement, we got a claims rate of 22%, and we're seeing more and more judges doing that at preliminary approval. It's really exciting on the plaintiffs' side for that."

As part of a similar $92 million privacy class action settlement with TikTok, U.S. District Judge John Lee of the Northern District of Illinois at a March 2 preliminary approval hearing, questioned why class members would not get notices through the popular short-form video app, which could bolster a predicted claims rate of less than 2%. Lee held a second hearing last month on the settlement, which he still hasn't approved.
Another increasing area of scrutiny is attorneys' fees, even at the preliminary approval stage.

"In larger consumer cases, I'm seeing requests for multipliers that make my eyes come out of my head," said U.S. District Judge Beth Freeman of the Northern District of California at last month's conference. "Attorneys don't do a very good job of justifying a multiplier. It's an area that bears scrutiny, and an area where they're potentially inviting years of litigation because objectors are waiting for those fee awards."

One of the most notable judges in this area is Koh, who, in 2019, rejected preliminary approval of the Yahoo data breach settlement after plaintiffs lawyers asked for what she considered to be an excessive amount of attorney fees.

'Creative Types of Class Actions'
But it's not just about rules changes. Some of the scrutiny comes as lawyers have crafted class action settlements that judges haven't seen before.

It took U.S. District Judge Alvin Hellerstein of the Southern District of New York less than 15 minutes to reject preliminary approval of what he called a "phony" class action settlement last year for the victims of ex-movie mogul Harvey Weinstein, sentenced to 23 years in prison on rape charges. Hellerstein said the deal, which included a tiered compensation fund worth $19 million, would have treated all of Weinstein's victims the same, whether they were physically assaulted or had just met him.

Taking up another sexual abuse settlement involving a former campus gynecologist at the University of Southern California, U.S. District Judge Stephen Wilson of the Central District of California raised concerns about the language of the notice when he rejected the original $240 million deal in 2019.

Declaration Of Michael T. Pines In Support Of Motion To Modify Class Certification And To Intervene

In both cases, lawyers were dealing with personal injury claims, which traditionally are brought through individual lawsuits. Whether they can be part of a class action remains "questionable," Rubenstein said.

'Starting with the NFL case, you're seeing lawyers playing around with this," he said. For judges, those efforts have led to "some of the more creative types of class actions they're seeing, and particular problems in the structuring of class action settlements.'

Many settlements, however, are simply high profile, attracting different kinds of objectors who are aware of a proposed deal long before notices go out to class members. Cases involving a prolific and controversial consumer product like Roundup, or well-known social media platforms like TikTok and Facebook, may receive a level of public attention that most class actions don't.

'You have cases involving sexual abuse or social media platforms that people use, or over-the-counter products that have a very wide consumer base, and judges know these settlements themselves are going to get scrutiny not only by the process, by the public at large, but by objectors and the media,' Naresh said.

81. I am going to start out taking a different approach rather than objecting to start with.

82. Lawyers have an obligation to advise a client of all the potential claims they have and the possible recovery. They have an obligation to discuss the advantages and disadvantages of a class action.

83. Being disbarred has its advantages. As a lawyer it would be improper for me to communicate with a party. As a citizen, I can talk to anyone I want to.

84. I intend to contact the lead plaintiffs, especially in cases involving home loans, and tell them about the millions of dollars that can potentially be recovered.

85. Some may waive the attorney client privilege and talk to me about what they have discussed with their attorneys about this which should be very interesting.

86. I am going to notify plaintiff's class counsel in cases that their clients would be much better off with individual actions and exactly why and demand they forward their communications to their clients, lead plaintiffs.

87. Ethically, they of course have an obligation to do so.

88. If they don't, I will report them to the state bars (which of course will do no good, but

might give them pause).

89. I have done this in three cases.  *Bret A. Evans v. SPS*, U.S. Dist. Court for Eastern Dist. of NY 2:18-cv-05985-PKC-SMG; *Samuel Voss v Quicken Loans and MERS*, Court of Common Pleas, Hamilton County Ohio, A200289, apparently removed to federal court - Ohio Southern District, 1:2020cv00756, and *Koustis v. Select Portfolio Servicing, Inc.* , U.S. District Court N.D. Ohio, 1:20-cv-02425)  I was mostly ignored.

90. This motion is timely. I have been trying to work with all counsel for almost a year, as soon as I discovered the matter. I hoped to achieve what I needed informally so as not to interfere with them.  However, it did not work.

91. I have a cognizable interest since I am a class member arguably bound now by what happens since I did not opt out.

92. My interests have been and will be impaired if I am not permitted to intervene. I have related claims which I am probably required to bring against the government and which plaintiffs will not pursue.

93. The plaintiffs do not represent my interests. The fact that ███████████████████ ██████████████████ .

94. I am seeking $10,000 for each time I logged onto Pacer during the time period covered and it is unlikely class plaintiffs will demand or get any kind of settlement for such sums or at least $10,000 the maximum allowed under The Little Tucker Act.

95. I have a "cognizable interest" since I was overcharged as found by the court. Equitable considerations need to be taken into account. My interests would be impaired by this case if I am forced to be a class member and provide some kind of  broad release. The existing parties do not represent my interest. In fact, they won't even talk to me.

96. Had I been permitted to be involved in settlement discussions, I had some ideas that might

have been helpful; however, I don't know the details of what can and can't be done to try to calculate damages but based on what I know, an equitable remedy needs to be applied. The class action should be decertified.

I, Michael T. Pines declare under penalty of perjury the foregoing is true and correct.

Dated: August 11, 2021                          /s/ Michael T. Pines