IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                              *Plaintiffs*,

                    v.

UNITED STATES OF AMERICA,
                              *Defendant*.

Case No. 16-745

## DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am the founding principal of Gupta Wessler PLLC, one of the two law firms appointed as lead class counsel by this Court on January 24, 2017. *See* ECF Nos. 32 & 33. Along with my partner Jonathan E. Taylor and our co-counsel at Motley Rice LLC, I have represented the plaintiffs throughout this litigation. I submit this declaration in support of the plaintiffs' motion for preliminary approval of a class-action settlement in this case. The declaration is accompanied by four exhibits: (1) a copy of the executed settlement agreement (Exhibit A); (2) a copy of the executed supplemental agreement (Exhibit B); (3) a proposed notice plan (Exhibit C); and (4) a declaration by KCC Class Action Services, the claims administrator (Exhibit D).

### *Background on PACER Fees*

2.      The Administrative Office of the U.S. Courts (AO) requires people to pay fees to access records through its Public Access to Court Electronic Records system, commonly known as PACER. This lawsuit was brought to challenge the lawfulness of those fees for one reason: the fees far exceed the cost of providing the records.

3.      By statute, the federal judiciary has long had the authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." S. Rep. 107–174, 107th Cong., 2d Sess. 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by authorizing fees "only to the extent necessary." 28 U.S.C. § 1913 note.

4.      Despite this statutory limitation designed to *reduce* PACER fees, the AO twice *increased* PACER fees in the years after the E-Government Act's passage—first to $.08 per page and then to $.10 per page. And it did so over a period when the costs of electronic data storage plunged exponentially.

5.      The result has been a widely unpopular PACER fee regime that has hindered equal access to justice, imposed serious barriers for low-income and *pro se* litigants, discouraged academic research and journalism, and thus inhibited public understanding of the courts. And the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

6.       I first became aware of the practical problems and dubious legality of PACER fees, and first considered whether litigation could be brought to address the issue, when I was a staff attorney at the nonprofit Public Citizen Litigation Group between 2005 and 2011. Government transparency was among the group's specialties, and I followed the efforts of Carl Malamud of Public.Resource.org, who led a sustained campaign to draw public attention to PACER fees and persuade the AO to make PACER free.

7.      Until this case was filed, litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime, for at least three main reasons. First, the judiciary has statutory authority to charge at least *some* amount in fees, so litigation alone could never result in a free PACER system—the ultimate goal of reformers. Second, few practicing litigators, let alone those who specialize in complex federal litigation, were likely to be eager to sue the federal judiciary and challenge policy decisions made by the Judicial Conference of the United States. They were even less likely to commit considerable time and resources to litigation when the prospect of recovery was so uncertain. Third, even if PACER fees could be shown to be excessive and even if qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. And advocates were unable to identify an alternative basis for jurisdiction, a cause of action, and a waiver of sovereign immunity to challenge PACER fees in court.

8.      I am aware of only one previous lawsuit directly challenging the PACER fee schedule; that suit was dismissed for lack of jurisdiction. *See Greenspan v. Administrative Office*, No. 14-cv-2396 (N.D. Cal.). I am also aware of one previous effort to challenge the AO's policy on fee waivers, which also foundered on jurisdiction. In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Public Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identify situations requiring their recusal,'" and they "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media." *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

9.      With litigation seemingly unavailable as a pathway, advocates for PACER reform had largely devoted their efforts to grassroots and technological strategies: making certain records available in an online database that could be accessed for free, downloading records in bulk, or mounting public-information campaigns to expand access. At one point, for example, when the judiciary initiated a free trial of PACER at several libraries, Carl Malamud encouraged activists "to push the court records system into the 21st century by simply grabbing enormous chunks of the database and giving the documents away." John Schwartz, *An Effort to Upgrade a Court Archive System to Free and Easy*, N.Y. Times, Feb. 12, 2009. An enterprising 22-year-old activist named Aaron Swartz managed to download millions of documents before the AO responded by pulling the plug on the free trial and calling in the FBI to investigate Swartz. *Id.* This heavy-handed response was seen by many as motivated by a desire to protect fee revenue at the expense of public access. Today, the Free Law Project and the of the Center for Information Technology Policy at Princeton University operate a searchable collection of millions of PACER documents and dockets that were gathered using their RECAP software, which allows users to share the records they download.

