**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant*. | Case No. 16-745-PLF |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND
FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676
bnarwold@motleyrice.com

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
moliver@motleyrice.com
cloper@motleyrice.com

*Counsel for Plaintiffs National Veterans Legal Services Program,
National Consumer Law Center, Alliance for Justice, and the Class*

August 28, 2023

# TABLE OF CONTENTS

Table of authorities ...................................................................................................iv

Introduction .............................................................................................................. 1

Background ................................................................................................................5

    A.    Factual and procedural background ...............................................................5

        1.    The legal framework for PACER fees ........................................5

        2.    District court proceedings ......................................................... 6

        3.    Appellate proceedings ...............................................................8

    B.    Mediation and settlement negotiations ........................................................ 9

    C.    Overview of the settlement agreement ....................................................... 11

        1.    The settlement class ................................................................. 11

        2.    The settlement relief ............................................................... 11

        3.    The released claims...................................................................12

        4.    Notice to settlement class and requests for exclusion................12

        5.    Allocation and payment...........................................................13

        6.    Service awards, attorneys' fees, and costs ................................15

        7.    Further settlement-related proceedings ................................... 16

Argument ................................................................................................................16

    I.    Because the settlement provides an exceptional recovery for the class, the Court should approve the settlement................................................... 16

        A.    The class representatives and class counsel have vigorously represented the class throughout this litigation.........................................18

        B.    The settlement is the product of informed, arm's-length negotiations. ......................................................................................19

        C.    The settlement relief provided to class members is exceptional—particularly given the costs, risks, and delays of further litigation. ....................................................................................20

i

    D.    The settlement agreement treats class members equitably relative to each other.................................................................21

    E.    The plaintiffs and class counsel support the settlement. ...........................24

II.    The notice and notice programs provided class members with the best notice practicable under the circumstances.....................................................24

III.    The requested attorneys' fee award is reasonable..................................................25

    A.    This Court should use the percentage-of-the-fund approach to assess the reasonableness of class counsel's fee request.........................25

    B.    A fee of 19.1% of the common fund is reasonable. ...................................27

        1.    The quality of counsel supports the requested fee. ........................28

        2.    The complexity and duration of the case supports the requested fee. ...........................................................................29

        3.    The risk of nonrecovery supports the award. ...............................30

        4.    The fee that likely would have been negotiated between private parties in similar cases supports the requested fee. ............................................................................31

        5.    The reaction of class members to date supports the requested fee. ...........................................................................32

        6.    The percentage awarded in other cases supports the requested fee. ...........................................................................33

        7.    The size of the award supports the requested fee. .........................34

    C.    A lodestar cross-check, although not required, would only confirm the reasonableness of the requested fee.......................................35

IV.    The Court should award each of the three class representatives $10,000 for their contributions to the case. ........................................................ 40

Conclusion .......................................................................................................................41

**Attachments**

1.    Declaration of Renee Burbank, National Veterans Legal Services Program

2.    Declaration of Stuart T. Rossman, National Consumer Law Center

3.    Declaration of Rakim Brooks, Alliance for Justice

4.  Declaration of Brian Fitzpatrick

5.  Declaration of Deepak Gupta, Gupta Wessler LLP

6.  Declaration of Meghan Oliver, Motley Rice LLC

7.  Declaration of Gio Santiago, KCC Class Action Services

8.  Proposed Order

# TABLE OF AUTHORITIES

## Cases

*Aerolineas Argentinas v. United States,*
 77 F.3d 1564 (Fed. Cir. 1996) ........................................................................................ 2

*Applegate v. United States,*
 52 Fed. Cl. 751 (2002) .................................................................................................... 25

*Blackman v. District of Columbia,*
 454 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................ 19, 20

*Cobell v. Salazar,*
 679 F.3d 909 (D.C. Cir. 2012) ...................................................................................... 23

*Cohen v. Chilcott,*
 522 F.Supp.2d 105 (D.D.C. 2007)................................................................................. 24

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,*
 62 F.4th 704 (2d Cir. 2023) .......................................................................................... 37

*Gaskill v. Gordon,*
 160 F.3d 361 (7th Cir. 1998) ......................................................................................... 31

*Geneva Rock Products, Inc. v. United States,*
 119 Fed. Cl. 581 (2015).................................................................................................. 38

*Health Republic Insurance Co. v. United States,*
 58 F.4th 1365 (Fed. Cir. 2023) ...............................................25, 26, 27, 28, 35, 36, 37, 39

*Hensley v. Eckerhart,*
 461 U.S. 424 (1983)........................................................................................................ 34

*Houser v. United States,*
 114 Fed. Cl. 576 (2014) ................................................................................................. 28

*In re Automotive Parts Antitrust Litigation,*
 2019 WL 7877812 (E.D. Mich. Dec. 20, 2019) ............................................................ 23

*In re Black Farmers Discrimination Litigation,*
 953 F. Supp. 2d 82 (D.C.C. 2013) ........................................26, 28, 29, 31, 34, 36, 37, 39

*In re Domestic Airline Travel Antitrust Litigation,*
 378 F. Supp. 3d 10 (D.D.C. 2019)............................................................................ 17, 20

*In re Equifax Inc. Customer Data Security Breach Litigation,*
 2020 WL 256132 (N.D. Ga. Mar. 17, 2020)................................................................. 38

*In re Equifax Inc. Customer Data Security Breach Litigation*,
  999 F.3d 1247 (11th Cir. 2021) ................................................................................................... 27, 33

*In re Federal National Mortgage Association Securities, Derivative, & "ERISA" Litigation*,
  4 F. Supp. 3d 94 (D.D.C. 2013) ............................................................. 29, 30, 33, 38, 40

*In re Rite Aid Corp. Securities Litigation*,
  396 F.3d 294 (3d Cir. 2005) ......................................................................................... 26, 27, 36

*In re Synthroid Marketing Litigation*,
  264 F.3d 712 (7th Cir. 2001) ...................................................................................................... 31, 34

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*,
  56 F.3d 295 (1st Cir. 1995) ...................................................................................................... 27

*In re Vitamins Antitrust Litigation*,
  2001 WL 34312839 (D.D.C. July 16, 2001) ........................................................................... 33

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*,
  746 Fed. App'x 655 (9th Cir. 2018) ........................................................................................ 38

*Kane County v. United States*,
  145 Fed. Cl. 15 (2019) .................................................................................... 27, 32, 33, 37, 40

*Kinard v. E. Capitol Family Rental, L.P.*,
  331 F.R.D. 206 (D.D.C. 2019) ................................................................................................... 20

*Little v. Washington Metropolitan Area Transit Authority*,
  313 F. Supp. 3d 27 (D.D.C. 2018) .......................................................................................... 17

*Martin v. Toyota Motor Credit Corp.*,
  2022 WL 17038908 (C.D. Cal. Nov. 15, 2022) .................................................................... 38

*Mercier v. United States*,
  156 Fed. Cl. 580 (2021) ........................................................................... 27, 28, 33, 40, 41

*Milliron v. T-Mobile USA, Inc.*,
  423 F. App'x 131 (3d Cir. 2011) ......................................................................................... 37, 38

*Moore v. United States*,
  63 Fed. Cl. 781 (2005) ............................................................................. 25, 27, 28, 33

*Mullane v. Central Hanover Bank Trust Co.*,
  339 U.S. 306 (1950) ................................................................................................................... 24

*Nunez v. BAE Systems San Diego Ship Repair Inc.*,
  292 F. Supp. 3d 1018 (S.D. Cal. 2017) ................................................................................. 26

*NVLSP v. United States,*
  291 F. Supp. 3d 123 (D.D.C. 2018) ................................................................................. 7

*NVLSP v. United States,*
  968 F.3d 1340 (Fed. Cir. 2020) ............................................................................... 3, 30

*Prince v. Aramark Corp.,*
  257 F. Supp. 3d 20 (D.D.C. 2017) ................................................................................ 24

*Quimby v. United States,*
  107 Fed. Cl. 126 (2012) ........................................................................... 27, 32, 33, 34, 40

*Radosti v. Envision EMI, LLC,*
  717 F.Supp.2d 37 (D.D.C. 2010) ................................................................................. 19

*Radosti v. Envision EMI, LLC,*
  760 F. Supp. 2d 73 (D.D.C. 2011) ............................................................................... 23

*Rogers v. Lumina Solar, Inc.,*
  2020 WL 3402360 (D.D.C. June 19, 2020) ................................................................. 17

*Ross v. Lockheed Martin Corp.,*
  267 F. Supp. 3d 174 (D.D.C. 2017) ............................................................................. 17

*Sabo v. United States,*
  102 Fed. Cl. 619 (2011) ............................................................................................... 32

*Silverman v. Motorola Solutions, Inc.,*
  739 F.3d 956 (7th Cir. 2013) ...................................................................................... 30

*Steele v. United States,*
  2015 WL 4121607 (D.D.C. June 30, 2015) ................................................................. 28

*Swedish Hospital Corp. v. Shalala,*
  1 F.3d 1261 (D.C. Cir. 1993) ................................................................................ 25, 27

