IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
                                    *Plaintiffs*,

                v.

UNITED STATES OF AMERICA,
                                    *Defendant*.

Case No. 16-745

### DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am the founding principal of Gupta Wessler LLP, one of the two law firms appointed as lead class counsel by this Court on January 24, 2017. *See* ECF Nos. 32 & 33. Along with my partner Jonathan E. Taylor and our co-counsel at Motley Rice LLC, I have represented the plaintiffs throughout this litigation. I am submitting this declaration in support of the plaintiffs' motion for final approval of the class settlement and for attorneys' fees, costs, and service awards. This declaration is accompanied by four exhibits: a copy of the executed settlement agreement (Exhibit A), a copy of the executed supplemental agreement (Exhibit B), a copy of a second amendment making further technical modifications (Exhibit C), a copy of my law firm biographical page (Exhibit D), and a copy of my colleague Jonathan Taylor's biographical page (Exhibit E).

### *Background on PACER Fees*

2.      The Administrative Office of the U.S. Courts (AO) requires people to pay fees to access records through its Public Access to Court Electronic Records system, commonly known as

PACER. This lawsuit was brought to challenge the lawfulness of those fees for one reason: the fees far exceed the cost of providing the records.

3.      By statute, the federal judiciary has long had the authority to impose PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But in 2002, Congress found that PACER fees (then set at $.07 per page) were "higher than the marginal cost of disseminating the information." S. Rep. 107-174, at 23 (2002). Congress sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by authorizing fees "only to the extent necessary." 28 U.S.C. § 1913 note.

4.      Despite this statutory limitation designed to *reduce* PACER fees, the AO twice *increased* PACER fees in the years after the E-Government Act's passage—first to $.08 per page and then to $.10 per page. And it did so over a period when the costs of electronic data storage plunged exponentially.

5.      The result has been a widely unpopular PACER fee regime that has hindered equal access to justice, imposed serious barriers for low-income and *pro se* litigants, discouraged academic research and journalism, and thus inhibited public understanding of the courts. And the AO has further compounded those harms by discouraging fee waivers, even for pro se litigants, journalists, researchers, and nonprofits; by prohibiting the free transfer of information by those who obtain waivers; and by hiring private collection lawyers to sue people who could not afford to pay the fees.

6.       I first became aware of the practical problems and dubious legality of PACER fees, and first considered whether litigation could be brought to address the issue, when I was a staff attorney at the nonprofit Public Citizen Litigation Group between 2005 and 2011. Government transparency was among the group's specialties, and I followed the efforts of Carl Malamud of Public.Resource.org, who led a sustained campaign to draw public attention to PACER fees and

persuade the AO to make PACER free. As I recall, my colleagues and I considered the possibility of bringing litigation to challenge PACER fees but were unable to identify a viable legal path.

7.      Until this case was filed, litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime, for at least three main reasons. First, the judiciary has statutory authority to charge at least *some* amount in fees, so litigation alone could never result in a free PACER system—the ultimate goal of reformers. Second, few practicing litigators, let alone those who specialize in complex federal litigation, were likely to be eager to sue the federal judiciary and challenge policy decisions made by the Judicial Conference of the United States. They were even less likely to commit considerable time and resources to litigation when the prospect of recovery was so uncertain. Third, even if PACER fees could be shown to be excessive and even if qualified counsel could be secured, the fees were still assumed to be beyond the reach of litigation. The judiciary is exempt from the Administrative Procedure Act, so injunctive relief is unavailable. And advocates were unable to identify an alternative basis for jurisdiction, a cause of action, and a waiver of sovereign immunity to challenge PACER fees in court.

8.      I am aware of only one previous lawsuit directly challenging the PACER fee schedule; that suit was dismissed for lack of jurisdiction. *See Greenspan v. Admin. Office*, No. 14-cv-2396 (N.D. Cal.). I am also aware of one previous effort to challenge the AO's policy on fee waivers, which also foundered on jurisdiction. In 2012, journalists at the Center for Investigative Reporting applied "for a four-month exemption from the per page PACER fee." *In re Application for Exemption from Elec. Pub. Access Fees*, 728 F.3d 1033, 1035–36 (9th Cir. 2013). They "wanted to comb court filings in order to analyze 'the effectiveness of the court's conflict-checking software and hardware to help federal judges identify situations requiring their recusal,'" and they "planned to publish their findings" online. *Id.* at 1036. But their application was denied because policy notes accompanying

the PACER fee schedule instruct courts not to provide a fee waiver to "members of the media." *Id.* at 1035. The Ninth Circuit held that it could not review the denial. *Id.* at 1040.

9. With litigation seemingly unavailable as a pathway, advocates for PACER reform had largely devoted their efforts to grassroots and technological strategies: making certain records available in an online database that could be accessed for free, downloading records in bulk, or mounting public-information campaigns to expand access. At one point, for example, when the judiciary initiated a free trial of PACER at several libraries, Carl Malamud encouraged activists "to push the court records system into the 21st century by simply grabbing enormous chunks of the database and giving the documents away." John Schwartz, *An Effort to Upgrade a Court Archive System to Free and Easy*, N.Y. Times (Feb. 12, 2009). An enterprising 22-year-old activist named Aaron Swartz managed to download millions of documents before the AO responded by pulling the plug on the free trial and calling in the FBI to investigate Swartz. *Id.* This heavy-handed response was seen by many as motivated by a desire to protect fee revenue at the expense of public access. Today, the Free Law Project and the Center for Information Technology Policy at Princeton University operate a searchable collection of millions of PACER documents and dockets that were gathered using their RECAP software, which allows users to share the records they download.

10. These efforts have been important in raising public awareness, and ameliorating the effects of PACER fees, but they have not eliminated or reduced the fees themselves. To the contrary, the fees have only continued on their seemingly inexorable—and indefensible—rise.

### *Overview of this Litigation*

11. Then came this case. On April 21, 2016, three nonprofits filed this lawsuit, asking this Court to declare that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges during the limitations period. They sued under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an

illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). Because that Act provides jurisdiction only for claims seeking monetary relief based on past overcharges, and because the judiciary is not subject to the APA, *see* 5 U.S.C. §§ 701(b)(1)(B) & 704, the plaintiffs could not seek any injunctive relief or other relief requiring the judiciary to lower PACER fees going forward. They therefore limited their requested relief to retroactive monetary relief.

12.     From the start, the plaintiffs were represented by a team of lawyers at our firm, Gupta Wessler LLP, a litigation boutique with experience bringing complex cases involving the federal government, and Motley Rice LLC, one of the nation's leading class-action firms. By the time that we filed this lawsuit together (as further detailed in my declaration in support of class certification, ECF No. 8-1, and as described further below), the two law firms together had an unparalleled combination of experience and expertise in prosecuting class claims for monetary relief against the federal government.

13.     In its first year, the litigation met with early success when this Court (Judge Ellen Huvelle) denied the government's motion to dismiss in December 2016. ECF Nos. 24 & 25. A month later, on January 24, 2017, the Court certified a nationwide opt-out class of all individuals and entities who paid fees for the use of PACER between April 21, 2010, and April 21, 2016, excluding federal-government entities and class counsel. ECF Nos. 32 & 33. The Court certified the plaintiffs' Little Tucker Act illegal-exaction claim for classwide treatment and appointed my firm and Motley Rice as co-lead class counsel. *Id.*

14.     The plaintiffs then submitted a proposal for class notice and retained KCC Class Action Services (KCC) as claims administrator. ECF Nos. 37 & 42. The Court approved the plan in April 2017, ECF No. 44, and notice was provided to the class in accordance with the Court's order. Of the approximately 395,000 people who received notice, about 1,100 opted out of the class.

15.     Informal discovery followed. It revealed that the judiciary had used PACER fees on a variety of categories of expenses during the class period. These include not only a category labeled by the judiciary as "Public Access Services," but also the following categories of expenses: "Case Management/Electronic Case Files System" (CM/ECF); "Electronic Bankruptcy Notification" (EBN); "Communications Infrastructure, Services, and Security" (or "Telecommunications"); "Court Allotments"; and then four categories of expenses falling under the heading "Congressional Priorities"—"Victim Notification (Violent Crime Control Act)," "Web-based Juror Services," "Courtroom Technology," and "State of Mississippi."

16.     The parties subsequently filed competing motions for summary judgment as to liability only, "reserving the damages determination for after formal discovery." ECF No. 52 at 1. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER and that the government was liable because the fees exceeded that amount. The government, by contrast, took the position that all PACER fees paid by the class were permissible. It argued that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." ECF No. 89 at 24.

17.     On March 31, 2018, this Court took a third view. As the Court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." *NVLSP v. United States*, 291 F. Supp. 3d 123, 148 (D.D.C. 2018). The Court thus concluded that the AO "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror [Services], and most of the expenditures for Courtroom Technology." *Id.* at 145–46.

18.     Within months, the judiciary took steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries

and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018*, at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories." *Id.*

19.     Meanwhile, both parties sought permission for an interlocutory appeal from this Court's decision, and the U.S. Court of Appeals for the Federal Circuit accepted both appeals to decide the scope of the statutory authorization to charge fees. The parties adhered to their same interpretations of the statute on appeal. In addition, the government argued that the court lacked jurisdiction, so the class was not entitled to damages even assuming that the AO had violated the statute.

20.     On appeal, the plaintiffs "attracted an impressive array of supporting briefs from retired judges, news organizations, civil rights groups," the "sponsor of the 2002 law" (Senator Joseph Lieberman) and legal-technology firms—all detailing the practical harms caused by excessive PACER fees. Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times (Feb. 4, 2019), https://perma.cc/LN5E-EBE9. Prominent media outlets, like the *New York Times*, published editorials championing the lawsuit. *See Public Records Belong to the Public*, N.Y. Times (Feb. 7, 2019), https://perma.cc/76P8-WFF7. And by the end of 2019, the judiciary announced that it was doubling the quarterly fee waiver for PACER from \$15 to \$30, which had the effect of eliminating PACER fees for approximately 75% of PACER users. *See* Kimberly Robinson, *Judiciary Doubles Fee Waiver for PACER Access to Court Records*, Bloomberg Law (Sept. 17, 2019), https://perma.cc/CHF3-XVTT; Theresa A. Reiss, Cong. Research Serv., LSB10672, *Legislative & Judicial Developments*

*Affecting Public Access to Court Electronic Records (PACER)* 1 (Feb. 1, 2022), https://perma.cc/WT8K-G64X.

