IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, NATIONAL
CONSUMER LAW CENTER, and
ALLIANCE FOR JUSTICE, for themselves
and all others similarly situated,
          *Plaintiffs*,

v.

UNITED STATES OF AMERICA,
          *Defendant*.

Case No. 16-745-PLF

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS SETTLEMENT AND FOR FEES, COSTS, AND SERVICE AWARDS**

      The Court should grant final approval of the settlement. Although this case involves perhaps the most litigious group of people and entities ever assembled in a single class action, the reception to the settlement continues to be almost universally positive. Out of a nationwide class of hundreds of thousands—including sophisticated data aggregators, federal-court litigators, and law firms of every stripe—we have received just three objections, all of them *pro se*. This reply addresses those objections and the government's response and is being filed within nine days of the hearing, as directed by the Court's preliminary-approval order. ECF No. 153 ¶ 6. It is accompanied by several supporting declarations that update the information provided with the motion, including declarations from counsel, the class administrator, and two experts (Professor Brian Fitzpatrick of Vanderbilt Law School and Professor William Rubenstein of Harvard Law School).

      **I. The objections regarding the settlement's fairness are misplaced.** We begin by summarizing the position of the government and that of each objector regarding the settlement's overall fairness. The government agrees that the settlement is fair and "concurs that the proposal

was negotiated at arm's length, that the relief provided for the class is adequate, and that the proposal treats class members equitably relative to each other." Gov. Resp. 2. The three *pro se* objectors complain that the settlement is unfair—but in different and even contradictory ways.

**A. Aaron Greenspan's objection.** Mr. Greenspan notes that he "was the plaintiff in one of the only lawsuits—if not the only lawsuit—to ever challenge the PACER fee structure, prior to this one." Greenspan Obj. 1. He contends that, because he "should not have had to pay a single penny to the federal government for fees that were unlawfully charged in the first place," "all of that money should be refunded in full." *Id.* ("I want my money—stolen by the courts—back. All of it. And I want the Administrative Office staff and the judges who approved this held accountable, by name."). Mr. Greenspan believes that "the judiciary has scammed the American public." *Id.* In his view, "the plaintiffs [were] 100% right, the government [was] 100% wrong," and so any "legal limitations" on the refund of all fees paid are "manifestly unjust." *Id.* His objection was filed two days late; he has not indicated an intent to appear at the hearing.

**B. Eric Alan Isaacson's objection.** Mr. Isaacson, a serial class-action objector, contends that this is a "run-of-the-mill settlement" and that class counsel has "achieved a remarkably mediocre result." Isaacson Obj. 3. In his assessment, this first-ever class action against the federal judiciary "was obviously an easy one to litigate" and an "easy one to settle." *Id.* at 14. Mr. Isaacson objects to the requested fees and service awards, objections that we address separately below. With respect to the settlement's overall fairness, his complaint is that class counsel disserved the class "by advocating a purely pro-rata distribution of settlement funds"—an approach that, in his view, "favor[s] large institutional users." *Id.* at 5 ("Named Plaintiffs' advocacy for pro-rata distribution was grossly inappropriate. The 'blend' reached as a compromise allocates far too much to a pro rata distribution that unfairly advantages large users and law firms[.]"). His objection was timely; he says that he intends to appear remotely.

**C. Geoffrey Miller's objection.** Mr. Miller's objection is exactly the opposite: Whereas Mr. Isaacson believes that class counsel's sin was to "favor large institutional users," *id.*, Mr. Miller thinks the settlement "favor[s] smaller users." Miller Obj. 2. And while Mr. Isaacson believes that counsel advocated too vigorously for a pro rata distribution, Mr. Miller contends they didn't do so vigorously enough. He derides the settlement's allocation plan—which reimburses every PACER user for up to $350 in fees paid, with a pro rata distribution to users who paid more—as a "[r]edistribution of wealth." *Id.* Mr. Miller does not contend that he himself is an allegedly disfavored large institutional user. And no large institutional users have seen fit to object, despite their presumed access to sophisticated legal counsel. Mr. Miller "has no problem with the total cash compensation or with the proposed maximum of 20% of the common fund for" fees and service awards. *Id.* at 1. His objection was timely; he does not plan to appear.[1]

