UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
NATIONAL VETERANS LEGAL                   )
SERVICES PROGRAM, NATIONAL                )
CONSUMER LAW CENTER, and                  )
ALLIANCE FOR JUSTICE, for themselves      )
and all others similarly situated,        )
                                          )
        v.                                )        Civil Action No. 16-0745 (PLF)
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
        Defendant.                        )
_____)


                            <u>OPINION</u>

        For over fifteen years, PACER fees – the per-page fees that the federal judiciary

charges the public for online access to court documents – have been a subject of controversy.  As

a result of the litigation in this case, the United States will return over $100 million of these fees

to users of PACER.  Today, this litigation substantially comes to a close.

        The Court has before it a motion of class representatives National Veterans Legal

Services Program, National Consumer Law Center, and Alliance for Justice (the "Named

Plaintiffs") for final approval of a settlement agreement that would resolve the pending claims of

hundreds of thousands of plaintiffs and reimburse them for PACER fees that the judiciary

unlawfully used to fund certain non-PACER services.  Counsel for the Named Plaintiffs also

request attorney's fees, costs, and service awards.

        After careful consideration of the arguments made by the Named Plaintiffs and by

the government, and of the comments and objections by interested persons submitted to the

Court and made at the hearing held on October 12, 2023, the Court will approve the settlement

agreement and award $23,863,345.02 in attorney's fees, $1,106,654.98 in costs, and $30,000 in

service awards.[1]

---

[1]     The filings and attachments considered by the Court in connection with this matter include:  Complaint ("Compl.") [Dkt. No. 1]; Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment ("Mot. to Dismiss") [Dkt. No. 11]; Plaintiffs' Unopposed Motion for Approval of Revised Plan of Class Notice and Class Notice Documents, Exhibit 3 ("Class Cert. Web Notice") [Dkt. No. 42-5]; Notice of Filing of Revised Notice Documents, Exhibit 1 ("Class Cert. Email Notice") [Dkt. No. 43-1]; Plaintiffs' Motion for Summary Judgment as to Liability ("Pls.' Summ. J. Mot.") [Dkt. No. 52]; Declaration of Jonathan E. Taylor, Exhibit B ("1997 AO Report") [Dkt. No. 52-3]; Declaration of Jonathan E. Taylor, Exhibit E ("Jud. Conf. Letter") [Dkt. No. 52-6]; Declaration of Jonathan E. Taylor, Exhibit H ("Lieberman Letter") [Dkt. No. 52-9]; Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts") [Dkt. No. 52-16];  Defendant's Cross-Motion for Summary Judgment ("Def.'s Summ. J. Mot.") [Dkt. No. 74]; Declaration of Wendell A. Skidgel Jr. ("Skidgel Decl.") [Dkt. No. 74-2]; Defendant's Statement of Material Facts as to Which There is No Genuine Dispute and Response to Plaintiffs' Statement of Undisputed Material Facts ("Def.'s Facts") [Dkt. No. 74-3]; Declaration of Wendell A. Skidgel Jr. ("2d Skidgel Decl.") [Dkt. No. 81-1]; Notice of Submission of Revised Proposed Order and Revised Notice Documents, Exhibit 5 ("Sett. Web Notice") [Dkt. No. 152-5]; Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Sett. Mot.") [Dkt. No. 158]; Declaration of Renée Burbank ("Burbank Decl.") [Dkt. No. 158-1]; Declaration of Stuart T. Rossman ("Rossman Decl.") [Dkt. No. 158-2]; Declaration of Rakim Brooks ("Brooks Decl.") [Dkt. No. 158-3]; Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") [Dkt. No. 158-4]; Declaration of Deepak Gupta ("Gupta Decl.") [Dkt. No. 158-5]; Declaration of Meghan S.B. Oliver ("Oliver Decl.") [Dkt. No. 158-6]; Declaration of Gio Santiago Regarding Implementation of Settlement Notice Program ("KCC Decl.") [Dkt. No. 158-7]; Defendant's Response to Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Def.'s Resp.") [Dkt. No. 159]; Plaintiffs' Reply in Support of Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards ("Pls.' Reply") [Dkt. No. 160]; Supplemental Declaration of Brian T. Fitzpatrick ("Fitzpatrick Supp. Decl.") [Dkt. No. 160-1]; Declaration of William B. Rubenstein in Support of Class Counsel's Motion for Attorneys' Fees ("Rubenstein Supp. Decl.") [Dkt. No. 160-2]; Supplemental Declaration of Deepak Gupta ("Gupta Supp. Decl.") [Dkt. No. 160-3]; Declaration of Meghan S.B. Oliver ("Oliver Supp. Decl.") [Dkt. No. 160-4]; Declaration of Gio Santiago Regarding Settlement Administration Costs ("KCC Supp. Decl.") [Dkt. No. 160-5]; Plaintiff-Class Member Don Kozich's Verified Objections to Settlement and Motion to Appear Telephonically or by Zoom ("Kozich Obj. and Mot.") [Dkt. No. 163]; Plaintiffs' Response to Objection of Don Kozich ("Resp. to Kozich Obj.") [Dkt. No. 165]; and Plaintiffs' Notice of Filing of All Objections Received to Date ("Compiled Objs.") [Dkt. No. 166].

The Court also reviewed the following objections to the settlement agreement: Objection of Aaron Greenspan ("Greenspan Obj.") [Dkt. No. 166-1]; Objection of Alexander Jiggetts ("Jiggetts Obj.") [Dkt. No. 166-2]; Objection of Geoffrey Miller ("Miller Obj.") [Dkt.

## I.  BACKGROUND

### A.  *Origin and History of PACER Fees*

Before the late 1980s, federal courts operated on paper.  If members of the public wanted to view court dockets or filings, they had to travel to the courthouses where those records physically existed.  Then, in 1988, the judiciary "authorized an experimental program of electronic access for the public to court information."  JUD. CONF. OF THE U.S., REPORT OF THE PROCEEDINGS 83 (Sept. 14, 1988), www.uscourts.gov/file/1642/download [perma.cc/HKS6-4B34].  This experiment gave rise to the Public Access to Court Electronic Records system, or "PACER."  Pls.' Facts ¶ 1.  PACER allows the public to access court documents without the need to review physical records or travel to the courthouse to access them.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, U.S. CTS. (Dec. 9, 2013), www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts [perma.cc/92NB-8BM7].

Originally, PACER worked via a dial-up phone connection and users were charged fees by the minute.  25 Years Later, PACER, Electronic Filing Continue to Change Courts, supra.  But in 1998, PACER moved online, and the judiciary started charging users on a per-page basis.  See Def.'s Facts ¶ 16.  Around the same time, the judiciary began to use PACER

---

No. 166-3]; Objection of Eric Isaacson ("Isaacson Obj.") [Dkt. No. 166-5]; and Written Statement of Eric Alan Isaacson of Intent to Appeal in Person at the October 12, 2023, Final-Approval Hearing ("Isaacson Stmt.") [Dkt. No. 166-6].

The Court also reviewed the following prior opinions in this case:  Nat'l Veterans Legal Servs. Program v. United States, Civil Action No. 16-0745, 2016 WL 7076986 (D.D.C. Dec. 5, 2016) ("Motion to Dismiss Op."); Nat'l Veterans Legal Servs. Program v. United States, 235 F. Supp. 3d 32 (D.D.C. 2017) ("Class Certification Op."); Nat'l Veterans Legal Servs. Program v. United States, 291 F. Supp. 3d 123 (D.D.C. 2018) ("Summary Judgment Op."); and Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340 (Fed. Cir. 2020) ("Federal Circuit Op.").

fees to pay for programs other than PACER, like Case Management / Electronic Case Filing ("CM/ECF"), a new system that allowed parties to file documents electronically.  See 1997 AO Report at 36; Pls.' Facts ¶ 9.  By fiscal year 2000, the judiciary was using the fees to pay for PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN") costs.  2d Skidgel Decl. ¶ 31; id. tab 30; see Summary Judgment Op., 291 F. Supp. 3d at 131.

In 2002, Congress passed the E-Government Act, a statute whose broad purpose was to improve electronic services and processes in government.  See E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899.  As relevant to this litigation, the Act amended the statutory note to 28 U.S.C. § 1913 ("Section 1913 Note") so that it read:

> COURT FEES FOR ELECTRONIC ACCESS TO INFORMATION
>
> [. . . .]
>
> (a)  The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts . . . for access to information available through automatic data processing equipment.  These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> (b)  The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note (internal quotation marks omitted); see E-Government Act of 2002, § 205(e).  The Senate Governmental Affairs Committee explained:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible. For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index. Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

S. REP. NO. 107-174 at 23 (June 24, 2002).  At that point, PACER fees were set at $0.07 per page.  See Skidgel Decl. Ex. G at 64.

But PACER fees continued to rise.  Effective January 2005, the Judicial Conference increased fees to $0.08 per page.  Jud. Conf. Letter at 1.  The Director of the Administrative Office of the United States Courts explained that the increase was "predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue to fund CM/ECF operations and maintenance."  Id.

By the end of 2006, the judiciary had accumulated $32.2 million of excess revenue from PACER fees.  Pls.' Facts ¶ 16; Summary Judgment Op., 291 F. Supp. 3d at 134.  For that reason, the judiciary further expanded the categories of programs that would be funded by the fees.  See Summary Judgment Op., 291 F. Supp. 3d at 134-35.  These programs included CM/ECF, EBN, courtroom technology upgrades, an online Jury Management System ("Web Juror"), a Violent Crime Control Act ("VCCA") notification system, and a study to determine the feasibility of providing access to state court documents through CM/ECF (the "State of Mississippi Study").  2d Skidgel Decl. tab 11, tab 12; see Summary Judgment Op., 291 F. Supp. 3d at 135.  In 2012, the judiciary increased PACER fees to $0.10 per page.  Pls.' Facts at ¶ 22.

