```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
NATIONAL VETERANS LEGAL          ) Civil Action
SERVICES PROGRAM, et al.,        ) No. 16-745
               Plaintiffs,       )
vs.                              )
                                 )
UNITED STATES OF AMERICA,        ) October 12, 2023
                                 ) 10:12 a.m.
               Defendant.        ) Washington, D.C.
                                 )
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SETTLEMENT HEARING**
**BEFORE THE HONORABLE PAUL L. FRIEDMAN,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**


<u>**APPEARANCES:**</u>

FOR THE PLAINTIFFS: DEEPAK GUPTA
                    JONATHAN TAYLOR
                    Gupta Wessler LLP
                    2001 K Street, NW, Suite 850 North
                    Washington, DC 20006
                    (202) 888-1741
                    Email: deepak@guptawessler.com

                    JONATHAN E. TAYLOR
                    Gupta Wessler PLLC
                    1900 L Street, NW, Suite 312
                    Washington, DC 20036
                    (202) 888-1741

                    MEGHAN S.B. OLIVER
                    CHARLOTTE LOPER
                    Motley Rice, LLC
                    28 Bridgeside Boulevard
                    Mt. Pleasant, SC 29464
                    (843) 216-9492
                    Email: moliver@motleyrice.com

                    WILLIAM H. NARWOLD
                    1 Corporate Center
                    20 Church Street, 17th Floor
                    Hartford, CT 06103
                    (860) 882-1676
                    Email: bnarwold@motleyrice.com

**(<u>Appearances Continued</u>)**

**<u>APPEARANCES (continued)</u>:**


FOR THE DEFENSE:       BRENDA A. GONZALEZ HOROWITZ
                       DOJ-USAO
                       U.S. Department of Justice
                       601 D Street NW
                       Washington, DC 20530
                       (202) 252-2512
                       Email: brenda.gonzalez.horowitz@usdoj.gov


                       ERIC ALAN ISAACSON, PRO SE
                       6580 Avenida Mirola
                       La Jolla, CA 92037
                       (858) 263-9581


ALSO PRESENT:          WILLIAM MEYERS, General Counsel,
                       Administration Office of the Courts

                       RENEE BURBANK, Director of Litigation
                       National Veterans Legal Services Program

                       STUART ROSSMAN, Director of Litigation
                       National Consumer Law Center

                       DON KOZICH, Objector

Court Reporter:        Elizabeth Saint-Loth, RPR, FCRR
                       Official Court Reporter
                       U.S. Courthouse


        This hearing was held via videoconference and/or
   telephonically and is, therefore, subject to the limitations
   associated with audio difficulties while using technology,
                 i.e., static interference, etc.


            Proceedings reported by machine shorthand.
         Transcript produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  This is Civil Action

3     16-745, National Veterans Legal Services Program, et al.

4     versus the United States.

5              Counsel, please step forward to the podium and

6     state your appearances for the record.

7              MR. GUPTA:  Good morning, Your Honor.

8     Deepak Gupta, class counsel for the plaintiffs.

9              THE COURT:  Good morning.

10             Anybody else at counsel table?

11             MR. NARWOLD:  Good morning, Your Honor.

12    Bill Narwold from Motley Rice, also for the class.

13             Meghan Oliver --

14             THE COURT:  Let me just say this.  Since we have

15    people on Zoom, the only way they can hear you is if you

16    speak from a microphone.

17             THE COURTROOM DEPUTY:  Counsel, would you please

18    approach the podium.

19             MR. NARWOLD:  Good morning, Your Honor.

20    Bill Narwold, Motley Rice, also on behalf of the plaintiffs.

21             MS. OLIVER:  Meghan Oliver, also with Motley Rice,

22    on behalf of the plaintiffs.

23             MR. TAYLOR:  Good morning, Your Honor.

24    Jonathan Taylor, Gupta Wessler, also appearing for the

25    plaintiffs.

```
 1              MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.
 2    Assistant U.S. Attorney Brenda Gonzalez Horowitz; and with
 3    me I have William Meyers, General Counsel of the
 4    Administration Office of the Courts, on behalf of the
 5    United States.
 6              THE COURT:  Good morning to all of you.
 7              MR. ISAACSON:  Good morning.
 8              THE COURT:  Yes, sir.
 9              MR. ISAACSON:  May it please the Court.
10              Good morning.  I am Eric Allan Isaacson.  I am an
11    objector.  I will be speaking after their presentations.
12    Thank you, Your Honor.
13              THE COURT:  Thank you.  Good morning.
14              All right.  So just to set the stage, this case,
15    National Veterans Legal Services Program, National Consumer
16    Law Center, and Alliance for Justice versus the
17    United States of America, which I always refer to as the
18    "Pacer case," was originally handled by my now retired --
19    and I must say quite happily retired colleague, Judge
20    Huvelle.  Judge Ellen Segal Huvelle had this case from its
21    inception in 2016 until she retired, then I took the case
22    over.
23              She considered the arguments of counsel about what
24    services, shall we say, were properly payable through Pacer
25    fees and what were not.  The Pacer fees are fees that are
```

1    charged, as I understand it, to law firms and lawyers and to

2    others who want to get, through the courts and the court

3    system, information about cases in which they are not

4    counsel.  If you are counsel, you are notified

5    automatically.

6              Now, all of this, of course, is a great thing

7    because when I started as a judge everything was on paper

8    and there was nothing electronic.  Then we put all of the

9    civil stuff on electronic filing, accessed it

10   electronically.  As Mr. Meyers will recall, if he has been

11   around long enough, criminal was a little harder because of

12   concerns about security for defendants and witnesses; but,

13   eventually, we wound up having all civil and all criminal

14   electronic filings; orders accessible electronically.  You

15   can sit in your office and be notified if you are counsel in

16   a case about what is happening in your case.  If it's not

17   your case, and you are interested, you go on Pacer and you

18   pay a fee.

19             Now, the only problem with the system is that it

20   used to be if you didn't get to the courthouse by 4:00 or

21   4:30 you couldn't file.  Now, if it's 11:59 p.m. you are

22   still timely, which makes law clerks' work harder and makes

23   lawyers' work harder.  That's an aside.

24             As I recall, there are seven categories of things

25   that Pacer fees are ultimately used for.  When this was

1    before Judge Huvelle, she considered arguments from the

2    plaintiffs and arguments from the government, the

3    Administrative Office of the Courts, represented by the

4    Justice Department; and she rejected both arguments.  She

5    found a middle ground and concluded that there were a great

6    many things that the Administrative Office of the Courts was

7    charging users for, but there were some things -- that were

8    legitimate, but there were some things that were not.

9         She wrote an opinion, 291 F. Supp. 3d. 123, in

10   which she explained her reasoning under the relevant

11   statutes and legislative history, and the case then went to

12   the federal circuit.

13        In reading their opinion, at 968 Fed 3d. 1340, as

14   I understand it, the parties essentially made the same

15   arguments they had made to Judge Huvelle in the federal

16   Circuit, rejected both sides' arguments; agreed with Judge

17   Huvelle, finding a middle ground.  And like any district

18   judge, I am sure she was delighted to read the first

19   paragraph of the opinion in which the Circuit said:  We

20   conclude that the district court got it just right.  As I

21   tell my friends in the D.C. Circuit, they don't say that

22   often enough.

23        As to the seven categories -- and you-all can

24   correct me if I am wrong on any of this; I just thought it

25   would be useful to try to, on the record, sort of set the

1    stage.  I guess there were six categories.

2            As to the six categories, Judge Huvelle and the

3    Circuit -- well, the first category is funding the operation

4    of Pacer itself, and that was clearly fundable through the

5    fees; then there were six additional categories.  She said

6    that funding the case management and electronic case filing

7    system, which I just talked about, CM/ECF, was legitimate

8    use of the fees; the electronic bankruptcy noticing, called

9    EBM, was legitimate.  There was a study called the "State of

10   Mississippi Study," she said no; it was wrong to use the

11   fees for that.  Violent Crime Control Act notification

12   system, she and the Circuit both said no.  Web-based juror

13   services, E-juror; again, no.  And finally, courtroom

14   technology, as I read it, you can correct me if I'm wrong,

15   the Circuit said mostly no, but there were a few exceptions.

16           They explained the reasoning and why they thought

17   she was right and concluded that Pacer fees, under the

18   statute, are limited to the amount needed to cover expenses

19   incurred and services providing public access to federal

20   court electronic docketing information; and then they sent

21   it back.  They affirmed, and sent it back to Judge Huvelle

22   for further proceedings consistent with their opinion.

23           That's where I come in and that's where you came

24   in.  Because after a lot of -- as I read it -- a lot of

25   effort -- not to prejudge anything, arm's length

1    negotiation, a settlement agreement was reached which sets

2    up, what would seem to me, to be kind of a complicated

3    system but a necessary system to reach all of the users over

4    the relevant years.  And so, on remand, there was a lot less

5    for me to do than might have been the case.  After all was

6    said and done, there was a settlement agreement concluded

7    and filed.

8              Having reviewed that in the filings that you

9    provided with it, I, on May 8, 2023, entered an order

10   granting plaintiffs' revised motion for preliminary approval

11   of class settlement and, then, the process to get us to

12   today, the yin, including the notices sent out; and I am

13   sure there will be some discussion of the adequacy of those

14   notices and whether everybody was properly attempted to be

15   reached and in all of the other things that you need to do

16   to get where we are.  And since then there have been

17   numerous filings by the parties, briefs, affidavits, or

18   declarations, and by some objectors as well.

19             So in scheduling the settlement hearing in Docket

20   No. 112, in my order of October 4, 2023 -- I have earlier

21   orders, too -- but it essentially set up how we were going

22   to do this, and that people -- certain people could appear

23   and speak if they wanted to virtually, and people here could

24   speak in person.  There would also be a public line for

25   anybody who wanted to hear what goes on in these proceedings

1    but not participate.

2          Essentially, what I had set forth in this order

3    was that we would start with the parties, the plaintiffs'

4    class counsel in the United States, having up to 20 minutes

5    to make opening remarks; and then I would hear from

6    objectors.  And anyone who had submitted a written statement

7    and wants to be heard can have ten minutes to talk, and

8    anybody who has not written a submitted written statement

9    can have five minutes to talk if they're here.  Counsel will

10   have time to respond to those objections and to make a

11   closing statement.

12          Then we, separately, will have an argument on

13   attorney's fees, with each side getting 15 minutes to

14   present their positions and to answer questions from me.

15          So unless anybody has anything preliminarily or

16   procedurally you want to say before we dive into it, I guess

17   we can start with the openings.

18          MR. GUPTA:  Good morning, Your Honor.

19          I am Deepak Gupta, class counsel in this matter.

20   It is an honor to be here to present this historic class

21   action settlement for the Court's consideration at the final

22   approval stage.

23          I just want to start by thanking the Court and the

24   court staff for the work that went into arranging this

25   hearing, thoughtfully, and for ensuring that the class

1    representatives, as well as class members, can appear and be

2    heard today, both in person and remotely.  We do have a

3    couple of folks remotely on Zoom.

4         Before we begin, I would just like to recognize

5    the people who are here in the courtroom this morning and

6    remotely as well, without whom we never would have gotten to

7    this point.

8         With me at counsel table, my colleague John Taylor

9    from the Gupta Wessler firm, who was there from the very

10   beginning and every step of this case.  My colleagues Bill

11   Narwold and Meghan Oliver from the Motley Rice firm, with

12   whom we worked hand in glove; and Charlotte Loper as well

13   from the Motley Rice firm.

14        If the Court has questions about the mechanics of

15   notice or class administration, claims administration, my

16   colleagues from Motley Rice, particularly Meghan Oliver, are

17   here to answer those.

18        We also have four people here from the class

19   representatives, both in the courtroom and via Zoom, that I

20   would like to thank for their service in this case and

21   introduce to the Court and indicate who will be speaking

22   here today.

23        In the courtroom we have Jake Faleschini.

24        THE COURT:  Say that more into the microphone,

25   please.

 1          MR. GUPTA:   Jake Faleschini, he is the director of

 2     justice programs at the Alliance for Justice, and he is

 3     going to say a few words on behalf of AFJ in support of the

 4     settlement.   Also in the courtroom we have Ryan Kelly, who

 5     is a staff attorney with the National Veterans Legal

 6     Services Program.

 7          And via Zoom we're joined by Renee Burbank.   She

 8     is the litigation director at the National Veterans Legal

 9     Services Program.   She's sorry she couldn't be here in

10     person today.   She has plenty of experience with class

11     actions; is actually a published expert on illegal exaction

12     claims, of all things.   She, too, will speak briefly in

13     support of the settlement.

14          And finally, last but not least, Stuart Rossman is

15     also joining us via Zoom from Boston; he is the litigation

16     director of the National Consumer Law Center.   He also

17     happens to be a leading expert on class actions and class

18     action settlements.   He will say a few words this morning in

19     support of the settlement.   We will try to keep all of those

20     statements brief.

21          So just a few words on the process first.   Those

22     who are unfamiliar with class actions might wonder why we

23     have a big hearing when a case is settled.   What is there to

24     talk about?   The case is over.   The parties have agreed to

25     settle it.

1            But a class action settlement like this one binds

2       hundreds of thousands of people.  People who haven't been

3       necessarily participating in the litigation.  And so it's

4       essential to the process that the Court ensure for itself

5       that the settlement is fair, that we allow people to have

6       notice and an opportunity to be heard.  And I think it's

7       important not just that the settlement is fair, it's

8       important that the public that will be bound understands

9       that it's fair and that they have had a say in the matter if

10      they want one.

11            So as the Court is well aware and, Judge Friedman,

12      as you discussed earlier, we go through kind of a three-step

13      process.

14            First, preliminary approval, which as you have

15      mentioned, you have already done that.

16            Then the Court directs reasonable notice to all

17      class members who would be bound; that, too, has already

18      occurred here.  We have given individual notice to about

19      500,000 people and publication notice as well.

20            The third step is where we are now, final

21      approval.  We have this hearing, we have objections, a

22      public fairness hearing, and the Court considers whether the

23      settlement meets the criteria spelled out in Rule 23.

24            We think we have extensively briefed all of the

25      factors that the Court considers under Rule 23, so I am not

1    going to belabor them here unless the Court has questions.

2    We believe it's clear that the class representatives and

3    class counsel have vigorously represented the class

4    throughout this long and hard-fought litigation.

5           We believe the settlement is the product of an

6    informed arm's length negotiation; that the settlement

7    relief provided to the class is adequate and, indeed,

8    exceptional, particularly given the costs, risks and delays

9    of potential further litigation which could well have

10   occurred on remand for many more years; and that the

11   settlement treats class members equitably relative to each

12   other.  Of course, the plaintiffs and class counsel support

13   the settlement.

14          I do want to say a few words, if I may, about the

15   unusual nature of this litigation because I think it does

16   bear on the analysis.

17          Pacer fees have long been the subject of

18   widespread criticism because they thwart equal access to

19   justice and inhibit public understanding of the courts.  But

20   until this case was filed, folks who care about this issue

21   just did not see litigation as a realistic path to reform.

22   As I noted in my declaration in support of the final

23   approval portion, I have actually been aware of and focusing

24   on these issues surrounding Pacer fees for a long time,

25   going back two decades to my time as a staff lawyer at the

1    Public Citizen Litigation Group which works on transparency

2    issues.

3         Despite much controversy and criticism, though, it

4    was always assumed that a case like this could never be

5    brought.  First, because the judiciary has statutory

6    authority to charge at least some fees.  So no litigation on

7    its own, just within the four corners of the litigation, was

8    ever going to bring down the Pacer-fee paywall and result in

9    a completely free Pacer system.

10        Second, a few lawyers with the necessary

11   experience in complex litigation, one might say, would be

12   crazy enough to sue the federal judiciary and spend

13   substantial time and money over many years on an endeavor

14   with little hope of payment.

15        Third, even if you could show that the fees were

16   unlawful and excessive and obtain qualified counsel, it was

17   still assumed that this was all beyond the reach of

18   litigation because the judiciary is exempt from the

19   Administrative Procedure Act and so injunctive relief would

20   not be possible.  Previous litigation had been dismissed for

21   lack of jurisdiction.  It was hard to know how there would

22   be an alternative basis for jurisdiction, a cause of action,

23   and a waiver of sovereign immunity.

24        So that is, in part, why this case is so unusual.

25        In the history of American litigation, this case

 1    and this settlement are unique.  This is the first-ever

 2    certified class action against the judiciary for monetary

 3    relief and the first settlement of such a case.

 4           When we filed this case seven years ago seeking to

 5    hold the judiciary accountable for overcharging people for

 6    access to court records, I doubt that anyone in Vegas would

 7    have given us good odds.  We were mounting a head-on legal

 8    challenge to a fee schedule that was set by the Judicial

 9    Conference of the United States, presided over by the Chief

10    Justice.  We were asking that the judiciary fork over

11    millions of dollars to people who paid the fees.

12           But I think it is a testament to our judicial

13    institutions that we could bring this case at all, a case

14    against the federal court system in the federal court

15    system, and that we were not laughed out of court.  I am not

16    sure if there is another nation on earth whose judicial

17    institutions would have been as fair-minded and as open

18    about such litigation.

19           It was not easy.  It was risky.  The

20    Administrative Office was not used to facing litigation or

21    discovery, and the Justice Department put up a strong fight.

22    But we never felt and our clients never felt that our

23    arguments were being ignored and rejected by the courts

24    because of the identity of the defendant.  To the contrary,

25    judges at the trial level and the appellate level heard our

1  arguments, gave them fair consideration, and we think ruled

2  effectively in our favor every step of the way.

3         I think you are right, Judge Friedman.  Judge

4  Huvelle chartered a middle path.  She found liability and so

5  did the federal circuit, unanimously.  We defeated the

6  government's motion to dismiss.  We obtained certification

7  of nationwide class in a case against the judiciary.

8  Through discovery, we were able to shine a light on how the

9  Administrative Office of the U.S. Courts had been using

10 Pacer fees; bringing new facts to life and spurring action

11 in the legislature.  And that discovery, in turn, led to

12 Judge Huvelle's unprecedented decision which, yes, it didn't

13 give us everything that we asked for when we swung for the

14 fences, but it did hold that the AO had violated the law by

15 using Pacer fees to fund certain activities.  Within months,

16 the AO announced that those activities would no longer be

17 funded with Pacer fees.

18        When we went up on appeal, we were able to muster

19 extensive amicus support from retired federal judges,

20 numerous media organizations, technology companies,

21 libraries, civil rights groups.  And the suit also garnered

22 widespread media coverage that brought public awareness to

23 these efforts.

24        Before long, the AO announced that it was doubling

25 the $15 quarterly fee waiver, eliminating Pacer fees for

 1      approximately 75 percent of Pacer users.

 2              As you mentioned, we secured what we think is a

 3      landmark federal circuit opinion unanimously affirming this

 4      Court's summary judgment ruling holding that the judiciary

 5      had unlawfully overcharged people.

 6              I think it's worth noting another thing that the

 7      federal circuit said besides that Judge Huvelle got it just

 8      right.  The federal circuit also acknowledged the important

 9      First Amendment stakes here.  It acknowledged that, as it

10      put it, quote:  "If large swaths of the public cannot afford

11      the fees required to access court records, it will diminish

12      the public's ability to participate and then serve as a

13      check upon the judicial process," which is an essential

14      component in our structure of self-government.

15              So a few words about the settlement itself.

16              After more than seven years, we now have a

17      landmark settlement under which the government must

18      reimburse the vast majority of Pacer users in full; 100

19      cents on the dollar for past Pacer charges.  The settlement

20      creates a common fund of $125 million from which each class

21      member will be automatically reimbursed up to $350 for any

22      Pacer fees paid in the eight-year class period.  And the

23      remainder, those who paid over 350, will receive their

24      pro rata share of any remaining funds.

25              This is notable because, unlike most class

```
1    actions -- almost every class action I have been involved
2    in -- there is no claims process; the money is distributed
3    automatically to class members.  By any measure, we think
4    this litigation has been an extraordinary achievement and we
5    think more so given the odds that were stacked against it.
6    It has also sparked widespread public interest in the need
7    to reform Pacer fees and has jump-started legislative action
8    that continues until this day.
9           Following the federal circuit's decision, the
10   House of Representatives passed a bipartisan bill, which is
11   not something that happens --
12              THE COURT:  It must have been a few years ago.
13              MR. GUPTA:  It was a few years ago, but it did.
14           It passed just a few years ago.  Even in these
15   times, it passed a bipartisan bill to eliminate Pacer fees,
16   and it really is truly a bipartisan effort; and the measure
17   advanced out of the Senate Judiciary Committee.
18           The Judicial Conference, too, now supports
19   legislation providing for free Pacer access to noncommercial
20   users.  If Congress were to enact such legislation, it would
21   produce an outcome that the plaintiffs had no way of
22   achieving through litigation alone given the jurisdictional
23   limitations.
24           Now, as I mentioned earlier, the purpose of a
25   hearing like this is to hear from class members; and not
```

1    just the class representatives, but class members who pay

2    may be opposed to the settlement and who wish to be heard.

3    No case is perfect.  Every settlement is a compromise.  And

4    of course, there are always things you wish you could

5    accomplish.  We wish we could have brought down the

6    Pacer-fee paywall entirely, but we couldn't because of the

7    jurisdictional limitations.

8             In any case of this size, with hundreds of

9    thousands of class members, one anticipates at least some

10   substantial number of objections, but this isn't just any

11   class.

12            This is a class that comprises every federal court

13   litigator.  It includes law firms of all stripes, including

14   the world's largest law firms; it includes journalists and

15   media organizations; it includes sophisticated data

16   companies with a lot of money at stake; and it includes a

17   whole lot of pro se litigants.  This is a class of

18   rabble-rousers.

19            In the wake of the settlement, we saw not just

20   extensive press coverage and public interest but, also, many

21   inquiries from individual class members.  Since the

22   settlement, class counsel has responded to over 300 class

23   member calls and emails.

24            THE COURT:  Say that again.  I didn't --

25            MR. GUPTA:  300.

```
 1              THE COURT:  300 what?
 2              MR. GUPTA:  300 class member calls and emails.
 3    Many of those communications involved multiple
 4    communications back and forth.  They came from all manner of
 5    class members.
 6              The class administrator KCC has received
 7    approximately 250 calls through its automated telephone
 8    line.  So the objections here, I think, really are the story
 9    of the dog that didn't bark.  None of the many
10    organizations --
11              THE COURT:  So they were all, these calls, to
12    class counsel and to KCC?
13              MR. GUPTA:  Correct.
14              THE COURT:  Out of that number or that number
15    plus, how many objections were actually filed?
16              MR. GUPTA:  There were five objections that were
17    actually filed, all of them pro se.  One we may discuss
18    later by someone we believe is not a class member, and I
19    think only two that are appearing today.  I may be wrong
20    about that, we'll see.
21              THE COURT:  One of the things -- and this may not
22    be the appropriate time.
23              I think, in reading your papers, in addition to
24    the five objections, you also mentioned something like 34
25    attempts to opt out, some of which may have come too late.
```

1    So at some point I hope you will address that or someone

2    will address that.

3                  MR. GUPTA:  Yes.

4                  Ms. Oliver has the statistics on that.  I think

5    that number is correct.  I think that's the number of valid

6    opt-outs.  We are happy to discuss that.

7                  But the point I am making is that there is a dog

8    that didn't bark; no transparency groups, no law firms, no

9    data companies, no groups that represent underrepresented

10   litigants; none of them have come forward.  I think that's a

11   measure of the universal support for the settlement.

12                 Of course, we want to hear from those objectors,

13   and they have the right to speak today; and that's an

14   important part of the process.

15                 THE COURT:  I have read all of the objections that

16   have been filed thoroughly, including what Mr. Isaacson

17   filed last night.

18                 MR. GUPTA:  But first, if I may, Your Honor, I

19   would like to turn things over to the class representatives

20   to just say a few words.

21                 THE COURT:  Sure.

22                 MR. GUPTA:  We can start with Jake Faleschini from

23   the Alliance for Justice.

24                 MR. FALESCHINI:  Good morning, Your Honor.

25                 THE COURT:  Mr. Faleschini, good morning.

```
 1                  MR. FALESCHINI:  Good morning.

 2             My name is Jake Faleschini.  I am the program

 3        director for the justice team at --

 4                  THE COURT:  Could you spell your last name for the

 5        court reporter.

 6                  MR. FALESCHINI:  Absolutely.  It's

 7        F-A-L-E-S-C-H-I-N-I.

 8                  THE COURT:  Thank you.

 9                  MR. FALESCHINI:  I am with the Alliance for

10        Justice.

11             I am happy to say that AFJ supports the proposed

12        class action settlement and the accompanying requests for

13        fees, costs, and service awards.  AFJ is proud to have

14        brought this case.

15             The Alliance for Justice is a national

16        organization and alliance of approximately 150 public

17        interest member organizations that share a commitment to an

18        equitable, just, and free society.

19             Among other things, AFJ works to ensure that the

20        federal judiciary advances core constitutional values and

21        preserves unfettered access to justice for all Americans.