10. These efforts have been important in raising public awareness, and ameliorating the effects of PACER fees, but they have not eliminated or reduced the fees themselves. To the contrary, the fees have only continued on their seemingly inexorable—and indefensible—rise.

### *Overview of this Litigation*

11.      Then came this case. On April 21, 2016, three nonprofit organizations filed this lawsuit, asking this Court to declare that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges during the limitations period. They sued under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996).

Because that Act provides jurisdiction only for claims seeking monetary relief based on past overcharges, and because the judiciary is not subject to the APA, *see* 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek any injunctive relief or other relief requiring the judiciary to lower PACER fees going forward. They therefore limited their requested relief to retroactive monetary relief.

12.     From the start, the plaintiffs were represented by a team of lawyers at our firm, Gupta Wessler PLLC, a litigation boutique with experience bringing complex cases involving the federal government, and Motley Rice PLLC, one of the nation's leading class-action firms. By the time our firms filed this lawsuit together (as further detailed in my declaration in support of class certification, ECF No. 8-1), we were able to draw from a considerable body of collective experience successfully bringing class actions for monetary relief against the federal government—a relatively rare form of litigation. Among other things, I had successfully represented (along with my colleague Mr. Taylor) a nationwide certified class of all of the nation's federal bankruptcy judges and their surviving spouses, estates, and beneficiaries, resulting in a judgment against the United States for $56 million in illegally withheld judicial pay and benefits. While still at Public Citizen, I had successfully represented a nationwide class of veterans challenging the Army Air Force Exchange Service's withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering $7.4 million in illegal charges. And, together with Motley Rice, we were already representing a recently certified class of tax-return prepares in this Court, seeking the recovery of millions of dollars in unlawfully excessive fees paid to the IRS. In each one of these cases, the claims sought recovery of illegal exactions from the federal government on a class basis, with jurisdiction premised on the Tucker Act or the Little Tucker Act.

13.     This Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, on January 24, 2017, the Court certified a

nationwide opt-out class of all individuals and entities who paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' Little Tucker Act illegal-exaction claim for classwide treatment and appointed my firm and Motley Rice as co-lead class counsel. *Id.*

14. The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (KCC) as claims administrator. ECF Nos. 37 & 42. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, about 1,100 opted out of the class.

15. Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only a category labeled by the judiciary as "Public Access Services," but also the following categories of expenses: "Case Management/Electronic Case Files System" (CM/ECF); "Electronic Bankruptcy Notification" (EBN); "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under the heading "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

16. The parties subsequently filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." ECF No. 89 at 24.

17.     On March 31, 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

18.     Within months, the judiciary took steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018*, at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories." *Id.*

19.     Meanwhile, both parties sought permission for an interlocutory appeal from this Court's decision, and the Federal Circuit accepted both appeals to decide the scope of the statutory authorization to charge fees. The parties adhered to their same interpretations of the statute on appeal. In addition, the government argued that the court lacked jurisdiction, so the class was not entitled to damages even assuming that the AO had violated the statute.

20.     On appeal, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups," the "sponsor of the 2002 law," and legal-technology firms—all detailing the practical harms caused by excessive PACER fees. Adam Liptak,

*Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Prominent media outlets, like the *New York Times*, published editorials championing the lawsuit. *See Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And by the end of 2019, the judiciary announced that it was doubling the quarterly fee waiver for PACER from $15 to $30, which had the effect of eliminating PACER fees for approximately 75% of PACER users. *See* Kimberly Robinson, *Judiciary Doubles Fee Waiver for PACER Access to Court Records*, Bloomberg Law (Sept. 17, 2019), https://perma.cc/CHF3-XVTT; Theresa A. Reiss, Cong. Research Serv., LSB10672, *Legislative & Judicial Developments Affecting Public Access to Court Electronic Records (PACER)* 1 (Feb. 1, 2022), https://perma.cc/WT8K-G64X.