*Trombley v. National City Bank,*
  759 F. Supp. 2d 20 (D.D.C. 2011) ............................................................................. 19

*United States v. MTU America Inc.,*
  105 F. Supp. 3d 60 (D.D.C. 2015) ............................................................................. 17

*Voulgaris v. Array Biopharma, Inc.,*
  60 F.4th 1259 (10th Cir. 2023) ................................................................................... 26

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
  396 F.3d 96 (2d Cir. 2005) ......................................................................................... 26

*Williams v. Rohm & Haas Pension Plan*,
   658 F.3d 629 (7th Cir. 2011) ......................................................................................... 36

## Rules

Fed. R. Civ. P. 23 .........................................................................................17, 20, 24, 25, 40

Fed. R. Civ. P. 23, Advisory Committee Note, 2018 Amendments .................................18

## Statutes

28 U.S.C. § 1913 note.......................................................................................................... 5

## Other Authorities

Adam Liptak,
   *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019 ............................. 3, 8

Brian T. Fitzpatrick,
   *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151
   (2021) ........................................................................................................................ 26

Brian T. Fitzpatrick,
   *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical
   Legal Studies 811 (2010).............................................................................................34

*Manual for Complex Litigation* § 14.121 (4th ed. 2004) .......................................................... 26

*Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019 ............................................... 3

S. Rep. 107-174 (2002) ......................................................................................................... 5

## INTRODUCTION

The plaintiffs ask the Court to grant final approval of this historic class-action settlement. Since the Court granted preliminary approval on May 8, 2023, the claims administrator has carried out the Court-approved notice program, sending individualized notice to approximately 500,000 class members and providing publication notice as well. The reception so far has been almost universally positive: As of this filing, the administrator has received only one objection and 34 valid opt-out requests. *See* KCC Decl. ¶ 21. The plaintiffs will update the Court on the number of opt-outs and objections, and respond to any additional objections, no later than October 3.

This settlement brings to an end a case that has generated more than seven years of hard-fought litigation, and that is unique in American history: a certified class action against the federal judiciary, concerning the fees that the judiciary charges for access to records through the Public Access to Court Electronic Records system, or PACER. Under the settlement, the government must reimburse the vast majority of PACER users in full—100 cents on the dollar—for past PACER charges. The settlement creates a common fund of $125 million from which each class member will automatically be reimbursed up to $350 for any PACER fees paid between April 21, 2010, and May 31, 2018. Those who paid over $350 in fees during that period will receive their pro rata share of the remaining settlement funds. Any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (subject to the caveat that no class members may receive more than the total fees that they actually paid). In addition to this remarkable monetary relief, the case has spurred the judiciary to eliminate fees for 75% of users going forward and prompted action in Congress to abolish the fees altogether.

By any measure, this litigation has been an extraordinary achievement—and even more so given the odds stacked against it. PACER fees have long been the subject of widespread criticism because they thwart equal access to justice and inhibit public understanding of the courts. But until

this case was filed, litigation wasn't seen as a realistic path to reform. That was for three reasons. First, the judiciary has statutory authority to charge at least *some* fees, so litigation alone could never result in a free PACER system. Second, few lawyers experienced in complex federal litigation would be willing to sue the federal judiciary—and spend considerable time and resources challenging decisions made by the Judicial Conference of the United States—with little hope of payment. Third, even if PACER fees could be shown to be excessive and qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. A lawsuit challenging PACER fees had been dismissed for lack of jurisdiction, and advocates had been unable for years to identify an alternative basis for jurisdiction, a cause of action, and a statutory waiver of sovereign immunity. So they devoted their efforts to other strategies: making some records freely available in a separate database, downloading records in bulk, and mounting public-information campaigns.

These efforts were important, but they didn't challenge the lawfulness of PACER fees. Despite public criticism—and despite being reproached in 2009 and 2010 by Senator Lieberman, the sponsor of a 2002 law curtailing the judiciary's authority to charge fees—the Administrative Office of the U.S. Courts did not reduce PACER fees. Instead, the AO *increased* fees in 2012.

There things stood until 2016, when three nonprofits filed this suit under the Little Tucker Act, a post-Civil-War-era statute that "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because the Act provides jurisdiction only for claims seeking money for past overpayments, the plaintiffs could not demand that the judiciary lower PACER fees going forward. They could seek only retroactive monetary relief.

Even with this built-in jurisdictional limitation, this lawsuit has been a resounding success. The plaintiffs defeated a motion to dismiss and obtained certification of a nationwide class by early

2017. Through discovery, they were then able to shine a light on how the AO had used the fees. Many things funded by the fees—such as flat screens for jurors—had nothing to do with PACER. This discovery in turn led to an unprecedented decision: In March 2018, this Court held that the AO had violated the law by using PACER fees to fund certain activities. Within months, the AO announced that these activities would "no longer be funded" with PACER fees. Gupta Decl. ¶ 18.

Success continued on appeal. In the Federal Circuit, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups, and the sponsor of the 2002 law"—all detailing the harms of high PACER fees. *See* Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times, Feb. 4, 2019, https://perma.cc/LN5E-EBE9. Media outlets published editorials championing the lawsuit. *See, e.g.*, *Public Records Belong to the Public*, N.Y. Times, Feb. 7, 2019, https://perma.cc/76P8-WFF7. And before long, the AO announced that it was doubling the $15 quarterly fee waiver for PACER, eliminating fees for approximately 75% of PACER users. Gupta Decl. ¶ 20. Then the plaintiffs secured a landmark Federal Circuit opinion unanimously affirming this Court's decision. *NVLSP v. United States*, 968 F.3d 1340 (Fed. Cir. 2020).

The litigation sparked widespread public interest in the need to reform PACER fees and jumpstarted legislative action that continues to this day. Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22. The Judicial Conference, too, now supports legislation providing for free PACER access to noncommercial users. *Id.* Were Congress to enact such legislation into law, it would produce an outcome that the plaintiffs had no way of achieving through litigation alone.

As for fees already paid—the claims at issue here—they will be refunded. Under the settlement, the average PACER user will be reimbursed for all PACER fees paid during the class period. And no class member will need to submit a claim to be paid.

This is an extraordinarily favorable result for the class, and it easily satisfies Rule 23(e)(2)'s criteria. This Court has already found that, on "a preliminary review," the settlement "appears to be fair, reasonable, and adequate" because it "(a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risks, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class" and an "additional Settlement Class"; "(d) does not provide undue preferential treatment to Class Representatives or to segments of the Class"; and "(e) does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1. Because a final review only confirms these findings, the plaintiffs respectfully request that the Court enter an order giving final approval to the settlement.

In addition, as authorized by the settlement, this motion seeks an award of attorneys' fees, settlement-administration and notice costs, litigation expenses, and service awards for the three class representatives in a total amount equal to 20% of the $125 million common fund. This request should be granted in full. The specific amounts sought are as follows: The motion seeks $29,654.98 in expenses because class counsel actually and reasonably incurred that amount to prosecute the case and achieve the settlement. The motion seeks $1,077,000 in settlement-administration and notice costs because the administrator initially agreed to perform its services for $977,000, and an additional $100,000 is needed due to unanticipated complexities. And the motion seeks an award of $10,000 per class representative to compensate them for their time working on the case and the responsibility that they have shouldered. Each of these requested amounts is reasonable. Class counsel seeks the remainder ($23,863,345.02) in attorneys' fees. This amount is approximately 19.1% of the common fund, which is below the average percentage fee awarded for funds of this size. Fitzpatrick Decl. ¶ 19. And the other factors that courts look to in assessing the reasonableness of a requested fee—including the degree of complexity and risk involved in the case, as well as the results obtained for the class—would, if anything, support a greater-than-average percentage here.

# BACKGROUND

## A.      Factual and procedural background

### 1.          The legal framework for PACER fees

By statute, the judiciary has long had authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then $.07 per page) were "higher than the marginal cost of disseminating the information," creating excess fee revenue that the judiciary had begun using to fund other projects. S. Rep. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.*

To this end, Congress passed the E-Government Act of 2002, which amended the statute by adding the words "only to the extent necessary." 28 U.S.C. § 1913 note. Despite this limitation, the AO twice increased PACER fees in the years after the E-Government Act's passage—first to $.08 per page, and then to $.10 per page—during a time when the costs of electronic data storage plunged exponentially. Gupta Decl. ¶ 4. This widening disparity prompted the Act's sponsor, Senator Lieberman, to reproach the AO for charging fees that were "well higher than the cost of dissemination," "against the requirement of the E-Government Act." ECF No. 52-8 at 3; ECF No. 52-9 at 1.

Excessive PACER fees have inflicted harms on litigants and the public alike. Whereas the impact of excess fees on the judiciary's $7-billion annual budget is slight, these harms are anything but: High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts. And the AO had further compounded the harmful effects of high fees in recent years by discouraging fee waivers, even for pro se litigants, journalists,

researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

### 2.    District court proceedings

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this lawsuit. From the start, the plaintiffs were represented by an expert team drawn from the law firms of Gupta Wessler LLP, a litigation boutique with experience bringing complex cases against the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. The plaintiffs asked the Court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges—the only relief available to them under the Little Tucker Act. *See* 28 U.S.C. § 1346(a). Because the judiciary is not subject to the APA, 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek injunctive relief requiring the AO to lower PACER fees in the future.

This Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, in January 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid PACER fees between April 21, 2010 and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' illegal-exaction Little Tucker Act claim for classwide treatment and appointed Gupta Wessler and Motley Rice as co-lead class counsel. *Id.*

The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (or KCC) as claims administrator. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, only about 1,100 opted out of the class. Gupta Decl. ¶ 14.

Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only what the judiciary

labeled as "Public Access Services," but also "Case Management/Electronic Case Files System" (or CM/ECF); "Electronic Bankruptcy Notification"; "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi [Study]."

Based on this discovery, the parties filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to disseminating information through electronic means.

In March 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [PACER] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

In the months that followed, the AO took steps "to implement the district court's ruling" and "reduce potential future legal exposure." Gupta Decl. ¶ 18. It announced in July 2018 that these four categories would "no longer be funded" with PACER fees. *Id.* "The Judiciary will instead seek appropriated funds for those categories," as it does for over 98% of its budget. *Id.* A year later, the

AO announced that it was doubling the quarterly fee waiver for PACER—from $15 to $30—which had the effect of eliminating PACER fees for approximately 75% of PACER users. *Id.* ¶ 20.

### 3. Appellate proceedings

Both parties sought permission for an interlocutory appeal from this Court's decision, and the Federal Circuit accepted both appeals. The parties adhered to their same interpretations of the statute on appeal. The plaintiffs' position was supported by a broad array of amici curiae—a group of prominent retired federal judges, Senator Lieberman, media organizations, legal-technology firms, and civil-liberties groups from across the ideological spectrum—detailing the harms caused by high PACER fees. *See* Liptak, *Attacking a Pay Wall that Hides Public Court Filings*. In response, the government defended the full amount of PACER fees, while strenuously arguing that the court lacked jurisdiction under the Little Tucker Act.

The Federal Circuit rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP*, 968 F.3d at 1350. It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (those not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was a "potential source of liability" because the court could not confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The Federal Circuit left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

Following the Federal Circuit's decision, federal lawmakers swung into action. The House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. Gupta Decl. ¶ 22.

**B.      Mediation and settlement negotiations**

On remand, the case was reassigned to Judge Friedman, and the parties came together to discuss the path forward. They understood that litigating the case to trial would entail significant uncertainty and delay. Gupta Decl. ¶ 23. Years of protracted litigation lay ahead. And the range of potential outcomes was enormous: On one side, the government argued that it owed zero damages to the class because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower (a litigating position that also made it difficult for the judiciary to lower fees while the case remained pending). *Id.* On the other side, the plaintiffs maintained that liability had already been established for four categories of expenses and that some portion of the CM/ECF expenditures were likely improper as well. *Id.*

Hoping to bridge this divide and avoid a lengthy delay, the parties were able to agree on certain structural aspects of a potential settlement and then agreed to engage in mediation on the amount and details. *Id.* ¶ 24. On December 29, 2020, at the parties' request, this Court stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation. *Id.*

Over the next few months, the parties exchanged information and substantive memoranda, which provided a comprehensive view of the strengths and weaknesses of the case. *Id.* ¶ 25. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, an experienced and accomplished mediator agreed upon by the parties. *Id.*

With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. *Id.* ¶ 26. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-

made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund. *Id.* But by the time the session ended, the parties still hadn't agreed on the total amount of the common fund or other important terms—including how the money would be allocated and distributed to class members, what to do with any unclaimed funds after the initial distribution, and the scope of the release. *Id.* ¶ 27. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were ultimately able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. *Id.* The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed. *Id.*

Further progress was slow, and at times the parties reached potentially insurmountable impasses. *Id.* ¶ 28. A particular sticking point concerned the allocation of settlement funds. *Id.* Consistent with the parties' litigating positions, the plaintiffs argued that funds should be distributed pro rata to class members, while the government argued for a large minimum amount per class member, which it maintained was in keeping with the AO's statutory authority (and longstanding policy) to "distinguish between classes of persons" in setting PACER fees "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note; Gupta Decl. ¶ 28. Over a period of many months, the parties were able to resolve their differences and reach a compromise on these competing approaches: a minimum payment of $350—the smallest amount the government would agree to—with a pro rata distribution beyond that amount. *Id.*

The final version of the settlement was executed on July 27, 2022. *Id.* ¶ 28; Gupta Decl. Ex. A ("Agreement"). The parties executed an amendment in September 2022 making certain technical modifications to the agreement, and a second amendment in April 2023 making further technical modifications. Gupta Decl. Ex. B ("First Supp. Agreement") & Ex. C ("Second Supp. Agreement").

**C.** **Overview of the settlement agreement**

**1.** **The settlement class**

As clarified by the first supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Agreement ¶ 3; First Supp. Agreement. The class period does not go beyond May 31, 2018 because the AO stopped using PACER fees to fund the four categories of prohibited expenses after this date.

This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Agreement ¶ 4. Because people in this second group are not part of the original class, they did not receive notice or a right to opt out when the original class was certified. For that reason, under the settlement, these additional class members received notice and a right to opt out in 2023. *Id.*

**2.** **The settlement relief**

The settlement provides for a total common-fund payment by the United States of $125 million, which covers the monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11.

Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust. *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16.

### 3.      The released claims

In exchange for the relief provided by the settlement, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. *Id.* ¶ 13.[1]

### 4.      Notice to settlement class and requests for exclusion

Over the past two months, KCC has sent court-approved settlement notice to over 500,000 PACER accountholders. KCC Decl. ¶¶ 8, 15. On July 6, it sent an initial batch of more than 336,000 email notices and over 100,000 postcard notices to those for whom email notice was not possible or successful. *Id.* ¶¶ 8–10. On August 7, KCC sent notice to an additional 184,478 accountholders who were inadvertently omitted from the first batch of notices. *Id.* ¶ 15. These 184,478 people were not prejudiced by the delay because they all received notice and opt-out rights in 2017, so they were not entitled to opt out of the settlement in 2023. Further, they all have 36 days to object to the settlement and 29 days to notify KCC that someone else paid PACER fees on their behalf. KCC also sent corrective notice on August 7 to an additional 53,446 accountholders who had received the wrong notice in the initial batch based on a data error. Instead of receiving notice providing only an opportunity to object to the settlement, and not also to opt out (which each of these accountholders had already been given in 2017), these accountholders received notice that mentioned an opportunity to opt out of the settlement. The corrective notice informed them of the mistake and included the court-approved text of the correct notice. *Id.* ¶ 16, Ex. G.

---

[1] This release excluded the claims that were then pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). Agreement ¶ 13. That unrelated case—which was voluntarily dismissed with prejudice on July 24, 2023—alleged that PACER overcharges users due to a systemic billing error concerning the display of some HTML docket sheets. The case did not challenge the PACER fee schedule and was not certified as a class action.

Of the approximately 500,000 PACER accountholders to whom settlement notice was sent, approximately 100,000 had an opportunity to request exclusion from the settlement class. *Id.* ¶¶ 8, 10. KCC has received a total of 50 exclusion requests (16 of which were invalid because they were submitted by individuals who had already a chance to opt out in 2017 or are federal employees who are excluded from the class definition). *Id.* ¶¶ 17, 21. Thirty-one of the 34 valid opt-out requests were received via the class website, while three were received by mail. *Id.* ¶ 21.

KCC also published notice in the *ABA Banking Journal eNewsletter* and distributed it via Cision PR Newswire. *Id.* ¶¶ 12–13. The press release has been posted in full 380 times online and on social media; has appeared on broadcast media, newspaper, and online news websites; and has also been posted on the class website at www.pacerfeesclassaction.com. *Id.* ¶¶ 12, 18.

**5.**      **Allocation and payment**

Under the settlement, class members will not have to submit a claim to receive their payment. Agreement ¶¶ 4, 16. Instead, KCC will use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.* These efforts include (1) sending checks to class members using PACER payment data maintained by the government; (2) allowing class members to notify KCC that someone else paid PACER fees on their behalf and is the proper recipient of any settlement funds; and (3) allowing individuals or entities to notify KCC that they paid PACER fees on behalf of someone else and are the proper recipients of settlement funds. Agreement ¶¶ 3, 19; KCC Decl. ¶¶ 18, 22.

The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. Agreement ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class

members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to a total of $100 million.

**First distribution.** KCC will distribute the Remaining Amount to class members using the following formula: It will first allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. *Id.* ¶ 19. Next, KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* KCC will then deduct this Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of PACER fees paid by that class member during the class period; and (b) each class member who paid more than $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

KCC will complete disbursement of each class member's share of the recovery within 180 days of receiving the $125 million from the United States, or within 180 days of receiving the necessary information from AO, whichever is later. Second Supp. Agreement. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. Agreement ¶ 22.