21.     In August 2020, the Federal Circuit unanimously rejected the government's jurisdictional argument and largely affirmed this Court's conclusions. It "agree[d] with the district court's interpretation that § 1913 Note limits PACER fees to the amount needed to cover expenses incurred in services providing public access to federal court electronic docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). It also "agree[d] with the district court's determination that the government is liable for the amount of the [PACER] fees used to cover the Mississippi Study, VCCA Notifications, E-Juror Services, and most Courtroom Technology expenses" (specifically, those that were not "used to create digital audio recordings of court proceedings"). *Id.* at 1357–58. The Federal Circuit noted that CM/ECF was "one other potential source of liability," because the court was not able to confirm whether all "those expenses were incurred in providing public access to federal court electronic docketing information." *Id.* The court left it to this Court's "discretion whether to permit additional argument and discovery regarding the nature of the expenses within the CM/ECF category and whether [PACER] fees could pay for all of them." *Id.*

22.     Following the Federal Circuit's decision, the House of Representatives passed a bipartisan bill to eliminate PACER fees, and a similar proposal with bipartisan support advanced out of the Senate Judiciary Committee. *See* Reiss, *Legislative & Judicial Developments Affecting PACER* at 1–2; Senate Judiciary Committee, *Judiciary Committee Advances Legislation to Remove PACER Paywall, Increase Accessibility to Court Records* (Dec. 9, 2021), https://perma.cc/8WBB-FTDY; Nate Raymond, *Free PACER? Bill to end fees for online court records advances in Senate*, Reuters (Dec. 9, 2021), https://perma.cc/H29N-C52M. Notes from a closed March 2022 meeting showed that "[t]he Judicial Conference of the United States [also now] supported offering free public access to the

federal court records system for noncommercial users." Craig Clough, *Federal Judiciary Policy Body Endorses Free PACER Searches*, Law360 (May 31, 2022), https://perma.cc/YP8M-Q5CK.

### *The Settlement Negotiations*

23.     On remand, the case was reassigned to Judge Paul Friedman, and the parties came together to discuss the path forward. They understood that, were the case to remain on a litigation track, there would be significant uncertainty and delay. Years of protracted litigation lay ahead, including a lengthy formal discovery process that could require the judiciary to painstakingly reconstruct line-item expenses and likely a second appeal and a trial on damages. And the range of potential outcomes was enormous: On one side, the government maintained that it owed *no* damages because the plaintiffs could not prove that, but for the unlawful expenditures, PACER fees would have been lower—a litigating position that also made it difficult for the judiciary to lower fees during the pendency of the litigation. The government further maintained that, in any event, the full category of CM/ECF was properly funded with PACER fees. On the other side, the plaintiffs maintained that liability had been established, and that some portion of CM/ECF was likely improper.

24.     Hoping to bridge this divide and avoid years of litigation, the parties were able to agree on certain structural aspects of a potential settlement, and they agreed to engage in mediation on the amount and details. On December 29, 2020, at the parties' request, Judge Friedman stayed the proceedings until June 25, 2021 to allow the parties to enter into private mediation.

25.     Over the next few months, the parties prepared and exchanged information and substantive memoranda, with detailed supporting materials, which together provided a balanced and comprehensive view of the strengths and weaknesses of the case. The parties scheduled an all-day mediation for May 3, 2021, to be supervised by Professor Eric D. Green, a retired Boston University law professor and one of the nation's most experienced and accomplished mediators.

26.     With Professor Green's assistance, the parties made considerable progress during the session in negotiating the details of a potential classwide resolution. The government eventually agreed to structure the settlement as a common-fund settlement, rather than a claims-made settlement, and the plaintiffs agreed to consider the government's final offer concerning the total amount of that fund, inclusive of all settlement costs, attorneys' fees, and service awards.

27.     But by the time the session had ended, the parties still hadn't reached agreement on the total amount of the settlement or several other key terms—including how the funds would be distributed, what to do with any unclaimed funds after the initial distribution, and the scope of the release. Professor Green continued to facilitate settlement discussions in the days and weeks that followed, and the parties were able to agree on the total amount of the common fund, inclusive of all settlement costs, attorneys' fees, and service awards. The parties then spent several months continuing to negotiate other key terms, while this Court repeatedly extended its stay to allow the discussions to proceed.

28.     Further progress was slow, and at times the parties reached what could have been insurmountable impasses. A particular sticking point concerned the allocation of settlement funds. Consistent with the parties' starkly differing litigating positions on both liability and damages, the plaintiffs argued that funds should be distributed pro rata to class members, while the government vigorously insisted that any settlement include a large minimum amount per class member, which it maintained was in keeping with the AO's longstanding policy and statutory authority to "distinguish between classes of persons" in setting PACER fees—including providing waivers— "to avoid unreasonable burdens and to promote public access to such information," 28 U.S.C. § 1913 note. Over a period of many months, the parties were able to resolve their differences and reach a compromise of these competing approaches: a minimum payment of $350—the smallest amount that the government would agree to—with a pro rata distribution beyond that amount.

The final version of the agreement was executed on July 27, 2022. *See* Ex. A. The parties later executed two supplemental agreements making certain technical modifications to the agreement. *See* Ex. B & C.

### The Parties' Settlement

29. As clarified by the supplemental agreement, the settlement defines the class as all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the class period"), excluding opt-outs, federal agencies, and class counsel. Ex. A ¶ 3 & Ex. B. This definition includes all members of the class initially certified by this Court in January 2017—those who paid PACER fees between April 21, 2010 and April 21, 2016—as well those who do not meet that definition, but who paid PACER fees between April 22, 2016 and May 31, 2018. Ex. A ¶ 4. Because this second group of people are not part of the original class, they did not receive notice or an opportunity to opt out when the original class was certified. For that reason, under the settlement, these additional class members will receive notice and an opportunity to opt out. *Id.*

30. The settlement provides for a total common-fund payment by the United States of $125 million, which covers monetary relief for the class's claims, interest, attorneys' fees, litigation expenses, administrative costs, and any service awards to the class representatives. *Id.* ¶ 11. Once this Court has ordered final approval of the settlement and the appeal period for that order has expired, the United States will pay this amount to the claims administrator (KCC) for deposit into a settlement trust (to be called the "PACER Class Action Settlement Trust"). *Id.* ¶¶ 12, 16. This trust will be established and administered by KCC, which will be responsible for distributing proceeds to class members. *Id.* ¶ 16. In exchange for their payments, class members agree to release all claims that they have against the United States for overcharges related to PACER usage during the class period. *Id.* ¶ 13. This release does not cover any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.), the only pending PACER-fee related lawsuit of which the AO is aware. Ex.

A ¶ 13. The amount of settlement funds disbursed to any class member in this case, however, will be deducted from any monetary recovery that the class member may receive in *Fisher*. *Id.*

31.     Within 90 days of a final order from this Court approving the settlement, the AO will provide KCC with the most recent contact information that it has on file for each class member, and with the information necessary to determine the amount owed to each class member. *Id.* ¶ 14. This information will be subject to the terms of the April 3, 2017 protective order entered by this Court (ECF No. 41), the extension of which the parties will be jointly requesting from this Court. Ex. A ¶ 14. After receiving this information, KCC will then be responsible for administering payments from the settlement trust in accordance with the agreement. *Id.*

32.     Under the settlement, class members will not have to submit a claim or to receive their payment. *Id.* Instead, KCC has and will continue to use whatever methods are most likely to ensure that class members receive payment and will make follow-up attempts if necessary. *Id.*

33.     The settlement provides that the trust funds be distributed as follows: KCC will first retain from the trust all notice and administration costs actually and reasonably incurred. *Id.* ¶ 18. KCC will then distribute any service awards approved by the Court to the named plaintiffs and any attorneys' fees and costs approved by the Court to class counsel. *Id.* After these amounts have been paid from the trust, the remaining funds ("Remaining Amount") will be distributed to class members. *Id.* The Remaining Amount will be no less than 80% of the $125 million paid by the United States. *Id.* In other words, the settlement entitles class members to at least $100 million.

34.     ***First distribution.*** KCC will distribute the Remaining Amount to class members like so: It will allocate to each class member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that class member during the class period. *Id.* ¶ 19. KCC will add up each minimum payment amount for each class member, producing the Aggregate Minimum Payment Amount. *Id.* It will then deduct this Aggregate Minimum Payment

Amount from the Remaining Amount and allocate the remainder pro rata to all class members who paid more than $350 in PACER fees during the class period. *Id.*

35.     Thus, under this formula: (a) each class member who paid no more than $350 in PACER fees during the class period will receive a payment equal to the total amount of PACER fees paid by that class member during the class period; and (b) each class member who paid more than $350 in PACER fees during the class period will receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount. *Id.* ¶ 20.

36.     KCC will complete disbursement of each class member's share of the recovery within 90 days of receiving the $125 million from the United States, or within 21 days after receiving the necessary information from AO, whichever is later. *Id.* ¶ 21. KCC will complete disbursement of the amounts for attorneys' fees and litigation expenses to class counsel, and service awards to the named plaintiffs, within 30 days of receiving the $125 million. *Id.* KCC will keep an accounting of the disbursements made to class members, including the amounts, dates, and status of payments made to each class member, and will make all reasonable efforts, in coordination with class counsel, to contact class members who do not deposit their payments within 90 days. *Id.* ¶ 22.

37.     ***Second distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the trust one year after the $125 million payment by the United States, those funds ("the Remaining Amount After First Distribution") will be distributed in the following manner. *Id.* ¶ 23. First, the only class members eligible for a second distribution will be those who (1) paid more than $350 in PACER fees during the class period, and (2) deposited or otherwise collected their payment from the first distribution. *Id.* Second, KCC will determine the number of class members who satisfy these two requirements and are therefore eligible for a second distribution. *Id.* Third, KCC will then distribute to each such class member an equal allocation of the Remaining Amount After

First Distribution, subject to the caveat that no class member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the class member paid during the class period. *Id.* Prior to making the second distribution, KCC will notify the AO that unclaimed or undistributed funds remain in the trust. *Id.* ¶ 24. Class members who are eligible to receive a second distribution will have three months from the time of the distribution to collect their payments. *Id.* If unclaimed or undistributed funds remain in the settlement trust after this three-month period expires, those funds will revert to the U.S. Treasury. *Id.* Upon expiration of this three-month period, KCC will notify the AO of this reverter, and the AO will provide KCC with instructions to effectuate the reverter. *Id.*

38.     ***Fairness hearing.*** The agreement further provides that, within 75 days of its execution—that is, by October 11, 2022—the plaintiffs will submit to the Court a motion for an order approving settlement notice to the class under Rule 23(e). *Id.* ¶ 27, Ex. B.