**D. Class counsel's responses to the objections.** Mr. Greenspan's frustration is perhaps understandable. But his demand for a perfect settlement overlooks the fact that any settlement is necessarily a compromise—one that must be reached within the bounds of the law. Here, that law included a Federal Circuit decision holding that some of the PACER fees that were charged by the federal judiciary during the class period were lawful because they covered "expenses incurred in services providing public access to federal court docketing information." *NVLSP v. United States*, 968 F.3d 1340, 1350 (Fed. Cir. 2020). Mr. Greenspan's preferred settlement, one that would reimburse every penny paid during the class period, would be impossible in light of that ruling. He also ignores the fact that, under *this* settlement, the vast majority of class members will

---

[1] In addition to these three objections, the Court received an email on September 26, 2023 from Alexander Jiggetts, indicating that he "oppose[s] the settlement" because he was "the first person to complain about Pacer Fees" and has not been credited for his efforts. Mr. Jiggetts's submission is without merit. Although untimely, class counsel has no objection to the Court's consideration of this submission on its merits.

in fact receive a full refund—one hundred cents on the dollar—of PACER fees that they paid during the class period.

Mr. Isaacson's and Mr. Miller's objections are diametrically opposed. They cannot both be correct. That is, it cannot simultaneously be true that the settlement both unfairly *advantages* and unfairly *disadvantages* large institutional users. Our motion (at 21–24) already responds to Mr. Miller's objection in detail; we will not repeat all those points here. In a nutshell: The plan of allocation reflects a reasonable compromise between, on the one hand, the plaintiffs' strong advocacy for a purely pro rata distribution and, on the other, the government's longstanding policy of expanding public access for the average PACER user, the E-Government Act's express authorization that the judiciary may "distinguish between classes of persons" to "avoid unreasonable burdens and promote public access," 28 U.S.C. § 1913 note, and the government's litigating and negotiating positions. The government makes similar points in its response. Gov. Resp. 2–3.

Mr. Isaacson's objection is much harder to fathom. He identifies no authority for the puzzling notion that it was "grossly inappropriate" for the class representatives to advocate for a pro rata distribution. Isaacson Obj. 5. Although Rule 23 does not *require* a pro rata distribution, *see UAW v. GM*, 497 F.3d 615, 629 (6th Cir. 2007), it has always been true—both in modern class actions and at equity—that "fair treatment" is "assured by straightforward pro rata distribution of proceeds of litigation amongst the class." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999); *see id.* at 840–41 (explaining that, historically, "the simple equity of a pro rata distribution provid[ed] the required fairness"). Much of Mr. Isaacson's objection also rests on a basic misunderstanding of the jurisdictional framework for this case. He wrongly asserts (at 7–9) that this class action, and hence this settlement, can't include entities whose claims total more than $10,000. Not so. As this Court explained when it certified the class, "[a] suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate

4

transactions for which the claims do not individually exceed $10,000," as is the case here. ECF No. 33 at 6; *see also* ECF No. 8 at 9–11. Mr. Isaacson's jurisdictional arguments are simply mistaken.[2]

**II. The percentage fee requested (19.1%) is reasonable.** The government and Mr. Isaacson also opine on various aspects of class counsel's fee request. Although their points differ in many respects, they all suffer from the same basic flaw: They treat this case as if it were a standard fee-shifting case, where fees are sought from a defendant under a fee-shifting statute (an exception to the "American rule" that each party must pay its own fees), rather than a "fee-spreading" case, where fees are sought from a common fund created for the benefit of the class (consistent with the American rule). *See In re Home Depot Inc.*, 931 F.3d 1065, 1079 n.12 (11th Cir. 2019).