PACER fees have been controversial since at least 2008.  That year, a group of activists attempted to download significant portions of the court documents available on PACER and make them available for free.  John Schwartz, An Effort to Upgrade a Court Archive System to Free and Easy, N.Y. TIMES (Feb. 12. 2009), www.nytimes.com/2009/02/13/us/13records.html. These activists, along with scholars and public officials, argued that PACER fees make it difficult for the public to access information integral to understanding our country's law and legal system.  E.g., Timothy B. Lee, The Case Against PACER: Tearing Down the Courts' Paywall, ARSTECHNICA (Apr. 9, 2009), www.arstechnica.com/tech-policy/2009/04/case-against-pacer [perma.cc/X52V-RYQT]; see also Pls.' Sett. Mot. at 5 ("High PACER fees hinder equal access to justice, impose often insuperable barriers for low-income and pro se litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts.").

In 2009, Senator Joe Lieberman, sponsor of the E-Government Act, expressed concern that the judiciary may have been violating the Act by collecting PACER fees "well higher than" the cost of funding PACER.  Lieberman Letter at 1.  Still, this trend continued. From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased from about $102.5 million in 2010 to $146.4 million in 2016.  See Pls.' Facts ¶¶ 28, 46, 62, 80, 98, 116, 134.

### B.  Procedural History

The current litigation began in April 2016, when the Named Plaintiffs filed a class-action lawsuit against the United States alleging that the judiciary had violated the

E-Government Act by charging excessive PACER fees.  Compl. ¶¶ 1-3, 34.[2]  The Named

Plaintiffs alleged jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a).  Id. ¶ 33.  The

Named Plaintiffs were, and still are, represented by Gupta Wessler LLP and Motley Rice LLC

("Class Counsel").

       The United States moved to dismiss.  See Mot. to Dismiss.  The government

argued that the Court lacked jurisdiction, id. at 15-19, that the Named Plaintiffs could not sue

without first alerting the PACER Service Center, id. at 13-15, and that other similar class action

lawsuits challenging PACER fees should be litigated first under the "first-to-file rule."  Id.

at 12-13.  This Court denied the motion to dismiss.  See Motion to Dismiss Op., 2016

WL 7076986.  In January 2017, the Court certified a class.  See Class Certification Op., 235 F.

Supp. 3d 32.  The class consisted of "[a]ll individuals and entities who have paid fees for the use

of PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and

federal government entities."  Id. at 39.  These class members were given notice and an

opportunity to opt out.  Gupta Decl. ¶ 14; see Order Approving Plan of Class Notice ("1st Notice

Appr.") [Dkt. No. 44].  The parties then engaged in informal discovery, which clarified what

categories of expenses were funded by PACER fees.  Gupta Decl. ¶ 15.

       In August 2017, the Named Plaintiffs filed a motion seeking "summary

adjudication of the defendant's liability, reserving the damages determination for after formal

discovery."  Pls.' Summ. J. Mot. at 1.  The United States then filed a cross-motion for summary

judgment as to liability.  Def.'s Summ. J. Mot. at 1.  In these motions, the parties asked the Court

to decide the central question in the case:  Under the E-Government Act, what categories of

---

[2]      Judge Ellen Segal Huvelle presided over this case until her retirement, at which
time the case was reassigned to the undersigned.

expenses may be funded by PACER fees?  See id. at 1-2; Pls.' Summ. J. Mot. at 1.  The Named

Plaintiffs argued that the Act "prohibits the [judiciary] from charging more in PACER fees than

is necessary to recoup the total marginal cost of operating PACER," so none of the additional

categories of expenses were permitted.  Pls.' Summ. J. Mot. at 11.  The United States urged a

broader reading of the statute which would allow the judiciary to "charge fees, as it deems

necessary, for the provision of information to the public through electronic means," making all of

the additional categories of expenses lawful.  Def.'s Summ. J. Mot. at 11.

   The Court rejected both positions, holding that the government's interpretation of

the E-Government Act was too broad, but that the Named Plaintiffs' interpretation was too

narrow.  See Summary Judgment Op., 291 F. Supp. 3d at 141-44.  The Court concluded that the

judiciary "properly used PACER fees to pay for CM/ECF and EBN, but should not have used

PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the

expenditures for [c]ourtroom [t]echnology."  Id. at 146.  Using PACER fees to pay for these

expenses was improper because the programs failed to further "the public's ability to access

information on the federal court's CM/ECF docketing system."  Id. at 150.

   The parties cross-appealed to the United States Court of Appeals for the Federal

Circuit.  In August 2020, the Federal Circuit affirmed this Court's interpretation.  See Federal

Circuit Op., 968 F.3d at 1359.  The Federal Circuit wrote that Judge Huvelle "got it just right" in

interpreting the E-Government Act to "limit[] PACER fees to the amount needed to cover

expenses incurred in services providing public access to federal court electronic docketing

information."  Id. at 1343, 1350.  The Named Plaintiffs' interpretation failed because it

"combine[d] part of the first sentence of paragraph (a) [of the Section 1913 Note] ('The Judicial

Conference may, only to the extent necessary, prescribe reasonable fees . . . .') with two parts of

the last sentence of paragraph (b) ('to reimburse expenses incurred in providing' the 'services rendered,' which plaintiffs construe to mean PACER access), paying little heed to the substantial amount of text in between." Id. at 1350.  Instead, the full text of the Section 1913 Note, along with its legislative history, made clear that the E-Government Act "limits the use of PACER fees to expenses incurred in providing (1) electronic access for members of the public (2) to information stored on a federal court docketing system." Id. at 1351-52.[3]

Applying this interpretation to the contested categories of expenses, the Federal Circuit agreed with this Court that it was unlawful for the judiciary to use PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most courtroom technology expenses. Federal Circuit Op., 968 F.3d at 1358.  The appellate court declined to decide whether it was lawful for PACER fees to fund all CM/ECF expenditures, holding that the issue was not properly before it and remanding to this Court for further proceedings.  Id. at 1358-59.

After remand, the parties began settlement discussions.  See Gupta Decl. ¶¶ 23-24.  Even after the Federal Circuit ruling, the government took the position that it did not owe damages to class members because the class could not prove that PACER fees would have been lower if the judiciary had refrained from making the unlawful expenditures.  Id. ¶ 23.  The government also maintained that all CM/ECF expenditures were properly funded by PACER fees.  Id.  The Named Plaintiffs disagreed with both positions.  Id.

In May 2021, the parties engaged in an all-day mediation session with Professor Eric Green.  Gupta Decl. ¶ 25.  During the mediation, the parties agreed to a common-fund settlement structure and the United States made a "final offer" for the total amount of the fund.

---

[3]     The Federal Circuit also held that the Little Tucker Act granted jurisdiction over the lawsuit because the E-Government Act was sufficiently "money-mandating."  Federal Circuit Op., 968 F.3d at 1347-49.

Id. ¶ 26.  Over the next few weeks, Professor Green continued to mediate, and the parties agreed

on a fund amount of $125 million.  See id. ¶ 27.  Reaching agreement on the remaining sticking

points – including how the fund would be distributed, what would happen to unclaimed money,

and the scope of the release of legal claims – took many months more.  Id. ¶¶ 27-28.  In July

2022, the parties executed a settlement agreement, which they amended once in September 2022

and again in April 2023 (collectively, the "Agreement").  Id. ¶ 28; see id. Ex. A ("Sett.

Agreement"); id. Ex. B ("First Supp. Agreement"); id. Ex. C ("Second Supp. Agreement").

On May 8, 2023, the Court granted preliminary approval of the Agreement and

scheduled a hearing to consider final approval for October 12, 2023 (the "Settlement Hearing").

See Order Granting Plaintiffs' Revised Motion for Preliminary Approval of Class Settlement

("Prelim. Approval") [Dkt. No. 153] at ¶¶ 1, 3.  At that time, the Court certified a revised

settlement class.  Id. ¶ 7.  The settlement class included all members of the original class who did

not opt out, plus those meeting the same criteria who had paid PACER fees before May 2018 but

after the original class was certified.  Id.  The Court directed that notice of the Agreement and its

terms be provided to the settlement class.  Id. ¶¶ 15, 16, 18.  Using the government's PACER

registration data, the claims administrator identified members of the class to be notified.  Id.

¶ 13; KCC Decl. ¶¶ 5-7.

In July 2023, the claims administrator sent the court-approved settlement notice,

both through email and through postcards, to over 500,000 PACER account holders.  KCC Decl.

¶¶ 8-11.  These notices provided class members with the settlement amount, an overview of the

litigation, information about opting out and submitting objections, and a link to additional

information and the full Agreement on a website dedicated to the settlement.  Id. Ex. B; see

PACER FEES CLASS ACTION, www.pacerfeesclassaction.com [https://perma.cc/N4L5-AYHS].

Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web Notice at 5.  Because some class members already had the opportunity to opt out when the original class was certified, the notice sent to them did not include the option to opt out.  KCC Decl. ¶8; see id. Ex. A.  The claims administrator also issued publication notice through a widely disseminated press release and a banking newsletter.  Id. ¶¶ 12, 13.

There were a few hiccups in the notice process.  First, the initial notice omitted some class members who were part of the original class.  KCC Decl. ¶ 15.  Second, the notice sent to some members of the original class incorrectly indicated that they had another opportunity to opt out.  Id. ¶ 16.  The settlement administrator corrected both mistakes and sent new notices on August 7, 2023.  Id. ¶¶ 15, 16.  Thirty-three individuals timely opted out of the settlement class.[4]  Five individuals filed objections.  See Compiled Objs.[5]

On August 28, 2023, the Named Plaintiffs moved for final approval of the class settlement and for attorney's fees, costs, and service awards.  Pls.' Sett. Mot.  The Court held the Settlement Hearing on October 12, 2023.  Class Counsel, as well as representatives for each of the three Named Plaintiffs, gave statements in support of the Agreement.  Two objectors spoke in opposition to the Agreement.  Then the Court gave the parties an opportunity to respond to

---

[4]      While the Named Plaintiffs initially stated that thirty-four individuals timely opted out, Pls.' Sett. Mot. at 13, the parties clarified at the Settlement Hearing that they had included a duplicate in their count and that the correct number is thirty-three.  In addition, the parties clarified at the Settlement Hearing that sixteen individuals attempted to opt out after the opt out deadline.  But none of these sixteen individuals were actually eligible to opt out, as all were either part of the original class and had the opportunity to opt out in 2017, or were federal employees who were never part of the class to begin with.  See id.