22             Our organization and many of our member

23        organizations regularly use Pacer to access court documents

24        for research on how court cases impact the issues that we

25        care most about.
```

1          When the courts charge exorbitant fees for access

2     to these documents, it puts our organizations at a

3     disadvantage vis-à-vis more wealthy interests.  In practice,

4     it gatekeeps access to important information, public

5     information, and it limits our collective ability to inform

6     the public about those happenings.

7          AFJ served as a named plaintiff in this class

8     action since its filing in April 2016, a period of more than

9     seven years.  For much of that time until his departure for

10    a position at the U.S. Senate last year, AFJ's legal

11    director, Daniel Goldberg, oversaw this litigation on AFJ's

12    behalf.  Among other things, Mr. Goldberg received updates

13    on motion practices and court rulings from class counsel,

14    reviewed draft pleadings, consulted on strategy, and

15    provided a declaration in support of class certification on

16    AFJ's behalf.

17          I understand that counsel will seek a service

18    award for AFJ of $10,000.  We conservatively estimate that

19    the value of the attorney time incurred by AFJ over the

20    seven-year life of this case exceeds that amount when

21    calculated at market rates.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. GUPTA:  Next, Your Honor, if she's available

25    by Zoom, Renee Burbank from the National Veterans Legal

1    Services Program would like to speak.

2              THE COURT:  Yes.  Ms. Burbank.

3              MS. BURBANK:  Good morning.

4              I am on Zoom.  Can you hear me?

5              THE COURT:  We can hear you.  Thank you.

6              MS. BURBANK:  Thank you, Your Honor.

7              As the attorney just said, my name is Renee

8    Burbank; spelled B-U-R-B-A-N-K.  I am the director of

9    litigation at National Veterans Legal Services Program, also

10   known as NVLSP.

11             We're a national nonprofit veterans service

12   organization and we represent all manner of active-duty

13   personnel and veterans when they are seeking benefits from

14   the federal government due to their service and disabilities

15   incurred or made worse through their service.

16             As an organization, NVLSP represents thousands of

17   veterans every year in court cases, including class actions

18   and individual representation; and we provide education and

19   research on the state of the law to advocates all over the

20   country.

21             Veterans overall, however, largely proceed pro se

22   without attorney representation when they go to the courts

23   to obtain benefits from the government.  And in order to

24   understand the state of the law, access to federal public

25   dockets is critical.  Specifically for NVLSP, we spend many

1     hours every year researching the law all over the country

2     and what is happening with veterans' benefits and other

3     Department of Defense-related activities that affect the

4     benefits and recognition that our military and veterans have

5     earned.

6              As you have already been apprised by Alliance for

7     Justice, we strongly support the settlement and the fees and

8     costs that reflect the complexity and unique nature of this

9     litigation.

10             NVLSP, as one of the named plaintiffs in this

11    class action, has spent a considerable amount of time and

12    effort on this case, understanding the filings as they were

13    being drafted, and providing input prior to class

14    certification, and to also understand and be able to tell

15    others about the status of the Pacer litigation.  Because

16    NVLSP is the first-named plaintiff, we have also received

17    some of those inquiries; we forward them to class counsel

18    when we receive them.  But we did get some information or,

19    rather, inquiry from individual class members wanting to

20    know about this important case.

21             The time that we have spent, the approximate

22    amount of billing rates that we would have for the time

23    incurred that NVLSP has spent is reflected in my declaration

24    previously filed with the Court.  And I think that that

25    declaration, as well as Attorney Gupta's explanation today,

 1      adequately and accurately explains why the settlement is

 2      appropriate in this case.  NVLSP agrees with that

 3      assessment, and we support the settlement.

 4              Thank you, Your Honor.

 5              THE COURT:  Thank you very much, Ms. Burbank.

 6              MR. GUPTA:  And finally, Your Honor, Stuart

 7      Rossman, the litigation director of the National Consumer

 8      Law Center is also with us.

 9              MR. ROSSMAN:  Thank you very much, Your Honor.

10      I hope you can hear me.

11              THE COURT:  Yes.

12              MR. ROSSMAN:  I just want to thank you for

13      allowing me to appear from Boston by Zoom.  It's a pleasure

14      to be able to appear before the Court in support of the

15      settlement in this particular case.

16              As it has already been stated, the National

17      Consumer Law Center has been a named class representative in

18      this case from its inception.

19              National Consumer Law Center is a 54-year-old

20      organization, originally partnered with the Legal Services

21      Corporation where we served as the national support center

22      on behalf of legal services in the area of consumer law.

23      Since 1995, we have been a private nonprofit 501(c)(3)

24      organization.

25              We represent the interests of low-income consumers

1    in the areas of consumer finance, affordable home ownership

2    and access to utilities.  As such, there are two areas in

3    which NCLC is highly dependent on access to the federal

4    court records through the Pacer system.  NCLC is the

5    publisher of a 22-set -- volume set of consumer law manuals

6    which rely heavily on federal law, specifically on federal

7    consumer laws, which, obviously, are updated on an annual

8    basis.  At this point we're digital, so they're being

9    uploaded on a daily basis.  And as an organization, we make

10   heavy use of Pacer ourselves in order to be able to maintain

11   our materials.

12           Beyond that, however, working with our primary

13   finance, which is not the direct service for consumers [sic]

14   but the lead services organizations that represent them,

15   legal services and public interest organizations, all rely

16   upon access to Pacer in order to provide representation to

17   their clients under the statutes like the Fair Lending Act,

18   the Fair Credit Reporting Act, Fair Debt Collection

19   Practices Act, Economic Opportunity Act -- I can go on.

20           Virtually all of the consumer laws in the

21   United States are based upon federal statutes that were

22   enacted from 1968 to the present.

23           So, therefore, having access to Pacer, these are

24   nonprofit public-interest organizations and legal services

25   organizations that have limited resources and, therefore,

1    the effort that was put into this case by the attorneys who

2    brought the litigation has direct impact not only on my own

3    organization but the groups that we serve as a national

4    service organization with national resources for legal

5    services organizations.

6            I do want to comment as well in terms of the

7    service award that is being requested on behalf of National

8    Consumer Law Center.  I have been involved in this case

9    since its inception seven and a half years ago.  I must say

10   that I outlasted the judge on the case but I am, in fact,

11   going to be retiring at the end of December of this year --

12           THE COURT:  At the end of when?  When are you

13   retiring?

14           MR. ROSSMAN:  At the end of December.

15           THE COURT:  So you would love me to approve the

16   settlement and approve it before you retire?

17           MR. ROSSMAN:  You know, I would be more than

18   happy.  But since anything that you approve is going to be

19   going to my organization, whatever we receive we would

20   greatly appreciate it.

21           I am looking forward to retirement.  My wife

22   retired two years ago and every morning she reminds me how

23   good retirement is.

24           THE COURT:  You know, I have been a senior judge

25   for some time; and what you just said, I hear that at home a

1    lot.

2            MR. ROSSMAN:  Yes.  There are some vacations and

3    trips that we have not been able to do, along with spending

4    some time with my grandchildren which is something that --

5    actually, what I really want to do is *The New York Times*

6    crossword puzzle the day after --

7            THE COURT:  My wife prefers Friday and Saturday

8    because they're the hardest.

9            MR. ROSSMAN:  I agree, Your Honor.  It is a great

10   motivation (indiscernible).

11           In any event, I have not only reviewed the

12   pleadings in this case.  I filed a declaration to the Court

13   to support class certification.  We provided discovery in

14   this case.  I have gone back and checked my time records on

15   it.  I have spent more than 250 [sic] hours working on this

16   case over the last seven and a half years.  And at my

17   current billing rate in Massachusetts, that would well

18   exceed the amount of the service award that is being

19   requested on behalf of the National Consumer Law Center.

20           I am happy to be able to respond to any questions

21   you have about the work that we have done in this case.

22           I will just finish by saying that over the last 25

23   years as the NCLC litigation director, I have been of

24   counsel or co-counsel in over 150 class action cases.  It's

25   an unusual situation for me to be a client.  It's been an

1    eye-opening experience for me.  I suspect it's been an

2    eye-opening experience for my counsel whom I have challenged

3    on occasions during the course of the last seven and a half

4    years.  But I think they have done an outstanding job in

5    terms of the work that they have done in this case as well

6    as the outcome it has achieved.  We are highly satisfied and

7    we completely endorse the settlement going forward.

8            So I thank you very much for the time that you

9    have given me to speak, Your Honor, and I am happy to answer

10   any questions that you have.

11           THE COURT:  Thank you very much, Mr. Rossman.

12           Mr. Gupta.

13           MR. GUPTA:  That's all we have for our opening

14   representation.  Thank you.

15           THE COURT:  Then I will hear from the government.

16           MS. GONZALEZ HOROWITZ:  Good morning, Your Honor.

17           Thank you for an opportunity to have the parties

18   and the class members appear before the Court today to

19   discuss the settlement approval in this, I think, as

20   Mr. Gupta called it, a landmark class action case.

21           Your Honor, you are aware that your task today is

22   to determine whether the proposed settlement is fair,

23   reasonable, and adequate for the class members.

24           You need not decide that settlement is perfect or

25   that it's even the best possible.  Stated another way, the

1    Court must examine whether the interests of the class are

2    better served by the settlement than by further litigation.

3           In evaluating that, the Court should determine

4    whether the settlement is adequate and reasonable and not

5    whether a better settlement is conceivable.

6           As demonstrated by both parties' filings in the

7    evidence and information that's been provided to you, this

8    settlement is an outstanding result; I think, as Mr. Gupta

9    called it, landmark for the class members and more than

10   meets the legal requirements for final approval.

11          This Court is well aware of the general principle

12   that settlement is always favored, especially in class

13   actions, where the avoidance of formal litigation can save

14   valuable time and resources; the same is certainly true

15   here.  As Mr. Gupta said, no settlement is perfect.

16          The United States concurs with plaintiffs that

17   this Court should grant final approval.  The settlement

18   proposal was negotiated at arm's length, the relief provided

19   for the class is more than adequate, and the proposal treats

20   class members equitably relative to each other.  Although

21   the parties address these factors extensively in their

22   filings, I would like to take a moment to address these

23   today.

24          First, although I was not personally involved in

25   the mediation and negotiation phase of this litigation, the

1    record before the Court amply demonstrates that the

2    settlement proposal was negotiated at arm's length.

3           As noted in the parties' filings, the parties

4    appeared before an experienced mediator with both parties

5    recognizing the litigation risk in moving forward.

6           The government vigorously defended this action

7    from its inception, as the Court mentioned earlier today in

8    its opening remarks and as Mr. Gupta discussed when giving

9    some of the procedural history and background of this case.

10          The Court and, later, the federal circuit upheld

11   certain electronic public access expenditures, while finding

12   that the Administrative Office of the Courts exceeded its

13   statutory authority as to others.  This has been a

14   hard-fought litigation for a significant period of time.

15   The parties engaged in informal discovery prior to

16   settlement discussions and, thus, were well informed.

17          As other judges in this district have noted, in

18   the absence of any evidence or collusion or coercion on the

19   part of the parties, the Court has no reason to doubt that

20   the settlement was the product of legitimate negotiation on

21   both sides; and the Court certainly has no reason to doubt

22   that here.

23          Second, the settlement provides for a common fund

24   of 125 million, and will provide a full recovery of up to

25   $350 to each class member for fees paid during the class

1    period, with the remaining funds to be distributed on a

2    pro rata basis to those class members who paid more than

3    $350 in fees during the class period.  This relief is more

4    than adequate especially considering some of the risks to

5    the class which I will address momentarily.

6              There is nothing inequitable about the plan of

7    allocation and distributing payments pro rata with a

8    guaranteed payment up to a certain amount in a common fund

9    case such as this one is not unusual.

10             As reflected in the parties' filings, the

11   allocation plan was the result of a compromise between the

12   parties and supports the Administrative Office's

13   long-standing policy of access to judicial records.

14             This principle is even more forceful here where

15   the E-Government Act allows for differentiation between

16   individuals.  Consistent with the statutory notes

17   articulated in 28 U.S.C. Section 1913, the statute permits

18   electronic public access fees to, quote:  "Distinguish

19   between classes of persons and shall provide for exempting

20   persons or classes of persons from the fees in order to

21   avoid unreasonable burdens and to promote public access to

22   such information."

23             As one of the objectors recognizes,

24   differentiation between class members can be permissible

25   when it is justified; and in this instance, it is certainly

1    justified considering the Administrative Office's interest

2    in ensuring public access especially to individual and

3    smaller users.

4         The settlement distribution will ensure that the

5    average Pacer user receives full compensation up to $350

6    which, for many users, will result in a full compensation of

7    all fees paid.  In other words, the settlement is consistent

8    with congressional intent.

9         Moreover, efforts taken by the judiciary to ensure

10   that public access fees do not create unnecessary barriers

11   or burdens to the public have resulted in an allocation of

12   the vast majority of Pacer maintenance costs to the system's

13   largest users, which are typically commercial entities that

14   re-sell Pacer data for profit.  That comes from the report

15   of the proceedings of the Judicial Conference of the

16   United States in September of 2019.

17        To address the concerns lodged by objectors that

18   the settlement either favors small users or institutional

19   ones which I think, as the parties have noted, are

20   diametrically opposed objections or does not favor

21   institutional users enough, the settlement is a marriage of

22   the parties' litigating positions which, in the end, is the

23   hallmark of compromise.  The settlement need not be perfect

24   but, rather, reasonable.

25        Finally, Your Honor, I want to address the terms

1    of the settlement in relation to the strength of plaintiffs'

2    case.  It is the government's position that absent a

3    settlement, the class would have faced significant

4    difficulty in demonstrating that the Administrative Office

5    would not have used the funds on otherwise permitted

6    categories.  This was a position that the government took at

7    all stages of the litigation; and as with any litigation, of

8    course, there are risks to both sides if the case were to

9    proceed.  But especially here, the results achieved are

10   extraordinary when compared to the difficulties the class

11   may have if the litigation were to move forward.  That, of

12   course, is without even considering the time, expense,

13   burden, and resources that the parties and, of course, the

14   Court, in turn, would expend if the case were to proceed to

15   additional discovery on damages and later to trial.  These

16   factors only further counsel in favor of approval of the

17   settlement agreement.

18          Because the Court has a lot of time at the end of

19   the hearing to discuss plaintiffs' motion for attorney's

20   fees, service awards, and costs, I will not address that

21   here other than to say that the government, in its response

22   to plaintiffs' motion, raised some questions in general

23   principles for this Court to consider in determining the

24   ultimate award.

25          In sum, Your Honor, we concur with plaintiffs in

 1    the class that the Court should approve the settlement.

 2    Thank you.

 3                THE COURT:  Thank you.

 4                So it seems to me now, under the schedule I've

 5    set, at some point I want to hear from Ms. Oliver about the

 6    opt-out question.  But I think at this point I will hear

 7    from Mr. Isaacson who is here and has filed a number of

 8    things; one a while ago and one last night.

 9                He is here in person to speak to his objections.

10    I am happy to hear from him.  Later I will hear from other

11    people if they want to be heard.

12                So good morning, sir.

13                MR. ISAACSON:  Good morning, Your Honor.

14                May it please the Court.

15                I am Eric Alan Isaacson, a member of the class to

16    be bound by the settlement.  I filed a timely objection on

17    September 12 and in response to this Court's order regarding

18    the hearing.  And preceding the hearing, I filed a written

19    statement that indicated my intent to appear here in person,

20    not remotely, as Mr. Gupta's filing stated.  Also, to

21    address some of the filings that they did, I think that they

22    were after the fact and late when it comes to the

23    requirements of Rule 23.

24                I think that the primary fairness problem with

25    this settlement -- well, I think there are two serious

1    fairness problems with the settlement.  Rule 23 asks whether

2    the settlement treats class members equitably with respect

3    to one another.

4         The big problem is that, as Mr. Gupta says, this

5    class includes the world's largest law firms.  The world's

6    largest law firms are very sophisticated and they did not

7    file an objection.  They didn't file an objection because

8    they know that they got fully reimbursed for their Pacer

9    expenses years ago.  They bill in 30-day cycles.  They pay

10   Pacer bills, and the clients then reimburse them for the

11   Pacer bills.  Class counsel in class actions that almost

12   always settlement, almost always produce a settlement fund

13   from which the class action law firms are fully reimbursed

14   for their Pacer expenses.

15        You have got a class that includes a lot of very

16   large Pacer users that spent a lot on Pacer; they got fully

17   reimbursed for it.  And you have got a claims process --

18   well, it's not a claims process.  They brag that there are

19   going to be no claims made, which means they are not even

20   asking people:  Have you been reimbursed for your Pacer

21   expenses?

22        THE COURT:  So at this point, I take it, is that

23   when the big law firms bill their clients quarterly or

24   whenever they bill, they included -- they say:  In doing

25   legal research for you on this matter, we used Pacer, and it

1    cost X dollars, and we're billing you for that.

2         MR. ISAACSON:  Yes, Your Honor.  That would be my

3    understanding.

4         I worked in a large law firm for about three years

5    at the beginning of my career.  I worked at large

6    plaintiffs' class action firms for the majority of my

7    career.  My understanding is that the law firms that are

8    going to be some of the biggest claimants are going to

9    receive the biggest payments over the pro rata distribution

10   part of this settlement -- have already been fully

11   compensated.

12        Now, one way to address that was the government's

13   position that you had to have a large minimum payment.  You

14   have got a large minimum payment and they ended up getting

15   negotiated down to $350.  If it's a large minimum payment,

16   double that or three times that, you are still dealing with

17   people getting the minimum payment who are members of the

18   public, who are not in a class that have been reimbursed for

19   this stuff; that would be one way to deal with it.  The

20   settlement is unfair if it does not have a larger minimum

21   payment and does not ask large claimants or large payees:

22   Have you been reimbursed?  I think it treats class members

23   inequitably relative to one another.

24        I think it's very ironic that the government, in

25   the settlement negotiations regarding the allocation of the

1   funds, did a better job advocating for the public interest

2   and for the interest of class members who haven't been

3   reimbursed than did class counsel.

4           There may have been arm's length negotiations in

5   the settlement process with respect to the total amount of

6   the settlement.  But when it comes to the allocation of the

7   funds, the government's position was preferable to the

8   plaintiffs' class action lawyers; I think that's most

9   unfortunate.

10          It is, I think, not coincidental that plaintiffs'

11  class action firms like themselves benefit from a low

12  minimum amount and high allocation to the pro rata

13  distribution.

14          I think that the $10,000 service awards are

15  problematic, I think, according to Supreme Court authority,

16  Supreme Court opinion; I addressed that in my papers.

17          With respect to the settlement adequacy as amended

18  in 2018, Federal Rule of Civil Procedure 23 requires the

19  Court, in evaluating adequacy of the settlement to consider,

20  and I quote:  "The terms of any proposed award of attorney's

21  fees."  That's Rule 23(e)(2)(C)(iii).

22          THE COURT:  Hold on one second.

23          Which part of 23?

24          MR. ISAACSON:  Rule 23(e), which deals with

25  settlement approval in class actions.

```
 1                    THE COURT:  Right.

 2                    MR. ISAACSON:  Subsection (2), Subsection (C),

 3       Subsection (iii).

 4                    THE COURT:  So it says that:  If the proposed

 5       class -- only in finding it's fair, reasonable, and adequate

 6       after considering the following.  And (C)(iii) basically

 7       says --

 8                    MR. ISAACSON:  Which I think --

 9                    THE COURT:  -- that the class represented class

10       counsel -- I'm sorry, that the relief provided for the class

11       is adequate taking into account the terms of any proposed

12       award of attorney's fees including timing of payment.

13                    So essentially, as you read this, there are two

14       questions on attorney's fees:  One is, are they entitled to

15       attorney's fees?  And secondly, how much?

16                    MR. ISAACSON:  Yes, Your Honor.

17                    THE COURT:  And this says that in determining

18       adequacy I have to consider both of those?

19                    MR. ISAACSON:  Yes, Your Honor.

20                    In considering adequacy of the settlement, you

21       need to consider that.  The reason is because in class

22       actions there is a tendency for class action lawyers to

23       settle cases on terms that guarantee themselves large

24       attorney's fee awards; in this case, four or five and a half

25       times their reasonable hourly billing rates if you look at
```

1       their lodestar -- their claimed lodestar, and compare it to

2       the fee award that they're asking for.

3              This is a case where class counsel has come in and

4       said:  We have got a quarter of the damages in this case --

5       because it's apparently a $500 million case according to

6       their expert Professor Fitzpatrick -- we have got a quarter

7       of the damages in this case, give us four times our billing

8       rates.  I don't think that's appropriate, Your Honor.

9              I think that it's going to be necessary, if you

10      want to approve the settlement, to dramatically reduce the

11      attorney's fees that they're requesting.

12             Now, they didn't document their lodestar; that's a

13      problem.  I think that's designed, quite frankly, to force

14      the Court to choose to do a percentage award rather than a

15      lodestar award.  I don't think that it's ethical for class

16      counsel to do that.  I think they need to provide the data

17      that would be necessary for the Court to make the choice.

18      And all of the circuits except for the District of Columbia

19      Circuit and the Eleventh Circuit have held that that is a

20      choice for the Court to make.

21             THE COURT:  Choice between what?

22             MR. ISAACSON:  Between lodestar award and

23      percentage of the fund award.

24             THE COURT:  What about the federal circuit?

25             MR. ISAACSON:  The federal circuit I think

1    indicates that you can choose between the two, you have

2    discretion.  But it is not something that they can force.

3         I think the recent *Health Care Republic* [sic] case

4    strongly indicates you ought to do a lodestar cross-check.

5         THE COURT:  A lodestar cross-check is different

6    from a lodestar.  In other words, as I understand it -- we

7    are going to talk about this more later.

8         As I understand it, there are cases in which you

9    apply the lodestar.  We used to call it -- I forget what it

10   used to be called, the U.S. Attorney's matrix, the D.C.

11   Attorney General's matrix, the Laffey Matrix.  We have all

12   of these things in this court which applies to certain kinds

13   of cases and in certain cases.  Then there are the common

14   fund cases which, I believe -- and we will talk more about

15   this later.  The case law seems to suggest that a percentage

16   of the fund is more normal than the lodestar, but there is

17   then the discussion of a separate thing called the lodestar

18   cross-check.  So there is the lodestar versus the percentage

19   of the fund, and then there is:  When you do a percentage of

20   the fund do you also do a lodestar cross-check, and is that

21   something judges have the discretion to do or not do to

22   satisfy themselves or to do a, for lack of a better word,

23   cross-check, or is it something that some courts require be

24   done?

25        I don't want to -- you can continue talk about

 1    this.  I will let you talk later this morning when we get to

 2    the separate discussion of attorney's fees; I will let you

 3    get up again and talk some more about that in response to

 4    what counsel says.

 5             In my mind at least, there is a vast difference

 6    between a lodestar and lodestar cross-check; they serve

 7    different functions.

 8             MR. ISAACSON:  Your Honor, my understanding is the

 9    Court is supposed to act as a fiduciary for the class.

10             THE COURT:  I agree.

11             MR. ISAACSON:  If we go back to the earliest

12    common fund cases, the Supreme Court in *Greenough* says the

13    Court needs to act with a zealous regard for the rights of

14    the class.  And you need to -- in evaluating whether to do a

15    percentage award and the amount of the percentage award,

16    consider whether it's going to cause a windfall to class

17    counsel, which I think, in this case, it does because they

18    are saying:  We recovered one quarter of the damages in this

19    case, give us four times our claimed lodestar.  Which they

20    haven't really documented, and they haven't documented the

21    fees.  They end up having supplemental submission from both

22    Fitzpatrick and Rubenstein supporting their fee application

23    on reply.  I think that's inappropriate because Rule 23(h)

24    says that they're supposed to put in the supporting

25    documentation in connection with the motion.  I think it's

 1      unfair and improper to put it in on reply both because,

 2      ordinarily, you don't get to introduce additional evidence

 3      on reply and because Rule 23(h) required them to file that

 4      stuff before the objections were due.

 5                  I think it's also important to realize that even

 6      if a judge is not going to go through line by line in their

 7      lodestar submissions and billing submissions, even if class

 8      members, for the most part, aren't going to be sophisticated

 9      enough to go through line by line, if those filings and that

10      evidence is made a part of their public record that other

11      folks may do it.

12                  In the *State Street* securities fraud litigation

13      there was settlement in the District of Massachusetts.  A

14      reporter for the Boston Globe went through the fee

15      applications after the district judge had approved the

16      attorney's fees and said:  Hey, there is a guy that gets

17      paid a lot of money but didn't do anything.  What's up?

18      Said:  Hey, there are folks who billed time and they are

19      being compensated more than once for it, more than one law

20      firm they were working for at the same time for the same

21      fees.  It's important for transparency that they have a

22      complete filing of the information.

23                  Now, in this case, I think a fee award of five

24      percent would more than cover their claimed lodestar and

25      would be more than adequate and would address the concerns

1      that I have got.

2              When it comes to presumptions with respect to

3      fees, the *Health Republic* case says that you can't presume

4      that the fee application is appropriate.  You have got to be

5      very critical of it.

6              The Supreme Court in *Perdue* said it's

7      presumptively sufficient for class counsel to get an

8      unenhanced lodestar award that presumptively covers the

9      costs and risks of class action litigation and that if they

10     want more than that they need to demonstrate with clear

11     evidence why they need to get more than that.

12             THE COURT:  Okay.

13             MR. ISAACSON:  In this case, I think that goes to

14     fairness of the settlement.

15             Now, if I am going to be able to address the fee

16     issues after they speak about fees --

17             THE COURT:  Yes.

18             MR. ISAACSON:  -- I will wait for that.

19             Thank you very much, Your Honor.

20             THE COURT:  Thank you very much, Mr. Isaacson.

21             Are there any other objectors in the courtroom or

22     on Zoom who want to be heard?  Any objectors?

23             I see someone.

24             MR. KOZICH:  Yes, Your Honor.

25             THE COURT:  Mr. Kozich, yes, sir.  Mr. Kozich has

1     filed a written objection which I have read.  I will hear

2     from you, Mr. Kozich.

3                MR. KOZICH:  Thank you, Your Honor.

4                One of the persons who spoke said there were

5     500,000 users who were actually entitled to some sort of

6     reimbursement for their Pacer fees; and they never had an

7     accounting of who is going to receive what money from the

8     settlement.

9                Now, one of the other attorneys that I know is a

10    class member -- but I am not a class member because --

11    basically saying that I didn't pay Pacer fees in a time that

12    is a class period.

13               I remember that I did pay Pacer fees during that

14    time but I was only able to find invoices that I submitted

15    to the Court.  The Pacer people tried to do a check on me,

16    they couldn't find my account at all.  So I don't know if

17    Pacer purposely lost my account or whatever.  I am claiming

18    that I am a class member and I would like to present my

19    argument now.

20               Now the --

21               THE COURT:  Are you objecting to aspects of the

22    settlement or are you objecting to the fact that you are not

23    being included in the class and getting your fair share, or

24    both?

25               MR. KOZICH:  Both, Your Honor.

1          THE COURT:  Okay.  Go ahead.

2          MR. KOZICH:  Okay.  The government entered into it

3     in December of 2002.  It mandates that Pacer cannot charge

4     beyond the margins -- marginal cost of document production

5     or transmission.  Transmission time is at the speed of

6     light, so at 186,000 miles per second; therefore,

7     transmission time is much less than one second and certainly

8     less than one cent per page to transmit.  All of that money,

9     the pennies that it cost to transmit, they already had the

10    documents, they're just transmitting the documents, it's

11    proper to pay Pacer.

12         The defendant instituted excessive Pacer fees.  I

13    only have two documents; one from August 18th of 2014, and

14    one from April 1st, 2017, which is charging ten cents per

15    page for excessive fees.  So the period of time to then come

16    back before 4/21/10 [sic] because they're charging excessive

17    fees back then too.

18         Ten cents per page is what Office Depot charged

19    before COVID.  It includes costs of copier, toner, drums,

20    paper, electricity, copies.  Pacer did not incur any of

21    these costs, only the cost of transmission, because the

22    document is already there.

23         The lawsuit was filed in 2016.  Class period is

24    from April the 10th, 2010, through May 31st of 2018.  This

25    period is why we cut off so -- just a short period of time

1    at any time before April the 10th or after May 31st of 2018,

2    when Pacer was charging ten cents a page.

3          Who picked the period?  I don't know who picked

4    the period.  Pacer users who pay less than $50 in excessive

5    Pacer fees -- I didn't pay my Pacer fee, but you see $250

6    because I am a disabled veteran.  And I was looking for

7    issues regarding the housing tax credit properties.  I had

8    an issue with the Broward County Housing Authority.  I was

9    researching records of California, Oregon, Washington, and

10    all over the country, actually, for help with my case.  So I

11    didn't pay the Pacer fees because I couldn't afford it, the

12    high fees.  Pacer cut me off from using Pacer, and I am

13    still cut off from Pacer.  I guess Pacer could waive the

14    fees; they haven't done that.

15          And then for the quarter ending for the year

16    ending 2010, Pacer had a net profit of 26,611,000.15 as part

17    of my filing of 163, Exhibit E, extrapolating a period,

18    which is a period of 37 quarters; basically at a net profit

19    for 2010, $984,626,129.

20          If you take over the settlement, there is still a

21    net profit of $859,626,129 [sic].  Net profit.  It's not

22    supposed to be making a profit, they're supposed to be

23    dealing at cost.  That money should be distributed to the

24    users who pay the excessive fees so that they can be made

25    whole.  They are not being made whole by the settlement.

 1          I presented evidence that I owed $354.67 in Pacer

 2   excessive fees for the period July 1st, 2015, through

 3   September 30th, 2015.  My account number is 2792766.

 4          I remind the Court that Pacer couldn't find my

 5   account.  So I don't know what they did with it; they lost

 6   it or something.

 7          I am opposed to the settlement because people are

 8   not being made whole.  It's the big large law firms, big

 9   corporations, and the big nonprofits that are making most of

10   the money because the small guy who you see incur fees is

11   not going to be made whole and maybe deserves to be made

12   whole by the settlement.

13          I am opposed to the settlement.  I would like to

14   know how -- who the money is going to go to before the Court

15   reaches a settlement on the amount that's being distributed.

16   I think the nonprofits and big corporations is taking a big

17   chunk of the money, and the small guy is not being made

18   whole.  Thank you, Judge.

19          THE COURT:  Thank you very much, Mr. Kozich.

20          Are there any other objectors in the courtroom or

21   on Zoom that want to be heard?

22          I don't hear anybody speaking up.

23          As I understand it, and as I have -- I have read

24   all of the objections.  In addition to Mr. Isaacson and

25   Mr. Kozich, there are only three other objectors:  Geoffrey

1     Miller, Alexander Jiggets, and Aaron Greenspan.  I have read

2     their objections, and none of them are here on Zoom or

3     otherwise.  None of them indicated that they wanted to be

4     heard today.

5             So I would suggest that maybe a logical thing to

6     do is to now hear responses to the objections.  You don't

7     need to use the full time, use whatever time you need, the

8     same for the government, and then we'll take a break.  Then

9     I will hear from Ms. Oliver on opt-outs and from whoever is

10    going to speak about attorney's fees.  I think we should

11    deal with the objections, both the written ones and those

12    who spoke today to support their written submissions.

13            Mr. Gupta.

14            MR. GUPTA:  Thank you, Your Honor.

15            I will try to be brief but, of course, I want to

16    be sure I answer any questions the Court has.

17            THE COURT:  Yes.

18            MR. GUPTA:  I do think we have tried to adequately

19    brief the responses to the objections.  I can discuss

20    Mr. Isaacson's objection first.

21            We thought it was interesting that you had two

22    sort of diametrically opposed objections.  You had

23    Mr. Miller's objection.  The complaint there is, we are

24    favoring the small users by compromising with this minimum

25    distribution.  Mr. Miller's complaint was:  We're favoring

1    the little guy over the big guy.

2            Mr. Isaacson's complaint, as I understand it, is

3    precisely the opposite.  He is saying:  You are favoring the

4    big guy over the little guy.  I suppose maybe that's a

5    measure of the fact that it's a compromise and we met

6    somewhere in between with the two positions.

7            I find Mr. Isaacson's objection, in particular, a

8    little difficult to understand because what he is saying is,

9    in his words, is grossly inappropriate was that we advocated

10   for a pro rata distribution of the funds; that was our

11   position in the negotiations with the government.

12           As we say in our reply brief, the Supreme Court

13   has said that a pro rata distribution is the typical measure

14   of fairness, both in modern class actions and in equity.

15   Fair treatment -- the Supreme Court said in *Ortiz* -- is

16   assured by the straightforward pro rata distribution of

17   proceeds from litigation amongst the class.  It's hard to

18   understand how our advocacy for a pro rata distribution

19   somehow ill-served the class or how this structure

20   discriminates against the small users on whose behalf we

21   brought this case.

22           If you look at the class representatives, you can

23   see that the whole point of this case was about access to

24   justice for the little guys, as it were.

25           Mr. Isaacson points out that large law firms often

1    will seek reimbursement from their clients for expenses like

2    Pacer fees.  This is something we gave considerable thought

3    to, both in bringing the case and also in settling the case.

4              I just wanted to draw the Court's attention to a

5    footnote in our reply brief because it can get missed; a

6    footnote at page 5.  We actually found a case.  It's a case

7    from the Northern District of Illinois where a similar kind

8    of objection was made to a class action settlement; the idea

9    being that:  You have this settlement with respect to

10   certain charges but, then, there might be a dispute with

11   other people, a matter with other people who reimburse those

12   charges.

13             What the law has always said here -- and this is a

14   long-standing legal principle that is true in Tucker Act

15   cases as well -- is that the claim is held by the person who

16   was subject to the illegal government charge; in that case,

17   that would be the person who paid the Pacer fees.  Any

18   downstream issues with respect to reimbursement by other

19   people is a matter between those people and those other

20   people.

21             That said, because we expected this issue to occur

22   and because we heard about it in the notice period -- I

23   think, actually, you may recall, Judge Friedman, we

24   mentioned this issue to you before final approval as a

25   potential issue.  We have actually worked with the class

1     administrator.  There is a form on the website that allows

2     people to indicate whether or not they paid Pacer fees for

3     somebody else or whether they are being reimbursed.

4              THE COURT:  Say that again.

5              MR. GUPTA:  There is a form on the website that

6     allows people to indicate whether they paid Pacer fees for

7     someone else.  The attempt there is to try to -- to the

8     extent possible -- resolve those questions so that they

9     don't become a problem in administering the settlement.

10             THE COURT:  Is the way it works -- if you get

11    information through this form, what do you do with the

12    information?

13             MR. GUPTA:  I think Ms. Oliver, who is our liaison

14    in cases, is in a much better position to address this.

15             I just -- I do want to emphasize, though, I think

16    this is a question now -- we're turning to a question of how

17    we're administering the settlement but not -- the certain

18    fairness question in this process.

19             THE COURT:  Wait.  Before I turn to Ms. Oliver, I

20    think what I heard you say is that there is a case law --

21             MR. GUPTA:  Yes.

22             THE COURT:  -- that says that -- in terms of

23    not -- settlement of the class action, that if you -- to

24    paraphrase:  If you are to be reimbursed by some third

25    party, not a member of the class --

```
1              MR. GUPTA:  Right.

2              THE COURT:  -- it doesn't disqualify you from

3    getting the pro rata; it's between you and those other

4    people.

5              MR. GUPTA:  Correct.  As a legal matter, that's

6    the answer to Mr. Isaacson's question.

7              THE COURT:  That's the legal answer.

8              MR. GUPTA:  That's the legal answer.

9              But we didn't kind of want to stop there because

10   we know that this is a real-world issue.  What Ms. Oliver is

11   now going to tell you about is how we have tried to resolve

12   this as a real-world problem.

13             THE COURT:  Come to the microphone, Ms. Oliver.

14   Thank you.

15             MS. OLIVER:  So there were two forms on the

16   website:  One was a payment notification form and the other

17   was an accountholder notification form.  They do two things.