21.     In August 2020, the Federal Circuit unanimously rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (specifically, those that were not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was "one other potential source of liability," because the court was not able to confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The court left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

22.     Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support recently advanced out of the Senate Judiciary Committee. *See* Reiss, *Legislative & Judicial Developments Affecting PACER* at 1–2; Senate Judiciary Committee, *Judiciary Committee Advances Legislation to Remove PACER Paywall, Increase Accessibility to Court Records*, Dec. 9, 2021, https://perma.cc/8WBB-FTDY; Nate Raymond, *Free PACER? Bill to end fees for online court records advances in Senate*, Reuters, Dec. 9, 2021, https://perma.cc/H29N-C52M. Notes from a closed March 2022 meeting showed that "[t]he Judicial Conference of the United States [also now] supported offering free public access to the federal court records system for noncommercial users." Craig Clough, *Federal Judiciary Policy Body Endorses Free PACER Searches*, Law360, May 31, 2022, https://perma.cc/YP8M-Q5CK.

### The Settlement Negotiations

23.     On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that, were the case to remain on a litigation track, there would be significant uncertainty and delay. Years of protracted litigation lay ahead, including a lengthy formal discovery process that could require the judiciary to painstakingly reconstruct line-item expenses and likely a second appeal. And the range of potential outcomes was enormous: On one side, the government maintained that it owed *no* damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower—a litigating position that also makes it difficult for the judiciary to lower fees during the pendency of the litigation. The government further maintained that, in any event, the full category of CM/ECF was properly funded with PACER fees. On the other side, the plaintiffs maintained that liability had been established, and that some portion of CM/ECF was likely improper.

24.     Hoping to bridge this divide and avoid years of litigation, the parties were able to agree on certain structural aspects of a potential settlement, and they agreed to engage in mediation

on the amount and details. On December 29, 2020, at the parties' request, Judge Friedman stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation.

25.     Over the next few months, the parties prepared and exchanged information and substantive memoranda, with detailed supporting materials, which together provided a balanced and comprehensive view of the strengths and weaknesses of the case. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, a retired Boston University law professor and one of the nation's most experienced and accomplished mediators.

26.     With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs' agreed to consider the government's final offer concerning the total amount of that fund, inclusive of all settlement costs, attorneys' fees, and service awards.

27.     But by the time the session had ended, the parties still hadn't reached agreement on the total amount of the settlement or several other key terms—including how the funds would be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed.

28.     Further progress was slow, and at times the parties reached what could have been insurmountable impasses. But over a period of many months, during which there were many calls and email exchanges between counsel, the parties were able to resolve their differences and come to an agreement, the final version of which was executed on July 27, 2022. *See* Ex. A. The parties

executed a supplemental agreement on September 29, 2022, which made certain technical modifications to the settlement agreement. *See* Ex. B.

### *The Parties' Settlement*

29.    As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the Class Period"), excluding opt-outs, federal agencies, and class counsel. Ex. A ¶ 3 & Ex. B. This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Ex. A ¶ 4. Because this second group of people are not part of the original class, they did not receive notice or an opportunity to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

30.    The settlement provides for a total common-fund payment by the United States of $125 million, which covers monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11. Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust (to be called the "PACER Class Action Settlement Trust"). *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16. In exchange for their payments, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the Class Period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only pending PACER-fee related lawsuit of which the AO is aware. Ex.

A ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any monetary recovery that the class member may receive in *Fisher*. *Id.*

31.     Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, and with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Ex. A ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

32.     Under the settlement, class members will not have to submit a claim or make any attestation to receive their payment. *Id.* Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

33.     The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

34.     ***First distribution.*** KCC will distribute the Remaining Amount to class members like so: It will allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the Class Period. *Id.* ¶ 19. KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* It will then deduct this Aggregate Minimum Payment

Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the Class Period. *Id.*

35.   Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the Class Period will receive a payment equal to the total amount of PACER fees paid by that class member during the Class Period; and (b) each class member who paid more than $350 in PACER fees during the Class Period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

36.   KCC will complete disbursement of each class member's share of the recovery within 90 days of receiving the $125 million from the United States, or within 21 days after receiving the necessary information from AO, whichever is later. *Id.* ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. *Id.* ¶ 22.

37.   ***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. *Id.* ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After

First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the Class Period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

38. ***Fairness hearing.*** The agreement further provides that, within 75 days of its execution—that is, by October 11, 2022—the plaintiffs will submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). *Id.* ¶ 27, Ex. B. By filing their motion on October 11, 2022, the plaintiffs have complied with this provision.

39. The plaintiffs intend to apply to this Court for an award of attorneys' fees and reimbursement of litigation expenses, and for service awards for the class representatives in amounts not to exceed $10,000 per representative. Ex. A ¶ 28. As noted above, these awards will be paid out of the settlement trust and will not exceed 20% of the $125 million paid by the United States. *Id.* The motion for an award of attorneys' fees and litigation expenses is subject to this Court's approval, and notice of that motion will be provided to class members informing them of the request and their right to object to the motion, as required by Rule 23(h). *Id.*

40. Within 30 days of an order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC will provide notice via email to all class members for whom the AO has an email address. *Id.* ¶ 29; Ex. C ¶ 2. Within 45 days of the order approving settlement notice, KCC will send postcard notice via U.S. mail to

all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Ex. A ¶ 29; Ex. C ¶ 5. KCC will also provide the relevant case documents on a website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Ex. A ¶ 29; Ex. C ¶ 3. The notice will include an explanation of the procedures for allocating and distributing the trust funds, the date upon which the Court will hold a fairness hearing under Rule 23(e), and the date by which class members must file their written objections, if any, to the settlement. Ex. A ¶ 29. The notice sent to the additional class members—those who are not part of the class already certified by this Court—will also inform them of their right to opt out and the procedures through which they may exercise that right. Ex. C ¶ 6. The opt-out period for these additional class members will be 90 days. *Id.*

41.     Any class member may express their views supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Ex. A ¶ 30. Counsel for the parties may respond to any objection within 21 days after receipt of the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Ex. C ¶ 7.

42.     After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing at which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Ex. A ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.* The parties will request that the Court schedule the fairness hearing no later than 150 days after entry of the Court's order approving settlement notice to the class. *Id.*

*     *     *

43.     This settlement is the result of more than a year of careful negotiation by the parties. It is, in my view and the view of the three class representatives, an excellent settlement for the class. Before this case was filed, there was no historical precedent for bringing suit against the federal judiciary—*in* the federal judiciary—based on fees charged *by* the federal judiciary. Now there is. If approved, the settlement will deliver real relief to every single class member: a full refund of up to $350 for any PACER fees that each class member paid during the Class Period, plus additional amounts for class members who paid more than $350 in PACER fees during that period. According to data provided by the government, this means that the vast majority of class members will receive a full refund—100 cents on the dollar—for all PACER fees that they paid during the class period.

44.     And the settlement will provide this relief quickly. Whereas litigating the case to a final judgment would take years—with no guarantee of *any* recovery for class members given the government's legal position—the settlement will produce a final judgment in a matter of months. Moreover, although the settlement does not include injunctive relief, that is only because this relief is unavailable against the judiciary. After this litigation was filed, however, Congress began taking steps to eliminate PACER fees, and there is now a Federal Circuit decision that interprets (and imposes limits on) the statute authorizing fees, while making clear that PACER users have a cause of action to challenge such fees in the future. It is hard to imagine a better result for the class.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC, on October 11, 2022.          */s/ Deepak Gupta*
                                                            Deepak Gupta