***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the settlement trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. Second Supp. Agreement. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the class period and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. Agreement ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

### 6.   Service awards, attorneys' fees, and costs

As noted, the settlement authorizes the plaintiffs to request service awards of up to $10,000 per class representative and an award of attorneys' fees and litigation expenses, and for KCC to retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18, 28. The total amount requested in service awards, fees, expenses, and costs does not exceed 20% of the total common fund. *Id.* Any amounts awarded by the Court will be paid out of the common fund. *Id.* As required by Rule 23(h), Class Members have the right to object these requests. *Id.*

### 7.     Further settlement-related proceedings

Any class member may express her views to the Court supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Agreement ¶ 30. Counsel for the parties may respond to any objection within 21 days of receiving the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32.

After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing, during which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Agreement ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.* The Court has scheduled the fairness hearing for October 12, 2023.

Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, along with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Agreement ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

## ARGUMENT

## I.    Because the settlement provides an exceptional recovery for the class, the Court should approve the settlement.

Rule 23(e) requires court approval of a class-action settlement. This entails a "three-stage process, involving two separate hearings." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 189–90

(D.D.C. 2017) (cleaned up). Before the Court may approve a class-action settlement, it "must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(e)(2), in turn, requires that the settlement be "fair, reasonable, and adequate."

The settlement in this case has advanced past the first and second stages, with this Court having preliminarily approved it and notice having now been provided to the class. The third stage involves a fairness hearing during which the Court examines the settlement and any objections to it, followed by a decision on whether to approve the settlement. *Ross*, 267 F. Supp. 3d at 190.

In considering whether to give final approval to a settlement, the court's discretion is constrained by the "long-standing judicial attitude favoring class action settlements" and "the principle of preference favoring and encouraging settlement in appropriate cases." *Rogers v. Lumina Solar, Inc.*, 2020 WL 3402360, at *4 (D.D.C. June 19, 2020) (Brown, J.); see *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 16 (D.D.C. 2019) ("Class action settlements are favored as a matter of public policy."); *United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) ("Settlement is highly favored."); *Ciapessoni v. United States*, 145 Fed. Cl. 685, 688 (2019) ("Settlement is always favored, especially in class actions where the avoidance of formal litigation can save valuable time and resources.").

The criteria guiding the final-approval determination are supplied by Rule 23(e)(2), which requires consideration of whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate"; and "(D) the proposal treats class members equitably relative to each other." In considering these factors, the Court will also look to "the opinion of experienced counsel." *Little v. Wash. Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 37 (D.D.C. 2018); *see also* Fed. R. Civ. P. 23,

Advisory Committee Note, 2018 Amendments (observing that the Rule's enumerated factors are not indented to "displace any factor" rooted in the case law). Because these are the same factors considered at the preliminary-approval stage, "settlement proposals enjoy a presumption of fairness afforded by a court's preliminary fairness determination." *Ciapessoni*, 145 Fed. Cl. at 688.

In its preliminary-approval order, this Court found that the settlement "appears to be fair, reasonable, and adequate" because it "(a) resulted from arm's-length negotiations between experienced counsel overseen by an experienced mediator; (b) eliminates the risks, costs, delay, inconvenience, and uncertainty of continued litigation; (c) involves the previously certified Class" and an "additional Settlement Class"; "(d) does not provide undue preferential treatment to Class Representatives or to segments of the Class"; and "(e) does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1. Nothing has happened in the three-and-a-half months since this Court made those preliminary findings that would justify a contrary conclusion. Quite the opposite: Closer examination only confirms that each factor strongly supports final approval.

## A.  The class representatives and class counsel have vigorously represented the class throughout this litigation.

The first factor examines the adequacy of representation. In certifying the class in 2017, this Court found that the three named plaintiffs are "particularly good class representatives" and that "[t]here is no dispute about the competency of class counsel"—Gupta Wessler, a litigation boutique with deep (and rare) experience in complex cases seeking monetary relief from the federal government, and Motley Rice, one of the nation's leading class-action firms. ECF No. 33 at 14–16.

That is no less true today. Since this Court's finding of adequate representation, the named plaintiffs and class counsel have spent nearly seven years vigorously representing the class. They did so first in this Court, obtaining informal discovery from the judiciary that paved the way for an unprecedented decision concluding that the AO had violated the law with respect to PACER fees.

They continued to do so on appeal, attracting an impressive set of amicus briefs and favorable press coverage, and ultimately securing a landmark Federal Circuit opinion affirming this Court's decision and rejecting arguments made by the Appellate Staff of the U.S. Department of Justice's Civil Division. And they did so finally in mediation, spending months negotiating the best possible settlement for the class. In short, the representation here is not just adequate, but exemplary.

**B.      The settlement is the product of informed, arm's-length negotiations.**

The next factor examines the negotiation process. It asks whether the negotiations were made at arm's length or whether there is instead some indication that the settlement could have been the product of collusion between the parties.

Here, "both sides negotiated at arms-length and in good faith," and "the interests of the class members were adequately and zealously represented in the negotiations." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 9 (D.D.C. 2006) (Friedman, J.). The plaintiffs were represented by class counsel, while lawyers at the Department of Justice and the AO appeared for the government. "Although the mediation occurred before formal fact discovery began," there had been "significant informal discovery," which ensured that "the parties were well-positioned to mediate their claims." *Radosti v. Envision EMI, LLC*, 717 F.Supp.2d 37, 56 (D.D.C. 2010); *see also Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26 (D.D.C. 2011) (explaining that "formal discovery is not . . . required even for final approval of a proposed settlement" if "significant factual investigation [had been] made prior to negotiating a settlement"). "[T]he parties reached a settlement only after a lengthy mediation session that was presided over by an experienced mediator," *Radosti*, 717 F.Supp.2d at 56, and the settlement was approved by DOJ leadership and the judiciary's administrative body. Even in the ordinary case, where a settlement is "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery," without government involvement, there is a

"presumption of fairness, adequacy, and reasonableness." *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019). The presumption here is at least as strong.

### C. The settlement relief provided to class members is exceptional—particularly given the costs, risks, and delays of further litigation.

The third and "most important factor" examines "how the relief secured by the settlement compares to the class members' likely recovery had the case gone to trial." *Blackman*, 454 F. Supp. 2d at 9–10. This factor focuses in particular on "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2); *see also In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d at 16.

The relief provided to class members is extraordinary. The total value of the settlement is $125 million, and class members will be fully reimbursed, up to $350, for all PACER fees that they paid during the class period. Those who paid more than $350 in fees during the class period will receive a payment of $350 plus their pro rata share of the remaining settlement funds. Further, any unclaimed funds after this initial distribution will be allocated evenly to all class members who collected their initial payment (capped at the total amount of fees that each class member paid during the class period). Because most class members paid less than $350 during the class period, the average class member will receive a full refund of all fees paid. This relief will also be provided in a highly efficient manner—through a common-fund settlement in which class members will not have to submit any claim or make any attestation to receive payment. Agreement ¶ 4.

This would be an excellent outcome for the class even if it were achieved after trial, but it is especially good given the significant costs, risks, and delays posed by pursuing further litigation against the federal court system. The $125 million common fund represents nearly 70% of the total

expenditures determined by the Federal Circuit to have been unlawfully funded with PACER fees during the class period. Without a settlement, the case would be headed for years of litigation and likely another appeal, with no guarantee that the class would wind up with any recovery given the government's remaining argument against liability (that the plaintiffs could not prove that PACER fees would have been lower—or by how much—but for the unlawful expenditures). Although the plaintiffs and class counsel believe that the government's argument is incorrect (and further, that the AO should be liable for some portion of the CM/ECF expenses), the uncertainty and complete lack of case law on this issue counsel in favor of compromise. Add to that the benefits provided by avoiding protracted litigation and time-and-resource-intensive discovery into the remaining issues, and this is a superb recovery for the class.

The settlement's provision for attorneys' fees and service awards is also reasonable, as we discuss in more detail later. The settlement provides that the total amount requested in service awards, litigation expenses, administrative costs, and attorneys' fees will be no more than 20% of the aggregate amount of the common fund; and that "the Court will ultimately determine whether the amounts requested are reasonable." *Id.* ¶¶ 18, 28. The settlement further provides that the plaintiffs will request service awards of no more than $10,000 per class representative. *Id.* ¶ 28.

### D.   The settlement agreement treats class members equitably relative to each other.

The fourth factor examines whether the settlement treats class members equitably vis-à-vis one other. The settlement here does so. It reimburses every class member for up to $350 in fees paid during the class period and distributes the remaining funds in a way that is proportional to the overcharges paid by each class member. This formula for calculating payments is reasonable under the circumstances. It advances the AO's longstanding policy goal of expanding public access for the average PACER user and, in doing so, approximates how the AO likely would have chosen

to reduce PACER fees during the class period had it been acting under a proper understanding of the law. Indeed, following this Court's summary-judgment decision, the AO doubled the size of the quarterly fee waiver, from $15 to $30. Gupta Decl. ¶ 20. Had it done the same over the class period, the total fee waiver available to all PACER users would have increased by $480. Reimbursing every PACER user for up to $350 in fees paid, with pro rata distributions to any users who paid more than that amount, is therefore fully in keeping with the AO's fee policy and a reasonable allocation of damages. The minimum payments also make it likelier that class members will collect their payments, thereby maximizing recovery to the class.