39.     Consistent with the agreement, the plaintiffs are applying to this Court for an award of attorneys' fees and reimbursement of litigation expenses, and for service awards for the class representatives in amounts not to exceed $10,000 per representative. Ex. A ¶ 28. As noted above, these awards will be paid out of the settlement trust and will not exceed 20% of the $125 million paid by the United States. *Id.* The motion for an award of attorneys' fees and litigation expenses is subject to this Court's approval, and class members have the right to object to the motion. *Id.*

40.     Within 30 days of the order approving settlement notice to the class (or within 30 days of KCC's receipt of the necessary information from the AO, if later), KCC provided notice via email to class members for whom the AO has an email address. *Id.* ¶ 29; Ex. C ¶ 2. Within 45 days of the order approving settlement notice, KCC sent postcard notice via U.S. mail to all class members for whom the AO does not have an email address or for whom email delivery was unsuccessful. Ex. A ¶ 29; Ex. C ¶ 5. KCC has also provided the relevant case documents on a

website it has maintained that is dedicated to the settlement (www.pacerfeesclassaction.com). Ex. A ¶ 29; Ex. C ¶ 3. The notice included an explanation of the procedures for allocating and distributing the trust funds, the date upon which the Court will hold a fairness hearing under Rule 23(e), and the date by which class members must file their written objections, if any, to the settlement. Ex. A ¶ 29. The notice sent to the additional class members—those who are not part of the class already certified by this Court—also informed them of their right to opt out and the procedures through which they may exercise that right. Ex. C ¶ 6. The opt-out period for these additional class members is 90 days. *Id.*

41.     Any class member may express their views supporting or opposing the fairness, reasonableness, and adequacy of the proposed settlement. Ex. A ¶ 30. Counsel for the parties may respond to any objection within 21 days after receipt of the objection. *Id.* ¶ 31. Any class member who submits a timely objection to the proposed settlement—that is, an objection made at least 30 days before the fairness hearing—may appear in person or through counsel at the fairness hearing and be heard to the extent allowed by the Court. *Id.* ¶ 32; Ex. C ¶ 7.

42.     After the deadlines for filing objections and responses have lapsed, the Court will hold the fairness hearing at which it will consider any timely and properly submitted objections made by class members to the proposed settlement. Ex. A ¶ 33. The Court will decide whether to enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. *Id.*

*         *         *

43.     This settlement is the result of more than seven years of hard-fought litigation, including more than a year of careful negotiation by the parties. It is, in my view and the view of the three class representatives, an excellent settlement for the class. Before this case was filed, there was no historical precedent for bringing suit against the federal judiciary—*in* the federal judiciary—

based on fees charged *by* the federal judiciary. Now there is. If approved, the settlement will deliver real relief to every single class member: a full refund of up to $350 for any PACER fees that each class member paid during the class period, plus additional amounts for class members who paid more than $350 in PACER fees during that period. According to data provided by the government, this means that the vast majority of class members will receive a full refund—100 cents on the dollar—for the PACER fees that they paid during the class period.

44.     And the settlement will provide this relief quickly. Whereas litigating the case to a final judgment would take years—with no guarantee of *any* recovery for class members given the government's legal position—the settlement will produce a final judgment in a matter of months. Moreover, although the settlement does not include injunctive relief, that is only because this relief is unavailable against the judiciary. After this litigation was filed, however, Congress began taking steps to eliminate PACER fees, and there is now a Federal Circuit decision that interprets (and imposes limits on) the statute authorizing fees, while making clear that PACER users have a cause of action to challenge such fees in the future. It is hard to imagine a better result for the class.

### Class Counsel's Experience and Qualifications

45.     Throughout the seven years of this hard-fought litigation, the plaintiffs were represented by two law firms appointed by the Court as lead class counsel: Gupta Wessler LLP and Motley Rice LLC. The firms worked together on all aspects of the litigation, with our team at Gupta Wessler taking the lead role on briefing, argument, research, and legal analysis, and Motley Rice taking a lead role in case management, discovery, and settlement administration.

46.     I am the founding principal of Gupta Wessler LLP, a boutique law firm that focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. I am also a Lecturer on Law at Harvard Law School, where I teach the Harvard Supreme Court Litigation Clinic and regularly teach courses on the American civil-justice system. I am a

public member of the American Law Institute and an elected member of the Administrative Conference of the United States. Over more than two decades, I have led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and numerous state and federal courts nationwide. I have also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of my advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. My biographical page is attached as Exhibit D.

47.     My colleague Jonathan Taylor played a key role on all aspects of this litigation, from conceptualizing the case with me at the outset, to presenting oral argument on summary judgment in the district court, to putting the finishing touches on the motion for final approval. When the case was filed, Mr. Taylor was an associate at the firm; he is now a principal. Mr. Taylor is a graduate of Harvard Law School who clerked for a federal circuit judge before joining Gupta Wessler. He has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries. His law firm biography is attached as Exhibit E.

48.     Class actions and litigation involving the federal government are a particular focus of my work and my firm's work. Mr. Taylor and I have both argued numerous appeals on class-action issues at all levels of the federal courts, and much of our firm's docket is occupied by appeals arising from class actions. Our firm also initiates select class-action cases, like this one, from the ground up—typically in collaboration with large, sophisticated class-action firms like Motley Rice.

49.     By the time that Gupta Wessler and Motley Rice filed this lawsuit together, we were able to draw from a considerable body of collective experience successfully bringing class actions for monetary relief against the federal government—a relatively rare form of litigation. Among other things, my colleague Jonathan Taylor and I had successfully represented a nationwide

certified class of all of the nation's federal bankruptcy judges and their surviving spouses, estates, and beneficiaries, resulting in a judgment against the United States for $56 million in illegally withheld judicial pay and benefits. *Houser v. United States*, No. 13–607C (Fed. Cl.). While still at Public Citizen, I had successfully represented a nationwide class of veterans challenging the Army Air Force Exchange Service's withholding of federal benefits to collect old debts arising out of purchases of military uniforms, recovering $7.4 million in illegal charges. *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760 (N.D. Cal.). And, together with Motley Rice, we were already representing a recently certified class of tax-return prepares in this Court, seeking the recovery of millions of dollars in unlawfully excessive fees paid to the IRS. In each one of these cases, the claims sought recovery of illegal exactions from the federal government on a class basis, with jurisdiction premised on the Tucker Act or the Little Tucker Act. *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.). This experience is further detailed below.

50.     ***Bankruptcy Judges' Compensation Litigation.*** In November 2012, I was approached by the National Conference of Bankruptcy Judges about whether I would agree to represent the nation's federal bankruptcy judges in preparation for class-action litigation over salary and benefits that the United States allegedly owed to the judges and their beneficiaries. Over a number of years, Congress had violated the U.S. Constitution's Compensation Clause with respect to the salaries of federal district judges. The bankruptcy judges wanted to explore potential statutory claims, under the Tucker Act, arising from those constitutional violations. The Conference had appointed members of a litigation committee, led by Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas (herself a former experienced complex litigator).

51.     This committee of federal bankruptcy judges conducted a nationwide search for the counsel most qualified to represent them. They sought lawyers experienced in both litigation with the federal government and class actions, and capable of handling any appellate proceedings. After

soliciting recommendations and interviewing several firms, they chose our firm to represent them and asked me to serve as lead counsel.

52.     As a result, our firm served as sole counsel to a certified nationwide class of current and former federal bankruptcy judges and their surviving spouses, life-insurance beneficiaries, and estates in *Houser v. United States*, No. 13–607C (Fed. Cl.)—one of the few certified class actions of federal judges in U.S. history. We litigated the case from start to finish, ultimately securing a judgment of approximately $56 million in November 2014 in the Court of Federal Claims, and working thereafter to administer a comprehensive claims process.

53.     I served as lead class counsel in *Houser*, working closely with Jonathan Taylor. The case required us to interact on a constant basis with our counterparts at the Department of Justice. Our formal litigation work eventually included successful briefing and argument on the government's motion to dismiss, cross-motions for summary judgment on liability, a motion for class certification, and a class-notice plan. Our work did not end with the certification of a class and the court's determination of liability. To the contrary, we retained damages experts, vetted the government's damages calculations, continued to respond to class members' inquiries, and negotiated with the government over a stipulated judgment and a class-claims process that delivered our clients one hundred cents on the dollar.

54.     In recognition of our successful efforts in the litigation, Mr. Taylor and I both received the President's Award from the National Conference of Bankruptcy Judges. On March 22, 2016, *The American Lawyer* reported on our role in this litigation, observing that "[i]t's hard to imagine a higher compliment than being hired to represent federal judges" in this important class-action litigation against the United States.

55.     ***IRS Tax Preparer Fees Litigation.***  We currently serve as co-counsel for the plaintiffs in *Steele v. United States*, No. 14-cv-01523-RCL (D.D.C.), another case in this Court with

many similarities to this litigation. In that case, we represent a certified nationwide class of tax-return preparers suing the federal government under the Little Tucker Act for excessive user fees.

56.     As in the litigation here, the plaintiffs in *Steele* bring an illegal-exaction claim against the government. A team from the national class-action firm Motley Rice LLC (co-lead in this case) serves as lead counsel in *Steele*, and brought us into the case because of our relevant expertise with litigation involving the federal government. On June 30, 2015, Judge Lamberth issued a decision appointing our team as interim class counsel in *Steele*. In his decision, he noted that he was "thoroughly impressed by the qualifications" of counsel—including previous work on "class actions against the government" and "illegal exaction claims." *Steele*, Dkt. 37, at 7. On February 9, 2016, Judge Lamberth certified a nationwide class and named us class counsel. *Steele*, Dkt. 54

57.     ***Experience Defending the Federal Government in Litigation.*** Before founding Gupta Wessler in 2012, I served as Senior Litigation Counsel in the U.S. Department of the Treasury, setting up the new Consumer Financial Protection Bureau (CFPB), and then in the Office of the General Counsel at the CFPB, where I successfully defended the agency in litigation. That work included serving as lead counsel in a successful defense in this Court—against an APA and Fifth Amendment challenge—of federal regulations that established nationwide licensing and regulation of mortgage brokers for the first time. *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112 (D.D.C. 2012). I was also responsible for setting up the new agency's appellate litigation and amicus programs and working with the Office of the Solicitor General on cases before the U.S. Supreme Court. Finally, my duties included advising senior government officials on issues of constitutional and administrative law, including issues related to the launch of the new federal agency. *See* Deepak Gupta, *The Consumer Protection Bureau and the Constitution*, 65 ADMIN. L. REV. 945 (2013).

58.     Before my stint in government service (and following my federal judicial clerkship), I spent seven years at Public Citizen Litigation Group in Washington, DC—one of the nation's preeminent public-interest organizations. There, as a staff attorney and director of the Consumer Justice Project, I focused on litigating cutting-edge class actions and appeals nationwide. I also spent my first year at the organization as the Alan Morrison Supreme Court Fellow, working on litigation before the U.S. Supreme Court.