**A. The government's response.** The government does not object to using the percentage-of-the-fund approach to determine the fee in this case—the approach used in the overwhelming majority of common-fund cases. *See* Mot. 25–27; *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("[A] percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases."). Nor does the government deny that a fee of 19.1% is reasonable in this case and is reasonable for funds of this size. *See* Mot. 33–34 (citing

---

[2] Mr. Isaacson also contends that large institutional class members, like law firms, have "suffered no injury" to the extent that they have passed on PACER charges to their clients, so any recovery for them is an "unfair windfall." Isaacson Obj. 4–5. This, too, is mistaken. The law has long held that, if plaintiffs are harmed "in the first instance by paying [an] unreasonable charge," they may recover the full amount of the overcharges even if they have "pass[ed] on the damage" to others. *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918). Indeed, damages under the Little Tucker Act are available *only* to those who paid the unlawful fee to the government—not to third-parties. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1303 (Fed. Cir. 2004). Thus, as other courts have recognized, subsequent reimbursement by third parties poses no barrier to the settlement. *See AT & T Mobility Wireless Data Services Sales Tax Litigation*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (rejecting objections to a class-action settlement on this ground because, "[i]f third-party employers subsequently reimbursed Class Members for the pertinent tax charges, then the question whether such Class Members must in turn reimburse their employers is a separate matter involving a question of law and equity between the employer and employee").

cases). As our motion explains, a fee award of 19.1% is well below the standard one-third recovery and is even "below the average percentage … for settlements between $69.6 and $175.5 million." *Id.* (quoting Fitzpatrick Decl. ¶ 19).

Instead, proceeding as if this were an ordinary fee-shifting case, the government directs its attention almost exclusively to the details of the lodestar calculation. But this "discussion of the lodestar and how it is calculated is an unnecessary sideshow." Fitzpatrick Supp. Decl. ¶ 2. Again, the lodestar is not the basis of the fee request, and it is relevant only to the extent that the Court believes that a cross-check is necessary. Regardless, none of the issues raised by the government require any lodestar reduction, nor provide any basis for reducing the percentage fee requested.

***1. Future time.*** The government first correctly notes that the lodestar includes an estimate for work that had not yet been performed when the lodestar was calculated ($400,000 for Gupta Wessler and $500,000 for Motley Rice). The government does not deny that an estimate for future work is appropriate and that precision is not required. *See* Mot. 37–38 n.3 (citing cases). But, without acknowledging the relevant case law, the government asserts that there has been "little, if any, explanation for these estimates." Gov. Resp. 4. As explained in the motion, however (at 37–38 n.3), the estimates include projections for "responding to inquiries from class members about legal issues, damages calculations, and the mechanics of the settlement; responding to potential objections and filing any replies in support of the settlement; preparing for and participating in the fairness hearing; handling any appeal; assisting class members during the settlement-administration process and ensuring that it is carried out properly; and addressing any unanticipated issues that may arise." Further, Motley Rice's projection was extrapolated from the "time spent on [class-administration] tasks since notice was sent in July." Oliver Decl. ¶ 9.

Nevertheless, class counsel have prepared supplemental declarations that provide additional support for their estimates. *See* Gupta Supp. Decl. ¶¶ 2–3; Oliver Supp. Decl. ¶¶ 3–5.

6

Class counsel note, for example, that the time they have spent working on the case since calculating the lodestar only confirms the reasonableness of their estimates. *Id.* And while only three class members have filed objections, the possibility of an appeal is very real given that Mr. Isaacson touts himself as "a prominent appellate litigator" who has objected to many class-action settlements and who has pursued appeals after his objections were overruled. Gupta Supp. Decl. ¶ 3.

  **2. *Current versus historical rates.*** The government next contends that the lodestar should not include class counsel's current billing rates but should instead use their historical rates. Gov. Resp. 4–5. But even in fee-shifting cases (which can raise sovereign-immunity questions not present here), courts "generally" compensate for the delay "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542, 556 (2010); *see, e.g.*, *James v. District of Columbia*, 302 F. Supp. 3d 213, 226–28 (D.D.C. 2018) (explaining that courts "routinely" use this approach and apply "current rates when calculating the lodestar" "to account for a delay in payment," because "it is only fair to award attorneys the present value of the services that they rendered"); *Thomas v. District of Columbia*, 908 F. Supp. 2d 233, 248–49 (D.D.C. 2012) (same). In common-fund cases, some courts go so far as to mandate use of "one of [these] two delay-compensation methods," holding that "failure to do so is an abuse of discretion." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016). Because class counsel have been working on this case for nearly eight years without compensation, it is appropriate for their lodestar to reflect their current rates to account for this delay.