[5]      These individuals were:  Aaron Greenspan, Alexander Jiggetts, Geoffrey Miller, Don Kozich, and Eric Isaacson.  Of the written objections, two of the five were timely (Mr. Miller's and Mr. Isaacson's), and one of the three untimely objections was filed by an individual who is likely not a class member (Mr. Kozich).  Nevertheless, the Court has considered all five objections filed.

written and oral objections.  Finally, the Court heard from the parties and from objectors on the issue of attorney's fees.

## II.  THE SETTLEMENT AGREEMENT

The Agreement creates a common fund of $125 million and provides for the distribution of at least 80% of that fund to the hundreds of thousands of persons or entities who paid PACER fees between April 21, 2010 and May 31, 2018 (the "Class Period").

### A.  The Settlement Class and Fund

The settlement class includes all persons or entities who paid PACER fees in the period beginning six years before the Named Plaintiffs filed their original complaint (April 22, 2010) and ending on the date the judiciary stopped using PACER fees to fund prohibited expenses (May 31, 2018) – with the exception of those who opted out, of federal agencies, and of Class Counsel.  Sett. Agreement ¶ 3; First Supp. Agreement; see Pls.' Sett. Mot. at 11.  This class includes at least several hundred thousand members.  See Class Certification Op., 235 F. Supp. 3d at 39.

The settlement common fund totals $125 million.  Sett. Agreement ¶ 11.  From this fund, at least 80%, or $100 million, is to be distributed to class members.  Id. ¶ 18.  Up to 20%, or $25 million, is to be used for attorney's fees, litigation expenses, and service awards for the class representatives.  Id. ¶ 28.  As to the attorney's fees and service awards, the Agreement specifies that "the Court will ultimately determine whether the amounts requested are reasonable."  Id.  The Agreement further specifies that service awards cannot exceed $10,000 per class representative.  Id.

### B. Fund Allocation and Distribution to Class Members

The Agreement allocates the common fund to class members through a two-step calculation. See Sett. Agreement ¶ 19. First, all class members are allocated either $350 or, if they paid less than $350 in PACER fees during the Class Period, the actual amount that they paid. Id. Second, class members who paid over $350 receive, in addition to the first $350, a pro rata allocation of the remaining common fund. Id. This pro rata allocation compares the amount that a given class member paid over $350 to the amounts that other class members paid over $350, and allots the remaining common fund accordingly. See id. To illustrate the calculation, if a class member paid $100 in PACER fees during the Class Period, they will get all of it back. See id. ¶¶ 19, 20. But if a class member paid $1000 in PACER fees during the Class Period, they will get $350 plus an amount from the remaining common fund proportional to the additional $650 that they paid. See id. If there is unclaimed money after these allocations are distributed to class members, then the rest of the common fund will be distributed to class members who have not been fully reimbursed for the PACER fees they paid during the Class Period and who successfully collected their first distribution. Id. ¶ 23.

In contrast to most class action settlements, class members will not need to submit claims to get their share of this common fund. See Pls.' Sett. Mot. at 13. Instead, the claims administrator will use the information provided to them by the government – which has comprehensive records of PACER registrants and the fees they paid – to identify class members and distribute their payments. See id.; Sett. Agreement ¶¶ 14, 21, 23; KCC Decl. ¶¶ 5-7. The claims administrator will disburse the first set of payments within 180 days of receiving the settlement fund from the government, and will distribute any remaining money three months after that. Second Supp. Agreement ¶ 21; Sett. Agreement ¶ 24.

III.  FAIRNESS

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be dismissed, settled, or compromised without the approval of the Court.  FED. R. CIV. P. 23(e). Before giving its approval, the Court must direct the provision of adequate notice to all members of the class, conduct a hearing, and find, after notice and a hearing, that the settlement is "fair, reasonable, and adequate."  Id.; see Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998); In re Black Farmers Discrimination Litig., 856 F. Supp. 2d 1, 26 (D.D.C. 2011).  In performing this task, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action.  See WILLIAM B. RUBENSTEIN, 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:40 (6th ed. 2023).

To determine whether a settlement is fair, reasonable, and adequate, the Court "looks to the 'paramount twin elements of procedural and substantive fairness.'"  Mercier v. United States, 156 Fed. Cl. 580, 584 (2021) (quoting Courval v. United States, 140 Fed. Cl. 133, 139 (2018) (internal quotation marks omitted)).  The Federal Rules instruct the Court to consider a variety of factors in doing so.  The first two of these factors are procedural:  whether "(A) the class representatives and class counsel have adequately represented the class; [and] (B) the proposal was negotiated at arm's length."  FED. R. CIV. P. 23(e)(2).  The remaining factors are substantive; the Court is to consider whether:

> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness
> of any proposed method of distributing relief to the class, including
> the method of processing class-member claims; (iii) the terms of any
> proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each
> other.

Id.

Having carefully considered the parties' arguments and all of the objections that have been filed with the Court and expressed at the Settlement Hearing, the Court concludes that the settlement is fair, reasonable, and adequate.

### A.   Procedural Fairness

The Court finds that the Named Plaintiffs and Class Counsel have more than "adequately represented" the class.  See FED. R. CIV. P. 23(e)(2)(A).  The Named Plaintiffs are nonprofit organizations who pay PACER fees despite their nonprofit status, and whose members experienced real burdens because of the fees.  Class Certification Op., 235 F. Supp. 3d at 42.  These characteristics made them "particularly good class representatives."  Id.  The two law firms representing the class, in tandem, have extensive experience both in class actions and in lawsuits against the federal government.  See Gupta Decl. ¶¶ 45-48, 50-55, 59-61; see also infra Section IV.B.1.

The Named Plaintiffs and Class Counsel have vigorously litigated this case for nearly eight years, over seven of them after the class was certified.  See Gupta Decl. ¶¶ 11-13.  They engaged in informal discovery, argued (and, in part, won) summary judgment, and successfully defended the summary judgment ruling on appeal.  See id. ¶¶ 14-21; see also infra Section IV.B.2.  After remand, they engaged in extensive settlement negotiations with the government.  Gupta Decl. ¶¶ 23-28.

By all accounts, these settlement negotiations happened at "arm's length," indicating no collusion between the parties.  See FED. R. CIV. P. 23(e)(2)(B).  Negotiations came at a point in the litigation where liability was resolved but there were still significant questions about the possibility, and amount, of damages.  The negotiations were thus neither "too early to be suspicious nor too late to be a waste of resources."  In re Vitamins Antitrust Litig., 305 F.

Supp. 2d 100, 105 (D.D.C. 2004).  And because of "significant informal discovery, . . . the parties were well-positioned to mediate their claims."  Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 56 (D.D.C. 2010).  The negotiations took place over nearly two years but came together "after a lengthy mediation session that was presided over by an experienced mediator," indicating skilled negotiating on both sides.  See id.  Further evidence that the negotiations were at arm's length and not collusive is provided by the positions taken by the parties during settlement negotiations and the compromises ultimately reached.  See infra at 24.

       The notice requirements of Rule 23 were also satisfied.  When the Court preliminarily approved the settlement, it "direct[ed] notice in a reasonable manner to all class members who would be bound by the proposal."  FED. R. CIV. P. 23(e)(1)(B); see Prelim. Approval ¶¶ 15, 16, 18.  The Court also found the planned notice to be "the best notice practicable under the circumstances," Prelim. Approval ¶ 21, as was required for the individuals and entities who were not part of the originally certified class.  See FED. R. CIV. P. 23(c)(2)(B). The claims administrator adequately executed this notice.  Using the government's PACER registration data, it identified over 500,000 potential class members and sent them court-approved notices, both through email and through postcards.  KCC Decl. ¶¶ 5-7, 8-11; see Prelim. Approval ¶ 13; see also FED. R. CIV. P. 23(c)(2)(B) (requiring, for new class members, "individual notice to all members who can be identified through reasonable effort").  The claims administrator also issued publication notice.  KCC Decl. ¶¶ 12, 13.  Each form of notice directed class members to additional information on the dedicated settlement website.  See id. Exs. A-H. While there were a few errors in the notice process – the initial notice omitted some class members and gave some class members incorrect information – the claims administrator promptly corrected these errors and gave recipients sufficient time to opt out or object.

Id. ¶¶ 15-18.[6]  The notice also satisfied Rule 23's substantive requirements for new class

members.  The emails, postcards, and publications, along with the dedicated settlement website:

> clearly and concisely state[d] in plain, easily understood language:
> (i) the nature of the action; (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses; (iv) that a class member
> may enter an appearance through an attorney if the member so
> desires; (v) that the court will exclude from the class any member
> who requests exclusion; (vi) the time and manner for requesting
> exclusion; and (vii) the binding effect of a class judgment on
> members under Rule 23(c)(3).

See FED. R. CIV. P. 23(c)(2)(B).  The Court finds that this notice was more than sufficient and

was "reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections."  Haggart v.

Woodley, 809 F.3d 1336, 1348-49 (Fed. Cir. 2016) (quoting Mullane v. Cent. Hanover Bank &

Tr. Co., 339 U.S. 306, 314 (1950)).

After class members were given notice, they had over a month (and most had over

two months) to file written objections.  See KCC Decl. ¶¶ 10, 15; Prelim. Approval ¶¶ 3, 20.

Objections could be filed by mailing or emailing Class Counsel and the Court.  See Sett. Web

Notice at 5.  Only five individuals filed written objections.  On October 12, 2023, the Court held

the Settlement Hearing.  After the parties' opening statements, the Court heard objections to the

settlement.  No one spoke who had not already submitted a written objection.  Then, the Court

gave the parties an opportunity to respond to objections.  Finally, the Court heard from the

parties and from objectors on the issue of attorney's fees.

---

[6]    Objector Don Kozich contends that he did not receive notice of the settlement.
Kozich Obj. and Mot. at 2.  While no method of notice is perfect, Mr. Kozich's failure to receive
notice was likely proper.  Mr. Kozich does not appear to be a member of the class.  He
incurred PACER fees during the Class Period, but he did not pay those fees during the Class Period, and
thus is ineligible for relief.  Resp. to Kozich Obj. at 1.