18   The payment notification form allowed the actual payer of

19   the fees to get onto the website and submit information

20   notifying the administrator that they paid Pacer fees on

21   behalf of someone else.  That can be any scenario.  That can

22   be an employer paying for an employee's Pacer fees; it can

23   be a client who actually paid -- they were passed through

24   the law firm to the client; that can be any particular

25   scenario.  There are not limitations on the website as far
```

1    as who can submit those notifications.

2              There is also a form that allows accountholders to

3    notify the administrator that somebody else paid their Pacer

4    fees for them.  And although they were the user, somebody

5    else paid the Pacer fees.

6              Once those notifications were submitted -- once

7    the payment notifications, so somebody notifying the

8    administrator that they paid Pacer fees on somebody else's

9    behalf -- once those were submitted to the administrator,

10   the administrator then sent an email to the accountholder

11   associated with that account, that was the subject of the

12   notification saying:  Hey, we have received a notification;

13   somebody has told us that they paid Pacer fees for your

14   account.  If you would like to dispute this, you have this

15   long to dispute it; and you can submit this information,

16   we'll then process the information.

17             Through that process, we have received zero

18   disputes.  We have received hundreds of notifications.  We

19   have received 409 of the payment notifications, and zero

20   disputes to any of those 409 payment notifications.

21             THE COURT:  Thank you.

22             MR. GUPTA:  So that is really all I wanted to say

23   about Mr. Isaacson's fairness objection.

24             Unless the Court has questions.

25             I would like to turn to one other issue that he

1        has raised because it's a legal question.

2                    THE COURT:  That he has raised.

3                    MR. GUPTA:  That he has raised.

4                    He has objected to the service awards for the

5        class representatives.  And the reason I want to mention --

6                    THE COURT:  Now, the service awards are the kind

7        of things that the three who spoke earlier on behalf of the

8        named plaintiffs were talking about.

9                    MR. GUPTA:  Right.

10                    THE COURT:  Which is, as I understand it, their

11       incentive for participating in the -- being up front and

12       being the named plaintiffs, and all of that.  But in

13       addition, they all spoke to the amount of time they, in

14       fact, actually spent, their institutions actually spent --

15                    MR. GUPTA:  Right.

16                    THE COURT:  So if you viewed it as a pure

17       incentive -- and you can tell me whether I have got the

18       concepts right -- that might be sufficient under the case

19       law.

20                    But in addition, they say here:  Even if we had to

21       prove that if I were billing what my ordinary rate is or, as

22       counsel, if I don't have an ordinary rate, the number of

23       hours I spent, it would have added up to more than 10,000

24       anyway, no matter how you slice it.

25                    MR. GUPTA:  That's right.  That's right.

1          You have got it exactly right.  Maybe you have

2     just taken the words out of my mouth.

3          The reason we're teeing this up is that

4     Mr. Isaacson has made this objection in many, many class

5     action settlements.  And the legal argument rests on this

6     Supreme Court case from 1882, the *Greenough* case.  It drew

7     this distinction between the expenses that occurred kind of

8     in the fair prosecution of the case, which can be things

9     like attorney time, and something else which was disapproved

10    which was -- I mean, this is a case before class actions;

11    but you had a bondholder who asked for, basically, a

12    personal salary for having handled a case that benefited a

13    lot of people.  And the Supreme Court said no, you can't

14    have that.

15          So Mr. Greenough's [sic] legal argument is that

16    the modern-day incentive award or case contribution award

17    for class representatives, in his view, is impermissible

18    under that case law.  We think he is wrong.  Virtually every

19    court that has addressed the question has disagreed with

20    him, but he has gotten some courts to agree.

21          What we're saying is:  This case does not even tee

22    up that legal question because even if you were to accept

23    the distinction that he is drawing, we fall on the correct

24    side of the line.  In other words, even if 1882, if you want

25    to think about it that way, the time that these class

 1     representatives' lawyers have spent on this case more than

 2     justifies these modest service awards.  So that's the only

 3     reason I wanted to tee that up.

 4          I don't want to be presumptuous, but if the Court

 5     is going to approve the settlement and write an order, I

 6     think it would be helpful to point out that we fall on the

 7     correct side of that line.

 8          I won't address the attorney's fees issues because

 9     I think you said we will address that later.

10          THE COURT:  No.  We will talk about that.

11          MR. GUPTA:  Just on the issue with Mr. Kozich.  We

12     have spent a fair bit of time with the class administrator

13     and with the government's counsel to get to the bottom of

14     this.  It's not the case that Mr. Kozich's account hasn't

15     been found.  His account has been found.  He does, in fact,

16     have a Pacer account and has long had one.

17          It's just the case that during the class period he

18     did not pay any Pacer fees and, therefore, there is nothing

19     to reimburse.  I do have some sympathy for him.  He said he

20     is a disabled veteran who is trying to use court records to

21     solve problems that he has.  It sounds like he is exactly

22     the sort of person on whose behalf the case was brought.  It

23     so happens that if he didn't pay fees during the Pacer fee

24     [sic] he does not have a claim that is compensable here.

25          That is really all I wanted to say, if the Court

1    has questions.

2          THE COURT:  I have one question about something he

3    said which may not apply to him but might apply to others; I

4    would like a response.  It's actually on page 3 of his

5    filing, Docket No. 163.

6          He says:  The settlement refunds only those

7    persons who paid more than $350 in excessive Pacer fees but

8    is paying zero to those to people who paid less than 350.

9    His argument, as I read it, is -- putting aside whether he

10   qualifies.  His argument, as I read it, is:  If I paid $351

11   over time, I would get $350.

12          If you paid $100, you get zero.

13          MR. GUPTA:  And that is just factually incorrect.

14   It's a misreading of the settlement.

15          I would point you to page 6 of the settlement

16   agreement, paragraph 19, which explains how the first

17   distribution works.

18          It says, in the first distribution:  The

19   administrator allocates to each class member a minimum

20   payment amount equal to the lesser of $350 or the total

21   amount paid in Pacer fees by that class member for the use

22   of Pacer during the class period.  So it's either 350 or the

23   lesser.  If you pay $100 or even $1, you are going to get

24   that back.

25          Then, once you do the pro rata distribution, if

 1    you paid 151, you are going to get that $1 back as well.  I

 2    think that is just a misunderstanding.

 3              THE COURT:  Okay.  I just wanted to clarify.

 4              Let me see if the government has anything they

 5    would like to say in response.

 6              Mr. Narwold?

 7              MR. GUPTA:  Yes.  Would the Court like to hear

 8    about any of the other objectors?  I do think we have

 9    addressed them in our papers.

10              THE COURT:  I don't have any specific questions.

11              I have read the papers and I have read your

12    responses, and they're standing on their papers.

13              MR. GUPTA:  Thank you.

14              THE COURT:  I will evaluate what they have had to

15    say in view of your responses.

16              MR. GUPTA:  Thank you.

17              MS. GONZALEZ HOROWITZ:  Your Honor, I don't really

18    have much to add beyond what's already been put into the

19    record.

20              We did address this issue of the concern about

21    compensating smaller users in my opening remarks to the

22    Court and how that is consistent with the text of the

23    statute, so I would refer the Court back to that.

24              As to Mr. Kozich, we concur with class counsel.

25    We did some further research as to Mr. Kozich's account.  It

1    is true that he has had an account for many years; however,

2    he did not actually pay any fees during the relevant class

3    period.  He has incurred fees during that time.  At multiple

4    points he has been granted the fee waiver which is now --

5    which was $15 at the time; that has now increased to 30.

6            He has -- I believe he mentioned on the call that

7    he has approximately $354 in an outstanding balance but that

8    has not been paid.  And so under the very terms of the class

9    definition, he would not fall as a member of the class.  So

10   unless the Court has any other questions for me, we agree

11   with the statements by class counsel as to the responses to

12   the objections.

13           THE COURT:  Good.  Thank you very much.

14           Why don't we take 15 minutes or so.  No more than

15   15 minutes.

16           I think the logical way to proceed, unless you

17   disagree, is to hear from Ms. Oliver on the opt-outs for the

18   34 people who say they are trying to opt out at this state

19   and, then, to hear from counsel on legal fees and

20   Mr. Isaacson on legal fees.  Thank you.

21           (Whereupon, a recess was taken.)

22           THE COURT:  So I have one follow-up question from

23   earlier.  I am not sure whether it's for Mr. Gupta or

24   Ms. Oliver, or both.

25           It has to do with this question of -- the fact

1    that some -- let's suppose I am a partner at a law firm and

2    I send out my bills and I include the hours, the hourly

3    rate, and all that stuff; but I also include all of the

4    costs and expenses.  And a portion of it is for the work I

5    did for finding stuff on Pacer.  I am charging my client for

6    it, my client has paid for it.

7           A couple of questions.  One, as I understand it,

8    your argument is -- the legal argument is:  It doesn't

9    matter.

10          The practical answer is that there were notices

11    that were sent out and an administrator received -- sent

12    emails to accountholders, and no one had -- there were a lot

13    of notices sent out; the response was that there were no

14    disputes.

15          A couple of questions.

16          One, are these forms or things that were sent out

17    somewhere in the record here?  Are they exhibits or were

18    they exhibits in prior filings?  If so, where are they?

19          Secondly, what did you or the administrators -- I

20    guess you said that what the administrator did when they got

21    the forms was to reach out by email.  Was anything else done

22    or done with responses?

23          So those are the practical questions.

24          The Rule 23 question is -- you say it's not -- it

25    doesn't matter as a matter of law.  But doesn't it --

1    explain to me why it does or does not affect my evaluation

2    of whether the settlement agreement is fair?

3          So the first few questions are kind of practical.

4    Please help me; explain this to me a little further.

5          The second one is:  My job is to decide all of the

6    Rule 23 issues.  Doesn't this affect fair and adequate?

7          MR. GUPTA:  I think -- so first of all, I will

8    just say:  I think the way you recounted it sounds to me

9    exactly right.  Ms. Oliver can address your practical

10   questions, and then I am happy to speak to the Rule 23

11   question.

12         THE COURT:  Okay.

13         MS. OLIVER:  So on the practical questions, we --

14   you mentioned these notices that were sent out.  So there

15   were hundreds of thousands of actual notices, court-approved

16   notices that were sent out.  This was a different process

17   from that.

18         So there were notification forms on the website.

19   We have not filed those notification forms with the

20   substance of those notification forms with the Court, but we

21   can do so.

22         THE COURT:  I would just like to see them just

23   for my own --

24         MS. OLIVER:  Once those notifications were

25   submitted, in the case of an individual notifying the

 1    administrator that they had paid Pacer fees on someone

 2    else's -- on an accountholder's behalf, then the

 3    administrator sent an email and there was no other attempt

 4    to contact.  It was by way of email to the accountholder

 5    saying:  Someone has filed a notification letting us know

 6    that they paid Pacer fees on your behalf.  If you would like

 7    to dispute this, here is the process for doing so.  We have

 8    not filed the substance of that email either, but we can

 9    also do that.

10              THE COURT:  Okay.  Thank you.

11              MS. OLIVER:  And I think --

12              THE COURT:  Nobody had any disputes.

13              MS. OLIVER:  There were no disputes filed as part

14    of that process.

15              THE COURT:  You said something like about 400 came

16    back.

17              MS. OLIVER:  So we had -- there were 409 of the

18    payment notifications filed.  So that's where someone said:

19    I paid Pacer fees on behalf of somebody else.  And then

20    there were 464 accountholder notifications where an

21    accountholder notified the administrator that somebody else

22    had paid their Pacer fees and identifying the payor.

23              THE COURT:  Okay.  Got it.  Thank you.

24              So you file that stuff, and I will at least see

25    what I have got.

1          MS. OLIVER:  We will.

2          THE COURT:  Now the question is:  Does all of this

3     or how does all of this affect fairness and adequacy under

4     the rules?

5          MR. GUPTA:  Your Honor, I think what you said

6     earlier is right.  That, as a legal matter, any sort of

7     potential claim that somebody might have for reimbursement

8     against somebody who paid the fees is a matter of law and

9     equity between those people; and that's what the cases we

10    have been able to find where this comes up in a class action

11    context have said.

12         THE COURT:  You mentioned a footnote in your

13    brief.  Is that the only reference in the briefs to this

14    question?

15         MR. GUPTA:  That is the only reference.  We have

16    raised this in response to an objection by Mr. Isaacson.

17         There is a Northern District of Illinois -- I will

18    point out we were actually surprised we were able to find a

19    case precisely on this point; it's a relatively esoteric

20    point.

21         The broader point is one that is well supported in

22    the law; not just in the Tucker Act context but in all sorts

23    of contexts, including an antitrust case that's going back

24    100 years where you have all sorts of complex payment

25    streams.  The question is:  What do you do about some

1    unreasonable charge that was assessed against one person but

2    then it was reimbursed by another person who has the claim?

3            And the general rule is that there is not a kind

4    of passing-off defense, that it's the person who paid the

5    charge that possesses the claim.  That's certainly true

6    under the Little Tucker Act.

7            THE COURT:  On the broader point, is there

8    specific case law you would point us to or anything in

9    Wright & Miller, Professor Rubenstein or in anybody else's

10   treatise on class actions?

11           MR. GUPTA:  Well, I guess I would just point

12   you -- the point that Mr. Isaacson is making about fairness

13   is that he is saying, as I mentioned earlier, that he thinks

14   it was wrong for us to advocate for a pro rata distribution.

15           In fact, the case law says exactly the opposite,

16   right?  I think *Ortiz* is really probably the best case on

17   this.

18           THE COURT:  Which case?

19           MR. GUPTA:  *Ortiz versus Fibreboard*, the Supreme

20   Court's decision.

21           THE COURT:  So it's basically a subset of that

22   point.

23           MR. GUPTA:  That's right.

24           THE COURT:  If you are settling a big class

25   action, I suppose the only other way you would even think

1    about doing it would be having some classes, and this class

2    is treated that way and that class is treated that way.

3              MR. GUPTA:  Right.

4              What is weird about his point is that he is saying

5    that we're favoring the big folks.  But, in fact, the

6    parties bent over backwards to engage in a settlement

7    structure that has this minimum distribution.  So the little

8    guy is -- we are ensuring that the little guy is getting

9    paid.  I think that's the principal point I would make.  I

10   think it's hard to say that this is an unfair settlement for

11   that reason.

12             One last point which is:  There are a lot of

13   really big users in this class who are not law firms, they

14   are data companies, they aggregate the date, and they don't

15   have this reimbursement issue, so it's important that they

16   get to be able to recoup what they have paid.  Thank you.

17             THE COURT:  Does the government have anything to

18   add on this point?

19             MS. GONZALEZ HOROWITZ:  No, Your Honor.  I don't

20   think we have anything to add.

21             MR. KOZICH:  Your Honor.

22             THE COURT:  Yes, sir.

23             MR. KOZICH:  Can I chime in?

24             THE COURT:  On what?

25             Very briefly.  What do you want to talk about,

1    what we have just been talking about?

2         MR. KOZICH:  Well, it's related.  The Department

3    of Justice said that, basically, I have paid Pacer fees.  I

4    am not part of the class action.  I apologize.  I thought

5    that the settlement was saying that the people paid less

6    than 350 are not getting paid; I misread it.  I read it

7    again.  You are correct.

8         My point is that I would like the Pacer people to

9    go in and reopen my account so I can use Pacer.  I will pay

10   the $4 and some cents that I owe that's a requirement; but I

11   would like the Pacer people to reopen my account if we can

12   do that.

13        THE COURT:  All right.  Well, maybe before the

14   hearing is over, the government can tell you who to talk to

15   or who to email, or something like that.  Okay?

16        MR. KOZICH:  Okay.

17        THE COURT:  So back to where we were.

18        I said, before the break, that I was going to ask

19   Ms. Oliver to explain the 34 objectors [sic] and what, if

20   anything, we do about that at this point, and then we'll

21   move on to the attorney's fees questions.

22        MS. OLIVER:  Before I get to the opt-outs --

23        THE COURT:  The opt-outs, I misspoke.  The

24   opt-outs.

25        MS. OLIVER:  Mr. Gupta had mentioned the numerous

1     class member contacts that we have been handling.  This is

2     our internal log (indicating) of those contacts, emails, and

3     phone calls.  I have handled a number of them.  I have

4     reviewed a number of drafts that Ms. Loper and another

5     lawyer back at our office have handled; so we have been

6     personally handling them.  There is no call center and there

7     are no customer service representatives, though, some days,

8     boy, I wish there were because we've spent a lot of time on

9     those.

10            Opt-outs.  In 2023, there have been 33 timely

11     opt-outs.  I believe the number in the filings was 34.  We

12     identified a duplicate entry in there, so it's really 33;

13     the same person with the same claim ID, there were two of

14     those received.  16 additional were untimely.  When I say

15     "untimely," I don't mean they filed 12 hours later; they

16     filed two days late.  They all had an opportunity to opt out

17     in 2017.

18            THE COURT:  Well, they had an opportunity to opt

19     out in 2017.  And then, pursuant to the notice that was sent

20     out, they had a new opportunity to opt out, right?

21            MS. OLIVER:  We did not -- so the new class

22     period --

23            THE COURT:  I see.

24            MS. OLIVER:  They had an opportunity to opt out in

25     2023.  But everybody who was a part of the earlier certified

1    class from April 21, 2010, through April 21, 2016, had an

2    opportunity to opt out in 2017.  They were not given another

3    opportunity to opt out in 2023.

4         There were ten individuals in 2023 who attempted

5    to opt out, they received the incorrect notice.

6         THE COURT:  That's in addition to the ones you

7    have just been talking about?

8         MS. OLIVER:  So there were 33 that were timely

9    and, then, there were 16 that were not timely.  Within the

10   16, 10 of those individuals received the incorrect notice

11   that told them they had an opportunity to opt out.  All 10

12   of those -- three of them were actually federal government

13   employees.  So the 7 who were not federal government

14   employees and received the incorrect notice were then sent a

15   corrective notice saying:  We goofed, you got the wrong

16   notice.  You had an opportunity to opt out in 2017; you no

17   longer have an opportunity to opt out.

18        THE COURT:  Okay.

19        MS. OLIVER:  And then there were an additional 6

20   individuals who received the correct notice in 2023 from the

21   get-go.  And they tried -- they sent in -- so because they

22   were part of that earlier 2017 group, the website would not

23   let them do it in 2023.  They sent in paper forms trying to

24   opt out, but they already had an opportunity to opt out in

25   2017.  So all of the so-called invalid or late opt-outs in

1    2023 had an opportunity to opt out in 2017.

2              THE COURT:  So the bottom line is those that were

3    filed -- it's because the settlement created a new subclass

4    or new time period --

5              MS. OLIVER:  That's right.

6              THE COURT:  -- an additional time period.

7              MS. OLIVER:  That's right.

8              THE COURT:  So with respect to the people that got

9    in because of the new time period, they were considered

10   timely, and they opted out.

11             MS. OLIVER:  Yes.  And there were 33 of those.

12             THE COURT:  Right.

13             With respect to the others, either because they

14   misunderstood from the get-go or because they were

15   inadvertently misled, they were ultimately not allowed to

16   opt out because they missed their opportunity.

17             MS. OLIVER:  Correct.

18             THE COURT:  And that explains the whole thing.

19             MS. OLIVER:  Yes.  I hope so.

20             THE COURT:  It did.

21             MS. OLIVER:  Thank you.

22             THE COURT:  So let's move on to the attorney's

23   fees question which is -- everybody agrees that class

24   counsel is entitled to attorney's fees.

25             The issues, as I understand them, are:  One,

1    lodestar versus percentage with the subset of percentage

2    of -- percentage with lodestar cross-check.  And the other

3    question is:  How much?

4            So I think those are the questions.

5            MR. GUPTA:  I am happy to start, Your Honor, but

6    please jump in if I can help out.

7            So I think, as you said earlier, there are two

8    approaches; there is the percentage approach and the

9    lodestar approach.  The lodestar approach is generally used

10   outside of common fund class actions the federal circuit has

11   recognized; it's used in garden variety fee shifting cases

12   where there is a statutory fee and it comes out of the

13   defendant's pocket.

14           The percentage approach is the prevailing approach

15   in common fund class actions.  So courts in common fund

16   class actions overwhelmingly prefer the percentage of the

17   fund approach.  For reasons that you recognized in your

18   Black farmers case, the reason that courts have gravitated

19   to the percentage approach is that it helps align the