One class member has nevertheless objected to the settlement's plan of allocation—the only objection received to date. *See* Aug. 8, 2023 Letter from G. Miller. After emphasizing that he has "no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for attorney fees, expenses, [service] awards," and costs, the objector takes issue with the formula for distribution because it "discriminates between larger and smaller claimants." *Id.* at 1. He acknowledges that such an approach is permissible when it can be justified. *Id.* at 1–2. Yet he contends that the line drawn in this case ($350) is substantively unfair and "seems based … on a wish to favor smaller users," which he derides as a "[r]edistribution of wealth." *Id.* at 2.

It is understandable that some class members may wonder why settlement funds are not distributed on a purely pro rata basis. But the objector is mistaken in assuming that there are no "valid reasons" for this. *Id.* To the contrary, there are at least three good reasons: *First*, the text of the E-Government Act—the statute on which the claims here are based—expressly authorizes the judiciary to "distinguish between classes of persons" in setting PACER fees "to avoid unreasonable burdens and to promote public access to such information." 28 U.S.C. § 1913 note. And the AO has long had a policy of doing just that. *Second*, the government's litigating position—and its position during the negotiation process—was that the plaintiffs, in order to prove liability and damages,

would need to show what PACER fees would have been in a but-for world in which the AO complied with the law. The government further maintained that, in keeping with the statutory text and longstanding AO policy, the Judicial Conference of the United States would have used the funds to increase the size of the fee waiver or otherwise expand public access to people burdened by the fees. Although the plaintiffs took a very different position—that liability had been established and damages should be calculated pro rata—the settlement reasonably reflects a blend of these approaches. It is partially pro rata. But, because settlement involves compromise, it is not exclusively pro rata. *Third*, the government insisted on the $350 initial payment as a condition of the settlement. Gupta Decl. ¶ 28. During negotiations, the plaintiffs and class counsel vigorously advocated for a pro-rata approach, and they were able to convince the government to reduce the minimum number to $350, but the government was unwilling to go further. *Id.* Faced with the choice between compromising and walking away, the plaintiffs chose to compromise. There was nothing unreasonable or unfair about doing so. To the contrary, courts routinely recognize that "a Plan of Allocation providing for a minimum payment, to incentivize claims distribution and avoid *de minimis* settlement payments, can be fair and reasonable." *In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812, at *2 (E.D. Mich. Dec. 20, 2019).

In addition, as we explain later, the settlement is equitable in allowing the class representatives to seek service awards of up to $10,000, while recognizing that this Court has discretion to award a smaller amount (or no award at all). *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012). Service awards "are not uncommon in common-fund-type class actions and are used to compensate plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011). The three nonprofits that prosecuted this case have been actively engaged in the litigation for more than seven years—preparing declarations, receiving case updates, spending countless hours

reviewing drafts and giving substantive feedback, and weighing in throughout the negotiation process, helping to produce a better outcome for all class members. Given their extraordinary contributions, it would be inequitable *not* to compensate them for their service.

### E.   The plaintiffs and class counsel support the settlement.

The final relevant factor is not enumerated in the text of Rule 23, but it is well-settled in the case law. Under this Court's cases, "the opinion of experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Prince v. Aramark Corp.*, 257 F. Supp. 3d 20, 26 (D.D.C. 2017). Counsel for both parties "are clearly of the opinion that the settlement in this action is fair, adequate, and reasonable," which only further confirms its reasonableness. *Cohen v. Chilcott*, 522 F.Supp.2d 105, 121 (D.D.C. 2007); *see also* Burbank Decl. ¶¶ 7–8 (Director of Litigation at the National Veterans Legal Services Program setting forth her strong support for the settlement); Rossman Decl. ¶¶ 4–5 (Litigation Director of the National Consumer Law Center setting forth his strong support for the settlement).

## II.   The notice and notice programs provided class members with the best notice practicable under the circumstances.

Due process requires that notice to class members be "reasonably calculated, under all the circumstances, to apprise [them] of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank Tr. Co.*, 339 U.S. 306, 314 (1950). Rule 23(e)(1) similarly requires that notice be directed in a "reasonable manner to all class members who would be bound by the proposal." The notice here meets these requirements. It described the lawsuit in plain English, including the key terms of the settlement, the procedures for objecting to it, and the date of the fairness hearing. Agreement ¶ 29; *see* ECF No. 153. The notice sent to the additional class members—those who paid fees only between April 22, 2016 and May 31, 2018—also informed them of their right to opt out and the procedures through which they may exercise that right. KCC

Decl. ¶ 8. Further, the notices were distributed in a way that was designed to reach all class members: email notice to all class members for whom the AO has an email address on file; postcard notice to all class members for whom the AO does not have an email address on file, or for whom email delivery was unsuccessful; and publication notice designed to reach individuals and entities whose contact information may not be in the AO's accountholder data. KCC Decl. ¶¶ 5, 8, 10, 12, 13, 15, 16. Relevant case documents are also available on the settlement website. KCC Decl. ¶ 18.

## III.   The requested attorneys' fee award is reasonable.

### A.   This Court should use the percentage-of-the-fund approach to assess the reasonableness of class counsel's fee request.

In class actions, "class counsel may request an award of fees from the common fund on the equitable notion that lawyers are entitled to reasonable compensation for their professional services from those who accept the fruits of their labors." *Moore v. United States*, 63 Fed. Cl. 781, 786 (2005); *see* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."); *Applegate v. United States*, 52 Fed. Cl. 751, 755 (2002) ("For more than a century, … courts have awarded fees to an attorney who succeeds in creating, protecting or enhancing a common fund from which members of a class are compensated for a common injury."); *see also Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1371 (Fed. Cir. 2023). The district court has a "duty to ensure that [any such request] for attorneys' fees [is] reasonable." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993).

Courts have identified two approaches for assessing the reasonableness of class counsel's fee request. The first is the "percentage-of-the-fund method, through which a reasonable fee is based on a percentage of the fund bestowed on the class." *Health Republic*, 58 F.4th at 1371 (cleaned up). The second is the "lodestar" method, "through which the court calculates the product of

reasonable hours times a reasonable rate and then adjusts that lodestar result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." *Id.* (cleaned up).

As between these two approaches, courts overwhelmingly prefer the percentage-of-the-fund approach in common-fund cases. *See* Fitzpatrick Decl. ¶ 10 (noting that this approach is used in about 90% of common-fund cases); *Manual for Complex Litig.* § 14.121 (4th ed. 2004) ("[T]he vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases."); *see also, e.g.*, *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1263 (10th Cir. 2023) ("We have … express[ed] a preference for the percentage-of-the-fund approach."). The lodestar method, in contrast, is "used generally outside the common-fund context," *Health Republic*, 58 F.4th at 1371, such as when a defendant is obligated to pay fees under a fee-shifting statute.

Courts use the percentage-of-the-fund approach for good reason. It replicates the market, is easy to apply, and "helps to align more closely the interests of the attorneys with the interests of the parties by discouraging inflation of attorney hours and promoting efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.C.C. 2013) (Friedman, J.) (cleaned up); *see Little*, 313 F. Supp. 3d at 38 (making same points); Fitzpatrick Decl. ¶¶ 9–12 (expanding on these points); Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1159–63 (2021); *see also, e.g.*, *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1055 (S.D. Cal. 2017) ("Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class."); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in

this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," whereas "the lodestar [method] creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." (cleaned up)); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995) ("[U]se of the POF method in common fund cases is the prevailing praxis" due to its "distinct advantages.").

The preference for the percentage-of-the-fund approach is so strong that some circuits, like the D.C. Circuit, have essentially mandated its use in common-fund cases. *See Swedish Hosp.*, 1 F.3d at 1271 ("[A] percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021) ("[I]n common fund settlements like this one, an attorney's fee award shall be based upon a reasonable percentage of the fund established for the benefit of the class.") (cleaned up); *Rite Aid*, 396 F.3d at 306 ("[T]he percentage of common fund approach is the proper method of awarding attorneys' fees."). Although the Federal Circuit has not gone this far, *see Health Republic*, 58 F.4th at 1371, fee awards in the circuit are "typically based on some percentage of the common fund." *Moore*, 63 Fed. Cl. at 786; *see, e.g.*, *Mercier v. United States*, 156 Fed. Cl. 580, 591 (2021) (awarding fees as a percentage); *Kane Cnty. v. United States*, 145 Fed. Cl. 15, 18–20 (2019) (same); *Quimby v. United States*, 107 Fed. Cl. 126, 133–35 (2012) (same). This case calls for the same approach.

**B.      A fee of 19.1% of the common fund is reasonable.**

The next question is whether the requested fee constitutes a reasonable percentage of the common fund. To help answer this question, courts within the Federal Circuit have devised a multifactor test, under which seven factors are relevant: "(1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been

negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award." *Health Republic*, 58 F.4th at 1372 (quoting *Moore*, 63 Fed. Cl. at 787).