59.     ***Veterans' Withholding Litigation.*** Much of my litigation at Public Citizen involved the federal government. In *Briggs v. Army & Air Force Exchange Service*, No. C 07–05760, 2009 WL 113387 (N.D. Cal. Jan. 16, 2009), for example, I successfully represented a nationwide class of veterans challenging the government's illegal withholding of federal benefits to collect old debts arising out of purchases of military uniforms. I took the lead in briefing and arguing several issues relevant to this litigation—including Little Tucker Act jurisdiction, and the interaction between the class-action device and the special venue rules applicable to the federal government. My co-counsel and I ultimately obtained a $7.4 million settlement for our clients.

60.     I also served as lead counsel for three national consumer groups in a successful and groundbreaking APA unreasonable-delay suit against the U.S. Department of Justice, resulting in the creation and implementation of the National Motor Vehicle Title Information System. *See Pub. Citizen, et al v. Mukasey*, 2008 WL 4532540 (N.D. Cal.).

61.     Finally, I served as co-counsel in a case in which we successfully represented survivors of Hurricanes Katrina and Rita in an APA and constitutional due-process challenge to FEMA's denial of federal disaster assistance. *See Ass'n of Comty. Orgs. for Reform Now v. Fed. Emergency Mgmt. Agency*, 463 F. Supp. 2d 26 (D.D.C. 2006).

### *Class Counsel's Hours, Lodestar, and Multiplier*

62.    The information in this declaration regarding the time spent on the case by Gupta Wessler LLP attorneys and other professional support staff is based on contemporaneous daily time records regularly prepared and maintained by the firm. I reviewed these time records in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the time entries as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation.

63.    Below is a summary lodestar chart which lists (1) the name of each timekeeper in my firm who worked on this case; (2) their title or position (e.g., principal, associate, paralegal) in the firm; (3) the total number of hours they worked on the case from its inception through and including August 28, 2023; (4) their current hourly rate; and (5) their lodestar (not including projected future work on class-action settlement administration). The chart also includes a projected $400,000 that we conservatively estimate for time that will be incurred address post-settlement issues and inquiries.

| Name | Title | Total Hours | Current Rate | Total Lodestar |
|---|---|---|---|---|
| Deepak Gupta | Principal | 1497.5 | 1150 | $1,722,125.00 |
| Jonathan E. Taylor | Principal | 1519 | 975 | $1,481,025.00 |
| Rachel Bloomekatz | Principal | 5.73 | 875 | $5,013.75 |
| Peter Romer-Friedman | Principal | 3.00 | 875 | $2,625.00 |
| Daniel Wilf-Townsend | Associate | 12.60 | 700 | $8,820.00 |
| Joshua Matz | Associate | 6.40 | 700 | $4,480.00 |
| Neil Sawhney | Associate | 3.30 | 700 | $2,310.00 |
| Robert Friedman | Associate | 2.60 | 700 | $1,820.00 |
| Stephanie Garlock | Paralegal | 27.55 | 350 | $9,642.50 |

| | | | | |
|---|---|---|---|---|
| Mahek Ahmad | Paralegal | 52.75 | 350 | $18,462.50 |
| Rana Thabata | Paralegal | 24.62 | 350 | $8,617.00 |
| Nabila Abdallah | Paralegal | 17.57 | 350 | $6,149.50 |
| Total Past Lodestar | | | | $3,271,090.25 |
| Gupta Wessler Projected Post-Settlement Lodestar | | | | $400,000 |
| Total Gupta Wessler Lodesar | | | | $3,671,090.25 |
| Total Lodestar for Both Law Firms | | | | $6,031,678.25 |

64.     Our firm's total lodestar is thus $3,671,090.25. As reflected in the contemporaneously filed Declaration of Meghan S.B. Oliver, Motley Rice calculates $1,860,588.00 in lodestar plus future projected lodestar of $500,000, for a total of $2,360,588. The total lodestar for both firms is thus $6,031,678.25. Because we are seeking a total fee award of $23,863,345.02—the amount equal to 20% of the $125 million common fund, minus the requested costs, expenses, and service awards— the multiplier in this case is approximately 3.956.

65.     Before this case was filed, each named plaintiff signed a retainer agreement with class counsel that provided for a contingency fee of up to 33% of the common fund.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC, on August 28, 2023.     */s/ Deepak Gupta*_____
                                                      Deepak Gupta

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,

        *Plaintiffs,*

    v.

UNITED STATES OF AMERICA,

        *Defendant.*

Civ. A. No. 16-0745 (PLF)

## CLASS ACTION SETTLEMENT AGREEMENT

For the purpose of disposing of the plaintiffs' claims in this case without any further judicial proceedings on the merits and without there being any trial or final judgment on any issue of law or fact, and without constituting an admission of liability on the part of the defendant, and for no other purpose except as provided herein, the parties stipulate and agree as follows:

### Background and Definitions

1.    The plaintiffs challenge the lawfulness of fees charged by the federal government to access to records through the Public Access to Court Electronic Records program or "PACER." The lawsuit claims that the fees are set above the amount permitted by statute and seeks monetary relief under the Little Tucker Act, 28 U.S.C. § 1346(a) in the amount of the excess fees paid. The government contends that all such fees are lawful.

2.    The complaint was filed on April 21, 2016. ECF No. 1. On January 24, 2017, this Court certified a nationwide class under Federal Rule of Civil Procedure ("Rule") 23(b)(3) and a single class claim alleging that PACER fees exceeded the amount authorized by statute and seeking

recovery of past overpayments. ECF Nos. 32, 33. The Court also appointed Gupta Wessler PLLC and Motley Rice LLC (collectively, "Class Counsel") as co-lead class counsel. *Id.*

3.     "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 22, 2010, and May 31, 2018 ("the Class Period"). Excluded from that class are: (i) entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

4.     The class originally certified by this Court consists only of individuals and entities who paid fees for use of PACER between April 21, 2010, and April 21, 2016 (with the same three exceptions noted in the previous paragraph). Plaintiffs who were not included in that original class definition—that is to say, PACER users who were not included in the original class and who paid fees for use of PACER between April 22, 2016, and May 31, 2018—shall be provided with notice of this action and an opportunity to opt out of the class.

5.     On April 17, 2017, the Court entered an order approving the plaintiffs' proposed plan for providing notice to potential class members. ECF No. 44. The proposed plan designated KCC as Class Action Administrator ("Administrator"). Notice was subsequently provided to all Class Members included in the original class, and they had until July 17, 2017, to opt out of the class, as explained in the notice and consistent with the Court's order approving the notice plan. The notice referenced in paragraph 4 above shall be provided by the Administrator.

6.     On March 31, 2018, the Court issued an opinion on the parties' cross-motions for summary judgment on liability. ECF No. 89; *see Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 126 (D.D.C. 2018). While briefing cross-motions on liability, the parties "reserv[ed] the damages determination for" a later point "after formal discovery." *Id.* at 138.

7.     On August 13, 2018, the Court certified its March 31, 2018, summary-judgment decision for interlocutory appeal to the Federal Circuit under 28 U.S.C. § 1292(b). ECF Nos. 104,

105; *see Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018).

8.  On August 6, 2020, the Federal Circuit affirmed this Court's decision on the parties' motions for summary judgment and remanded the case to this Court for further proceedings. *See Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 (Fed. Cir. 2020).

9.  Following the Federal Circuit's decision, the parties agreed to engage in mediation to discuss the possibility of settling Plaintiffs' claims. On December 29, 2020, this Court stayed the proceedings through June 25, 2021, and it has repeatedly extended that stay since then as the parties have made progress on negotiating a global settlement.

10.  On May 3, 2021, the parties participated in a day-long private mediation session in an attempt to resolve Plaintiffs' claims. Since then, the parties have engaged in numerous follow-up conversations via phone and email to come to an agreement on resolving the claims.

### Common Fund Payment and Release

11.  Plaintiffs have offered to settle this action in exchange for a common-fund payment by the United States in the total amount of one hundred and twenty-five million dollars ($125,000,000.00) (the "Aggregate Amount") inclusive of monetary relief for Plaintiffs' claims, interest, attorney fees, litigation expenses, administration costs, and any service awards to Class Representatives. Subject to this Court's approval, as set forth in paragraph 33, Plaintiffs' offer has been accepted by the United States.

12.  Following the Court's order granting final approval of the settlement, as described in the "Fairness Hearing" portion of this agreement, and only after the appeal period for that order has expired, the United States shall pay the Aggregate Amount to the Administrator for deposit in the Settlement Trust, as referenced in paragraph 16.

13.     Upon release of the Aggregate Amount from the U.S. Department of the Treasury's Judgment Fund, Plaintiffs and all Class Members release, waive, and abandon, as to the United States, its political subdivisions, its officers, agents, and employees, including in their official and individual capacities, any and all claims, known or unknown, that were brought or could have been brought against the United States for purported overcharges of any kind arising from their use of PACER during the Class Period. This release does not cover any claims based on PACER usage after May 31, 2018, nor any of the claims now pending in *Fisher v. United States*, No. 15-1575 (Fed. Cl.). But the amount of settlement funds disbursed to any Class Member in this case shall be deducted in full from any monetary recovery that the Class Member may receive in *Fisher*. The Administrative Office of the U.S. Courts ("Administrative Office") represents that, apart from *Fisher*, it is aware of no other pending PACER-fee lawsuit pertaining to claims based on PACER usage on or before May 31, 2018.

**Information**

14.     Within 30 days of a final order approving the settlement, Class Counsel shall provide to the Administrative Office the PACER account numbers of Class Counsel and all individuals who have opted out of the Class. Within 90 days of a final order approving the settlement, the Administrative Office shall make available to the Administrator the records necessary to determine the total amount owed to each Class Member, and the last known address or other contact information of each Class Member contained in its records. Should the Administrative Office need more than 90 days to do so, it will notify the Administrator and Class Counsel and provide the necessary information as quickly as reasonably possible. The Administrator shall bear sole responsibility for making payments to Class Members, using funds drawn from the Settlement Trust, as provided below. In doing so, the Administrator will use the data that the Administrative Office

4

currently possesses for each Class Member, and the United States shall be free of any liability based on errors in this data (*e.g.*, inaccurate account information, incorrect addresses, etc.).

15.     The PACER account information provided in accordance with the previous paragraph shall be provided pursuant to the terms of the Stipulated Protective Order issued in this lawsuit on April 3, 2017 (ECF No. 41) as modified to encompass such information and shall be subject to the terms of the Stipulated Protective Order. The parties agree to jointly request that the Court extend the Stipulated Protective Order to encompass such information prior to the 90-day period set forth in the previous paragraph.