  **3. *The Fitzpatrick Matrix.*** The government suggests that the Court "inquire as to the basis for [class counsel's] rates" and consider using rates from "the U.S. Attorney's Office Fitzpatrick Matrix." Gov. Resp. 5–7. But as the matrix's creator himself explains, the government misunderstands its purpose. By its own terms, the Fitzpatrick Matrix is for cases "in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees." *See* Fitzpatrick

7

Matrix, Explanatory Note 2, https://perma.cc/EVQ5-NNMC. Even then, the matrix is only "a settlement tool, designed 'to minimize fee disputes' with the Department [of Justice]" because the government has "agreed not to oppose any fee-shifting request based on the rates in the Matrix." Fitzpatrick Supp. Decl. ¶ 5 (quoting Explanatory Note 10); *see* Explanatory Note 3. For these reasons, the matrix is "irrelevant to this fee request." Fitzpatrick Supp. Decl. ¶ 5

"Nothing about the matrix precludes" counsel from seeking higher rates. *Id.* ¶ 5. That is particularly true because the matrix represents rates found in the *middle* of data from a potpourri of cases, including individual employment and FOIA matters. *Id.* ¶ 6. The rates "ranged from $100 to $1250." *Id.* As Professor Fitzpatrick explains: "Above-average lawyers commanded rates at the high end of the range and below-average lawyers at the low end. Class counsel here include some of the best class action lawyers not just in the District of Columbia, but in the entire United States of America. It is not surprising that their rates fall at the high end of the range. What is surprising is that class counsel's rates do not exceed the range altogether given that the range was drawn from data from several years ago." *Id.*

In fact, an examination of the data used in the matrix, once filtered for class-action cases, strongly supports the fee request here. As Professor William Rubenstein of Harvard Law School points out, the data underlying the Fitzpatrick Matrix is drawn largely from garden-variety fee-shifting cases and contains few class actions. Professor Rubenstein "reviewed the entire PACER docket in each of [the] 84 cases" in the Fitzpatrick dataset and "found that only 8 were class action cases and that many of the remaining 76 cases were routine fee-shifting matters." Rubenstein Decl. ¶ 21. He found, further, that "the rates in the Matrix's 8 class action cases are on average 43.98% higher than the rates in its 74 non-class action cases." *Id.* ¶ 22. "[W]hen the proposed rates in this case are plotted against the class action rates in the Fitzpatrick Matrix," Professor Rubenstein found that "the rates in this case are, on average, precisely the same as (only .65% above) the

8

Matrix's class action rates. What this means is that the *relevant* data that underlie the Matrix actually provide strong empirical evidence *in support of* the rates that Class Counsel propose here." *Id.* ¶ 23.

Professor Rubenstein provides additional "empirical evidence" showing that class counsel's rates "are in line with rates found in fee petitions approved by District of Columbia (and Court of Federal Claims) judges overseeing large fund class actions." *Id.* ¶ 19. He "created a database of approved fee petitions filed in large fund class actions in the District of the District of Columbia and in the Court of Federal Claims (for District of Columbia cases) since 2010, and then delved into those petitions to find the hourly rates that lawyers were billing." *Id.* ¶ 14. He "reviewed the lodestar submissions," "extracted 185 individual hourly rates of partners and associates (partnership-track attorneys)," "obtained the year of admission to the bar for each," and "adjusted all these rates to 2023 dollars." *Id.* This produced a scatterplot showing that "Class Counsel are charging rates roughly comparable to the norm" (just 9.3% above it on average), which in his view is "impressive" given that they "are among the leading class action law and plaintiff-side firms in the United States, and the lawyers who worked on this case possess years of experience, have track records of success, and can be counted among the elite of the profession generally and this area of law specifically." *Id.* ¶ 18. And class counsel's rates are, in Gupta Wessler's case, "rates that [the] firm actually charges to paying clients." Gupta Suppl. Decl. ¶ 5. The government gives no reason why this Court should ignore those rates and the empirical evidence supporting them, and instead use a fee matrix created for settlement purposes in fee-shifting cases against the federal government—"a formula that takes into account only a single factor ([] years since admission to the bar)," which "does not adequately measure [every] attorney's true market value." *See Perdue*, 559 U.S. at 554–55.