Objector Eric Isaacson has questioned a few procedural aspects of the Settlement Hearing.  First, he argues that discussing the proper award of attorney's fees after the time scheduled for objectors to speak deprives objectors of due process and runs afoul of the Federal Rules, Isaacson Stmt. at 7, which instruct the Court to consider "the terms of any proposed award of attorney's fees" in evaluating the adequacy of "the relief provided for the class" in the proposed settlement.  FED. R. CIV. P. 23(e)(2)(C)(iii).  Second, Mr. Isaacson argues that objectors at the hearing should have been given the opportunity to cross-examine declarants who provided support for Class Counsel's requested fees.  Isaacson Stmt. at 7.[7]

Both of these arguments overstate an objector's role in the class settlement process.  While the Court must consider – and has considered – the arguments of any class member who objects to the settlement, the Court need not give objectors the opportunity to speak at every possible point in the hearing; nor does the Court need to give objectors the opportunity to probe declarations or exhibits through cross-examination or other means.  See 4 RUBENSTEIN, supra, § 13:42.  Moreover, to assuage Mr. Isaacson's concerns, the Court allowed him to speak during the portion of the hearing addressing attorney's fees, in addition to his opportunity to speak during the portion of the hearing during which the reasonableness of the settlement was discussed.

---

[7]     Mr. Isaacson further objects that "the settling parties arranged with the court to keep class members' objections off the public record."  Isaacson Stmt. at 3.  This objection has no factual basis.  Though the objections the Court received through email were not automatically docketed, they were available upon request.  In fact, at Mr. Isaacson's request, Class Counsel filed all objections to the public docket.  See Compiled Objs.

### B. Substantive Fairness

In considering a proposed class action settlement, the Court must compare the benefits afforded to class members under the settlement with the likely recovery that plaintiffs would have realized if they pursued the resolution of their claims through litigation in court. Thomas v. Albright, 139 F.3d at 231; see In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 30. The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more by litigating rather than settling. Thomas v. Albright, 139 F.3d at 231. The Court should scrutinize the terms of the settlement carefully, but should also keep in mind "the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources." Christensen v. United States, 65 Fed. Cl. 625, 629 (2005) (quoting Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993)). And "the opinion of 'experienced and informed counsel should be afforded substantial consideration by [the C]ourt in evaluating the reasonableness of a proposed settlement.'" Prince v. Aramark Corp., 257 F. Supp. 3d 20, 26 (D.D.C. 2017) (quoting In re Lorazepam & Clorazepate Antitrust Litig., Civil Action No. 99-0790, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003)).

In its analysis of the Agreement's substantive fairness, the Court is guided by the substantive factors enumerated in the Federal Rules of Civil Procedure: whether "the relief provided for the class is adequate, taking into account" various subfactors, and whether "the proposal treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2).

### 1. Whether the Relief is Adequate

The relief the settlement provides to class members is substantial. The majority of class members will receive a full refund for the PACER fees they paid during the Class

Period.  Gupta Decl. ¶ 43.  Although the minority of class members – those who paid over $350 in fees during the Class Period – will likely not receive a full refund, they may receive substantially more than $350.  See Sett. Agreement ¶ 19.  In addition, the "proposed method of distributing relief to the class" is efficient.  See FED. R. CIV. P. 23(e)(2)(C)(ii).  There are no claims to process, and class members will receive the relief even if they have never contacted Class Counsel or the claims administrator.  See Pls.' Sett. Mot. at 13.

Contrast this substantial relief with the potential "costs, risks, and delay of trial and appeal."  See FED. R. CIV. P. 23(e)(2)(C)(i).  The Federal Circuit's liability ruling in this case found some, but not all, of the PACER fees collected during the Class Period to be unlawful.  Federal Circuit Op., 968 F.3d at 1350-51, 1357.  It left open the question of the extent to which it was lawful for the judiciary to fund CM/ECF through PACER fees.  See id. at 1358.  And the ruling effectively set the maximum possible recoverable damages for the class at around $500 million.  Fitzpatrick Decl. ¶ 20.

Even putting aside the costs of trial and potential further appeal, the path to obtaining this $500 million would have been anything but smooth.  "[T]here are several reasons to think a full recovery is unrealistic."  In re APA Assessment Fee Litig., 311 F.R.D. 8, 19 (D.D.C. 2015).  After the Federal Circuit's ruling, the government continued to assert that the class had no claim to damages because class members could not prove that – but for the unlawful expenditures – PACER fees would have been lower.  Gupta Decl. ¶ 23.  Moreover, even if class members would not have had to prove damages with specificity, the amount of potentially recoverable damages still would have been uncertain.  Much of the potential recovery came from fees the judiciary used to pay for CM/ECF services, Fitzpatrick Decl. ¶ 20, and the Federal Circuit explicitly declined to rule on how much of these services were appropriately funded

through PACER fees.  Federal Circuit Op., 968 F.3d at 1358.  The recoverability of a sizable portion of the potential damages was thus an open question at the time of settlement.

In other words, at the point of the litigation at which the parties agreed on the terms of their settlement, it would have been a substantial risk to class members to proceed to trial.  Evidence could have shown that <u>all</u> of the judiciary's CM/ECF expenditures were lawful.  Or the government could have convinced the Court of its position on damages.  In that case, the Named Plaintiffs would have faced the difficult task of proving that the judiciary would have chosen to charge lower PACER fees had its expenditures been limited to the lawful categories.  The common fund amount – roughly a quarter of the potential recovery if every legal and factual issue had gone the plaintiffs' way – was impressively large in comparison to the risks of continuing to litigate.

Some objectors see a quarter of the maximum potential recovery as an unimpressive figure.  <u>See</u> Isaacson Obj. at 3 (calling the settlement "remarkably mediocre"); Greenspan Obj. at 1 (asserting that the settlement should have fully reimbursed PACER users).  These views do not properly account for the formidable arguments that were available to the government if the case had proceeded to trial.  In addition, Objector Aaron Greenspan asserts that the common fund amount is too low because the judiciary can only legally charge for the marginal cost of document transmission, and that marginal cost is zero.  Greenspan Obj. at 1.  But the Court has explicitly rejected an interpretation of the E-Government Act that would limit lawful fees to those necessary to pay the marginal cost of operating PACER.  Summary Judgment Op., 291 F. Supp. 3d at 140-43.  Instead, the judiciary can use PACER fees to fund the full cost of providing public access to federal court electronic docketing information, including fixed costs.  <u>See</u> Federal Circuit Op., 968 F.3d at 1349-52.

Other objectors argue that the Agreement is unreasonable because of its provision regarding attorney's fees, expenses, and service awards. See Isaacson Obj. at 9-17; Greenspan Obj. at 1-2. The Court has conducted a full analysis of the proper fee awards below. See infra Section IV. For now, it suffices to say that the fees provision of the Agreement is reasonable. See FED. R. CIV. P. 23(e)(2)(C)(iii) (instructing courts to consider the provisions of settlement agreements that relate to attorney's fees). The Agreement does not fix an amount of attorney's fees or service awards. Instead, it sets an upper limit on both – Class Counsel was able to request up to 20% of the common fund for attorney's fees, expenses, and service awards, including no more than $10,000 per service award for each class representative. Sett. Agreement ¶ 28. The Agreement leaves to the Court the ultimate determinations of how much to award. Id. Rather than setting an unreasonably high amount of attorney's fees or service awards, the Agreement thus caps the amount the Court has the opportunity to approve as reasonable.

Finally, the relative paucity of objections to the Agreement is a strong indicator of the adequacy of the relief. See In re Black Farmers Discrimination Litig., 856 F. Supp. 2d at 29; Mercier v. United States, 156 Fed. Cl. at 597. As Class Counsel notes, the settlement class is comprised of hundreds of thousands of PACER users and is "perhaps the most litigious group of people and entities ever assembled in a single class action, . . . including sophisticated data aggregators, federal-court litigators, and law firms of every stripe." Pls.' Reply at 1. Of this group, only thirty-three opted out of the class, and only five have objected to the settlement. In light of the terms of the Agreement and class members' lack of opposition to them, the Court finds the settlement relief adequate.

2.   Whether the Settlement Treats Class Members Equitably

The Court concludes that the Agreement "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D).  While it treats those who paid $350 or less in PACER fees during the Class Period differently from those who paid more than $350, this difference in treatment is fair and justified.

The requirement of intra-class equity exists to ensure that "class counsel ha[s not] sold out some of the class members at the expense of others, or for their own benefit." 4 RUBENSTEIN, supra, § 13:56.  If class counsel prioritizes settling a case over vigorously advocating for all class members' claims, counsel may agree to provide some (more powerful or more vocal) class members more relief than they deserve while giving other class members less than they deserve.  To ensure that class counsel has not done so, it falls upon the Court to determine whether similarly situated class members are treated similarly and whether "dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." Id.

There is absolutely no indication that Class Counsel "sold out" any group of class members in this case.  The Agreement strikes a balance between two competing goals:  First, to give relief to small-scale PACER users – the non-lawyer members of the public and individual law practitioners who were most affected by having to pay unlawful fees; the full reimbursement of all PACER fees paid up to $350 makes it more likely that small-scale users will be wholly compensated.  See Sett. Agreement ¶ 20.  And second, to treat all class members – including large-scale users like law firms – equitably based on what they actually paid.  The pro rata allocation above $350 makes it more likely that the sizable fees paid by large-scale users will be adequately accounted for.  See id.  The Agreement thus does a good job of treating similarly

situated class members similarly, while accounting for the differences between dissimilarly situated class members.

The details the parties have provided about the settlement negotiations further support the reasonableness of the Agreement's common fund distribution. As to the allocation of settlement funds, the Named Plaintiffs initially took the position that the fund should be distributed on an exclusively pro rata basis. Gupta Decl. ¶ 28. The government countered that, before the pro rata allocation, class members should first be fully reimbursed up to a large amount. Id. It grounded this position in the E-Government Act's authorization to "'distinguish between classes of persons' in setting PACER fees . . . 'to avoid unreasonable burdens and to promote public access to'" electronic docketing information. Id. (quoting 28 U.S.C. § 1913 note). Consistent with the judiciary's policy of offering waivers and other pricing mechanisms to make PACER cheaper for some groups of users, the government wanted more of the settlement fund to go to reimbursing those who used PACER less. See id. The $350 figure reflected a compromise between the Named Plaintiffs' position and the government's position. Far from "selling out" class members, the different treatment of different groups within the class reflects vigorous negotiation on both sides, and reflects the text of the E-Government Act.