20   interests of the lawyers more closely with those of the

21   parties by discouraging the inflation of attorney hours and

22   promoting efficient prosecution and resolution of litigation

23   which benefits the litigants and the judicial system.

24           So I don't take the government to be quarrelling

25   with the notion that the percentage approach is the

1    appropriate approach here.  I actually don't take them to be

2    quarrelling even with the percentage that we have proposed.

3    There is one objector, Mr. Isaacson, who does quarrel with

4    all of that; we can get into that.

5         I thought it might be helpful -- just in talking

6    about the percentage -- to give you some background here

7    because this is an unusual class action in which there was

8    actually a negotiation between the two parties about the

9    percentage.

10         First, the retainer agreements with the class

11    representatives provide for an attorney fee of 33 percent.

12         THE COURT:  It's contingent.

13         MR. GUPTA:  Correct.  Correct.

14         THE COURT:  So, again, if there was no success --

15         MR. GUPTA:  Correct.

16         THE COURT:  -- even with that retainer agreement,

17    they get zero.

18         MR. GUPTA:  Exactly.  That is the standard kind of

19    contingency fee arrangement in plaintiffs' class action

20    litigation and other kinds of contingency litigation.  So

21    that's -- paragraph 65 of my declaration mentions that.

22         Then the notice that was sent out to class members

23    said:  By participating in this class action, you agree to

24    compensate counsel at 30 percent of the recovery.  That's

25    ECF 43-1 and 44.

1            So we're going from 33 percent down to 30 percent.

2    Then, as I mentioned, we have this unusual negotiation with

3    the government.   In the mind run of class actions -- and

4    Mr. Narwold or Ms. Oliver can speak to this, they have done

5    many, many class actions -- you don't have a cap of this

6    kind, it's just left to the discretion of the Court.   But

7    here --

8            THE COURT:   Even a common fund?

9            MR. GUPTA:   Yes.   The cap is unusual even in a

10   common fund fee where there is already -- before this comes

11   to you in arm's length negotiation about what that cap is,

12   we agreed with the government to cap any fee and expenses at

13   20 percent of the common fund; and then, now what we're

14   requesting is a fee of 19.1 percent.

15           The upshot of all of that is that the percentage

16   that we're requesting is well below the standard one-third

17   recovery and is even below the average for settlements of

18   this range.   Professor Fitzpatrick goes into this in some

19   detail in his declaration, and you will see this at

20   paragraph 19 of his declaration.   For settlements that are

21   within the range of 70 million to 175 million, this

22   percentage is below even the average within that range.

23           Then, as you heard, the government -- this is

24   also, in our experience, quite unusual in a class action.

25   The defendant is coming to you and saying:   This is an

1    outstanding result for the class members; this is a landmark

2    settlement.

3                So we think this is a humbly, I would say, better

4    than average class action and a better than average class

5    action settlement.  Even if you are looking at the average

6    run-of-the-mill class action settlement, the fee that we're

7    requesting is well below the average.

8                Then I think that raises this question of lodestar

9    cross-check.  There has been a lot of ink that's been spilt

10   about precisely how one does the cross-check.  I think I was

11   saying to my friend from the government in the hallway

12   during the break, I think you actually have helped us out.

13   They pointed out some things that we had not provided the

14   Court with that would -- if you choose to do a lodestar

15   cross-check, and it's entirely within the Court's

16   discretion -- that would aid the Court's process in

17   performing that lodestar cross-check and, hopefully, getting

18   some comfort that this is a reasonable fee.  Whether you are

19   looking at it just from a straight percentage standpoint or

20   whether you are looking at it based on the multiplier in the

21   case.  So you have the discretion to do that.  I hope that

22   we have given you the tools necessary that, if you choose to

23   do that --

24               THE COURT:  You will provide additional tools you

25   say?

 1          MR. GUPTA:  No, no.  I think we have.

 2          THE COURT:  I thought you said she had suggested

 3     there were some things she should --

 4          MR. GUPTA:  Let me try to say this a little more

 5     clearly.

 6          What I am saying is that the government's filing,

 7     their response, raised a number of questions and issues that

 8     were exclusively trained on the question of how one would do

 9     the lodestar calculation.  Now, we could have just taken the

10     position that:  Look, all of that is irrelevant because the

11     correct way to do this is it's a percentage fee and our

12     percentage fee is reasonable.  That is our frontline

13     position.

14          But we didn't stop there.  We also provided

15     information and expert reports that I hope show the Court

16     that:  Even if one were to do the cross-check route, that

17     the percentage fee that we're requesting is well within the

18     range of reasonableness.

19          I am happy to answer any questions the Court may

20     have about either the percentage approach or the cross-check

21     but, hopefully, that's a helpful kind of orientation.

22          THE COURT:  As I understand it, the D.C. Circuit

23     may or may not have set out some factors.  The federal

24     circuit -- maybe the D.C. Circuit has and the federal

25     circuits are slightly different, but they are pretty

1    comparable.

2           MR. GUPTA:  They are pretty similar.  And

3    honestly, they are pretty similar across the circuits.  We

4    organized our brief around the federal circuit's factors in

5    the *Health Republic* case.

6           THE COURT:  Do you think, as you read federal

7    circuit's -- not this decision, I don't think.

8           MR. GUPTA:  The *Health Republic* case?

9           THE COURT:  Do you think that that decision

10   requires a lodestar cross-check?

11          MR. GUPTA:  I don't think that it does.  And in

12   fact --

13          THE COURT:  There is some language that suggests

14   it's a little stronger than a recommendation.  I can't find

15   it right now.

16          MR. GUPTA:  The court says:  We are not deciding

17   that question; that's Footnote 2 of the decision.

18          It was an unusual case because the class notice in

19   that case said:  We will do a lodestar cross-check; and then

20   they didn't.

21          So in one sense, it's a very easy case.  The

22   holding of the case is:  When you say you are going to do

23   something, you need to do something.  Right?

24          THE COURT:  Because that's what the class relied

25   upon when they got the notice.

1          MR. GUPTA:  Right.  And I think, also, there were

2     some judicial eyebrows raised because they said they would

3     do this cross-check and, then, the fee was 18 or 19 times

4     the hourly rates.  But the holding -- the holding is one

5     that is inapplicable here, which is:  If you say you are

6     going to do it, you have got to do it.

7          Now, the court said it wasn't deciding the

8     question of whether a lodestar cross-check was required.

9     But in Footnote 2 of the decision -- I just want to be

10    candid about this.  The court points out why a cross-check

11    might be warranted.  And I can see why it was warranted on

12    the facts of that case.  So the federal circuit hasn't

13    decided the question.

14         But if you were to write an opinion that's like

15    your Black farmers' decision that says:  Look, the

16    percentage requested here is reasonable; but, in addition, a

17    lodestar cross-check would only confirm that result.  I

18    think that is something that would probably be greeted well

19    by the federal circuit given the language in this decision.

20         THE COURT:  What are the most -- what are the

21    common fund settlement decisions of the courts that are most

22    comparable to the situation we're facing here.  Don't feel

23    like you have to say "Black farmers."

24         MR. GUPTA:  Well, which aspect of this situation,

25    if I may ask?

1          THE COURT:  Well, I guess only than the Swedish

2     Hospital and Health -- whatever it's called -- in the

3     federal circuit, in my own decision in Black farmers, are

4     there other cases that you say, "Aha!  This one is really a

5     lot like what we're facing here" for whatever reasons?

6          MR. GUPTA:  I mean, you named the ones that I

7     would point to.  And I would say on *Health Republic* I hope I

8     have persuaded you that it's actually super different.

9          THE COURT:  Which one?

10         MR. GUPTA:  The *Health Republic* case is very, very

11    different from this one.  Right?  I think those are the

12    cases that I would point you to.

13         We also cite a number of Court of Federal Claims

14    cases in our submission; the *Moore* case, the *King County*

15    case, *Quimby* case.  The reason we cite those is it -- in

16    effect, when you are a federal district court in the Little

17    Tucker Act case, you are kind of sitting as the Court of

18    Federal Claims, so we think those are analogous.  They are

19    also cases involving large claims against the federal

20    government, so I think they're analogous.

21         THE COURT:  Helpful.  Thank you.

22         I will hear from the government.

23         MR. GUPTA:  Thank you.

24         MS. GONZALEZ HOROWITZ:  Just so it's clear on the

25    record, Mr. Gupta did say to me out in the hallway that, you

1    know, "I think I helped you."  And for the record, my

2    response was, "I know."

3              Your Honor, I am happy to answer any questions you

4    may have.  I think we do agree, as a general principle, that

5    the D.C. Circuit case law appears to be pretty clear that

6    the percentage of the fund method is the preferred approach

7    in a common fund case such as this one; that's from the

8    Swedish hospital case.

9              We have talked at length about the *Health Republic*

10   case.  I think, like this Court identified, it perhaps

11   suggested strongly that not just in situations where it is

12   required in a class notice to conduct a lodestar

13   cross-check, but the Court, as a general matter, may conduct

14   the cross-check anyway just to assure itself that the amount

15   that is requested is reasonable.  Because, ultimately, that

16   is well within the Court's decision, is to determine what is

17   the reasonableness of the fee.

18             The government had raised some concerns in its

19   filing about the initial submission that plaintiffs made

20   with respect to the justification and the declarations about

21   the lodestar.  I think some of those concerns have been

22   remedied by the documentation that was supplied on reply.

23   Ultimately, it's within this Court's discretion to conduct a

24   cross-check.  But plaintiffs have now provided the Court

25   with some additional information, not just about their

1    lodestar at the rates at which they have requested but,

2    also, their lodestar at the Fitzpatrick matrix rates which

3    the government had noted for the Court essentially has been

4    considered by other judges in this district as a baseline in

5    federal complex litigation.  And, of course, as we

6    recognized in our filing, those cases were not class action

7    cases but they are cases that talk extensively about the

8    going market rates in this district and what complex federal

9    litigation looks like.  I am referring there to the *Brackett*

10   *versus Mayorkas* decision by Chief Judge Boasberg and, also,

11   the *J.T.* decision that we cited in our brief by former Chief

12   Judge Howell.

13           Unless the Court has any questions -- actually, I

14   would also point the Court to one additional case that I

15   think I don't believe I heard class counsel mention but I

16   think would be analogous; it is a Court of Federal Claims

17   case.  But that would be the *Mercier versus United States*,

18   and that's 156 Federal Claims, Fed Claim 580.  It's from

19   2021.

20           THE COURT:  I do have one or two questions.

21           In your initial filing, as I understand your

22   position, you agree:  Percentage of the common fund in the

23   common funds case, not lodestar.  And you think that

24   lodestar cross-check is at least a good idea and, possibly,

25   D.C. Circuit has suggested it should be done -- or the

1    federal circuit?

2         MS. GONZALEZ HOROWITZ:  Just to clarify, the

3    federal circuit, I think, has perhaps stated a stronger

4    emphasis on the cross-check than the D.C. Circuit has.

5         I think the D.C. Circuit was perhaps a little less

6    convinced in the Swedish hospital case but, certainly, the

7    decision from the federal circuit is from earlier this year,

8    so I think that would be persuasive to the Court's analysis.

9    But, ultimately, the circuit case law in this District holds

10   that it's within the Court's discretion to conduct the

11   cross-check.

12        THE COURT:  Now, I was going to say the

13   $64 million question but, really, the $23 million question

14   is, in your initial filing, you argue that the 19.1 percent,

15   or whatever it is, that leads to about a $23 million award

16   is too much.  You didn't tell me what you thought was

17   appropriate.

18        So my two questions are:  In view of subsequent

19   filings, do you still think that that is too much in this

20   case.  If so, where does the government come out in terms of

21   a dollar amount or percentage amount?

22        MS. GONZALEZ HOROWITZ:  So I want to be clear,

23   Your Honor, we didn't oppose plaintiffs' request for

24   23.8 million.  I didn't read our filing to mean that we

25   believed that the 19.1 percent was inappropriate or that it

1     should be reduced.  Ultimately, that is well within the

2     Court's discretion as to what to award.  We are not taking a

3     position on whether the 23.8 is reasonable.

4          We believe that there were some holes in the

5     filing that have been addressed by plaintiffs, by class

6     counsel, on reply about how it is that they came to that

7     lodestar and whether the -- taking aside whether the 19.1 is

8     reasonable, I think everyone agrees the case law, in this

9     District at least, has suggested that anything from 15 to 45

10    percent in a common fund case may be appropriate and, of

11    course, that's always depending on the circumstances of the

12    particular case.

13         Ultimately, if the Court found that 19.1 here,

14    which is slightly below the threshold that the parties had

15    negotiated in the settlement agreement, is appropriate, we

16    wanted to ensure that the Court had sufficient information

17    in the record to base its decision in awarding the full

18    amount of fees.  And I think that plaintiffs have done some

19    of the legwork on the back end to address those concerns.

20         So I just want to be clear.  We're not

21    specifically advocating for a reduction, but we had some

22    concerns about how that amount was calculated.

23         Certainly, we also pointed to the case law about

24    the multiplier.  In this case I think, again, the

25    D.C. Circuit has suggested that it can be between 2 to 4

 1    percent depending on which lodestar the Court is working off

 2    of; the ranges here can be slightly higher.  Of course,

 3    there has been some case law in the federal circuit that has

 4    suggested that perhaps it should be on the lower end, closer

 5    to the 2 percent.  Again, that is within the Court's

 6    discretion to determine.

 7              THE COURT:  Okay.  Thank you for clarifying your

 8    position.  Actually, it's not a clarification.  I think that

 9    it's -- your position is about, because the plaintiffs have

10    filed more supporting documentation for what they're

11    requesting.  Thank you.

12              MS. GONZALEZ HOROWITZ:  Thank you.

13              THE COURT:  So I will hear from Mr. Isaacson.

14              Mr. Isaacson, you already made some points with

15    respect to attorney's fees earlier so why don't we -- please

16    try not to say the same things you have already said; I have

17    heard it, we took notes on it.  We have a transcript we are

18    going to look at.  Whatever additional points you want to

19    make about attorney's fees and/or responses to what has been

20    said.

21              MR. ISAACSON:  Absolutely, Your Honor.

22              One of the things that was said was that there

23    were retainer agreements signed for one-third of the

24    recovery, 33 percent.  The retainer agreements do not bind

25    the class and they do not bind this Court.

1          THE COURT:  Correct.

2          MR. ISAACSON:  There was a statement that an

3    earlier class notice said:  You agree to 30 [sic] percent if

4    you don't opt out.  I did not agree to 30 percent.

5          I saw that notice and I said to myself:  If they

6    try to enforce that, I am objecting because that is wrong;

7    that is not enforceable.  It was grossly inappropriate.

8          They sent a new notice that supersedes that older

9    notice saying I can appear to object to the attorney's fees.

10   So the notion that there is some kind of binding effect of

11   that first notice is --

12         THE COURT:  I don't think there is a binding

13   effect on me of anything.

14         MR. ISAACSON:  Pardon me?

15         THE COURT:  I don't think there is a binding

16   effect on me of anything.

17         MR. ISAACSON:  That's true.

18         THE COURT:  You have pointed out and we have all

19   read Rule 23(e).  You have specifically pointed out the

20   subpart that talks about how fees are a part of fair and

21   adequate.

22         MR. ISAACSON:  Absolutely, Your Honor.

23         They say that the standard is one-third.  Well,

24   that's in personal injury cases.  Personal injury cases are

25   extremely labor intensive; they don't have the economy scale

1    the big class actions do.  One-third is not the appropriate

2    reference.

3           On the question of whether *Health Republic*

4    requires a consideration of the lodestar, I think it does.

5    I think lodestar needs to be considered in determining a

6    reasonable percentage, quite frankly.  It's more appropriate

7    to take the lodestar amount up front to determine the

8    percentage than it is to try to bring it in at the end as

9    merely a cross-check.

10          Now, there are judges like former Chief Judge

11   Vaughn Walker of the Northern District of California who

12   wrote an article saying that judges have an ethical duty to

13   consider the lodestar.  I think it was published in the

14   *Georgetown Journal of Legal Ethics*; there was a co-author

15   whose name escapes me at the moment.

16          The Swedish hospital case was mentioned, that's a

17   D.C. Circuit case which says that:  In common fund cases,

18   attorney's fees must be awarded as a percentage of the fund.

19   The Eleventh Circuit also has held that in a case called

20   Camden I Associates -- *Camden I Condominium Association,*

21   pardon me.  They are the only two circuits that have held

22   that, and their holdings are in conflict with Supreme Court

23   authority.

24          THE COURT:  Which Supreme Court authority in

25   particular?

1              MR. ISAACSON:  The foundational decision

2      established in the common fund doctrine, *Greenough* --

3      *Trustees versus Greenough*; the same one that I rely on with

4      respect to incentive awards.

5              In that case, the court established the common

6      fund doctrine, saying that the class representative could

7      receive compensation from the common fund reimbursing him

8      for his actual outlays incurred.  There was no percentage in

9      that case.

10             The later cases, the Eleventh Circuit in *Camden I*

11     *Condominium Association*, the D.C. Circuit in Swedish

12     hospital -- and I think they both rely on a district court

13     case called *Mashburn*; it might have been out of the District

14     of Alabama.  They all say that *Greenough* was a percent fund

15     case.  It wasn't.  I mean, the trend toward the percent of

16     fund misrepresents the foundational decisions of the Supreme

17     Court.  The first one was not percent of fund.  The second

18     one, *Pettus*, that was percent of fund.  The lower courts

19     awarded 10 percent.  The Supreme Court said that's excessive

20     and cut it to 5 percent.

21             There are cases, I think, from the '20s and '30s

22     where the Supreme Court deals with common fund or equitable

23     fund fee awards.  I don't believe it has ever approved of a

24     common fund fee award or equitable fund fee award that

25     exceeded 10 percent.  So the notion that there is a

1     benchmark of 25 percent or a much higher amount is at odds,

2     again, with the Supreme Court decisions.

3              The *Mercier* case was mentioned.  I think *Mercier*

4     is quite relevant; I mean, it's one of the cases Rubenstein

5     included in his comparators when he deconstructed

6     Fitzpatrick's matrix.  That's a case where there was a

7     65 percent recovery, not 25 percent like in this case.

8     Fitzpatrick was the expert witness in that case and

9     recommended a 30 percent fee award that amounted to a

10    multiplier of 4.4.  The Court said, no, that's way too much;

11    that's a windfall.  I think you need to consider the

12    lodestar in setting the amount of the fee.

13             I think that a reasonable amount of the fee in

14    this case -- 5 percent will more than cover their claimed

15    lodestar.  10 percent would be more than double their

16    lodestar; a multiplier of two.  20 percent is way too much.

17             I also want to note that another case that's often

18    cited as a percent of fund case, the Supreme Court's

19    decision in *Boeing versus Van Gemert,* a 1978 decision.  The

20    fees in that case ultimately were awarded on the lodestar

21    basis; they were not awarded as a percentage of the fund.

22             I spent many years with plaintiffs' class action

23    firms where, quite frankly, the firm management regarded

24    percent of fund fee awards as the way to get paid the most

25    money as quickly as possible.  If you look at a single case

1      and focus only on one case and imagine that is the only case

2      that a law firm is ever going to try then, yeah, it makes

3      sense to think that they're going to try to maximize the

4      recovery in that one case so that they can get a larger -- a

5      percentage of a larger amount; that's not how the Court --

6      how law firms run their practice.  They have a portfolio of

7      cases.

8             In the class action practice, the assumption is

9      that the defendants are going to settle quickly for a

10     fraction of the damages; you can put minimum work in for a

11     fraction of the damages settlement; and based on the minimal

12     hours put in, your percent of fund award will amount to a

13     large multiplier.  That's how you get paid the most.  That

14     is not something that maximizes the interests of classes and

15     recoveries and it, quite frankly, in the long run, does not

16     align the interest of the classes with the interests of

17     counsel.

18            THE COURT:  Okay.  Are you almost done?

19            MR. ISAACSON:  I am almost done.

20            I would also note that when they talk about their

21     projected lodestar for any appeal in the matter, to the

22     extent that an appeal is focusing on attorney's fees,

23     they're not entitled to recover for their work -- applying

24     for or defending attorney's fees in a common fund case.

25            Because Professor Rubenstein and Professor

1    Fitzpatrick are not here to be cross-examined and because I

2    think that their opinions submitted in this case are, with

3    respect to the later ones, untimely and unreliable, I

4    respectfully move to strike them.  I move to strike them as

5    hearsay; they are out-of-court statements to be taken for

6    the truth or falsity of the matters asserted --

7            THE COURT:  I am not sure whether an objector has