Here, each factor supports the requested fee. A thorough application of the multifactor test thus only confirms this Court's preliminary finding that the settlement—which authorizes class counsel to seek fees of up to 20% of the common fund (minus the amounts for expenses and service awards)—"does not provide excessive compensation to counsel for the Class." ECF No. 153 at 1.

### 1.    The quality of counsel supports the requested fee.

On the first factor, there can be "little question about the skill and efficiency demonstrated by class counsel in this case." *Black Farmers*, 953 F. Supp. 2d at 92. Class counsel are a small team of lawyers from two preeminent law firms: Gupta Wessler, a litigation boutique with significant experience in complex cases seeking monetary relief against the federal government, and Motley Rice, a leading class-action firm. *See* Gupta Decl. ¶¶ 12, 45–48; Oliver Decl. ¶ 2. This Court has already recognized that these lawyers are "experienced," ECF No. 153 at 1, and that "[t]here is no dispute about the[ir] competency," ECF No. 33 at 15–16. Other courts have agreed. *See, e.g.*, *Steele v. United States*, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (finding the same lawyers to be "accomplished attorneys" who have "demonstrated significant experience in handling class actions, including class actions … against the government," and appointing them as class counsel in an illegal-exaction case against the United States, while emphasizing that "the Court is thoroughly impressed by the[ir] qualifications"); *Mercier*, 156 Fed. Cl. at 591 (finding that Motley Rice "has extensive experience litigating class actions" and has "vigorously prosecuted" class actions against the federal government, achieving "excellent result[s]"); *Houser v. United States*, 114 Fed. Cl. 576 (2014) (certifying class of all federal bankruptcy judges represented by the same two Gupta Wessler lawyers, who later obtained a $56 million judgment).

28

Further, class counsel faced a formidable group of lawyers from the Department of Justice, who tenaciously defended this case on every possible ground, from jurisdiction to class certification to the merits. The government did so not only in this Court, but also in the Federal Circuit, where it presented arguments from the Civil Division's Appellate Staff. Defeating all of these arguments—and then successfully negotiating a historic settlement—"called for a host of skills by class counsel." *Black Farmers*, 953 F. Supp. 2d at 92; *see* Burbank Decl. ¶¶ 5, 7–8 (testifying to the quality and skill of class counsel's work); Rossman Decl. ¶¶ 2, 4 (same); Brooks Decl. ¶ 3 (same); Fitzpatrick Decl. ¶¶ 8, 20–21 (same); *see also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 112 (D.D.C. 2013) ("[T]he best testament to their effectiveness was their ability to successfully resolve this exceedingly complex case and secure the … settlement … while battling opposing counsel at the very top of the defense bar."). The first factor thus strongly supports the requested fee.

### 2. The complexity and duration of the case supports the requested fee.

So does the second factor. Class counsel have been litigating this case for over seven years. They defeated a motion to dismiss, obtained certification of a nationwide class of hundreds of thousands of people, engaged in informal discovery, secured an unprecedented ruling from this Court on liability, successfully defended that ruling on appeal (both as to jurisdiction and liability), negotiated a historic settlement on remand, obtained preliminary approval of the settlement, and assisted class members with an unusually large and complex set of questions about the settlement-administration process—a process that is ongoing and that will only intensify once the settlement is administered. Moreover, the legal and practical questions that they have confronted have been extraordinarily complex and challenging. *See* Gupta Decl. ¶¶ 6–9 (detailing complexity of legal issues); Fitzpatrick Decl. ¶ 20 (same); Burbank Decl. ¶¶ 3, 8 (same, with a focus on illegal-exaction issues); Oliver Decl. ¶¶ 5–7 (detailing complexity of settlement-administration issues); KCC Decl.

¶¶ 15–17 (same). By any measure, then, the second factor supports the requested fee. *See Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 105 ("[T]he settlement certainly 'does not come too early to be suspicious.' Nor does it come 'too late to be a waste of resources.'").

### 3.    The risk of nonrecovery supports the award.

Now for the third factor: litigation risk. When lawyers take a case on contingency, their percentage fee must compensate them "for the risk of nonpayment." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). "The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Id.*

To say that this case was "unusually risky" is an understatement. *Id.* It involved a challenge to a fee schedule promulgated by the Judicial Conference of the United States, presided over by the Chief Justice. The challenge concerned a statute that had "never [been] interpreted by a court," *Black Farmers*, 953 F. Supp. 2d at 93, and that "nowhere explicitly requires payment of damages by the government for overcharging users," *NVLSP*, 968 F.3d at 1348; *see* ECF No. 105 at 5–7 (authorizing appeal because "there is a complete absence of any precedent from any jurisdiction," the government's argument "is not without merit," and "there would be no liability and the case would be over" if the argument were correct). The contours of the "relatively obscure cause of action" on which the plaintiffs relied had "remained unresolved in the courts" when the case was filed. Burbank Decl. ¶ 8. And, because the judiciary is not subject to the Administrative Procedure Act and bringing individual claims would not have been economically rational, the plaintiffs had to pursue a class action for money damages against the judiciary, which had no historical precedent. *See* Fitzpatrick Decl. ¶ 20 ("In all my years of studying class actions and litigation against the federal government, I am not aware of any previous class action that has successfully been brought against the federal judiciary."). All the while, class counsel went about their work, devoting thousands of hours to the case without receiving any compensation, or any guarantee of future

compensation. If this case doesn't carry with it a considerable risk of nonrecovery, it is hard to imagine a case that would.

As Professor Fitzpatrick puts it: "[E]very step of this lawsuit required a new trail to be cut. Not only procedurally—Did the Court have jurisdiction? Was there a cause of action? Did the judiciary have sovereign immunity?—but also on the merits—How should the E-Government Act be interpreted? How can any violation of it be proved? None of these questions were even 50-50 propositions for the class when this litigation began. People had been complaining about high PACER fees for years, but no one had invented a legal solution to the problem until class counsel did." Fitzpatrick Decl. ¶ 20. As this Court explained in a different class action against the federal government that also carried considerable risk: "The prospect of such litigation is daunting, and many attorneys would not have undertaken it." *Black Farmers*, 953 F. Supp. 2d at 93.

Of course, now that the "legal solution" that had escaped so many for so long is clear, Fitzpatrick Decl. ¶ 20, it might be easy to forget how risky this case was at the start. But that is only because "hindsight alters the perception of the suit's riskiness." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Properly understood, this factor emphatically supports the requested fee.

### 4.   The fee that likely would have been negotiated between private parties in similar cases supports the requested fee.

The next factor only further confirms the fee's reasonableness. A contingency fee of 19.1% is a much smaller percentage than what the private market would bear. *See* Fitzpatrick Decl. ¶ 14 ("The request here is about 19% of the settlement. It is well known that this is well below what private parties negotiate when they hire lawyers on contingency."). For contingency cases, it is "typical" to have a fee arrangement "between 33 and 40 percent." *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998). That is exactly what the three named plaintiffs agreed to here. Before the case was filed, each signed a retainer agreement with class counsel that provided for a contingency fee

of up to 33% of the common fund. Gupta Decl. ¶ 65; *see Kane Cnty.*, 145 Fed. Cl. at 19 ("A fee of one third the total recovery is consistent with the fee that likely would have been negotiated by private parties. In fact, that was the fee negotiated between class counsel and the lead plaintiff.").

More importantly, when the class was certified in 2017, the notice informed class members: "By participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." *See* ECF Nos. 43-1 & 44. The notice also informed them of their right to opt out of the class. "A contingent fee that is reached by the free consent of private parties should be respected as fair as between them." *Quimby*, 107 Fed. Cl. at 134. That is all the more true here, where class members agreed to "a fee request *even greater* than" the 19.1% fee now sought by class counsel, and where many class members are "sophisticated parties like lawyers and large institutions." Fitzpatrick Decl. ¶ 26; *see Quimby*, 107 Fed. Cl. at 134 (relying on similar language and reasoning that, by choosing to participate in the class, "each member effectively accepted the offer of representation for a thirty percent contingency fee, and presumably concluded that a better deal could not be reached with their own counsel").

### 5. The reaction of class members to date supports the requested fee.

"The free consent of class members to a thirty percent fee perhaps explains the absence of objections" to date—the fifth factor. *See Quimby*, 107 Fed. Cl. at 134. Indeed, as of the filing of this motion, none of the hundreds of thousands of class members has signaled any objection to the settlement's fee provision (or for that matter, to the amount of the common fund). *See id.* (approving fee where "only one class member has objected to the [settlement's] terms related to attorneys' fees"); *Sabo v. United States*, 102 Fed. Cl. 619, 628–29 (2011) (explaining that a relative lack of objections "weigh[s] in favor of approv[al]"). And the class representatives fully support the fee request. *See*

Burbank Decl. ¶ 7; Rossman Decl. ¶ 5; Brooks Decl. ¶ 3. The lack of objections to the fee provision is particularly relevant here because, as just noted, class members are disproportionately likely to read and pay attention to legal filings, and to be aware of their legal rights. Thus, while it is possible that objections will be forthcoming, as of now, this factor provides additional support for the fee.