### Disbursement of the Aggregate Amount

16.     The Administrator shall establish a Settlement Trust, designated the "PACER Class Action Settlement Trust," to disburse the proceeds of the settlement. The administration and maintenance of the Settlement Trust, including responsibility for distributing the funds to Class Members using methods that are most likely to ensure that Class Members receive the payments, shall be the sole responsibility of the Administrator. Class Members will not be required to submit a claim form or make any attestation to receive their payments. The only obligation of the United States in connection with the disbursement of the Aggregate Amount will be: (i) to transfer the Aggregate Amount to the Administrator once the Court has issued a final order approving the settlement and the appeal period for that order has expired, and (ii) to provide the Administrator with the requisite account information for PACER users, as referenced in paragraph 14. The United States makes no warranties, representations, or guarantees concerning any disbursements that the Administrator makes from the Settlement Trust, or fails to make, to any Class Member. If any Class Member has any disagreement concerning any disbursement, the Class Member shall resolve any such concern with the Administrator.

17.     The Settlement Trust is intended to be an interest-bearing Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1. The Administrator shall be solely responsible for filing all informational and other tax returns as may be necessary. The Administrator shall also be responsible for causing payments to be made from the Settlement Trust for any taxes owed with respect to the funds held by the Settlement Trust. The Administrator shall timely make all such elections and take such other actions as are necessary or advisable to carry out this paragraph.

18.     As approved by the Court, the Administrator shall disburse the proceeds of the settlement as follows: The Administrator shall retain from the Settlement Trust all notice and administration costs actually and reasonably incurred, which includes actual costs of publication, printing, and mailing the notice, as well as the administrative expenses actually incurred and fees reasonably charged by the Administrator in connection with providing notice and processing the submitted claims. The Administrator shall distribute any service awards approved by the Court to the named plaintiffs, and any attorney fees and costs approved by the Court to Class Counsel, as set forth in the "Fairness Hearing" portion of this agreement. After the amounts for attorney fees, expenses, service awards, and notice and administration costs have been paid from the Aggregate Amount, the remaining funds shall be distributed to the class ("Remaining Amount"). The Remaining Amount shall be no less than 80% of the Aggregate Amount, or $100,000,000.

19.     *First Distribution.* The Administrator shall allocate the Remaining Amount among Class Members as follows: First, the Administrator shall allocate to each Class Member a minimum payment amount equal to the lesser of $350 or the total amount paid in PACER fees by that Class Member for use of PACER during the Class Period. Second, the Administrator shall add together each minimum payment amount for each Class Member, which will produce the Aggregate Minimum Payment Amount. Third, the Administrator shall then deduct the Aggregate Minimum Payment Amount from the Remaining Amount and allocate the remainder pro rata (based on the

amount of PACER fees paid in excess of $350 during the Class Period) to all Class Members who paid more than $350 in PACER fees during the Class Period.

20.     Thus, under the formula for the initial allocation: (a) each Class Member who paid a total amount less than or equal to $350 in PACER fees for use of PACER during the Class Period would receive a payment equal to the total amount of PACER fees paid by that Class Member for PACER use during the Class Period; and (b) each Class Member who paid more than $350 in PACER fees for use of PACER during the Class Period would receive a payment of $350 plus their allocated pro-rata share of the total amount left over after the Aggregate Minimum Payment is deducted from the Remaining Amount.

21.     The Administrator shall complete disbursement of each Class Member's individual share of the recovery, calculated in accordance with the formula set forth in the previous two paragraphs, within 90 days of receipt of the Aggregate amount, or within 21 days after receiving from the Administrative Office the information set forth in paragraph 14 above, whichever is later. The Administrator shall complete disbursement of the amounts for attorney fees and litigation expenses to Class Counsel, and service awards to the named plaintiffs, within 30 days of the receipt of the Aggregate Amount.

22.     The Administrator shall keep an accounting of the disbursements made to Class Members, including the amounts, dates, and outcomes (*e.g.*, deposited, returned, or unknown) for each Class Member, and shall make all reasonable efforts, in coordination with Class Counsel, to contact Class Members who do not deposit their payments within 90 days of the payment being made to them.

23.     *Second Distribution.* If, despite these efforts, unclaimed or undistributed funds remain in the Settlement Trust one year after the United States has made the payment set forth in paragraph 12, those funds ("the Remaining Amount After First Distribution") shall be distributed to

Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed following one year after the United States has made the payment set forth in paragraph 12 shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel

One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

24.     Class Members who are eligible to receive a second distribution shall have three months from the time of the distribution to deposit or otherwise collect their payments. If, after this three-month period expires, unclaimed or undistributed funds remain in the Settlement Trust, those funds shall revert unconditionally to the U.S. Department of the Treasury. Upon expiration of this three month period, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the addresses referenced in paragraph 23 of this reverter. Instructions to effectuate the reverter will be provided to the Administrator following receipt of such notice, and the Administrator agrees to promptly comply with those instructions.  The three-month period will run for all Class Members eligible to receive a second distribution from the date the earliest distribution is made of a second distribution to any Class Member eligible for such a distribution. Upon request, the Administrator will notify the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office of the date the three-month period commenced. To the extent a payment in connection with the Second Distribution is made to a Class Member by the Administrator by check, any check that remains uncashed following this three-month period shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for reverter to the United States.

25.     The Class Representatives have agreed to a distribution structure that may result in a reverter to the U.S. Treasury for purposes of this settlement only.

26.     Neither the parties nor their counsel shall be liable for any act or omission of the Administrator or for any mis-payments, overpayments, or underpayments of the Settlement Trust by the Administrator.

**Fairness Hearing**

27.     As soon as possible and in no event later than 60 days after the execution of this agreement, Class Counsel shall submit to the Court a motion for an Order Approving Settlement Notice to the Class under Rule 23(e). The motion shall include (a) a copy of this settlement agreement, (b) the proposed form of the order, (c) the proposed form of notice of the settlement to be mailed to Class Members and posted on an internet website dedicated to this settlement by the Administrator, and (d) the proposed form of notice to be mailed to Class Members who were not included in the original class definition certified by the Court on January 24, 2017, as discussed in paragraph 4, and posted on the same website, advising them of their right to opt out. The parties shall request that a decision on the motion be made promptly on the papers or that a hearing on the motion be held at the earliest date available to the Court.

28.     Under Rule 54(d)(2), and subject to the provisions of Rule 23(h), Plaintiffs will apply to the Court for an award of attorney fees and reimbursement of litigation expenses, and for service awards for the three Class Representatives in amounts not to exceed $10,000 per representative. These awards shall be paid out of the Aggregate Amount. When combined, the total amount of attorney fees, service awards, and administrative costs shall not exceed 20% of the Aggregate Amount. With respect to the attorney fees and service awards, the Court will ultimately determine whether the amounts requested are reasonable. The United States reserves its right, upon submission of Class Counsel's applications, to advocate before the Court for the use of a lodestar cross-check in determining the fee award, and for a lower service award for the Class Representatives should Plaintiffs seek more than $1,000 per representative. Plaintiffs' motion for an award of attorney fees and litigation expenses shall be subject to the approval of the Court and notice of the motion shall be provided to Class Members informing them of the request and their right to object to the motion, as required by Rule 23(h).

29.     Within 30 days of the Court's entry of the Order Approving Settlement Notice to the Class, the Administrator shall mail or cause to be mailed the Notice of Class Action Settlement by email or first-class mail to all Class Members. Contemporaneous with the mailing of the notice and continuing through the date of the Fairness Hearing, the Administrator shall also display on an internet website dedicated to the settlement the relevant case documents, including the settlement notice, settlement agreement, and order approving the notice. The Notice of Class Action Settlement shall include an explanation of the procedures for allocating and distributing funds paid pursuant to this settlement, the date upon which the Court will hold a "Fairness Hearing" under Rule 23(e), and the date by which Class Members must file their written objections, if any, to the settlement.

30.     Any Class Member may express to the Court his or her views in support of, or in opposition to, the fairness, reasonableness, and adequacy of the proposed settlement. If a Class Member objects to the settlement, such objection will be considered only if received no later than the deadline to file objections established by the Court in the Order Approving Settlement Notice to the Class. The objection shall be filed with the Court, with copies provided to Class Counsel and counsel for the United States, and the objection must include a signed, sworn statement that (a) identifies the case number, (b) describes the basis for the objection, including citations to legal authority and evidence supporting the objection, (c) contains the objector's name, address, and telephone number, and if represented by counsel, the name, address, email address, and telephone number of counsel, and (d) indicates whether objector intends to appear at the Fairness Hearing.

31.     Class Counsel and counsel for the United States may respond to any objection within 21 days after receipt of the objection.

32.     Any Class Member who submits a timely objection to the proposed settlement may appear in person or through counsel at the Fairness Hearing and be heard to the extent allowed by the Court. Any Class Members who do not make and serve written objections in the manner

11

provided in paragraph 30 shall be deemed to have waived such objections and shall forever be foreclosed from making any objections (by appeal or otherwise) to the proposed settlement.

33.     After the deadlines for filing objections and responses to objections have lapsed, the Court will hold the Fairness Hearing at which it will consider any timely and properly submitted objections made by Class Members to the proposed settlement. The Court will decide whether to approve the settlement and enter a judgment approving the settlement and dismissing this lawsuit in accordance with the settlement agreement. The parties shall request that the Court schedule the Fairness Hearing no later than 150 days after entry of the Court's Order Approving Settlement Notice to the Class.

34.     If this settlement is not approved in its entirety, it shall be void and have no force or effect.

**Miscellaneous Terms**

35.     This agreement is for the purpose of settling Plaintiffs' claims in this action without the need for further litigation, and for no other purpose, and shall neither constitute nor be interpreted as an admission of liability on the part of the United States.

36.     Each party fully participated in the drafting of this settlement agreement, and thus no clause shall be construed against any party for that reason in any subsequent dispute.

37.     In the event that a party believes that the other party has failed to perform an obligation required by this settlement agreement or has violated the terms of the settlement agreement, the party who believes that such a failure has occurred must so notify the other party in writing and afford it 45 days to cure the breach before initiating any legal action to enforce the settlement agreement or any of its provisions.

38.     The Court shall retain jurisdiction for the purpose of enforcing the terms of this settlement agreement.

39.    Plaintiffs' counsel represent that they have been and are authorized to enter into this agreement on behalf of Plaintiffs and the class.

40.    Undersigned defense counsel represents that he has been authorized to enter into this agreement by those within the Department of Justice with appropriate settlement authority to authorize the execution of this agreement.

41.    This document constitutes a complete integration of the agreement between the parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between them.