To the contrary, even in the fee-shifting context, the Federal Circuit has held that "it would be an abuse of discretion for a court to blindly use [a fee] matrix without considering all the relevant facts and circumstances." *Biery v. United States*, 818 F.3d 704, 714 (Fed. Cir. 2016). That makes sense.

When sophisticated clients shop for legal services, they look for more than just the year a lawyer passed the bar. They also consider credentials, skill level, quality of work, relevant experience, track record, and so on. It is only fitting that the rates would reflect these other variables.

In any event, even if rates from the Fitzpatrick Matrix were used, the requested fee award would still be fully justified. If the Court were to conduct a lodestar cross-check using these rates, it would show that the multiplier would still be just 5.53. *See* Gupta Supp. Decl. ¶ 6. That "is still well within the range of multipliers that resulted from previous percentage-method fee awards," and "still does not suggest there will be any windfall here: the risk this case would yield nothing far outstrips even the adjusted multiplier." Fitzpatrick Supp. Decl. ¶ 7.

***4. Lodestar cross-check***. Finally, the government vaguely states (at 8) that the Court "may wish" to conduct a lodestar cross-check. But the government addresses none of the points made in our motion or in Professor Fitzpatrick's declaration, which identify the problems when courts rely on lodestar calculations for common-fund fees. *See* Mot. 25–27, 35–37. If anything, the government's quibbles only underscore these problems, suggesting that the Court and counsel perform additional (and unnecessary) work to address details that have little bearing on the appropriateness of the fee. *See* Fitzpatrick Supp. Decl. ¶ 3 ("The ink that has already been spilled over class counsel's hourly rates shows why a focus on the lodestar defeats one of the principal virtues of the percentage method for setting attorneys' fees in class actions.").

But again, even if the Court were to apply a lodestar cross-check, it would simply confirm the reasonableness of the requested fee here. As explained in the motion (at 37), a multiplier of up to four is the "norm." *Health Republic Ins. Co. v. United States*, 58 F.4th 1365, 1375 (Fed. Cir. 2023); *see also In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 102 (D.D.C. 2013) (Friedman, J.) ("Multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied." (cleaned up)); *Kane Cnty. v. United States*, 145 Fed. Cl. 15, 20 (2019) (approving a

multiplier of 6.13 and collecting cases approving or referencing multipliers between 5.39 and 19.6); *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (approving a 10.15 multiplier). A higher multiplier may be justified by the circumstances of a "particular case," including "the risk of nonpayment," the lack of significant "object[ion] to the award," and whether the notice indicated an "agreement by the class to a specified percentage." *Health Republic*, 58 F.4th at 1375–77.

The motion explains why each of these factors is present here, and the government does not contend otherwise. *See* Mot. 35–39. The government does not deny that the risks of suing the federal judiciary in this case were sky high, while the results achieved are exceptional. Gov. Resp. 2 (agreeing that the relief here is "extraordinary"). Although the government suggests (at 9) that the requested fee could be "to the detriment of class members," it does not explain what is unfair about an arrangement in which class members (1) owe no legal fees in the event that they do not prevail, (2) receive eight years of high-quality representation in a complex, risky, and novel class action, and (3) ultimately share in a $125 million settlement that (at a minimum) makes them whole up to $350, while paying less than 20% of that total in fees. Class members themselves apparently saw no unfairness in that arrangement. They were informed that, "[b]y participating in the Class, you agree to pay Class Counsel up to 30 percent of the total recovery in attorneys' fees and expenses with the total amount to be determined by the Court." ECF Nos. 43-1 & 44. And each named plaintiff signed a retainer agreement with class counsel providing for a contingency fee of up to 33% of the common fund. Gupta Decl. ¶ 65. This is evidence of "the market value for class counsel's services" and "certainly supports a fee award [at a smaller percentage]." *Black Farmers*, 953 F. Supp. 2d at 99–100. In fact, only one class member has objected to a fee award of 19.1%—an objection to which we now turn.