A number of the objectors dispute the reasonableness of the distribution. Mr. Isaacson argues that too much of the common fund is allocated pro rata, unfairly favoring large-scale users over small-scale users. Isaacson Obj. at 4-5. Objector Geoffrey Miller argues that too much of the common fund is allocated to fully reimbursing users who paid $350 or less, unfairly favoring small-scale users over large-scale users. Miller Obj. at 1-2.[8] As Class Counsel

---

[8]     Mr. Miller also objects that "[t]he proposed plan of allocation under Federal Rule 23 is in tension with the Rules Enabling Act, 28 U.S.C. §[§] 2071-2077, because, by providing different treatment to litigants with identical legal claims, it arguably abridges their

points out, these arguments cannot both be correct, and the fact that each of them was made indicates, if anything, a good compromise.  See Pls.' Reply at 4.  Moreover, the structure of the distribution is on sound legal footing.  "Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members . . . ."  Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 629 (6th Cir. 2007).  At the same time, courts routinely approve settlements providing for pro rata distributions of common funds because such distributions directly account for the differences in the value of the claims of different class members.  See, e.g., In re APA Assessment Fee Litig., 311 F.R.D. at 13; In re Facebook Biometric Info. Priv. Litig., 522 F. Supp. 3d 617, 629 (N.D. Cal. 2021); In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 580-81 (S.D.N.Y. 2008).

The fact that two objectors (Mr. Isaacson and Mr. Miller) hold these contradictory positions is understandable.  A class member who paid substantially more than $350 in PACER fees, but substantially less than a large-scale user, may look at large-scale users and feel disappointed that these users are getting so much more in absolute dollars.  And a large-scale user may look at a class member who paid $350 or less in PACER fees and find it unfair that that class member is getting fully reimbursed by the Agreement, while the large-scale user is not.  At bottom, however, this dissatisfaction arises from the amount of the common fund, not its allocation.  There is simply not enough money in the common fund to reimburse every class member for all of what they paid in PACER fees – nor should there be, as some of the fees were

right to be treated equally before the law."  Miller Obj. at 2.  But the Rules Enabling Act is irrelevant to allocations between class members in common-fund settlements.  Instead, as applied to class actions, the Rules Enabling Act prevents courts from "giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action."  Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 458 (2016).

lawful.  No settlement is perfect.  But the Court finds that the difference in how this settlement treats different class members is justified, fair, and equitable.

Mr. Isaacson raises another issue of equity.  He points out that many of the institutional class members are law firms, and that these firms have likely already been reimbursed – by their clients or through settlement agreements in other cases – for PACER fees paid during the Class Period.  Isaacson Obj. at 4-7.  Because these law firms have already been reimbursed, he argues, it is inequitable to treat them like other class members, particularly like individuals who never received reimbursement.  See id. at 4.[9]

This argument makes some sense in the abstract.  While a reasonable settlement hypothetically could differentiate between law firm class members who had been reimbursed for their PACER fees and other class members who had not been reimbursed for their PACER fees, there were good reasons not to do so here.  First, prior to settlement, the claims of the law firms that had been reimbursed by their clients were just as valid as the claims of other class members.  See S. Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918).  In fact, the law firm class members were likely the only plaintiffs who could have brought claims against the government to recover the relevant PACER fees.  Their clients could not have brought such claims because damages under the Little Tucker Act are available only to those who paid unlawful fees to the government, to those who paid unlawful fees to others "at the direction of

---

[9]  Mr. Isaacson further argues that the common fund allocations to many large-scale claimants are improper because entities whose aggregated claims total over $10,000 fall outside of Little Tucker Act jurisdiction.  Isaacson Obj. at 7-8.  This argument misunderstands the law. "A suit in district court under the Little Tucker Act may seek over $10,000 in total monetary relief, as long as the right to compensation arises from separate transactions for which the claims do not individually exceed $10,000."  Class Certification Op., 235 F. Supp. 3d at 38 (citing Am. Airlines, Inc. v. Austin, 778 F. Supp. 72, 76-77 (D.D.C. 1991); Alaska Airlines v. Austin, 801 F. Supp. 760, 762 (D.D.C. 1992); United States v. Louisville & Nashville R.R. Co., 221 F.2d 698, 701 (6th Cir. 1955)).

the government to meet a governmental obligation," see Aerolineas Argentinas v. United States,

77 F.3d 1564, 1573 (Fed. Cir. 1996), or to those against whom the government took action,

related to unlawful fees, that had a "direct and substantial impact."  See Ontario Power

Generation, Inc. v. United States, 369 F.3d 1298, 1303 (Fed. Cir. 2004) (quoting Casa de

Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)).  Because

clients who reimbursed law firms for unlawful PACER fees do not appear to fit into any of these

categories, it would have been difficult – perhaps impossible – for them to recover anything from

the government.  Instead, once law firm class members have received their distributions under

the Agreement, clients may have claims against them – to recover what the clients paid to the

law firms in PACER fees – through sources of law unrelated to class actions, like contract law or

state statutes.  See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 789 F. Supp. 2d

935, 967 (N.D. Ill. 2011) (approving a settlement even though some class members had been

reimbursed for unlawful fees).  That is between lawyers and their clients and beyond the scope of

this litigation.

Second, it makes sense to leave disputes concerning reimbursement to law firm

class members and the clients who reimbursed them, rather than to the claims administrator.  It is

true, as Mr. Isaacson points out, that law firms often bill clients for PACER fees.  Isaacson Obj.

at 4; see, e.g., Decastro v. City of New York, Civil Action No. 16-3850, 2017 WL 4386372, at

*10 (S.D.N.Y. Sept. 30, 2017).  But it would be complicated and burdensome for the claims

administrator to sort through billing records to determine what happened with respect to each set

of PACER fees billed.  Sometimes, firms write fees off.  Sometimes, clients do not pay.  And if a

client paid part, but not all, of their bills, it may not even be possible for the claims administrator

to figure out what portion of a client's payment went towards PACER charges.  On the other

hand, law firm class members are better equipped to determine which of their clients to reimburse for PACER charges, and by how much.  If the clients believe the firms to be unlawfully withholding reimbursement, they can sue.  More likely, law firms and clients will resolve any disputes over reimbursement out of court.  Allowing this process to play out does not make the settlement inequitable.

In short, the benefits offered to class members by the Agreement are substantial, and the likely outcome for the class if the case were to proceed to trial is uncertain.  The Court is convinced that the Agreement is fair, reasonable, and adequate.

## IV.  ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  FED. R. CIV. P. 23(h). Here, the Agreement authorizes attorney's fees, costs, and services awards, but limits the amount the Court can award for these categories combined to no more than 20% of the common fund, or $25 million.  Sett. Agreement ¶ 28.  The Agreement further specifies that service awards cannot exceed $10,000 per Named Plaintiff.  Id.

Class Counsel effectively requests the maximum amount allowed by the settlement:  $1,106,654.98 in costs, $30,000 in service awards ($10,000 for each of the three Named Plaintiffs), and $23,863,345.02 – the difference between the $25 million cap and the

other two amounts – in attorney's fees.  Pls.' Sett. Mot. at 4.[10]  The government does not oppose

their request.[11]

        The Court must independently determine the reasonableness of the requested fees,

costs, and service awards.  After carefully considering the submissions of the parties, the relevant

Federal Rule, and the case law, and after considering all of the objections that have been filed

with the Court and expressed at the Settlement Hearing, the Court awards the full amount

requested by Class Counsel in fees, costs, and service awards.

### A.  Legal Background

#### 1.  Attorney's Fees

        "The 'common fund doctrine' allows an attorney whose efforts created, increased

or preserved a fund 'to recover from the fund the costs of his litigation, including attorneys'

fees.'"  In re Baan Co. Sec. Litig., 288 F. Supp. 2d 14, 16 (D.D.C. 2003) (quoting Vincent v.

Hughes Air West, Inc., 557 F.2d 759, 769 (9th Cir.1977)).  In common-fund cases, courts have a

duty to "ensure that claims for attorneys' fees are reasonable, in light of the results obtained."

Rogers v. Lumina Solar, Inc., Civil Action No. 18-2128, 2020 WL 3402360, at *11 (D.D.C. June

19, 2020) (K.B. Jackson, J.) (quoting In re Black Farmers Discrimination Litig., 953 F. Supp. 2d

82, 87 (D.D.C. 2013)).  The Court's independent scrutiny of an award's reasonableness is

particularly important in common-fund cases because "the conflict between a class and its

---

[10]      The $1,106,654.98 that Class Counsel requests in costs is comprised of
$29,654.98 in attorney expenses and $1,077,000 in settlement-administration and noticing costs.
Pls.' Sett. Mot. at 4.

[11]      In its briefs, the government raised concerns about the size of the requested fees.
Def.'s Resp. at 4-7.  At the Settlement Hearing, however, the government indicated that Class
Counsel's reply brief had alleviated their concerns.

attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery." <u>Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n</u>, 3 F.3d 1568, 1573 (D.C. Cir. 1993) (quoting <u>Weinberger v. Great N. Nekoosa Corp.</u>, 925 F.2d 518, 524 (1st Cir. 1991)).  Thus, in common-fund cases, the court acts "as fiduciary for the beneficiaries" of the fund "because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set" and because "there is no adversary process that can be relied upon in the setting of a reasonable fee." <u>In re Dep't of Veterans Affs. (VA) Data Theft Litig.</u>, 653 F. Supp. 2d 58, 60 (D.D.C. 2009) (quoting <u>Court Awarded Attorney Fees, Report of the Third Circuit Task Force</u>, 108 F.R.D. 237, 251 (1985)).

Courts have identified two approaches to calculating reasonable attorney's fees in common-fund cases. The first is the "percentage-of-the-fund method, through which 'a reasonable fee is based on a percentage of the fund bestowed on the class.'" <u>Health Republic Ins. Co. v. United States</u>, 58 F.4th 1365, 1371 (Fed. Cir. 2023) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 900 n.16 (1984)).  The second is the lodestar method, "through which the court calculates the product of reasonable hours times a reasonable rate, and then adjusts that 'lodestar' result, if warranted, on the basis of such factors as the risk involved and the length of the proceedings." <u>Id</u>. (cleaned up).