8    standing to move to strike.  If you want me to disregard

9    them for the reasons you have --

10           MR. ISAACSON:  I respectfully request you

11   disregard them, Your Honor.  Thank you very much.

12           THE COURT:  Thank you, Mr. Isaacson.

13           Mr. Gupta.

14           MR. GUPTA:  I will try to be brief because it's

15   been a long day, but I do want to make sure that I answer

16   any questions you have.

17           I would just emphasize at the outset that I hope I

18   wasn't misunderstood earlier.  I was not at all suggesting

19   that anything that I was reciting was binding on the Court

20   with respect to those agreements.  I think the Court has

21   absolute discretion and, in fact, a duty to assure itself

22   that the absence --

23           THE COURT:  Somebody said -- I don't know whether

24   it was Mr. Isaacson or one of the parties -- I have

25   fiduciary obligations.

 1           MR. GUPTA:  Yes.  The Court acts as a fiduciary on

 2    behalf of the absent class members.  And your role here is

 3    important because there might not otherwise be adversarial

 4    presentation.  And the danger with a class action is that

 5    lawyers are going to sell out their clients in exchange for

 6    red carpet treatment on attorney's fees, and courts have to

 7    be on guard against that.  Now, we don't think this is

 8    remotely a case of that kind.

 9           You heard what the government said about the

10    quality of settlement, the risks involved.  We're proud of

11    this case.  But I also think that the Court's duty here is

12    important.  I think, just as I mentioned earlier there was a

13    kind of dog that didn't bark, the dog that didn't bark here

14    is you have very sophisticated players in this very, very

15    large class that are paying the fee -- that are going to pay

16    the fee that we're asking and none of them are here

17    objecting.  I think that's notable.

18           The argument that Mr. Isaacson is making about how

19    courts should handle attorney fee applications in reliance

20    on this 1882 case, *Trustees versus Greenough,* is one that,

21    as far as we can tell, has been rejected by every one of the

22    federal circuits, including in many cases in which he has

23    been an objector which he doesn't acknowledge in his

24    objection.

25           If you want to read one of those cases, I might

1     recommend a district court case from a few years back by

2     Judge Ali Nathan in New York; it's the *Bioscrip* case that is

3     cited on page 12.

4             THE COURT:  I mean, without prejudging anything,

5     she's one of the smartest judges I know in the whole

6     country.

7             MR. GUPTA:  Yes.  It won't surprise you to know

8     that it's a pretty darn scholarly opinion and it rejects

9     these arguments, as I have said, as have many other

10    circuits.

11            THE COURT:  What's the cite?  I'm sorry.

12            MR. GUPTA:  That is 273 F. Supp. 3d 474.  You can

13    take a look at page 478 to -89.

14            What she explains is that Mr. Isaacson's argument

15    that there is a presumption against lodestar enhancement in

16    fee shifting cases, that just doesn't apply in the common

17    fund context.  The common fund context is quite different.

18            So I think that that set of arguments has been

19    roundly rejected.  I can't prevent Mr. Isaacson from taking

20    an appeal.  And I don't have -- as I did with the service

21    awards, I don't have a kind of factual argument that will

22    take that issue off the table because his attack is a

23    categorical attack on the way things are done.  He is

24    entitled to make that argument, and I hope he has had a fair

25    hearing.  I don't really have anything else to add unless

1    the Court has questions.

2         I thank the government for pointing out some holes

3    in our filing and causing us to file the things we filed in

4    reply.  I hope that gives the Court the tools it needs to

5    decide this request.  Thank you.

6         MS. GONZALEZ HOROWITZ:  Nothing further by the

7    government.

8         THE COURT:  Well, it seems to me that I have

9    everything I need except for the few things that Ms. Oliver

10   is going to file to edify me about what's going on on the

11   administrative side of things.

12        I know what my responsibilities are.  I think that

13   the filings from both sides in the presentations from

14   counsel this morning, as well as from Mr. Isaacson and

15   Mr. Kozich, have been very, very helpful.  I don't think I

16   need anything more than what I already have, other than

17   those few little educational informative things.  I will try

18   to get to this as soon as I can.  It's an important case.

19        Again, I have to decide whether it's fair and

20   accurate, how significant it is, and the contributions made

21   by counsel and everything.

22        You know, this tool of Pacer and electronic

23   filing, as I said at the beginning, has revolutionized the

24   federal courts in the practice of law.  What we're talking

25   about here is very, very important to a lot of people and

1    institutions.  It involves a lot of money.  But everyone has

2    to be appreciative of whoever developed these technologies,

3    the Administrative Office of the Courts for -- Congress and

4    the Administrative Office of the Courts for making the court

5    system more accessible to the public and to lawyers and to

6    everybody through electronic filings and through Pacer.

7           The AO has done a terrific job and the leadership

8    of the Chief Justices -- I guess it started with Justice

9    Rehnquist and Justice Roberts -- the directors of the

10   Administrative Office, among others, and their staffs.

11          I know that our lives are a lot easier; lawyers'

12   lives are certainly a lot easier.  We need to put this in

13   the perspective of:  We have come a long way, not just since

14   quill pens.  But, frankly -- this is a digression.  It's

15   late in the morning.

16          When I was clerking back here in the old building

17   for Judge Aubrey Robinson, we heard motions hearings.  Now

18   we have an individual calendar system; you know who your

19   judge is from the beginning of the case, unless she retires

20   and dumps things on other judges.

21          We had a master calendar system.  You would look

22   at the docket and you may have seen five, six, seven

23   different judges in a case.  On Wednesdays somebody from the

24   clerk's office would come up with these piles of files --

25   some of you may go back that far -- with these piles of

1    motions and say:  Here are the civil motions for Friday.

2    There might be 30 of them, nothing is electronic; it's all

3    like this (indicating).  Judge Robinson would say:  Okay,

4    you take half, I will take half.  Let's start reading --

5    Judges only had one clerk in those days -- let's start

6    reading; we'll talk on Thursday afternoon.  They may still

7    do it that way in the Eastern District of Virginia; I have

8    argued there.  They decide most things from the bench there.

9    They probably think that we can decide from the bench here

10   more frequently, too, but we don't do that so much anymore.

11   So times have really changed.  That having been said, I am

12   not going to decide this from the bench.  Thank you, all,

13   very much.

14            THE COURTROOM DEPUTY:  This court is adjourned.

15            (Whereupon, the proceeding concludes, 12:49 p.m.)

16                       *  *  *  *  *

17                       **CERTIFICATE**

18         I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
19   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
20   ability.

21         This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
22   manner by any party without authorization of the signatory
     below.
23
         Dated this 15th day of May, 2024.
24
     /s/ Elizabeth Saint-Loth, RPR, FCRR
25   Official Court Reporter

## $

**$10,000** [2] - 23:18, 39:14
**$100** [2] - 59:12, 59:23
**$125** [1] - 17:20
**$15** [2] - 16:25, 61:5
**$23** - 82:13, 82:15
**$250** [1] - 48:5
**$350** [8] - 17:21, 32:25, 33:3, 34:5, 38:15, 59:7, 59:11, 59:20
**$351** [1] - 59:10
**$354** [1] - 61:7
**$354.67** [1] - 49:1
**$50** [1] - 48:4
**$500** [1] - 41:5
**$64** [1] - 82:13
**$859,626,129** [1] - 48:21
**$984,626,129** [1] - 48:19

## '

**'20s** [1] - 87:21
**'30s** [1] - 87:21

## /

**/s** [1] - 95:24

## 0

**06103** [1] - 1:23

## 1

**1** [3] - 1:22, 59:23, 60:1
**10** [5] - 70:10, 70:11, 87:19, 87:25, 88:15
**10,000** [1] - 56:23
**100** [2] - 17:18, 65:24
**10:12** [1] - 1:5
**10th** [2] - 47:24, 48:1
**112** [1] - 8:20
**11:59** [1] - 5:21
**12** [4] - 1:5, 36:17, 69:15, 92:3
**123** [1] - 6:9
**125** [1] - 32:24
**12:49** [1] - 95:15
**1340** [1] - 6:13
**15** [4] - 9:13, 61:14, 61:15, 83:9
**150** [2] - 22:16, 29:24
**151** [1] - 60:1
**156** [1] - 81:18

**15th** [1] - 95:23
**16** [3] - 69:14, 70:9, 70:10
**16-745** [2] - 1:3, 3:3
**163** [2] - 48:17, 59:5
**175** [1] - 74:21
**17th** [1] - 1:23
**18** [1] - 78:3
**186,000** [1] - 47:6
**1882** [3] - 57:6, 57:24, 91:20
**18th** [1] - 47:13
**19** [3] - 59:16, 74:20, 78:3
**19.1** [5] - 74:14, 82:14, 82:25, 83:7, 83:13
**1900** [1] - 1:16
**1913** [1] - 33:17
**1968** [1] - 27:22
**1978** [1] - 88:19
**1995** [1] - 26:23
**1st** [2] - 47:14, 49:2

## 2

**2** [5] - 40:2, 77:17, 78:9, 83:25, 84:5
**20** [4] - 1:23, 9:4, 74:13, 88:16
**20006** [1] - 1:13
**2001** [1] - 1:12
**2002** [1] - 47:3
**20036** [1] - 1:16
**2010** [4] - 47:24, 48:16, 48:19, 70:1
**2014** [1] - 47:13
**2015** [2] - 49:2, 49:3
**2016** [4] - 4:21, 23:8, 47:23, 70:1
**2017** [8] - 47:14, 69:17, 69:19, 70:2, 70:16, 70:22, 70:25, 71:1
**2018** [3] - 39:18, 47:24, 48:1
**2019** [1] - 34:16
**202** [3] - 1:13, 1:17, 2:5
**2021** [1] - 81:19
**2023** [10] - 1:5, 8:9, 8:20, 69:10, 69:25, 70:3, 70:4, 70:20, 70:23, 71:1
**2024** [1] - 95:23
**20530** [1] - 2:4
**21** [2] - 70:1
**216-9492** [1] - 1:20
**22-set** [1] - 27:5
**23** [9] - 12:23, 12:25, 36:23, 37:1, 39:18,

39:23, 62:24, 63:6, 63:10
**23(e** [1] - 39:24
**23(e)** [1] - 85:19
**23(e)(2)(C)(iii)** [1] - 39:21
**23(h** [2] - 43:23, 44:3
**23.8** [2] - 82:24, 83:3
**25** [3] - 29:22, 88:1, 88:7
**250** [2] - 20:7, 29:15
**252-2512** [1] - 2:5
**26,611,000.15** [1] - 48:16
**263-9581** [1] - 2:8
**273** [1] - 92:12
**2792766** [1] - 49:3
**28** [2] - 1:19, 33:17
**291** [1] - 6:9
**29464** [1] - 1:20

## 3

**3** [1] - 59:4
**30** [7] - 61:5, 73:24, 74:1, 85:3, 85:4, 88:9, 95:2
**30-day** [1] - 37:9
**300** [4] - 19:22, 19:25, 20:1, 20:2
**30th** [1] - 49:3
**312** [1] - 1:16
**31st** [2] - 47:24, 48:1
**33** [7] - 69:10, 69:12, 70:8, 71:11, 73:11, 74:1, 84:24
**34** [4] - 20:24, 61:18, 68:19, 69:11
**350** [4] - 17:23, 59:8, 59:22, 68:6
**37** [1] - 48:18
**3d** [3] - 6:9, 6:13, 92:12

## 4

**4** [3] - 8:20, 68:10, 83:25
**4.4** [1] - 88:10
**4/21/10** [1] - 47:16
**400** [1] - 64:15
**409** [3] - 55:19, 55:20, 64:17
**43-1** [1] - 73:25
**44** [1] - 73:25
**45** [1] - 83:9
**464** [1] - 64:20
**474** [1] - 92:17
**478** [1] - 92:13
**4:00** [1] - 5:20

**4:30** [1] - 5:21

## 5

**5** [3] - 52:6, 87:20, 88:14
**500,000** [2] - 12:19, 46:5
**501(c)(3** [1] - 26:23
**54-year-old** [1] - 26:19
**580** [1] - 81:18

## 6

**6** [2] - 59:15, 70:19
**601** [1] - 2:4
**65** [2] - 73:21, 88:7
**6580** [1] - 2:7

## 7

**7** [1] - 70:13
**70** [1] - 74:21
**75** [1] - 17:1

## 8

**8** [1] - 8:9
**843** [1] - 1:20
**850** [1] - 1:12
**858** [1] - 2:8
**860** [1] - 1:24
**882-1676** [1] - 1:24
**888-1741** [2] - 1:13, 1:17
**89** [1] - 92:13

## 9

**92037** [1] - 2:8
**968** [1] - 6:13

## A

**a.m** [1] - 1:5
**Aaron** [1] - 50:1
**ability** [3] - 17:12, 23:5, 95:20
**able** [12] - 16:8, 16:18, 25:14, 26:14, 27:10, 29:3, 29:20, 45:15, 46:14, 65:10, 65:18, 67:16
**absence** [2] - 32:18, 90:22
**absent** [2] - 35:2, 91:2
**absolute** [1] - 90:21
**absolutely** - 22:6, 84:21, 85:22
**accept** [1] - 57:22

**access** [21] - 7:19, 13:18, 15:6, 17:11, 18:19, 22:21, 22:23, 23:1, 23:4, 24:24, 27:2, 27:3, 27:16, 27:23, 32:11, 33:13, 33:18, 33:21, 34:2, 34:10, 51:23
**accessed** [1] - 5:9
**accessible** [2] - 5:14, 94:5
**accompanying** [1] - 22:12
**accomplish** [1] - 19:5
**according** [2] - 39:15, 41:5
**account** [14] - 40:11, 46:16, 46:17, 49:3, 49:5, 55:11, 55:14, 58:14, 58:15, 58:16, 60:25, 61:1, 68:9, 68:11
**accountable** [1] - 15:5
**accountholder** [5] - 54:17, 55:10, 64:4, 64:20, 64:21
**accountholder's** [1] - 64:2
**accountholders** [2] - 55:2, 62:12
**accounting** [1] - 46:7
**accurate** [2] - 93:20, 95:18
**accurately** [1] - 26:1
**achieved** [2] - 30:6, 35:9
**achievement** [1] - 18:4
**achieving** [1] - 18:22
**acknowledge** [1] - 91:23
**acknowledged** [2] - 17:8, 17:9
**act** [2] - 43:9, 43:13
**Act** [11] - 7:11, 14:19, 27:17, 27:18, 27:19, 33:15, 52:14, 65:22, 66:6, 79:17
**action** [37] - 9:21, 11:18, 12:1, 14:22, 15:2, 16:10, 18:1, 18:7, 22:12, 23:8, 25:11, 29:24, 30:20, 32:6, 37:13, 38:6, 39:8, 39:11, 40:22, 45:9, 52:8, 53:23, 57:5, 65:10, 66:25, 68:4, 73:7, 73:19, 73:23, 74:24, 75:4, 75:5, 75:6, 81:6,

2

88:22, 89:8, 91:4
**Action** [2] - 1:2, 3:2
**actions** [18] - 11:11,
11:17, 11:22, 18:1,
24:17, 31:13, 37:11,
39:25, 40:22, 51:14,
57:10, 66:10, 72:10,
72:15, 72:16, 74:3,
74:5, 86:1
**active** [1] - 24:12
**active-duty** [1] - 24:12
**activities** [3] - 16:15,
16:16, 25:3
**acts** [1] - 91:1
**actual** [3] - 54:18,
63:15, 87:8
**add** [4] - 60:18, 67:18,
67:20, 92:25
**added** [1] - 56:23
**addition** [6] - 20:23,
49:24, 56:13, 56:20,
70:6, 78:16
**additional** [7] - 5:24,
35:15, 44:2, 69:14,
70:19, 71:6, 75:24,
80:25, 81:14, 84:18
**address** [18] - 21:1,
21:2, 31:21, 31:22,
33:5, 34:17, 34:25,
35:20, 36:21, 38:12,
44:25, 45:15, 53:14,
58:8, 58:9, 60:20,
63:9, 83:19
**addressed** [4] - 39:16,
57:19, 60:9, 83:5
**adequacy** [6] - 8:13,
39:17, 39:19, 40:18,
40:20, 65:3
**adequate** [10] - 13:7,
30:23, 31:4, 31:19,
33:4, 40:5, 40:11,
44:25, 63:6, 85:21
**adequately** [2] - 26:1,
50:18
**adjourned** [1] - 95:14
**administering** [2] -
53:9, 53:17
**Administration** [2] -
2:10, 4:4
**administration** [2] -
10:15
**administrative** [1] -
93:11
**Administrative** [12] -
6:3, 6:6, 14:19,
15:20, 16:9, 32:12,
33:12, 34:1, 35:4,
94:3, 94:4, 94:10
**administrator** [14] -
20:6, 53:1, 54:20,

55:3, 55:8, 55:9,
55:10, 58:12, 59:19,
62:11, 62:20, 64:1,
64:3, 64:21
**administrators** [1] -
62:19
**advanced** [1] - 18:17
**advances** [1] - 22:20
**adversarial** [1] - 91:3
**advocacy** [1] - 51:18
**advocate** [1] - 66:14
**advocated** [1] - 51:9
**advocates** [1] - 24:19
**advocating** [2] - 39:1,
83:21
**affect** [4] - 25:3, 63:1,
63:6, 65:3
**affidavits** [1] - 8:17
**affirmed** [1] - 7:21
**affirming** [1] - 17:3
**afford** [2] - 17:10,
48:11
**affordable** [1] - 27:1
**AFJ** [7] - 11:3, 22:11,
22:13, 22:19, 23:7,
23:18, 23:19
**AFJ's** [3] - 23:10,
23:11, 23:16
**afternoon** [1] - 95:6
**aggregate** [1] - 67:14
**ago** [8] - 15:4, 18:12,
18:13, 18:14, 28:9,
28:22, 36:8, 37:9
**agree** [4] - 29:9,
43:10, 57:20, 61:10,
73:23, 80:4, 81:22,
85:3, 85:4
**agreed** [3] - 6:16,
11:24, 74:12
**agreement** [7] - 8:1,
8:6, 35:17, 59:16,
63:2, 73:16, 83:15
**agreements** [4] -
73:10, 84:23, 84:24,
90:20
**agrees** [3] - 26:2,
71:23, 83:8
**Aha** [1] - 79:4
**ahead** [1] - 47:1
**aid** [1] - 75:16
**aided** [1] - 2:21
**al** [2] - 1:3, 3:3
**Alabama** [1] - 87:14
**ALAN** [1] - 2:7
**Alan** [1] - 36:15
**Alexander** [1] - 50:1
**Ali** [1] - 92:2
**align** [2] - 72:19, 89:16
**Allan** [1] - 4:10
**alliance** [1] - 22:16

**Alliance** [6] - 4:16,
11:2, 21:23, 22:9,
22:15, 25:6
**allocates** [1] - 59:19
**allocation** [6] - 33:7,
33:11, 34:11, 38:25,
39:6, 39:12
**allow** [1] - 12:5
**allowed** [2] - 54:18,
71:15
**allowing** [1] - 26:13
**allows** [4] - 33:15,
53:1, 53:6, 55:2
**almost** [5] - 18:1,
37:11, 37:12, 89:18,
89:19
**alone** [1] - 18:22
**ALSO** [1] - 2:13
**alternative** [1] - 14:22
**amended** [1] - 39:17
**Amendment** [1] - 17:9
**America** [1] - 4:17
**AMERICA** [1] - 1:5
**American** [1] - 14:25
**Americans** [1] - 22:21
**amicus** [1] - 16:19
**amount** [24] - 7:18,
23:20, 25:11, 25:22,
29:18, 33:8, 39:5,
39:12, 43:15, 49:15,
56:13, 59:20, 59:21,
80:14, 82:21, 83:18,
83:22, 86:7, 88:1,
88:12, 88:13, 89:5,
89:12
**amounted** [1] - 88:9
**amply** [1] - 32:1
**analogous** [3] - 79:18,
79:20, 81:16
**analysis** [2] - 13:16,
82:8
**announced** [2] -
16:16, 16:24
**annual** [1] - 27:7
**answer** [11] - 9:14,
10:17, 30:9, 50:16,
54:6, 54:7, 54:8,
62:10, 76:19, 80:3,
90:15
**anticipates** [1] - 19:9
**antitrust** [1] - 65:23
**anyway** [2] - 56:24,
80:14
**AO** [4] - 16:14, 16:16,
16:24, 94:7
**apologize** [1] - 68:4
**appeal** [4] - 16:18,
89:21, 89:22, 92:20
**appear** [9] - 8:22,
10:1, 26:13, 26:14,

30:18, 36:19, 85:9
**Appearances** [1] -
1:25
**APPEARANCES** [2] -
1:10, 2:1
**appearances** [1] - 3:6
**appeared** [1] - 32:4
**appearing** [2] - 3:24,
20:19
**appellate** [1] - 15:25
**application** [2] -
43:22, 45:4
**applications** [2] -
44:15, 91:19
**applies** [1] - 42:12
**apply** [4] - 42:9, 59:3,
92:16
**applying** [1] - 89:23
**appreciate** [1] - 28:20
**appreciative** [1] - 94:2
**apprised** [1] - 25:6
**approach** [12] - 3:18,
72:8, 72:9, 72:14,
72:17, 72:19, 72:25,
73:1, 76:20, 80:6
**approaches** [1] - 72:8
**appropriate** [10] -
20:22, 26:2, 41:8,
45:4, 73:1, 82:17,
83:10, 83:15, 86:1,
86:6
**approval** [11] - 8:10,
9:22, 12:14, 12:21,
13:23, 30:19, 31:10,
31:17, 35:16, 39:25,
52:24
**approve** [6] - 28:15,
28:16, 28:18, 36:1,
41:10, 58:5
**approved** [3] - 44:15,
63:15, 87:23
**approximate** [1] -
25:21
**April** [6] - 23:8, 47:14,
47:24, 48:1, 70:1
**area** [1] - 26:22
**areas** [2] - 27:1, 27:2
**argue** [1] - 82:14
**argued** [1] - 95:8
**argument** [12] - 9:12,
46:19, 57:5, 57:15,
59:9, 59:10, 62:8,
91:18, 92:14, 92:21,
92:24
**arguments** [10] - 4:23,
6:1, 6:2, 6:4, 6:15,
6:16, 15:23, 16:1,
92:9, 92:18
**arm's** [6] - 7:25, 13:6,
31:18, 32:2, 39:4,

74:11
**arrangement** [1] -
73:19
**arranging** [1] - 9:24
**article** [1] - 86:12
**articulated** [1] - 33:17
**aside** [3] - 5:23, 59:9,
83:7
**aspect** [1] - 78:24
**aspects** [1] - 46:21
**asserted** [1] - 90:6
**assessed** [1] - 66:1
**assessment** [1] - 26:3
**Assistant** [1] - 4:2
**associated** [2] - 2:19,
55:11
**Associates** [1] - 86:20
**Association** [2] -
86:20, 87:11
**assumed** [2] - 14:4,
14:17
**assumption** [1] - 89:8
**assure** [2] - 80:14,
90:21
**assured** [1] - 51:16
**attack** [2] - 92:22,
92:23
**attempt** [2] - 53:7,
64:3
**attempted** [2] - 8:14,
70:4
**attempts** [1] - 20:25
**attention** [1] - 52:4
**attorney** [8] - 11:5,
23:19, 24:7, 24:22,
57:9, 72:21, 73:11,
91:19
**Attorney** [3] - 4:2,
25:25, 42:11
**Attorney's** [1] - 42:10
**attorney's** [22] - 9:13,
35:19, 39:20, 40:12,
40:14, 40:15, 40:24,
41:11, 43:2, 44:16,
50:10, 58:8, 68:21,
71:22, 71:24, 84:15,
84:19, 85:9, 86:18,
89:22, 89:24, 91:6
**attorneys** [2] - 28:1,
46:9
**Aubrey** [1] - 94:17
**audio** [1] - 2:19
**August** [1] - 47:13
**author** [1] - 86:14
**authority** [5] - 14:6,
32:13, 39:15, 86:23,
86:24
**Authority** [1] - 48:8
**authorization** [1] -
95:22

3

**automated** [1] - 20:7
**automatically** [3] - 5:5, 17:21, 18:3
**available** [1] - 23:24
**Avenida** [1] - 2:7
**average** [7] - 34:5, 74:17, 74:22, 75:4, 75:5, 75:7
**avoid** [1] - 33:21
**avoidance** [1] - 31:13
**award** [23] - 23:18, 28:7, 29:18, 35:24, 39:20, 40:12, 41:2, 41:14, 41:15, 41:22, 41:23, 43:15, 44:23, 45:8, 57:16, 82:15, 83:2, 87:24, 88:9, 89:12
**awarded** [4] - 86:18, 87:19, 88:20, 88:21
**awarding** [1] - 83:17
**awards** [11] - 22:13, 35:20, 39:14, 40:24, 56:4, 56:6, 58:2, 87:4, 87:23, 88:24, 92:21
**aware** [4] - 12:11, 13:23, 30:21, 31:11
**awareness** [1] - 16:22

**B**

**B-U-R-B-A-N-K** [1] - 24:8
**background** [2] - 32:9, 73:6
**backwards** [1] - 67:6
**balance** [1] - 61:7
**bankruptcy** [1] - 7:8
**bark** [4] - 20:9, 21:8, 91:13
**barriers** [1] - 34:10
**base** [1] - 83:17
**based** [4] - 7:12, 27:21, 75:20, 89:11
**baseline** [1] - 81:4
**basis** [5] - 14:22, 27:8, 27:9, 33:2, 88:21
**bear** [1] - 13:16
**become** [1] - 53:9
**BEFORE** [1] - 1:8
**begin** [1] - 10:4
**beginning** [4] - 10:10, 38:5, 93:23, 94:19
**behalf** [18] - 3:20, 3:22, 4:4, 11:3, 23:12, 23:16, 26:22, 28:7, 29:19, 51:20, 54:21, 55:9, 56:7, 58:22, 64:2, 64:6,

64:19, 91:2
**belabor** [1] - 13:1
**below** [6] - 74:16, 74:17, 74:22, 75:7, 83:14, 95:22
**bench** [3] - 95:8, 95:9, 95:12
**benchmark** [1] - 88:1
**benefit** [1] - 39:11
**benefited** [1] - 57:12
**benefits** [5] - 24:13, 24:23, 25:2, 25:4, 72:23
**bent** [1] - 67:6
**best** [3] - 30:25, 66:16, 95:19
**better** [7] - 31:2, 31:5, 39:1, 42:22, 53:14, 75:3, 75:4
**between** [15] - 33:11, 33:15, 33:19, 33:24, 41:21, 41:22, 42:1, 43:6, 51:6, 52:19, 54:3, 57:7, 65:9, 73:8, 83:25
**beyond** [4] - 14:17, 27:12, 47:4, 60:18
**big** [14] - 11:23, 37:4, 37:23, 49:8, 49:9, 49:16, 51:1, 51:4, 56:24, 67:5, 67:13, 86:1
**biggest** [2] - 38:8, 38:9
**bill** [7] - 3:12, 3:20, 18:10, 18:15, 37:9, 37:23, 37:24
**Bill** [1] - 10:10
**billed** [1] - 44:18
**billing** [7] - 25:22, 29:17, 38:1, 40:25, 41:7, 44:7, 56:21
**bills** [3] - 37:10, 37:11, 62:2
**bind** [2] - 84:24, 84:25
**binding** [4] - 85:10, 85:12, 85:15, 90:19
**binds** [1] - 12:1
**Bioscrip** [1] - 92:2
**bipartisan** [3] - 18:10, 18:15, 18:16
**bit** [1] - 58:12
**Black** [4] - 72:18, 78:15, 78:23, 79:3
**bnarwold@ motleyrice.com** [1] - 1:24
**Boasberg** [1] - 81:10
**Boeing** [1] - 88:19
**bondholder** [1] -

57:11
**Boston** [3] - 11:15, 26:13, 44:14
**bottom** [2] - 58:13, 71:2
**Boulevard** [1] - 1:19
**bound** [3] - 12:8, 12:17, 36:16
**boy** [1] - 69:8
**Brackett** [1] - 81:9
**brag** [1] - 37:18
**break** [3] - 50:8, 68:18, 75:12
**Brenda** [1] - 4:2
**BRENDA** [1] - 2:2
**brenda.gonzalez. horowitz@usdoj. gov** [1] - 2:5
**Bridgeside** [1] - 1:19
**brief** [9] - 11:20, 50:15, 50:19, 51:12, 52:5, 65:13, 77:4, 81:11, 90:14
**briefed** [1] - 12:24
**briefly** [2] - 11:12, 67:25
**briefs** [8] - 8:17, 65:13
**bring** [3] - 14:8, 15:13, 86:8
**bringing** [2] - 16:10, 52:3
**broader** [2] - 65:21, 66:7
**brought** [7] - 14:5, 16:22, 19:5, 22:14, 28:2, 51:21, 58:22
**Broward** [1] - 48:8
**building** [1] - 94:16
**BURBANK** [3] - 2:11, 24:3, 24:6
**Burbank** [5] - 11:7, 23:25, 24:2, 24:8, 26:5
**burden** [1] - 35:13
**burdens** [2] - 33:21, 34:11

**C**

**C)(iii** [1] - 40:6
**CA** [1] - 2:8
**calculated** [2] - 23:21, 83:22
**calculation** [1] - 76:9
**calendar** [2] - 94:18, 94:21
**California** [2] - 48:9, 86:11
**Camden** [3] - 86:20, 87:10

**candid** [1] - 78:10
**cannot** [2] - 17:10, 47:3
**cap** [4] - 74:5, 74:9, 74:11, 74:12
**care** [2] - 13:20, 22:25
**Care** [1] - 42:3
**career** [2] - 38:5, 38:7
**carpet** [1] - 91:6
**case** [147] - 4:14, 4:18, 4:20, 4:21, 5:16, 5:17, 6:11, 7:6, 8:5, 10:10, 10:20, 11:23, 11:24, 13:20, 14:4, 14:24, 14:25, 15:3, 15:4, 15:13, 16:7, 19:3, 19:8, 22:14, 23:20, 25:12, 25:20, 26:2, 26:15, 26:18, 28:1, 28:8, 28:10, 29:12, 29:14, 29:16, 29:21, 30:5, 30:20, 32:9, 33:9, 35:2, 35:8, 35:14, 40:24, 41:3, 41:4, 41:5, 41:7, 42:3, 42:15, 43:17, 43:19, 44:23, 45:3, 45:13, 48:10, 51:21, 51:23, 52:3, 52:6, 52:16, 53:20, 56:18, 57:6, 57:8, 57:10, 57:12, 57:16, 57:18, 57:21, 58:1, 58:14, 58:17, 58:22, 63:25, 65:19, 65:23, 66:8, 66:15, 66:16, 66:18, 72:18, 75:21, 77:5, 77:8, 77:18, 77:19, 77:21, 77:22, 78:12, 79:10, 79:14, 79:15, 79:17, 80:5, 80:7, 80:8, 80:10, 81:14, 81:17, 81:23, 82:6, 82:9, 82:20, 83:8, 83:10, 83:12, 83:23, 83:24, 84:3, 86:16, 86:17, 86:19, 87:5, 87:9, 87:13, 87:15, 88:3, 88:6, 88:7, 88:8, 88:14, 88:17, 88:18, 88:20, 88:25, 89:1, 89:4, 89:24, 90:2, 91:8, 91:11, 91:20, 92:1, 92:2, 93:18, 94:19, 94:23
**cases** [31] - 5:3, 22:24, 24:17, 29:24, 40:23, 42:8, 42:13, 42:14, 43:12, 52:15, 53:14,

65:9, 72:11, 79:4, 79:12, 79:14, 79:19, 81:6, 81:7, 85:24, 86:17, 87:10, 87:21, 88:4, 89:7, 91:22, 91:25, 92:16
**categorical** [1] - 92:23
**categories** [6] - 5:24, 6:23, 7:1, 7:2, 7:5, 35:6
**category** [1] - 7:3
**causing** [1] - 93:3
**cent** [1] - 47:8
**center** [2] - 26:21, 69:6
**Center** [9] - 1:22, 2:13, 4:16, 11:16, 26:8, 26:17, 26:19, 28:8, 29:19
**cents** [5] - 17:19, 47:14, 47:18, 48:2, 68:10
**certain** [8] - 8:22, 16:15, 32:11, 33:8, 42:12, 42:13, 52:10, 53:17
**certainly** [8] - 31:14, 32:21, 33:25, 47:7, 66:5, 82:6, 83:23, 94:12
**CERTIFICATE** [1] - 95:17
**certificate** [1] - 95:21
**certification** [4] - 16:6, 23:15, 25:14, 29:13
**certified** [2] - 15:2, 69:25
**certify** [1] - 95:18
**challenge** [1] - 15:8
**challenged** [1] - 30:2
**changed** [1] - 95:11
**charge** [6] - 14:6, 23:1, 47:3, 52:16, 66:1, 66:5
**charged** [2] - 5:1, 47:18
**charges** [3] - 17:19, 52:10, 52:12
**charging** [5] - 6:7, 47:14, 47:16, 48:2, 62:5
**Charlotte** [1] - 10:12
**CHARLOTTE** [1] - 1:18
**chartered** [1] - 16:4
**check** [28] - 17:13, 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 46:15, 72:2, 75:9, 75:10, 75:15, 75:17,

76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9