### 6. The percentage awarded in other cases supports the requested fee.

The sixth factor—comparing the percentage fee to other class actions—further supports the fee request. Generally speaking, a contingency fee of "one-third is a typical recovery." *Moore*, 63 Fed. Cl. at 787; *see, e.g., Kane Cnty.*, 145 Fed. Cl. at 19 ("[A]n award equal to one third of the common fund is commensurate with attorney fees awarded in other class action common fund cases."); *Quimby*, 107 Fed. Cl. at 133 ("A fee equal to thirty percent of the common fund totaling nearly $74 million is ... within the typical range of acceptable attorneys' fees."); *Moore*, 63 Fed. Cl. at 787 (awarding 34% as "well within the acceptable range"); *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 111 ("Both nationally and in this Circuit, 'a majority of common fund class action fee awards fall between twenty and thirty percent.'"); *see also* Fitzpatrick Decl. ¶ 15 (providing statistical averages).

A fee award of 19.1% is well within the norm for settlements of this size. It is "actually below the average percentage ... for settlements between $69.6 and $175.5 million" (19.4%). Fitzpatrick Decl. ¶ 19; *see Equifax*, 999 F.3d at 1281 ("20.36 percent is well within the percentages permitted in other common fund cases, and even in other megafund cases"); *see also, e.g., Mercier*, 156 Fed. Cl. at 592 (20% of $160 million fund); *Fed. Nat'l Mortg.*, 4 F. Supp. 3d at 112 (19% of $153 million fund); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *12 (D.D.C. July 16, 2001) (33% of $365 million fund). And the reasonableness of the percentage becomes even clearer when the amounts of older funds are adjusted for inflation. *See, e.g., Quimby*, 107 Fed. Cl. at 133 (30% award of fund equal to $100 million in today's dollars according to the U.S. Bureau of Labor Statistics' CPI Inflation Calculator,

https://perma.cc/TEE4-BAJX). Professor Fitzpatrick's study, for example, analyzed data from 2006 to 2007 and found that, for settlements of between $72.5 million and $100 million—or about $110 million to $150 million today—the average award was 23.9%. *See* Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 839 (2010). An award of 19.1% of the common fund thus "clearly would be reasonable" in a typical case involving a $125-million fund today. *Black Farmers*, 953 F. Supp. 2d at 99. And, as already discussed, the "considerations … that reveal this case to be dissimilar" to the typical case would justify a *higher* percentage—not a lower one. *Id.*[2]

### 7. The size of the award supports the requested fee.

That leaves the last factor. Although the requested fee award is sizable ($23,863,345.02), it pales in comparison to the relief obtained for the class. And because "[t]he result is what matters" most in the end, when "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *see also Quimby*, 107 Fed. Cl. at 133.

As explained earlier, the relief that the settlement provides to class members is remarkable. The total value of the settlement is $125 million, and every class member will be reimbursed, up to

---

[2] A decade ago, this Court described a "megafund" as a recovery of "$100 million or more." *Black Farmers*, 953 F. Supp. 2d at 98. That amount would equal more than $140 million in today's dollars, so this case wouldn't qualify as a megafund even under that definition. Moreover, as Professor Fitzpatrick explains, lowering the percentage simply because the common fund is over $100 million could "actually make class counsel *better off* by resolving a case for less rather than more if it is not done only on the margin (e.g., only for the *portion* above $100 million)." Fitzpatrick Decl. ¶ 17. This case provides an example. If the common fund were $99 million instead of $125 million, the same requested fee would be about 24% of the fund—well within the typical range. It would be irrational to punish class counsel for doing better by the class. *See Synthroid*, 264 F.3d at 718 ("This means that [class] counsel … could have received [more] fees" had they not "obtained an extra $14 million for their clients … Why there should be such a notch is a mystery. Markets would not tolerate that effect."). In any event, as this Court observed (and as the data shows), "even in megafund cases involving recoveries of $100 million or more, fees of fifteen percent are common." *Black Farmers*, 953 F. Supp. 2d at 98 (cleaned up).

$350, for PACER fees that they paid between April 21, 2010 and May 31, 2018. Those who paid more than $350 in fees during that period will receive $350 plus their pro rata share of the remaining settlement funds. And the relief will be provided in a highly efficient manner. This would be a terrific outcome for the class even if it were achieved after trial, but it is especially good given the substantial costs, risks, and delays presented by pursuing further litigation against the federal judiciary—including the very real risk that the plaintiffs would ultimately not prevail at all. As compared to this result for the class, the requested fee is fair and reasonable.

### C.     A lodestar cross-check, although not required, would only confirm the reasonableness of the requested fee.

Courts sometimes use a "lodestar cross-check" to further inform the reasonableness of a percentage fee. *See Health Republic*, 58 F.4th at 1372, 1374 n.2; Fitzpatrick Decl. ¶ 22 (noting that a "significant minority of courts" do so). Such a cross-check is not required by D.C. Circuit or Federal Circuit precedent. The danger with the lodestar cross-check is that it "brings through the backdoor all of the bad things the lodestar method used to bring through the front door. Not only does the court have to concern itself again with class counsel's timesheets, but, more importantly, it reintroduces the very same misaligned incentives that the percentage method was designed to correct in the first place." Fitzpatrick Decl. ¶ 23. To illustrate, Professor Fitzpatrick hypothesizes a case in which "a lawyer had incurred a lodestar of $1 million in a class action case. If that counsel believed that a court would not award him a 25% fee if it exceeded twice his lodestar, then he would be *rationally indifferent* between settling the case for $8 million and $80 million (or any number higher than $8 million). Either way he will get the same $2 million fee. Needless to say, the incentive to be indifferent as to the size of the settlement is not good for class members." Fitzpatrick Decl. ¶ 24. 25.

When courts nevertheless elect to conduct a cross-check, they do so "by dividing the proposed fee award by a lodestar calculation, resulting in a lodestar multiplier." *Health Republic*, 58 F.4th at 1372 (cleaned up). Because the multiplier "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work," *Rite Aid*, 396 F.3d at 306, courts that elect to perform a lodestar cross-check should "take care to explain how the application of a multiplier is justified by the facts of a particular case," while also considering the "multipliers used in comparable cases," *Health Republic*, 58 F.4th at 1375.

At the same time, courts must keep in mind that "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Rite Aid*, 396 F.3d at 307. This general principle has two relevant corollaries: The first is that the "multiplier need not fall within any pre-defined range." *Health Republic*, 58 F.4th at 1375; *see Rite Aid*, 396 F.3d at 307 ("[T]he resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award."); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (rejecting the argument "that any percentage fee award exceeding a certain lodestar multiplier is excessive"). Were it otherwise, and the multiplier could serve to cap fees, it would "eliminate counsel's incentive to press for a higher settlement" in many cases, *Williams*, 658 F.3d at 636 (cleaned up)—and thus "reintroduce[] the very same misaligned incentives that the percentage method was designed to correct in the first place," Fitzpatrick Decl. ¶ 23. The second corollary is that "mathematical precision" is not required in a cross-check. *Rite Aid*, 396 F.3d at 306. "Requiring the Court to examine and evaluate [] detailed" time records "would defeat one of the primary benefits of the 'percentage of the fund' method"—conserving 'judicial resources" and preventing "delay in distribution of the common fund to the class." *Black Farmers*, 953 F. Supp. 2d at 101 n.8. Heeding these two corollary principles helps to ensure that the lodestar cross-check is used truly as a cross-check—and not just a way of "bring[ing] through the backdoor all of the bad things the lodestar

method used to bring through the front door." *See* Fitzpatrick Decl. ¶¶ 23–25 ; *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 729 (2d Cir. 2023) (Jacobs, J., concurring) (noting that the cross-check, if it operates as a hard cap on fees, can provide "an incentive for counsel to prolong litigation and maximize billable hours to arrive at a lodestar that does not operate as a cap on a percentage award").