<REMAINDER OF PAGE LEFT BLANK; SIGNATURES PAGES TO FOLLOW>

AGREED TO ON BEHALF OF PLAINTIFFS:

_____

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
Meghan S.B. Oliver (D.C. Bar No. 493416)
Elizabeth Smith (D.C. Bar No. 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 1001
Washington, DC 20004
(202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: ___07/27/2022___

14

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____     7-12-22

JEREMY S. SIMON, D.C. BAR #447956                    Dated
Assistant United States Attorney
601 D. Street, NW
Washington, DC 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Attorneys for the United States of America

15

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL SERVICES PROGRAM, NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE, for themselves and all others similarly situated, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. 16-0745 (PLF) |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Defendant.* | ) ) | |
| _____ | ) | |

### STIPULATION AND FIRST AMENDMENT
### TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Amendment, the parties agree to the following modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July 27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 3 of the Agreement shall be replaced with the following language:

3.    "Plaintiffs" or "Class Members," as used in this agreement, are defined to include all persons or entities who paid PACER fees between April 21, 2010, and May 31, 2018 ("the Class Period") regardless of when such persons or entities used the PACER system. Excluded from that class are: (i) persons or entities that have already opted out; (ii) federal agencies; and (iii) Class Counsel.

In addition, the parties agree that the phrases "who paid PACER fees between [date x] and [date y]" and "who paid fees for use of PACER between [date x] and [date y]," as used in paragraphs 3 and 4 of the Agreement, refer to the payment of PACER fees in the specified period rather than the use of PACER in the specified period. The parties further agree that each specified period in those paragraphs includes both the start and end dates unless otherwise specified.

Finally, in paragraph 27 of the Agreement, the parties agree that the reference to "60 days" shall be changed to "75 days."

The remainder of Agreement remains unchanged by this Stipulation and Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C. Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: September 29, 2022 _____

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____        7-29-22
       JEREMY S. SIMON, D.C. Bar No. 447956           Dated
       Assistant United States Attorney
       601 D Street, NW
       Washington, DC 20530
       (202) 252-2528
       Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL VETERANS LEGAL | ) | |
| SERVICES PROGRAM, NATIONAL | ) | |
| CONSUMER LAW CENTER, and | ) | |
| ALLIANCE FOR JUSTICE, for themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
|               *Plaintiffs*, | ) | Civil Action No. 16-0745 (PLF) |
| | ) | |
|    v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|               *Defendant*. | ) | |
| _____ | ) | |

## STIPULATION AND SECOND AMENDMENT
## TO CLASS ACTION SETTLEMENT AGREEMENT

Through this Stipulation and Second Amendment, the parties agree to the following modification to the Class Action Settlement Agreement, executed by counsel for Plaintiffs on July 27, 2022 and counsel for Defendant on July 12, 2022 (the "Agreement").

Paragraph 21 of the Agreement shall be replaced with the following language:

21.    The Administrator shall complete disbursement of each Class Member's individual share of the recovery, calculated in accordance with the formula set forth in the previous two paragraphs, within 180 days of receipt of the Aggregate amount, or within 180 days after receiving from the Administrative Office the information set forth in paragraph 14 above, whichever is later. The Administrator shall complete disbursement of the amounts for attorney fees and litigation expenses to Class Counsel, and service awards to the named plaintiffs, within 30 days of the receipt of the Aggregate Amount.

Paragraph 23 of the Agreement shall be replaced with the following language:

23.    ***Second Distribution.*** If, despite these efforts, unclaimed or undistributed funds remain in the Settlement Trust 180 days after the Administrator has made the distribution described in paragraph 21, those funds ("the Remaining Amount After

1

First Distribution") shall be distributed to Class Members as follows. First, the only Class Members who will be eligible for a second distribution will be those who (1) paid a total amount of more than $350 in PACER fees for use of PACER during the Class Period, and (2) deposited or otherwise collected their payment from the first distribution, as confirmed by the Administrator. Second, the Administrator shall determine the number of Class Members who satisfy these two requirements and are therefore eligible for a second distribution. Third, the Administrator shall then distribute to each such Class Member an equal allocation of the Remaining Amount After First Distribution, subject to the caveat that no Class Member may receive a total recovery (combining the first and second distributions) that exceeds the total amount of PACER fees that the Class Member paid for use of PACER during the Class Period. The entire amount of the Remaining Amount After First Distribution will be allocated in the Second Distribution. To the extent a payment is made to a Class Member by the Administrator by check, any check that remains uncashed 180 days after the Administrator has made the distribution described in paragraph 21, shall be void, and the amounts represented by that uncashed check shall revert to the Settlement Trust for the Second Distribution. Prior to making the Second Distribution, the Administrator will notify in writing the Administrative Office's Office of General Counsel and the Administrative Office's Court Services Office at the following addresses that unclaimed or undistributed funds remain in the Settlement Trust.

If to the Administrative Office's Court Services Office:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Court Services Office
One Columbus Circle, N.E., Ste. 4-500
Washington, DC 20544

If to the Administrative Office's Office of General Counsel:

Administrative Office of the U.S. Courts
Thurgood Marshall Federal Judiciary Building
Office of General Counsel
One Columbus Circle, N.E. Ste. 7-290
Washington, DC 20544

The remainder of Agreement remains unchanged by this Stipulation and Second Amendment.

AGREED TO ON BEHALF OF PLAINTIFFS:

DEEPAK GUPTA (D.C. Bar No. 495451)
JONATHAN E. TAYLOR (D.C. Bar No. 1015713)
**GUPTA WESSLER PLLC**
2001 K Street, NW, Suite 850 N
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*deepak@guptawessler.com, jon@guptawessler.com*

WILLIAM H. NARWOLD (D.C. Bar No. 502352)
MEGHAN S. B. OLIVER (D.C Bar No. 493416)
ELIZABETH SMITH (D.C. Bar No 994263)
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Phone: (202) 232-5504
*bnarwold@motleyrice.com, moliver@motleyrice.com*

*Attorneys for Plaintiffs*

Date: 04-12-23

AGREED TO FOR THE UNITED STATES:

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:

DEREK S. HAMMOND, D.C. Bar No. 1017784          4-11-23
Assistant United States Attorney                          Dated
601 D Street, NW
Washington, D.C. 20530
(202) 252-2511
Derek.Hammond@usdoj.gov

*Attorneys for the United States of America*

# EXHIBIT D

Case 1:16-cv-00745-PLF    Document 158-5    Filed 08/28/23    Page 49 of 63

# Gupta / Wessler

Browse: **Home** » **People** » Deepak Gupta

## DEEPAK GUPTA

**deepak@guptawessler.com**

**202.888.1741 |** 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Legal Assistant: Mahek Ahmad, mahek@guptawessler.com



**Deepak Gupta** is the founding principal of Gupta Wessler, where his practice focuses on Supreme Court, appellate, and complex litigation on behalf of plaintiffs and public-interest clients. He is also a Lecturer at Harvard Law School, where he teaches the Harvard Supreme Court Litigation Clinic and seminars on forced arbitration, the civil justice system, and public interest entrepreneurship.

Over more than two decades, Deepak has led high-stakes litigation before the U.S. Supreme Court, all thirteen federal circuits, and state supreme courts from Alaska to West Virginia. He has also testified before the U.S. Senate, the U.S. House of Representatives, and the Presidential Commission on the Supreme Court. Much of Deepak's advocacy has focused on ensuring access to justice for consumers, workers, and communities injured by corporate or governmental wrongdoing. His varied clients have included national nonprofits, labor unions, state and local governments, public officials ranging from federal judges to members of Congress, professional athletes, distinguished artists and scientists, and people from all walks of life.

Confidential: Pending Prospect Cooperation for LBP

Deepak is "known as a skilled appellate lawyer" (*New York Times*) and "an all-star progressive Supreme Court litigator" (*Washington Post*) and has been described as "one of the emerging giants of the appellate and the Supreme Court bar," a "heavy hitter," a "principled" and "incredibly talented lawyer" (*Law 360*), and a "progressive legal rock star." *(New York Law Journal). Chambers USA* cites his "impressive" and "highly rated appellate practice," describing him as "an incredible oral advocate" who "writes terrific briefs" and maintains a "vibrant appellate practice focused on public interest cases and plaintiff-side representations." Deepak is consistently ranked as one of the "Best Lawyers" for Supreme Court cases by *Washingtonian* magazine; he is the only non-corporate lawyer on that list. Fastcase has honored Deepak as "one of the country's top litigators," noting that "what sets him apart" is his legal creativity. The *National Law Journal* has singled out Deepak's "calm, comfortable manner that conveys confidence" in oral argument. And *Empirical SCOTUS* cited one of Deepak's briefs as the single most readable in a recent U.S. Supreme Court term.

Deepak's Supreme Court and appellate advocacy has been recognized with several national awards, including the 2022 Appellate Advocacy Award from the National Civil Justice Institute, which "recognizes excellence in appellate advocacy in America," the Steven J. Sharpe Award for Public Service from the American Association for Justice, and the President's Award from the National Conference of Bankruptcy Judges.

Deepak is a veteran advocate before the U.S. Supreme Court, where he has filed over one hundred briefs and regularly presents oral argument. Highlights include:

- Deepak recently argued and won a landmark victory for access to justice in *Ford Motor Co. v. Montana Eighth Judicial District*, 141 S. Ct. 1017 (2021), in which the Supreme Court ruled that people injured by mass-market products can establish personal jurisdiction to sue out-of-state corporations where their injury occurred, bucking a trend of jurisdiction-limiting decisions stretching back four decades.

- In *Smith v. Berryhill,* 139 S.Ct. 1285 (2019), Deepak argued at the Court's invitation in support of a judgment left undefended by the Solicitor General. He is the first Asian-American to be appointed by the U.S. Supreme Court to argue a case.

- In 2017, Deepak's firm was counsel for parties in three argued merits cases before the Court; he was lead counsel in two, prevailing in both. In *Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144 (2017), he successfully argued a First Amendment challenge to a law designed to keep consumers in the dark about the cost of credit cards. And in *Hernández v. Mesa*, 137 S.Ct. 2003 (2017), he represented the family of a Mexican teenager killed in a cross-border shooting by a border patrol agent, successfully obtaining reversal of the Fifth Circuit's 15-0 en banc ruling that the officer was entitled to qualified immunity.

- Deepak argued *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740 (2011), a watershed case on corporations' use of forced arbitration to prevent consumers and workers from banding together to seek justice.

As an appellate advocate, Deepak is frequently sought out by trial lawyers to defend their most consequential victories or resurrect worthy claims on appeal—often after years of hard-fought litigation. He is currently defending several nine-figure and eight-figure verdicts on appeal, including $275-million and $185-million verdicts against Monsanto (over toxic chemical exposure), and a $200-million verdict against UnitedHealth (over insurance bad faith). He also serves as outside counsel to the American Association for Justice.