**B. Mr. Isaacson's fee objection.** Like the government, Mr. Isaacson urges the Court to calculate class counsel's lodestar using the Fitzpatrick Matrix (an argument that is no more

11

persuasive in his filing than in the government's). *See* Isaacson Obj. 13. But his principal contention is far more ambitious. He takes the position that fees in a class action should be presumptively limited to class counsel's lodestar—a position that is not the law in any circuit. For support, he cites the Supreme Court's decision in *Perdue* (which interprets language in a fee-shifting statute) and several 19th-century cases that predate Rule 23. *Id.* at 9–11. As courts have recognized in rejecting this argument and approving other settlements to which Mr. Isaacson has objected, "the *Perdue* presumption against a lodestar enhancement does not apply when a court awards fees from a common fund created after a [class-action] settlement" and no fee-shifting statute is available. *In n re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 478–89 (S.D.N.Y. 2017) (Nathan, J.) (cleaned up); *see Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 67–72 (2d Cir. 2019) (rejecting same argument by Isaacson). Every circuit to have addressed the question has held that "Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases" and "restricting the use of multipliers in statutory fee-shifting cases does not apply to common-fund cases." *Home Depot*, 931 F.3d at 1085; *see Fresno Cnty.*, 925 F.3d at 67–72; *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 564–65 (7th Cir. 1994); *Staton v. Boeing Co.*, 327 F.3d 938, 967–69 (9th Cir. 2003).

Mr. Isaacson does not cite or acknowledge any of these cases (not even the ones in which he was an objector). Nor does he cite or acknowledge the Federal Circuit's decision earlier this year reaffirming that the "percentage-of-the-fund method" is a permissible way to set fees in a common-fund class action. *Health Republic*, 58 F.4th at 1371. Nor does he have anything to say about the reasons *why* courts overwhelmingly turned away from the lodestar method in favor of the percentage approach, detailed by the D.C. Circuit in *Shalala* and by Professor Fitzpatrick in his original declaration. *See* Mot. 26. As this Court has noted, the percentage approach replicates the market, is easy to apply, and "helps to align more closely the interests of the attorneys with the interests of the parties by discouraging inflation of attorney hours and promoting efficient

prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *Black Farmers*, 953 F. Supp. 2d at 88. As against these virtues, Mr. Isaacson identifies no countervailing considerations—or any benefits at all—in favor of his preferred approach.

And his approach is quite wrong. The market for plaintiff-side services rewards results, not hours. Even if that weren't so, and plaintiffs paid their counsel by the hour, there would quite naturally be a stiff premium on the hourly rate for any arrangement in which the client (1) would not have to pay anything in legal fees in the event of a loss, (2) would never owe more than a modest percentage of their recovery in the case, and (3) would make no payments along the way.

Mr. Isaacson has no rebuttal to any of these points. He simply asserts, without support, that no multiplier at all would be warranted because the case "was obviously an easy one to litigate" and "an easy one to settle" and the results are "remarkably mediocre." Isaacson Obj. 3, 9–14. The evidence in the record, however, shows the opposite. Professor Fitzpatrick—an expert not only on class actions, but on litigation against the federal government—has set forth his view that this case was exceptionally difficult to litigate, resulting in a remarkable recovery for the class. *See* Fitzpatrick Decl. ¶¶ 20–21. And the class representatives—themselves experts on class-action settlements and litigation against the federal government (including the esoteric area of user-fee jurisprudence)—testified to the same. *See* Burbank Decl. ¶¶ 3, 5, 7–8; Rossman Decl. ¶¶ 1–2, 4–5.[3]

---

[3] Elsewhere, Mr. Isaacson declares that a fee of 5% of the common fund would be "wholly appropriate here" because that was what the Supreme Court found reasonable 140 years ago in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885). Isaacson Obj. 12. Yet he does not grapple with the governing framework for assessing a reasonable fee under the percentage approach, or with the data showing that, even if this case were really just a "run-of-the-mill settlement," *id.* at 3, a fee of 19.1% of the common fund would be a "run-of-the-mill" percentage—indeed, a *lower*-than-average percentage—for a settlement of this size. *See* Mot. 33; Fitzpatrick Decl. ¶ 19.