While courts have discretion to use either method, fee awards in common-fund cases are "typically based on some percentage of the common fund." <u>Moore v. United States</u>, 63 Fed. Cl. 781, 786 (2005).  The lodestar method, by contrast, generally is used in fee-shifting cases. <u>Health Republic Ins. Co. v. United States</u>, 58 F.4th at 1371.  Many courts of appeals have expressed an explicit preference for using the percentage method in common-fund cases. 5 Rubenstein, <u>supra</u>, § 15:64 & n.15; <u>see</u>, <u>e.g.</u>, <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d 1261,

1271 (D.C. Cir. 1993); <u>see also</u> <u>In re Baan Co. Sec. Litig.</u>, 288 F. Supp. 2d at 17.  This is because the percentage method "helps to align more closely the interests of the attorneys with the interests of the parties," <u>Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro.</u> <u>Area Transit Comm'n</u>, 3 F.3d at 1573, by discouraging inflation of attorney hours and promoting "efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." <u>Trombley v. Nat'l City Bank</u>, 826 F. Supp. 2d 179, 205 (D.D.C. 2011) (quoting <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 205 F.R.D. 369, 383 (D.D.C. 2002)). The lodestar method, on the other hand, may give attorneys "an incentive to run up" "the number of hours they have billed," which could "prolong[] litigation unnecessarily and hence defer[] the class's compensation." 5 RUBENSTEIN, <u>supra</u>, § 15:65; <u>see</u> <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1268.

When using the percentage-of-the-fund method, the Federal Circuit has identified the following factors to consider:

> (1) the quality of counsel; (2) the complexity and duration of the litigation; (3) the risk of nonrecovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class members' objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award.

<u>Health Republic Ins. Co. v. United States</u>, 58 F.4th at 1372 (quoting <u>Moore v. United States</u>, 63 Fed. Cl. at 787).  In addition, "as settlement amounts increase in magnitude, the percentage of fees awarded should decrease." <u>Haggart v. United States</u>, 116 Fed. Cl. 131, 147 (2014).  This is because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." <u>Id</u>. (alterations in original) (quoting <u>In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions</u>, 148 F.3d 283, 339 (3d Cir. 1998)).

Courts sometimes employ a "lodestar cross-check" when they use the percentage method.  See 5 RUBENSTEIN, supra, § 15:85.  In a lodestar cross-check, "the reasonableness of a potential percentage-of-the-fund fee is checked by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier, and when this implicit multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (cleaned up).  While "the resulting multiplier need not fall within any pre-defined range, . . . courts must take care to explain how the application of a multiplier is justified by the facts of a particular case, . . . [and] must provide sufficient analysis and consideration of multipliers used in comparable cases to justify the award made."  Id. at 1375 (cleaned up).  That said, lodestar cross-checks "need entail neither mathematical precision nor bean-counting," as "district courts may rely on summaries submitted by the attorneys and need not review actual billing records."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306-07 (3d Cir. 2005).  Although not required, the Federal Circuit has strongly suggested using a lodestar cross-check, "at least as a general matter."  Health Republic Ins. Co. v. United States, 58 F.4th at 1374 n.2.

## 2.   Costs and Service Awards

Rule 23 contemplates recovery of "nontaxable costs,"  FED. R. CIV. P. 23(h), the "reasonable expenses normally charged to a fee paying client."  5 RUBENSTEIN, supra, § 16:5; see Quimby v. United States, 107 Fed. Cl. 126, 135 (2012).  And "[i]t is well settled that counsel who have created a common fund for the benefit of a class are entitled to be awarded for out-of-pocket costs reasonably incurred in creating the fund."  Mercier v. United States, 156 Fed. Cl. at 593.  Aside from being reasonable, such expenses must be adequately documented.  5 RUBENSTEIN, supra, § 16:10.

Service awards, also known as "incentive" or "case-contribution" awards, are distributions from the common fund to class representatives in recognition of their service to the class and their role in the litigation.  See 5 RUBENSTEIN, supra, § 17:1.  Service awards "recognize the unique risks incurred and additional responsibility undertaken by named plaintiffs in class actions," Mercier v. United States, 156 Fed. Cl. at 589, and also compensate class representatives for expenses and work performed by in-house counsel.  See In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. at 400.  Service awards must be reasonable and proportionate to class representatives' role in the case.  See 5 RUBENSTEIN, supra, § 17:13.

## B.  Reasonableness of Requested Attorney's Fees

Class Counsel and the government agree that the Court should use the percentage-of-the-fund method to assess the reasonableness of the requested fees.  Pls.' Sett. Mot. at 27; Def.'s Resp. at 8-9.  Mr. Isaacson argues that the Court should use the lodestar method and award fees not exceeding Class Counsel's lodestar.  Isaacson Obj. at 9-10.  He relies primarily on Supreme Court precedent discussing fee-shifting cases and on precedent predating Rule 23 and the modern class action lawsuit.  Id.  But as the D.C. Circuit has noted, "the latest guidance from the High Court counsels the use of a percentage-of-the-fund methodology." Swedish Hosp. Corp. v. Shalala, 1 F.3d at 1268 (citing Blum v. Stenson, 465 U.S. at 900 n.16); see also In re Home Depot Inc., 931 F.3d 1065, 1085 (11th Cir. 2019) ("[T]he Supreme Court precedent requiring the use of the lodestar method in statutory fee-shifting cases does not apply to common-fund cases."); In re BioScrip, Inc. Sec. Litig., 273 F. Supp. 3d 474, 479-89 (S.D.N.Y. 2017) (Nathan, J.) (rejecting similar arguments made by Mr. Isaacson).  For these reasons, and because the percentage method promotes efficiency and ensures that class counsel is compensated primarily based on the result achieved, the Court will use the percentage method.

The government urges the Court to also employ a lodestar cross-check.  Def.'s Resp. at 7.  Class Counsel points out, rightly, that a lodestar cross-check is not required, but it stops short of arguing that the Court should refrain from doing one.  Pls.' Sett. Mot. at 35; see id. at 36-37; Pls.' Reply at 10.  The Court will add a lodestar cross-check to its percentage-method analysis to confirm that the fee awarded properly accounts for the effort Class Counsel expended to litigate the case.  The Court will first analyze the percentage requested using each of the above-described Federal Circuit factors, and then will conduct a lodestar cross-check.

### 1.   The Quality of Counsel

As the Court has stated before, "[t]here is no dispute about the competency of class counsel."  Class Certification Op., 235 F. Supp. 3d at 43.  Gupta Wessler is one of the nation's leading plaintiff and public interest appellate boutiques, and also has extensive experience in complex litigation against the federal government.  See Gupta Decl. ¶¶ 46-48, 50-55, 59-61.  Motley Rice is a leading class-action law firm.  Id. ¶ 45.  In dividing case responsibilities, each firm took charge of what it does best – Gupta Wessler led the briefing, argument, research, and legal analysis, and Motley Rice led the case management, discovery, and settlement administration.  Id.  These two firms have "thoroughly impress[ive] . . . qualifications" and class members undoubtedly "benefit[ted] from the wealth of experience" they brought to the case.  Steele v. United States, Civil Action No. 14-2221, 2015 WL 4121607, at *4 (D.D.C. June 30, 2015) (describing groups of attorneys including current members of Class Counsel).

### 2.   The Complexity and Duration of the Litigation

The litigation was reasonably complex.  As in most class actions, the litigation involved a motion to dismiss, disputes regarding class certification, and cross-motions for summary judgment.  See Motion to Dismiss Op., 2016 WL 7076986; Class Certification Op., 235 F. Supp. 3d 32; Summary Judgment Op., 291 F. Supp. 3d 123.  But unlike most class actions, this case required appellate argument both as to a novel theory of jurisdiction and as to the most important merits issue in the case.  See Federal Circuit Op., 968 F.3d at 1343.  After remand, Class Counsel engaged in lengthy settlement negotiation with the government.  Gupta Decl. ¶¶ 23-28.  And even after the parties reached an agreement, Class Counsel put significant effort into answering class members' questions.  Gupta Supp. Decl. ¶¶ 2, 3.  All told, Class Counsel worked on this case for nearly eight years.  See Gupta Decl. ¶¶ 11, 12.

Mr. Isaacson asserts that this case was easy to litigate because it involved an issue of statutory construction that was ultimately settled by the Federal Circuit.  Isaacson Obj. at 14.  But this argument ignores the fact that it was Class Counsel's very efforts that caused the Federal Circuit to construe the statute in a way that would allow the class to recover.  The unsettled interpretation of the E-Government Act at the outset of the litigation speaks to the complexity of the case, not against it.

### 3.   The Risk of Nonrecovery

There was an exceptionally high risk of nonrecovery in this case.  As one of the attorneys representing the class describes, before this lawsuit, "litigation against the federal judiciary was not seen as a realistic way to bring about reform of the PACER fee regime" – both because "the judiciary has statutory authority to charge at least some amount in fees" and because "the fees were still assumed to be beyond the reach of litigation."  Gupta Decl. ¶ 7.  He

points out correctly that the Administrative Procedure Act – which normally provides jurisdiction and a waiver of sovereign immunity for lawsuits against agencies – explicitly exempts the federal judiciary from its reach.  See id.; 5 U.S.C. § 551(1)(B).

Even after Class Counsel identified their alternative and ultimately successful strategy of arguing that the Little Tucker Act provided the necessary jurisdiction and waiver of sovereign immunity, there was still a significant risk of nonrecovery for class members.  To show illegal exaction under the Little Tucker Act, the Named Plaintiffs had to "demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." Federal Circuit Op., 968 F.3d at 1348 (internal quotation marks omitted) (quoting Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005)).  But the E-Government Act, which Class Counsel argued caused the exaction, "nowhere explicitly requires payment of damages by the government for overcharging users."  Id.  Thus, before even getting to the merits, Class Counsel had to fight an uphill interpretive battle.