**checked** [1] - 29:14
**Chief** [5] - 15:9, 81:10, 81:11, 86:10, 94:8
**chime** [1] - 67:23
**choice** [3] - 41:17, 41:20, 41:21
**choose** [4] - 41:14, 42:1, 75:14, 75:22
**chunk** [1] - 49:17
**Church** [1] - 1:23
**circuit** [18] - 6:12, 16:5, 17:3, 17:7, 17:8, 32:10, 41:24, 41:25, 72:10, 76:24, 78:12, 78:19, 79:3, 82:1, 82:3, 82:7, 82:9, 84:3
**Circuit** [19] - 6:16, 6:19, 6:21, 7:3, 7:12, 7:15, 41:19, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 86:19, 87:10, 87:11
**circuit's** [3] - 18:9, 77:4, 77:7
**circuits** [6] - 41:18, 76:25, 77:3, 86:21, 91:22, 92:10
**circumstances** [1] - 83:11
**cite** [3] - 79:13, 79:15, 92:11
**cited** [3] - 81:11, 88:18, 92:3
**Citizen** [1] - 14:1
**Civil** [3] - 1:2, 3:2, 39:18
**civil** [4] - 5:9, 5:13, 16:21, 95:1
**Claim** [1] - 81:18
**claim** [6] - 52:15, 58:24, 65:7, 66:2, 66:5, 69:13
**claimants** [2] - 38:8, 38:21
**claimed** [4] - 41:1, 43:19, 44:24, 88:14
**claiming** [1] - 46:17
**claims** [7] - 10:15, 11:12, 18:2, 37:17, 37:18, 37:19, 79:19
**Claims** [4] - 79:13, 79:18, 81:16, 81:18
**clarification** [1] - 84:8

**clarify** [2] - 60:3, 82:2
**clarifying** [1] - 84:7
**class** [173] - 3:8, 3:12, 8:11, 9:4, 9:19, 9:20, 9:25, 10:1, 10:15, 10:18, 11:10, 11:17, 11:22, 12:1, 12:17, 13:2, 13:3, 13:7, 13:11, 13:12, 15:2, 16:7, 17:20, 17:22, 17:25, 18:1, 18:3, 18:25, 19:1, 19:9, 19:11, 19:12, 19:17, 19:21, 19:22, 20:2, 20:5, 20:6, 20:12, 20:18, 21:19, 22:12, 23:7, 23:13, 23:15, 24:17, 25:11, 25:13, 25:17, 25:19, 26:17, 29:13, 29:24, 30:18, 30:20, 30:23, 31:1, 31:9, 31:12, 31:19, 31:20, 32:25, 33:2, 33:3, 33:5, 33:24, 35:3, 35:10, 36:1, 36:15, 37:2, 37:5, 37:11, 37:13, 37:15, 38:6, 38:18, 38:22, 39:2, 39:3, 39:8, 39:11, 39:25, 40:5, 40:9, 40:10, 40:21, 40:22, 41:3, 41:15, 43:9, 43:14, 43:16, 44:7, 45:7, 45:9, 46:10, 46:12, 46:18, 46:23, 47:23, 51:14, 51:17, 51:19, 51:22, 52:8, 52:25, 53:23, 53:25, 56:5, 57:4, 57:10, 57:17, 57:25, 58:12, 58:17, 59:19, 59:21, 59:22, 60:24, 61:2, 61:8, 61:9, 61:11, 65:10, 66:10, 66:24, 67:1, 67:2, 67:13, 68:4, 69:1, 69:21, 70:1, 71:23, 72:10, 72:15, 72:16, 73:7, 73:10, 73:19, 73:22, 73:23, 74:3, 74:5, 74:24, 75:1, 75:4, 75:6, 77:18, 77:24, 80:12, 81:6, 81:15, 83:5, 84:25, 85:3, 86:1, 87:6, 88:22, 89:8, 91:2, 91:4, 91:15
**classes** [5] - 33:19, 33:20, 67:1, 89:14, 89:16

**clear** [6] - 13:2, 45:10, 79:24, 80:5, 82:22, 83:20
**clearly** [2] - 7:4, 76:5
**clerk** [1] - 95:5
**clerk's** [1] - 94:24
**clerking** [1] - 94:16
**clerks'** [1] - 5:22
**client** [5] - 29:25, 54:23, 54:24, 62:5, 62:6
**clients** [6] - 15:22, 27:17, 37:10, 37:23, 52:1, 91:5
**closely** [1] - 72:20
**closer** [1] - 84:4
**closing** [1] - 9:11
**CM/ECF** [1] - 7:7
**co** [2] - 29:24, 86:14
**co-author** [1] - 86:14
**co-counsel** [1] - 29:24
**coercion** [1] - 32:18
**coincidental** [1] - 39:10
**colleague** [2] - 4:19, 10:8
**colleagues** [2] - 10:10, 10:16
**Collection** [1] - 27:18
**collective** [1] - 23:5
**collusion** [1] - 32:18
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 41:18
**comfort** [1] - 75:18
**coming** [1] - 74:25
**comment** [1] - 28:6
**commercial** [1] - 34:13
**commitment** [1] - 22:17
**Committee** [1] - 18:17
**common** [25] - 17:20, 32:23, 33:8, 42:13, 43:12, 72:10, 72:15, 74:8, 74:10, 74:13, 78:21, 80:7, 81:22, 81:23, 83:10, 86:17, 87:2, 87:5, 87:7, 87:22, 87:24, 89:24, 92:16, 92:17
**communications** [2] - 20:3, 20:4
**companies** [4] - 16:20, 19:16, 21:9, 67:14
**comparable** [2] - 77:1, 78:22
**comparators** [1] - 88:5
**compare** [1] - 41:1

**compared** [1] - 35:10
**compensable** [1] - 58:24
**compensate** [1] - 73:24
**compensated** [2] - 38:11, 44:19
**compensating** [1] - 60:21
**compensation** [3] - 34:5, 34:6, 87:7
**complaint** [3] - 50:23, 50:25, 51:2
**complete** [2] - 44:22, 95:19
**completely** [2] - 14:9, 30:7
**complex** [4] - 14:11, 65:24, 81:5, 81:8
**complexity** [1] - 25:8
**complicated** [1] - 8:2
**component** [1] - 17:14
**comprises** [1] - 19:12
**compromise** [4] - 19:3, 33:11, 34:23, 51:5
**compromising** [1] - 50:24
**computer** [1] - 2:21
**computer-aided** [1] - 2:21
**conceivable** [1] - 31:5
**concepts** [1] - 56:18
**concern** [1] - 60:20
**concerns** [7] - 5:12, 34:17, 44:25, 80:18, 80:21, 83:19, 83:22
**conclude** [1] - 6:20
**concluded** [3] - 6:5, 7:17, 8:6
**concludes** [1] - 95:15
**concur** [2] - 35:25, 60:24
**concurs** [1] - 31:16
**Condominium** [2] - 86:20, 87:11
**conduct** [4] - 80:12, 80:13, 80:23, 82:10
**Conference** [3] - 15:9, 18:18, 34:15
**confirm** [1] - 78:17
**conflict** [1] - 86:22
**Congress** [3] - 18:20, 94:3
**congressional** [1] - 34:8
**connection** [1] - 43:25
**conservatively** [1] - 23:18
**consider** [7] - 35:23,

39:19, 40:18, 40:21, 43:16, 86:13, 88:11
**considerable** [2] - 25:11, 52:2
**consideration** [3] - 9:21, 16:1, 86:4
**considered** [6] - 4:23, 6:1, 71:9, 81:4, 86:5, 95:21
**considering** [5] - 33:4, 34:1, 35:12, 40:6, 40:20
**considers** [2] - 12:22, 12:25
**consistent** [4] - 7:22, 33:16, 34:7, 60:22
**constitutes** [1] - 95:18
**constitutional** [1] - 22:20
**consulted** [1] - 23:14
**consumer** [5] - 26:22, 27:1, 27:5, 27:7, 27:20
**Consumer** [8] - 2:13, 4:15, 11:16, 26:7, 26:17, 26:19, 28:8, 29:19
**consumers** [2] - 26:25, 27:13
**contact** [1] - 64:4
**contacts** [2] - 69:1, 69:2
**context** [4] - 65:11, 65:22, 92:17
**contexts** [1] - 65:23
**contingency** [2] - 73:19, 73:20
**contingent** [1] - 73:12
**continue** [1] - 42:25
**Continued** [1] - 1:25
**continued** [1] - 2:1
**continues** [1] - 18:8
**contrary** [1] - 15:24
**contribution** [1] - 57:16
**contributions** [1] - 93:20
**Control** [1] - 7:11
**controversy** [1] - 14:3
**convinced** [1] - 82:6
**copier** [1] - 47:19
**copies** [1] - 47:20
**core** [1] - 22:20
**corners** [1] - 14:7
**Corporate** [1] - 1:22
**Corporation** [1] - 26:21
**corporations** [2] - 49:9, 49:16
**correct** [15] - 6:24,

7:14, 20:13, 21:5, 54:5, 57:23, 58:7, 68:7, 70:20, 71:17, 73:13, 73:15, 76:11, 85:1
**corrective** [1] - 70:15
**cost** [5] - 38:1, 47:4, 47:9, 47:21, 48:23
**costs** [9] - 13:8, 22:13, 25:8, 34:12, 35:20, 45:9, 47:19, 47:21, 62:4
**Counsel** [2] - 2:10, 4:3
**counsel** [44] - 3:5, 3:8, 3:10, 3:17, 4:23, 5:4, 5:15, 9:4, 9:9, 9:19, 10:8, 13:3, 13:12, 14:16, 19:22, 20:12, 23:13, 23:17, 25:17, 29:24, 30:2, 35:16, 37:11, 39:3, 40:10, 41:3, 41:16, 43:4, 43:17, 45:7, 56:22, 58:13, 60:24, 61:11, 61:19, 71:24, 73:24, 81:15, 83:6, 89:17, 93:14, 93:21
**country** [4] - 24:20, 25:1, 48:10, 92:6
**County** [2] - 48:8, 79:14
**couple** [3] - 10:3, 62:7, 62:15
**course** [12] - 5:6, 13:12, 19:4, 21:12, 30:3, 35:8, 35:12, 35:13, 50:15, 81:5, 83:11, 84:2
**Court** [87] - 2:15, 2:16, 4:9, 9:23, 10:14, 10:21, 12:4, 12:11, 12:16, 12:22, 12:25, 13:1, 25:24, 26:14, 29:12, 30:18, 31:1, 31:3, 31:11, 31:17, 32:1, 32:7, 32:10, 32:19, 32:21, 35:14, 35:18, 35:23, 36:1, 36:14, 39:15, 39:16, 39:19, 41:14, 41:17, 41:20, 43:9, 43:12, 43:13, 45:6, 46:15, 49:4, 49:14, 50:16, 51:12, 51:15, 55:24, 57:6, 57:13, 58:4, 58:25, 60:7, 60:22, 60:23, 61:10, 63:20, 74:6, 75:14, 76:15, 76:19, 79:13, 79:17, 80:10, 80:13, 80:24,

81:3, 81:13, 81:14, 81:16, 83:13, 83:16, 84:1, 84:25, 86:22, 86:24, 87:17, 87:19, 87:22, 88:2, 88:10, 89:5, 90:19, 90:20, 91:1, 93:1, 93:4, 95:25
**court** [30] - 5:2, 6:20, 7:20, 9:24, 15:6, 15:14, 15:15, 17:11, 19:12, 22:5, 22:23, 22:24, 23:13, 24:17, 27:4, 42:12, 57:19, 58:20, 63:15, 77:16, 78:7, 78:10, 79:16, 87:5, 87:12, 90:5, 92:1, 94:4, 95:14
**COURT** [128] - 1:1, 1:9, 3:9, 3:14, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8

**Court's** [15] - 9:21, 17:4, 36:17, 52:4, 66:20, 75:15, 75:16, 80:16, 80:23, 82:8, 82:10, 83:2, 84:5, 88:18, 91:11
**court-approved** [1] - 63:15
**Courthouse** [1] - 2:16
**courthouse** [1] - 5:20
**courtroom** [7] - 7:13, 10:5, 10:19, 10:23, 11:4, 45:21, 49:20
**COURTROOM** [3] - 3:2, 3:17, 95:14
**courts** [14] - 5:2, 13:19, 15:23, 23:1, 24:22, 42:23, 57:20, 72:15, 72:18, 78:21, 87:18, 91:6, 91:19, 93:24
**Courts** [8] - 2:10, 4:4, 6:3, 6:6, 16:9, 32:12, 94:3, 94:4
**cover** [3] - 7:18, 44:24, 88:14
**coverage** [2] - 16:22, 19:20
**covers** [1] - 45:8
**COVID** [1] - 47:19
**crazy** [1] - 14:12
**create** [1] - 34:10
**created** [1] - 71:3
**creates** [1] - 17:20
**Credit** [1] - 27:18
**credit** [1] - 48:7
**Crime** [1] - 7:11
**criminal** [2] - 5:11, 5:13
**criteria** [1] - 12:23
**critical** [2] - 24:25, 45:5
**criticism** [2] - 13:18, 14:3
**cross** [27] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19, 78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9, 90:1
**cross-check** [26] - 42:4, 42:5, 42:18, 42:20, 42:23, 43:6, 72:2, 75:9, 75:10, 75:15, 75:17, 76:16, 76:20, 77:10, 77:19,

78:3, 78:8, 78:10, 78:17, 80:13, 80:14, 80:24, 81:24, 82:4, 82:11, 86:9
**cross-examined** [1] - 90:1
**crossword** [1] - 29:6
**CT** [1] - 1:23
**current** [1] - 29:17
**customer** [1] - 69:7
**cut** [4] - 47:25, 48:12, 48:13, 87:20
**cycles** [1] - 37:9

## D

**D.C** [12] - 1:6, 6:21, 42:10, 76:22, 76:24, 80:5, 81:25, 82:4, 82:5, 83:25, 86:17, 87:11
**daily** [1] - 27:9
**damages** [6] - 35:15, 41:4, 41:7, 43:18, 89:10, 89:11
**danger** [1] - 91:4
**Daniel** [1] - 23:11
**darn** [1] - 92:8
**data** [5] - 19:15, 21:9, 34:14, 41:16, 67:14
**date** [1] - 67:14
**Dated** [1] - 95:23
**days** [3] - 69:7, 69:16, 95:5
**DC** [3] - 1:13, 1:16, 2:4
**deal** [2] - 38:19, 50:11
**dealing** [2] - 38:16, 48:23
**deals** [2] - 39:24, 87:22
**Debt** [1] - 27:18
**decades** [1] - 13:25
**December** [3] - 28:11, 28:14, 47:3
**decide** [7] - 30:24, 63:5, 93:5, 93:19, 95:8, 95:9, 95:12
**decided** [1] - 78:13
**deciding** [2] - 77:16, 78:7
**decision** [18] - 16:12, 18:9, 66:20, 77:7, 77:9, 77:17, 78:9, 78:15, 78:19, 79:3, 80:16, 81:10, 81:11, 82:7, 83:17, 87:1, 88:19
**decisions** [3] - 78:21, 87:16, 88:2
**declaration** [8] -

13:22, 23:15, 25:23, 25:25, 29:12, 73:21, 74:19, 74:20
**declarations** [2] - 8:18, 80:20
**deconstructed** [1] - 88:5
**Deepak** [2] - 3:8, 9:19
**DEEPAK** [1] - 1:11
**deepak@ guptawessler.com** [1] - 1:14
**defeated** [1] - 16:5
**Defendant** [1] - 1:6
**defendant** [3] - 15:24, 47:12, 74:25
**defendant's** [1] - 72:13
**defendants** [2] - 5:12, 89:9
**defended** [1] - 32:6
**defending** [1] - 89:24
**defense** [1] - 66:4
**DEFENSE** [1] - 2:2
**Defense** [1] - 25:3
**Defense-related** [1] - 25:3
**definition** [1] - 61:9
**delays** [1] - 13:8
**delighted** [1] - 6:18
**demonstrate** [1] - 45:10
**demonstrated** [1] - 31:6
**demonstrates** [1] - 32:1
**demonstrating** [1] - 35:4
**Department** [5] - 2:3, 6:4, 15:21, 25:3, 68:2
**departure** [1] - 23:9
**dependent** [1] - 27:3
**Depot** [1] - 47:18
**DEPUTY** [3] - 3:2, 3:17, 95:14
**deserves** [1] - 49:11
**designed** [1] - 41:13
**despite** [1] - 14:3
**detail** [1] - 74:19
**determine** [5] - 30:22, 31:3, 80:16, 84:6, 86:7
**determining** [3] - 35:23, 40:17, 86:5
**developed** [1] - 94:2
**diametrically** [1] - 34:20, 50:22
**difference** [1] - 43:5
**different** [8] - 42:5,

6

43:7, 63:16, 76:25, 79:8, 79:11, 92:17, 94:23
**differentiation** [2] - 33:15, 33:24
**difficult** [1] - 51:8
**difficulties** [2] - 2:19, 35:10
**difficulty** [1] - 35:4
**digital** [1] - 27:8
**digression** [1] - 94:14
**diminish** [1] - 17:11
**direct** [2] - 27:13, 28:2
**director** [8] - 11:1, 11:8, 11:16, 22:3, 23:11, 24:8, 26:7, 29:23
**Director** [2] - 2:11, 2:13
**directors** [1] - 94:9
**directs** [1] - 12:16
**disabilities** [1] - 24:14
**disabled** [2] - 48:6, 58:20
**disadvantage** [1] - 23:3
**disagree** [1] - 61:17
**disagreed** [1] - 57:19
**disapproved** [1] - 57:9
**disassembled** [1] - 95:21
**discouraging** [1] - 72:21
**discovery** [6] - 15:21, 16:8, 16:11, 29:13, 32:15, 35:15
**discretion** [10] - 42:2, 42:21, 74:6, 75:16, 75:21, 80:23, 82:10, 83:2, 84:6, 90:21
**discriminates** [1] - 51:20
**discuss** [5] - 20:17, 21:6, 30:19, 35:19, 50:19
**discussed** [2] - 12:12, 32:8
**discussion** [3] - 8:13, 42:17, 43:2
**discussions** [1] - 32:16
**dismiss** [1] - 16:6
**dismissed** [1] - 14:20
**dispute** [4] - 52:10, 55:14, 55:15, 64:7
**disputes** [5] - 55:18, 55:20, 62:14, 64:12, 64:13
**disqualify** [1] - 54:2
**disregard** [2] - 90:8,

90:11
**distinction** [2] - 57:7, 57:23
**distinguish** [1] - 33:18
**distributed** [4] - 18:2, 33:1, 48:23, 49:15
**distributing** [1] - 33:7
**distribution** [13] - 34:4, 38:9, 39:13, 50:25, 51:10, 51:13, 51:16, 51:18, 59:17, 59:18, 59:25, 66:14, 67:7
**District** [9] - 41:18, 44:13, 52:7, 65:17, 82:9, 83:9, 86:11, 87:13, 95:7
**DISTRICT** [3] - 1:1, 1:1, 1:9
**district** [9] - 6:17, 6:20, 32:17, 44:15, 79:16, 81:4, 81:8, 87:12, 92:1
**dive** [1] - 9:16
**docket** [1] - 94:22
**Docket** [2] - 8:19, 59:5
**docketing** [1] - 7:20
**dockets** [1] - 24:25
**doctrine** [2] - 87:2, 87:6
**document** [3] - 41:12, 47:4, 47:22
**documentation** [1] - 43:25, 80:22, 84:10
**documented** [2] - 43:20
**documents** [5] - 22:23, 23:2, 47:10, 47:13
**dog** [4] - 20:9, 21:7, 91:13
**DOJ** [1] - 2:3
**DOJ-USAO** [1] - 2:3
**dollar** [2] - 17:19, 82:21
**dollars** [2] - 15:11, 38:1
**DON** [1] - 2:14
**done** [16] - 8:6, 12:15, 29:21, 30:4, 30:5, 42:24, 48:14, 62:21, 62:22, 74:4, 81:25, 83:18, 89:18, 89:19, 92:23, 94:7
**double** [2] - 38:16, 88:15
**doubling** [1] - 16:24
**doubt** [3] - 15:6, 32:19, 32:21
**down** [4] - 14:8, 19:5,

38:15, 74:1
**downstream** [1] - 52:18
**draft** [1] - 23:14
**drafted** [1] - 25:13
**drafts** [1] - 69:4
**dramatically** [1] - 41:10
**draw** [1] - 52:4
**drawing** [1] - 57:23
**drew** [1] - 57:6
**drums** [1] - 47:19
**due** [2] - 24:14, 44:4
**dumps** [1] - 94:20
**duplicate** [1] - 69:12
**during** [10] - 30:3, 32:25, 33:3, 46:13, 58:17, 58:23, 59:22, 61:2, 61:3, 75:12
**duty** [4] - 24:12, 86:12, 90:21, 91:11

# E

**E-Government** [1] - 33:15
**E-juror** [1] - 7:13
**earliest** [1] - 43:11
**earned** [1] - 25:5
**earth** [1] - 15:16
**easier** [2] - 94:11, 94:12
**Eastern** [1] - 95:7
**easy** [2] - 15:19, 77:21
**EBM** [1] - 7:9
**ECF** [1] - 73:25
**Economic** [1] - 27:19
**economy** [1] - 85:25
**edify** [1] - 93:10
**education** [1] - 24:18
**educational** [1] - 93:17
**effect** [4] - 79:16, 85:10, 85:13, 85:16
**effectively** [1] - 16:2
**efficient** [1] - 72:22
**effort** [4] - 7:25, 18:16, 25:12, 28:1
**efforts** [1] - 16:23, 34:9
**eight** [1] - 17:22
**eight-year** [1] - 17:22
**either** [5] - 34:18, 59:22, 64:8, 71:13, 76:20
**electricity** [1] - 47:20
**electronic** [11] - 5:8, 5:9, 5:14, 7:6, 7:8, 7:20, 32:11, 33:18, 93:22, 94:6, 95:2

**electronically** [2] - 5:10, 5:14
**Eleventh** [3] - 41:19, 86:19, 87:10
**eliminate** [1] - 18:15
**eliminating** [1] - 16:25
**Elizabeth** [2] - 2:15, 95:24
**ELIZABETH** [1] - 95:18
**Ellen** [1] - 4:20
**email** [6] - 55:10, 62:21, 64:3, 64:4, 64:8, 68:15
**Email** [4] - 1:14, 1:21, 1:24, 2:5
**emails** [4] - 19:23, 20:2, 62:12, 69:2
**emphasis** [1] - 82:4
**emphasize** [2] - 53:15, 90:17
**employee's** [1] - 54:22
**employees** [2] - 70:13, 70:14
**employer** [1] - 54:22
**enact** [1] - 18:20
**enacted** [1] - 27:22
**end** [9] - 28:11, 28:12, 28:14, 34:22, 35:18, 43:21, 83:19, 84:4, 86:8
**endeavor** [1] - 14:13
**ended** [1] - 38:14
**ending** [2] - 48:15, 48:16
**endorse** [1] - 30:7
**enforce** [1] - 85:6
**enforceable** [1] - 85:7
**engage** [1] - 67:6
**engaged** [1] - 32:15
**enhancement** [1] - 92:15
**ensure** [5] - 12:4, 22:19, 34:4, 34:9, 83:16
**ensuring** [3] - 9:25, 34:2, 67:8
**entered** [2] - 8:9, 47:2
**entirely** [2] - 19:6, 75:15
**entities** [1] - 34:13
**entitled** [5] - 40:14, 46:5, 71:24, 89:23, 92:24
**entry** [1] - 69:12
**equal** [2] - 13:18, 59:20
**equitable** [3] - 22:18, 87:22, 87:24
**equitably** [3] - 13:11,

31:20, 37:2
**equity** [2] - 51:14, 65:9
**ERIC** [1] - 2:7
**Eric** [2] - 4:10, 36:15
**escapes** [1] - 86:15
**esoteric** [1] - 65:19
**especially** [4] - 31:12, 33:4, 34:2, 35:9
**essential** [2] - 12:4, 17:13
**essentially** [5] - 6:14, 8:21, 9:2, 40:13, 81:3
**established** [2] - 87:2, 87:5
**estimate** [1] - 23:18
**et** [2] - 1:3, 3:3
**etc** [1] - 2:19
**ethical** [2] - 41:15, 86:12
**Ethics** [1] - 86:14
**evaluate** [1] - 60:14
**evaluating** [3] - 31:3, 39:19, 43:14
**evaluation** [1] - 63:1
**event** [1] - 29:11
**eventually** [1] - 5:13
**evidence** [6] - 31:7, 32:18, 44:2, 44:10, 45:11, 49:1
**exaction** [1] - 11:11
**exactly** [5] - 57:1, 58:21, 63:9, 66:15, 73:18
**examine** [1] - 31:1
**examined** [1] - 90:1
**exceed** [1] - 29:18
**exceeded** [2] - 32:12, 87:25
**exceeds** [1] - 23:20
**except** [2] - 41:18, 93:9
**exceptional** [1] - 13:8
**exceptions** [1] - 7:15
**excessive** [9] - 14:16, 47:12, 47:15, 47:16, 48:4, 48:24, 49:2, 59:7, 87:19
**exchange** [1] - 91:5
**exclusively** [1] - 76:8
**exempt** [1] - 14:18
**exempting** [1] - 33:19
**Exhibit** [1] - 48:17
**exhibits** [2] - 62:17, 62:18
**exorbitant** [1] - 23:1
**expected** [1] - 52:21
**expend** [1] - 35:14
**expenditures** [1] -

32:11
**expense** [1] - 35:12
**expenses** [8] - 7:18, 37:9, 37:14, 37:21, 52:1, 57:7, 62:4, 74:12
**experience** [5] - 11:10, 14:11, 30:1, 30:2, 74:24
**experienced** [1] - 32:4
**expert** [5] - 11:11, 11:17, 41:6, 76:15, 88:8
**explain** [3] - 63:1, 63:4, 68:19
**explained** [2] - 6:10, 7:16
**explains** [4] - 26:1, 59:16, 71:18, 92:14
**explanation** [1] - 25:25
**extensive** [2] - 16:19, 19:20
**extensively** [3] - 12:24, 31:21, 81:7
**extent** [2] - 53:8, 89:22
**extraordinary** [2] - 18:4, 35:10
**extrapolating** [1] - 48:17
**extremely** [1] - 85:25
**eye** [2] - 30:1, 30:2
**eye-opening** [2] - 30:1, 30:2
**eyebrows** [1] - 78:2

## F

**F-A-L-E-S-C-H-I-N-I** [1] - 22:7
**faced** [1] - 35:3
**facing** [3] - 15:20, 78:22, 79:5
**fact** [11] - 28:10, 36:22, 46:22, 51:5, 56:14, 58:15, 61:25, 66:15, 67:5, 77:12, 90:21
**factors** [5] - 12:25, 31:21, 35:16, 76:23, 77:4
**facts** [2] - 16:10, 78:12
**factual** [1] - 92:21
**factually** [1] - 59:13
**Fair** [3] - 27:17, 27:18
**fair** [16] - 12:5, 12:7, 12:9, 15:17, 16:1, 30:22, 40:5, 46:23, 51:15, 57:8, 58:12,

63:2, 63:6, 85:20, 92:24, 93:19
**fair-minded** [1] - 15:17
**fairness** [9] - 12:22, 36:24, 37:1, 45:14, 51:14, 53:18, 55:23, 65:3, 66:12
**FALESCHINI** [4] - 21:24, 22:1, 22:6, 22:9
**Faleschini** [5] - 10:23, 11:1, 21:22, 21:25, 22:2
**fall** [3] - 57:23, 58:6, 61:9
**falsity** [1] - 90:6
**far** [3] - 54:25, 91:21, 94:25
**farmers** [3] - 72:18, 78:23, 79:3
**farmers'** [1] - 78:15
**favor** [9] - 16:2, 34:20, 35:16
**favored** [1] - 31:12
**favoring** [4] - 50:24, 50:25, 51:3, 67:5
**favors** [1] - 34:18
**FCRR** [3] - 2:15, 95:18, 95:24
**Fed** [2] - 6:13, 81:18
**Federal** [5] - 39:18, 79:13, 79:18, 81:16, 81:18
**federal** [43] - 6:12, 6:15, 7:19, 14:12, 15:14, 16:5, 16:19, 17:3, 17:7, 17:8, 18:9, 19:12, 22:20, 24:14, 24:24, 27:3, 27:6, 27:21, 32:10, 41:24, 41:25, 70:12, 70:13, 72:10, 76:23, 76:24, 77:4, 77:6, 78:12, 78:19, 79:3, 79:16, 79:19, 81:5, 81:8, 82:1, 82:3, 82:7, 84:3, 91:22, 93:24
**fee** [40] - 5:18, 14:8, 15:8, 16:25, 19:6, 40:24, 41:2, 43:22, 44:14, 44:23, 45:4, 45:15, 48:5, 58:23, 61:4, 72:11, 72:12, 73:11, 73:19, 74:10, 74:12, 74:14, 75:6, 75:18, 76:11, 76:12, 76:17, 78:3, 80:17, 87:23, 87:24, 88:9,

88:12, 88:13, 88:24, 91:15, 91:16, 91:19, 92:16
**fees** [96] - 4:25, 5:25, 7:5, 7:8, 7:11, 7:17, 9:13, 13:17, 13:24, 14:6, 14:15, 15:11, 16:10, 16:15, 16:17, 16:25, 17:11, 17:22, 18:7, 18:15, 22:13, 23:1, 25:7, 32:25, 33:3, 33:18, 33:20, 34:7, 34:10, 35:20, 39:21, 40:12, 40:14, 40:15, 41:11, 43:2, 43:21, 44:16, 44:21, 45:3, 45:16, 46:6, 46:11, 46:13, 47:12, 47:15, 47:17, 48:5, 48:11, 48:12, 48:14, 48:24, 49:2, 49:10, 50:10, 52:2, 52:17, 53:2, 53:6, 54:19, 54:20, 54:22, 55:4, 55:5, 55:8, 55:13, 58:8, 58:18, 58:23, 59:7, 59:21, 61:2, 61:3, 61:19, 61:20, 64:1, 64:6, 64:19, 64:22, 65:8, 68:3, 68:21, 71:23, 71:24, 83:18, 84:15, 84:19, 85:9, 85:20, 86:18, 88:20, 89:22, 89:24, 91:6
**felt** [2] - 15:22
**fences** [1] - 16:14
**few** [15] - 7:15, 11:3, 11:18, 11:21, 13:14, 14:10, 17:15, 18:12, 18:13, 18:14, 21:20, 63:3, 92:1, 93:9, 93:17
**Fibreboard** [1] - 66:19
**fiduciary** [3] - 43:9, 90:25, 91:1
**fight** [1] - 15:21
**file** [7] - 5:21, 37:7, 44:3, 64:24, 93:3, 93:10
**filed** [24] - 8:7, 13:20, 15:4, 20:15, 20:17, 21:16, 21:17, 25:24, 29:12, 36:7, 36:16, 36:18, 46:1, 47:23, 63:19, 64:5, 64:8, 64:13, 64:18, 69:15, 69:16, 71:3, 84:10, 93:3
**files** [1] - 94:24

**filing** [16] - 5:9, 7:6, 23:8, 36:20, 44:22, 48:17, 59:5, 76:6, 80:19, 81:6, 81:21, 82:14, 82:24, 83:5, 93:3, 93:23
**filings** [15] - 5:14, 8:8, 8:17, 25:12, 31:6, 31:22, 32:3, 33:10, 36:21, 44:9, 62:18, 69:11, 82:19, 93:13, 94:6
**final** [6] - 9:21, 12:20, 13:22, 31:10, 31:17, 52:24
**finally** [4] - 7:13, 11:14, 26:6, 34:25
**finance** [2] - 27:1, 27:13
**finish** [1] - 29:22
**firm** [9] - 10:9, 10:11, 10:13, 38:4, 44:20, 54:24, 62:1, 88:23, 89:2
**firms** [16] - 5:1, 19:13, 19:14, 21:8, 37:5, 37:6, 37:13, 37:23, 38:6, 38:7, 39:11, 49:8, 51:25, 67:13, 88:23, 89:6
**First** [1] - 17:9
**first** [18] - 6:18, 7:3, 11:21, 12:14, 14:5, 15:1, 15:3, 21:18, 25:16, 31:24, 50:20, 59:16, 59:18, 63:3, 63:7, 73:10, 85:11, 87:17
**first-ever** [1] - 15:1
**first-named** [1] - 25:16
**Fitzpatrick** [6] - 41:6, 43:22, 74:18, 81:2, 88:8, 90:1
**Fitzpatrick's** [1] - 88:6
**five** [6] - 9:9, 20:16, 20:24, 40:24, 44:23, 94:22
**Floor** [1] - 1:23
**focus** [1] - 89:1
**focusing** [2] - 13:23, 89:22
**folks** [5] - 10:3, 13:20, 44:11, 44:18, 67:5
**follow** [1] - 61:22
**follow-up** [1] - 61:22
**following** [2] - 18:9, 40:6
**footnote** [3] - 52:5, 52:6, 65:12
**Footnote** [2] - 77:17,

78:9
**FOR** [3] - 1:1, 1:11, 2:2
**force** [2] - 41:13, 42:2
**forceful** [1] - 33:14
**foregoing** [1] - 95:18
**forget** [1] - 42:9
**fork** [1] - 15:10
**form** [7] - 53:1, 53:5, 53:11, 54:16, 54:17, 54:18, 55:2
**formal** [1] - 31:13
**former** [2] - 81:11, 86:10
**forms** [7] - 54:15, 62:16, 62:21, 63:18, 63:19, 63:20, 70:23
**forth** [2] - 9:2, 20:4
**forward** [7] - 3:5, 21:10, 25:17, 28:21, 30:7, 32:5, 35:11
**fought** [2] - 13:4, 32:14
**foundational** [2] - 87:1, 87:16
**four** [5] - 10:18, 14:7, 40:24, 41:7, 43:19
**fraction** [2] - 89:10, 89:11
**frankly** [5] - 41:13, 86:6, 88:23, 89:15, 94:14
**fraud** [1] - 44:12
**free** [3] - 14:9, 18:19, 22:18
**frequently** [1] - 95:10
**Friday** [2] - 29:7, 95:1
**Friedman** [3] - 12:11, 16:3, 52:23
**FRIEDMAN** [1] - 1:8
**friend** [1] - 75:11
**friends** [1] - 6:21
**front** [2] - 56:11, 86:7
**frontline** [1] - 76:12
**full** [7] - 17:18, 32:24, 34:5, 34:6, 50:7, 83:17, 95:19
**fully** [4] - 37:8, 37:13, 37:16, 38:10
**functions** [1] - 43:7
**fund** [43] - 16:15, 17:20, 32:23, 33:8, 37:12, 41:23, 42:14, 42:16, 42:19, 42:20, 43:12, 72:10, 72:15, 72:17, 74:8, 74:10, 74:13, 78:21, 80:6, 80:7, 81:22, 83:10, 86:17, 86:18, 87:2, 87:6, 87:7, 87:14,

87:16, 87:17, 87:18,
87:22, 87:23, 87:24,
88:18, 88:21, 88:24,
89:12, 89:24, 92:17
**fundable** [1] - 7:4
**funded** [1] - 16:17
**funding** [2] - 7:3, 7:6
**funds** [7] - 17:24,
33:1, 35:5, 39:1,
39:7, 51:10, 81:23

### G

**garden** [1] - 72:11
**garnered** [1] - 16:21
**gatekeeps** [1] - 23:4
**Gemert** [1] - 88:19
**General** [2] - 2:10, 4:3
**general** [5] - 31:11,
35:22, 66:3, 80:4,
80:13
**General's** [1] - 42:11
**generally** [1] - 72:9
**Geoffrey** [1] - 49:25
**Georgetown** [1] -
86:14
**get-go** [2] - 70:21,
71:14
**given** [9] - 12:18, 13:8,
15:7, 18:5, 18:22,
30:9, 70:2, 75:22,
78:19
**Globe** [1] - 44:14
**glove** [1] - 10:12
**Goldberg** [2] - 23:11,
23:12
**GONZALEZ** [10] - 2:2,
4:1, 30:16, 60:17,
67:19, 79:24, 82:2,
82:22, 84:12, 93:6
**Gonzalez** [1] - 4:2
**goofed** [1] - 70:15
**Government** [1] -
33:15
**government** [32] - 6:2,
17:14, 17:17, 24:14,
24:23, 30:15, 32:6,
35:6, 35:21, 38:24,
47:2, 50:8, 51:11,
52:16, 60:4, 67:17,
68:14, 70:12, 70:13,
72:24, 74:3, 74:12,
74:23, 75:11, 79:20,
79:22, 80:18, 81:3,
82:20, 91:9, 93:2,
93:7
**government's** [6] -
16:6, 35:2, 38:12,
39:7, 58:13, 76:6
**grandchildren** [1] -

29:4
**grant** [1] - 31:17
**granted** [1] - 61:4
**granting** [1] - 8:10
**gravitated** [1] - 72:18
**great** [3] - 5:6, 6:5,
29:9
**greatly** [1] - 28:20
**Greenough** [6] -
43:12, 57:6, 87:2,
87:3, 87:14, 91:20
**Greenough's** [1] -
57:15
**Greenspan** [1] - 50:1
**greeted** [1] - 78:18
**grossly** [2] - 51:9,
85:7
**ground** [2] - 6:5, 6:17
**Group** [1] - 14:1
**group** [1] - 70:22
**groups** [4] - 16:21,
21:8, 21:9, 28:3
**guarantee** [1] - 40:23
**guaranteed** [1] - 33:8
**guard** [1] - 91:7
**guess** [7] - 7:1, 9:16,
48:13, 62:20, 66:11,
71:7, 94:8
**GUPTA** [60] - 1:11,
3:7, 9:18, 11:1,
18:13, 19:25, 20:2,
20:13, 20:16, 21:3,
21:18, 21:22, 23:24,
26:6, 30:13, 50:14,
50:18, 53:5, 53:13,
53:21, 54:1, 54:5,
54:8, 55:22, 56:3,
56:9, 56:15, 56:25,
58:11, 59:13, 60:7,
60:13, 60:16, 63:7,
65:5, 65:15, 66:11,
66:19, 66:23, 67:3,
72:5, 73:13, 73:15,
73:18, 74:9, 76:1,
76:4, 77:2, 77:8,
77:11, 77:16, 78:1,
78:24, 79:6, 79:10,
79:23, 90:14, 91:1,
92:7, 92:12
**Gupta** [17] - 1:12,
1:15, 3:8, 3:24, 9:19,
10:9, 30:12, 30:20,
31:8, 31:15, 32:8,
37:4, 50:13, 61:23,
68:25, 79:25, 90:13
**Gupta's** [2] - 25:25,
36:20
**guy** [9] - 44:16, 49:10,
49:17, 51:1, 51:4,
67:8

**guys** [1] - 51:24

### H

**half** [6] - 28:9, 29:16,
30:3, 40:24, 95:4
**hallmark** [1] - 34:23
**hallway** [2] - 75:11,
79:25
**hand** [1] - 10:12
**handle** [1] - 91:19
**handled** [4] - 4:18,
57:12, 69:3, 69:5
**handling** [2] - 69:1,
69:6
**happenings** [1] - 23:6
**happily** [1] - 4:19
**happy** [10] - 21:6,
22:11, 28:18, 29:20,
30:9, 36:10, 63:10,
72:5, 76:19, 80:3
**hard** [5] - 13:4, 14:21,
32:14, 51:17, 67:10
**hard-fought** [2] - 13:4,
32:14
**harder** [3] - 5:11, 5:22,
5:23
**hardest** [1] - 29:8
**Hartford** [1] - 1:23
**head** [1] - 15:7
**head-on** [1] - 15:7
**Health** [9] - 42:3, 45:3,
77:5, 77:8, 79:2,
79:7, 79:10, 80:9,
86:3
**hear** [23] - 3:15, 8:25,
9:5, 18:25, 21:12,
24:4, 24:5, 26:10,
28:25, 30:15, 36:5,
36:6, 36:10, 46:1,
49:22, 50:6, 50:9,
60:7, 61:17, 61:19,
79:22, 84:13
**heard** [16] - 9:7, 10:2,
12:6, 15:25, 19:2,
36:11, 45:22, 49:21,
50:4, 52:22, 53:20,
74:23, 81:15, 84:17,
91:9, 94:17
**hearing** [12] - 2:18,
8:19, 9:25, 11:23,