In this case, class counsel's lodestar is $6,031,678.25, yielding a lodestar multiplier of less than 3.96. *See* Gupta Decl. ¶ 64; Oliver Decl. ¶ 13. That is in line with a standard multiplier. *See* Fitzpatrick Dec. ¶ 27. As the Federal Circuit recently remarked, a multiplier of up to four is the "norm." *Health Republic*, 58 F.4th at 1375; *see also Black Farmers*, 953 F. Supp. 2d at 102 ("Multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied." (cleaned up)); *Kane Cnty.*, 145 Fed. Cl. at 20 ("[A] multiplier of approximately 6.13 … is within the range courts have approved in common fund cases."); *Geneva Rock Prods.*, 119 Fed. Cl. at 595 ("[A]n award 5.39 times the lodestar is reasonable … given the complexity of the litigation, the diligent and skillful work by class counsel, and the pendency of the case for over six years."); *Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131, 135 (3d Cir. 2011) ("Although the lodestar multiplier need not fall within any pre-defined range, we have approved a multiplier of 2.99 in a relatively simple case." (cleaned up)). And a higher multiplier may be justified by the circumstances of a "particular case," including "the risk of nonpayment," the lack of significant "object[ion] to the award," and whether the notice indicated an "agreement by the class to a specified percentage." *Health Republic*, 58 F.4th at 1375–77.[3]

--------

[3] This total figure includes $3,271,090.25 and $1,860,588.00 in lodestar incurred to date by Gupta Wessler and Motley Rice, respectively, as well as projected future work that will produce an additional lodestar of about $900,000. Gupta Decl. ¶ 62 ($400,000 for Gupta Wessler); Oliver Decl. ¶ 9 ($500,000 for Motley Rice). The past lodestar figures, standing alone, are "incomplete," *Black Farmers*, 953 F. Supp. 2d at 102, because they do not include work that class counsel will perform

All these features are present in this case. As one judge on this Court has explained: "The flaw with comparisons to fees in other cases, of course, is that they inevitably tend to focus on averages and medians and ranges. This case, however, was anything but average." *Fed. Nat'l Mortgage Ass'n*, 4 F. Supp. 3d at 112. The same point applies here. *Id.* Far from being a "relatively simple case," *Milliron*, 423 F. App'x at 135, "there is no question that this litigation was lengthy, highly complex, and vigorously contested," *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 112. The "complexity and duration of the case," "high risk of nonpayment," and "skill and performance of the attorneys" distinguish this case from the ordinary case, justifying an above-average multiplier. *Id.* And the lack of significant "object[ion] to the award," and the notice language signaling an "agreement by the class to a specified percentage" that greatly *exceeds* the fee requested here, only

---

going forward—including responding to inquiries from class members about legal issues, damages calculations, and the mechanics of the settlement; responding to potential objections and filing any replies in support of the settlement; preparing for and participating in the fairness hearing; handling any appeal; assisting class members during the settlement-administration process and ensuring that it is carried out properly; and addressing any unanticipated issues that may arise. *See Geneva Rock Prods., Inc. v. United States*, 119 Fed. Cl. 581, 595 (2015), *rev'd on other grounds sub nom. Longnecker Prop. v. United States*, 2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) ("When cross-checking an award," the lodestar "must be augmented … to reflect the additional time that has been and will be spent by class counsel on the request for the court's approval of the settlement, the fairness hearing and supplemental submissions, and further settlement obligations"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 746 Fed. App'x 655, 659 (9th Cir. 2018) (finding it appropriate for cross-check to "compar[e] the fee award to a lodestar that included projected work," such as work "defend[ing] against appeals and assist[ing] in implementing the settlement"). The projected figures here are based in part on an extrapolation of the settlement-related work performed in recent months and are appropriately included as part of the lodestar. *See, e.g., Martin v. Toyota Motor Credit Corp.*, 2022 WL 17038908, at *14 (C.D. Cal. Nov. 15, 2022) ("Class Counsel additionally estimate they will incur at least an additional $600,000 in fees … . Although this is merely a projection, the Court finds that projected fees are appropriate considerations in lodestar cross-checks." (cleaned up)); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *40 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, 999 F.3d 1247, 1278 (11th Cir. 2021) (explaining that a "reasonable estimate" of future time—there, 10,000 hours—may properly be included in conducting a lodestar cross-check, because, "[i]f the fee was lodestar-based, class counsel would be entitled to file supplemental applications for future time"; "[e]xcluding such time thus would misapply the lodestar methodology and needlessly penalize class counsel").

drive the point home. *Health Republic*, 58 F.4th at 1375–77; *see* Fitzpatrick Decl. ¶ 26 ("[A]t the outset of the litigation, would class members have objected to paying class counsel 19% of whatever was recovered here? We do not have to guess at the answer: despite the opportunity to opt out when they received the class certification notice advising them of a fee request *even greater* than this one, the original class—which … are largely sophisticated parties like lawyers and large institutions— decided not to opt out. … [N]ew class members are currently being given the same chance.").

In fact, "the risk of nonpayment" alone justifies the multiplier. *Health Republic*, 58 F.4th at 1375. A simple math exercise shows why. To "properly incentivize … contingency representation," a multiplier would have to at least be "the inverse of the riskiness of the case." Fitzpatrick Decl. ¶ 28. Here, there were at least three novel, fiercely contested, and independently case-dispositive issues: Is there jurisdiction (including a cause of action and waiver of sovereign immunity) for this claim? Can a class action for monetary relief be certified against the federal judiciary? And did the judiciary violate the statute, and do so in a way that created liability? If the government prevailed on even just one of these issues, there would no classwide liability and therefore no attorneys' fees. So if the government had even a 40% chance of prevailing on any of these independent issues, that would meant that the plaintiffs had little more than a 20% chance of obtaining any classwide relief when the case was filed—fully justifying a multiplier of five. And, if Professor Fitzpatrick were right that "[n]one of these questions were even 50-50 propositions for the class when this litigation began," the multiplier would have to be over eight to account for the risk. *Id.* ¶ 20. Hence his conclusion that, "in light of the extreme risks involved here," the multiplier is "below what would have been needed to properly incentivize this contingency representation." *Id.* ¶ 28.

"Applying a lodestar cross-check, therefore, confirms that the award sought by class counsel is neither unusual nor unreasonable." *Black Farmers*, 953 F. Supp. 2d at 102. To the contrary, the cross-check "yields an award consistent with the one derived from the application of the percentage

[method]," confirming the reasonableness of the requested fee. *Kane Cnty.*, 145 Fed. Cl. at 20. The litigation and settlement-administration expenses incurred by class counsel were reasonable and should be reimbursed from the common fund.

"In addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *Fed. Nat'l Mortg. Ass'n*, 4 F. Supp. 3d at 113; *see Mercier*, 156 Fed. Cl. at 593 ("It is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund."); Fed. R. Civ. P. 23(h); *see also, e.g.*, *Kane Cnty.*, 145 Fed. Cl. at 20–21.

Here, class counsel incurred $29,654.98 in expenses. Many of these expenses were for hiring the mediator and for travel costs, and each expense was actually and reasonably incurred. *See* Oliver Decl. ¶¶ 14–19. Accordingly, class counsel should be reimbursed for these reasonable, out-of-pocket expenses. *See Quimby*, 107 Fed. Cl. at 135.

In addition, the settlement authorizes KCC to retain from the common fund all notice and administration costs actually and reasonably incurred. KCC originally provided class counsel with a total not-to-exceed amount of $977,000, which we have revised to include an additional $100,000 to account for previously unanticipated complexities. *See* Oliver Decl. ¶ 19. We ask that this amount be set aside to cover current and "future administrative fees and costs." *Quimby*, 107 Fed. Cl. at 135.

## IV.   The Court should award each of the three class representatives $10,000 for their contributions to the case.

Finally, class counsel seeks service awards (also known as case-contribution awards) for each class representative. "Case contribution awards recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions." *Mercier*, 156 Fed. Cl. at 589 (awarding $20,000 per representative). This Court has already recognized that "the nonprofit organizations who are named plaintiffs in this case make particularly good class representatives" because they

"have dual incentives to reduce PACER fees, both for themselves and for the constituents that they represent." ECF No. 33 at 14. It should now recognize that their service justifies a modest award.

The three named plaintiffs here took on considerable risk and responsibility when they agreed to serve as class representatives. They all "consulted regularly with counsel throughout the litigation and were actively involved in all material aspects of the lawsuit." *Mercier*, 156 Fed. Cl. at 589; *see* Rossman Decl. ¶¶ 2–3; Burbank Decl. ¶¶ 4–6; Brooks Decl. ¶ 2. In fact, the individuals at each organization who participated in the case are themselves lawyers, and they estimate that, for each organization, the full requested award may be justified based solely on the amount of attorney time spent working on the case. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2.

Yet there is another reason to grant the requested awards here. Just as "it takes courage to be the public face of litigation against one's employer," *Mercier*, 156 Fed. Cl. at 589, it also takes courage for legal-advocacy organizations to be the public face of litigation against the federal-court system. *See* Rossman Decl. ¶ 2; Burbank Decl. ¶ 5. Thus, whether the Court wants to focus on "the contributions of the named representatives" or "the risks they bore," both were "unique." *Mercier*, 156 Fed. Cl. at 590. And together, they undoubtedly justify an award of $10,000 per representative.

## CONCLUSION

This Court should grant the motion and enter the proposed order. In addition to approving the settlement, the Court should award 20% of the settlement fund to cover attorneys' fees, notice and settlement costs, litigation expenses, and service awards. Specifically, the Court should (1) award $10,000 to each class representative, (2) award $29,654.98 to class counsel to reimburse litigation expenses, (3) order that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) award the remainder (19.1% of the settlement fund, or $23,863,345.02) to class counsel as attorneys' fees.

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com

WILLIAM H. NARWOLD
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
(860) 882-1676
bnarwold@motleyrice.com

MEGHAN S.B. OLIVER
CHARLOTTE E. LOPER
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
moliver@motleyrice.com
cloper@motleyrice.com

August 28, 2023

Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2023, I electronically filed this motion and related documents through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Deepak Gupta
Deepak Gupta