In addition to his appellate advocacy, Deepak designs and prosecutes class actions and other legal challenges from the ground up. Highlights include:

- In *National Veterans Legal Services Program v. United States*, Deepak is lead counsel in a nationwide class action in which he persuaded the Federal Circuit that the federal judiciary has been charging people millions of dollars in unlawful fees for online access to court records. The case recently culminated in a $125 million settlement that reimburses the majority of PACER users by 100 cents on the dollar.

- In another one-of-a-kind class action, Deepak represented all of the nation's bankruptcy judges, recovering $56 million in back pay for Congress's violation of the Judicial Compensation Clause. *The American Lawyer* observed: "it's

Deepak Gupta | Gupta Wessler PLLC

hard to imagine a higher compliment than being hired to
represent federal judges."

Deepak also frequently leads high-stakes administrative and
constitutional cases involving the federal government. In recent
years, he has:

- persuaded the D.C. Circuit to issue a rare emergency
  injunction halting an attempted government takeover of the
  Open Technology Fund, an internet-freedom nonprofit;

- represented environmental groups in a successful procedural
  challenge to a midnight rule that would have crippled the
  ability of the incoming EPA leadership to rely on science in
  setting public-health standards;

- obtained a ruling striking down the Trump Administration's
  decision to halt IRS collection of nonprofit donor information
  by dark-money groups;

- established that the Acting Director of the Bureau of Land
  Management had been serving unlawfully for 424 days; and

- persuaded the Second Circuit, in *Citizens for Responsibility
  and Ethics v. Trump*, that President Trump's competitors in
  the hotel and restaurant industry had standing to sue him for
  accepting payments in violation of the Constitution's
  Emoluments Clauses.

Before founding his law firm in 2012, Deepak was Senior Counsel
for Litigation and Senior Counsel for Enforcement Strategy at the
newly created Consumer Financial Protection Bureau. As the first
appellate litigator hired under Elizabeth Warren's leadership, he
launched the new agency's amicus program, defended its
regulations, and worked with the Solicitor General's office on
Supreme Court cases.

For seven years previously, Deepak was an attorney at Public
Citizen Litigation Group, where he founded and directed the
Consumer Justice Project and was the Alan Morrison Supreme
Court Assistance Project Fellow. Before that, Deepak worked on
voting rights at the Civil Rights Division of the U.S. Department of
Justice; prisoners' rights at the ACLU's National Prison Project;
and religious freedom at Americans United for Separation of
Church and State. He clerked for Judge Lawrence K. Karlton of the

Deepak Gupta - Gupta Wessler LLP

U.S. District Court for the Eastern District of California and studied law at Georgetown, Sanskrit at Oxford, and philosophy at Fordham.

Deepak is a member of the American Law Institute and the Administrative Conference of the United States. He sits on the boards of the National Consumer Law Center, the Alliance for Justice, the Open Markets Institute, the Lawyers' Committee for Civil Rights Under Law, the People's Parity Project, the Civil Justice Research Initiative at UC Berkeley, the Biden Institute, and the Institute for Consumer Antitrust Studies. He is a judge of the American Constitution Society's Annual Richard D. Cudahy Writing Competition on Regulatory and Administrative Law.

Deepak's publications include *Arbitration as Wealth Transfer*, 5 Yale L. & Pol'y Rev. 499 (2017) (with Lina Khan), *Leveling the Playing Field on Appeal: The Case for a Plaintiff-Side Appellate Bar*, 54 Duq. L. Rev. 383 (2016), and *The Consumer Protection Bureau and the Constitution*, 65 Admin L. Rev. 945 (2013), as well as shorter pieces for *The New York Times*, SCOTUSblog, and *Trial* magazine. He has appeared in broadcast and print media including CNN, MSNBC, FOX News, ABC's *World News* and *Good Morning America*, NPR's *All Things Considered* and *Marketplace*, and *The New York Times*, *Washington Post*, *Los Angeles Times*, *Wall Street Journal*, and *USA Today*.

---

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin

# EXHIBIT E

Gupta / Wessler

---

Browse: Home » Jonathan E. Taylor

# JONATHAN E. TAYLOR

**jon@guptawessler.com**

**202.888.1741** | 2001 K Street, NW, Suite 850 North, Washington, DC 20006

Twitter: @jontaylor1 | Legal Assistant: Abbe Murphy, abbe@guptawessler.com



**Jonathan E. Taylor** is a principal at Gupta Wessler, where he represents plaintiffs and public-interest clients in Supreme Court, appellate, and constitutional litigation.

Since joining the firm a few months after it was founded in 2012, Jon has presented oral argument in the majority of federal circuits and has been the principal author of dozens of briefs filed in the U.S. Supreme Court and all levels of the state and federal judiciaries.

In 2021, Jon served as counsel of record in the U.S. Supreme Court in *Lombardo v. City of St. Louis*, in which he successfully obtained an unheard-of opinion summarily vacating a pro-officer decision on the merits of a police-excessive-force case. Jon was awarded the 2021 National Law Journal Rising Star award for his stellar appellate advocacy.

Among Jon's recent arguments are a Ninth Circuit appeal defending a $102 million class-action judgment against Walmart for violations of California labor law; a D.C. Circuit appeal for a certified class of tax-return preparers challenging the legality of

over $250 million in IRS-imposed fees; Third and Seventh Circuit appeals resulting in landmark decisions expanding the availability of paid-military leave; a summary-judgment hearing for a nationwide class of PACER users challenging the judiciary's fee structure for accessing court filings; a First Circuit appeal successfully defending Boston and Brookline's public-carry restrictions against a Second Amendment challenge; an Eighth Circuit appeal upholding a punitive-damages award against a constitutional attack; an Eighth Circuit appeal successfully reinstating a a jury's finding of negligence by GM in the design of a seat-belt system, and ordering a new trial on damages only; and an Eighth Circuit appeal successfully defeating a claim of immunity in a constitutional challenge to a city's "pay-to-play" system, in which people arrested for minor infractions are jailed if they can't afford to pay fees.

As these cases illustrate, Jon's work has spanned a wide range of topics—including the First Amendment, Second Amendment, Fourth Amendment, due process, Article III standing, personal jurisdiction, class certification, civil rights, administrative law, and a broad array of issues involving consumers' and workers' rights. He has represented classes of consumers and workers, tort victims, federal judges, members of Congress, national nonprofits, military reservists, former NFL players, retail merchants, and the families of people killed by police violence. Jon was also part of the litigation team that sued Donald Trump for violating the Constitution's Emoluments Claims.

Jon is from St. Louis, Missouri, and is a *cum laude* graduate of Harvard Law School. He joined the firm following his clerkship with Judge Ronald Lee Gilman of the U.S. Court of Appeals for the Sixth Circuit. In 2014, Jon received the President's Award from the National Conference of Bankruptcy Judges for his work helping to obtain a $56 million judgment on behalf of a nationwide class of federal bankruptcy judges.

Jon's experience at the firm includes the following significant matters:

- Jon presented oral argument in the Eighth Circuit and prepared the firm's successful briefing in *Bavlsik v. General Motors*, an appeal from a district court order vacating a jury's finding of negligence by General Motors in the design of a seat-belt system, following a rollover collision that left the plaintiff quadriplegic. After obtaining reversal in the Eighth

Circuit—which reinstated the jury's negligence finding and ordered a new trial on damages only—Jon served as counsel of record for the firm's brief in opposition in the U.S. Supreme Court, defeating GM's petition for certiorari. Brief in Opposition | Eighth Circuit Opinion | Eighth Circuit Opening Brief | Reply Brief | Oral Argument Audio

- Jon presented oral argument in the D.C. Circuit on behalf of a certified class of tax-return preparers challenging the legality of fees imposed by the IRS. The district court invalidated the fees—which total more than $250 million—as unauthorized. The case is *Montrois v. United States*, and the firm represents the class along with co-counsel from Motley Rice. D.C. Circuit Brief | Oral Argument Audio | Opinion Granting Summary Judgment | Motion for Summary Judgment | Opinion Granting Motion for Reconsideration | Motion for Reconsideration | Class Certification Opinion | Motion for Class Certification | Amended Complaint

- Jon presented oral argument in the First Circuit on behalf of the Town of Brookline, Massachusetts, successfully defending against a Second Amendment challenge to its restrictions on the public carry of firearms. He was also a principal author of the firm's appellate brief, which argues that the restrictions are constitutional because they rest on a seven-century Anglo-American tradition of public-carry regulations. First Circuit Brief

- Jon presented argument and was a principal author of the firm's briefing in *National Veterans Legal Services Program v. United States* (District Court for the District of Columbia), a certified nationwide class action challenging the federal judiciary's PACER fee structure as excessive. In March 2018, the court had a three-hour summary-judgment hearing in which Jon presented argument for the class. Shortly after the hearing, the court held that the judiciary had misused PACER fees during the class period, exceeding the scope of its statutory authorization to charge fees "only to the extent necessary" to recoup the costs of providing records through PACER. Our firm has been appointed class counsel in the case, along with co-counsel from Motley Rice. The lead plaintiffs are three nonprofit legal organizations (National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice). Summary-Judgment Opinion | Motion for Summary Judgment | Reply in Support

of Motion for Summary Judgment | Opinion Certifying Class | Class-Certification Motion | Class-Certification Reply | Opinion Denying Motion to Dismiss | Opposition to Motion to Dismiss | Complaint

- Jon played a lead role in *Houser v. United States* (U.S. Court of Federal Claims), in which the firm represented a class of current and former federal bankruptcy judges and their beneficiaries in a suit against the federal government under the Constitution's Judicial Compensation Clause. His work helped obtain class certification and a $56 million judgment on behalf of his clients. Jon also took the lead in coordinating the administration of the class claims process with the Department of Justice. The National Conference of Bankruptcy Judges presented Jon with its President's Award for his work on the case. Summary Judgment Brief | Complaint

- Jon presented oral argument in the Eighth Circuit and prepared the firm's appellate brief in *Webb v. City of Maplewood*, concerning a constitutional challenge to a Missouri city's "pay-to-play" system, in which people arrested for minor municipal infractions are placed in jail if they can't afford to pay fees. Along with co-counsel from ArchCity Defenders and Tycko & Zavareei, the firm successfully defeated the city's claim to immunity in an interlocutory appeal to the Eighth Circuit. Eighth Circuit Opinion | Eighth Circuit Brief | Oral Argument Audio