In fact, even if the lodestar method were used to determine the fee in this case, as opposed to the percentage-of-the-fund approach, the record would still fully support the fee request. Using class counsel's current rates would compensate them for the years-long *delay* in payment. Using their actual rates would reflect the *quality* of their work. And applying a multiplier of under four would account for the high *risk* of nonpayment in this litigation and be fully consistent with the language in the class notice, the retainers with the named representatives, and the paucity of objections. The only difference would be that the court would have to sift through class counsel's time records and examine them line by line—a waste of judicial resources that is not required even if the Court were to conduct a lodestar cross-check. *See* Mot. 36; *Black Farmers*, 953 F. Supp. 2d at 101 n.8; *contra* Isaacson Obj. 12 (complaining that the lodestar is "inadequately documented").

**III. The proposed service awards are reasonable.** Finally, Mr. Isaacson objects to the requested $10,000 payments for the National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice. Courts in the D.C. and Federal Circuits routinely award such payments—known variously as service, incentive, or case-contribution awards—to class representatives. *See, e.g., Keepseagle v. Perdue*, 856 F.3d 1039, 1056 (D.C. Cir. 2017); *Cobell v. Jewell*, 802 F.3d 12, 24–25 (D.C. Cir. 2015); *Mercier v. United States*, 156 Fed. Cl. 580, 590 (2021). And courts have specifically approved of service awards for organizations where, as here, they have "provided in-house counsel" who aided in the prosecution of the case and "direct[ed] class counsel in settling the case." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002).

Mr. Isaacson asks this Court to depart from settled practice and conclude that *all* service awards are categorically barred on the basis of two 19th-century cases, *see Trustees v. Greenough*, 105 U.S. 527 (1882); *Pettus*, 113 U.S. 116 (1885), both of which predate the modern class action. But "neither *Greenough* nor *Pettus* prohibits incentive awards in class actions," and an "overwhelming majority"

14

of circuits "have concluded that district courts are permitted to grant incentive awards." *Moses v. N.Y. Times Co.,* 79 F.4th 235, 256 (2d Cir. 2023).[4]

Mr. Isaacson does not acknowledge this contrary authority—even though much of it comes from recent appeals in which he has unsuccessfully pressed this issue. Nor does he acknowledge the Supreme Court's recent recognition that, in a typical class action, "[t]he class representative might receive a share of class recovery above and beyond her individual claim"—for example, through a "$25,000 incentive award." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018). Because it discusses incentive awards in Rule 23 class actions, *China Agritech*—not *Greenough* or *Pettus*—is the more relevant source for guidance on the Supreme Court's view of incentive awards. And it is consistent with the prevailing view that, as the Supreme Court put it, "[t]he plaintiff who" does the work "to lead the class" may get an "attendant financial benefit." *Id.* at 1810–11.

Even if this Court were free to set aside all modern practice and precedent, this case wouldn't present the abstract legal question that Mr. Isaacson is trying to tee up under the 19th-century cases. *Greenough* allowed a bondholder, whose suit benefited others, to recover his "reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit," but held that he couldn't recover a large annual salary for his "personal services" or recoup all of his "private expenses." 105 U.S. at 537; *see Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1257 (11th Cir. 2020) (drawing this same line). Because the requested payments here fall on the right side of this

---

[4] *Accord Hyland v. Navient Corp.*, 48 F.4th 110, 123–24 (2d Cir. 2022); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785–86 (9th Cir. 2022); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 353 (1st Cir. 2022); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017); *Pelzer v. Vassalle*, 655 F. App'x 352, 361 (6th Cir. 2016); *Tennille v. W. Union Co.*, 785 F.3d 422, 434–35 (10th Cir. 2015); *Berry v. Schulman*, 807 F.3d 600, 613–14 (4th Cir. 2015); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001).

line—that is, because they cover time by "counsel" "incurred in the fair prosecution of the suit"—this case doesn't present a suitable vehicle for a crusade against service awards.