On the merits, Class Counsel's argument was similarly difficult.  Take, for example, the one sentence in the E-Government Act that explicitly spoke to PACER fees:  "The Judicial Conference may, only to the extent necessary, prescribe reasonable fees . . . for collection by the courts under those sections for access to information available through automatic data processing equipment."  28 U.S.C. § 1913 note.  As the Federal Circuit acknowledged, far from supporting its ultimate holding, this sentence "supports the government's interpretation, as it authorizes charging fees for electronic access to information without any express restrictions."  Federal Circuit Op., 968 F.3d at 1351.  Nevertheless, Class Counsel persuaded the Federal Circuit that the rest of the statute, and its context, imposed

restrictions on the sorts of electronic information dissemination for which the judiciary could use PACER fees.  See id. at 1352-57.

Finally, there was litigation risk even after the Federal Circuit held that the E-Government Act did impose such restrictions.  See supra Section III.B.1.  Whether the judiciary could use PACER fees to pay for all of CM/ECF was still an open question.  See Federal Circuit Op., 968 F.3d at 1358.  And the government made plausible arguments that the class could not recover damages without an additional evidentiary showing.  See Gupta Decl. ¶ 23.  Until the moment the Named Plaintiffs reached a settlement with the government, there was a significant risk of nonrecovery.

### 4.   The Fee that Likely Would Have Been Negotiated in Similar Cases

The Court is to consider what fee "likely would have been negotiated between private parties in similar cases."  Health Republic Ins. Co. v. United States, 58 F.4th at 1372 (quoting Moore v. United States, 63 Fed. Cl. at 787).  The truth is that there are few "similar cases" with which to compare this case:  a class action lawsuit against the federal judiciary for charging too much in fees that it is explicitly authorized to charge at least in part.  See infra Section IV.B.6.  Still, it is worth noting that the percentage award Class Counsel requests here is below the typical 33% contingency fee.  And as Class Counsel points out, each Named Plaintiff signed a retainer agreement providing for a contingency fee of up to 33% of the common fund, Gupta Decl. ¶ 65, and each class member who was also part of the original class agreed to a contingency fee of up to 30% by declining to opt out.  Class Cert. Email Notice; Class Cert. Web Notice at 7; see 1st Notice Appr.  At the same time, the Court takes these agreements with a grain of salt.  Each plaintiff in a class action "typically has a small interest in the overall controversy" and thus "has no incentive to negotiate a competitive rate with class counsel."

5 RUBENSTEIN, <u>supra</u>, § 15:74.  And while one third of the recovery may be the typical fee in

cases with relatively few plaintiffs, it is not the standard for large class actions where the size of

the class is one of the main determinants of the size of the recovery.  This factor thus has

minimal bearing on the reasonableness of Class Counsel's requested fee.  <u>See</u> <u>Mercier v. United</u>

<u>States</u> 156 Fed. Cl. at 592 ("Even if some other class members had agreed to a 33.3%

contingency fee, they almost certainly would have evaluated the fee's reasonableness in terms of

their own recoveries, overlooking the economies of scale that class counsel enjoyed by

representing thousands of similarly situated plaintiffs.").

   5.  Class Members' Objections to the Settlement Terms or Fees Requested by Class Counsel

      Most of the objections to the Agreement or the requested fees have already been

discussed in the context of the fairness of the settlement, <u>see</u> <u>supra</u> Section III, or with regard to

another fee approval factor.  <u>See</u> <u>supra</u> Section IV.B.2.  Mr. Isaacson raises several additional

arguments regarding attorney's fees.  First, Mr. Isaacson argues that the Court should not

consider the supplemental declarations of Professor William Rubenstein and Professor Brian

Fitzpatrick because Class Counsel submitted these declarations after the deadline for class

members to file objections.  Isaacson Stmt. at 3.  Second, Mr. Isaacson quibbles with the content

of these supplemental declarations.  <u>Id</u>. at 3-6.

      Strictly construed, Mr. Isaacson's first argument lacks merit.  Under the Federal

Rules of Civil Procedure, the only relevant requirement is that notice of a motion for attorney's

fees must be "directed to class members in a reasonable manner" so that class members "may

object to the motion."  FED. R. CIV. P. 23(h).  The Advisory Committee notes that, "[i]n setting

the date objections are due, the court should provide sufficient time after the full fee motion is on

file to enable potential objectors to examine the motion."  <u>Id</u>. advisory committee's note (2003).

Rule 23 thus requires only that class members have sufficient time to respond to the fee <u>motion</u> and accompanying evidence, not to evidence submitted in response or reply.  Here, Class Counsel submitted their motion for attorney's fees over two weeks before the objection deadline, giving objectors sufficient time to respond.  <u>See</u> Pls.' Sett. Mot.

That said, it is a fair point that class members lack a meaningful opportunity to object to attorney's fees requests if counsel submits declarations raising new bases of support for the requested fees after the objection deadline.  And the professors' supplemental declarations do just that.  Professor Fitzpatrick's declaration provides information about why the Fitzpatrick Matrix should not be used as Mr. Isaacson suggests.  <u>See</u> Fitzpatrick Supp. Decl. ¶¶ 4-6. Professor Rubenstein's declaration examines the data used in the Fitzpatrick Matrix and comes to certain conclusions about reasonable fees based on a subset of that data.  <u>See</u> Rubenstein Supp. Decl. ¶¶ 13-26.  Neither of these points was raised in the professors' original declarations, which accompanied Class Counsel's fees motion.

Based on Mr. Isaacson's objections, the Court will not rely on the supplemental declarations of Professor Fitzpatrick or Professor Rubenstein in assessing the reasonableness of Class Counsel's requested fees.  Because the Court will not rely on the declarations, it need not address Mr. Isaacson's arguments about their content.

### 6.   The Percentage Applied in Other Class Actions

Thirty years ago, the D.C. Circuit noted that "a majority of common fund class action fee awards fall between twenty and thirty percent."  <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d at 1272.  This remains true today.  <u>See</u> 5 RUBENSTEIN, <u>supra</u>, § 15:83 (summary of empirical studies on common fund fee awards finding means between 22% and 27% and medians between 24% and 29%).  For cases in which the common fund is especially large, fee

awards tend towards the low end of this range.  The latest comprehensive study on class action

fee awards, using data from 2009-2013, reports that the mean percentage awarded from common

funds greater than $67.5 million is 22.3%.  Theodore Eisenberg et al., <u>Attorneys' Fees in Class

Actions: 2009-2013</u>, 92 N.Y.U. L. REV. 937, 948 (2017).

   Although it is difficult to locate good comparisons to the settlement in this case,

the comparisons that the Court did find are in line with these statistics.  Two cases involving

insufficient pay by the Department of Veterans Affairs provide the closest analogues.  In

<u>Quimby v. United States</u>, a class of over 40,000 health professionals formerly employed by the

Department alleged that they were deprived of additional pay that they earned for working

undesirable shifts.  <u>Quimby v. United States</u>, 107 Fed. Cl. at 128-29.  As this Court has done in

this case, the Court of Claims granted in part and denied in part cross-motions for summary

judgment on the government's liability.  <u>Id</u>. at 128.  The class ultimately settled with the

government in 2012 – after eleven years of contentious litigation – and the settlement agreement

provided for a common fund of $74 million.  <u>See id</u>. at 133.  The Court of Claims granted class

counsel's request for 30% of the common fund in attorney's fees, <u>id</u>. at 132, 135, reasoning that

the attorneys obtained "excellent results," <u>id</u>. at 133 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S.

424, 435 (1983)), and that "[t]he complexity of this litigation, the government's opposition to the

Court's ruling on the merits, and the absence of controlling precedent concerning many of the

issues presented together indicate that continued litigation would have created substantial

uncertainty for members of the class."  <u>Id</u>.

   The plaintiffs in <u>Mercier v. United States</u> brought similar claims.  <u>See</u> <u>Mercier v.

United States</u>, 156 Fed. Cl. 580.  There, a class of over 3,000 nurses and physician assistants

sued the Department of Veterans Affairs, alleging that they were deprived of overtime pay.  <u>Id</u>.

at 583.  The Court of Claims granted the government's motion to dismiss, but was reversed on appeal.  Id.  The litigation continued.  Id.  The class settled with the government in 2021 – after eight years of litigation – and the settlement agreement provided for a common fund of $160 million.  Id. at 583-84.  Class counsel requested 30% of the common fund in attorney's fees.  Id. at 590.  In analyzing the reasonableness of this request, the Court of Claims found that class counsel was skilled and experienced, that the litigation was complex, and that the risk of nonrecovery was substantial.  Id. at 591.  But because the common fund was so large (in part due to the size of the class itself), the court rejected class counsel's request and awarded 20% of the fund instead of the requested 30%.  Id. at 592-93.  The court found that the awarded percentage would "protect[] the interests of the class members but also provide[] ample compensation to counsel for their excellent work in this case" and "encourage other counsel to take on the representation of plaintiffs in similar cases."  Id. at 593.

Here, the requested percentage is 19.1%.  It is smaller than the percentage the Court of Claims awarded in Quimby, a complex case that lasted longer than this one – and where, as here, the government opposed the court's rulings on novel issues of law.  See Quimby v. United States, 107 Fed. Cl. at 128-133.  It is approximately what the Court of Claims awarded in Mercier, another complex case, of similar duration to this one – and where, as here, counsel for the class successfully litigated issues of liability on appeal.  See Mercier v. United States 156 Fed. Cl. at 583-84, 591-93.  Furthermore, according to the most recent comprehensive study on class action fee awards, the requested percentage is around the average for common funds in the range of the fund created by this settlement.  See Eisenberg et al., supra, at 948.  Because the requested fee award fits neatly within the relevant statistical range and aligns with the best case analogues, this factor strongly counsels in favor of approval of the attorney's fees request.