12:21, 12:22, 18:25,
35:19, 36:18, 68:14,
92:25
**HEARING** [1] - 1:8
**hearings** [1] - 94:17
**hearsay** [1] - 90:5
**heavily** [1] - 27:6
**heavy** [1] - 27:10
**held** [5] - 2:18, 41:19,

52:15, 86:19, 86:21
**help** [3] - 48:10, 63:4,
72:6
**helped** [2] - 75:12,
80:1
**helpful** [5] - 58:6,
73:5, 76:21, 79:21,
93:15
**helps** [1] - 72:19
**hereby** [1] - 95:18
**high** [2] - 39:12, 48:12
**higher** [2] - 84:2, 88:1
**highly** [2] - 27:3, 30:6
**historic** [1] - 9:20
**history** [3] - 6:11,
14:25, 32:9
**hold** [3] - 15:5, 16:14,
39:22
**holding** [4] - 17:4,
77:22, 78:4
**holdings** [1] - 86:22
**holds** [1] - 82:9
**holes** [2] - 83:4, 93:2
**home** [2] - 27:1, 28:25
**honestly** [1] - 77:3
**honor** [1] - 9:20
**Honor** [42] - 3:7, 3:11,
3:19, 3:23, 4:1, 4:12,
9:18, 21:18, 21:24,
23:22, 23:24, 24:6,
26:4, 26:6, 26:9,
29:9, 30:9, 30:16,
30:21, 34:25, 35:25,
36:13, 38:2, 40:16,
40:19, 41:8, 43:8,
45:19, 45:24, 46:3,
46:25, 50:14, 60:17,
65:5, 67:19, 67:21,
72:5, 80:3, 82:23,
84:21, 85:22, 90:11
**HONORABLE** [1] - 1:8
**hope** [10] - 14:14,
21:1, 26:10, 71:19,
75:21, 76:15, 79:7,
90:17, 92:24, 93:4
**hopefully** [2] - 75:17,
76:21
**HOROWITZ** [10] - 2:2,
4:1, 30:16, 60:17,
67:19, 79:24, 82:2,
82:22, 84:12, 93:6
**Horowitz** [1] - 4:2
**Hospital** [1] - 79:2
**hospital** [4] - 80:8,
82:6, 86:16, 87:12
**hourly** [3] - 40:25,
62:2, 78:4
**hours** [7] - 25:1,
29:15, 56:23, 62:2,
69:15, 72:21, 89:12

**House** [1] - 18:10
**housing** [1] - 48:7
**Housing** [1] - 48:8
**Howell** [1] - 81:12
**humbly** [1] - 75:3
**hundreds** [4] - 12:2,
19:8, 55:18, 63:15
**Huvelle** [9] - 4:20, 6:1,
6:15, 6:17, 7:2, 7:21,
16:4, 17:7
**Huvelle's** [1] - 16:12

### I

**i.e** [1] - 2:19
**ID** [1] - 69:13
**idea** [2] - 52:8, 81:24
**identified** [2] - 69:12,
80:10
**identifying** [1] - 64:22
**identity** [1] - 15:24
**ignored** [1] - 15:23
**iii** [1] - 40:3
**ill** [1] - 51:19
**ill-served** [1] - 51:19
**illegal** [2] - 11:11,
52:16
**Illinois** [2] - 52:7,
65:17
**imagine** [1] - 89:1
**immunity** [1] - 14:23
**impact** [2] - 22:24,
28:2
**impermissible** [1] -
57:17
**important** [13] - 12:7,
12:8, 17:8, 21:14,
23:4, 25:20, 44:5,
44:21, 67:15, 91:3,
91:12, 93:18, 93:25
**improper** [1] - 44:1
**inadvertently** [1] -
71:15
**inapplicable** [1] - 78:5
**inappropriate** [4] -
43:23, 51:9, 82:25,
85:7
**incentive** [4] - 56:11,
56:17, 57:16, 87:4
**inception** [4] - 4:21,
26:18, 28:9, 32:7
**include** [2] - 62:2,
62:3
**included** [3] - 37:24,
46:23, 88:5
**includes** [7] - 19:13,
19:14, 19:15, 19:16,
37:5, 37:15, 47:19
**including** [7] - 8:12,
19:13, 21:16, 24:17,

40:12, 65:23, 91:22
**income** [1] - 26:25
**incorrect** [4] - 59:13, 70:5, 70:10, 70:14
**increased** [1] - 61:5
**incur** [2] - 47:20, 49:10
**incurred** [6] - 7:19, 23:19, 24:15, 25:23, 61:3, 87:8
**indeed** [1] - 13:7
**indicate** [3] - 10:21, 53:2, 53:6
**indicated** [2] - 36:19, 50:3
**indicates** [2] - 42:1, 42:4
**indicating** [1] - 69:2
**indicating)** [1] - 95:3
**indiscernible)** [1] - 29:10
**individual** [7] - 12:18, 19:21, 24:18, 25:19, 34:2, 63:25, 94:18
**individuals** [4] - 33:16, 70:4, 70:10, 70:20
**inequitable** [1] - 33:6
**inequitably** [1] - 38:23
**inflation** [1] - 72:21
**inform** [1] - 23:5
**informal** [1] - 32:15
**information** [16] - 5:3, 7:20, 23:4, 23:5, 25:18, 31:7, 33:22, 44:22, 53:11, 53:12, 54:19, 55:15, 55:16, 76:15, 80:25, 83:16
**informative** [1] - 93:17
**informed** [2] - 13:6, 32:16
**inhibit** [1] - 13:19
**initial** [3] - 80:19, 81:21, 82:14
**injunctive** [1] - 14:19
**injury** [2] - 85:24
**ink** [1] - 75:9
**input** [1] - 25:13
**inquiries** [2] - 19:21, 25:17
**inquiry** [1] - 25:19
**instance** [1] - 33:25
**instituted** [1] - 47:12
**institutional** [2] - 34:18, 34:21
**institutions** [4] - 15:13, 15:17, 56:14, 94:1
**intensive** [1] - 85:25
**intent** [2] - 34:8, 36:19

**interest** [9] - 18:6, 19:20, 22:17, 27:15, 27:24, 34:1, 39:1, 39:2, 89:16
**interested** [1] - 5:17
**interesting** [1] - 50:21
**interests** [6] - 23:3, 26:25, 31:1, 72:20, 89:14, 89:16
**interference** [1] - 2:19
**internal** [1] - 69:2
**introduce** [2] - 10:21, 44:2
**invalid** [1] - 70:25
**invoices** [1] - 46:14
**involved** [5] - 18:1, 20:3, 28:8, 31:24, 91:10
**involves** [1] - 94:1
**involving** [1] - 79:19
**ironic** [1] - 38:24
**irrelevant** [1] - 76:10
**Isaacson** [6] - 4:10, 21:16, 36:7, 36:15, 45:20, 49:24
**ISAACSON** [24] - 2:7, 4:7, 4:9, 36:13, 38:2, 39:24, 40:2, 40:8, 40:16, 40:19, 41:22, 41:25, 43:8, 43:11, 45:13, 45:18, 84:21, 85:2, 85:14, 85:17, 85:22, 87:1, 89:19, 90:10
**isaacson** [13] - 51:25, 57:4, 61:20, 65:16, 66:12, 73:3, 84:13, 84:14, 90:12, 90:24, 91:18, 92:19, 93:14
**Isaacson's** [1] - 50:20
**isaacson's** [5] - 51:2, 51:7, 54:6, 55:23, 92:14
**issue** [11] - 13:20, 48:8, 52:21, 52:24, 52:25, 54:10, 55:25, 58:11, 60:20, 67:15, 92:22
**issues** [10] - 13:24, 14:2, 22:24, 45:16, 48:7, 52:18, 58:8, 63:6, 71:25, 76:7
**itself** [5] - 7:4, 12:4, 17:15, 80:14, 90:21

**J**

**J.T** [1] - 81:11
**Jake** [4] - 10:23, 11:1, 21:22, 22:2

**Jiggets** [1] - 50:1
**job** [4] - 30:4, 39:1, 63:5, 94:7
**John** [1] - 10:8
**joined** [1] - 11:7
**joining** [1] - 11:15
**Jolla** [1] - 2:8
**Jonathan** [1] - 3:24
**JONATHAN** [2] - 1:11, 1:15
**Journal** [1] - 86:14
**journalists** [1] - 19:14
**judge** [7] - 5:7, 6:18, 28:10, 28:24, 44:6, 44:15, 94:19
**JUDGE** [1] - 1:9
**Judge** [20] - 4:19, 4:20, 6:1, 6:15, 6:16, 7:2, 7:21, 12:11, 16:3, 16:12, 17:7, 49:18, 52:23, 81:10, 81:12, 86:10, 92:2, 94:17, 95:3
**Judges** [1] - 95:5
**judges** [10] - 15:25, 16:19, 32:17, 42:21, 81:4, 86:10, 86:12, 92:5, 94:20, 94:23
**judgment** [1] - 17:4
**Judicial** [3] - 15:8, 18:18, 34:15
**judicial** [6] - 15:12, 15:16, 17:13, 33:13, 72:23, 78:2
**Judiciary** [1] - 18:17
**judiciary** [10] - 14:5, 14:12, 14:18, 15:2, 15:5, 15:10, 16:7, 17:4, 22:20, 34:9
**July** [1] - 49:2
**jump** [2] - 18:7, 72:6
**jump-started** [1] - 18:7
**jurisdiction** [2] - 14:21, 14:22
**jurisdictional** [2] - 18:22, 19:7
**juror** [2] - 7:12, 7:13
**Justice** [13] - 2:3, 4:16, 6:4, 11:2, 15:10, 15:21, 21:23, 22:10, 22:15, 25:7, 68:3, 94:8, 94:9
**justice** [5] - 11:2, 13:19, 22:3, 22:21, 51:24
**Justices** [1] - 94:8
**justification** [1] - 80:20
**justified** [2] - 33:25,

34:1
**justifies** [1] - 58:2

**K**

**KCC** [2] - 20:6, 20:12
**keep** [1] - 11:19
**Kelly** [1] - 11:4
**kind** [16] - 8:2, 12:12, 52:7, 54:9, 56:6, 57:7, 63:3, 66:3, 73:18, 74:6, 76:21, 79:17, 85:10, 91:8, 91:13, 92:21
**kinds** [2] - 42:12, 73:20
**King** [1] - 79:14
**known** [1] - 24:10
**Kozich** [8] - 45:25, 46:2, 49:19, 49:25, 58:11, 60:24, 93:15
**KOZICH** [9] - 2:14, 45:24, 46:3, 46:25, 47:2, 67:21, 67:23, 68:2, 68:16
**Kozich's** [2] - 58:14, 60:25

**L**

**labor** [1] - 85:25
**lack** [2] - 14:21, 42:22
**Laffey** [1] - 42:11
**landmark** [5] - 17:3, 17:17, 30:20, 31:9, 75:1
**language** [2] - 77:13, 78:19
**large** [15] - 17:10, 37:16, 38:4, 38:5, 38:13, 38:14, 38:15, 38:21, 40:23, 49:8, 51:25, 79:19, 89:13, 91:15
**largely** [1] - 24:21
**larger** [3] - 38:20, 89:4, 89:5
**largest** [4] - 19:14, 34:13, 37:5, 37:6
**last** [9] - 11:14, 21:17, 22:4, 23:10, 29:16, 29:22, 30:3, 36:8, 67:12
**late** [5] - 20:25, 36:22, 69:16, 70:25, 94:15
**laughed** [1] - 15:15
**law** [42] - 5:1, 5:22, 16:14, 19:13, 19:14, 21:8, 24:19, 24:24, 25:1, 26:22, 27:5,

27:6, 37:5, 37:6, 37:13, 37:23, 38:4, 38:7, 42:15, 44:19, 49:8, 51:25, 52:13, 53:20, 54:24, 56:19, 57:18, 62:1, 62:25, 65:8, 65:22, 66:8, 66:15, 67:13, 80:5, 82:9, 83:8, 83:23, 84:3, 89:2, 89:6, 93:24
**Law** [8] - 2:13, 4:16, 11:16, 26:8, 26:17, 26:19, 28:8, 29:19
**laws** [2] - 27:7, 27:20
**lawsuit** [1] - 47:23
**lawyer** [2] - 13:25, 69:5
**lawyers** [8] - 5:1, 14:10, 39:8, 40:22, 58:1, 72:20, 91:5, 94:5
**lawyers'** [2] - 5:23, 94:11
**lead** [1] - 27:14
**leadership** [1] - 94:7
**leading** [1] - 11:17
**leads** [1] - 82:15
**least** [7] - 11:14, 14:6, 19:9, 43:5, 64:24, 81:24, 83:9
**led** [1] - 16:11
**left** [1] - 74:6
**legal** [20] - 15:7, 23:10, 26:22, 27:15, 27:24, 28:4, 31:10, 37:25, 52:14, 54:5, 54:7, 54:8, 56:1, 57:5, 57:15, 57:22, 61:19, 61:20, 62:8, 65:6
**LEGAL** [1] - 1:2
**Legal** [9] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9, 26:20, 86:14
**legislation** [2] - 18:19, 18:20
**legislative** [2] - 6:11, 18:7
**legislature** [1] - 16:11
**legitimate** [4] - 6:8, 7:7, 7:9, 32:20
**legwork** [1] - 83:19
**Lending** [1] - 27:17
**length** [7] - 7:25, 13:6, 31:18, 32:2, 39:4, 74:11, 80:9
**less** [7] - 8:4, 47:7, 47:8, 48:4, 59:8,

68:5, 82:5
**lesser** [2] - 59:20, 59:23
**letting** [1] - 64:5
**level** [2] - 15:25
**liability** [1] - 16:4
**liaison** [1] - 53:13
**libraries** [1] - 16:21
**life** [2] - 16:10, 23:20
**light** [2] - 16:8, 47:6
**limitations** [4] - 2:18, 18:23, 19:7, 54:25
**limited** [2] - 7:18, 27:25
**limits** [1] - 23:5
**line** [9] - 8:24, 20:8, 44:6, 44:9, 57:24, 58:7, 71:2
**litigants** [3] - 19:17, 21:10, 72:23
**litigating** [1] - 34:22
**Litigation** [3] - 2:11, 2:13, 14:1
**litigation** [40] - 11:8, 11:15, 12:3, 13:4, 13:9, 13:15, 13:21, 14:6, 14:7, 14:11, 14:18, 14:20, 14:25, 15:18, 15:20, 18:4, 18:22, 23:11, 24:9, 25:9, 25:15, 26:7, 28:2, 29:23, 31:2, 31:13, 31:25, 32:5, 32:14, 35:7, 35:11, 44:12, 45:9, 51:17, 72:22, 73:20, 81:5, 81:9
**litigator** [1] - 19:13
**lives** [2] - 94:11, 94:12
**LLC** [1] - 1:19
**LLP** [1] - 1:12
**lodestar** [49] - 41:1, 41:12, 41:15, 41:22, 42:4, 42:5, 42:6, 42:9, 42:16, 42:17, 42:18, 42:20, 43:6, 43:19, 44:7, 44:24, 45:8, 72:1, 72:2, 72:9, 75:8, 75:14, 75:17, 76:9, 77:10, 77:19, 78:8, 78:17, 80:12, 80:21, 81:1, 81:2, 81:23, 81:24, 83:7, 84:1, 86:4, 86:5, 86:7, 86:13, 88:12, 88:15, 88:16, 88:20, 89:21, 92:15
**lodged** [1] - 34:17
**log** [1] - 69:2
**logical** [2] - 50:5,

61:16
**long-standing** [2] - 33:13, 52:14
**look** [8] - 40:25, 51:22, 76:10, 78:15, 84:18, 88:25, 92:13, 94:21
**looking** [5] - 28:21, 48:6, 75:5, 75:19, 75:20
**looks** [1] - 81:9
**Loper** [2] - 10:12, 69:4
**LOPER** [1] - 1:18
**lost** [2] - 46:17, 49:5
**LOTH** [1] - 95:18
**Loth** [2] - 2:15, 95:24
**love** [1] - 28:15
**low** [2] - 26:25, 39:11
**low-income** [1] - 26:25
**lower** [2] - 84:4, 87:18

## M

**machine** [1] - 2:21
**maintain** [1] - 27:10
**maintenance** [1] - 34:12
**majority** [3] - 17:18, 34:12, 38:6
**management** [2] - 7:6, 88:23
**mandates** [1] - 47:3
**manner** [1] - 20:4, 24:12, 95:22
**manuals** [1] - 27:5
**marginal** [1] - 47:4
**margins** [1] - 47:4
**market** [2] - 23:21, 81:8
**marriage** [1] - 34:21
**Mashburn** [1] - 87:13
**Massachusetts** [2] - 29:17, 44:13
**master** [1] - 94:21
**materials** [1] - 27:11
**matrix** [4] - 42:10, 42:11, 81:2, 88:6
**Matrix** [1] - 42:11
**matter** [14] - 9:19, 12:9, 37:25, 52:11, 52:19, 54:5, 56:24, 62:9, 62:25, 65:6, 65:8, 80:13, 89:21
**matters** [1] - 90:6
**maximize** [1] - 89:3
**maximizes** [1] - 89:14
**Mayorkas** [1] - 81:10
**mean** [7] - 57:10, 69:15, 79:6, 82:24, 87:15, 88:4, 92:4

**means** [1] - 37:19
**measure** [5] - 18:3, 18:16, 21:11, 51:5, 51:13
**mechanics** [1] - 10:14
**media** [3] - 16:20, 16:22, 19:15
**mediation** [1] - 31:25
**mediator** [1] - 32:4
**meets** [2] - 12:23, 31:10
**Meghan** [4] - 3:13, 3:21, 10:11, 10:16
**MEGHAN** [1] - 1:18
**member** [16] - 17:21, 19:23, 20:2, 20:18, 22:17, 22:22, 32:25, 36:15, 46:10, 46:18, 53:25, 59:19, 59:21, 61:9, 69:1
**members** [24] - 10:1, 12:17, 13:11, 18:3, 18:25, 19:1, 19:9, 19:21, 20:5, 25:19, 30:18, 30:23, 31:9, 31:20, 33:2, 33:24, 37:2, 38:17, 38:22, 39:2, 44:8, 73:22, 75:1, 91:2
**mention** [2] - 56:5, 81:15
**mentioned** [15] - 12:15, 17:2, 18:24, 20:24, 32:7, 52:24, 61:6, 63:14, 65:12, 66:13, 68:25, 74:2, 86:16, 88:3, 91:12
**mentions** [1] - 73:21
**Mercier** [3] - 81:17, 88:3
**merely** [1] - 86:9
**met** [1] - 51:5
**method** [1] - 80:6
**MEYERS** [1] - 2:10
**Meyers** [2] - 4:3, 5:10
**microphone** [3] - 3:16, 10:24, 54:13
**middle** [3] - 6:5, 6:17, 16:4
**might** [13] - 8:5, 11:22, 14:11, 52:10, 56:18, 59:3, 65:7, 73:5, 78:11, 87:13, 91:3, 91:25, 95:2
**miles** [1] - 47:6
**military** [1] - 25:4
**mill** [1] - 75:6
**Miller** [2] - 50:1, 66:9
**Miller's** [2] - 50:23, 50:25

**million** [9] - 17:20, 32:24, 41:5, 74:21, 82:13, 82:15, 82:24
**millions** [1] - 15:11
**mind** [2] - 43:5, 74:3
**minded** [1] - 15:17
**minimal** [1] - 89:11
**minimum** [10] - 38:13, 38:14, 38:15, 38:17, 38:20, 39:12, 50:24, 59:19, 67:7, 89:10
**minutes** [6] - 9:4, 9:7, 9:9, 9:13, 61:14, 61:15
**Mirola** [1] - 2:7
**misled** [1] - 71:15
**misread** [1] - 68:6
**misreading** [1] - 59:14
**misrepresents** [1] - 87:16
**missed** [2] - 52:5, 71:16
**Mississippi** [1] - 7:10
**misspoke** [1] - 68:23
**misunderstanding** [1] - 60:2
**misunderstood** [2] - 71:14, 90:18
**modern** [2] - 51:14, 57:16
**modern-day** [1] - 57:16
**modest** [1] - 58:2
**moliver@motleyrice.com** [1] - 1:21
**moment** [2] - 31:22, 86:15
**momentarily** [1] - 33:5
**monetary** [1] - 15:2
**money** [12] - 14:13, 18:2, 19:16, 44:17, 46:7, 47:8, 48:23, 49:10, 49:14, 49:17, 88:25, 94:1
**months** [1] - 16:15
**Moore** [1] - 79:14
**moreover** [1] - 34:9
**morning** [24] - 3:7, 3:9, 3:11, 3:19, 3:23, 4:1, 4:6, 4:7, 4:10, 4:13, 9:18, 10:5, 11:18, 21:24, 21:25, 22:1, 24:3, 28:22, 30:16, 36:12, 36:13, 43:1, 93:14, 94:15
**most** [10] - 17:25, 22:25, 39:8, 44:8, 49:9, 78:20, 78:21, 88:24, 89:13, 95:8
**mostly** [1] - 7:15

**motion** [6] - 8:10, 16:6, 23:13, 35:19, 35:22, 43:25
**motions** [3] - 94:17, 95:1
**motivation** [1] - 29:10
**Motley** [7] - 1:19, 3:12, 3:20, 3:21, 10:11, 10:13, 10:16
**mounting** [1] - 15:7
**mouth** [1] - 57:2
**move** [6] - 35:11, 68:21, 71:22, 90:4, 90:8
**moving** [1] - 32:5
**MR** [103] - 3:7, 3:11, 3:19, 3:23, 4:7, 4:9, 9:18, 11:1, 18:13, 19:25, 20:2, 20:13, 20:16, 21:3, 21:18, 21:22, 21:24, 22:1, 22:6, 22:9, 23:24, 26:6, 26:9, 26:12, 28:14, 28:17, 29:2, 29:9, 30:13, 36:13, 38:2, 39:24, 40:2, 40:8, 40:16, 40:19, 41:22, 41:25, 43:8, 43:11, 45:13, 45:18, 45:24, 46:3, 46:25, 47:2, 50:14, 50:18, 53:5, 53:13, 53:21, 54:1, 54:5, 54:8, 55:22, 56:3, 56:9, 56:15, 56:25, 58:11, 59:13, 60:7, 60:13, 60:16, 63:7, 65:5, 65:15, 66:11, 66:19, 66:23, 67:3, 67:21, 67:23, 68:2, 68:16, 72:5, 73:13, 73:15, 73:18, 74:9, 76:1, 76:4, 77:2, 77:8, 77:11, 77:16, 78:1, 78:24, 79:6, 79:10, 79:23, 84:21, 85:2, 85:14, 85:17, 85:22, 87:1, 89:19, 90:10, 90:14, 91:1, 92:7, 92:12
**MS** [31] - 3:21, 4:1, 24:3, 24:6, 30:16, 54:15, 60:17, 63:13, 63:24, 64:11, 64:13, 64:17, 65:1, 67:19, 68:22, 68:25, 69:21, 69:24, 70:8, 70:19, 71:5, 71:7, 71:11, 71:17, 71:19, 71:21, 79:24, 82:2, 82:22,

84:12, 93:6
**Mt** [1] - 1:20
**multiple** [2] - 20:3,
61:3
**multiplier** [5] - 75:20,
83:24, 88:10, 88:16,
89:13
**must** [6] - 4:19, 17:17,
18:12, 28:9, 31:1,
86:18
**muster** [1] - 16:18

# N

**name** [4] - 22:2, 22:4,
24:7, 86:15
**named** [7] - 23:7,
25:10, 25:16, 26:17,
56:8, 56:12, 79:6
**Narwold** [5] - 3:12,
3:20, 10:11, 60:6,
74:4
**NARWOLD** [3] - 1:22,
3:11, 3:19
**Nathan** [1] - 92:2
**nation** [1] - 15:16
**national** [5] - 22:15,
24:11, 26:21, 28:3,
28:4
**National** [15] - 2:12,
2:13, 3:3, 4:15, 11:5,
11:8, 11:16, 23:25,
24:9, 26:7, 26:16,
26:19, 28:7, 29:19
**NATIONAL** [1] - 1:2
**nationwide** [1] - 16:7
**nature** [2] - 13:15,
25:8
**NCLC** [3] - 27:3, 27:4,
29:23
**necessarily** [1] - 12:3
**necessary** [5] - 8:3,
14:10, 41:9, 41:17,
75:22
**need** [16] - 8:15, 18:6,
30:24, 34:23, 40:21,
41:16, 43:14, 45:10,
45:11, 50:7, 77:23,
88:11, 93:9, 93:16,
94:12
**needed** [1] - 7:18
**needs** [3] - 43:13,
86:5, 93:4
**negotiated** [4] - 31:18,
32:2, 38:15, 83:15
**negotiation** [7] - 8:1,
13:6, 31:25, 32:20,
73:8, 74:2, 74:11
**negotiations** [3] -
38:25, 39:4, 51:11

**net** [4] - 48:16, 48:18,
48:21
**never** [5] - 10:6, 14:4,
15:22, 46:6
**new** [7] - 16:10, 69:20,
69:21, 71:3, 71:4,
71:9, 85:8
**New** [2] - 29:5, 92:2
**next** [1] - 23:24
**night** [2] - 21:17, 36:8
**nobody** [1] - 64:12
**noncommercial** [1] -
18:19
**none** [5] - 20:9, 21:10,
50:2, 50:3, 91:16
**nonprofit** [3] - 24:11,
26:23, 27:24
**nonprofits** [2] - 49:9,
49:16
**normal** [1] - 42:16
**North** [1] - 1:12
**Northern** [3] - 52:7,
65:17, 86:11
**notable** [2] - 17:25,
91:17
**note** [2] - 88:17, 89:20
**noted** [5] - 13:22,
32:3, 32:17, 34:19,
81:3
**notes** [3] - 33:16,
84:17, 95:19
**nothing** [5] - 5:8, 33:6,
58:18, 93:6, 95:2
**notice** [22] - 10:15,
12:6, 12:16, 12:18,
12:19, 52:22, 69:19,
70:5, 70:10, 70:14,
70:15, 70:16, 70:20,
73:22, 77:18, 77:25,
80:12, 85:3, 85:5,
85:8, 85:9, 85:11
**notices** [7] - 8:12,
8:14, 62:10, 62:13,
63:14, 63:15, 63:16
**noticing** [1] - 7:8
**notification** [10] -
7:11, 54:16, 54:17,
54:18, 55:12, 63:18,
63:19, 63:20, 64:5
**notifications** [9] -
55:1, 55:6, 55:7,
55:18, 55:19, 55:20,
63:24, 64:18, 64:20
**notified** [5] - 5:4, 5:15,
64:21
**notify** [1] - 55:3
**notifying** [3] - 54:20,
55:7, 63:25
**noting** [1] - 17:6
**notion** [1] - 72:25,

85:10, 87:25
**null** [1] - 95:21
**number** [13] - 19:10,
20:14, 21:5, 36:7,
49:3, 56:22, 69:3,
69:4, 69:11, 76:7,
79:13
**numerous** [3] - 8:17,
16:20, 68:25
**NVLSP** [7] - 24:10,
24:16, 24:25, 25:10,
25:16, 25:23, 26:2
**NW** [3] - 1:12, 1:16,
2:4

# O

**object** [1] - 85:9
**objected** [1] - 56:4
**objecting** [4] - 46:21,
46:22, 85:6, 91:17
**objection** [12] - 36:16,
37:7, 46:1, 50:20,
50:23, 51:7, 52:8,
55:23, 57:4, 65:16,
91:24
**objections** [18] - 9:10,
12:21, 19:10, 20:8,
20:15, 20:16, 20:24,
21:15, 34:20, 36:9,
44:4, 49:24, 50:2,
50:6, 50:11, 50:19,
50:22, 61:12
**objector** [4] - 4:11,
73:3, 90:7, 91:23
**Objector** [1] - 2:14
**objectors** [11] - 8:18,
9:6, 21:12, 33:23,
34:17, 45:21, 45:22,
49:20, 49:25, 60:8,
68:19
**obligations** [1] - 90:25
**obtain** [2] - 14:16,
24:23
**obtained** [1] - 16:6
**obviously** [1] - 27:7
**occasions** [1] - 30:3
**occur** [1] - 52:21
**occurred** [3] - 12:18,
13:10, 57:7
**October** [2] - 1:5, 8:20
**odds** [3] - 15:7, 18:5,
88:1
**OF** [3] - 1:1, 1:5, 1:8
**Office** [12] - 2:10, 4:4,
6:3, 6:6, 15:20, 16:9,
32:12, 35:4, 47:18,
94:3, 94:4, 94:10
**office** [3] - 5:15, 69:5,
94:24

**Office's** [2] - 33:12,
34:1
**Official** [1] - 2:16
**official** [1] - 95:25
**often** [3] - 6:22, 51:25,
88:17
**old** [1] - 94:16
**older** [1] - 85:8
**OLIVER** [21] - 1:18,
3:21, 54:15, 63:13,
63:24, 64:11, 64:13,
64:17, 65:1, 68:22,
68:25, 69:21, 69:24,
70:8, 70:19, 71:5,
71:7, 71:11, 71:17,
71:19, 71:21
**Oliver** [17] - 3:13,
3:21, 10:11, 10:16,
21:4, 36:5, 50:9,
53:13, 53:19, 54:10,
54:13, 61:17, 61:24,
63:9, 68:19, 74:4,
93:9
**once** [6] - 44:19, 55:6,
55:9, 59:25, 63:24
**one** [67] - 12:1, 12:10,
14:11, 19:9, 20:17,
20:21, 25:10, 33:9,
33:23, 36:8, 37:3,
38:12, 38:19, 38:23,
39:22, 40:14, 43:18,
44:19, 46:4, 46:9,
47:7, 47:8, 47:13,
47:14, 54:16, 55:25,
58:16, 59:2, 61:22,
62:7, 62:12, 62:16,
63:5, 65:21, 66:1,
67:12, 71:25, 73:3,
74:16, 75:10, 76:8,
76:16, 77:21, 78:4,
79:4, 79:9, 79:11,
80:7, 81:14, 81:20,
84:22, 84:23, 85:23,
86:1, 87:3, 87:17,
87:18, 88:4, 89:1,
89:4, 90:24, 91:20,
91:21, 91:25, 92:5,
95:5
**one-third** [4] - 74:16,
84:23, 85:23, 86:1
**ones** [5] - 34:19,
50:11, 70:6, 79:6,
90:3
**open** [1] - 15:17
**opening** [6] - 9:5,
30:1, 30:2, 30:13,
32:8, 60:21
**openings** [1] - 9:17
**operation** [1] - 7:3
**opinion** [8] - 6:9, 6:13,

6:19, 7:22, 17:3,
39:16, 78:14, 92:8
**opinions** [1] - 90:2
**opportunity** [14] -
12:6, 30:17, 69:16,
69:18, 69:20, 69:24,
70:2, 70:3, 70:11,
70:16, 70:17, 70:24,
71:1, 71:16
**Opportunity** [1] -
27:19
**oppose** [1] - 82:23
**opposed** [5] - 19:2,
34:20, 49:7, 49:13,
50:22
**opposite** [2] - 51:3,
66:15
**opt** [27] - 20:25, 21:6,
36:6, 50:9, 61:17,
61:18, 68:22, 68:23,
68:24, 69:10, 69:11,
69:16, 69:18, 69:20,
69:24, 70:2, 70:3,
70:5, 70:11, 70:16,
70:17, 70:24, 70:25,
71:1, 71:16, 85:4
**opt-out** [1] - 36:6
**opt-outs** [9] - 21:6,
50:9, 61:17, 68:22,
68:23, 68:24, 69:10,
69:11, 70:25
**opted** [1] - 71:10
**order** [9] - 8:9, 8:20,
9:2, 24:23, 27:10,
27:16, 33:20, 36:17,
58:5
**orders** [2] - 5:14, 8:21
**ordinarily** [1] - 44:2
**ordinary** [2] - 56:21,
56:22
**Oregon** [1] - 48:9
**organization** [10] -
22:16, 22:22, 24:12,
24:16, 26:20, 26:24,
27:9, 28:3, 28:4,
28:19
**organizations** [11] -
16:20, 19:15, 20:10,
22:17, 22:23, 23:2,
27:14, 27:15, 27:24,
27:25, 28:5
**organized** [1] - 77:4
**orientation** [1] - 76:21
**originally** [2] - 4:18,
26:20
**Ortiz** [3] - 51:15,
66:16, 66:19
**otherwise** [3] - 35:5,
50:3, 91:3
**ought** [1] - 42:4

**ourselves** [1] - 27:10
**out-of-court** [1] - 90:5
**outcome** [2] - 18:21, 30:6
**outlasted** [1] - 28:10
**outlays** [1] - 87:8
**outs** [9] - 21:6, 50:9, 61:17, 68:22, 68:23, 68:24, 69:10, 69:11, 70:25
**outset** [1] - 90:17
**outside** [1] - 72:10
**outstanding** [4] - 30:4, 31:8, 61:7, 75:1
**overall** [1] - 24:21
**overcharged** [1] - 17:5
**overcharging** [1] - 15:5
**oversaw** [1] - 23:11
**overwhelmingly** [1] - 72:16
**owe** [1] - 68:10
**owed** [1] - 49:1
**own** [4] - 14:7, 28:2, 63:23, 79:3
**ownership** [1] - 27:1

# P

**p.m** [2] - 5:21, 95:15
**Pacer** [88] - 4:18, 4:24, 4:25, 5:17, 5:25, 7:4, 7:17, 13:17, 13:24, 14:8, 14:9, 16:10, 16:15, 16:17, 16:25, 17:1, 17:18, 17:19, 17:22, 18:7, 18:15, 18:19, 19:6, 22:23, 25:15, 27:4, 27:10, 27:16, 27:23, 34:5, 34:12, 34:14, 37:8, 37:10, 37:11, 37:14, 37:16, 37:20, 37:25, 46:6, 46:11, 46:13, 46:15, 46:17, 47:3, 47:11, 47:12, 47:20, 48:2, 48:4, 48:5, 48:11, 48:12, 48:13, 48:16, 49:1, 49:4, 52:2, 52:17, 53:2, 53:6, 54:20, 54:22, 55:3, 55:5, 55:8, 55:13, 58:16, 58:18, 58:23, 59:7, 59:21, 59:22, 62:5, 64:1, 64:6, 64:19, 64:22, 68:3, 68:8, 68:9, 68:11, 93:22, 94:6
**Pacer-fee** [2] - 14:8,
19:6
**page** [9] - 47:8, 47:15, 47:18, 48:2, 52:6, 59:4, 59:15, 92:3, 92:13
**paid** [37] - 15:11, 17:22, 17:23, 32:25, 33:2, 34:7, 44:17, 52:17, 53:2, 53:6, 54:20, 54:23, 55:3, 55:5, 55:8, 55:13, 59:7, 59:8, 59:10, 59:12, 59:21, 60:1, 61:8, 62:6, 64:1, 64:6, 64:19, 64:22, 65:8, 66:4, 67:9, 67:16, 68:3, 68:5, 68:8, 88:24, 89:13
**paper** [3] - 5:7, 47:20, 70:23
**papers** [5] - 20:23, 39:16, 60:9, 60:11, 60:12
**paragraph** [4] - 6:19, 59:16, 73:21, 74:20
**paraphrase** [1] - 53:24
**pardon** [2] - 85:14, 86:21
**part** [13] - 14:24, 21:14, 32:19, 38:10, 39:23, 44:8, 44:10, 48:16, 64:13, 68:4, 69:25, 70:22, 85:20
**participate** [2] - 9:1, 17:12
**participating** [3] - 12:3, 56:11, 73:23
**particular** [5] - 26:15, 51:7, 54:24, 83:12, 86:25
**particularly** [2] - 10:16, 13:8
**parties** [18] - 6:14, 8:17, 9:3, 11:24, 30:17, 31:21, 32:3, 32:4, 32:15, 32:19, 33:12, 34:19, 35:13, 67:6, 72:21, 73:8, 83:14, 90:24
**parties'** [4] - 31:6, 32:3, 33:10, 34:22
**partner** [1] - 62:1
**partnered** [1] - 26:20
**party** [2] - 53:25, 95:22
**passed** [4] - 18:10, 18:14, 18:15, 54:23
**passing** [1] - 66:4
**passing-off** [1] - 66:4
**past** [1] - 17:19
**path** [2] - 13:21, 16:4
**PAUL** [1] - 1:8
**pay** [16] - 5:18, 19:1, 37:9, 46:11, 46:13, 47:11, 48:4, 48:5, 48:11, 48:24, 58:18, 58:23, 59:23, 61:2, 68:9, 91:15
**payable** [1] - 4:24
**payees** [1] - 38:21
**payer** [1] - 54:18
**paying** [3] - 54:22, 59:8, 91:15
**payment** [16] - 14:14, 33:8, 38:13, 38:14, 38:15, 38:17, 38:21, 40:12, 54:16, 54:18, 55:7, 55:19, 55:20, 59:20, 64:18, 65:24
**payments** [2] - 33:7, 38:9
**payor** [1] - 64:22
**paywall** [2] - 14:8, 19:6
**pennies** [1] - 47:9
**pens** [1] - 94:14
**people** [35] - 3:15, 8:22, 8:23, 10:5, 10:18, 12:2, 12:5, 12:19, 15:5, 15:11, 17:5, 36:11, 37:20, 38:17, 46:15, 49:7, 52:11, 52:19, 52:20, 53:2, 53:6, 54:4, 57:13, 59:8, 61:18, 65:9, 68:5, 68:8, 68:11, 71:8, 93:25
**per** [4] - 47:6, 47:8, 47:14, 47:18
**percent** [33] - 17:1, 44:24, 73:11, 73:24, 74:1, 74:13, 74:14, 82:14, 82:25, 83:10, 84:1, 84:5, 84:24, 85:3, 85:4, 87:14, 87:15, 87:17, 87:18, 87:19, 87:20, 87:25, 88:1, 88:7, 88:9, 88:14, 88:15, 88:16, 88:18, 88:24, 89:12
**percentage** [35] - 41:14, 41:23, 42:15, 42:18, 42:19, 43:15, 72:1, 72:2, 72:8, 72:14, 72:16, 72:19, 72:25, 73:2, 73:6, 73:9, 74:15, 74:22, 75:19, 76:11, 76:12, 76:17, 76:20, 78:16, 80:6, 81:22, 82:21,
86:6, 86:8, 86:18, 87:8, 88:21, 89:5
**Perdue** [1] - 45:6
**perfect** [4] - 19:3, 30:24, 31:15, 34:23
**performing** [1] - 75:17
**perhaps** [4] - 80:10, 82:3, 82:5, 84:4
**period** [23] - 17:22, 23:8, 32:14, 33:1, 33:3, 46:12, 47:15, 47:23, 47:25, 48:3, 48:4, 48:17, 48:18, 49:2, 52:22, 58:17, 59:22, 61:3, 69:22, 71:4, 71:6, 71:9
**permissible** [1] - 33:24
**permits** [1] - 33:17
**permitted** [1] - 35:5
**person** [12] - 8:24, 10:2, 11:10, 36:9, 36:19, 52:15, 52:17, 58:22, 66:1, 66:2, 66:4, 69:13
**personal** [3] - 57:12, 85:24
**personally** [2] - 31:24, 69:6
**personnel** [1] - 24:13
**persons** [5] - 33:19, 33:20, 46:4, 59:7
**perspective** [1] - 94:13
**persuaded** [1] - 79:8
**persuasive** [1] - 82:8
**Pettus** [1] - 87:18
**phase** [1] - 31:25
**phone** [1] - 69:3
**photocopied** [1] - 95:21
**picked** [2] - 48:3
**piles** [2] - 94:24, 94:25
**plaintiff** [2] - 23:7, 25:16
**Plaintiffs** [1] - 1:3
**plaintiffs** [17] - 3:8, 3:20, 3:22, 3:25, 6:2, 13:12, 18:21, 25:10, 31:16, 35:25, 56:8, 56:12, 80:19, 80:24, 83:5, 83:18, 84:9
**PLAINTIFFS** [1] - 1:1
**plaintiffs'** [11] - 8:10, 9:3, 35:1, 35:19, 35:22, 38:6, 39:8, 39:10, 73:19, 82:23, 88:22
**plan** [2] - 33:6, 33:11
**players** [1] - 91:14
**pleadings** [2] - 23:14, 29:12
**Pleasant** [1] - 1:20
**pleasure** [1] - 26:13
**plenty** [1] - 11:10
**PLLC** [1] - 1:15
**plus** [1] - 20:15
**pocket** [1] - 72:13
**podium** [2] - 3:5, 3:18
**point** [28] - 10:7, 21:1, 21:7, 27:8, 36:5, 36:6, 37:22, 51:23, 58:6, 59:15, 65:18, 65:19, 65:20, 65:21, 66:7, 66:8, 66:11, 66:12, 66:22, 67:4, 67:9, 67:12, 67:18, 68:8, 68:20, 79:7, 79:12, 81:14
**pointed** [4] - 75:13, 83:23, 85:18, 85:19
**pointing** [1] - 93:2
**points** [5] - 51:25, 61:4, 78:10, 84:14, 84:18
**policy** [1] - 33:13
**portfolio** [1] - 89:6
**portion** [2] - 13:23, 62:4
**position** [13] - 23:10, 35:2, 35:6, 38:13, 39:7, 51:11, 53:14, 76:10, 76:13, 81:22, 83:3, 84:8, 84:9
**positions** [3] - 9:14, 34:22, 51:6
**possesses** [1] - 66:5
**possible** [4] - 14:20, 30:25, 53:8, 88:25
**possibly** [1] - 81:24
**potential** [3] - 13:9, 52:25, 65:7
**practical** [5] - 62:10, 62:23, 63:3, 63:9, 63:13
**practice** [4] - 23:3, 89:6, 89:8, 93:24
**Practices** [1] - 27:19
**practices** [1] - 23:13
**preceding** [1] - 36:18
**precisely** [3] - 51:3, 65:19, 75:10
**prefer** [1] - 72:16
**preferable** [1] - 39:7
**preferred** [1] - 80:6
**prefers** [1] - 29:7
**prejudge** [1] - 7:25
**prejudging** [1] - 92:4
**preliminarily** [1] - 9:15
**preliminary** [2] - 8:10,

12:14