- Jon has been a principal brief writer in all of the firm's First Amendment challenges to state credit-card surcharge laws brought in the wake of a $7 billion swipe-fee antitrust settlement with the major credit-card companies, including the firm's successful briefing in the U.S. Supreme Court in *Expressions Hair Design v. Schneiderman*. Jon's work helped obtain victories in California, Florida, and New York, where courts struck down the laws as unconstitutional. The cases are *Expressions Hair Design* (U.S. Supreme Court, Second Circuit), *Dana's Railroad Supply v. Bondi* (Eleventh Circuit), *Rowell v. Pettijohn* (Fifth Circuit), and *Italian Colors v. Harris* (Ninth Circuit). Petitioners' Brief (Expressions) | Petitioners' Reply (Expressions) | Supreme Court Opinion | Petition for Certiorari (Expressions)| Petition for Certiorari (Rowell) | Second Circuit Brief | Eleventh Circuit Brief | Eleventh Circuit Reply | Eleventh Circuit Opinion | Fifth

Circuit Brief | Fifth Circuit Reply | Ninth Circuit Brief | Ninth Circuit Opinion | More Filings in These Matters

- Jon was one of the lead authors of the firm's briefing in the U.S. Supreme Court in *Hernández v. United States*, a case arising out of a close-range, cross-border shooting of an unarmed Mexican teenager by a U.S. border patrol agent standing on U.S. soil. After granting the firm's petition, a unanimous Supreme Court reversed the en banc Fifth Circuit's 15-0 holding that the border guard was entitled to qualified immunity. Supreme Court Opinion | Petitioners' Brief | Petitioners' Reply | Petition for Certiorari | Reply Brief | Supplemental Brief

- Jon is part of the litigation team that has sued Donald Trump in two cases for violating the Constitution's Foreign and Domestic Emoluments Clauses. The first case, brought on behalf of businesses who compete with Trump for governmental patrons, is *Citizens for Responsibility and Ethics in Washington v. Trump* and is currently on appeal to the Second Circuit. The second case, brought on behalf of Maryland and the District of Columbia, is *District of Columbia v. Trump* and is currently proceeding in the District of Maryland, where the district court has denied Trump's motion to dismiss for lack of standing and held that the case is justiciable. Second Circuit Brief | Opinion on Justiciability (Maryland) | Opposition to Motion to Dismiss (Maryland) | More Filings in These Matters

- Jon played a leading role in the firm's briefing in *Chevron v. Donziger* (Second Circuit), a RICO action brought by Chevron in an effort to avoid paying an $8.6 billion Ecuadorian judgment holding the company accountable for decades of pollution in the Amazon rainforest. Petition for Certiorari | Petition for Rehearing | Opening brief | Reply Brief | Post-Argument Letter Brief | Motion for Judicial Notice | Motion to Dismiss for Lack of Subject Matter Jurisdiction | Reply in Support of Motion to Dismiss | More Filings in This Matter

- Jon played a key role in the firm's representation of 34 former NFL players currently challenging the proposed global settlement of all claims against the NFL related to brain injuries caused by professional football. He was a primary author of the firm's petition for certiorari in the U.S. Supreme

Court. The case is *In re National Football League Players Concussion Injury Litigation* (U.S. Supreme Court, Third Circuit). Petition for Certiorari | Petitioners' Reply Brief | Third Circuit Opening Brief | Third Circuit Reply Brief

- Jon has written *amicus* briefs on behalf of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, in more than half a dozen Second Amendment cases threatening common-sense gun laws, including *Peruta v. San Diego County*, in which the en banc Ninth Circuit adopted the firm's historical analysis, as well as *Wrenn v. District of Columbia* (D.C. Circuit), *Grace v. District of Columbia* (D.C. Circuit), *Kolbe v. Hogan* (en banc Fourth Circuit), *Silvester v. Harris* (Ninth Circuit), *Peña v. Lindley* (Ninth Circuit), and *Norman v. Florida* (Florida Supreme Court). The briefs in these cases oppose challenges to public-carry regulations in California and the District of Columbia, as well as Maryland's assault-weapons ban and California's 10-day waiting period and "microstamping" law. Peruta Amicus Brief | Peruta En Banc Opinion | Grace Amicus Brief | Wrenn Amicus Brief | Kolbe Amicus Brief (en banc) | Kolbe Amicus Brief (petition stage) | Kolbe En Banc Opinion | Silvester Amicus Brief | Silvester Opinion | Peña Amicus Brief | Norman Opinion

- Jon has written two U.S. Supreme Court *amicus* briefs on behalf of the co-sponsors of the Fair Housing Act of 1968 and other current and former Members of Congress, explaining why Congress intended the Act to permit disparate-impact liability. His work was quoted in a New Yorker article discussing the issue. In June 2015, the Supreme Court issued a surprise opinion upholding disparate-impact liability, in which Justice Kennedy adopted the firm's historical analysis. Texas Department of Housing Amicus Brief | Mount Holly Amicus Brief | U.S. Supreme Court Opinion in Texas Department of Housing

- Jon played a key role in the firm's high-profile petition for en banc review in *Carrera v. Bayer* (Third Circuit), a controversial class-action case about the ascertainability requirement. Jon's efforts helped persuade four judges to dissent from the denial of en banc review and to call on the Federal Rules Committee to examine the issue. Jon has continued to focus on ascertainability issues since *Carrera*, most recently successfully opposing a petition filed by former

Solicitor General Paul Clement in *Soutter v. Equifax* (Fourth Circuit). Carrera Petition | Soutter Answer to Interlocutory Appeal Petition

- Jon has been the lead author of briefs filed in a number of important appeals concerning workers' and consumers' rights, including *Alaska Trustee v. Ambridge* (Supreme Court of Alaska), in which he successfully obtained a ruling that the Fair Debt Collection Practices Act covers foreclosures, and *Mais v. Gulf Coast Collection Bureau* (Eleventh Circuit), concerning the meaning of the Telephone Consumer Protection Act's "prior express consent" requirement. He presented oral argument in both cases. He also presented argument before the Ninth Circuit in *Koby v. ARS National Services*, in which he argued a novel question of class-action jurisdiction, successfully objecting to a nationwide class-action settlement that sought to extinguish millions of claims in exchange for nothing. Ambridge Brief | Alaska Supreme Court Opinion in Ambridge | Oral Argument Video in Ambridge | Mais Brief | Mais Answer to Interlocutory Appeal Petition | Objector's Brief in Koby | Objector's Reply Brief in Koby | Ninth Circuit Opinion in Koby | Oral Argument Video in Koby

- Jon was also a principal drafter in several other cases concerning workers' and consumers' rights, such as *Brady v. Deloitte & Touche* (Ninth Circuit), an appeal from decertification of a class of unlicensed audit employees at Deloitte & Touche who allege overtime violations; *Kingery v. Quicken Loans* (Fourth Circuit), an appeal addressing what it means for a credit-reporting agency to "use" a credit score for purposes of the Fair Credit Reporting Act; *Cole v. CRST* (Ninth Circuit), a petition involving the application of the Supreme Court's *Tyson Foods* decision to California wage-and-hour class actions; and *Dreher v. Experian* (Fourth Circuit), in which Jon twice helped defeat petitions for interlocutory review raising questions of Article III standing, class certification is statutory-damages cases, and application of the Supreme Court's decision in *Safeco v. Burr*. Brady Reply Brief (other briefing in this case filed under seal) | Cole Rule 23(f) Petition | Kingery Opening Brief | Kingery Reply Brief | Dreher Answer to Rule 23(f) Petition | Dreher Answer to § 1292(b) Petition

- Jon was the primary draftsman of the firm's brief opposing certiorari in *American Express v. Italian Colors* (U.S. Supreme Court), a major antitrust case asking whether courts must enforce arbitration even when doing so would preclude the plaintiffs from vindicating their federal statutory rights. Jon also assisted the firm's co-counsel, former Solicitor General Paul Clement, in writing the merits brief and helped coordinate amicus briefs in support of the respondents filed by the United States, 22 States, and various scholars, trade groups, and public-interest organizations. Brief in Opposition

- Jon was a primary drafter of *amicus* briefs filed on behalf of leading nonprofit organizations in two important Supreme Court cases. The first is *Tyson Foods v. Bouaphakeo*, in which the Supreme Court adopted the firm's argument for why the Court should not decertify a class of workers at a slaughterhouse seeking overtime compensation improperly denied to them. The second is *Sheriff v. Gillie*, in which the firm represents three consumer-advocacy groups supporting a challenge to debt-collecting law firms' misleading practice of using Attorney General letterhead to collect debts owed to the state constituted clear violations of the Fair Debt Collection Practices Act. Brief of Nonprofit Organizations in Tyson | U.S. Supreme Court Opinion in Tyson | Brief of Consumer-Advocacy Groups in Gillie

- Jon wrote an *amicus* brief on behalf of former Congressman Patrick Kennedy, the author and lead sponsor of the Mental Health Parity and Addiction Equity Act, in an important test case concerning the Act's scope, in which the Second Circuit held that the Act applies to claims administrators. The case is called *New York State Psychiatric Association v. UnitedHealth* (Second Circuit). Amicus Brief of Former Congressman Kennedy | Second Circuit Opinion

- Jon helped draft the firm's merits briefing in *McBurney v. Young* (U.S. Supreme Court), a constitutional challenge under the Privileges and Immunities Clause and dormant Commerce Clause to a provision of the Virginia Freedom of Information Act denying non-residents the same right of access to public records that Virginia affords its own citizens. Merits Brief for Petitioners | Merits Reply for Petitioners

Before his judicial clerkship, Jon spent a year at Public Citizen Litigation Group on a Redstone Fellowship from Harvard. While there, Jon worked with Deepak Gupta to prepare for his Supreme Court argument in *AT&T Mobility v. Concepcion*, served as principal author of a Supreme Court amicus brief concerning the False Claims Act, wrote a Ninth Circuit brief in a consumer case, and helped advise a public-health nonprofit on federal preemption of food-labeling laws. Jon also worked as an intern at Public Citizen during law school, where he worked with Deepak Gupta and Brian Wolfman on their successful Supreme Court merits brief in *Mohawk Industries v. Carpenter* and assisted with the brief filed on behalf of Senators John McCain and Russell Feingold in *Citizens United v. Federal Election Commission*.

Jon has previously worked on microfinance and antipoverty issues in Ethiopia, studied Spanish in Chile, and helped prepare a Medicaid fraud case against drug companies as an intern in the Missouri Attorney General's Office. During law school, he helped teach legal writing as a member of the Board of Student Advisers, competed in the Upper-Level Ames Moot Court Competition, and had the Best Appellee Brief in his first-year legal writing section. Jon received his undergraduate degree, *magna cum laude*, from the University of Southern California, where he was elected to Phi Beta Kappa, was awarded a Presidential Scholarship, and was a National Merit Scholar. He is a member of the bar of the District of Columbia and the Supreme Court of the United States.

Copyright © 2023 Gupta Wessler LLP

Powered by WordPress and Origin