Although Isaacson makes sweeping legal arguments about service awards in general, he is silent on the evidence supporting the requested awards in this case—evidence that would *fully justify the exact same awards* if relabeled as attorneys' fees. As the class representatives explained in their declarations, the market value of the in-house attorney time incurred by each organization greatly exceeded the $10,000 in claimed service awards. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2. Over seven years, experienced lawyers at each organization "performed invaluable work" that could otherwise have been performed by "outside counsel hired by each organization at far greater expense." Gupta Supp. Decl. ¶ 7. "The requested awards here are thus entirely unlike typical incentive awards: They are not for the personal services or private expenses of an individual class representative nor do they reflect any sort of personal 'salary' or 'bounty.' They instead reflect a bargain price for work that was actually performed by experienced in-house counsel and that was necessary to carry out the prosecution of this suit." *Id.*[5] Put differently: If the National Veterans Legal Services Program had hired an outside law firm to perform the same work, and had sought payment from the common fund for that work, there would be no question that it would be compensable. Indeed, it would have been compensable in full, at market rates, even if this were a

---

[5] Mr. Isaacson makes two other points, both belied by the evidence. *First*, he contends (at 16) that the named plaintiffs had all the incentive they needed because they had "substantial claims of their own." But the claims were for much less than the value of the in-house attorney time they expended over seven years. *See* ECF Nos. 28, 29, 30. *Second*, he complains (at 17) that the plaintiffs haven't documented their request. But, again, he ignores the fact that each organization submitted a declaration indicating that the amount of attorney time it incurred greatly exceeded $10,000 at market rates. *See* Rossman Decl. ¶ 3; Burbank Decl. ¶ 6; Brooks Decl. ¶ 2.

16

garden-variety statutory fee-shifting case.[6] Mr. Isaacson has no explanation for why the non-profit class representatives here should be denied a more modest payment to compensate them for their substantial contributions to this groundbreaking litigation over the past seven years.

## CONCLUSION

This Court should grant the motion and enter the proposed order. In addition to approving the settlement, the Court should award 20% of the settlement fund to cover attorneys' fees, notice and settlement costs, litigation expenses, and service awards. Specifically, the Court should (1) award $10,000 to each of the three class representatives, (2) award $29,654.98 to class counsel to reimburse litigation expenses, (3) order that $1,077,000 of the common fund be set aside to cover notice and settlement-administration costs, and (4) award the remainder (19.1% of the settlement fund, or $23,863,345.02) to class counsel as attorneys' fees.

---

[6] *See, e.g.*, *Kay v. Ehrler*, 499 U.S. 432, 436 n.7 (1991) (observing that, under 42 U.S.C. § 1988, "Congress intended organizations to receive an attorney's fee even when they represented themselves"); *Blum v. Stenson*, 465 U.S. 886 (1984) (holding that, under section 1988, a non-profit legal services organization is entitled to an attorneys' fee based on prevailing market rates rather than its own in-house cost in providing the service); *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 929 (Fed. Cir. 2000) (en banc) (holding that time spent on litigation by a labor union's in-house staff counsel should be compensated at market rates under a fee-shifting statute); *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1569 (Fed. Cir. 1988) (awarding attorneys' fees by statute for time spent on litigation by in-house counsel).

                      Respectfully submitted,

                      */s/ Deepak Gupta*
                      DEEPAK GUPTA
                      JONATHAN E. TAYLOR
                      GUPTA WESSLER LLP
                      2001 K Street, NW, Suite 850 North
                      Washington, DC 20006
                      (202) 888-1741
                      *deepak@guptawessler.com*
                      *jon@guptawessler.com*

                      WILLIAM H. NARWOLD
                      MOTLEY RICE LLC
                      One Corporate Center
                      20 Church Street, 17th Floor
                      Hartford, CT 06103
                      (860) 882-1676
                      *bnarwold@motleyrice.com*

                      MEGHAN S.B. OLIVER
                      CHARLOTTE E. LOPER
                      MOTLEY RICE LLC
                      28 Bridgeside Boulevard
                      Mount Pleasant, SC 29464
                      (843) 216-9000
                      *moliver@motleyrice.com*
                      *cloper@motleyrice.com*

October 3, 2023                *Counsel for Plaintiffs National Veterans Legal Services Program, National Consumer Law Center, Alliance for Justice, and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2023, I electronically filed this reply and related documents through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*
Deepak Gupta