41

### 7.   The Size of the Award

The size of the requested fee award – nearly $24 million – is large.  But "so is the class members' total recovery."  See Raulerson v. United States, 108 Fed. Cl. 675, 680 (2013) (approving fee award of approximately $11 million).  Three additional considerations convince the Court that the absolute size of the requested award is not a cause for concern.  First, $24 million is nowhere near the highest amounts courts have awarded in attorney's fees in common-fund cases.  See, e.g., 52 Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 723-24 (2d Cir. 2023) (affirming fee award of approximately $523 million); In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1281 (11th Cir. 2021) (affirming fee award of $77.5 million); see also Eisenberg et al., supra, at 943-44 (finding yearly average fee awards between $37.9 million and $124 million in common-fund cases with recoveries greater than $100 million).  Second, $24 million is close to the absolute size of the fees awarded in the closest comparator cases identified above.  See Mercier v. United States 156 Fed. Cl. at 593 (awarding $32 million in fees); Quimby v. United States, 107 Fed. Cl. at 135 (awarding approximately $22 million in fees).  And third, the Court's lodestar cross-check, performed below, directly accounts for the size of the fee award by comparing it to the amount of effort that Class Counsel expended in this case.  As a result, this factor does not move the needle in either direction.

### 8.   Lodestar Cross-Check

The Federal Circuit has noted a "norm of . . . multipliers in the range of 1 to 4" in lodestar cross-checks of reasonable fee requests.  Health Republic Ins. Co. v. United States, 58 F.4th at 1375.  Statistics show that, between 2009 and 2013, the mean lodestar multiplier was 1.48.  Eisenberg et al., supra, at 965 tbl.12.  For cases with common funds over $67.5 million, the mean multiplier was 2.72.  Id. at 967 tbl.13.  Multipliers significantly above this

mean may be cause for concern.  In <u>Mercier</u>, for example, the Court of Claims found a multiplier of 4.4 to be too high, but a multiplier of 2.95 to result in "a very generous but reasonable recovery."  <u>Mercier v. United States</u>, 156 Fed. Cl. at 592; <u>see</u> <u>also</u> 5 RUBENSTEIN, <u>supra</u>, § 15:87 ("Empirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1-2 range; this fact counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean.").

Here, Class Counsel estimates their lodestar at $6,031,678.25 based on the hourly rates that the firms' attorneys charge in non-contingency cases.  Gupta Decl. ¶¶ 63, 64; Oliver Decl. ¶¶ 12, 13.  Both the government and Mr. Isaacson suggest that Class Counsel's lodestar should be estimated using the hourly rates in the U.S. Attorney's Office Fitzpatrick Matrix, instead of using Class Counsel's actual rates.  Def.'s Resp. at 5-7; Isaacson Obj. at 12-13.  But the Fitzpatrick Matrix was not designed to be used for lodestar cross-checks in common fund class actions; instead, "[t]he matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees."  U.S. ATT'Y'S OFF. FOR D.C., THE FITZPATRICK MATRIX, Explanatory Note 2, www.justice.gov/usao-dc/page/file/1504361/download [https://perma.cc/EVQ5-NNMC]; <u>see</u>, <u>e.g.</u>, <u>J.T. v. District of Columbia</u>, 652 F. Supp. 3d 11, 26-27, 31-36 (D.D.C. 2023) (using Fitzpatrick Matrix to calculate reasonable attorney's fees under the fee-shifting provision of the Individuals with Disabilities Education Act).  Mr. Isaacson also asserts that the Court should require Class Counsel to submit itemized records of hours billed in order to make "appropriate deductions."  Isaacson Obj. at 12.  But the Court declines to engage in the "bean-counting" that it has been cautioned against, and instead

will "rely on summaries submitted by the attorneys."  In re Rite Aid Corp. Sec. Litig., 396 F.3d at 306-07.[12]

In addition, the government argues that Class Counsel's use of current billing rates "fail[s] to account [for the fact] that the litigation began in 2016, with class certification in 2017, when rates for both firms presumably were lower."  Def's Resp. at 4.  But courts routinely use current billing rates for lodestar cross-checks, even when the attorneys requesting fees charged lower rates at the outset of litigation.  See, e.g., Bakhtiar v. Info. Res., Inc., Civil Action No. 17-4559, 2021 WL 4472606, at *9 (N.D. Cal. Feb. 10, 2021); In re Apollo Grp. Inc. Sec. Litig., Civil Action No. 04-2147, 2012 WL 1378677, at *7 & n.2 (D. Ariz. Apr. 20, 2012).  Until fees are awarded, class action attorneys work on a case without pay.  Using current billing rates, which are almost always higher than historical rates, accounts for this delay in payment. See James v. District of Columbia, 302 F. Supp. 3d 213, 226-28 (D.D.C. 2018) (citing Perdue v. Kenny A. ex. rel. Winn, 559 U.S. 542, 556 (2010)); cf. Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016) (when calculating attorney's fees using the lodestar method, rather than the percentage-of-the-fund method, in common-fund cases, "[t]he lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement").

Dividing Class Counsel's requested fees ($23,863,345.02) by their estimated lodestar ($6,031,678.25) results in a multiplier of 3.96.  Put another way, Class Counsel's

---

[12]   The Court agrees with the government, as it represented at the Settlement Hearing, that any concerns about Class Counsel's future time estimate included in their estimated lodestar have been addressed through Class Counsel's supplemental declarations.  See Gupta Supp. Decl. ¶¶ 2-3; Oliver Supp. Decl. ¶¶ 3-5.

requested fee award would compensate them at slightly below four times their hourly rates for the work they performed in this case.  This multiplier is within the normal range of one to four – although, admittedly, on the high end of it.  The Court believes that a multiplier of this magnitude is warranted due to the risk Class Counsel took on in agreeing to litigate the case. Class Counsel provided exceptional service to the class for over seven years, all the while in danger of being paid nothing (or close to it).  And multipliers of this size, or even higher, are by no means unheard of.  See 5 RUBENSTEIN, supra, § 15:89 (noting "roughly 70 reported cases with multipliers over 4"); e.g., Kane Cnty., Utah v. United States, 145 Fed. Cl. 15, 20 (2019) (multiplier of 6.13 for attorney's fee award of approximately $6 million, one third of the common fund); Geneva Rock Prod., Inc. v. United States, 119 Fed. Cl. 581, 595 (2015) (multiplier of 5.39 for attorney's fee award of approximately $4 million, 17.5% of the common fund).  After all, when counsel in a class action request a reasonable percentage of a common fund, the lodestar cross-check must remain a cross-check of that percentage, and no more. "[T]he point is not to identify the precise outdoor temperature at noon but to know whether or not a coat might be necessary when venturing out for lunch."  5 RUBENSTEIN, supra, § 15:87. Here, the temperature is just fine.

The Court will award the full amount of attorney's fees requested by Class Counsel.  In addition to reflecting a reasonable lodestar multiplier, the fees requested reflect a percentage of the fund around the average for common funds of similar size – even though Class Counsel's representation, and the result they achieved for the class, were well above average. Class Counsel did an exceptional job in novel litigation with a high risk of nonrecovery.  For these reasons, their fee request is warranted.

### C. Expenses and Service Awards

Class Counsel requests $10,000 for each of the three Named Plaintiffs as service awards.  Pls.' Sett. Mot. at 40-41.  Mr. Isaacson objects that awards of this type are unlawful under nineteenth-century Supreme Court precedent.  Isaacson Obj. at 14-15; see Trustees v. Greenough, 105 U.S. 527 (1882); Cent. R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885).  The "overwhelming majority" of circuits disagree with Mr. Isaacson's interpretation of these cases.  Moses v. N.Y. Times Co., 79 F.4th 235, 253 (2d Cir. 2023) (collecting cases).  Mr. Isaacson urges the Court to adopt the reasoning of the Eleventh Circuit, the one outlier from this modern consensus.  See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1255 (11th Cir. 2020).  But even the Eleventh Circuit – and the Supreme Court cases on which Mr. Isaacson relies – acknowledges that "[a] plaintiff suing on behalf of a class can be reimbursed for attorneys' fees and expenses incurred in carrying on the litigation."  Id. at 1257; see Trustees v. Greenough, 105 U.S. at 537; Cent. R.R. & Banking Co. v. Pettus, 113 U.S. at 122-23.  And each Named Plaintiff in this case has expended over $10,000 worth of attorney time and expenses in leading this litigation.  See Burbank Decl. ¶ 6; Rossman Decl. ¶ 3; Brooks Decl. ¶ 2.  Thus, the Court finds the award to the Named Plaintiffs here appropriate.  As one of the attorneys representing the class stated in his declaration:

> [E]xperienced in-house lawyers [for the Named Plaintiffs] performed invaluable work that was necessary to prosecute this case effectively and ethically.  Had they not performed that work on the litigation, the same work would have had to be performed by class counsel or, perhaps more likely, by other outside counsel hired by each organization at far greater expense.

Gupta Supp. Decl. ¶ 7.

The Court also approves Class Counsel's request for $29,654.98 in attorney expenses and $1,077,000 in settlement administration costs. Pls.' Sett. Mot. at 40. As documented by Class Counsel, the attorney expense reimbursements requested include travel, food, lodging, court fees, Westlaw/Lexis fees, photocopying, printing, and mail services; they also include the plaintiffs' portion of the cost of mediation services. Oliver Decl. ¶¶ 14-18. The settlement administration amount was calculated based on the noticing expenses, as well as the "not-to-exceed" amount quoted by the settlement administrator. Id. ¶ 19; KCC Supp. Decl. ¶ 4. The Court finds these expenses and administration costs to be reasonable and adequately documented.

## V. CONCLUSION

The Named Plaintiffs and the United States have reached an historic settlement agreement in this case that reimburses PACER users for $100 million of the fees they paid within a period of over eight years. The Agreement reimburses many small-scale PACER users for all of the fees they paid during this period. And it reimburses large-scale users substantially, and in proportion to what they paid. The Court finds the Agreement to be fair, reasonable, and adequate.

Before reaching a settlement in this unique case, Class Counsel impressively litigated for nearly eight years. They took the case from an untested idea, to a certified class action, to a win on partial summary judgment, to a successful appeal. They negotiated with the federal government to deliver to the class much of the recovery the class sought – although, as with any compromise, not all of it. The Court approves Class Counsel's full request for attorney's fees, costs, and service awards.

Plaintiffs' Motion for Final Approval of Class Settlement and for Attorneys' Fees, Costs, and Service Awards [Dkt. No. 158] is hereby GRANTED.  The Final Judgment and Order on Final Approval of Class Settlement, Attorney's Fees, Costs, and Service Awards will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 3|20|24