**PRESENT** [1] - 2:10
**present** [4] - 9:14, 9:20, 27:22, 46:18
**presentation** [1] - 91:4
**presentations** [2] - 4:11, 93:13
**presented** [1] - 49:1
**preserves** [1] - 22:21
**presided** [1] - 15:9
**press** [1] - 19:20
**presume** [1] - 45:3
**presumption** [1] - 92:15
**presumptions** [1] - 45:2
**presumptively** [2] - 45:7, 45:8
**presumptuous** [1] - 58:4
**pretty** [5] - 76:25, 77:2, 77:3, 80:5, 92:8
**prevailing** [1] - 72:14
**prevent** [1] - 92:19
**previous** [1] - 14:20
**previously** [1] - 25:24
**primary** [2] - 27:12, 36:24
**principal** [1] - 67:9
**principle** [4] - 31:11, 33:14, 52:14, 80:4
**principles** [1] - 35:23
**private** [1] - 26:23
**PRO** [1] - 2:7
**pro** [15] - 17:24, 19:17, 20:17, 24:21, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**problem** [6] - 5:19, 36:24, 37:4, 41:13, 53:9, 54:12
**problematic** [1] - 39:15
**problems** [2] - 37:1, 58:21
**procedural** [1] - 32:9
**procedurally** [1] - 9:16
**Procedure** [2] - 14:19, 39:18
**proceed** [4] - 24:21, 35:9, 35:14, 61:16
**proceeding** [1] - 95:15
**proceedings** [4] - 7:22, 8:25, 34:15, 95:19
**Proceedings** [1] -

2:21
**proceeds** [1] - 51:17
**process** [17] - 8:11, 11:21, 12:4, 12:13, 17:13, 18:2, 21:14, 37:17, 37:18, 39:5, 53:18, 55:16, 55:17, 63:16, 64:7, 64:14, 75:16
**produce** [2] - 18:21, 37:12
**produced** [1] - 2:21
**product** [2] - 13:5, 32:20
**production** [1] - 47:4
**Professor** [5] - 41:6, 66:9, 74:18, 89:25
**profit** [6] - 34:14, 48:16, 48:18, 48:21, 48:22
**PROGRAM** [1] - 1:3
**program** [1] - 22:2
**Program** [7] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9
**programs** [1] - 11:2
**projected** [1] - 89:21
**promote** [1] - 33:21
**promoting** [1] - 72:22
**proper** [1] - 47:11
**properly** [2] - 4:24, 8:14
**properties** [1] - 48:7
**proposal** [3] - 31:18, 31:19, 32:2
**proposed** [6] - 22:11, 30:22, 39:20, 40:4, 40:11, 73:2
**prosecution** [2] - 57:8, 72:22
**proud** [2] - 22:13, 91:10
**prove** [1] - 56:21
**provide** [7] - 24:18, 27:16, 32:24, 33:19, 41:16, 73:11, 75:24
**provided** [10] - 8:9, 13:7, 23:15, 29:13, 31:7, 31:18, 40:10, 75:13, 76:14, 80:24
**provides** [1] - 32:23
**providing** [3] - 7:19, 18:19, 25:13
**Public** [1] - 14:1
**public** [25] - 7:19, 8:24, 12:8, 12:22, 13:19, 16:22, 17:10, 18:6, 19:20, 22:16, 23:4, 23:6, 24:24, 27:15, 27:24, 32:11,

33:18, 33:21, 34:2, 34:10, 34:11, 38:18, 39:1, 44:10, 94:5
**public's** [1] - 17:12
**public-interest** [1] - 27:24
**publication** [1] - 12:19
**published** [2] - 11:11, 86:13
**publisher** [1] - 27:5
**pure** [1] - 56:16
**purpose** [1] - 18:24
**purposely** [1] - 46:17
**pursuant** [1] - 69:19
**put** [10] - 5:8, 15:21, 17:10, 28:1, 43:24, 44:1, 60:18, 89:10, 89:12, 94:12
**puts** [1] - 23:2
**putting** [1] - 59:9
**puzzle** [1] - 29:6

## Q

**qualified** [1] - 14:16
**qualifies** [1] - 59:10
**quality** [1] - 91:10
**quarrel** [1] - 73:3
**quarrelling** [1] - 72:24, 73:2
**quarter** [4] - 41:4, 41:6, 43:18, 48:15
**quarterly** [2] - 16:25, 37:23
**quarters** [1] - 48:18
**questions** [29] - 9:14, 10:14, 13:1, 29:20, 30:10, 35:22, 40:14, 50:16, 53:8, 55:24, 59:1, 60:10, 61:10, 62:7, 62:15, 62:23, 63:3, 63:10, 63:13, 68:21, 72:4, 76:7, 76:19, 80:3, 81:13, 81:20, 82:18, 90:16, 93:1
**quickly** [2] - 88:25, 89:9
**quill** [1] - 94:14
**Quimby** [1] - 79:15
**quite** [8] - 4:19, 41:13, 74:24, 86:6, 88:4, 88:23, 89:15, 92:17
**quote** [3] - 17:10, 33:18, 39:20

## R

**rabble** [1] - 19:18
**rabble-rousers** [1] -

19:18
**raised** [8] - 35:22, 56:1, 56:2, 56:3, 65:16, 76:7, 78:2, 80:18
**raises** [1] - 75:8
**range** [4] - 74:18, 74:21, 74:22, 76:18
**ranges** [1] - 84:2
**rata** [12] - 17:24, 33:2, 33:7, 38:9, 39:12, 51:10, 51:13, 51:16, 51:18, 54:3, 59:25, 66:14
**rate** [4] - 29:17, 56:21, 56:22, 62:3
**rates** [8] - 23:21, 25:22, 40:25, 41:8, 78:4, 81:1, 81:2, 81:8
**rather** [3] - 25:19, 34:24, 41:14
**re** [1] - 34:14
**re-sell** [1] - 34:14
**reach** [3] - 8:3, 14:17, 62:21
**reached** [2] - 8:1, 8:15
**reaches** [1] - 49:15
**read** [17] - 6:18, 7:14, 7:24, 21:15, 40:13, 46:1, 49:23, 50:1, 59:9, 59:10, 60:11, 68:6, 77:6, 82:24, 85:19, 91:25
**reading** [4] - 6:13, 20:23, 95:4, 95:6
**real** [2] - 54:10, 54:12
**real-world** [2] - 54:10, 54:12
**realistic** [1] - 13:21
**realize** [1] - 44:5
**really** [14] - 18:16, 20:8, 29:5, 43:20, 55:22, 58:25, 60:17, 66:16, 67:13, 69:12, 79:4, 82:13, 92:25, 95:11
**reason** [9] - 32:19, 32:21, 40:21, 56:5, 57:3, 58:3, 67:11, 72:18, 79:15
**reasonable** [14] - 12:16, 30:23, 31:4, 34:24, 40:5, 40:25, 75:18, 76:12, 78:16, 80:15, 83:3, 83:8, 86:6, 88:13
**reasonableness** [2] - 76:18, 80:17
**reasoning** [2] - 6:10,

7:16
**reasons** [3] - 72:17, 79:5, 90:9
**receive** [6] - 17:23, 25:18, 28:19, 38:9, 46:7, 87:7
**received** [13] - 20:6, 23:12, 25:16, 55:12, 55:17, 55:18, 55:19, 62:11, 69:14, 70:5, 70:10, 70:14, 70:20
**receives** [1] - 34:5
**recent** [1] - 42:3
**recess** [1] - 61:21
**reciting** [1] - 90:19
**recognition** [1] - 25:4
**recognize** [1] - 10:4
**recognized** [3] - 72:11, 72:17, 81:6
**recognizes** [1] - 33:23
**recognizing** [1] - 32:5
**recommend** [1] - 92:1
**recommendation** [1] - 77:14
**recommended** [1] - 88:9
**record** [9] - 3:6, 6:25, 32:1, 44:10, 60:19, 62:17, 79:25, 80:1, 83:17
**records** [7] - 15:6, 17:11, 27:4, 29:14, 33:13, 48:9, 58:20
**recounted** [1] - 63:8
**recoup** [1] - 67:16
**recover** [1] - 89:23
**recovered** [1] - 43:18
**recoveries** [1] - 89:15
**recovery** [6] - 32:24, 73:24, 74:17, 84:24, 88:7, 89:4
**red** [1] - 91:6
**reduce** [1] - 41:10
**reduced** [1] - 83:1
**reduction** [1] - 83:21
**refer** [2] - 4:17, 60:23
**reference** [3] - 65:13, 65:15, 86:2
**referring** [1] - 81:9
**reflect** [1] - 25:8
**reflected** [2] - 25:23, 33:10
**reform** [2] - 13:21, 18:7
**refunds** [1] - 59:6
**regard** [1] - 43:13
**regarded** [1] - 88:23
**regarding** [3] - 36:17, 38:25, 48:7
**regularly** [1] - 22:23

**Rehnquist** [1] - 94:9
**reimburse** [4] - 17:18, 37:10, 52:11, 58:19
**reimbursed** [11] - 17:21, 37:8, 37:13, 37:17, 37:20, 38:18, 38:22, 39:3, 53:3, 53:24, 66:2
**reimbursement** [5] - 46:6, 52:1, 52:18, 65:7, 67:15
**reimbursing** [1] - 87:7
**rejected** [5] - 6:4, 6:16, 15:23, 91:21, 92:19
**rejects** [1] - 92:8
**related** [2] - 25:3, 68:2
**relation** [1] - 35:1
**relative** [3] - 13:11, 31:20, 38:23
**relatively** [1] - 65:19
**relevant** [4] - 6:10, 8:4, 61:2, 88:4
**reliance** [1] - 91:19
**relied** [1] - 77:24
**relief** [6] - 13:7, 14:19, 15:3, 31:18, 33:3, 40:10
**rely** [4] - 27:6, 27:15, 87:3, 87:12
**remainder** [1] - 17:23
**remaining** [2] - 17:24, 33:1
**remand** [2] - 8:4, 13:10
**remarks** [3] - 9:5, 32:8, 60:21
**remedied** [1] - 80:22
**remember** [1] - 46:13
**remind** [1] - 49:4
**reminds** [1] - 28:22
**remotely** [5] - 10:2, 10:3, 10:6, 36:20, 91:8
**RENEE** [1] - 2:11
**Renee** [3] - 11:7, 23:25, 24:7
**reopen** [2] - 68:9, 68:11
**reply** [8] - 43:23, 44:1, 44:3, 51:12, 52:5, 80:22, 83:6, 93:4
**report** [1] - 34:14
**reported** [1] - 2:21
**reporter** [2] - 22:5, 44:14
**Reporter** [3] - 2:15, 2:16, 95:25
**Reporting** [1] - 27:18
**reports** [1] - 76:15

**represent** [4] - 21:9, 24:12, 26:25, 27:14
**representation** [4] - 24:18, 24:22, 27:16, 30:14
**representative** [2] - 26:17, 87:6
**representatives** [10] - 10:1, 10:19, 13:2, 19:1, 21:19, 51:22, 56:5, 57:17, 69:7, 73:11
**Representatives** [1] - 18:10
**representatives'** [1] - 58:1
**represented** [3] - 6:3, 13:3, 40:9
**represents** [1] - 24:16
**Republic** [8] - 42:3, 45:3, 77:5, 77:8, 79:7, 79:10, 80:9, 86:3
**request** [3] - 82:23, 90:10, 93:5
**requested** [5] - 28:7, 29:19, 78:16, 80:15, 81:1
**requesting** [6] - 41:11, 74:14, 74:16, 75:7, 76:17, 84:11
**requests** [1] - 22:12
**require** [1] - 42:23
**required** [4] - 17:11, 44:3, 78:8, 80:12
**requirement** [1] - 68:10
**requirements** [2] - 31:10, 36:23
**requires** [3] - 39:18, 77:10, 86:4
**research** [4] - 22:24, 24:19, 37:25, 60:25
**researching** [2] - 25:1, 48:9
**resolution** [1] - 72:22
**resolve** [2] - 53:8, 54:11
**resources** [4] - 27:25, 28:4, 31:14, 35:13
**respect** [13] - 37:2, 39:5, 39:17, 45:2, 52:9, 52:18, 71:8, 71:13, 80:20, 84:15, 87:4, 90:3, 90:20
**respectfully** [2] - 90:4, 90:10
**respond** [2] - 9:10, 29:20
**responded** [1] - 19:22

**response** [9] - 35:21, 36:17, 43:3, 59:4, 60:5, 62:13, 65:16, 76:7, 80:2
**responses** [7] - 50:6, 50:19, 60:12, 60:15, 61:11, 62:22, 84:19
**responsibilities** [1] - 93:12
**rests** [1] - 57:5
**result** [6] - 14:8, 31:8, 33:11, 34:6, 75:1, 78:17
**resulted** [1] - 34:11
**results** [1] - 35:9
**retainer** [4] - 73:10, 73:16, 84:23, 84:24
**retire** [1] - 28:16
**retired** [5] - 4:18, 4:19, 4:21, 16:19, 28:22
**retirement** [2] - 28:21, 28:23
**retires** [1] - 94:19
**retiring** [2] - 28:11, 28:13
**reviewed** [4] - 8:8, 23:14, 29:11, 69:4
**revised** [1] - 8:10
**revolutionized** [1] - 93:23
**Rice** [7] - 1:19, 3:12, 3:20, 3:21, 10:11, 10:13, 10:16
**rights** [2] - 16:21, 43:13
**risk** [1] - 32:5
**risks** [5] - 13:8, 33:4, 35:8, 45:9, 91:10
**risky** [1] - 15:19
**Roberts** [1] - 94:9
**Robinson** [2] - 94:17, 95:3
**role** [1] - 91:2
**Rossman** [3] - 11:14, 26:7, 30:11
**ROSSMAN** [7] - 2:13, 26:9, 26:12, 28:14, 28:17, 29:2, 29:9
**roundly** [1] - 92:19
**rousers** [1] - 19:18
**route** [1] - 76:16
**RPR** [3] - 2:15, 95:18, 95:24
**Rubenstein** [4] - 43:22, 66:9, 88:4, 89:25
**rule** [1] - 66:3
**Rule** [13] - 12:23, 12:25, 36:23, 37:1, 39:18, 39:21, 39:24,

43:23, 44:3, 62:24, 63:6, 63:10, 85:19
**ruled** [1] - 16:1
**rules** [1] - 65:4
**ruling** [1] - 17:4
**rulings** [1] - 23:13
**run** [4] - 74:3, 75:6, 89:6, 89:15
**run-of-the-mill** [1] - 75:6
**Ryan** [1] - 11:4

## S

**S.B** [1] - 1:18
**SAINT** [1] - 95:18
**Saint** [2] - 2:15, 95:24
**SAINT-LOTH** [1] - 95:18
**Saint-Loth** [2] - 2:15, 95:24
**salary** [1] - 57:12
**satisfied** [1] - 30:6
**satisfy** [1] - 42:22
**Saturday** [1] - 29:7
**save** [1] - 31:13
**saw** [2] - 19:19, 85:5
**SC** [1] - 1:20
**scale** [1] - 85:25
**scenario** [2] - 54:21, 54:25
**schedule** [2] - 15:8, 36:4
**scheduling** [1] - 8:19
**scholarly** [1] - 92:8
**se** [3] - 19:17, 20:17, 24:21
**SE** [1] - 2:7
**second** [7] - 14:10, 32:23, 39:22, 47:6, 47:7, 63:5, 87:17
**secondly** [2] - 40:15, 62:19
**Section** [1] - 33:17
**secured** [1] - 17:2
**securities** [1] - 44:12
**security** [1] - 5:12
**see** [12] - 13:21, 20:20, 45:23, 48:5, 49:10, 51:23, 60:4, 63:22, 64:24, 69:23, 74:19, 78:11
**seek** [2] - 23:17, 52:1
**seeking** [2] - 15:4, 24:13
**seem** [1] - 8:2
**Segal** [1] - 4:20
**self** [1] - 17:14
**self-government** [1] - 17:14

**sell** [2] - 34:14, 91:5
**Senate** [2] - 18:17, 23:10
**send** [1] - 62:2
**senior** [1] - 28:24
**SENIOR** [1] - 1:9
**sense** [2] - 77:21, 89:3
**sent** [17] - 7:20, 7:21, 8:12, 55:10, 62:11, 62:13, 62:16, 63:14, 63:16, 64:3, 69:19, 70:14, 70:21, 70:23, 73:22, 85:8
**separate** [2] - 42:17, 43:2
**separately** [1] - 9:12
**September** [3] - 34:16, 36:17, 49:3
**serious** [1] - 36:25
**serve** [3] - 17:12, 28:3, 43:6
**served** [4] - 23:7, 26:21, 31:2, 51:19
**service** [17] - 10:20, 22:13, 23:17, 24:11, 24:14, 24:15, 27:13, 28:4, 28:7, 29:18, 35:20, 39:14, 56:4, 56:6, 58:2, 69:7, 92:20
**Services** [8] - 2:12, 3:3, 4:15, 11:6, 11:9, 24:1, 24:9, 26:20
**SERVICES** [1] - 1:3
**services** [8] - 4:24, 7:13, 7:19, 26:22, 27:14, 27:15, 27:24, 28:5
**set** [9] - 4:14, 6:25, 8:21, 9:2, 15:8, 27:5, 36:5, 76:23, 92:18
**sets** [1] - 8:1
**setting** [1] - 88:12
**settle** [3] - 11:25, 40:23, 89:9
**settled** [1] - 11:23
**settlement** [103] - 8:1, 8:6, 8:11, 8:19, 9:21, 11:4, 11:13, 11:19, 12:1, 12:5, 12:7, 12:23, 13:5, 13:6, 13:11, 13:13, 15:1, 15:3, 17:15, 17:17, 17:19, 19:2, 19:3, 19:19, 19:22, 21:11, 22:12, 25:7, 26:1, 26:3, 26:15, 28:16, 30:7, 30:19, 30:22, 30:24, 31:2, 31:4, 31:5, 31:8, 31:12,

31:15, 31:17, 32:2, 32:16, 32:20, 32:23, 34:4, 34:7, 34:18, 34:21, 34:23, 35:1, 35:3, 35:17, 36:1, 36:16, 36:25, 37:1, 37:2, 37:12, 38:10, 38:20, 38:25, 39:5, 39:6, 39:17, 39:19, 39:25, 40:20, 41:10, 44:13, 45:14, 46:8, 46:22, 48:20, 48:25, 49:7, 49:12, 49:13, 49:15, 52:8, 52:9, 53:9, 53:17, 53:23, 58:5, 59:6, 59:14, 59:15, 63:2, 67:6, 67:10, 68:5, 71:3, 75:2, 75:5, 75:6, 78:21, 83:15, 89:11, 91:10

**SETTLEMENT** [1] - 1:8

**settlements** [4] - 11:18, 57:5, 74:17, 74:20

**settling** [2] - 52:3, 66:24

**seven** [10] - 5:24, 6:23, 15:4, 17:16, 23:9, 23:20, 28:9, 29:16, 30:3, 94:22

**seven-year** [1] - 23:20

**shall** [3] - 4:24, 33:19, 95:21

**share** [3] - 17:24, 22:17, 46:23

**shifting** [2] - 72:11, 92:16

**shine** [1] - 16:8

**short** [1] - 47:25

**shorthand** [1] - 2:21

**show** [2] - 14:15, 76:15

**sic** [8] - 27:13, 29:15, 42:3, 47:16, 57:15, 58:24, 68:19, 85:3

**sic]** [1] - 48:21

**side** [4] - 9:13, 57:24, 58:7, 93:11

**sides** [3] - 32:21, 35:8, 93:13

**sides'** [1] - 6:16

**signatory** [1] - 95:22

**signed** [1] - 84:23

**significant** [3] - 32:14, 35:3, 93:20

**similar** [3] - 52:7, 77:2, 77:3

**single** [1] - 88:25

**sit** [1] - 5:15

**sitting** [1] - 79:17

**situation** [3] - 29:25, 78:22, 78:24

**situations** [1] - 80:11

**six** [4] - 7:1, 7:2, 7:5, 94:22

**size** [1] - 19:8

**slice** [1] - 56:24

**slightly** [3] - 76:25, 83:14, 84:2

**small** [5] - 34:18, 49:10, 49:17, 50:24, 51:20

**smaller** [2] - 34:3, 60:21

**smartest** [1] - 92:5

**so-called** [1] - 70:25

**society** [1] - 22:18

**solve** [1] - 58:21

**someone** [8] - 20:18, 21:1, 45:23, 53:7, 54:21, 64:1, 64:5, 64:18

**somewhere** [2] - 51:6, 62:17

**soon** [1] - 93:18

**sophisticated** [4] - 19:15, 37:6, 44:8, 91:14

**sorry** [3] - 11:9, 40:10, 92:11

**sort** [5] - 6:25, 46:5, 50:22, 58:22, 65:6

**sorts** [2] - 65:22, 65:24

**sounds** [2] - 58:21, 63:8

**sovereign** [1] - 14:23

**sparked** [1] - 18:6

**speaking** [3] - 4:11, 10:21, 49:22

**specific** [2] - 60:10, 66:8

**specifically** [4] - 24:25, 27:6, 83:21, 85:19

**speed** [1] - 47:5

**spell** [1] - 22:4

**spelled** [2] - 12:23, 24:8

**spend** [2] - 14:12, 24:25

**spending** [1] - 29:3

**spent** [12] - 25:11, 25:21, 25:23, 29:15, 37:16, 56:14, 56:23, 58:1, 58:12, 69:8, 88:22

**spilt** [1] - 75:9

**spurring** [1] - 16:10

**stacked** [1] - 18:5

**staff** [3] - 9:24, 11:5, 13:25

**staffs** [1] - 94:10

**stage** [3] - 4:14, 7:1, 9:22

**stages** [1] - 35:7

**stake** [1] - 19:16

**stakes** [1] - 17:9

**standard** [3] - 73:18, 74:16, 85:23

**standing** [4] - 33:13, 52:14, 60:12, 90:8

**standpoint** [1] - 75:19

**start** [7] - 9:3, 9:17, 9:23, 21:22, 72:5, 95:4, 95:5

**started** [5] - 5:7, 18:7, 94:8

**State** [2] - 7:9, 44:12

**state** [4] - 3:6, 24:19, 24:24, 61:18

**statement** [5] - 9:6, 9:8, 9:11, 36:19, 85:2

**statements** [3] - 11:20, 61:11, 90:5

**STATES** [3] - 1:1, 1:5, 1:9

**States** [9] - 3:4, 4:5, 4:17, 9:4, 15:9, 27:21, 31:16, 34:16, 81:17

**static** [1] - 2:19

**statistics** [1] - 21:4

**status** [1] - 25:15

**statute** [3] - 7:18, 33:17, 60:23

**statutes** [3] - 6:11, 27:17, 27:21

**statutory** [4] - 14:5, 32:13, 33:16, 72:12

**stenographic** [1] - 95:19

**step** [5] - 3:5, 10:10, 12:12, 12:20, 16:2

**still** [7] - 5:22, 14:17, 38:16, 48:13, 48:20, 82:19, 95:6

**stop** [2] - 54:9, 76:14

**story** [1] - 20:8

**straight** [1] - 75:19

**straightforward** [1] - 51:16

**strategy** [1] - 23:14

**streams** [1] - 65:25

**Street** [5] - 1:12, 1:16, 1:23, 2:4, 44:12

**strength** [1] - 35:1

**strike** [3] - 90:4, 90:8

**stripes** [1] - 19:13

**strong** [1] - 15:21

**stronger** [2] - 77:14, 82:3

**strongly** [3] - 25:7, 42:4, 80:11

**structure** [3] - 17:14, 51:19, 67:7

**Stuart** [2] - 11:14, 26:6

**STUART** [1] - 2:13

**study** [1] - 7:9

**Study** [1] - 7:10

**stuff** [6] - 5:9, 38:19, 44:4, 62:3, 62:5, 64:24

**subclass** [1] - 71:3

**subject** [4] - 2:18, 13:17, 52:16, 55:11

**submission** [3] - 43:21, 79:14, 80:19

**submissions** [1] - 44:7, 50:12

**submit** [3] - 54:19, 55:1, 55:15

**submitted** [7] - 9:6, 9:8, 46:14, 55:6, 55:9, 63:25, 90:2

**subpart** [1] - 85:20

**subsection** [1] - 40:2

**Subsection** [2] - 40:2, 40:3

**subsequent** [1] - 82:18

**subset** [2] - 66:21, 72:1

**substance** [2] - 63:20, 64:8

**substantial** [2] - 14:13, 19:10

**success** [1] - 73:14

**sue** [1] - 14:12

**sufficient** [3] - 45:7, 56:18, 83:16

**suggest** [2] - 42:15, 50:5

**suggested** [6] - 76:2, 80:11, 81:25, 83:9, 83:25, 84:4

**suggesting** [1] - 90:18

**suggests** [1] - 77:13

**suit** [1] - 16:21

**Suite** [2] - 1:12, 1:16

**sum** [1] - 35:25

**summary** [1] - 17:4

**super** [1] - 79:8

**supersedes** [1] - 85:8

**Supp** [2] - 6:9, 92:12

**supplemental** [1] - 43:21

**supplied** [1] - 80:22

**support** [14] - 11:3, 11:13, 11:19, 13:12, 13:22, 16:19, 21:11, 23:15, 25:7, 26:3, 26:14, 26:21, 29:13, 50:12

**supported** [1] - 65:21

**supporting** [3] - 43:22, 43:24, 84:10

**supports** [3] - 18:18, 22:11, 33:12

**suppose** [3] - 51:4, 62:1, 66:25

**supposed** [4] - 43:9, 43:24, 48:22

**Supreme** [16] - 39:15, 39:16, 43:12, 45:6, 51:12, 51:15, 57:6, 57:13, 66:19, 86:22, 86:24, 87:16, 87:19, 87:22, 88:2, 88:18

**surprise** [1] - 92:7

**surprised** [1] - 65:18

**surrounding** [1] - 13:24

**suspect** [1] - 30:1

**swaths** [1] - 17:10

**Swedish** [5] - 79:1, 80:8, 82:6, 86:16, 87:11

**swung** [1] - 16:13

**sympathy** [1] - 58:19

**system** [14] - 5:3, 5:19, 7:7, 7:12, 8:3, 14:9, 15:14, 15:15, 27:4, 72:23, 94:5, 94:18, 94:21

**system's** [1] - 34:12

**T**

**table** [3] - 3:10, 10:8, 92:22

**talks** [1] - 85:20

**task** [1] - 30:21

**tax** [1] - 48:7

**TAYLOR** [3] - 1:11, 1:15, 3:23

**Taylor** [2] - 3:24, 10:8

**team** [1] - 22:3

**technologies** [1] - 94:2

**technology** [3] - 2:19, 7:14, 16:20

**tee** [2] - 57:21, 58:3

**teeing** [1] - 57:3

**telephone** [1] - 20:7

**telephonically** [1] - 2:18

**ten** [5] - 9:7, 47:14, 47:18, 48:2, 70:4
**tendency** [1] - 40:22
**terms** [9] - 28:6, 30:5, 34:25, 39:20, 40:11, 40:23, 53:22, 61:8, 82:20
**terrific** [1] - 94:7
**testament** [1] - 15:12
**text** [1] - 60:22
**thanking** [1] - 9:23
**THE** [133] - 1:1, 1:8, 1:11, 2:2, 3:2, 3:9, 3:14, 3:17, 4:6, 4:8, 4:13, 10:24, 18:12, 19:24, 20:1, 20:11, 20:14, 20:21, 21:15, 21:21, 21:25, 22:4, 22:8, 23:23, 24:2, 24:5, 26:5, 26:11, 28:12, 28:15, 28:24, 29:7, 30:11, 30:15, 36:3, 37:22, 39:22, 40:1, 40:4, 40:9, 40:17, 41:21, 41:24, 42:5, 43:10, 45:12, 45:17, 45:20, 45:25, 46:21, 47:1, 49:19, 50:17, 53:4, 53:10, 53:19, 53:22, 54:2, 54:7, 54:13, 55:21, 56:2, 56:6, 56:10, 56:16, 58:10, 59:2, 60:3, 60:10, 60:14, 61:13, 61:22, 63:12, 63:22, 64:10, 64:12, 64:15, 64:23, 65:2, 65:12, 66:7, 66:18, 66:21, 66:24, 67:17, 67:22, 67:24, 68:13, 68:17, 68:23, 69:18, 69:23, 70:6, 70:18, 71:2, 71:6, 71:8, 71:12, 71:18, 71:20, 71:22, 73:12, 73:14, 73:16, 74:8, 75:24, 76:2, 76:22, 77:6, 77:9, 77:13, 77:24, 78:20, 79:1, 79:9, 79:21, 81:20, 82:12, 84:7, 84:13, 85:1, 85:12, 85:15, 85:18, 86:24, 89:18, 90:7, 90:12, 90:23, 92:4, 92:11, 93:8, 95:14
**themselves** [3] - 39:11, 40:23, 42:22
**therefore** [5] - 2:18, 27:23, 27:25, 47:6, 58:18

**thinks** [1] - 66:13
**third** [7] - 12:20, 14:15, 53:24, 74:16, 84:23, 85:23, 86:1
**thoroughly** [1] - 21:16
**thoughtfully** [1] - 9:25
**thousands** [4] - 12:2, 19:9, 24:16, 63:15
**three** [6] - 12:12, 38:4, 38:16, 49:25, 56:7, 70:12
**three-step** [1] - 12:12
**threshold** [1] - 83:14
**throughout** [1] - 13:4
**Thursday** [1] - 95:6
**thwart** [1] - 13:18
**timely** [6] - 5:22, 36:16, 69:10, 70:8, 70:9, 71:10
**timing** [1] - 40:12
**today** [13] - 8:12, 10:2, 10:22, 11:10, 20:19, 21:13, 25:25, 30:18, 30:21, 31:23, 32:7, 50:4, 50:12
**toner** [1] - 47:19
**took** [3] - 4:21, 35:6, 84:17
**tool** [1] - 93:22
**tools** [3] - 75:22, 75:24, 93:4
**total** [2] - 39:5, 59:20
**toward** [1] - 87:15
**trained** [1] - 76:8
**transcript** [4] - 84:17, 95:19, 95:19, 95:21
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 2:21
**transcription** [1] - 2:21
**transmission** [4] - 47:5, 47:7, 47:21
**transmit** [2] - 47:8, 47:9
**transmitting** [1] - 47:10
**transparency** [3] - 14:1, 21:8, 44:21
**treated** [1] - 67:2
**treatise** [1] - 66:10
**treatment** [2] - 51:15, 91:6
**treats** [3] - 13:11, 31:19, 37:2, 38:22
**trend** [1] - 87:15
**trial** [2] - 15:25, 35:15
**tried** [4] - 46:15, 50:18, 54:11, 70:21
**trips** [1] - 29:3
**true** [7] - 31:14, 52:14,

61:1, 66:5, 85:17, 95:18, 95:19
**truly** [1] - 18:16
**Trustees** [2] - 87:3, 91:20
**truth** [1] - 90:6
**try** [12] - 6:25, 11:19, 50:15, 53:7, 76:4, 84:16, 85:6, 86:8, 89:2, 89:3, 90:14, 93:17
**trying** [3] - 58:20, 61:18, 70:23
**Tucker** [4] - 52:14, 65:22, 66:6, 79:17
**turn** [4] - 26:11, 21:19, 35:14, 53:19, 55:25
**turning** [1] - 53:16
**two** [20] - 13:25, 20:19, 27:2, 28:22, 36:25, 40:13, 42:1, 47:13, 50:21, 51:6, 54:15, 54:17, 69:13, 69:16, 72:7, 73:8, 81:20, 82:18, 86:21, 88:16
**typical** [1] - 51:13
**typically** [1] - 34:13

### U

**U.S** [6] - 2:3, 2:16, 4:2, 16:9, 23:10, 42:10
**U.S.C** [1] - 33:17
**ultimate** [1] - 35:24
**ultimately** [8] - 5:25, 71:15, 80:15, 80:23, 82:9, 83:1, 83:13, 88:20
**unanimously** [2] - 16:5, 17:3
**under** [11] - 6:10, 7:17, 12:25, 17:17, 27:17, 36:4, 56:18, 57:18, 61:8, 65:3, 66:6
**underrepresented** [1] - 21:9
**unenhanced** [1] - 45:8
**unfair** [3] - 38:20, 44:1, 67:10
**unfamiliar** [1] - 11:22
**unfettered** [1] - 22:21
**unfortunate** [1] - 39:9
**unique** [2] - 15:1, 25:8
**United** [9] - 3:4, 4:5, 4:17, 9:4, 15:9, 27:21, 31:16, 34:16, 81:17
**UNITED** [3] - 1:1, 1:5, 1:9

**universal** [1] - 21:11
**unlawful** [1] - 14:16
**unlawfully** [1] - 17:5
**unless** [8] - 9:15, 13:1, 55:24, 61:10, 61:16, 81:13, 92:25, 94:19
**unlike** [1] - 17:25
**unnecessary** [1] - 34:10
**unprecedented** [1] - 16:12
**unreasonable** [2] - 33:21, 66:1
**unreliable** [1] - 90:3
**untimely** [3] - 69:14, 69:15, 90:3
**unusual** [9] - 13:15, 14:24, 29:25, 33:9, 73:7, 74:2, 74:9, 74:24, 77:18
**up** [24] - 5:13, 8:2, 8:21, 9:4, 15:21, 16:18, 17:21, 32:24, 33:8, 34:5, 38:14, 43:3, 43:21, 44:17, 49:22, 56:11, 56:23, 57:3, 57:22, 58:3, 61:22, 65:10, 86:7, 94:24
**updated** [1] - 27:7
**updates** [1] - 23:12
**upheld** [1] - 32:10
**uploaded** [1] - 27:9
**upshot** [1] - 74:15
**USAO** [1] - 2:3
**useful** [1] - 6:25
**user** [2] - 34:5, 55:4
**users** [18] - 6:7, 8:3, 17:1, 17:18, 18:20, 34:3, 34:6, 34:13, 34:18, 34:21, 37:16, 46:5, 48:4, 48:24, 50:24, 51:20, 60:21, 67:13
**utilities** [1] - 27:2

### V

**vacations** [1] - 29:2
**valid** [1] - 21:5
**valuable** [1] - 31:14
**value** [1] - 23:19
**values** [1] - 22:20
**Van** [1] - 88:19
**variety** [1] - 72:11
**vast** [3] - 17:18, 34:12, 43:5
**Vaughn** [1] - 86:11
**Vegas** [1] - 15:6
**versus** [10] - 3:4, 4:16,

42:18, 66:19, 72:1, 81:10, 81:17, 87:3, 88:19, 91:20
**veteran** [2] - 48:6, 58:20
**VETERANS** [1] - 1:2
**Veterans** [7] - 2:12, 3:3, 4:15, 11:5, 11:8, 23:25, 24:9
**veterans** [5] - 24:11, 24:13, 24:17, 24:21, 25:4
**veterans'** [1] - 25:2
**via** [4] - 2:18, 10:19, 11:7, 11:15
**videoconference** [1] - 2:18
**view** [3] - 57:17, 60:15, 82:18
**viewed** [1] - 56:16
**vigorously** [2] - 13:3, 32:6
**violated** [1] - 16:14
**violent** [1] - 7:11
**Virginia** [1] - 95:7
**virtually** [3] - 8:23, 27:20, 57:18
**vis-à-vis** [1] - 23:3
**void** [1] - 95:21
**volume** [1] - 27:5
**vs** [1] - 1:4

### W

**wait** [2] - 45:18, 53:19
**waive** [1] - 48:13
**waiver** [3] - 14:23, 16:25, 61:4
**wake** [1] - 19:19
**Walker** [1] - 86:11
**wants** [1] - 9:7
**warranted** [2] - 78:11
**Washington** [5] - 1:6, 1:13, 1:16, 2:4, 48:9
**wealthy** [1] - 23:3
**Web** [1] - 7:12
**Web-based** [1] - 7:12
**website** [7] - 53:1, 53:5, 54:16, 54:19, 54:25, 63:18, 70:22
**Wednesdays** [1] - 94:23
**weird** [1] - 67:4
**Wessler** [4] - 1:12, 1:15, 3:24, 10:9
**whole** [10] - 19:17, 48:25, 49:8, 49:11, 49:12, 49:18, 51:23, 71:18, 92:5
**widespread** [3] -

13:18, 16:22, 18:6
**wife** [2] - 28:21, 29:7
**WILLIAM** [2] - 1:22, 2:10
**William** [1] - 4:3
**windfall** [2] - 43:16, 88:11
**wish** [4] - 19:2, 19:4, 19:5, 69:8
**witness** [1] - 88:8
**witnesses** [1] - 5:12
**wonder** [1] - 11:22
**word** [1] - 42:22
**words** [11] - 11:3, 11:18, 11:21, 13:14, 17:15, 21:20, 34:7, 42:6, 51:9, 57:2, 57:24
**works** [4] - 14:1, 22:19, 53:10, 59:17
**world** [2] - 54:10, 54:12
**world's** [3] - 19:14, 37:5
**worse** [1] - 24:15
**worth** [1] - 17:6
**wound** [1] - 5:13
**Wright** [1] - 66:9
**write** [2] - 58:5, 78:14
**written** [7] - 9:6, 9:8, 36:18, 46:1, 50:11, 50:12
**wrote** [2] - 6:9, 86:12

## Y

**year** [8] - 17:22, 23:10, 23:20, 24:17, 25:1, 28:11, 48:15, 82:7
**years** [20] - 8:4, 13:10, 14:13, 15:4, 17:16, 18:12, 18:13, 18:14, 23:9, 28:9, 28:22, 29:16, 29:23, 30:4, 37:9, 38:4, 61:1, 65:24, 88:22, 92:1
**yin** [1] - 8:12
**York** [2] - 29:5, 92:2
**you-all** [1] - 6:23

## Z

**zealous** [1] - 43:13
**zero** [5] - 55:17, 55:19, 59:8, 59:12, 73:17
**Zoom** [11] - 3:15, 10:3, 10:19, 11:7, 11:15, 23:25, 24:4, 26:13, 45:22, 49:21, 50:2